**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br>Plaintiff,<br>v.<br><br>THE MORTGAGE LAW GROUP, LLP, (D/B/A THE LAW FIRM OF MACEY, ALEMAN & SEARNS), CONSUMER FIRST LEGAL GROUP, LLC, THOMAS G. MACEY, JEFFREY J. ALEMAN, JASON E. SEARNS, and HAROLD E. STAFFORD,<br>Defendants. | Case No. 3:14-cv-00513 |

**MEMORANDUM IN SUPPORT OF**
**<u>PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ............ iii

I. INTRODUCTION ............ 1

II. LEGAL ARGUMENT ............ 2

A. Summary Judgment is Appropriate Where There Is No Genuine Dispute as to Material Fact and Movant Is Entitled to Judgment as a Matter of Law ............ 2

B. Defendants are Liable for Their Violations as Covered Persons ............ 3

C. Defendants Committed Multiple Violations of Regulation O ............ 3

1. Regulation O Background ............ 3

2. Defendants Are Not Exempt from Regulation O or the CFPA ............ 4

a. Attorney Exemption under Regulation O ............ 4

i. The Practice of Law ............ 6

ii. Defendants Did Not Provide Mortgage Loan Modification Services as Part of the Practice of Law ............ 7

iii. Licensing of Attorneys and Compliance with State Laws ............ 11

b. Attorney Exemption under the CFPA ............ 12

3. Defendants' Violations of Regulation O ............ 13

a. TMLG and CFLG Requested and Received Advance Fees ............ 13

b. TMLG and CFLG Made Material Misrepresentations in Violation of Regulation O 15

i. TMLG and CFLG Misrepresented the Likelihood of Obtaining Mortgage Loan Modifications ............ 15

ii. TMLG and CFLG Misrepresented the Amount of Time to Obtain a Mortgage Loan Modification ............ 16

iii. TMLG and CFLG Misrepresented Consumers' Obligations to Pay Their Mortgages ........ 16

iv. TMLG and CFLG Misrepresented that Consumers Would Receive Legal Representation ........ 17

v. TMLG and CFLG Misrepresented to Consumers the Performance of Nonprofit Alternatives to For-Profit Mortgage Assistance Relief Services ........ 18

c. TMLG and CFLG Made the Prohibited Representation to Consumers that They Should Not Communicate with Their Lenders or Servicers ........ 18

d. TMLG and CFLG Failed to Make Required Disclosures ........ 19

D. Defendants' Deceptive Acts and Practices Violated the CFPA ........ 20

E. Individual Defendants Macey, Aleman, Searns, and Stafford Are Liable for Their Actions and the Actions of TMLG and CFLG ........ 22

1. Macey's Liability for TMLG and CFLG ........ 23

2. Aleman's Liability for TMLG and CFLG ........ 24

3. Searns's Liability for TMLG ........ 25

4. Stafford's Liability for CFLG ........ 25

F. Remedies ........ 26

1. Disgorgement and Restitution ........ 26

2. Injunctive Relief ........ 27

3. Civil Money Penalties ........ 28

III. CONCLUSION ........ 29

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................................. 2

*Baron v. City of Los Angeles*, 469 P.2d 353 (Cal. 1970) ............................................................. 7

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .................................................................... 2

*Consumer Sales Corp. v. FTC*, 198 F.2d 404 (2d Cir. 1952) ...................................................... 23

*Fed. Trade Comm'n v. Construct Data Publishers*, No. 13-CV-01999, 2014 WL 7004999 (N.D. Ill. Dec. 11, 2014) ........................................................................................................ 23

*FTC v. Am. Tax Relief LLC*, 751 F. Supp. 2d 972 (N.D. Ill. 2010) ............................................. 20

*FTC v. Amy Travel Svc., Inc.*, 875 F.2d 564 (7th Cir. 1989) ............................................... 23, 27

*FTC v. Bay Area Business Council, Inc.*, 423 F.3d 627 (7th Cir. 2005)................................ 22, 27

*FTC v. Bay Area Business Council, Inc.*, No. 02 C 5762, 2004 WL 769388 (N.D. Ill. Apr. 9, 2004) ......................................................................................................................... 21

*FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611 (6th Cir. 2014)............................ 4, 13, 15, 18, 20

*FTC v. Kitco of Nevada, Inc.*, 612 F. Supp. 1282 (D. Minn. 1985)...................................... 20, 23

*FTC v. Pac. First Benefit, LLC*, 472 F. Supp. 2d 974 (N.D. Ill. 2007)................................. 23, 27

*FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013 (N.D. Ind. 2000) *aff'd*, 312 F.3d 259 (7th Cir. 2002) .................................................................................................................. 27

*FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020 (7th Cir. 1988)........................ 20, 21

*Gmerek v. State Ethics Comm'n*, 751 A.2d 1241 (Pa. Cmwlth. 2000).......................................... 7

*Harrell v. U.S. Postal Serv*., 445 F.3d 913 (7th Cir. 2006) ......................................................... 2

*Harris N.A. v. Hershey*, 711 F.3d 794 (7th Cir. 2013).................................................................. 3

*Illinois v. Alta Colleges, Inc.*, No. 14 C 3786, 2014 WL 4377579 (N.D. Ill. Sept. 4, 2014)........ 20

*Massachusetts Conveyancers Ass'n Inc. v. Colonial Title & Escrow, Inc.*, 2001 WL 669280 (Mass. Super. 2001) ............................................................................................................ 7

*People ex rel. Illinois State Bar Ass'n v. People's Stock Yards State Bank*, 176 N.E. 901 (1931) . 7

*Posey v. Skyline Corp*., 702 F.2d 102 (7th Cir. 1983) .................................................................. 2

*Ptasznik v. St. Joseph Hospital*, 464 F.3d 691 (7th Cir. 2006) ..................................................... 3

*Sanders v. Jackson*, 209 F.3d 998 (7th Cir. 2000) .................... 20

*SEC v. Collins*, No. 01 C 3085, 2003 WL 21196236 (N.D. Ill. May 21, 2003) .................... 26

*SEC v. First City Fin. Corp.*, 890 F.2d 1215 (D.C. Cir. 1989) .................... 26

*SEC v. First Jersey Secs,* 101 F.3d 1450 (2d Cir. 1996) .................... 26

*SEC v. Patel*, 61 F.3d 137 (2d Cir. 1995) .................... 26

*Southwest Sunsites, Inc. v. FTC*, 785 F.2d 1431 (9th Cir. 1986) .................... 20

*State v. Foster*, 674 So. 2d 747 (Fla. Dist. Ct. App.), *as clarified* (Apr. 26, 1996), *cause dismissed*, 677 So. 2d 840 (Fla. 1996) .................... 7

*United States v. Patel*, 778 F.3d 607 (7th Cir. 2015) .................... 20

*United States v. W.T. Grant Co*. 345 U.S. 629 (1953) .................... 27

**Statutes**

11 U.S.C. § 362(a) .................... 1

11 U.S.C. § 362(b)(4) .................... 1

12 U.S.C. § 1027(e) .................... 13

12 U.S.C. § 5481(14) .................... 26

12 U.S.C. § 5481(15)(viii)(II) .................... 3

12 U.S.C. § 5481(19) .................... 3

12 U.S.C. § 5481(25)(B) .................... 23

12 U.S.C. § 5481(25)(C) .................... 23

12 U.S.C. § 5481(6)(A) .................... 3

12 U.S.C. § 5517(e) .................... 12

12 U.S.C. § 5517(e)(1) .................... 12

12 U.S.C. § 5517(e)(2) .................... 12

12 U.S.C. § 5531 .................... 20

12 U.S.C. § 5531(a) .................... 3

12 U.S.C. § 5536(a)(1)(B) .................... 3, 20

12 U.S.C. § 5538(a) .................... 3

12 U.S.C. § 5561(c)(1) .................... 28

12 U.S.C. § 5564 .......... 3
12 U.S.C. § 5565(a)(1) .......... 26, 27
12 U.S.C. § 5565(a)(2) .......... 26
12 U.S.C. § 5565(a)(2)(G) .......... 27
12 U.S.C. § 5565(c)(2) .......... 28
12 U.S.C. § 5565(c)(2)(A) .......... 28
12 U.S.C. § 5565(c)(2)(B) .......... 28
12 U.S.C. § 5565(c)(2)(C) .......... 28
15 U.S.C. § 45(a)(1) .......... 20
N.C. Gen. Stat. Ann. § 84-2.1 .......... 7
R.I. Gen. Laws Ann. § 11-27-2 .......... 7
Wis. R. App. P. REG UNAUTH PRAC LAW S. 23.01 .......... 7

**Regulations**

12 C.F.R. § 1015.2 .......... 4, 19, 28
12 C.F.R. § 1015.3(a) .......... 18
12 C.F.R. § 1015.3(b) .......... 15
12 C.F.R. § 1015.3(b)(1) .......... 15
12 C.F.R. § 1015.3(b)(2) .......... 16
12 C.F.R. § 1015.3(b)(4) .......... 16
12 C.F.R. § 1015.3(b)(8) .......... 17
12 C.F.R. § 1015.3(b)(9) .......... 18
12 C.F.R. § 1015.4(b)(1) .......... 20
12 C.F.R. § 1015.5(a) .......... 13
12 C.F.R. § 1015.7(a) .......... 5
12 C.F.R. § 1015.7(a)(1) .......... 7, 11
12 C.F.R. § 1015.7(a)(2) .......... 11
12 C.F.R. § 1015.7(a)(3) .......... 11
12 C.F.R. § 1015.7(b) .......... 11, 12

