**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

|  |  |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>                              Plaintiff,<br><br>          v.<br><br><br>THE MORTGAGE LAW GROUP, LLP, (D/B/A THE LAW FIRM OF MACEY, ALEMAN & SEARNS), CONSUMER FIRST LEGAL GROUP, LLC, THOMAS G. MACEY, JEFFREY J. ALEMAN, JASON E. SEARNS, and HAROLD E. STAFFORD,<br><br>                              Defendants. | Case No. 3:14-cv-00513 |

**PLAINTIFF'S STATEMENT OF PROPOSED FINDINGS OF FACT**

Plaintiff, the Consumer Financial Protection Bureau (the "Bureau"), hereby submits its Statement of Proposed Findings of Fact in support of Plaintiff's Motion for Summary Judgment. The following represents material facts not in dispute:

I.      **Parties**

     A. *Consumer Financial Protection Bureau*

1.      The Bureau is an independent agency of the United States charged with regulating the offering and provision of consumer financial products or services under federal consumer financial laws, including the Consumer Financial Protection Act and Regulation O. 12 U.S.C. §§ 5481(12)(Q), (14), 5491(a), 5531, 5538(a).

1

### B.  The Mortgage Law Group, LLP

2.       The Mortgage Law Group, LLP ("TMLG") was a Nevada limited liability

partnership with its principal place of business at 233 S. Wacker Dr., Suite 5150, Chicago,

Illinois. TMLG Corporate Filing, Plaintiff's Motion for Summary Judgment ("Pl.'s Mot. Summ.

J.") Ex. 1.

3.       Beginning January 2011, TMLG offered, provided, or arranged for others to

provide "mortgage assistance relief services," as those terms are defined in Regulation O, 12

C.F.R. § 1015.2, and provided "financial advisory services" within the meaning of the CFPA, 12

U.S.C. § 5481(15)(A)(viii), including, but not limited to, providing services to assist a consumer

with modifying the terms of an extension of credit.  Deposition of Kelly Patrick Sibert, April 23,

2015 ("Sibert Dep."), ECF No. 77, at 51, 54.

4.       After approximately November 2013, TMLG ceased providing services to

consumers and stopped operating.  Aleman Dep., ECF No. 76, at 20-21; Exhibit A to Declaration

of Ryan Thomas, ECF No. 95.

5.       On April 7, 2014, TMLG filed a voluntary Chapter 7 bankruptcy petition, and that

petition is pending.  TMLG Bankruptcy Petition, Pl.'s Mot. Summ. J. Ex. 37.

### C.  Consumer First Legal Group, LLC

6.       Consumer First Legal Group, LLC ("CFLG") was a Wisconsin limited liability

company with its principal places of business located at 2810 Crossroads Drive, Suite 4000,

Madison, Wisconsin, and at 233 S. Wacker Dr., Suite 5150, Chicago, Illinois.  CFLG Corporate

Filing, Pl.'s Mot. Summ. J. Ex. 2; CFLG Operating Agreement, Pl.'s Mot. Summ. J. Ex. 3, at

DEF.000168.

7.       Beginning January 2012, CFLG offered, provided, or arranged for others to

provide "mortgage assistance relief services," as those terms are defined in Regulation O, 12

C.F.R. § 1015.2, and provided "financial advisory services" within the meaning of the CFPA, 12 U.S.C. § 5481(15)(A)(viii), including, but not limited to, providing services to assist a consumer with modifying the terms of an extension of credit.  Deposition of CFLG 30(b)(6) Corporate Representative Harold E. Stafford Part 1 ("Stafford CFLG 30(b)(6) Dep. Part 1"), June 3, 2015, ECF No. 64, at 20; Deposition of CFLG 30(b)(6) Corporate Representative Jeffrey John Aleman Part 1 ("Aleman CFLG 30(b)(6) Dep. Part 1"), May 19, 2015, ECF No. 66, at 35.

8.      After approximately July 2013, CFLG ceased providing services to consumers and stopped operating.  Deposition of Jeffrey John Aleman, May 20, 2015 ("Aleman Dep."), ECF No. 76, at 13; Exhibit B to Declaration of Ryan Thomas, ECF No 95.

**D. Thomas G. Macey**

9.      Thomas G. Macey ("Macey") was a founding member, managing partner, and majority owner in TMLG, with a 76.6% ownership interest. Deposition of Thomas Macey, May 27, 2015 ("Macey Dep."), ECF No. 78, at 9-12; Aleman Dep., ECF No. 76, at 23, 34, 48, 240.

10.     In July 2012, Macey and Jeffrey J. Aleman ("Aleman") together purchased a 95% interest in CFLG from Harold E. Stafford ("Stafford").  Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 33; Aleman Dep., ECF No. 76, at 13; Deposition of CFLG 30(b)(6) Corporate Representative Thomas Macey ("Macey CFLG 30(b)(6) Dep."), ECF No. 68, at 12-13.

11.     Since July 2012, Macey was a partner with an approximately 78% interest in CFLG. Macey CFLG 30(b)(6) Dep., ECF No. 68, at p 17; CFLG Operating Agreement, Pl.'s Mot. Summ. J. Ex. 3, at DEF.000172.

12.     As the majority shareholder in TMLG and CFLG (collectively, the "Companies") Macey had the ability to make day-to-day operational decisions, financial decisions, policy decisions, and large decisions for both entities. Macey Dep., ECF No. 78, at 47-48; Macey

CFLG 30(b)(6) Dep., ECF No. 68, at 24, 28-29, 31; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 33, 101-102; Aleman Dep., ECF No. 76, at 48.

13.     At all relevant times, Macey was an attorney licensed in Illinois. Macey CFLG 30(b)(6) Dep., ECF No. 68, at 10-11.

   **E.  Jeffrey J. Aleman**

14.     Aleman was a founding member and managing partner in charge of operations of TMLG, with a 14% interest. Aleman Dep., ECF No. 76, at 23-24, 27, 29, 30, 45.

15.     Aleman worked for TMLG for the duration of the company. Aleman Dep., ECF No. 76, at 15, 20.

16.     Since July 2012, Aleman was a partner with an approximately 16.98% interest in CFLG. CFLG Operating Agreement, Pl.'s Mot. Summ. J. Ex. 3, at DEF.000172.

17.     Aleman managed the day-to-day business and operations of TMLG and CFLG, and he had authority to manage all employees or independent contractors of the companies, and to make or delegate all company decisions for both Companies.  Jeffrey Aleman Answers to Interrogatories, Pl.'s Mot. Summ. J, Ex. 32, p. 8-9 (answer to ¶7); Aleman Dep., ECF No. 76, at 27, 29-30, 31-33, 37, 40-41, 46-47, 147, 282-83; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 14 and 27.

18.     Aleman made decisions and engaged in other conduct pertaining to the day-to-day operations of TMLG, including, but not limited to, serving as the managing partner in charge of operations, developing its loan modification services, creating its policies, and managing all associated personnel and nearly every aspect of the business. Aleman has the most knowledge about TMLG's operations.  Jeffrey Aleman Answers to Interrogatories, Pl.'s Mot. Summ. J, Ex. 32, p. 8-9 (answer to ¶7); Aleman Dep., ECF No. 76, at 27, 29-30, 31-33, 37, 40-41, 46-47, 147, 282-83.

4

19.     Aleman made decisions pertaining to the day-to-day operations of CFLG, including, but not limited to, decisions about enrollment of consumers, purchasing of CFLG, the opening of an office in Florida, the hiring and firing of employees, use of payment processors, payments of bonuses to salespeople, the CFLG website, processes and procedures, retainer agreements, and roles of local attorneys.  Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 13, 101, 209; Deposition of CFLG 30(b)(6) Corporate Representative Jeffrey John Aleman Part 2, ("Aleman CFLG 30(b)(6) Dep. Part 2"),  June 3, 2015, ECF No. 67, at 390, 416-417, 448.

20.     At all relevant times, Aleman was an attorney licensed in Illinois and Wisconsin. Aleman Dep., ECF No. 76, at 10.

### F.  Jason E. Searns

21.     Jason E. Searns ("Searns") was a Class A Member and founding partner of TMLG, with an 8% interest that later was changed for accounting reasons to a 9.1% interest in the company. Deposition of Jason Searns, May 28, 2015 ("Searns Dep."), ECF No. 74, at 17-18, 23, 33-34.

22.     Searns served as the general counsel and ethics counsel of TMLG. Searns Dep., ECF No. 74, at 17-18; Jason Searns Response to Interrogatories, Pl.'s Mot. Summ. J. Ex. 38, p. 7-8 (answer to ¶ 7).

23.     In his role as general counsel, Searns was responsible for setting up TMLG with regard to ethics and regulatory issues. Searns Dep., ECF No. 74, at 25.

24.     As the general counsel and minority shareholder in TMLG, Searns oversaw the operation of TMLG from a compliance standpoint and had the ability to make day-to-day compliance decisions and other significant decisions for TMLG. Searns Dep., ECF No. 74, at 24, 38-40, 62-63, 81-83.

25.      At all relevant times, Searns was an attorney licensed in Colorado. Searns Dep., ECF No. 74, at 26; Jason Searns Response to Interrogatories, Pl.'s Mot. Summ. J. Ex. 38, p. 6 (answer to ¶ 3).

### G. Harold E. Stafford

26.      From at least January 2012 until July 2012, Stafford was the sole owner, founder, and operator of CFLG.  Stafford CFLG 30(b)(6) Dep. Part 1, ECF No. 64, at 20-21; Deposition of CFLG 30(b)(6) Corporate Representative Harold Stafford Part 2, July 22, 2015 ("Stafford CFLG 30(b)(6) Dep. Part 2"), ECF No. 65, at 144; CFLG Operating Agreement, Pl.'s Mot. Summ. J. Ex. 3, at DEF.000172.

27.      Prior to July 2012, as the sole owner and founder of CFLG, Stafford oversaw the operation of CFLG, managed the day-to-day activities, and made business decisions for CFLG. Stafford CFLG 30(b)(6) Dep. Part 2, ECF No. 65, at 69-101.

28.      In July 2012, Stafford sold 95% of CFLG to Macey and Aleman, and retained a 5% interest in the company.  Stafford CFLG 30(b)(6) Dep. Part 2, ECF No. 65, at 144; CFLG Operating Agreement, Pl.'s Mot. Summ. J. Ex. 3, p. DEF.000172.

29.      Since July 2012, Stafford continued to have managerial responsibility for aspects of CFLG's operations. Stafford Amended Answer to Complaint, ECF No. 44, at 9 (answer to ¶ 34).

30.      At all relevant times, Stafford was an attorney licensed in Wisconsin. Harold Stafford Answers to Interrogatories, Pl.'s Mot. Summ. J. Ex. 31, at 5 (answer to ¶ 5); Deposition of Harold E. Stafford, July 23, 2015 ("Stafford Dep."), ECF No. 72, at 122.

## II.     Material Facts Not in Dispute Supporting the Violations
### A.     *Thomas G. Macey, Jeffrey J. Aleman, Jason E. Searns, and the Creation of The Mortgage Law Group*

31.     Macey and his partners operated TMLG to provide purported mortgage assistance relief services under the guise of a law firm. TMLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 4; Macey Dep., ECF No. 78, at 9.

32.     Macey and his partners, Aleman and Searns, have repeatedly set up national debt and mortgage relief schemes that sell purported legal services to financially desperate customers. Macey Dep., ECF No. 78, at 85-87, 89-90; Macey CFLG 30(b)(6) Dep., ECF No. 68, at 14, 21-22, 27, 39-40.

33.     Macey, Aleman, and Searns together devised this business model, which they touted as a "national law firm."  Aleman Dep., ECF No. 76, at 53-55; Macey Dep., ECF No. 78, at 15, 31-32, 37-38.

34.     The so-called "national law firm" approach has marketing appeal to desperate consumers because Defendants convince them that lawyers will have a greater ability to help them with their difficulties, or get a better result. Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000158-000159.

35. However, in reality, most of the employees of these firms, like TMLG or CFLG, are either salespeople or document processors, and nearly all the work for these so-called "national law firms" is done by these non-attorneys. Aleman Dep., ECF No. 76, at 53-58; Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 295-316; Deposition of Victor Matthew Anderson, July 2, 2015 ("Anderson Dep."), ECF No. 79, at 47-48, 58, 65-66, 69-70; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, p. 53, 54; Sibert Dep. ECF No. 77, at 123-124, 126.