12 C.F.R. pt. 1015 .......... 2, 3

16 C.F.R. pt. 322 .......... 3

**Rules**

Fed. R. Civ. P. 56(a) .......... 2

Fed. R. Civ. P. 56(c) .......... 2

**Other Authorities**

MARS Rule Statement, Mortgage Assistance Relief Services, Final Rule, 75 Fed. Reg. 75092 (December 1, 2010) .......... 3, 5, 6, 14, 19

## I. INTRODUCTION

The Consumer Financial Protection Bureau (the "Bureau") brought this action against two mortgage assistance relief services providers and their principals who preyed on financially distressed and desperate homeowners struggling to make their monthly mortgage payments. Defendants, The Mortgage Law Group, LLP ("TMLG"), Consumer First Legal Group, LLC ("CFLG"), and owners Thomas G. Macey ("Macey"), Jeffrey J. Aleman ("Aleman"), Jason E. Searns ("Searns"), and Harold E. Stafford ("Stafford") (collectively, "Defendants"), lured consumers to sign up for TMLG's and CFLG's mortgage loan modification services with the promise that they would more easily obtain mortgage loan modifications by being represented by attorneys. In fact, TMLG[1] and CFLG (collectively the "Companies") typically did not obtain the mortgage loan modifications that these consumers sought and so desperately needed, even after consumers paid them thousands of dollars. Indeed, Defendants charged multiple illegal advance fees in violation of Regulation O—an "initial retainer" of at least $1,195 and subsequent monthly payments between $500 and $895 per month—taken from consumers' bank accounts prior to and regardless of the Companies' obtaining any mortgage loan modification agreements for these consumers. Since 2011, more than 6,000 consumers across the country have paid a total of more than $20 million in such illegal advance fees to TMLG and CFLG.

Nor did the Companies provide the promised legal representation that they convinced consumers would pave the way for such needed relief. Defendants' contention that TMLG and CFLG were law firms providing "foreclosure defense services," and not merely providers of mortgage loan modification services, is a farce. Non-attorneys performed nearly all of the tasks associated with the Companies' mortgage loan modification services, with attorneys' tasks limited to duplicating the non-legal administrative work that was already performed by non-attorneys. Next to no consumers ever spoke with an attorney after signing up for the Companies' services.

Further, even though the so-called "retainer agreements" were styled as including "foreclosure defense," consumers who paid the exorbitant initial retainer fee and monthly payments were not entitled to receive any legal services relating to foreclosure defense even after

[1] On April 7, 2014, TMLG filed a voluntary Chapter 7 bankruptcy petition. That petition is pending in the United States Bankruptcy Court for the Northern District of Illinois, *In re The Mortgage Law Group, LLP*, Case Number 14-12825. *SF 5*. The automatic stay of the Bankruptcy Code, however, does not stay the Bureau's action against TMLG because the action falls within the police and regulatory power exception to the stay. 11 U.S.C. § 362(a), (b)(4). TMLG did not file an answer, take any other action in its defense, or participate in discovery.

they informed TMLG or CFLG that they received notice that their lenders were initiating foreclosure action against them in court. Rather, the Companies only provided purported "foreclosure defense services" if consumers paid an additional fee of $800. Of the more than 6,000 consumers who signed up for the Companies' services, only *30* individuals received such "foreclosure defense services," and only after paying that additional fee. All other consumers signed up and paid for mortgage loan modification services, not "foreclosure defense services."

The Bureau now moves for summary judgment against Defendants. The undisputed facts show that their conduct violated Regulation O, 12 C.F.R. pt. 1015, and the Consumer Financial Protection Act of 2010 ("CFPA"), by charging illegal advance fees, discouraging consumers from communicating with their lenders or servicers, failing to make required disclosures to consumers, and making several specifically prohibited misrepresentations regarding, among other things, the fact that consumers would receive legal representation, and the likelihood and timeframe of mortgage modifications that consumers would obtain. These violations had a devastating impact on some of the nation's most vulnerable consumers.

As demonstrated by this memorandum and the accompanying Plaintiff's Statement of Proposed Findings of Fact (cited as "*SF*"), the pleadings, discovery, and declarations provided to the Court show that there is no genuine issue as to any material fact, and, therefore, that the Bureau is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To ensure that consumer harm is redressed and that Defendants do not engage in unlawful practices again, the Bureau seeks restitution and disgorgement, a permanent injunction and order against all Defendants, and civil money penalties, as described fully in section II(F) below.

## II. LEGAL ARGUMENT

### A. Summary Judgment is Appropriate Where There Is No Genuine Dispute as to Material Fact and Movant Is Entitled to Judgment as a Matter of Law

Summary judgment should be granted if the pleadings, depositions, documents, answers to interrogatories, declarations, and other materials show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c); *Harrell v. U.S. Postal Serv*., 445 F.3d 913, 918 (7th Cir. 2006) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). Upon such a showing, Defendants, in order to avoid summary judgment, must "set forth specific facts showing that there is a genuine issue for trial." *Posey v. Skyline Corp*., 702 F.2d 102, 105 (7th Cir. 1983); *see Anderson v. Liberty Lobby*,

*Inc.*, 477 U.S. 242, 250 (1986). A "mere scintilla" of evidence in support of Defendants' position is not sufficient; rather, there must be "evidence on which the [finder of fact] could reasonably find for the non-moving party." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013) (citing *Ptasznik v. St. Joseph Hospital*, 464 F.3d 691, 694 (7th Cir. 2006)).

### B. Defendants are Liable for Their Violations as Covered Persons

Under the CFPA, Defendants are "covered person[s]" who are liable for their unlawful acts and practices. The CFPA provides that "[i]t shall be unlawful for any covered person . . . to engage in any . . . deceptive . . . act or practice." 12 U.S.C. § 5536(a)(1)(B); *see also* 12 U.S.C. § 5531(a). A "covered person" means any person, including any individual, that engages in "offering or providing a consumer financial product or service." 12 U.S.C. § 5481(6)(A), (19). Under the CFPA, financial advisory services, including services to assist consumers with "modifying the terms of any extension of credit," are consumer financial products and services. 12 U.S.C. § 5481(15)(viii)(II). The uncontroverted evidence overwhelmingly shows that TMLG, CFLG, Macey, Aleman, Searns, and Stafford were engaged in offering and providing services aimed at modifying the terms of an extension of credit, through TMLG and CFLG's mortgage loan modification services, and are "covered persons" under the CFPA. *SF 3, 7, 31, 47, 48, 55, 63, 129, 159, 182-183, 194-195, 214.*

### C. Defendants Committed Multiple Violations of Regulation O

#### 1. Regulation O Background

In 2010, to address and prohibit unfair and deceptive acts or practices involving mortgage loan modifications and foreclosure relief services, the Federal Trade Commission ("FTC") promulgated the Mortgage Assistance Relief Services ("MARS") Rule. MARS Rule Statement, Mortgage Assistance Relief Services, Final Rule, 75 Fed. Reg. 75092 (December 1, 2010) (to be codified at 16 C.F.R. pt. 322). Congress transferred rulemaking authority over the MARS Rule to the Bureau, and the Bureau recodified the rule as 12 C.F.R. pt. 1015 and designated it "Regulation O." Pursuant to 12 U.S.C. §§ 5538(a) and 5564, the Bureau has authority to enforce Regulation O. Regulation O applies to persons providing "mortgage assistance relief services" to homeowners, and it prohibits mortgage assistance relief service providers from, among other things: (1) charging advance fees for negotiating loan modifications with consumers' lenders; (2) making certain misrepresentations and representations to consumers; and (3) failing to make specific written disclosures in their advertisements or other material directed to consumers. *See*

*FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611 (6th Cir. 2014) (affirming summary judgment against the marketers and sellers of mortgage loan modification services for violations of the MARS Rule, including requesting and receiving advance fees, making prohibited representations, and making prohibited misrepresentations).

As discussed below, Defendants repeatedly violated all of these prohibitions and, in the process, harmed thousands of consumers. Pursuant to Regulation O, "mortgage assistance relief service" means "any service, plan, or program, offered or provided to the consumer in exchange for consideration, that is represented, expressly or by implication, to assist or attempt to assist the consumer with . . . [n]egotiating, obtaining, or arranging a modification of any term of a dwelling loan, including a reduction in the amount of interest, principal balance, monthly payments, or fees." 12 C.F.R. § 1015.2. A "mortgage assistance relief service provider" is any person—including an individual, partnership, or other business entity—"that provides, offers to provide, or arranges for others to provide, any mortgage assistance relief service." 12 C.F.R. § 1015.2.

Defendants offered to provide or provided the above services—including mortgage loan modification services in exchange for fees—and were, therefore, mortgage assistance relief service providers under Regulation O. *SF 3, 7, 31, 47, 48, 55, 63, 129, 154-156, 158-159, 182-183, 194-195*. Additionally, Defendants' marketing materials, welcome letters to consumers, retainer agreements with consumers, and sales representative calls with consumers, all demonstrated that Defendants offered to provide and purportedly provided mortgage loan modification services, all of which Regulation O covers. *SF 63, 159, 182-183, 188-192, 204*.