36.     While most of the work of these businesses was centralized in just a few states, Defendants crafted their "national law firm" business model to have a presence in as many states as possible from east to west.  Aleman Dep., ECF No. 76, at 53-58.

37.     Defendants achieved this by using what they called "local counsel" in many states, some with multiple bar licenses, attorneys whom Defendants misleadingly called "partners" or "Class B members" of the so-called "national law firm." Deposition of William P. Harrington, Jr. June 17, 2015 ("Harrington Dep.") ECF No. 81, at 37, 45, 48, 62-64, 115, 117-18, 153-54, 157, 214, 220-21; Deposition of Jacqueline Delgado, April 9, 2015 ("Delgado Dep."), ECF No. 73, at105-108; Deposition of Frank Grey Powell, July 15, 2015 ("Powell Dep."), ECF No. 71, p. 64-65, 171; Declaration of Edith Gray, ECF No. 94, ¶¶ 4-5; TMLG Class B Agreement, Pl.'s Mot. Summ. J. Ex. 12; CFLG Class B Agreement, Pl.'s Mot. Summ. J. Ex. 18; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, p. 107.

38.     These "local counsel" did nothing more than duplicate the non-legal work of non-attorney processors or salespeople, and the non-legal work of the headquarters attorneys, and provided no state-specific legal expertise.  Sibert Dep., ECF No. 77, at 92-93, 98-100; Harrington Dep., ECF No. 81, at 31, 43-44, 46, 53, 96-97, 109, 234; Deposition of Daniel Goldsmith Ruggiero, July 8, 2015 ("Ruggiero Dep."), ECF No. 70, at 90-91; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 125-127, 161-164.

39.     A review of Macey and his partners' histories reveals that they have operated this purported "national law firm" business model for consumers in bankruptcy, then debt relief, and then mortgage assistance relief. Macey Dep., ECF No. 78, at 85-87, 90.

40.     This business model was used for both TMLG and CFLG, which were run in a nearly identical manner. Macey CFLG 30(b)(6) Dep., ECF No. 68, at 13, 15; Deposition of Jay L. Gerst, June 24, 2015 ("Gerst Dep."), ECF No. 75, at 113-116.

8

### B. *The Mortgage Law Group Background*

41.     In 2011, Macey and Aleman were using their "national law firm" ruse to sell debt relief services to struggling consumers through Legal Helpers Debt Resolution, LLC ("LHDR"). Macey Dep., ECF No. 78, at 23, 54, 86-87.

42.     Seeing that LHDR was doing well, Macey and his partners saw a business opportunity to expand their debt relief business to consumers seeking mortgage assistance relief and desperate to save their homes. Macey Dep., ECF No. 78, at 9-10.

43.     Defendants thus expanded their business even though they had no experience with mortgage assistance relief or foreclosure defense. Sworn Statement of Aaron Cushman, Pl.'s Mot. Summ. J. Ex. 9, at 29-30, 33-35.

44.     Instead, they relied on so-called "strategic alliances" with back-end processors who did have such experience in order to break into the business of mortgage modification services. Sworn Statement of Aaron Cushman, Pl.'s Mot. Summ. J. Ex. 9, at 29-30, 33-35.

45.     Therefore, sometime in 2011, Macey, Aleman, and Searns, relying on the non-legal expertise of these back-end processors, started marketing mortgage assistance relief services through LHDR, along with the debt relief services. Searns Dep., ECF No. 74, at 23-25; LHDR Class B Agreement, Pl.'s Mot. Summ. J. Ex. 10, at CFPB-TMLG-0052813, ¶(a),  CFPB-TMLG-0052818, ¶A.1.

46.     True to the so-called "national law firm" model, LHDR contracted with local attorneys – attorneys with licenses in states other than those in which the LHDR attorneys were licensed. The contracts specified that the role of local attorneys was to review mortgage loan modification submission packages, and that local attorneys would be paid specifically for that role, from $25 to $40 per file approved.  LHDR Class B Agreement, Pl. Mot. Summ. J. Ex. 10, at CFPB-TMLG-0058218.

47.     One day in early 2011, Macey, Aleman, and Searns rebranded the mortgage assistance relief services arm of LHDR with TMLG's name. Sibert Dep., ECF No. 77, p. 54.

48.     LHDR employees and "local attorneys" involved with the mortgage modification work at LHDR found that on or around January 31, 2011, they were suddenly working for TMLG. Sibert Dep., ECF No. 77, at 54; Delgado Dep., ECF No. 73, at 27, 29, 32, 36.

49.     At its peak, TMLG operated its business in 34 to 35 states.  However, nearly all of the actual work of the company was done in only a few states: Illinois, Florida, and Arizona. Aleman Dep., ECF No. 76, at 53-58.

50.     When regulators began investigating TMLG in 2012 and TMLG's Better Business Bureau ("BBB") rating plummeted to "F," Macey and Aleman purchased CFLG. CFLG then provided the same services in the same fashion using the same model as TMLG. Stafford CFLG 30(b)(6) Dep. Part 2, ECF No. 65, p. 132 and 137; Anderson Dep., ECF No. 79, at 43-51; Searns Dep., ECF No. 74, at 108-109.

51.     The State Attorneys General in Arizona, Missouri, and Indiana sued TMLG for violations of state law, and they have entered into consent orders with TMLG prohibiting the company from doing business in those states. Arizona TMLG Consent Order, Pl.'s Mot. Summ. J. Ex. 5; Missouri TMLG Consent Order, Pl.'s Mot. Summ. J. Ex. 6; Indiana TMLG Consent Order, Pl.'s Mot. Summ. J. Ex. 7.

C.  *Consumer First Legal Group Background*

a.  CFLG Background and Structure

52.     Beginning at least January 1, 2012, and continuing to July 2012, Stafford owned and managed CFLG from an office in Madison, Wisconsin.  Harold Stafford's Amended Answer to the Complaint ("Stafford Amended Answer"), ECF No. 44, p. 4 (answer to ¶ 11), p. 8 (answer to ¶ 32).

10

53.     Stafford ran CFLG in an attempt to use the "national law firm" model, purporting to provide mortgage mitigation services to consumers in financial distress in exchange for advance fees from consumers.  Stafford CFLG 30(b)(6) Dep. Part 1, ECF No. 64 at 21; Stafford CFLG 30(b)(6) Dep. Part 2, ECF No. 65, at 108-110.

54.     Stafford tried to get CFLG off the ground in the volume business of the "national law firm" model by relying on a back office processing company that collected, assembled, and submitted loan modification application packages to lenders, making arrangements with local attorneys with licenses in 15 states, and collaborating with another purported "national law firm" in Florida called Consumer Defense Attorneys. Stafford CFLG 30(b)(6) Dep. Part 1, ECF No. 64, at 20-21, 25-26, 29-32; Stafford Amended Answer, ECF No. 44, at 4 (answer to ¶ 11), at 8 (answer to ¶ 32).

55.     During this time, only 27 consumers enrolled in CFLG's services, seeking mortgage loan modifications. Stafford CFLG 30(b)(6) Dep. Part 1, ECF No. 64, at 28.

56.     Despite paying an initial fee of $1,300, with subsequent monthly payments of $600 to $650 withdrawn directly from their bank accounts, only 13 (or 48%) of CFLG's 27 consumers who enrolled in or before July 2012 received loan modifications. Declaration of Ryan Thomas, ECF No. 95, p. 3 ¶ 16; Stafford CFLG 30(b)(6) Dep. Part 2, ECF No. 65, at 69-70, 72-73, 76-77, 80-81, 84, 109; Stafford CFLG 30(b)(6) Dep. Part 1, ECF No. 64, p. 33.

b. <u>Macey and Aleman Purchase of Majority of CFLG</u>

57.      In July 2012, Stafford sold 95% of CFLG to Macey and Aleman, and Stafford retained a 5% stake in the company. Stafford CFLG 30(b)(6) Dep. Part 2, ECF No. 65, p. 144; CFLG Operating Agreement, Pl.'s Mot. Summ. J. Ex. 3, at DEF.000172.

58.     Macey, Aleman, and Stafford built CFLG into the same business model as TMLG, using almost entirely the same employees and nearly identical written agreements with

11

consumers and local attorneys, under only slightly different ownership. TMLG Operating

Agreement, Pl.'s Mot. Summ. J. Ex. 16; CFLG Operating Agreement, Pl.'s Mot. Summ. J. Ex. 3;

TMLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 4; CFLG Retainer Agreement, Pl.'s Mot.

Summ. J. Ex. 17; TMLG Class B Agreement, Pl.'s Mot. Summ. J. Ex. 12; CFLG Class B

Agreement, Pl.'s Mot. Summ. J. Ex. 18.

59.     While consumers already in the pipeline at TMLG remained with that entity,

Macey, Aleman, and Searns stopped enrolling new TMLG consumers and instead new

consumers were enrolled into CFLG shortly after July 2012. Anderson Dep., ECF No. 79, at 47-

48, 69-70; Gerst Dep., ECF No. 75, at 112; Stafford CFLG 30(b)(6) Dep. Part 2, ECF No. 65, at

157-158.

60.     After July 2012, just as TMLG's BBB rating had plummeted in the past, CFLG's

BBB rating plummeted to "F," and it received complaints from state regulators and the BBB.

CFLG stopped enrolling new consumers in November 2012. Stafford Dep., ECF No. 72, at 86;

Stafford CFLG 30(b)(6) Dep. Part 2, ECF No. 65, at 179-181.

61.     The Indiana Attorney General sued CFLG and entered into a consent decree with

CFLG prohibiting it from doing business in Indiana. Indiana CFLG Consent Order, Pl.'s Mot.

Summ. J. Ex. 8.

62.     Ultimately, both TMLG and CFLG failed. Aleman Dep., ECF No. 76, at 59-60.

### D.  TMLG and CFLG Operations

a.  Marketing and Sales

63.     TMLG and CFLG consumers were drawn in through misleading advertising on

television and on the internet that promised mortgage loan modifications through attorney

representation.  Declaration of Tim Ledbetter, ECF No. 92, ¶¶ 2-5; Declaration of Montez

Saunders, ECF No. 91, ¶¶ 3-5; Declaration of Brett Peterson, ECF. No. 84, ¶¶ 3, 5; Declaration of Daniel Teynor, ECF No. 85, ¶¶ 2-4; Declaration of Fadi Halwani, ECF No. 86, ¶¶ 2-4.

64.     CFLG's website described CFLG as "one of the most sophisticated consumer protection law firms in the country" with over 100 associate attorneys "insuring the best possible outcome during uncertain times." The website also made representations about the quality of services CFLG would provide, such as: "[w]hile foreclosure scams are rampant, our mortgage relief specialists are some of the highest rated professionals in the field;" and "[CFLG attorneys] have years of experience keeping people in their homes and have a long list of testimonials from people who were on the brink of disaster."  CFLG Amended Answer to Complaint, ECF No. 41, p. 9-10 (answer to ¶ 37 and answer to ¶ 38).

65.     TMLG and CFLG paid lead generators who sold the information of consumers who called a phone number shown on television advertisements to TMLG, CFLG, and other companies like them. Aleman Dep., ECF No. 76, at 83-87; Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 412-415; Anderson Dep., ECF No. 79, at 93.

66.     Consumers interacted with high-pressure salespeople who promised consumers that TMLG and CFLG could provide them with modifications of their mortgages. Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000153; Declaration of Daniel Teynor, ECF No. 85, ¶ 12; Declaration of Tim Ledbetter, ECF No. 92, ¶ 4; Declaration of George Halpin, ECF No. 88, ¶ 4; Declaration of Mark Pultz, ECF No. 90, ¶ 4; Declaration of Montez Saunders, ECF No. 91, ¶ 4; Declaration of Veronica Bruce, ECF No. 93, ¶ 3; Anderson Dep., ECF No. 79, at 103-105, 113, 123-124.

67.     TMLG and CFLG salespeople told consumers that they would receive attorney services.  Aleman Dep., ECF No. 76, at 105; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33

(filed under seal), at TMLG.MO.LIT.000152-000154; Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 449-451; Anderson Dep., ECF No. 79, at 110-111.

68.     Salespeople told consumers they could not receive loan modifications unless they were behind on their mortgage payments. Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154.