**2. Defendants Are Not Exempt from Regulation O or the CFPA**

Defendants CFLG, Macey, Aleman, Searns, and Stafford asserted as affirmative defenses that, as attorneys, they are exempt from both Regulation O and the CFPA.[2] Despite their assertions, Defendants are not exempt under either law because they were "law firms" in name only, with the principals using their bar licenses as an end run around the prohibitions in Regulation O and the CFPA, and as an enticement to unwitting consumers.

**a. Attorney Exemption under Regulation O**

In their First Affirmative Defenses, CFLG, Macey, Aleman, Searns, and Stafford contend that they were engaged in the practice of law, provided all mortgage assistance relief services as part of the practice of law, were a law firm that complied with all applicable state laws and

[2] Since TMLG did not file an answer, it has not pled any affirmative defenses.

regulations, did not receive any funds from clients before performing legal services, complied with all state laws and regulations applicable to client trust accounts, and are, therefore, exempt from Regulation O's provisions. These contentions have no merit.

Under 12 C.F.R. § 1015.7(a), an attorney is exempt from all provisions of Regulation O other than the prohibition on advance fees, if the attorney meets all three of the following requirements:

> (1) Provides mortgage assistance relief services as part of the practice of law;
>
> (2) Is licensed to practice law in the state in which the consumer for whom the attorney is providing mortgage assistance relief services resides or in which the consumer's dwelling is located; and
>
> (3) Complies with state laws and regulations that cover the same type of conduct the rule requires.[3]

12 C.F.R. § 1015.7(a). If an attorney fails to meet even one of these requirements, then the attorney is not exempt from any of Regulation O's prohibitions or requirements.

The requirements of this exemption became law as part of the FTC's express rejection of a blanket exemption for attorneys. Mortgage Assistance Relief Services, 75 Fed. Reg. 75092, 75128. The FTC found that substantial numbers of attorneys had engaged in the types of deceptive and unfair conduct that the MARS Rule prohibited and had specifically used exemptions in comparable state laws to circumvent those laws. *Id.* at 75128-29. With the attorney exemption's strict requirements, the FTC sought to stop such practices:

> [I]ndividuals with law licenses frequently engage in deceptive or unfair MARS practices or assist others who do. As with other services sold routinely through deceptive or unfair means, a broad attorney exemption can become an easy way for fraud artists to ply their trade without fear of law enforcement. Thus, the Commission concludes that merely possessing a law degree or a license to practice law is not an adequate basis for an exemption from the Rule. The Commission's goal is to craft an exemption that enables attorneys to engage in the bona fide practice of law, but does not create a loophole for unscrupulous

[3] The Bureau will demonstrate that Defendants cannot meet the requirements of subpart (1) of this exemption because they did not provide mortgage loan modification services—which comprised nearly 100% of the Companies' mortgage assistance relief services—as part of the practice of law. With respect to subpart (3), the Bureau notes that several state attorneys general sued TMLG, and one sued CFLG, alleging that they did not comply with those states' laws and regulations covering the same type of conduct that Regulation O requires. These states entered into consent orders prohibiting the Companies from doing business in those states. *SF 52, 62*.

> attorneys who themselves engage in unfair or deceptive acts and practices in selling MARS or lend their credentials to others who do so.

*Id.* at 75130. Therefore, Regulation O is designed to ensure that a license to practice law does not become a license to defraud and cheat. The Court should not permit Defendants to hide behind their law licenses, the very practice that the MARS Rule, now Regulation O, sought to prevent.

**i. The Practice of Law**

The practice of law in the context of Regulation O was not intended to refer simply to a law firm *structure*, but, rather, to the professional legal work of attorneys on behalf of clients. Of course, this Court is inherently familiar with what constitutes the practice of law, which is commonly understood to mean legal knowledge, judgment, or skill. The FTC, however, provided important guidance in the Supplementary Information section accompanying the Final MARS Rule:

> [T]he services that attorneys may deliver to consumers with mortgage problems can be legal or non-legal in nature. Limiting the exemption to attorneys engaged in the ''practice of law'' is intended to draw the distinction between legal and non-legal services, even though performed or supervised by an attorney. The ''practice of law'' generally encompasses providing advice or counsel that requires knowledge of the law and preparing documents, including court pleadings and contracts, to secure clients' legal rights. The activities that constitute the ''practice of law,'' however, may vary based on state laws and licensing regulations, as interpreted by state courts and state bars. The Final Rule only allows an exemption for attorneys who are engaged in the ''practice of law,'' as interpreted by the jurisdiction where the consumer or the consumer's dwelling is located.

Mortgage Assistance Relief Services, 75 Fed. Reg. 75092, 75130-31. State law and state courts have determined that the practice of law includes, *inter alia*, the following: giving advice to clients that required the use of legal knowledge or skill, including regarding the law, their legal rights, or the legal rights or responsibilities of others; conducting legal or other research; drafting agreements or other legal documents that required familiarity with legal principles beyond the ken of the ordinary layman; appearing for consumers before public tribunals; representing consumers in formal adjudicative proceedings; negotiating legal rights and responsibilities; or rendering any other service to consumers that required the use of legal knowledge or skill. *See*,

*e.g.*, *State v. Foster*, 674 So. 2d 747, 752 (Fla. Dist. Ct. App.), *as clarified* (Apr. 26, 1996), *cause dismissed*, 677 So. 2d 840 (Fla. 1996) (noting that the practice of law requires the possession of legal skill and knowledge greater than that of the average citizen) (internal citation omitted); *Baron v. City of Los Angeles*, 469 P.2d 353, 358 (Cal. 1970) ("resolution of legal questions for another by advice and action is practicing law if difficult or doubtful legal questions are involved which, to safeguard the public, reasonably demand the application of a trained legal mind") (internal citation omitted); *Massachusetts Conveyancers Ass'n Inc. v. Colonial Title & Escrow, Inc.*, 2001 WL 669280 at *5 (Mass. Super. 2001) (noting the necessity of using "legal methods" as an element of the practice of law); *People ex rel. Illinois State Bar Ass'n v. People's Stock Yards State Bank,* 176 N.E. 901, 908 (1931) (finding that the practice of law requires more than the knowledge of the layman); *Gmerek v. State Ethics Comm'n*, 751 A.2d 1241 (Pa. Cmwlth. 2000) (requiring a familiarity with legal principles beyond the ken of the ordinary layman); N.C. Gen. Stat. Ann. § 84-2.1 (limiting the practice of law to actual legal services); R.I. Gen. Laws Ann. § 11-27-2 (defining the practice of law to include the preparation of an instrument that "requires legal knowledge and capacity"); Wis. R. App. P. REG UNAUTH PRAC LAW S. 23.01 (the practice of law requires the knowledge, judgment, and skill of a person trained as a lawyer).

#### ii. Defendants Did Not Provide Mortgage Loan Modification Services as Part of the Practice of Law

Defendants did not provide mortgage loan modification services as part of the practice of law; their so-called "national law firm" was merely a façade to provide mortgage modification services without having to comply with the requirements of Regulation O. There was no "practice of law," except in the extremely rare instances of the 30 TMLG consumers (out of the more than 6,000 who enrolled with the Companies) who received foreclosure defense services from local attorneys. *SF 138, 186-187*. Even for these 30 TMLG consumers, however, the local attorneys provided such services without any input from TMLG, which in those instances acted more as a referral service. *SF 139*. Therefore, the Companies did not meet even the initial exemption requirement of 12 C.F.R. § 1015.7(a)(1). As demonstrated above, the overriding principles in determining whether services constitute the practice of law is whether or not those

services required the use of legal knowledge or skill, or knowledge of legal principles beyond the ken of the ordinary layman. The evidence overwhelmingly demonstrates that Defendants' mortgage loan modification services did not require such knowledge or skill.

Defendants operated their businesses in as many as 35 states, having contracted with local attorneys in those states for mortgage loan modification review work. *SF 46-49, 54*. Defendants claim that these relationships with local attorneys rendered TMLG and CFLG "national law firms." *SF 33-37, 39, 40, 46, 53, 54, 93*. Neither the Companies' attorneys nor the local attorneys, however, provided legal services to consumers in connection with mortgage loan modification services—the attorneys were merely window-dressing.

The Companies' overall operations used high-pressure, boiler-room style sales tactics to reel in consumers, and they had a sales floor operation with routine processes for gathering basic consumer information and setting up payments. *SF 66, 70-72, 75-77, 80-85.* The Companies' sales and administrative operations were so extensive that the salespeople alone—who were not supervised by attorneys—vastly outnumbered the attorneys. *SF 73.* In addition to all of those sales and administrative personnel, the Companies had document processors who gathered consumers' documents and communicated with lenders. *SF 44-45, 54, 109-112, 129-130.*

Defendants set up the Companies to have three levels of *identical* review of consumers' mortgage loan modification information and documents: the first level by non-attorney salespeople or document processors; the second level by one of the Companies' two headquarters attorneys; and the third level by local attorneys who were independent contractors managed by the headquarters attorneys. *SF 38, 91, 97, 113-114, 117-118*. The non-attorneys and attorneys at each of the three levels reviewed and approved the same consumer information in conjunction with the same criteria, using checklists that the Companies provided, ensuring that the consumers met the lender-required mortgage loan requirements and provided all of the lender-required documents. *SF 38, 91-92, 97-99, 101, 113-114, 117-118, 120, 122*. All of the information reviewed was financial or other non-legal consumer information that the lenders required, as straightforward as, for example, determining by how many months a consumer was behind in payments. *SF 91, 97-98, 100, 116*. These reviews involved no use of legal knowledge or skill. *SF 145*. In fact, even the headquarters attorneys followed a script when speaking to consumers to confirm their basic financial and related information. *SF 80, 81, 83.* Aleman

himself characterized the attorney duplication as "belt and suspenders," a telling admission of the redundant processes and lack of legal skill needed. *SF 117*.