69.     Salespeople also told consumers that they did not have to make any payments to their lenders until their mortgage loan was modified, and that the lender would incorporate all past due payments into the loan modification. Declaration of Brett Peterson ECF No. 84, ¶ 11; Declaration of Daniel Teynor ECF No. 85, ¶ 12; Declaration of Mark Pultz ECF No. 90, ¶ 11.

70.     Salespeople employed "boiler room"-style sales tactics during intake to lure consumers to enroll in TMLG's mortgage modification services. Anderson Dep., ECF No. 79, at 24-26, 29-32, 50-51, 73-76, 97-101.

71.     The role of a salesperson was to field calls to and from consumers to get consumers to agree to sign up for TMLG's services using a "fronter" and "closer" model, typical for boiler room sales floors. Anderson Dep., ECF No. 79, at 24-26, 74-75, 265.

72.     The fronters' role included establishing communication and rapport with consumers, while the closers' role included explaining the service to consumers and asking consumers to retain TMLG's services. Deposition of William August Murphy II, July 1, 2015 ("Murphy Dep."), ECF No. 80, at 56-57.

73.     Salespeople, who were supervised by non-attorneys, far outnumbered attorneys at the Companies' Chicago headquarters. For example, in early- to mid-2012, TMLG had approximately 30-40 "fronters" and 15-20 "closers" at its headquarters offices in Chicago. Both Companies, however, had fewer than 5 attorney employees. Anderson Dep., ECF No. 79, at 47-

14

48, 69-70. Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 53, 54; Sibert Dep., ECF No. 77, at 123-124, 126; Anderson Dep., ECF No. 79, at 58, 65-66, 69-70.

74.    The Companies incentivized and rewarded the salespeople for signing up struggling homeowners by paying them bonuses in addition to their hourly wages.  TMLG based the bonuses on the number of consumers to whom the salespeople spoke, whom they enrolled in the program, and of those, how many paid the initial retainer fee. Aleman Dep., ECF No. 76, at 97-98; Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 445-447; Anderson Dep., ECF No. 79, at 101-103.

75.    When a consumer did not immediately enroll, salespeople read from a collection of scripts specifically designed to persuade consumers to overcome any hesitations the consumers may have had so that the consumers ultimately enrolled in the program. Anderson Dep., ECF No. 79, at 50-51, 171-172, 222-223; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000155-000169.

76.    These scripts include content on what to tell consumers if they wanted to talk to their spouse before enrolling in the program, if they wanted to negotiate with their lenders themselves, if they objected that the program cost too much, or, if because of the company's BBB rating they wanted to cancel after they were already enrolled. Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000155-000169.

77.    Salespeople used the scripts as a basic template to sell mortgage loan modification services, but they often made representations that went well outside of the scripted language in order to secure a sale. Anderson Dep., ECF No. 79, at 68-69, 93, 99-106, 113; Murphy Dep., ECF No. 80, at 56-57.

78.    When TMLG's compliance officer pressed to review TMLG's marketing materials for compliance upon hearing about marketing compliance problems at TMLG's Florida

location, Aleman told the compliance officer to "back off" and terminated him from TMLG four days later. Murphy Dep., ECF No. 80, at 87-88, 99-100, 124-125.

79.     At least one former TMLG salesperson was demoted from "closer" to "fronter" by one of the sales managers because he "wasn't selling enough" or pushing consumers enough to close on the same day as the initial sales call. Murphy Dep., ECF No. 80, at 58-59, 81-83.

80.     The next stage in the sales process after a salesperson collected payment information and qualified and enrolled a consumer for TMLG's or CFLG's services was for the consumer to speak to an attorney at TMLG or CFLG headquarters. The attorney read the consumer a script that repeated the same points made by the salesperson's script and repeated the qualification process.  Aleman Dep., ECF No. 76, at 28, 92; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 145-146, 149-150; Sibert Dep., ECF No. 77, at 134-136.

81.     The headquarters attorney's script consisted of statements about TMLG or CFLG's services, and the consumer was required to answer "yes" after each statement to indicate he or she understood what was being read to him or her. Sibert Dep., ECF No. 77, at 134-136; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 150-151; TMLG Verification and Sales Scripts, Pl.'s Mot. Summ. J. Ex. 30, at KS.00014-KS.00016, KS.00020-KS.00031; CFLG Verification Script, Pl.'s Mot. Summ. J. Ex. 19.

82.     TMLG and CFLG did not enroll a consumer in their mortgage modification programs unless he or she answered "yes" after each statement that the headquarters attorney read to him or her.  Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 150-152, 154-155; Sibert Dep., ECF No. 77, at 135-136.

83.     After the consumer answered "yes" to all questions asked by the headquarters attorney in his script, the consumer was transferred back to a salesperson to sign a retainer

16

agreement for services. Sibert Dep., ECF No. 77, at 135-136, Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 144-145; Aleman Dep., ECF No. 76, at 92.

84.     The salesperson also gathered consumers' bank account information and set up payments of a purported "initial retainer fee" of at least $1,195 per month and recurring monthly payments averaging $895 per month through a third-party payment processor.  Murphy Dep., ECF No. 80, at 75-76; Consumer Contract with Meracord, Pl.'s Mot. Summ. J. Ex. 20, at CFPB-TMLG-0036972; NoteWorld Sign-Up Agreement contained in TMLG Response to US Senate, Pl.'s Mot. Summ. J. Ex. 36 (filed under seal), at DEF.0003090-92; Exhibit B to TMLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 4, at CFPB-TMLG-0037260; Exhibit B to CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000188; Declaration of Fadi Halwani, ECF No. 86,¶ 7.

85.     On the same day that the consumer enrolled over the phone for TMLG's or CFLG's program, the consumer completed and executed an agreement with the payment processor, often during the initial intake call, authorizing the payment processor to withdraw the "initial retainer" and the subsequent monthly payments. Consumer Contract with Meracord, Pl.'s Mot. Summ. J. Ex. 20, at CFPB-TMLG-0036972; NoteWorld Sign-Up Agreement contained in TMLG Response to US Senate, Pl.'s Mot. Summ. J. Ex. 36 (filed under seal), at DEF.0003090-DEF.0003092; Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 453-454; Declaration of Linda White, ECF No. 89, ¶ 9-10; Declaration of Mark Pultz, ECF No. 90, ¶ 8; Declaration of Montez Saunders, ECF No. 91, ¶ 8; Declaration of Veronica Bruce, ECF No. 93, ¶ 7.

86.     Even after consumers enrolled, salespeople called consumers to pressure them into making their initial retainer payment sooner than the date on which they scheduled to have the payment taken from their bank account. Urgent sounding statements, such as "this is a time sensitive matter and the sooner you are able to make your first retainer payment the sooner we

can get to work on your file," and "[w]e have been seeing very strong results from the lenders we've been working with …," followed by the question "[c]an funds be available any sooner?" were made in "payment follow up" calls to consumers. Salesperson Scripts, Pl.'s Mot. Summ. J, Ex. 33 (filed under seal), at TMLG.MO.LIT.000156-000157.

87.    TMLG enrolled at least 5,265 consumers who made one or more payments between May 2011 and January 2013. Declaration of Ryan Thomas, ECF No. 95, ¶ 13.

88.    CFLG enrolled at least 1,116 consumers who made one or more payments between May 2012 and January 2013. Declaration of Ryan Thomas, ECF No. 95, ¶ 15.

89.    The Companies required consumers to make their first payments – the initial flat-fee retainer – before the Companies had any obligation to provide any services, before the Companies would start working for them, and even before the Companies approved the consumers for their program or services.  Aleman Dep., ECF No. 76, at 165-66, 180, 229; Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 378.

b.    Role of "Local Attorneys"

i.    Local Attorney Role Generally

90.    TMLG and CFLG included roles in the process for so-called "local attorneys." These "local attorneys" did not serve in a traditional attorney role for the Companies' customers; TMLG had no procedure for providing consumers with local attorneys' contact information if the consumers did not request that information.  TMLG and CFLG correspondence with consumers did not even contain contact information for any local attorneys.  Aleman Dep., ECF No. 76, at 123-24, 127; TMLG Welcome Packet, Pl.'s Mot. Summ. J. Ex. 34 (filed under seal), at CFPB-TMLG-0037110-0037112; CFLG Welcome Packet, Pl.'s Mot. Summ. J. Ex. 21, at 1.

91.     The roles of local attorneys were simply to compare TMLG or CFLG checklists with consumer financial information collected on a computer screen at intake to assure that a

18

consumer met lender criteria to apply for a loan modification, and to compare TMLG or CFLG checklists with documents submitted by a consumer to assure that the package contained all of the lender-required mortgage loan modification documents. These tasks could be done by non-attorneys, and in fact, were already done by non-attorneys before the local attorneys took them on.  Sibert Dep., ECF No. 77, at 103-105, 236; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 27, 54; Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 452-455; Aleman Dep., ECF No. 76, at 201-02, 215.

92.     TMLG provided the local attorneys with the lender criteria and other directions and instructions on what the local attorneys were to do; local attorneys followed these instructions in their work for both Companies.  Aleman Dep., ECF No. 76, at 140-41, 261-63; Scripts and Local Attorney Instructions, Pl.'s Mot. Summ. J. Ex. 35 (filed under seal), at CFPB-TMLG-0037045-0037046, CFPB-TMLG-0037076-0037077; Ruggiero Dep., ECF No. 70, at 92, 95-96, 110, 116; Harrington Dep., ECF No. 81, at 37, 45, 214; Powell Dep., ECF No. 71, at 56, 64-65, 171; Declaration of Edith Gray, August 31, 2015, ECF No. 94, ¶¶ 4-5; TMLG Class B Agreement, Pl.'s Mot. Summ. J. Ex. 12; CFLG Class B Agreement, Pl.'s Mot. Summ. J. Ex. 18; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 107.

93.     The Companies paid attorneys, who were acting as independent contractors, to do this ministerial work in furtherance of this "national law firm" scheme, because they could claim that they had "local counsel" or, as they called them, "Class B members" in many states, purportedly practicing law. Aleman Dep., ECF No. 76, at 260; Sibert Dep., ECF No. 77, at103-104, 105-106; Harrington Dep., ECF No. 81, at 37, 45, 70-71, 214, 230; Powell Dep., ECF No. 71, p. 64-65, 171; Declaration of Edith Gray, ECF No. 94, ¶¶ 4-5; TMLG Class B Agreement, Pl.'s Mot. Summ. J. Ex. 12; CFLG Class B Agreement, Pl.'s Mot. Summ. J. Ex. 18; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 107.

94.     TMLG and CFLG inaccurately and falsely misrepresented the role of local counsel. For example, the Companies listed local attorneys as "partners" on their letterhead, misrepresenting their role in and their relationship to the Companies.  Local attorneys were not partners: they were not compensated as if they were partners, and they received no equity, health benefits, or retirement benefits from the Companies. Harrington Dep., ECF No. 81, at 48, 62-64, 115, 117-18, 153-54, 157, 220-21; Delgado Dep., ECF No. 73, at 105-108; Ruggiero Dep., ECF No. 70, at 64-65; Declaration of Edith Gray, ECF No. 94, ¶¶ 4-5.

95.      Indeed, local attorneys did not agree to or approve of being listed as a partner, and did not know they were listed as partners until learning of that well after the fact.  Harrington Dep., ECF No. 81, at 48, 62-64, 115, 117-18, 153-54, 157, 220-21; Delgado Dep., ECF No. 73, at 105-108.

96.     Moreover, when responding to inquiries about CFLG consumer complaints, CFLG misrepresented to state regulatory agencies the roles of at least two local attorneys. Specifically, Stafford, as managing attorney of CFLG, misrepresented that the local attorneys communicated with the consumers in question, compiled and assembled documents for loan modification submission packages, and collected monies from consumers. Declaration of Edith Gray, ECF No. 94, at 3 ¶ 18; Ruggiero Dep., ECF No. 70, at 230-241.

ii.   Local Attorney Role in Intake Reviews

97.     After the headquarters attorney reviewed and approved a consumer for enrollment following the initial sales intake, an e-mail with the consumer's basic mortgage loan and financial information was sent to a local attorney to perform the same intake review. A headquarters attorney told local attorneys that they would "rarely decline" consumers for intake. Sibert Jan. 23, 2013 Email, Pl.'s Mot. Summ. J. Ex. 11, at CFPB-TMLG-0061123; Harrington Dep., ECF No. 81, at 79-80, 150, 173, Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 54,

112-113, 121, 137, 140-142; Aleman Dep., ECF No. 76, at 203-04, 206-07. Sibert Dep., ECF No. 77, at 88, 90-91.