The Companies built these redundancies into two stages of their process: first, at intake, and, second, before submitting documents to a mortgage lender or servicer. *SF 91, 97, 113-114.* Local attorneys spent as little as one or two minutes conducting the intake-stage review, a step that one local attorney described as something he could do "in a heartbeat" by looking at the information in a short email from the Companies; the local attorneys reviewed no documents from the consumer. *SF 99, 104-105.* For the local attorneys, the intake review was a third look—after the salespeople and the Companies' headquarters attorneys—to see if consumers provided sufficient financial information to show that they would qualify, based on lender criteria, for some form of mortgage loan relief or assistance. *SF 38, 91-92, 97-100*. Such information included general consumer information, address, amount of time behind on the mortgage, the servicer or mortgage company, the consumer's budget and real estate information, debt-to-income ratio, and hardship and related financial information. *SF 100.* No legal judgment was required for such a review. *SF 98, 145.* Similarly, local attorneys spent as little as five minutes or less conducting the submission-stage review. *SF 121*. The local attorneys merely checked to make sure that the document processors had put the required consumer residence and financial information and documents in the submission packet; if so, the local attorneys approved it. *SF 115-116*. No legal judgment was required at the submission stage either. *SF 115-116, 145.*

Indeed, the local attorneys served as no more than rubber stamps. The Companies paid them only if they *approved* the consumer information or files they reviewed. *SF 46, 106, 123*. As a result, local attorneys approved 100% or close to 100% of the consumers' intake and submission files. *SF 107, 126*. Moreover, because this information and these documents had already been reviewed and approved twice before, the Companies directed the local attorneys that they would "rarely decline" to approve, and, indeed, that was the case. *SF 97, 107, 126.* One local attorney testified that on the rare occasions that he declined a loan modification submission package, the Companies always directed him to approve the file anyway, and the attorney always complied. *SF 125*. Even emails to consumers that *appeared* to be from the local attorneys were really just emails automatically generated by the Companies; the local attorneys had no part in writing or sending those emails. *SF 108, 127, 134-135*. One local attorney

testified that she was not even aware that the Companies had sent such emails under her name. *SF 135*.

The intake and submission reviews for mortgage loan modification services comprised the entirety of the local attorneys' duties under their contracts with the Companies, and in connection with the retainer and monthly fees agreed to and paid for by consumers to the Companies. *SF 128, 157-158, 182-183*. In performing these services, local attorneys did not give legal advice to consumers, have any communication with consumers or lenders, manage or supervise anyone, provide any services unique to their own state, or do any work that a non-attorney could not also do—and did, in fact, do—when reviewing intake or submission packages. *SF 38, 91, 119, 128, 132-133, 145-147*. Most importantly, with respect to these mortgage loan modification services, neither the headquarters attorneys nor the local attorneys used legal knowledge or skills, or applied a knowledge of legal principles beyond the ken of the ordinary layman. *SF 38, 98, 113, 115-116, 145*.

Neither the headquarters attorneys nor the local attorneys were necessary for the Companies' mortgage loan modification services—services that were entirely non-legal. Rather, Defendants used those two levels of unnecessary and duplicative attorney review simply as window dressing to create the law firm façades that they hoped would allow them to circumvent Regulation O's prohibitions and entice consumers with the promise of more effective assistance. There were isolated instances in which consumers who signed up with TMLG obtained legal representation in connection with foreclosures on their homes. *SF 136, 138, 142, 186*. This representation took place, however, outside the context of the initial fee and the monthly fee paid to the Companies by these consumers, who had to specially request this assistance and pay an additional $800 to obtain this representation from local attorneys. *SF 185*. Moreover, out of the more than 6,000 consumers who sought help from the Companies, *no* CFLG consumers and only *30* TMLG consumers were thus represented. *SF 138, 186-187*. This is less than 0.5% of the Companies' customers. For these actual legal services, the Companies separately compensated the local attorneys who handled them, and the Companies served not as representing law firms, but more as referral services. *SF 137, 139-141*.

All told, therefore, with their high-pressured, highly routinized, and almost mechanical sales and document-processing systems, and the triple-level non-legal review process of the salespeople, processors, and attorneys, the Companies were not "law firms" as they had

marketed and have claimed, but, rather, mere mortgage loan modification companies. Most importantly, the Companies did not provide any of their mortgage loan modification services as part of the practice of law. As a result, they did not meet the requirements of 12 C.F.R. § 1015.7(a)(1) and, on that basis alone, do not qualify for the attorney exemption under Regulation O.

#### iii. Licensing of Attorneys and Compliance with State Laws

Even if Defendants could convince the Court that they were entitled to the exemption under 12 C.F.R. § 1015.7(a)(1) concerning the practice of law, and under subsections (a)(2) and (a)(3) concerning licensing and compliance with state laws, Regulation O provides that an attorney may only be exempt from the prohibition on advance fees if the attorney: "(1) [d]eposits any funds received from the consumer prior to performing legal services in a client trust account; and (2) [c]omplies with all state laws and regulations, including licensing regulations, applicable to client trust accounts." 12 C.F.R. § 1015.7(b). Defendants cannot show that they met these requirements, and, therefore, even if the Court were to find that they were entitled to the partial exemption under subsection (a), they would have still taken illegal advance fees.

Simply having client trust accounts is not enough. Here, consumers' payments went through accounts called "IOLTA" accounts, but no one monitored those accounts, and they essentially served as pass-through accounts as consumers' payments cleared at a payment processor. *SF 164-166, 169-170*. The entire process, from consumers' accounts to TMLG's or CFLG's operating accounts at Chase Bank, took only two to four days. *SF 167*. Although the Companies set up a process that might have made it appear as if consumer payments were held in client trust accounts and then disbursed to the Companies as costs were incurred and stages of services completed, that was not the case. Rather, the payment processors disbursed the consumers' payments to the Companies' operating accounts *automatically*, regardless of what, if any, services the Companies rendered. *SF 168, 172-173*. Moreover, client trust account rules differ from state to state, and in order to sustain a contention that TMLG and CFLG complied with client trust account rules, Defendants would have to prove that they did so in each of the approximately 35 states in which they operated. *SF 49*. Because no one monitored the so-called IOLTA accounts at US Bank through which almost all of the consumers' payments passed, no one at TMLG or CFLG, or anyone on their behalf, could have ensured compliance with each

state's client trust account rules. *SF 169-170*. As a result, Defendants do not meet the exemption requirements of 12 C.F.R. § 1015.7(b) concerning client trust accounts.

**b. Attorney Exemption under the CFPA**

In addition to their contention that their sham law practices should shield them from the requirements of Regulation O, in their Second Affirmative Defenses, Defendants similarly contend that they are exempt from the CFPA and its prohibitions against the deceptive practices alleged in the Complaint, because they were engaged in the practice of law, provided all mortgage assistance relief services as part of the practice of law under the laws of the states in which they were licensed, provided such services incidental to or as part of their practice of law, provided such legal services as partners of a law firm, and did not provide such services outside of an attorney-client relationship. 12 U.S.C. § 5517(e). As with these defendants' contentions regarding Regulation O's attorney exemption discussed above, and based on essentially the same reasons and evidence, these contentions regarding the CFPA's attorney exemption have no merit.

Under the CFPA's attorney exemption, "the Bureau may not exercise any . . . enforcement authority with respect to an activity engaged in by an attorney as part of the practice of law under the laws of a State in which an attorney is licensed to practice law." 12 U.S.C. § 5517(e)(1). This exemption, however, has two exceptions. The Bureau may exercise enforcement authority over an attorney regarding the offering or provision of a consumer financial product or service:

> (A) that is not offered or provided as part of, or incidental to, the practice of law, occurring exclusively within the scope of the attorney-client relationship; or
>
> (B) that is otherwise offered or provided by the attorney in question with respect to any consumer who is not receiving legal advice or services from the attorney in connection with such financial product or service.

12 U.S.C. § 5517(e)(2). If the facts demonstrate that either of these exceptions applies, then the CFPA attorney exemption does not apply.

In the case of Defendants, *both* of these exceptions apply. As demonstrated in detail above regarding the Regulation O attorney exemption, Defendants' mortgage loan modification services consisted primarily of the gathering and review of basic lender-required consumer financial information and documents that non-attorneys not only *could* easily review and process, but *did*, in fact, review and process. *SF 38, 91-92, 97-99, 100, 101, 113-114, 116-118, 120, 122*. In what was a triple-level repetitious review, the headquarters attorneys and then local

attorneys merely duplicated the work of the salespeople and document processors without doing anything that required the use of legal knowledge or skills, and without having any relationship with consumers, let alone a relationship that included advising them about the law or legal rights, or providing any other legal services. *SF 38, 91-92, 97-99, 101, 113-119, 120, 122, 128, 132-133, 145-147*. Again, in the context of their mortgage loan modification businesses, Defendants were attorneys in name only, and, therefore, cannot avail themselves of the CFPA exemption offered by 12 U.S.C. § 1027(e). Defendants are subject to the CFPA's provisions.