98.     Local attorneys' intake review was simply to determine – by just looking at financial information and criteria – if there would be a financial benefit to the consumer.  For example, if the consumer had an interest rate above the market interest rate, then the consumer was considered a good candidate for the Companies' services.  Harrington Dep., ECF No. 81, at 39-40, 79, 173-74.

99.     The local attorneys' review consisted only of reading information in an e-mail or computer portal that was previously collected by the salesperson and input into the computer system.  Sibert Jan. 23, 2012 Email, Pl.'s Mot. Summ. J. Ex. 11, at CFPB-TMLG-0061123; Ruggiero Dep., ECF No. 70, at 60, 110-111.

100.     The type of information the local attorneys reviewed included the following: general consumer information, address, amount of time behind on the mortgage, the servicer/mortgage company, budget and real estate information, debt-to-income ratio, and hardship and related financial information.  Sibert Jan. 23, 2012 Email, Pl.'s Mot. Summ. J. Ex. 11, at CFPB-TMLG-0061123; Aleman Dep., ECF No. 76, at 76-78, 132-33, 137, 141, 201-02; Ruggiero Dep., ECF No. 70, at 60, 110-111.

101.     Local attorneys applied the same criteria and requirements when reviewing each intake file, and they reviewed the same type of information on the computer screen for every consumer file they reviewed for intake. Harrington Dep., ECF No. 81, at 99-100; Ruggiero Dep., ECF No. 70, at 115-116.

102.     Once the local attorney reviewed the information and made sure the consumer was a good candidate for TMLG or CFLG's mortgage loan modification program, the attorney approved the file.  Harrington Dep., ECF No. 81, at 77-79, 81; TMLG Local Attorney Intake

21

Instructions, Pl.'s Mot. Summ. J. Ex. 22, at CFPB-TMLG-0033290-0033291; Sibert Jan. 23, 2012 Email, Pl.'s Mot. Summ. J. Ex. 11, at CFPB-TMLG-0061123; Harrington Dep., ECF No. 81, at 99-100.

103.     TMLG and CFLG urged local attorneys to review mortgage modification intake files within 24 hours, and told them that the Companies could not charge consumers fees until the intake review took place.  Banyon June 12, 2012 Email, Pl.'s Mot. Summ. J. Ex. 23, at CFPB-TMLG-0053048.

104.     Local attorneys spent as little as 1-2 minutes reviewing TMLG and CFLG mortgage loan modification intake review files.  Ruggiero Dep., ECF No. 70, at 114; Harrington Dep., ECF No. 81, at 175-77, 235.

105.     One local attorney described the review of intake files as "a quick glance" and work that he could do "in a heartbeat." Harrington Dep., ECF No. 81, at 176-177.

106.     If the local attorney did not approve the mortgage loan modification intake review file, the Companies did not pay the local attorney for that service.  Aleman Dep., ECF No. 76, at 271-72; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 135-136; Harrington Dep., ECF No. 81, at 150-51, 218-19; TMLG Class B Agreement, Pl.'s Mot. Summ. J. Ex. 12, at CFPB-TMLG-0061205; CFLG Class B Agreement, Pl.'s Mot. Summ. J. Ex. 18, at CFPB-TMLG-0052829.

107.     Local attorneys approved 100%, or close to 100%, of the TMLG and CFLG mortgage loan modification intake files that they reviewed.  Harrington Dep., ECF No. 81, at 109-110, 139, 236; Ruggiero Dep., ECF No. 70, 115-116.

108.     After the local attorney approved a consumer's intake file, TMLG and CFLG automatically generated an e-mail to the newly enrolled consumer in the name of the local attorney, acknowledging that the consumer had been approved for enrollment. Sibert Dep., ECF No. 77, at 228-229; Delgado Sept. 19, 2012 Email, Pl.'s Mot. Summ. J. Ex. 24.

22

      c.  <u>Document Processing and Submission Reviews</u>

          i.  <u>Document Processing</u>

109.    After the initial calls with the salesperson and headquarters attorney, and the approval by the local attorney, the Companies mailed the consumer a welcome packet with a list of documents that the consumer was required to submit to document processing staff to gather the consumer's documents and assemble them for a mortgage loan modification application. TMLG Welcome Packet, Pl.'s Mot. Summ. J. Ex. 34 (filed under seal), at CFPB-TMLG-0037114; Aleman Dep., ECF No. 76, at 250-253, 279; CFLG Welcome Packet, Pl.'s Mot. Summ. J. Ex. 21, at 5; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 68-69, 78, 160-161, 246-247.

110.    TMLG worked with independent companies to provide this document processing work – companies that provided mortgage loan modification assistance directly to consumers prior to their work for TMLG -- while CFLG used its own employees. However, all of CFLG's document processors shared office space with TMLG's document processors. Aleman Dep., ECF No. 76, at 253-254, 279; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 68-69, 78, 160-161, 246-247; TMLG Agreement with APS, Pl.'s Mot. Summ. J. Ex. 13; TMLG Agreement with CAPS, Pl.'s Mot. Summ. J. Ex. 14; TMLG Agreement with UPS, Pl.'s Mot. Summ. J. Ex. 15.

111.    The personnel at TMLG-contracted document processing companies and CFLG's document processing offices used guidelines from the consumer's lender or servicer, or from the website for the federal government's Making Home Affordable program, to gather and assemble the documents. These personnel also checked to make sure consumers provided all required documentation. Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 160-161; Gerst Dep., ECF No. 75, at 60-62.

112.    Once the document processors assembled and reviewed the documents, they used the companies' internal customer relationship management software to indicate that the document compilation was complete and ready for headquarters attorney review. Gerst Dep., ECF No. 75, at 71, 76.

113.    Next, a headquarters attorney simply reviewed consumers' mortgage loan modification packets for completeness, like the document processors had, before notifying the local attorneys that the packages were ready for the same review. Harrington Dep., ECF No. 81, at 79-80, 150, 173; Sibert Dep., ECF No. 77, at 99-100; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 162-163.

114.    After that, the headquarters attorneys passed the consumer files along to "local attorneys" for their duplicative review.  Declaration of Edith Gray, ECF No. 94, ¶ 10; Delgado Dep., ECF No. 73, at 32-33; Harrington Dep., ECF No. 81, at 79-80, 150, 173; Sibert Dep., ECF No. 77, at 99-100; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 162-163.

115.    TMLG and CFLG required the local attorneys to review the consumer's mortgage modification submission packet to make sure it contained all of the information and documents needed for the consumer to apply for a loan modification, and to approve that packet of information before it was submitted to the lender or servicer.  Aleman Dep., ECF No. 76, at 77-78, 132-33, 139; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 125-126.

116.    The local attorney simply ensured that the submission package contained the required consumer residence and financial information and documents, and if it did, the local attorney approved it.  Harrington Dep., ECF No. 81, at 43, 82-84; Ruggiero Dep., ECF No. 70, at 67-68; Declaration of Edith Gray, ECF No. 94, ¶ 10; Delgado Dep., ECF No. 73, at 33-34.

117.    In fact, the local attorney review was merely "belt and suspenders" in a duplicative process. Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 127.

24

118.    Local attorneys did not receive files for review until TMLG deemed the package to be in a state that was ready for local attorney approval. Sibert Dep., ECF No. 77, at 99.

119.    Local attorneys did not do any work that a non-attorney could not also do when reviewing mortgage modification submission packages. Sibert Dep., ECF No. 77, at 236; Ruggiero Dep., ECF No. 70, at 169; Harrington Dep., ECF No. 81, 173-174.

120.    The local attorney criteria and requirements for reviews of mortgage modification submission documents were the same for CFLG as for TMLG, and the local attorneys reviewed the same types of documents for submission reviews for both companies. Harrington Dep., ECF No. 81, at 215-17, 230, 235; Ruggiero Dep., ECF No. 70, at 62-63; Powell Dep., ECF No. 71, at 56.

121.    At least two local attorneys testified that they spent as little as five minutes or less to review the mortgage modification submission packages. Ruggiero Dep., ECF No. 70, at 90; Harrington Dep., ECF No. 81, at 141, 235.

122.    For the most part, the requirements and criteria applied to each submission review were universal across lenders. Harrington Dep., ECF No. 81, at 99-100; Gerst Dep., ECF No. 75, at 60-63.

123.    TMLG and CFLG paid local attorneys $25 to $40 per file for the submission review regardless of the length of time that it took, but just as with the intake stage, they were only paid if they approved the file. TMLG Class B Agreement, Pl.'s Mot. Summ. J. Ex. 12, at CFPB-TMLG-0061205; CFLG Class B Agreement, Pl.'s Mot. Summ. J. Ex. 18, at CFPB-TMLG-0052829; Aleman Dep., ECF No. 76, at 271-72; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 135-136; Harrington Dep., ECF No. 81, at 152-53, 218-19.

124.    If the submission packet did not include the required documents, the local attorney was supposed to decline the file and inform the companies' headquarters attorneys. Harrington Dep., ECF No. 81, at 83, 106-109, 236.

125.    However, at least one local attorney testified that each time he declined a file, the headquarters attorneys directed him to approve it even if the file did not have all of the required documents. This local attorney testified that headquarters told him to do this approximately 10-20% of time for the TMLG submission packet reviews, and a little less than 10-20% of the time for CFLG submission packet reviews.  Harrington Dep., ECF No. 81, at 83, 106-109, 236.

126.    Unsurprisingly, given the fact that they were only paid if they approved the packages and the fact that there was pressure to approve them even when they were incomplete, local attorneys approved 100% or close to 100% of TMLG and CFLG loan modification submission packages.  Harrington Dep., ECF No. 81, at 109-110, 139, 236; Ruggiero Dep., ECF No. 70, at 81; Powell Dep., ECF No. 71, at 127.

127.    When the local attorney indicated approval of the submission package in the Companies' system, the approval triggered an automatic email from TMLG or CFLG to consumers over the relevant local attorney's name and purporting to be from that local attorney. The local attorney did not draft or approve the automated email. Harrington Dep., ECF No. 81, at 86, 190-91; Sibert Dep., ECF No. 77, 234-235.

ii.  No Local Attorney Role after Intake and Submission Reviews

128.    For both TMLG and CFLG, local attorneys' roles were limited to the reviewing of mortgage modification intake files and submission packages. After that, the local attorneys did not perform any further mortgage loan modification services. They never found out what happened to the consumers' files, nor did they have any contact with lenders. Aleman Dep., ECF No. 76, at 217; Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 338; Harrington Dep., ECF

No. 81, at 70-72, 95, 230-31; Declaration of Edith Gray, ECF No. 94, at ¶¶ 6, 11; Ruggiero Dep., ECF No. 70, at 122, 132.

129.    The document processors were the ones who handled the actual mortgage modification efforts. They forwarded the packages to the lenders, and were responsible for all communications with the lenders. Harrington Dep., ECF No. 81, at 86, 190-91; Sibert Dep., ECF No. 77, at 95, 216-217; Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 300-301.

130.    If any follow-up was needed with the lender, the document processors called a lender's general number – no one had the "contacts" the salespeople and welcome letter promised. Gerst Dep., ECF No. 75, at 85-86; TMLG Welcome Packet, Pl.'s Mot. Summ. J. Ex. 34 (filed under seal), at TMLG.MO.LIT.000181.

131.    The local attorneys never followed up with consumers after review of their intake or submission packages; to the extent that there was any such follow-up, the TMLG or CFLG headquarters attorneys or processing staff handled that.  Harrington Dep., ECF No. 81, at 100; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 66; Gerst Dep., ECF No. 75, at 87-88, 90-91.

### iii.   Limitations on Local Attorneys' Role

132.    Local attorneys did not communicate or interact – by telephone, in writing, or in person – with consumers whose mortgage loan modification information and documents they reviewed.  Harrington Dep., ECF No. 81, at 16-17, 85-87, 119-20, 238; Delgado Dep., ECF No. 73, at 117-118; Declaration of Edith Gray, ECF No. 94, ¶ 9; Ruggiero Dep., ECF No. 70, at 73, 121.

133.    In fact, but for the rare exception when a consumer might have contacted a local attorney directly (instead of TMLG or CFLG) to complain about how long the company was

taking to obtain the consumer's loan modification, local attorneys did not communicate at all with TMLG or CFLG consumers.  Harrington Dep., ECF No. 81, at 16-17, 85-87, 119-20, 238.