**3. Defendants' Violations of Regulation O**

**a. TMLG and CFLG Requested and Received Advance Fees**

Regulation O prohibits any mortgage assistance relief service provider from "request[ing] or receiv[ing] payment of any fee or other consideration until the consumer has executed a written agreement between the consumer and the consumer's dwelling loan holder or servicer incorporating the offer of mortgage assistance relief that the provider obtained from the consumer's dwelling loan holder or servicer." 12 C.F.R. § 1015.5(a). In the course of providing, offering to provide, or arranging for others to provide mortgage loan modifications, TMLG and CFLG repeatedly violated this provision as to thousands of consumers by requesting and receiving payment of fees before consumers had executed mortgage loan modification agreements with their lenders or servicers that incorporated modification offers that TMLG or CFLG obtained. 12 C.F.R. § 1015.5(a). *See FTC v. E.M.A. Nationwide, Inc*., 767 F.3d 611, 634-35 (6th Cir. 2014) (affirming summary judgment against the marketers and sellers of mortgage loan modification services for violations of the MARS Rule prohibitions against requesting and receiving advance fees). *SF 89, 154-156, 158, 173, 213.*

TMLG committed these violations for all 5,265 consumers who contracted with it for mortgage loan modifications, and CFLG committed these violations for all 1,116 consumers who contracted with it for mortgage loan modifications. *SF 84-85, 87-88, 155, 156, 158-159, 194-195*. Under the terms of their retainer agreements, TMLG and CFLG charged consumers an "Initial Flat Fee Retainer" for the first stage of services in the typical amount of $1,195, though initially, TMLG charged a significantly higher retainer. *SF 155, 156, 159*. That initial fee purportedly covered an initial review and analysis of the consumer's financial condition. *SF 157*. The Companies' salespeople pressured consumers into paying this initial fee at the time of or shortly after they signed the retainer agreement by making "payment follow-up" calls to

consumers and making urgent-sounding statements such as: "this is a time sensitive matter and the sooner you are able to make your first retainer payment the sooner we can get to work on your file." *SF 86*. Consumers paid the fees, and at the time they did so, they and their lenders had not entered into mortgage loan modification agreements as required by Regulation O for the charging of such fees. *SF 89, 154-156, 158, 173.*

After charging and receiving from consumers the "Initial Flat Fee Retainer," TMLG and CFLG charged and received from consumers a "Monthly Recurring Flat Fee Retainer" in the typical amount of $895. *SF 56, 84-85, 155-156, 158, 160-161, 183, 213*. Consumers paid this fee each month, and as of the time they did so, they and their lenders had not entered into mortgage loan modification agreements as required by Regulation O for the charging of such fees. *SF 56, 84-85, 155-156, 158, 160-161, 183, 213*. The Companies collected this $895 fee every month, regardless of what services the Companies did or did not provide to consumers, until consumers received a loan modification or left the program. *SF 160-161, 173, 183, 213*.

To ensure that they received these fees and that these already struggling consumers parted with considerable sums each month, TMLG and CFLG required the consumers to sign up for automatic monthly payments to be made by automatic transfers from the consumers' bank accounts. *SF 85, 160-161*. These monthly fees purportedly covered continued underwriting analysis, transmission of the loan modification package to the lender, and continued monitoring of the package review with the lender. *SF 158*. Non-attorney processing staff performed these services independently, with no direct supervision from attorneys. *SF 45, 110-112, 147-148*.

Defendants have asserted that the fees were for services rendered. *SF 56, 89, 156-159, 183*. However, that claim is irrelevant to the advance fee prohibition, which, other than the narrow attorney exemption that does not apply in this case, has no exception. Moreover, the FTC's MARS Rule Statement demonstrates that Regulation O "prohibits MARS providers from collecting fees [even] for piecemeal services." Mortgage Assistance Relief Services, 75 Fed. Reg. 75092, 75122.

Indeed, despite paying a total of more than $20 million in fees, none of the consumers received a mortgage modification before paying such fees, and an overwhelming majority never received a mortgage modification at all through the Companies. *SF 87-89, 154-156, 158, 179-181, 193-195*. Therefore, all of the fees that the Companies charged to consumers were in violation of Regulation O.

**b. TMLG and CFLG Made Material Misrepresentations in Violation of Regulation O**

Regulation O prohibits certain misrepresentations in the course of providing, offering to provide, or arranging for others to provide mortgage assistance relief services. For example, it is prohibited to misrepresent: the likelihood of negotiating, obtaining, or arranging any particular result; the amount of time it will take the provider to accomplish a result; the consumer's obligation to make scheduled periodic payments pursuant to the terms of his or her mortgage; the fact that the consumer will receive legal representation; and the performance of a for-profit mortgage assistance relief services provider as compared to a non-profit housing counselor agency or program. 12 C.F.R. § 1015.3(b). The Companies, through their boiler-room sales tactics and their advertising and other consumer-facing materials, made these prohibited misrepresentations to consumers, most of whom ended up thousands of dollars out-of-pocket, and much worse off than they were before retaining the Companies. *SF 63, 65, 70-77, 179-181, 188-214.*

**i. TMLG and CFLG Misrepresented the Likelihood of Obtaining Mortgage Loan Modifications**

In violation of 12 C.F.R. § 1015.3(b)(1), in the course of providing, offering to provide, or arranging for others to provide mortgage loan modifications, TMLG and CFLG misrepresented, expressly or by implication, the likelihood of obtaining those modifications. *See E.M.A. Nationwide*, 767 F.3d at 634-35 (affirming summary judgment against the marketers and sellers of mortgage loan modification services for the violation of the MARS Rule prohibition against misrepresenting the amount of relief consumers could obtain). The Companies' salespeople made statements aimed at convincing consumers that they were eligible for and would obtain mortgage loan modifications. *SF 190-191*. TMLG and CFLG salespeople also made statements designed to convince consumers that they would obtain mortgage loan modifications if they hired TMLG or CFLG. *SF 191*. For example, salespeople told some consumers that "we have been seeing very strong results from the lenders we've been working with. . . ." *SF 86*. Moreover, TMLG's welcome letters told consumers that "you have a significant advantage because we are familiar with the process and expedite it through our contacts." *SF 203*.

In fact, however, the likelihood of obtaining mortgage loan modifications through TMLG and CFLG was extremely low, with the Companies regularly failing to obtain modifications.

TMLG failed to obtain modifications for approximately 74% of consumers who enrolled for mortgage loan modification services, and CFLG failed to obtain modifications for approximately 83% of consumers who enrolled for mortgage loan modification services. *SF 194-195*. These high failure rates came about despite Defendants' claims and testimony that they reviewed consumers' information at the outset to ensure—even before consumers enrolled with the Companies—that the consumers met the modification criteria. *SF 80-83, 97-107*. In addition, the Companies did not have special or other "contacts"; rather, the document processors, who were the main points of contact with the lenders or servicers, just called the main telephone numbers provided to the public. *SF 130, 203.* These dismal modification results demonstrate that the Companies misrepresented the likelihood of obtaining modifications.

#### ii. TMLG and CFLG Misrepresented the Amount of Time to Obtain a Mortgage Loan Modification

In violation of 12 C.F.R. § 1015.3(b)(2), in the course of providing, offering to provide, or arranging for others to provide mortgage loan modifications, TMLG and CFLG misrepresented, expressly or by implication, the amount of time it would take the Companies to obtain those modifications. *SF 196-198.* These misrepresentations included TMLG and CFLG's cover letter statements that "[c]urrently we are seeing many workouts take anywhere from 90-120 days; however, every case is unique. . ." *SF 197*. In practice, TMLG and CFLG generally did not obtain loan modifications for consumers within the represented time, if at all. *SF 198.* For the only 26% of TMLG consumers who obtained modifications, it took TMLG an average of 211 days to obtain modifications, and for the only 17% of CFLG consumers who obtained modifications, and it took CFLG an average of 165 to 170 days to obtain modifications. *SF 198*. For both Companies, therefore, the amount of time was materially greater than the stated 90-120 day period represented.

#### iii. TMLG and CFLG Misrepresented Consumers' Obligations to Pay Their Mortgages

In violation of 12 C.F.R. § 1015.3(b)(4), in the course of providing, offering to provide, or arranging for others to provide mortgage loan modifications, TMLG and CFLG misrepresented, expressly or by implication, consumers' obligations to make scheduled payments pursuant to the terms of their dwelling loans. The Companies' salespersons instructed or strongly implied to consumers that they should stop paying their mortgage loans altogether. *SF 212*. To convince consumers to do that, salespersons told consumers that they could not

receive mortgage loan modifications unless they were behind in their payments. *SF 68*. Salespersons also told consumers that they would not have to make any payments to their lenders until their mortgage loan was modified, and that the lender would incorporate all past due amounts into the modification. *SF 69*. All of these statements misrepresented consumers' mortgage loan obligations.

#### iv. TMLG and CFLG Misrepresented that Consumers Would Receive Legal Representation

In violation of 12 C.F.R. § 1015.3(b)(8), in the course of providing, offering to provide, or arranging for others to provide mortgage loan modifications, TMLG and CFLG misrepresented, expressly or by implication, that consumers seeking modifications would receive legal representation. Television and internet advertising promised modifications through attorney representation and the "highest rated professionals in the field." *SF 64*. During intake calls with the consumers, the Companies' representatives told consumers that they would receive attorney services in seeking mortgage loan modifications. *SF 67, 199*. The Companies' welcome packets, cover letters, and retainer agreements suggested to consumers that they would receive attorney services. *SF 201*. TMLG's and CFLG's cover letters routinely stated: "Fortunately by using an attorney you have a significant advantage . . . ." *SF 203*. The cover letters thanked the consumers for "entrusting their home to TMLG. . . a full service law firm that focuses on resolving all mortgage related issues." *SF 204*.