134.     Nonetheless, TMLG and CFLG sent consumers automated emails using the local attorneys' names and purporting to be from the local attorneys. Sibert Dep., ECF No. 77, at 234-235; Delgado May 15, 2012 Email, Pl.'s Mot. Summ. J. Ex. 25; Delgado Sept. 19, 2012 Email, Pl.'s Mot. Summ. J. Ex. 24.

135.     At least one local attorney never authorized the use of her name with automated emails to consumers, and only learned that automated emails in her name were being sent to consumers after she stopped doing work for CFLG and a consumer who received an automated e-mail contacted her.  Delgado Dep., ECF No. 73, at 94-98, 149-153.

136.     Local attorneys rarely, if ever, provided services to TMLG or CFLG consumers outside of reviewing files for intake and reviewing mortgage modification submission packages. Ruggiero Dep., ECF No. 70, at 58, 132-133; Harrington Dep., ECF No. 81, at 72, 87-90, 130, 142-43, 230-233, 242.

137.     When local attorneys did provide other services, they did so after an attorney at TMLG or CFLG headquarters referred consumers to them. Ruggiero Dep., ECF No. 70, at 58; Declaration of Edith Gray, ECF No. 94, ¶ 15.

138.     These other services included representing a consumer in an active foreclosure proceeding and attempting to delay or stop a foreclosure sale; however, the evidence reflects that only 30 consumers – out of more than 6000 – received such services. Ruggiero Dep., ECF No. 70, at 58; Declaration of Edith Gray, ECF No. 94, ¶ 15; Declaration of Ryan Thomas, ECF No. 95, ¶ 18.

139.     In the rare instances when TMLG referred a consumer to the local attorney for the local attorney's services to delay or stop a foreclosure sale, the local attorney performed all the

28

services. TMLG headquarters performed no services to delay or stop foreclosure after the referral was made. Declaration of Edith Gray, ECF No. 94, ¶ 15.

140.    After local attorneys attempted to delay or stop foreclosure, the local attorneys informed TMLG headquarters of the result. Declaration of Edith Gray, ECF No. 94, ¶ 15.

141.    For these additional services, TMLG and CFLG paid local attorneys separately from what they were paid for intake and modification submission reviews. Ruggiero Dep., ECF No. 70, at 65-66; TMLG Class B Agreement, Pl.'s Mot. Summ. J. Ex. 12, at CFPB-TMLG-0061205; CFLG Class B Agreement, Pl.'s Mot. Summ. J. Ex. 18, at CFPB-TMLG-0052829.

142.    Although TMLG and CFLG retainer agreements with consumers state that TMLG or CFLG "will counsel Client regarding mortgage workout solutions," which can include "deed-in-lieu of foreclosure, cash for keys, consent foreclosure, or short sale," local attorneys rarely, if ever, performed or were ever asked to perform such services by TMLG or CFLG.  At least two local attorneys testified that they never performed, and were never asked by TMLG or CFLG to perform, deeds in lieu of foreclosure, short sales, cash for keys, or consent foreclosures. Ruggiero Dep., ECF No. 70, at 151-152; Harrington Dep., ECF No. 81, at 72, 87-90, 130, 142-43, 230-233, 242; TMLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 4, at CFPB-TMLG-0037260; CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000188.

143.    Local attorneys also did not conduct any assessment at the time of consumer intake review of whether or not consumers needed any services beyond loan modification services or whether the consumer was in active foreclosure. Harrington Dep., ECF No. 81, at 72, 87-90, 130, 142-43, 230-33, 242; Ruggiero Dep., ECF No. 70, at 137-138.

144.    When reviewing consumer intake files and loan modification submission packages, local attorneys never provided any services unique to the state in which they were licensed to practice or the laws of those states, and they never had any reason to take into

account any factors specific to any particular locality, region, or municipality. Harrington Dep., ECF No. 81, at 96-97, 234; Ruggiero Dep., ECF No. 70, at 90-91.

145.    When reviewing consumers' mortgage loan modification intake files and submission packages, local attorneys did not provide any of the following legal services for TMLG or CFLG consumers: give advice to consumers regarding the law, their legal rights, or the legal rights or responsibilities of other persons; give advice to consumers that required the use of legal knowledge or skill; conduct legal or other research; select, draft, or complete for consumers legal documents or agreements; prepare documents for consumers that required familiarity with legal principles beyond the ken of the ordinary layman; appear for consumers before public tribunals; represent consumers in court or any other formal adjudicative proceeding; negotiate legal rights or responsibilities for consumers; or render any service to consumers that required the use of legal knowledge or skill.  Harrington Dep., ECF No. 81, at 130, 202-04, 239-40; Ruggiero Dep., ECF No. 70, at 172-174.

146.    If given the same guidelines, checklists, or other criteria, non-attorneys could have performed the same intake and mortgage loan modification submission review work that local attorneys did for TMLG and CFLG. Harrington Dep., ECF No. 81, at 173-74, 203, 240; Sibert Dep., ECF No. 77, at 236; Ruggiero Dep., ECF No. 70, at 169-170.

147.    Local attorneys did not manage or supervise any TMLG or CFLG in-house attorneys, local attorneys, paralegals, intake personnel, processors, other employees, other contractors, or other persons associated with TMLG or CFLG. Harrington Dep., ECF No. 81, at 162-63, 182-183, 231, 238; Ruggiero Dep., ECF No. 70, at 163-165.

148.    Even a local attorney who also worked for two months in TMLG's and CFLG's processing office in Delray Beach, Florida, did not supervise any staff. Delgado Dep., ECF No. 73, at 59-60, 70.

149.    Local attorneys considered consumers to be clients of the Companies, rather than their own clients.  Declaration of Edith Gray, ECF No. 94, ¶ 13; Delgado Dep., ECF No. 73, at 46.

150.    The Companies did not consider consumers to be clients of the local attorneys in their states, but, rather, clients of the Companies.  Aleman Dep., ECF No. 76, at 129.

151.    At least one local attorney stated that she did not have an attorney-client relationship with those consumers. Declaration of Edith Gray, ECF No. 94, ¶ 9.

152.    At least one local attorney did not want her contact information provided to TMLG consumers, and expected consumers whose files she reviewed for intake or mortgage modification submission8 to contact TMLG and not her. Delgado Dep., ECF No. 73, at 156-158.

153.    At least one local attorney did not authorize TMLG or CFLG to sign retainer agreements with his digital signature, and only learned after the fact that TMLG used his digital signature. Ruggiero Dep., ECF No. 70, at 251.

        d.   Payment Processing and Advance Fees

154.    As part of the enrollment process, the Companies requested and received payment of fees from consumers before those consumers had executed written agreements with the consumers' lenders or servicers for modifications of those consumers' mortgage loans. Aleman Dep., ECF No. 76, at 228-29; Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 380-381.

155.    Under the terms of its retainer agreement, TMLG required an "Initial Flat Fee Retainer," the amount of which varied but included a "Processing Flat Fee" and "Mitigation Flat Fee," totaling at least $2,920, and a "Monthly Recurring Flat Fee Retainer" of $500 per month. Exhibit B to TMLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 4, at CFPB-TMLG-0037271; Jeffrey Aleman Amended Answer to Complaint, ECF No. 40, at 7 (Answer to ¶ 26); Thomas

Macey Amended Answer to Complaint, ECF No. 42, at 7 (Answer to ¶ 26); Jason Searns

Amended Answer to Complaint, ECF No. 43, at 7 (Answer to ¶ 26).

156.    Under the terms of its retainer agreements, CFLG required an "Initial Flat Fee

Retainer," the amount of which varied but included an initial fee for "Stage I" services in the

amount of $1,195 and "Monthly Flat Fee Retainer" of $895. Exhibit B to CFLG Retainer

Agreement, Pl.'s Mot. Summ. J. Ex. 17, at 11; CFLG Amended Answer to Complaint, ECF No.

41, at 12 (answer to ¶ 45); Jeffrey Aleman Amended Answer to Complaint, ECF No. 40, at 12

(answer to ¶ 45); Thomas Macey Amended Answer to Complaint, ECF No. 42, at 12 (answer to

¶ 45); Harold Stafford Amended Answer to Complaint, ECF No. 44, at 12 (answer to ¶ 45).

157.    The retainer agreements stated that the "Initial Flat Fee Retainer" purportedly

covered an initial review and analysis of the consumer's financial condition, such as

"preliminary underwriting" analysis. Exhibit B to TMLG Retainer Agreement, Pl.'s Mot. Summ.

J. Ex. 4, at CFPB-TMLG-0037271; Exhibit B to CFLG Retainer Agreement, Pl.'s Mot. Summ. J.

Ex. 17, at 11.

158.    After consumers paid the "Initial Flat Fee Retainer," TMLG and CFLG charged

consumers a "Monthly Recurring Flat Fee Retainer" for services. According to the retainer

agreement, the "Monthly Recurring Flat Fee Retainer" covered continued underwriting analysis,

transmission of the loan modification package to the lender, and continued monitoring of the

package review with the lender. *Id.*

159.    The retainer agreements stated that where TMLG's or CFLG's "provision of

Mortgage Relief Services includes negotiating for modification of Client's mortgage loan terms,"

the client's payments would be held in the company's client trust account and disbursed to the

company as costs were incurred by the company, based upon completion of stages of work set

out in the agreement. The "staging" differed between the Companies, but both included "Stage I"

services in the amount of $1,195. Exhibit B to TMLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 4, at CFPB-TMLG-0037271-0037273; Exhibit B to CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at 11-13.

160.     The Companies required consumers to agree to and sign up for automated payments through NoteWorld, which later changed its name to Meracord (Meracord"), a third-party processor. At the time of enrolling, the consumers provided their bank information to the Companies and consented to automated monthly payments. NoteWorld Sign-Up Agreement contained in TMLG Response to US Senate, Pl.'s Mot. Summ. J. Ex. 36 (filed under seal), at DEF.0003090-0003093.

161.     Bookkeepers then set up a consumer's account with Meracord so that it would automatically withdraw payments from a consumer's account monthly on a set date each month. Deposition of Allison Lanham, August 25, 2015 ("Lanham Dep."), ECF No. 63, at 28-32, 34-36.

162.     The Companies used Meracord to process consumers' ACH and/or credit card payments from approximately August 2011 to approximately March 2013. TMLG Noteworld Agreement, Pl.'s Mot. Summ. J. Ex. 26, at 6; Deposition of Christopher Kesterson ("Kesterson Dep."), July 14, 2015, ECF No. 69, at 94-95.

163.     While Meracord processed payments for the Companies, a consumer's payment was pulled from the consumer's account into a Meracord bank account (ending in -1048) held at US Bank. Declaration of Ryan Thomas, ECF No. 95, at 5 ¶ 32.

164.     Funds were then transferred from the Meracord account ending in -1048 to a TMLG IOLTA bank account (ending in -6391) for TMLG consumers and to a CFLG IOLTA bank account (ending in -1399) for CFLG consumers.  Both of these accounts were held at US Bank. Declaration of Ryan Thomas, ECF No. 95, at 5 ¶ 33.

165.    Nearly all – 99.9% – of the funds transferred into the TMLG and CFLG IOLTA accounts originated from Meracord's -1048 account, and 99.9% of the funds transferred out of these accounts were sent back to Meracord's -1048 account, indicating that the TMLG and CFLG US Bank IOLTA accounts were simply pass-through accounts from the Meracord -1048 account back to the Meracord -1048 account before being disbursed. Declaration of Ryan Thomas, ECF No. 95, at 5 ¶ 34.

166.    The bank records for the Companies' operating accounts at Chase Bank show that money was disbursed from Meracord to the Companies. Specifically, money was disbursed from Meracord to TMLG's operating accounts ending in -8832 and -3833, and CFLG's operating accounts ending in -3900 and -4736. Declaration of Ryan Thomas, ECF No. 95, at 5 ¶ 36.

167.    This entire process – from the consumer's account to one of TMLG's or CFLG's operating accounts – took only two to four days. Lanham Dep., ECF No. 63, at 62-63.

168.    The entire process – from the consumer's account to one of TMLG's or CFLG's operating accounts – was automated. Lanham Dep., ECF No. 63, at 69-70, 130.