Additionally, CFLG's website described CFLG as "one of the most sophisticated consumer protection law firms in the country" with over 100 associate attorneys "insuring the best possible outcome during uncertain times." *SF 64*. CFLG's website also made representations about the quality of services that CFLG would provide, such as: "[w]hile foreclosure scams are rampant, our mortgage relief specialists are some of the highest rated professionals in the field;" and "[CFLG attorneys] have years of experience keeping people in their homes and have a long list of testimonials from people who were on the brink of disaster." *SF 64*.

In fact, however, TMLG and CFLG consumers who hired the Companies for loan modification services did not receive attorney representation. As discussed above in section II(C)(2)(a)(ii), TMLG and CFLG headquarters attorneys and local attorneys' work was restricted to reviewing limited non-legal information relating to consumers' mortgage loan modifications,

performing the same work that non-attorneys had already done. *SF 38, 97-102, 109-119*. These attorneys did not advise or otherwise communicate with consumers. *SF 96, 132-133, 136, 142, 145, 149, 151, 207*. None of the attorneys used any legal knowledge or skills, or applied any knowledge of legal principles beyond the ken of the ordinary layman, and, the attorneys had no relationships with lenders or servicers that they used to benefit consumers. *SF 91-92, 97-102, 128-130, 136, 142-147*. In short, no TMLG or CFLG headquarters attorneys or local attorneys provided legal representation to consumers seeking mortgage loan modifications.

**v. TMLG and CFLG Misrepresented to Consumers the Performance of Nonprofit Alternatives to For-Profit Mortgage Assistance Relief Services**

In violation of 12 C.F.R. § 1015.3(b)(9), in the course of providing, offering to provide, or arranging for others to provide mortgage loan modifications, TMLG and CFLG misrepresented, expressly or by implication, the performance of an alternative to for-profit mortgage assistance relief services through which consumers could obtain mortgage loan modifications. Specifically, the Companies misrepresented the performance of a nonprofit housing counselor agency or program that consumers could have used instead of using the Companies. *SF 192.*

**c. TMLG and CFLG Made the Prohibited Representation to Consumers that They Should Not Communicate with Their Lenders or Servicers**

In violation of 12 C.F.R. § 1015.3(a), in the course of providing, offering to provide, or arranging for others to provide mortgage loan modifications, TMLG and CFLG represented, expressly or by implication, that consumers should not contact or communicate with their lenders or servicers. *See E.M.A. Nationwide*, 767 F.3d at 634-35 (affirming summary judgment against the marketers and sellers of mortgage loan modification services for the violation of the MARS Rule prohibition against representing that consumers should not speak with their mortgage lenders). TMLG and CFLG's welcome packet cover letters stated: "While we will not tell you not to speak to your servicer, we must advise you that to do so is risky. We have seen several clients hurt by deceptive practices when their servicer calls." *SF 210*. Consumers also report having been told by telephone not to speak with their mortgage lenders or servicers. *SF 209*. The Companies' strategies and tricks—implicitly currying trust with consumers under the guise

of providing "legal representation"—included warning both verbally through salespersons' statements, and in writing, of supposed risks of communicating with their lenders. *SF 208-211*.

In sending a clear message to struggling and vulnerable consumers that they should not communicate with their lenders and servicers, the Companies reduced the opportunities that consumers would have had to help themselves, including by trying to expedite the modification process and save money. As the FTC stated in the Supplementary Information section accompanying the Final MARS Rule:

> consumers who follow this instruction suffer or are likely to suffer substantial injury. As the commenters noted, consumers who stop communicating with their lender or servicer are deprived of critical information about (1) possible work-out options, (2) the veracity of the provider's claims, (3) whether the provider is actually performing, and (4) in some cases, that foreclosure and the loss of their homes is imminent. Consumers who lack this information may end up paying hundreds or thousands of dollars for MARS services that do not provide the promised relief, and may even lose their homes. . . . A ''benefit'' this practice might bring is to increase MARS providers' revenues by increasing the number of consumers who decide to contract with them.

Mortgage Assistance Relief Services, 75 Fed. Reg. 75092, 75106-07. The Companies' use of these tactics increased the chances that the modification process would take longer than needed. The tactics also increased the likelihood that the Companies would increase their profits by luring more consumers to enroll in the first place, and then by dragging out the many months of consumers' automatic payments.

#### d. TMLG and CFLG Failed to Make Required Disclosures

Regulation O requires mortgage assistance relief service providers such as TMLG and CFLG to make certain disclosures in all of their consumer-specific commercial communications. A "consumer-specific commercial communication" is a commercial communication, either oral or written, which is designed to effect a sale and "that occurs prior to the consumer agreeing to permit the provider to seek offers of mortgage assistance relief on behalf of the consumer, or otherwise agreeing to use the mortgage assistance relief service, and that is directed at a specific consumer." 12 C.F.R. § 1015.2. In all of those communications, providers must tell consumers, in a clear and prominent manner, that:

> You may stop doing business with us at any time. You may accept or reject the offer of mortgage assistance we obtain from your lender [or servicer]. If you reject the offer, you do not have to pay us. If you accept the offer, you will have to pay us (insert amount or method for calculating the amount) for our services.

12 C.F.R. § 1015.4(b)(1). *See E.M.A. Nationwide,* 767 F.3d at 634-35 (affirming summary judgment against the marketers and sellers of mortgage loan modification services for failing to make required disclosures under the MARS Rule). In this case, none of the Companies' consumer-specific communications contained these required disclosures in any manner, let alone in a clear and prominent manner: not the Companies' scripts, not the welcome packet letters, and not the retainer agreements. *SF 214-215*. Therefore, the Companies violated Regulation O's requirement to provide these disclosures.

**D. Defendants' Deceptive Acts and Practices Violated the CFPA**

Sections 1031 and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B), prohibit covered persons from engaging "in any unfair, deceptive, or abusive act or practice in connection with any transaction with a consumer for a consumer financial product or service." The CFPA does not define a "deceptive" practice, but a court interpreting a statute will consider the construction of similar terms in other statutes, as well as the purpose of the statute being interpreted. *United States v. Patel,* 778 F.3d 607, 613 (7th Cir. 2015) (citing *Sanders v. Jackson*, 209 F.3d 998, 1000 (7th Cir. 2000). In the context of deception, courts have looked to the law interpreting deception under the Federal Trade Commission Act ("FTCA"). *See* 12 U.S.C. § 5536(a)(1)(B); 15 U.S.C. § 45(a)(1); *Illinois v. Alta Colleges, Inc.,* No. 14 C 3786, 2014 WL 4377579, at *4 (N.D. Ill. Sept. 4, 2014) (holding that the prohibitions against deceptive practices in the CFPA and FTCA are "virtually identical").

A deception claim has three elements: (1) the representation, omission, act, or practice is likely to mislead the consumer; (2) the consumer's interpretation of the representation, omission, act, or practice is reasonable under the circumstances; and (3) the representation, omission, act, or practice is material. "[M]isrepresentations of material facts made for the purpose of inducing consumers to purchase services constitute . . . deceptive acts or practices." *FTC v. World Travel Vacation Brokers, Inc.,* 861 F.2d 1020, 1029 (7th Cir. 1988) (citing *FTC v. Kitco of Nevada, Inc.,* 612 F. Supp. 1282, 1291 (D. Minn. 1985)). "In order to establish that an act or practice is deceptive, the [Bureau] must establish that the representations, omissions, or practices likely would mislead consumers, acting reasonably, to their detriment." *World Travel,* 861 F.2d at 1029 (citing *Southwest Sunsites, Inc. v. FTC,* 785 F.2d 1431, 1435 (9th Cir. 1986)). In addition, a statement or practice is material if it is "likely to affect a consumer's decision to buy a product or service." *FTC v. Am. Tax Relief LLC,* 751 F. Supp. 2d 972, 978 (N.D. Ill. 2010)*; see also*

*FTC v. Bay Area Business Council, Inc.*, No. 02 C 5762, 2004 WL 769388, at *10 (N.D. Ill. Apr. 9, 2004). These misrepresentations or practices need not be made with an intent to deceive to be actionable. *World Travel*, 861 F.2d at 1029.

As described in detail in section II(C)(3)(b) above, through their marketing and sales tactics, Defendants misrepresented to consumers, expressly or by implication, all of the following: (1) the likelihood of the Companies obtaining mortgage loan modifications for consumers (*SF 188-191*); (2) the amount of time it would take the Companies to obtain those modifications (*SF 196-198*); (3) the consumers' obligations to make scheduled payments under the terms their mortgage loans (*SF 212-213*); (4) that consumers would receive legal representation (*SF 199-207*); and (5) the performance of nonprofit alternatives as compared to the Companies (*SF 192).* In addition to having been violations of Regulation O, each of these constituted deceptive acts and practices under the CFPA.