169.    While representatives from the Companies set up these US Bank IOLTA accounts, no one at TMLG or CFLG, or anyone on their behalf, monitored these accounts. Lanham Dep., ECF No. 63, at 119; Kesterson Dep., ECF No. 69, at 69, 76.

170.    No one at the Companies, or anyone on their behalf, monitored the IOLTA accounts at US Bank to ensure compliance with client trust account rules. Kesterson Dep., ECF No. 69, at 73-74.

171.    No one at TMLG or CFLG, or anyone on their behalf, made any deposits or withdrawals from the IOLTA accounts at US Bank outside of the automated process described above, other than one unexplained deposit of $250 from an unknown account. Declaration of Ryan Thomas, ECF No. 95, at 5 ¶¶ 34-35.

34

172.     The Companies set up the Meracord accounts to automatically disburse consumer payments from the payment processor's account into one of TMLG's or CFLG's operating accounts once the payment cleared, with a portion of the payment going to CAPS, a processing company. CFLG Meracord Agreement, Pl.'s Mot. Summ. J. Ex. 27; Lanham Dep., ECF No. 63, at 69-70, 80, 130.

173.     The payment processors disbursed the consumers' payments to the Companies' operating accounts automatically, regardless of what, if any, services TMLG or CFLG rendered. *Id.*

174.     Meracord ceased to process payments for TMLG and CFLG in or about March 2013. Kesterson Dep., ECF No. 69, at 94-95.

175.     After approximately March 2013, TMLG and CFLG used Chase Bank to process consumer payments via ACH or credit card payments, instead of using Meracord. *Id.*

176.     Bookkeepers monitored consumer payments to Meracord, and later to Chase Bank, in order to determine TMLG's and CFLG's projected cash flows and identify payments that were rejected. Lanham Dep., ECF No. 63, at 64-66.

177.     When a payment failed, a collection department followed up with the consumer. Most of those functions were outsourced to a non-attorney, James Van Elswyk, and his management company, CAPS. Lanham Dep., ECF No. 63, at 16-17, 64-65.

178.     When consumers who left the Companies' programs asked for refunds, they only received partial refunds, if they received any refunds at all. According to the Companies, the partial refund consisted of the total fees the consumer paid, less fees for services rendered, even though the consumer never received a mortgage loan modification while enrolled in the Companies' program. Searns Dep., ECF No. 74, at 123-124, 132-133.

179.    Defendants' records show that TMLG collected $18,454,222 and issued $122,485 in refunds, resulting in TMLG receiving a net amount of $18,331,737 from consumers. Declaration of Ryan Thomas, ECF No. 95, at 3 ¶ 21.

180.    Defendants' records show that CFLG collected $3,082,055, while CFLG issued $89,759 in refunds, resulting in CFLG receiving a net amount of $2,992,296 from consumers. Declaration of Ryan Thomas, ECF No. 95, at 3 ¶ 22.

181.    The total amount, less refunds, received by the Companies was $21,324,033. Declaration of Ryan Thomas, ECF No. 95, at 4 ¶ 23.

<u>e.   TMLG and CFLG were Mortgage Loan Modification Companies</u>

182.    Consumers who signed retainer agreements with TMLG and CFLG for purported mortgage loan modification services made payments only for mortgage loan modification services, not for any other mortgage loan services, including what might be called "foreclosure defense services." TMLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 4, at CFPB-TMLG-0037271-0037273; CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000198-000201; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154.

183.    The initial retainer and subsequent recurring monthly payments were collected by TMLG and CFLG specifically for purported services relating only to obtaining a mortgage loan modification. TMLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 4, at CFPB-TMLG-0037271-0037273; CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000198-000201; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154.

184.    Two consumers who paid the initial retainer and monthly fees received a summons or notice of a foreclosure proceeding instigated by their lenders. Upon informing

36

TMLG or CFLG, neither of the Companies made any attempt to stop the foreclosure, and the consumers never spoke with an attorney. Declaration of Tim Ledbetter, ECF No. 92, ¶¶ 10, 14; Declaration of Montez Saunders, ECF No. 91, ¶¶ 13, 16.

185.     Salespersons told consumers that if the bank tried to foreclose on their property, and the consumers wanted TMLG to try to stop the foreclosure sale, there would be a separate and additional charge of $800 each time TMLG had to file paperwork to stop the sale. Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154.

186.     Consumers who signed up with TMLG almost never received so-called "foreclosure defense services," as contrasted with mortgage loan modification services. Based on data provided by Defendants, only 30 TMLG consumers were provided foreclosure defense services.  Declaration of Ryan Thomas, ECF No. 95, at 3 ¶ 18.

187.     Based on data provided by Defendants, no CFLG consumers received foreclosure defense services, as contrasted with mortgage loan modification services. Declaration of Ryan Thomas, ECF No. 95, at 3 ¶ 19.

       f.   TMLG and CFLG Made Material Misrepresentations to Consumers

188.     Consumers who viewed TMLG's or CFLG's websites believed that TMLG or CFLG could help them modify their loan by helping them obtain a mortgage loan modification. Declaration of Brett Peterson, ECF No. 84, ¶ 3; Declaration of Daniel Teynor ECF No. 85, ¶ 3; Declaration of Floy Johnson, ECF No. 87, ¶ 3; Declaration of Montez Saunders, ECF No. 91, ¶ 3.

189.     Consumers who viewed television commercials advertising mortgage relief services to be provided by the Companies were led to believe that TMLG or CFLG could help them obtain a loan modification. Declaration of Mark Pultz, ECF No. 90, ¶ 2-3; Declaration of Tim Ledbetter, ECF No. 92, ¶ 2-3.

190.    Salespeople made statements to consumers to convince consumers that they were eligible for mortgage loan modifications. Declaration of Tim Ledbetter, ECF No. 92, ¶ 4; Declaration of George Halpin, ECF No. 88, ¶ 4; Declaration of Mark Pultz, ECF No. 90, ¶ 4; Declaration of Montez Saunders, ECF No. 91, ¶ 4; Declaration of Veronica Bruce, ECF No. 93, ¶ 3.

191.    Salespeople made statements to consumers to convince consumers that they would obtain mortgage loan modifications if they enrolled with TMLG or CFLG. Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33, at TMLG.MO.LIT.000152-000154; Declaration of Daniel Teynor, ECF No. 85, ¶ 12; Declaration of Tim Ledbetter, ECF No. 92, ¶ 4; Declaration of George Halpin, ECF No. 88, ¶ 4; Declaration of Mark Pultz, ECF No. 90, ¶ 4; Declaration of Montez Saunders, ECF No. 91, ¶ 4; Declaration of Veronica Bruce, ECF No. 93, ¶ 3.

192.    Salespeople made statements aimed at convincing consumers that using the free services of a non-profit organization to gather documents and submit a mortgage loan modification would not get them a loan modification, but that TMLG's and CFLG's services would get them a mortgage loan modification. Anderson Dep., ECF No. 79, at 130-134; CFLG Amended Answer to Complaint, Dec. 31, 2014, ECF No. 41, at ¶ 39; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33, at TMLG.MO.LIT.000160 (filed under seal).

193.    After consumers enrolled and paid advance fees to TMLG or CFLG, TMLG or CFLG routinely failed to obtain mortgage loan modifications for consumers. Declaration of Ryan Thomas, ECF No. 95, at 2 ¶ 12.

194.    TMLG enrolled at least 5,265 consumers in its mortgage loan modification program. Of these consumers, only 26% received loan modifications. Declaration of Ryan Thomas, ECF No. 95, at 2 ¶ 13.

195.    CFLG enrolled at least 1,116 consumers in its mortgage loan modification program. Of these consumers, only 17% received loan modifications. Declaration of Ryan Thomas, ECF No. 95, at 2 ¶ 14.

196.    TMLG and CFLG expressly or implicitly misrepresented the amount of time it would take for the Companies to obtain mortgage loan modifications. Anderson Dep., ECF No. 79, at 121-122; Declaration of Fadi Halwani, ECF No. 86, ¶¶ 8, 17; TMLG Welcome Packet, Pl.'s Mot. Summ. J. Ex. 34 (filed under seal), at CFPB-TMLG-0037110; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 279.

197.    In the cover letters sent to consumers in the welcome packet, TMLG and CFLG stated: "Currently we are seeing many workouts take anywhere from 90-120 days; however, every case is unique. . . ." Jeffrey Aleman Amended Answer to Complaint, ECF No. 40, at 7 (answer to ¶ 25), at 11 (answer to ¶ 44); CFLG Amended Answer to Complaint, ECF No. 41, at 11 (answer to ¶ 44); TMLG Welcome Packet, Pl.'s Mot. Summ. J. Ex. 34 (filed under seal), at CFPB-TMLG-0037110; Harold Stafford Amended Answer to Complaint, ECF No. 44, at 11 (answer to ¶ 44); Thomas Macey Amended Answer to Complaint, ECF No. 42, at 7 (answer to ¶ 25), at 11 (answer to ¶ 44); Jason Searns Amended Answer to Complaint, ECF No. 43, at 7 (answer to ¶ 25).

198.    In practice, TMLG and CFLG did not obtain mortgage loan modifications for consumers within the represented time frame, if at all. In the few instances in which TMLG and CFLG obtained loan modifications for consumers enrolled with them, it generally took TMLG an average of 211 days to obtain modifications, and CFLG an average of 165 to 170 days to obtain modifications. Declaration of Ryan Thomas, ECF No. 95, at. 2-3 ¶¶ 14, 17; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 279.

199.    TMLG and CFLG salespeople and headquarters attorneys represented to consumers that after enrolling, consumers would receive legal representation and associated attorney services. Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000153, 000158-000160; TMLG Verification and Sales Scripts, Pl.'s Mot. Summ. J. Ex. 30, at KS.00015, KS.00021, KS.00024, KS.00027, KS.00030, KS.00034-00035; Declaration of Veronica Bruce, ECF No. 93, ¶ 4.

200.    In fact, salespeople specifically touted the use of "lawyers tying up the foreclosure process" as part of a "very definitive strategy in an attempt to achieve the BEST possible outcome…"  Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000160.

201.    The welcome letters and retainer agreements sent by TMLG and CFLG to consumers represented to consumers that by enrolling with TMLG or CFLG, consumers would receive attorney services. CFLG Welcome Packet, Pl.'s Mot. Summ. J. Ex. 21, at 1; TMLG Welcome Packet, Pl.'s Mot. Summ. J. Ex. 34 (filed under seal), at TMLG.MO.LIT.000181; TMLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 4; CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17.

202.    TMLG's and CFLG's welcome letters used letterhead that contained the name of the company on the top, and a list of "partners" on the left side, along with the abbreviation of the state in which each "partner" was licensed to practice law. CFLG Welcome Packet, Pl.'s Mot. Summ. J. Ex. 21, at 1; TMLG Welcome Packet, Pl.'s Mot. Summ. J. Ex. 34 (filed under seal), at TMLG.MO.LIT.000181.

203.    TMLG's welcome letters stated: "Fortunately by using an attorney you have a significant advantage because we are familiar with the process and expedite it through our

40

contacts." TMLG Welcome Packet, Pl.'s Mot. Summ. J. Ex. 34 (filed under seal), at

TMLG.MO.LIT.000181.

204.    TMLG's welcome letters began by thanking consumers for "entrusting their home

to TMLG . . . a full service law firm that focuses on resolving all mortgage related issues."

Jeffrey Aleman Amended Answer to Complaint, ECF No. 40, at 6 (answer to ¶ 23); TMLG

Response to US Senate, Pl.'s Mot. Summ. J. Ex. 36 (filed under seal), at DEF.0003071; Thomas

Macey Amended Answer to Complaint, ECF No. 42, at 6 (answer to ¶ 23); Jason Searns

Amended Answer to Complaint, ECF No. 43, at 6 (answer to ¶ 23).

205.    TMLG's and CFLG's welcome letters also represented to consumers that "[y]ou

will be assigned a specific attorney and/or caseworker to handle your file."  CFLG Welcome

Packet, Ex. 21, at 3; TMLG Welcome Packet, Pl.'s Mot. Summ. J. Ex. 34 (filed under seal), at

TMLG.MO.LIT.000183.