Regarding deception's first element, the Companies' representations were *likely to mislead* consumers. Television and internet advertising promised modifications through attorney representation and the "highest rated professionals in the field." *SF 64*. Once consumers were drawn in through that advertising, high-pressure salespeople promised not merely services, but *attorney* services, as well as modifications. *SF 66-67, 199-200*. Defendants designed all of these representations to convince consumers that they would receive both attorney services and modifications. In addition, the Companies' suggestions that modifications would take 90-120 days substantially understated the far less appealing actual time that they took in the rare instances in which consumers obtained modifications. *SF 197-198.* Further, the Companies encouraged consumers to fall behind on their payments if they were not already behind, and encouraged them to stop paying altogether. *SF 68, 212*. Finally, through discouraging comments, the Companies misled consumers about nonprofit alternatives. *SF 192.* All of these types of statements were likely to mislead—and, in this case, *did* mislead—consumers, including through the Companies' unscrupulous hard-sell tactics.

With respect to deception's second element, consumers who were misled by the Companies' representations *acted reasonably* under the circumstances. Defendants' schemes relied on consumers'—financially strapped, vulnerable, and seeking a way out—believing that the Companies would follow through on their promises, and the Companies went to great lengths to make consumers believe. Through television commercials, websites, written materials, and

sales pitches by both salespeople and headquarters attorneys, the Companies induced consumers to believe the misrepresentations and to enroll. *SF 63-69, 188-215.* The Companies lured consumers by appealing to what was, quite understandably, their greatest fear: losing their homes. The Companies told consumers of the "years of experience keeping people in their homes," sparing them from "the brink of disaster." *SF 64.* Not only did salespeople make their sales pitches using scripts designed to push past hesitations typically expressed by consumers, such as a desire to consult with spouses before enrolling, but when the scripts did not close the sale, the bonus-incentivized salespeople made sales pitches well beyond the scripted language. *SF 74-77.* To further the pressure and sales pitches through the "law firm" sham, after consumers listened to the salespersons' hard sell, the Companies required consumers to speak with one of the headquarters attorneys to go over the salesperson's same points. *SF 80-83.* Under these circumstances and conditions, these consumers most certainly acted reasonably.

Finally, regarding deception's third element, the Companies' representations were *material*. The misleading representations were likely to affect—and, as the evidence demonstrates, *did* affect—these struggling consumers' decisions to buy the Companies' services. As a direct result of these strategically crafted false statements, consumers were likely to be persuaded to enroll—and thousands *did* enroll—with the Companies, with detrimental effects. *SF 193-198.* By enrolling, these desperate consumers obligated themselves to pay thousands of dollars to the Companies, with money automatically withdrawn from their accounts every month while they fell farther and farther behind on their mortgage payments. *SF 84-89*. In lieu of such a costly step, the consumers could have obtained mortgage modification assistance for free from nonprofit organizations, and they could have used what limited money they had to pay their mortgage loans or other expenses, rather than to pay the Companies' illegal advance fees in return for, in most cases, nothing. *SF 194-195.*

### E. Individual Defendants Macey, Aleman, Searns, and Stafford Are Liable for Their Actions and the Actions of TMLG and CFLG

Macey, Aleman, Searns, and Stafford are liable for the violations of Regulation O and the CFPA described herein. Courts in the Seventh Circuit hold individuals liable for the acts of companies under the FTCA (which previously governed Regulation O) when the individuals have (1) "participated directly" in the company's acts or had the "authority to control" them, and (2) either "knew or should have known" about the deceptive practices. *FTC v. Bay Area*

*Business Council, Inc.,* 423 F.3d 627, 636 (7th Cir. 2005) (citing *FTC v. Amy Travel Svc., Inc.,* 875 F.2d 564, 573 (7th Cir. 1989). The same standard should apply here. Furthermore, the CFPA provides that "related persons" are "covered persons" for purposes of the CFPA's prohibition of unfair, deceptive, or abusive acts or practices. 12 U.S.C. § 5481(25)(B). Related persons, in turn, are defined to include directors, officers, or employees who "materially participate" in the conduct of an entity's affairs and are "charged with managerial responsibility for" an entity. 12 U.S.C. § 5481(25)(C).

Macey, Aleman, Searns, and Stafford are liable under Regulation O because they "participated directly in the practices or acts or had authority to control them." *Fed. Trade Comm'n v. Construct Data Publishers,* No. 13-CV-01999, 2014 WL 7004999, at *7-8 (N.D. Ill. Dec. 11, 2014) (quoting *Amy Travel,* 875 F.2d at 573). Authority to control the Companies can be evidenced by active involvement in business affairs as well as the making of corporate policy, including the assumption of the duties of a corporate officer. *Amy Travel,* 875 F.2d at 573-74 (citing *FTC v. Kitco of Nevada, Inc.,* 612 F. Supp. 1282, 1292 (D. Minn. 1985)); *see, e.g., Consumer Sales Corp. v. FTC,* 198 F.2d 404, 408 (2d Cir. 1952). The standard for individual liability for officers of a corporation also applies to limited liability companies. *See FTC v. Pac. First Benefit, LLC,* 472 F. Supp. 2d 974 (N.D. Ill. 2007).

The facts below show that each of the individual defendants was an attorney who thus would have had even greater knowledge of and responsibility for what constituted Regulation O violations and deceptive practices than the average businessperson might possess. The facts also show that each of the individual defendants was a managing partner of one or both of the Companies, was extensively involved in the Companies' business affairs, and had the requisite knowledge and control for the Court to hold them individually liable. *See, e.g., Amy Travel,* 875 F.2d at 574.

**1. Macey's Liability for TMLG and CFLG**

Macey was an attorney, founding member, managing partner, and majority owner in TMLG and CFLG, with a 76.6% ownership interest in TMLG and an approximately 78% ownership interest in CFLG after July 2012. *SF 9, 11, 13*. As the majority shareholder in the Companies, Macey had the ability to make day-to-day operational decisions, financial decisions, policy decisions, and large decisions for both entities. *SF 12*.

Macey approved the Companies' business plans and the structure of the Companies' operations. *SF 12, 216, 219*. He reviewed and negotiated vendor contracts and reviewed and approved some of the Companies' policies, processes, and procedures. *SF 216*. He reviewed reports and suggested changes to operations when appropriate. *SF 216*. Macey had final decision-making authority on major decisions and could weigh in on the Companies' operations whenever he desired. *SF 12, 217-218*. As a result, Macey is individually liable as a related person, and as someone who had managerial responsibility for and was a controlling shareholder of the Companies, who materially and directly participated in the Companies' affairs, who had authority to control the Companies' conduct, and who knew or should have known about the Companies' deception and other violative acts.

**2. Aleman's Liability for TMLG and CFLG**

Aleman was an attorney, founding member, and managing partner in charge of operations at TMLG and CFLG. He managed the day-to-day operations at the Companies, and he owned a 14% share of TMLG and a 16.98% share of CFLG. *SF 14, 16-17, 20*. Aleman had managerial responsibility for TMLG at all times, and for CFLG after July 2012. *SF 14, 17-19, 225-227, 230*. He had authority to hire and fire employees, and he had ultimate authority to manage everyone who worked for the Companies. *SF 226-227, 231*.

Aleman was intimately familiar with – and directed – the Companies' operations. He developed and approved the Companies' mortgage assistance relief services by reviewing and approving the Companies' policies and procedures, retainer agreements with consumers, Class B agreements with local attorneys, and checklists and instructions to local attorneys. *SF 225-227, 232-234*. He approved the use of local attorneys in states in which the Companies operated, the creation of content on CFLG's website, and the payment of monetary bonuses to the Companies' salespersons. *SF 225-227, 232-234*. In addition to managing the day-to-day operations, Aleman also made business decisions about the Companies' direction. *SF 225-226, 232*.

Indeed, Aleman had so much control—yet so little interest in complying with the law—that when TMLG's own compliance officer tried to investigate compliance concerns about TMLG's marketing practices, Aleman instructed the compliance officer to "back off," and then terminated him just a few days later. *SF 78*. As a result of all of this extensive knowledge, participation, and control, Aleman is individually liable as a related person, and as someone who had managerial responsibility for the Companies, who materially and directly participated in the

Companies' affairs, who had authority to control the Companies' conduct, and who knew or should have known about the Companies' deception and other violative acts.

**3. Searns's Liability for TMLG**

Searns was an attorney and founding member of TMLG, with an approximately 9% ownership interest in the company. *SF 21, 25*. He was intimately familiar with TMLG's operations and practices. *SF 24, 236-237*. He served as the general counsel and ethics counsel of TMLG. *SF 22, 235*. In his role as general counsel, Searns was responsible for creating the business model for TMLG and setting up TMLG with regard to ethics and regulatory issues. *SF 23, 236*. In addition, Searns oversaw the operation of TMLG and had the ability to make day-to-day compliance decisions for TMLG. *SF 24, 235*. He had managerial responsibility for TMLG, serving as TMLG's partner for ethics, compliance, and regulatory matters. *SF 24, 235*. He materially participated in the conduct of TMLG's affairs, including in the development and approval of TMLG's mortgage assistance relief services, by creating policies and procedures for TMLG, directing client processing managers, and addressing escalated client matters. *SF 236*.