206.    Consumers who enrolled in TMLG's and CFLG's services believed they would

be represented by an attorney.  Declaration of Brett Peterson, ECF No. 84, ¶ 5; Declaration of

Daniel Teynor, ECF No. 85, ¶ 5; Declaration of Fadi Halwani, ECF No. 86, ¶ 4; Declaration of

Tim Ledbetter, ECF No. 92, ¶ 5; Declaration of Floy Johnson, ECF No. 87, ¶ 6; Declaration of

George Halpin, ECF No. 88, ¶ 5; Declaration of Linda White, ECF No. 89, ¶ 5, 10; Declaration

of Mark Pultz, ECF No. 90, ¶ 5; Declaration of Montez Saunders, ECF No. 91, ¶ 5.

207.    In fact, a number of consumers who sought mortgage loan modifications through

TMLG or CFLG said that they never communicated with a headquarters attorney or local

attorney while they were enrolled for services. Declaration of Brett Peterson, ECF No. 84, ¶ 16;

Declaration of Fadi Halwani, ECF No. 86, ¶ 16; Declaration of Tim Ledbetter, ECF No. 92, ¶ 14;

Declaration of Floy Johnson, ECF No. 87, ¶ 17; Declaration of Mark Pultz, ECF No. 90, ¶ 14;

Declaration of Montez Saunders, ECF No. 91, ¶ 16; Declaration of Veronica Bruce, ECF No. 93, ¶ 17.

208.    TMLG did not want consumers to communicate with their lenders or servicers, and, to that end, TMLG told consumers that there was a risk in doing so. Aleman Dep., ECF No. 76, at 106-07, 179-180; Anderson Dep., ECF No. 79, at 129-130.

209.    TMLG and CFLG told consumers, expressly or by implication, that consumers should not contact or communicate with their lenders or servicers. TMLG Welcome Packet, Pl.'s Mot. Summ. J. Ex. 34 (filed under seal), at TMLG.MO.LIT.000183 (last paragraph); CFLG Welcome Packet, Pl.'s Mot. Summ. J. Ex. 21, at 3 (last paragraph); Aleman Dep., ECF No. 76, at 106-07, 179-180; Anderson Dep., ECF No. 79, at 129-130; Declaration of Brett Peterson, ECF No. 84, ¶ 10; Declaration of Daniel Teynor, ECF No. 85, ¶ 11; Declaration of Fadi Halwani, ECF No. 86, ¶ 11; Declaration of Floy Johnson, ECF No. 87, ¶ 11; Declaration of Linda White, ECF No. 89, ¶ 12; Declaration of Mark Pultz, ECF No. 90, ¶ 10; Declaration of Montez Saunders, ECF No. 91, ¶ 10; Declaration of Veronica Bruce, ECF No. 93, ¶ 9.

210.    TMLG's and CFLG's welcome packets contained cover letters stating: "While we will not tell you not to speak to your servicer, we must advise you that to do so is risky.  We have seen several clients hurt by deceptive practices when their servicer calls." Jeffrey Aleman Amended Answer to Complaint, ECF No. 40, at 6-7 (answer to ¶ 24), at 11 (answer to ¶ 43); CFLG Amended Answer to Complaint, ECF No. 41, at 11 (Answer to ¶ 43); TMLG Welcome Packet, Pl.'s Mot. Summ. J. Ex. 34 (filed under seal), at TMLG.MO.LIT.000183 (last paragraph); CFLG Welcome Packet, Pl.'s Mot. Summ. J. Ex. 21, at 3 (last paragraph); Jason Searns Amended Answer to Complaint, ECF No. 43, at 6 (answer to ¶ 24); Thomas Macey Amended Answer to Complaint, ECF No. 42, at 7 (answer to ¶ 24), at 11 (answer to ¶ 43); Harold Stafford Amended Answer to Complaint, ECF No. 44, at 11 (answer to ¶ 43).

211.     Indeed, TMLG required consumers to agree not to have any negotiation or workout discussions with consumers' servicers.  Aleman Dep., ECF No. 76, at 106-07, 179-180; Anderson Dep., ECF No. 79, at 129-130.

212.     TMLG and CFLG told or strongly implied to consumers that they should stop paying their mortgages. Anderson Dep., ECF No. 79, at 113-116, 170-171, 175-176, 311-312; Declaration of Brett Peterson, ECF No. 84, ¶ 11; Declaration of Daniel Teynor, ECF No. 85, ¶ 12; Declaration of Mark Pultz, ECF No. 90, ¶ 11; Declaration of Montez Saunders, ECF No. 91,¶ 11; Declaration of Veronica Bruce, ECF No. 93, ¶ 10.

213.     Consumers were required under their retainer agreements to continue making monthly fee payments to TMLG or CFLG prior to receiving written offers from their lenders for mortgage loan modifications. TMLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 4, at CFPB-TMLG-0037260; CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000188.

214.     In the course of offering or providing mortgage assistance relief services, TMLG and CFLG failed to make the following required disclosures in consumer-specific commercial communications in a clear and prominent manner, or in any manner:

> a.  That the consumer may stop doing business with TMLG or CFLG at any time. CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17; CFLG Welcome Packet, Pl.'s Mot. Summ. J. Ex. 21; Declaration of Brett Peterson, ECF No. 84, ¶. 7; Declaration of Daniel Teynor, ECF No. 85, ¶ 8; Declaration of Fadi Halwani, ECF No. 86, ¶ 6; Declaration of Tim Ledbetter, ECF No. 92, ¶ 7; Declaration of Floy Johnson, ECF No. 87, ¶ 8; Declaration of Linda White, ECF No. 89, ¶ 7; Declaration of Mark Pultz, ECF No. 90, ¶ 7; Declaration of Montez Saunders, ECF No. 91, ¶ 7; Declaration of Veronica Bruce, ECF No. 93, ¶ 6.

43

b.  That the consumer may accept or reject an offer of mortgage assistance TMLG or CFLG obtains from the consumer's lender or servicer. CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17; CFLG Welcome Packet, Pl.'s Mot. Summ. J. Ex. 21; Declaration of Brett Peterson, ECF No. 84, ¶ 7; Declaration of Daniel Teynor, ECF No. 85, ¶ 8; Declaration of Fadi Halwani, ECF No. 86, ¶ 6; Declaration of Tim Ledbetter, ECF No. 92, ¶ 7; Declaration of Floy Johnson, ECF No. 87, ¶ 8; Declaration of Linda White, ECF No. 89, ¶ 7; Declaration of Mark Pultz, ECF No. 90, ¶ 7; Declaration of Montez Saunders, ECF No. 91, ¶ 7; Declaration of Veronica Bruce, ECF No. 93, ¶ 6; Aleman Dep., ECF No. 76, at 112.

c.  That if a consumer rejects an offer of mortgage assistance, the consumer does not have to pay TMLG or CFLG. CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17; CFLG Welcome Packet, Pl.'s Mot. Summ. J. Ex. 21; Declaration of Daniel Teynor, ECF No. 85, ¶ 8; Declaration of Fadi Halwani, ECF No. 86, ¶ 6; Declaration of Tim Ledbetter, ECF No. 92, ¶ 7; Declaration of Floy Johnson, ECF No. 87, ¶ 8; Declaration of Linda White, ECF No. 89, ¶ 7; Declaration of Mark Pultz, ECF No. 90, ¶ 7; Declaration of Montez Saunders, ECF No. 91, ¶ 7; Declaration of Veronica Bruce, ECF No. 93, ¶ 6; Aleman Dep., ECF No. 76, at 112.

d.  That if a consumer accepts the offer the consumer will have to pay TMLG or CFLG a certain amount for its services. Aleman Dep., ECF No. 76, at 112; CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17; CFLG Welcome Packet, Pl.'s Mot. Summ. J. Ex. 21.

215. The scripts and welcome packet (including a cover letter and retainer agreement, among other things) demonstrate that neither TMLG nor CFLG provided these required disclosures. TMLG Verification and Sales Scripts, Pl.'s Mot. Summ. J. Ex. 30; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal); TMLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 4; CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17; TMLG Welcome Letter, Pl.'s Mot. Summ. J. Ex. 28; CFLG Welcome Packet, Pl.'s Mot. Summ. J. Ex. 21; TMLG Welcome Packet, Pl.'s Mot. Summ. J. Ex. 34 (filed under seal).

### E. Individual Defendants Controlled Company Defendants

#### a. Thomas G. Macey

##### i. Macey – Individual Liability – TMLG

216. Macey was a Class A partner of TMLG. In that position, he served as a managing partner of the firm and had final decision-making authority on a number of issues regarding the company. He reviewed and negotiated most of the vendor contracts and reviewed and approved some of TMLG's policies, processes, and procedures. He reviewed reports for TMLG and suggested changes to operations when appropriate. March 17, 2015, Thomas Macey Answers to Interrogatories, Ex. 29, at 9 (Response to Interrogatory No. 7); Macey Dep., ECF No. 78, at 33-35.

217. Macey was the majority shareholder of TMLG and could weigh in whenever he desired.  Aleman Dep., ECF No. 76, at 46-48; Jeffrey Aleman Answers to Interrogatories, Pl.'s Mot. Summ. J. Ex. 32, at 8 (Response to Interrogatory 7).

218. Macey had final decision-making authority at TMLG. Macey Dep., ECF No. 78, at 18, 23-24, 47-48.

219.     Macey materially participated in the conduct of TMLG's affairs, including the development and approval of TMLG's mortgage assistance relief services by, among other things:

       a.  Creating or changing policy for running TMLG and setting up the company. Macey Dep., ECF No. 78, at 24-25, 37-38.

       b.  Reviewing retainer agreements that TMLG entered into with its consumers. Macey Dep., ECF No. 78, at 27.

       c.  Instructing the managers who were in charge of client support, processing, and document collection, and providing them with instructions on procedures, thereby creating policy and protocol for them.  Macey Dep., ECF No. 78, at 9-11, 42-44; Aleman Dep., ECF No. 76, at 46-48; Jeffrey Aleman Answers to Interrogatories, Pl.'s Mot. Summ. J. Ex. 32, at 8 (Response to Interrogatory 7).

       d.  Participating in the decision of TMLG to have independent contractors who handled loan modification processing, often referred to as "strategic alliance partners." Macey Dep., ECF No. 78, at 16-17; Aleman Dep., ECF No. 76, at 253.

       e.  Participating in the decision of TMLG to file for bankruptcy. Macey Dep., ECF No. 78, at 71.

      ii.  *Macey – Individual Liability – CFLG*

220.     Macey was a Class A partner of CFLG. In that position, he served as a managing partner of the company and had final decision-making authority on a number of issues regarding the company. Macey CFLG 30(b)(6) Dep., ECF No. 68, at 11-12, 24, 46, 48.

221.     Macey reviewed reports for CFLG and suggested changes to operations when appropriate. Macey CFLG 30(b)(6) Dep., ECF No. 68, at 28-29.

222.    Macey was the majority shareholder of CFLG and could weigh in whenever he desired.  Macey CFLG 30(b)(6) Dep., ECF No. 68, at 31; Aleman Dep., ECF No. 76, at 46-48; Jeffrey Aleman Answers to Interrogatories, Pl.'s Mot. Summ. J. Ex. 32, at 8 (Response to Interrogatory 7).

223.    Macey had final decision-making authority at CFLG. Macey CFLG 30(b)(6) Dep., ECF No. 68, at 31.

224.    Macey materially participated in the conduct of CFLG's affairs, including the development and approval of CFLG's mortgage assistance relief services by, among other things:

>    a.    Creating or changing policy for running CFLG. Macey CFLG 30(b)(6) Dep., ECF No. 68, at 24, 28-29, 31.
>
>    b.    Monitoring new consumer enrollments and the financials of CFLG. Macey CFLG 30(b)(6) Dep., ECF No. 68, at 28-29.
>
>    c.    Participating in the decision of CFLG to have non-attorneys who handled loan modification processing. Macey CFLG 30(b)(6) Dep., ECF No. 68, at 36, 38-39.

>  b.  Jeffrey Aleman

>      i.  Aleman – Individual Liability – TMLG

225.    Aleman had managerial responsibility for TMLG, serving as TMLG's managing partner in charge of operations.  Jeffrey Aleman Answers to Interrogatories, Pl.'s Mot. Summ. J. Ex. 32, at 8 (Response to Interrogatory 7); Aleman Dep., ECF No. 76, at 46, 147, 282.

226.    Aleman was intimately familiar with and directed TMLG's operations.  He was the boss and the "go-to," and no one knew more about TMLG's operations.  TMLG personnel – including other managers – answered to him on daily matters, issues, and policies, and his

responsibilities "would really run the gamut."  Jeffrey Aleman Answers to Interrogatories, Pl.'s

Mot. Summ. J. Ex. 32, at 8 (Response to Interrogatory 7); Aleman Dep., ECF No. 76, at 30, 50-

51.