Searns helped set up TMLG to have independent contractors handling mortgage loan modification processing. *SF 236*. Searns's responsibilities included instructing the managers in charge of client support, processing, and document collection, and providing them with instructions on training and procedure, thereby creating policy and protocol for them. Searns also audited TMLG processors and other staff, and investigated and responded to complaints from consumers and regulatory authorities. *SF 236*. He reviewed and approved the local attorney agreements, the TMLG retainer agreement and Exhibit A to that agreement that consumers signed, scripts, and other communications provided to consumers. *SF 236*. As a result, Searns is individually liable as a related person, and as someone who had managerial responsibility for TMLG, who materially and directly participated in TMLG's affairs, who had authority to control TMLG's conduct particularly in his roles as general counsel and ethics counsel, and who knew or should have known about TMLG's deception and other violative acts.

**4. Stafford's Liability for CFLG**

As CFLG's sole owner from January to July 2012, Stafford had complete managerial authority over it. *SF 238*. As sole owner, he made all business decisions and managed its day-to-day operations. *SF 27, 238-239*.

After July 2012, Stafford sold 95% of CFLG to Macey and Aleman, but he maintained a 5% partnership interest. *SF 28, 241*. He remained involved in the company, actively participated in the screening of new local attorneys, and, on behalf of CFLG as a managing member, actively participated in the drafting of letters in response to consumer complaints from the BBB or state regulators. *SF 242, 244-245*. Stafford had intimate knowledge of CFLG's business through weekly phone calls with Aleman, notes on the client management system, and visits to CFLG's headquarters in Chicago. *SF 243, 246*. Throughout his affiliations with CFLG, Stafford was an attorney. *SF 30.*

As a result of this wide-ranging knowledge, participation, and control, Stafford is individually liable as a related person, and as someone who had managerial responsibility for CFLG, who was a controlling shareholder of CFLG at its inception and for a significant period thereafter, who materially and directly participated in CFLG's affairs, who had authority to control CFLG's conduct, and who knew or should have known about CFLG's deception and other violative acts.

**F. Remedies**

The CFPA authorizes courts to order any appropriate legal or equitable relief with respect to any violation of Federal consumer financial law, including a violation of a rule or order prescribed under a Federal consumer financial law. 12 U.S.C. § 5565(a)(1). Violations of Federal consumer financial law include, as here, both Regulation O violations and CFPA violations based on deceptive acts and practices. 12 U.S.C. § 5481(14). The relief that the Court may order includes disgorgement, restitution, compensation for unjust enrichment, limits on the activities or functions of persons, and civil money penalties. 12 U.S.C. § 5565(a)(1), (2).

**1. Disgorgement and Restitution**

On behalf of the consumers harmed by Defendants' unlawful conduct, the Bureau seeks from Defendants both disgorgement and restitution. Disgorgement is an equitable remedy designed to deprive wrongdoers of their ill-gotten gains or unjust enrichment, and to deter others from violating the law. *SEC v. Collins*, No. 01 C 3085, 2003 WL 21196236, at *5 (N.D. Ill. May 21, 2003) (citing *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1230 (D.C. Cir. 1989)). The Court has broad discretion in fixing the amount to be disgorged, and it should reasonably approximate the amount of unjust enrichment. *Collins*, 2003 WL at 21196236, *5 (citing *SEC v. First Jersey Secs*, 101 F.3d 1450, 1474 (2d Cir. 1996); *SEC v. Patel*, 61 F.3d 137, 139 (2d Cir.

1995)). In this case, given that the Companies charged fees to consumers in violation of Regulation O, and that the consumers enrolled with the Companies and paid the fees as a result of a multitude of deceptive practices that violated the CFPA, Defendants should be required to disgorge all of those amounts as ill-gotten gains. In addition, the appropriate measure for restitution is "the amount paid by the consumer victims of an illegal scheme, less any amounts previously returned to the victims." *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013, 1019 (N.D. Ind. 2000) *aff'd*, 312 F.3d 259 (7th Cir. 2002).

The advance fees that TMLG and CFLG requested and received from consumers violated Regulation O regardless of whether or not the consumers ultimately obtained mortgage loan modifications after retaining TMLG or CFLG. Accordingly, the Bureau seeks judgment against TMLG, Macey, Aleman, and Searns, jointly and severally, in the amount of $18,331,737, as restitution for the unlawful advance fees that TMLG requested and received from May 2011 to January 2013. *SF 87, 179*. The Bureau seeks judgment against CFLG, Macey, Aleman, and Stafford, jointly and severally, in the amount of $2,992,296, as restitution for the unlawful advance fees that CFLG requested and received from May 2012 through January 2013.[4] *SF 88, 180*. To the extent that any portions of these amounts cannot be returned to consumers as restitution, the Bureau asks the Court to order that Defendants part with such portions as disgorgement of ill-gotten gains.

**2. Injunctive Relief**

The CFPA authorizes courts to determine appropriate equitable relief, including "limits on the activities or functions of the person." 12 U.S.C. § 5565(a)(1), (2)(G). The Bureau seeks permanent injunctions against Defendants. Permanent injunctions are necessary and appropriate here to protect consumers from future harm that may be caused by Defendants. *United States v. W.T. Grant Co*. 345 U.S. 629, 633 (1953) (holding that a permanent injunction is justified when there is a "cognizable danger of recurrent violation, or some reasonable likelihood of future violations"). Courts in this circuit have enjoined violators for similar practices. *Amy Travel,* 875 F.2d at 564 (granting a permanent injunction against telemarketing firm for violation of section 5 of the FTCA); *FTC v. Pac. First Benefit, LLC,* 472 F. Supp. 2d 974 (N.D. Ill. 2007) (granting a permanent injunction against telemarketing company for violating elements of the FTCA and Telemarketing Sales Rule); *Bay Area Business Council,* 423 F.3d 627 (granting a permanent

[4] These are the net amounts after subtracting sums refunded to consumers from the totals paid.

injunction against corporations for participating in a telemarketing scheme that falsely led consumers to believe they would receive a credit card in exchange for a one-time fee, finding that it was a deceptive trade practice that violated FTCA and Telemarketing Sales Rule).

The Bureau asks the Court to order that Defendants, whether acting directly or through any other person, are permanently restrained and enjoined from marketing, selling, providing, offering to provide, or arranging for others to market, sell, or provide, any mortgage assistance relief services as defined in 12 C.F.R. § 1015.2, and any debt relief products or services. The Bureau also asks the Court to order that Defendants, whether acting directly or through any other person, are permanently restrained and enjoined from engaging in any conduct that violates Regulation O or the CFPA.

**3. Civil Money Penalties**

The CFPA authorizes the Court to issue civil money penalties for violations of Federal consumer financial laws. 12 U.S.C. § 5561(c)(1). The CFPA provides three tiers of civil money penalties, calibrated by scienter. 12 U.S.C. § 5565(c)(2). Each tier establishes a range of discretion, setting a maximum penalty for each violation. The first tier provides for penalties of up to $5,000 "for any violation of a law, rule, or final order or condition imposed in writing by the Bureau." The second tier provides for penalties of up to $25,000 for each violation for "any person that recklessly engages in a violation of a Federal consumer financial law." The third tier provides for penalties of up to $1,000,000 for each violation for "any person that knowingly violates a Federal consumer financial law." Each penalty maximum applies to each day during which the violation continues. 12 U.S.C. § 5565(c)(2)(A)-(C).

Given the egregious nature and extent of Defendants' violations, the penalties in this case should be based on the third tier in the statute, *i.e.,* knowing violations of Federal consumer financial law. Defendants acted knowingly by designing and building the TMLG and CFLG businesses with policies, procedures, practices, and structures designed to give the grossly false impression to consumers that these businesses were "national law firms," that these firms would provide consumers with attorneys, and that these attorneys would provide legal services to consumers to help them obtain mortgage loan modifications. *SF 12, 17-19, 22-24, 27, 29, 216-227, 232-233, 235-236, 238-239, 242-245*. The consumers whom Defendants targeted were not just any consumers, but, rather, consumers who were already desperate and struggling to pay their mortgage loans and other expenses. *SF 35, 188-189*. Moreover, the people who set up

these shams were not just any businessmen, but, rather, attorneys—officers of the court—who had both professional and ethical obligations to conduct themselves in full accordance with the law. *SF 13, 20, 25, 30*. Instead, Defendants designed these sham operations to both exploit and evade the law, and to take advantage of desperate consumers at the same time. Defendants' violations were long-term, pervasive, and systemic, over several years bilking thousands of consumers nationwide out of thousands of dollars, and doing so by design. *SF 87-88, 179-181*. Accordingly, the Bureau asks the Court to award significant civil money penalties against all Defendants, jointly and severally.

## III. CONCLUSION

For the foregoing reasons, the Bureau respectfully requests that the Court enter judgment as requested awarding disgorgement and restitution, enjoining specified acts and practices associated with mortgage assistance and debt relief services, and imposing civil money penalties.

Date: October 9, 2015

Respectfully submitted,


Anthony Alexis (DC Bar #384545)
*Enforcement Director*

David M. Rubenstein (DC Bar #458770)
*Deputy Enforcement Director*

Cynthia Gooen Lesser (NY Bar #2578045)
*Assistant Deputy Enforcement Director*

*/s/Seth B. Popkin*
Seth B. Popkin, DC Bar #417365
Seth.Popkin@cfpb.gov
202-435-9496
Shirley Chiu, IL Bar #6296079
Shirley.Chiu@cfpb.gov
202-435-7592
Leanne Hartmann, MA Bar #667852
Leanne.Hartmann@cfpb.gov
202-435-7453
*Enforcement Attorneys*

Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552