227.     Aleman materially participated in the conduct of TMLG's affairs, including the

development and approval of TMLG's mortgage assistance relief services, including mortgage

loan modification services.  Aleman Dep., ECF No. 76, at 282-83.  He participated by, among

other things:

      a.   Creating policy for running TMLG, directing client processing managers and

         third-party vendors, and addressing escalated client matters.  These

         responsibilities included instructing the managers who were in charge of client

         support, processing, and document collection, and providing them with

         instructions on procedures, thereby creating policy and protocol for them.

         Aleman Dep., ECF No. 76, at 46-47; Jeffrey Aleman Answers to

         Interrogatories, Pl.'s Mot. Summ. J. Ex. 32, at 8 (Response to Interrogatory 7).

      b.   Supervising the support staff by reviewing and approving the process by which

         they did their jobs.  Aleman Dep., ECF No. 76, at 72.

      c.   Overseeing the managing attorneys directly under him in TMLG's

         headquarters in Chicago, working directly with the accounting department on

         financial matters – including bookkeeping, and providing updates to Macey on

         key decision-making issues regarding the company.  Aleman Dep., ECF No.

         76, at 27, 31; Jeffrey Aleman Answers to Interrogatories, Pl.'s Mot. Summ. J.

         Ex. 32, at 8 (Response to Interrogatory 7).

d.  Managing local attorneys in states in which TMLG operated, including providing the procedures, protocols, and instructions to which they should adhere.  Aleman Dep., ECF No. 76, at 32.

e.  Managing the person in charge of finance for TMLG.  Aleman Dep., ECF No. 76, at 33.

f.  Managing TMLG's client support managers, as well as the personnel who worked under those managers by assisting the managers in making decisions. Aleman Dep., ECF No. 76, at 37.

g.  Participating in the decision for TMLG to have independent contractors who handled loan modification processing, often referred to as "strategic alliance partners," and then managing them and TMLG's vendors.  He traveled to the strategic alliance partners' offices in other states as many as nine times for meetings, and to, among other things, view their offices and resources. Aleman Dep., ECF No. 76, at 41-43, 249, 253.

h.  Overseeing an independent contractor (CLC) that purportedly provided to consumers budget counseling, financial coaching, and identity monitoring. Aleman Dep., ECF No. 76, at 164.

i.  Reviewing contracts.  Aleman Dep., ECF No. 76, at 27.

j.  Supervising the TMLG marketing, making the ultimate marketing decisions, reviewing and approving content on TMLG's website, and approving marketing expenditures.  Aleman Dep., ECF No. 76, at 90-91.

k.  Reviewing and approving processes, procedures, and reports, including ensuring that TMLG operated the way he and its other founders had designed it and set it up, that TMLG's goals were being met, and that TMLG adhered to

49

the processes and protocols the founders had set.  Aleman Dep., ECF No. 76, at 27, 30-31.

l.   Approving TMLG expenditures.  Aleman Dep., ECF No. 76, at 27, 43.

m.  Discussing resources and employment matters.  Aleman Dep., ECF No. 76, at 30.

n.   Approving the hiring and firing of TMLG personnel.  Aleman Dep., ECF No. 76, at 27, 38.

o.   Approving the compensation system whereby TMLG paid bonuses to salespersons, and whereby those persons received a higher bonus if they enrolled more consumers.  Aleman Dep., ECF No. 76, at 99-100.

p.   Approving the use of a third-party payment processor;

q.   Resolving operational and other issues and complaints brought to his attention, including consumer complaints, employee matters, and vendor issues.  Aleman Dep., ECF No. 76, at 27, 29-30, 40-41.

    ii.   <u>Aleman – Individual Liability – CFLG</u>

228.   Aleman met in person and spoke with Stafford in the Spring of 2012 on multiple occasions prior to his and Macey's agreement to purchase 95% of the company from Stafford on July 12, 2012. Stafford CFLG 30(b)(6) Dep. Part 2, ECF No. 65, at 138-139.

229.   During those conversations, Stafford discussed in detail with Aleman the operations of CFLG before July 2012.  Stafford CFLG 30(b)(6) Dep. Part 2, ECF No. 65, at 140.

230.   Aleman had managerial responsibility over CFLG's operations after July 2012. Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 13, 33.

231.    Aleman had the authority to hire and fire CFLG personnel, and had ultimate authority to manage everyone who worked for CFLG. Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 14-15, 23.

232.    Aleman made large business decisions and decisions about day-to-day activities for CFLG. Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 101-102.

233.    Aleman materially participated in the conduct of CFLG's affairs, including the development and approval of CFLG's mortgage assistance relief services, by, among other things:

    a.  Working for CFLG approximately 5 to 30 hours per week.  Aleman Dep., ECF No. 76, at 12, 14-15.

    b.  Approving the use of local attorneys in states in which CFLG operated and deciding to pay them as independent contractors. Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 105, 107-108.

    c.  Reviewing and approving the checklists and instructions that CFLG sent to local attorneys on reviewing consumer intake files and loan modification submission packages. Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 200.

    d.  Reviewing and approving the use of CFLG's retainer agreements. Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 209.

    e.  Reviewing and approving the use of CFLG's Class B Member agreements. Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 105.

    f.  Approving the creation of CFLG's website and its contents. Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 416-417.

g.   Reviewing and approving CFLG's processes and procedures. Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 13.

h.   Approving CFLG business expenditures. Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 13.

i.   Approving the payment of bonuses to CFLG salespeople. Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 448.

j.   Approving the use of a third-party payment processor to automate the collection of consumers' payments. Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 390.

k.   Contracting with entities or individuals who performed certain services for CFLG, including, but not limited to:

   i.   Marketing. Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 412-413, 415.

   ii.   Controlling collection of consumer payments. CFLG Meracord Agreement, Pl.'s Mot. Summ. J. Ex. 27, at CFPB-TMLG-0028790-0028793, 0028795-0028801, 0028806, 0028808.

234.   Aleman was intimately familiar with and directed CFLG's operations. Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 13, 14, 23, 27.

c.   Searns – Individual Liability – TMLG

235.   Searns had managerial responsibility for TMLG, serving as TMLG's managing partner for ethics, compliance, and regulatory matters.  Aleman Dep., ECF No. 76, at 146-47, 284-85.

236.    Searns materially participated in the conduct of TMLG's affairs, including the development and approval of TMLG's mortgage assistance relief services, by, among other things:

   a.  Creating policy for running TMLG, directing client processing managers, and addressing escalated client matters.  These responsibilities included instructing the managers who were in charge of client support, processing, and document collection, and providing them with instructions on procedures, thereby creating policy and protocol for them.  Aleman Dep., ECF No. 76, at 46-48; Jeffrey Aleman Answers to Interrogatories, Pl.'s Mot. Summ. J. Ex. 32, at 8 (Response to Interrogatory 7).

   b.  Creating and modifying the TMLG business model.  Searns Dep., ECF No. 74, at 24; Aleman Dep., ECF No. 76, at 53.

   c.  Reviewing and approving the TMLG retainer agreement and Exhibit A to that agreement.  Searns Dep., ECF No. 74, at 81-83; Aleman Dep., ECF No. 76, at 148.

   d.  Reviewing and approving scripts and communications that would be sent to consumers. Searns Dep., ECF No. 74, at 62-63, 116.

   e.  Supervising and auditing TMLG paralegals and other support staff.  Searns Dep., ECF No. 74, at 38-40; Aleman Dep., ECF No. 76, at 75.

   f.  Participating in the decision for TMLG to have independent contractors who handled loan modification processing, often referred to as "strategic alliance partners." Aleman Dep., ECF No. 76, at 253.

   g.  Investigating and responding to complaints from consumers and regulatory authorities. Searns Dep., ECF No. 74, at 97-98, 100-104.

237.   Searns was intimately familiar with TMLG's operations and practices. Searns Dep., ECF No. 74, at 24, 49-52, 86-88.

      d. <u>Stafford – Individual Liability – CFLG</u>

238.   Stafford had managerial responsibility for and was the sole owner of CFLG from at least January 2012 to July 2012. CFLG Amended Answer to Complaint, ECF No. 41, at 8 (answer to ¶ 32); Stafford Amended Answer to Complaint, ECF No. 44, at 8 (answer to ¶32); Stafford CFLG 30(b)(6) Dep. Part 1, ECF No. 64, at 19.

239.   Between January 2012 and July 2012, Stafford materially participated in the conduct of CFLG's affairs, including the development and approval of CFLG's mortgage assistance relief services, by, among other things:

      a. Approving the use and screening of local attorneys in states in which CFLG operated. Stafford CFLG 30(b)(6) Dep. Part 1, ECF No. 64, at 26; Stafford CFLG 30(b)(6) Dep. Part 2, ECF No. 65, at 160.

      b. Deciding to use a Florida-based purported "national law firm," Consumer Defense Attorneys, to refer customers to CFLG. Stafford CFLG 30(b)(6) Dep. Part 1, ECF No. 64, at 30; Stafford CFLG 30(b)(6) Dep. Part 2, ECF No. 65, at 161-162.

      c. Deciding to use a back office document processor to collect documents from consumers for loan modification submission packages and to communicate with lenders. Stafford CFLG 30(b)(6) Dep. Part 1, ECF No. 64, at 31-32; Stafford CFLG 30(b)(6) Dep. Part 2, ECF No. 65, at 161-162.

      d. Using a payment processor to collect payments from consumers. Stafford CFLG 30(b)(6) Dep. Part 2, ECF No. 65, at 114-115.

240.     Stafford was intimately familiar with and directed CFLG's operations between January 2012 and July 2012. CFLG Amended Answer to Complaint, ECF No. 41, at 8 (answer to ¶ 32); Stafford Amended Answer to Complaint, ECF No. 44, at 8 (answer to ¶ 32); Stafford CFLG 30(b)(6) Dep. Part 2, ECF No. 65, at 69-101.

241.     After July 2012, Stafford owned 5% of CFLG. CFLG Operating Agreement, Pl.'s Mot. Summ. J. Ex. 3, at DEF.000172.

242.     After July 2012, Stafford screened and chose new local attorneys who were recruited to CFLG. Stafford CFLG 30(b)(6) Dep. Part 2, ECF No. 65, at 144-145, 148-149.

243.     After July 2012, Stafford acquired knowledge of CFLG's operations through weekly conversations with Aleman, notes on the client management system, and visits to CFLG's headquarters in Chicago.  Stafford CFLG 30(b)(6) Dep. Part 2, ECF No. 65, at 156-157, 178-179, 208-209; Stafford Dep., ECF No. 72, at 9.

244.     After July 2012, Stafford received consumer complaints against CFLG from the Better Business Bureau and state regulators. Stafford CFLG 30(b)(6) Dep. Part 2, ECF No. 65, at 178-180.

245.     After July 2012, Stafford drafted written responses to consumer complaints from the Better Business Bureau and state regulators, as "managing member" of CFLG. Exhibit A to Declaration of Edith Gray, ECF No. 94; Stafford CFLG 30(b)(6) Dep. Part 2, ECF No. 65, at 182-183.

246.     After July 2012, Stafford was intimately familiar with and directed CFLG's operations.  Stafford CFLG 30(b)(6) Dep. Part 2, ECF No. 65, at 156-157, 178-180, 182-183, 208-209.

Date: October 9, 2015                          Respectfully submitted,

                                               Anthony Alexis (DC Bar #384545)
                                               *Enforcement Director*

                                               David M. Rubenstein (DC Bar #458770)
                                               *Deputy Enforcement Director*

                                               Cynthia Gooen Lesser (NY Bar #2578045)
                                               *Assistant Deputy Enforcement Director*

                                               */s/Seth B. Popkin*
                                               Seth B. Popkin, DC Bar #417365
                                               Seth.Popkin@cfpb.gov
                                               202-435-9496
                                               Shirley Chiu, IL Bar #6296079
                                               Shirley.Chiu@cfpb.gov
                                               202-435-7592
                                               Leanne Hartmann, MA Bar #667852
                                               Leanne.Hartmann@cfpb.gov
                                               202-435-7453
                                               *Enforcement Attorneys*

                                               Consumer Financial Protection Bureau
                                               1700 G Street, NW
                                               Washington, DC 20552