# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

CONSUMER FINANCIAL PROTECTION )
BUREAU, )
          )
     Plaintiff, )
          )   Case No. 3:14-cv-00513
   v. )
          )   Hon. Barbara C. Crabb
THE MORTGAGE LAW GROUP, LLP, )
CONSUMER FIRST LEGAL GROUP, )
LLC, THOMAS G. MACEY, JEFFREY J. )
ALEMAN, JASON E. SEARNS and )
HAROLD E. STAFFORD, )
          )
     Defendants. )

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................1

FACTUAL BACKGROUND...................................................................................2

    The Formation Of TMLG..............................................................................2

    TMLG's Operational Structure .....................................................................3

    TMLG's Legal Services For Its Clients ........................................................4

    TMLG Winds Up Its Operations And Enters Bankruptcy ...........................5

    Harold Stafford Forms Consumer First Law Group In Early 2012...............6

    In July 2012, Macey And Aleman Obtain A 95% Interest In CFLG ...............6

    CFLG Winds Down Beginning In November 2012........................................7

    The CFPB Files This Lawsuit .......................................................................8

ARGUMENT.......................................................................................................9

I.    The States – Not Congress – Have Traditionally Regulated The Practice
    Of Law ........................................................................................................9

II.    The Legislative History Of The CFPA And Regulation O ...........................11

    A.    Congress Promulgates The FTC Act .................................................11

    B.    Congress Authorizes The FTC To Enact The MARS Rule – And Makes It Clear
        That The Scope Of The Mars Rule Must Mirror The Scope Of The FTC Act ..11

    C.    The FTC Enacts The MARS Rule And – Without Any Authorization
        From Congress – Determines That Attorneys Should Be Subject
        To The Rule ......................................................................................12

    D.    Congress Enacts The Dodd-Frank Act And Authorizes The Creation
        Of The CFPB ....................................................................................14

    E.    The CFPB Promulgates Regulation O (Which Essentially Mirrors
        The MARS Rule)...............................................................................16

    II.    Counts I-VIII Fail Because Congress Did Not Authorize The Regulation Of
        Attorneys Under The MARS Rule (Or Its Successor, Regulation O) .....................16

      A.      The *Chevron* Standard ................................................................16

      B.      To The Extent It Seeks To Regulate Attorneys, Regulation O Fails Under the First Prong Of *Chevron* ................................................................18

            1.      The Omnibus Act, Credit Card Act, and FTC Act Do Not Authorize The Regulation of Attorneys ................................................................18

            2.      The CFPA Does Not Authorize The Regulation of Attorneys............19

      C.      Regulation O Is Invalid Under Chevron's Second Prong...................20

   III.     Counts I-VIII Fail Because Regulation O Is Invalid Under The APA's Arbitrary And Capricious Standard To The Extent It Purports To Regulate Attorneys ..........25

      A.      The Arbitrary And Capricious Standard Under The Administrative Procedures Act...........................................................25

      B.      Regulation O Is Arbitrary And Capricious........................................26

V.     In The Alternative, Counts I-VIII Fail Because Regulation O's Attorney Exemption Applies To Defendants ................................................................27

VI.    Counts IX-X Fail As A Matter Of Law Because Defendants Are All Attorneys ..........29

VII.   All Claims Fail With Respect To Macey And Stafford.................................30

CONCLUSION .................................................................................33

# TABLE OF AUTHORIES

## CASES

*Adams v. Attorney Registration and Disciplinary Comm'n*, 600 F. Supp. 390 (N.D. Ill. 1984)...10

*Adventist GlenOaks Hosp. v. Sebelius*, 663 F.3d 939 (7th Cir. 2011)...........................26

*Akram v. Holder*, 721 F.3d 853 (7th Cir. 2013). .........................................................17

*Am. Bar Ass'n v. F.T.C.*, 430 F.3d 457 (D.D.C. 2005).................................................18

*Beyers v. Richmond*, 937 A.2d 1082 (Pa. 2007);.........................................................10

*CE Design Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443 (7th Cir. 2010)...................17

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). ...............17

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971); .............................26

*Consumer Fin. Prot. Bureau v. Frederick J. Hanna & Assoc.*,
2015 WL 4282252 (N.D. Ga. July 14, 2015) ...............................................................15

*Cripe v. Leiter*, 703 N.E.2d 100 (Ill. 1998). ...............................................................10

*Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557 (7th Cir. 1999).................................25

*F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F. 3d 611 (6th Cir. 2014) ...............................32

*F.T.C. v. Freecom Commc'ns*, 401 F. 3d 1192 (10th Cir. 2005)...................................32

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ........................................26

*Fed. Trade Comm'n v. Amy Travel Serv., Inc.*, 875 F.2d 564 (7th Cir. 1989) .............32

*Fed. Trade Comm'n v. World Media Brokers*, 415 F.3d 758 (7th Cir. 2005)................32

*Judulang v. Holder*, 132 S.Ct. 476 (2011)...................................................................26

*Michigan v. EPA*, 135 S. Ct. 2699 (2015) ...................................................................26

*Middlesex Co. Ethics Comm. v. Garden St. Bar Assoc.*, 457 U.S. 423 (1982) .........9, 10

*Motor Vehicle Mfrs. Ass'n of United States v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......................................................................................................26

*People ex rel Brazen v. Finley*, 519 N.E.2d 898 (Ill. 1988) ...........................................................9

*Persels & Assoc., LLC v. Banking Commissioner*, 318 Conn. 652 (Conn. 2015)...........................9

*Preston v. Stoops*, 285 S.W.3d 606 (Ark. 2008) ...........................................................................9

*State ex rel. Reynolds v. Dinger*, 109 N.W.2d 685, 692 (1961) ...................................................9

*U.S. v. P.H. Glatfelter Co.*, 768 F.3d 662 (7th Cir. 2014)......................................................26, 27

*White v. Scibana*, 390 F.3d 997 (N.D. Ill. 2004). ......................................................................21

*Whitman v. Am. Trucking Assn's*, 531 U.S. 457 (2001)..............................................................10

## STATUTES

5 U.S.C. § 706(2)(A). ...................................................................................................................25

12 U.S.C. § 5301 ...............................................................................................................1, 8, 14

12 U.S.C. § 5511 .........................................................................................................................22

12 U.S.C. § 5517 ...................................................................................................................15, 19

12 U.S.C. § 5517(e). .............................................................................................................19, 31

12 U.S.C. § 5517(e)(1) ..........................................................................................................15, 30

12 U.S.C. § 5517(e)(2). ....................................................................................................15, 20, 30

12 U.S.C. § 5517(e)(3) ................................................................................................................15

12 U.S.C. § 5531. ..................................................................................................................14, 22

12 U.S.C. § 5581(b)(5). ........................................................................................................14, 15

2009 Credit Card Accountability Responsibility and Disclosure Act,
Pub. L. No. 11-24, § 511, 123 Stat. 524 (2009) ........................................................................11

2009 Omnibus Appropriations Act,
Pub. L. No. 111-8, § 626, 123 Stat. 524 (2009) ........................................................................11

Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act")
Pub. L. No. 111-203, §§ 1062, 1097 (1) 124 Stat. 1376 (2010)................................................14

Federal Trade Commission Act ("FTC Act")
15 U.S.C. §§ 41-58 (as amended)...........................................................................11

75 F.R. 57252 (Sept. 20, 2010)............................................................................14

74 F.R. 26130 (June 1, 2009) ..............................................................................12

75 F.R. 10707 (Mar. 9, 2010)..............................................................................12

75 F.R. 75093 (Dec. 1, 2010) ..............................................................................13

## RULES & REGULATIONS

12 C.F.R. § 1015...................................................................................................16

12 C.F.R. § 1015.1...........................................................................................1, 8

12 C.F.R. § 1015.3...............................................................................................16

12 C.F.R. § 1015.5...............................................................................................16

12 C.F.R. § 1015.7...............................................................................................16

12 C.F.R. § 1015.7(a)..........................................................................................16

12 C.F.R. § 1015.7(b)..........................................................................................16

16 C.F.R. § 322.7(a)............................................................................................13

16 C.F.R. § 322.7(b)............................................................................................13

## OTHER AUTHORITIES

156 Cong. Rec. E1347-01, 2010 WL 2788137 (June 30, 2010) ......................15

# INTRODUCTION

In this action, the Consumer Financial Protection Bureau ("CFPB") is bringing claims against two now-defunct law firms (The Mortgage Law Group ("TMLG") and Consumer First Legal Group ("CFLG")) and four attorneys (Thomas Macey, Jason Searns, Jeff Aleman and Harold Stafford) who were associated with one or both of those firms. There are several fundamental problems that are fatal to the CFPB's claims.

***First***, the CFPB does not have Congressional authorization to bring such claims. As the Supreme Court has recognized, the power to regulate attorneys has historically been reserved to the states, and Congress has historically respected the states' right to exercise that power. In the absence of an express Congressional statement to the contrary, it is presumed that Congress does ***not*** intend to regulate attorneys or the practice of law. Eight of the CFPB's claims (Counts I-VIII) arise under the CFPB's Regulation O, 12 C.F.R. § 1015.1 *et. seq.* However, when Congress authorized the enactment of Regulation O (or, more accurately, when it authorized the enactment of Regulation O's predecessor, the Federal Trade Commission's ("FTC") Mortgage Assistance Relief Services Rule ("MARS Rule"), 16 C.F.R. § 322 (2011), it did not authorize any regulation of attorneys. Accordingly, to the extent it purports to permit the regulation of attorneys, Regulation O exceeds the scope of Congress' authorization.[1]

***Second***, Counts IX-X arise under the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. § 5301 *et. seq.* When it enacted the CFPA, Congress expressly addressed

---

[1] Were this Court to find otherwise, it would effectively transfer the power to regulate and define the practice of law from state judiciaries to the federal government. The CFPB would be permitted to determine whether attorneys are (or are not) "practicing law," and to bring enforcement actions against those attorneys which (in the CFPB's opinion) are not doing so. The federal courts would then become the arbiters of issues such as whether attorneys are practicing law, or are violating the Rules of Professional Conduct. Defendants submit that such questions should be left to entities such as the Wisconsin Office of Lawyer Regulation ("OLR") and the Wisconsin Supreme Court.

the regulation of attorneys, and made it clear that attorneys were not subject to the CFPA, except under the circumstances that are not present here.

**Third**, the CFPB alleges that all four individual Defendants are personally liable for any violations of Regulation O or the CFPA by TMLG and CFLG. That claim fails as a matter of law with respect to two of the Defendants: Macey and Stafford. There is no evidence that either of them were actively involved in the management of either TMLG or CFLG. Macey made a significant monetary investment in both firms, but was not living or working in Chicago (where the firms were managed). Similarly, Stafford (who was located in Madison) started CFLG, but very quickly sold 95% of the firm. After that transaction, Stafford had little to no involvement in the management of CFLG. Accordingly, the claims against them fail as a matter of law.

## FACTUAL BACKGROUND

### The Formation Of TMLG

TMLG was formed in 2011 by Macey, Aleman and Searns. (Defendants' Proposed Findings of Fact ("Defs' PFOF") ¶¶ 19-21.) At the time, the three were members of another law firm (Legal Helpers Debt Resolution or "LHDR") that represented clients in obtaining out-of-court settlements of credit card debt. (Defs' PFOF ¶¶ 15-19.) For a brief period of time, LHDR also represented clients in mortgage mitigation situations. (Defs' PFOF ¶ 18.) However, Aleman perceived the need for a separate law firm to provide that service, and persuaded Searns and Macey to co-found TMLG. (Defs' PFOF ¶¶ 19-20.)

Macey (who lived in Florida at the time) contributed over $600,000 to capitalize the firm, and later loaned money to the firm. (Defs' PFOF ¶¶ 2, 22, 28, 56.) He was a 76% owner. (Defs' PFOF ¶ 22.) Searns (who lived in Colorado at the time) assisted in creating the structure for TMLG with respect to regulatory and ethics issues. (Defs' PFOF ¶ 25.) He owned approximately 9% of

the firm. (Defs' PFOF ¶ 24.) Aleman (who lived and worked in Chicago) managed the firm on a day-to-day basis. (Defs' PFOF ¶¶ 26-27.) Aleman contributed over $100,000 in capital to the firm and was granted a 14% partnership interest in it. (Defs' PFOF ¶ 23.)

### TMLG's Operational Structure

TMLG was headquartered in Chicago. (Defs' PFOF ¶ 26.) TMLG had approximately 100 member attorneys in 40 different states. (Defs' PFOF ¶ 29.) Those attorneys were not "local counsel." (Defs' PFOF ¶ 30.) Rather, they were partners in the law firm. (*Id.*) Aleman managed the business with assistance from other counsel in the Chicago office. (Defs' PFOF ¶ 27.) Collectively, they made the day-to-day decisions regarding the firm's operations. (*See id.*) TMLG represented clients in mortgage mitigation. (Defs' PFOF ¶ 31.) Generally, TMLG's goal was to keep a client in his or her home for as long as possible. (*Id.*) That goal was accomplished through foreclosure defense, mortgage mitigation, short sales and other possible remedies for a client's hardship. (Defs' PFOF ¶¶ 32-35.)

TMLG did not do its own advertising. (Defs' PFOF ¶ 45.) Instead, it contracted with various companies that would provide TMLG with "qualified leads" that those companies developed. (Defs' PFOF ¶ 46.) When TMLG was provided with a lead, its intake personnel would speak with the prospective client over the telephone and gather certain information regarding the prospective client (*e.g.*, contact information, name of mortgage lender, personal financial information, etc.). (Defs' PFOF ¶ 47.) The intake person (using scripts prepared by TMLG) would describe TMLG's services and the manner in which TMLG charged for those services. (Defs' PFOF ¶ 48.) If the person wanted to retain TMLG, a TMLG attorney would then speak with the person to confirm their understanding of TMLG, its structure and fees, the services it provided, and the risks associated with those services. (Defs' PFOF ¶ 49.) Once the person spoke with a

TMLG attorney and signed a retainer agreement, the person's information and retainer agreement were packaged into a file and sent to a TMLG partner in the person's home state for review. (Defs' PFOF ¶ 50.)

### TMLG's Legal Services For Its Clients

In a typical mortgage modification, a TMLG client worked with non-attorney support staff under the supervision of TMLG's attorneys, including people in TMLG's support facility in Delray Beach, Florida. (Defs' PFOF ¶¶ 36-37.) The people working in the Delray Beach facility were either TMLG employees, or contract workers employed by CAPS, a company that signed a contract with TMLG to provide certain support services. (Defs' PFOF ¶¶ 38-39.) TMLG signed contracts with other companies, including APS and UPS, to provide additional support services. (Defs' PFOF ¶ 40.) TMLG's employees and contractors were directly supervised by the firm's attorneys – either through the presence of a TMLG attorney on-site, or through the policies, procedures, and training implemented by, and the reviews conducted by, TMLG attorneys in Chicago and across the country. (Defs' PFOF ¶ 41.)

The support staff worked with clients to gather the information necessary to secure a loan modification (or other services provided by TMLG). (Defs' PFOF ¶ 42.) Once the appropriate documents were gathered, a loan modification package was prepared by the support staff, and then reviewed by a TMLG attorney in the state where the client lived to confirm the package was complete and appropriate. (Defs' PFOF ¶ 43.) Upon attorney approval, the package was sent to a mortgage lender to secure a refinance or other type of loan modification. (Defs' PFOF ¶ 44.)

In addition to loan modifications and foreclosure defense, TMLG's services, included short sales and "cash for keys" programs. (Defs' PFOF ¶¶ 32, 34-35.) TMLG's short sale services included working with the client, a potential buyer, and the client's lender to do a short sale

whereby the property would be sold to the third party potential buyer with the lender's agreement. (Defs' PFOF ¶ 34.) "Cash for keys" involved working with the client and the client's lender to get the client cash form the lender if the client was willing to effectively surrender his or her property in a timely manner – such a service was generally a last resort when all other measures were exhausted. (Defs' PFOF ¶ 35.)

As compensation to TMLG for the legal services it provided, clients made retainer payments to the firm, out of which TMLG withdrew its fees. (Defs' PFOF ¶ 51.) Upon enrolling with TMLG, a client would make an initial flat-fee retainer payment, and would then make monthly flat-fee retainer payments for a set amount of time. (Defs' PFOF ¶ 52.) To facilitate those payments, each client set up an account with the payment processing service company NoteWorld (later known as Meracord), with which TMLG had accounts as well. (Defs' PFOF ¶ 53.) In general terms, the processing of client payments went as follows: (1) clients made their payments into their individual NoteWorld/Meracord accounts; (2) NoteWorld/Meracord distributed the funds pursuant to its contracts, including to TMLG's IOLTA trust accounts, and to itself for its account fees; (3) TMLG transferred funds to cover its fees from the trust accounts into its NoteWorld/Meracord account and then to its operating account(s). (Defs' PFOF ¶ 54.)

### TMLG Winds Up Its Operations And Enters Bankruptcy

Ultimately, TMLG was not a profitable enterprise. (Defs' PFOF ¶ 55.) Neither Macey nor Aleman were able to fully recoup their investments in the firm over the course of its operations. (*Id.*) In total, Macey lost over $100,000 in cash from his capital investments and loans to the firm. (Defs' PFOF ¶ 56.) Aleman lost over $30,000 in capital investments and loans. (Defs' PFOF ¶ 57.) TMLG continued to operate into 2013. (Defs' PFOF ¶ 59.) During the first quarter of 2013, TMLG stopped taking on new clients and went into a wind-down. (Defs' PFOF ¶ 61.) By the

third quarter of 2013, TMLG no longer had any clients. (Defs' PFOF ¶ 62.)  Nationally, TMLG had approximately 5000 clients over the course of its operations. (Defs' PFOF ¶ 59.)  Of those clients, TMLG secured bank-approved loan modifications for nearly 1,300 of them. (Defs' PFOF ¶ 60.)  TMLG filed a bankruptcy petition in March 2014. (Defs' PFOF ¶ 7.)

### Harold Stafford Forms Consumer First Law Group In Early 2012

Harold Stafford is an attorney who lives in the Madison area. (Defs' PFOF ¶¶ 4, 11.)  In early 2012, Stafford formed the law firm CFLG. (Defs' PFOF ¶ 63.)  He intended for CFLG to provide mortgage mitigation legal services for homeowners in distress with the goal being keeping clients in their homes as long as possible. (Defs' PFOF ¶¶ 64, 67.)  Stafford entered into contracts with various attorneys across the country, and established a business plan for CFLG. (Defs' PFOF ¶ 68.)  Between January 2012 and July 2012, CFLG did not grow very quickly:  it only enrolled 26 clients during that time. (Defs' PFOF ¶ 71.)  During that time, Stafford directed CFLG's daily operations from his office in Madison. (Defs' PFOF ¶ 66.)

### In July 2012, Macey And Aleman Obtain A 95% Interest In CFLG

In July 2012, Stafford was approached by Aleman, who indicated that he and Macey wanted to acquire a majority interest in CFLG. (Defs' PFOF ¶¶ 73-75.)  In July 2012, Macey and Aleman obtained a 95% interest in CFLG. (Defs' PFOF ¶¶ 76-77.)  From that time forward, CFLG was operated out of Chicago, with Aleman managing its daily operations. (Defs' PFOF ¶ 79.)  Stafford had no operational control, management, or direction over CFLG after July 2012. (Defs' PFOF ¶ 80.)  Searns was not associated with CFLG in any way. (*See* Defs' PFOF ¶ 72.)

Beginning in July 2012, CFLG was operated in a similar manner to TMLG.  CFLG represented clients with respect to mortgage mitigation matters and alleviation of mortgage-related hardships, including foreclosure, mortgage modifications, and short sales. (Defs' PFOF ¶¶ 82-

86.)  Like TMLG, CFLG did not do any advertising.  (Defs' PFOF ¶ 91.)  Instead, it accepted

referrals prior to July 2012 and acquired leads from third party lead generators thereafter.  (Defs'

PFOF ¶ 92-93.)

Unlike TMLG, CFLG did not contract with third parties to provide support services for its

attorneys after July 2012.  (Defs' PFOF ¶ 94.)  Instead, all of those services were provided by

CFLG employees, many of whom worked out of CFLG's Delray Beach, Florida office, who

reported to the CFLG attorneys in Chicago or in the various states.  (Defs' PFOF ¶¶ 95-96.)

CFLG's attorneys monitored, directed, and supervised the work of those employees in various

ways.  (Defs' PFOF ¶ 97.)  CFLG attorneys, including Aleman had regular meetings with Gerst

and the other support staff employees, either through in-person meetings or by teleconference.

(Defs' PFOF ¶ 98.)  CFLG imposed policies and procedures – crafted and approved of by CFLG's

managing attorneys – for its support staff.  (Defs' PFOF ¶ 99.)  Support staff employees were also

given scripts for use during the intake process and each prospective client went through a "quality

control" telephone interview with a CFLG attorney.  (Defs' PFOF ¶ 100.)

### CFLG Winds Down Beginning In November 2012

Like TMLG, CFLG was not profitable.  (Defs' PFOF ¶ 110.)  By the end of 2012 (after

only a few months of operation), Macey directed Aleman to stop taking on new clients, and wind-

up representation of any existing CFLG clients.  (Defs' PFOF ¶¶ 111-12.)  CFLG stopped taking

new clients in November 2012, and had no clients or operations after July 2013.  (Defs' PFOF ¶¶

112-13.)  During that venture, Macey lost approximately $650,000 and Aleman lost approximately

$100,000.  (Defs' PFOF ¶¶ 114-15.)

At its peak, CFLG had approximately 37 member attorneys licensed in 39 states.  (Defs'

PFOF ¶ 88.)  During its tenure, CFLG provided mortgage mitigation legal representation to

approximately 1100 clients nationally. (Defs' PFOF ¶ 89.) CFLG secured bank-approved loan modifications for nearly 200 of its clients. (Defs' PFOF ¶ 90.)

**The CFPB Files This Lawsuit**

On July 22, 2014 (*i.e.*, a year after CFLG and TMLG went out of business and four months after TMLG filed a bankruptcy petition), the CFPB filed this action. (Defs' PFOF ¶ 116.) In its complaint, the CFPB alleges that, during the years TMLG and CLFG were in operation (2011-2013), various aspects of their operations violated Regulation O, 12 C.F.R. § 1015.1, *et seq.* and the CFPA 12 U.S.C.A. § 5301 *et. seq.* (Defs' PFOF ¶ 118.) The CFPB claims that all Defendants are liable for those violations. (Defs' PFOF ¶ 122.)

The CFPB's complaint does not mention any TMLG or CFLG clients by name. (Defs' PFOF ¶ 123.) Nor does the complaint allege any specific misconduct in the handling of any particular client file. (Defs' PFOF ¶ 124.) Instead, the CFPB's complaint suggests that TMLG's and CFLG's general business practices – not their specific representation of any particular client(s) – violated both Regulation O and the CFPA. (Defs' PFOF ¶ 125.)

- In Counts I and II, the CFPB alleges that Defendants violated Regulation O by collecting advance fees for services provided by TMLG and CFLG (Defs' PFOF ¶ 126);

- In Counts III and IV, the CFPB alleges that Defendants violated Regulation O by improperly advising clients not to communicate with their mortgage lenders (Defs' PFOF ¶ 127);

- In Counts V and VI, the CFPB alleges that Defendants violated Regulation O by making material representations to their clients regarding: (1) the likelihood of obtaining loan modifications; (2) the amount of time it would take to receive a modification; (3) the nature of any obligation to make periodic payments; and (4) the clients would receive legal representation (Defs' PFOF ¶ 128);

- In Counts VII and VIII, the CFPB alleges that Defendants violated Regulation O by failing to include a required disclosure in their client communications (Defs' PFOF ¶ 129); and

8

- In Counts IX and X, the CFPB alleges that Defendants violated the CFPB Act by falsely representing that TMLG and CFLG's clients would receive legal representation, and that they could provide mortgage modification and foreclosure assistance within 90-120 days (Defs' PFOF ¶ 130).

In its complaint, the CFPB acknowledges that Macey, Aleman, Searns, and Stafford are all attorneys and that CFLG and TMLG were law firms offering "mortgage assistance relief services" to their clients. (Defs' PFOF ¶ 131.) Further, according to the complaint, the clients of CFLG and TMLG were told that they were retaining a law firm when they enrolled. (Defs' PFOF ¶ 132.)

## ARGUMENT

**I. The States – Not Congress – Have Traditionally Regulated The Practice Of Law.**

In the United States, the power to define and regulate the practice of law has historically been the exclusive province of the states. As the Supreme Court stated in *Middlesex Ethics Commission v. Garden State Bar Association*, 457 U.S. 423 (1982)

> The [state] has an extremely important interest in maintaining and assuring the professional conduct of the attorneys it licenses. States traditionally have exercised extensive control over the professional conduct of attorneys.

*Id.* at 434. In most states, the power to define the practice of law and regulate the conduct of attorneys resides with the state's judicial branch.[2] State supreme courts have not hesitated to strike down (or narrowly construe) legislation that may impinge on the judiciary's exclusive regulation of the practice of law. *See, e.g., Persels & Assoc., LLC v. Banking Commissioner*, 318 Conn. 652 (Conn. 2015); *Preston v. Stoops*, 285 S.W.3d 606 (Ark. 2008); *Beyers v. Richmond*, 937 A.2d 1082

---

[2] Wisconsin (the forum state) and Illinois (the location of TMLG's and CFLG's main offices) are no exceptions; their supreme courts are charged with defining and regulating the practice of law. *Seitzinger v. Community Health Network*, 2004 WI 28, ¶ 39, 270 Wis. 2d 1, 22, 676 N.W.2d 426, 436; *Sands v. Menard, Inc.*, 2010 WI 96, ¶ 51, 328 Wis. 2d 647, 673, 787 N.W.2d 384, 397; *State ex rel. Reynolds v. Dinger*, 14 Wis. 2d 193, 206, 109 N.W.2d 685, 692 (1961); *see also People ex rel Brazen v. Finley*, 519 N.E.2d 898, 902 (Ill. 1988) ("[T]he power to prescribe rules governing attorney conduct, and to discipline attorneys for violating those rules, rests solely in this court.").

(Pa. 2007); *Cripe v. Leiter*, 703 N.E.2d 100 (Ill. 1998).

Because issues of attorney regulation implicate "important state issues," federal courts, cognizant of comity, proceed hesitantly in this area. *See Adams v. Attorney Registration and Disciplinary Comm'm*, 600 F. Supp. 390, 393 (N.D. Ill. 1984) (citing *Middlesex Ethics Commission v. Garden State Bar Association*, 457 U.S. 423 (1982)). Courts have typically declined to construe statutes to apply to attorneys absent an express Congressional statement that it intends to supplant state regulation of the practice of law. On this issue, Congressional intent must be clearly and expressly stated. As the Supreme Court has admonished, "Congress, as we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions – it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

In *American Bar Association v. FTC*, 430 F.3d 457, the FTC argued that it had a right to regulate attorneys under the Gramm-Leach-Bliley Act because, *inter alia*: (1) Congress intended for the statute to govern "financial institutions and other persons;" and (2) the Act did not contain an express attorney exemption. *Id.* at 468-70. The D.C. Circuit decisively rejected that argument:

> It is undisputed that the regulation of the practice of law is traditionally the province of the states. Federal law may not be interpreted to reach into areas of State sovereignty unless the language of the federal law compels the intrusion. Otherwise put, if Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakeably clear in the language of the statute.

*Id.* at 471 (internal cites omitted). "The states have regulated the practice of law throughout the history of the country; the federal government has not. This is not to conclude that the federal government could not do so. We simply conclude that it is not reasonable for an agency to decide that Congress has chosen such a course of action in language that is, even charitably viewed, at most ambiguous." *Id.* at 472.

## II.    The Legislative History Of The CFPA And Regulation O.

### A.    Congress Promulgates The FTC Act.

The Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 41, *et seq.*, was enacted in 1914 and has been amended many times since that date. The FTC Act has never contained any language to suggest Congress intended for it to be applied to attorneys engaged in the practice of law. Indeed, the FTC Act does not now (and, to the best of Defendants' knowledge, has never) mentioned attorneys, lawyers, or the practice of law. In short, there is nothing in the FTC Act that confers authority to the FTC to regulate the practice of law or attorneys.

### B.    Congress Authorizes The FTC To Enact The MARS Rule – And Makes It Clear That The Scope Of The Mars Rule Must Mirror The Scope Of The FTC Act.

On March 11, 2009, Congress enacted the Omnibus Appropriations Act ("Omnibus Act"). 2009 Omnibus Appropriations Act, Pub. L. No. 111-8, § 626, 123 Stat. 524 (2009). In Section 626 of that Act, Congress authorized the FTC to initiate a rulemaking proceeding to address mortgage lending practices. *Id.* at § 626. Section 626 provided little guidance regarding which persons or entities were (or were not) subject to the new rule.

Congress remedied that shortcoming two months later. On May 22, 2009, Congress passed the Credit Card Accountability Responsibility and Disclosure Act ("Credit Card Act"), which clarified portions of the Omnibus Act. 2009 Credit Card Act, Pub. L. No. 11-24, § 511, 123 Stat. 524 (2009). Importantly, Section 511 of the Credit Card Act narrowed the scope of rulemaking authority provided to the FTC under Section 626 of the Omnibus Act. *Id.* at § 511(a)(2). Section 511 amended Section 626 of the Omnibus Act to make clear it could not be "construed to authorize the [FTC] to promulgate a rule with respect to an entity that is not subject to enforcement of the [FTC Act]." *Id.* at § 511(a)(2).

**C.    The FTC Enacts The MARS Rule And – Without Any Authorization From Congress – Determines That Attorneys Should Be Subject To The Rule.**

On June 1, 2009, the FTC issued an Advance Notice of Proposed Rulemaking for the MARS Rule. 74 F.R. 26130. Therein, the FTC acknowledged that it "intends that any rules that it issues in this proceeding would apply only to the same types of entities over which the Commission has jurisdiction under the FTC Act." *Id.* at 26132. In the Advance Notice, the FTC noted that many state "foreclosure consultant" statutes contained attorney exemptions. *Id.* at 26137. The FTC requested comment on whether the "proposed rule [should] include an exemption for attorneys or any other class of persons or entities." *Id.* at 26138. Notably, the FTC did not cite any provision of the FTC Act that permitted regulation of attorneys; rather, it cited only state statutes that exempted attorneys from coverage.

On March 9, 2010, the FTC published the proposed MARS Rule (the "Proposed Rule"). 75 F.R. 10707. The Proposed Rule acknowledged that the FTC's "rulemaking authority was limited to entities that are subject to enforcement by the Commission under the FTC Act." *Id.* at 10707. The Proposed Rule did not contain a general exemption for attorneys. Instead, it contained a limited exemption for attorneys that contained criteria established by the FTC (including that the attorney comply with all applicable state laws). *Id.* at 10723, 10737. The Proposed Rule did not point to any Congressional authorization for such regulation. Rather, it asserted that a narrow attorney exemption was appropriate based on "the Commission's law enforcement experience, as well as that of state attorneys general." *Id.* at 10724. The FTC asserted that the proposed attorney exemption "exempts attorneys from those parts of the proposed Rule that interfere with the attorneys' provision of traditional bona fide legal services to homeowners." *Id.* The FTC did not cite any authority for that assertion regarding what is (or is not) a "traditional" or "bona fide" legal service. The FTC noted that "[t]he Commission is concerned that the narrowness of the exemption

could interfere with the ability of attorneys to offer counsel and advice to their clients" and sought comment on the exemption. *Id.* at 10725.

In response to the Proposed Rule, the FTC received 75 comments, many of which related to the proposed attorney exemption. 75 F.R. 75093 (Dec. 1, 2010). Approximately 30 commenters (primarily attorneys and entities such as the Wisconsin State Bar Association and American Bar Association) proposed expanding the scope of the attorney exemption. For example, the American Bar Association proposed to exempt any "licensed attorney engaged in the practice of law and those individuals acting under the direction of the attorney." (Decl. Winters Dkt. No. 102 at Ex. A at MARS000329-MARS000340) Other commenters (such as the National Association of Attorneys General) urged the FTC to maintain the exemption in the Proposed Rule. *Id.* (*Id.* Winters at Ex. A at MARS000292-MARS000293)

December 1, 2010, the FTC issued the final MARS Rule, which was codified at 16 C.F.R. § 322. *See* 75 F.R. 75092. Like the Proposed Rule, the final MARS Rule did not contain a general exemption for attorneys. Instead, it contained a limited attorney exemption. In general, attorneys were not subject to the MARS Rule if: (1) they provided mortgage relief services as part of the practice of law; (2) they were licensed in the state in which the client and/or client's home was located; and (3) they complied with state laws and regulation governing attorney conduct. 16 C.F.R. § 322.7(a). The MARS Rule also provided that an attorney could collect advance fees for mortgage relief services so long as he satisfied the criteria above, and also placed those fees in a state-law compliant client trust account. 16 C.F.R. § 322.7(b).

In short, the FTC answered the right to determine which attorneys were (or were not) engaged in the practice of law and which attorneys were (and were not) abiding by the Rules of Professional Conduct. The FTC did not cite to any Congressional authorization for ***any*** regulation

of attorneys. Nor did the FTC state what expertise it had with respect to regulating attorneys, or defining the practice of law. Instead, the FTC cited its belief (and the belief of state law enforcement authorities) that regulation of attorneys was necessary because many attorneys were engaged in "deceptive and unfair conduct." 75 F.R. 75128. The FTC also noted that federal regulation was needed because many state statutes exempted attorneys from their coverage. *Id.* at 75129. In short, the FTC arrogated to itself a power that neither the state legislatures nor Congress were willing to take from the state judiciaries.

### D. Congress Enacts The Dodd-Frank Act And Authorizes The Creation Of The CFPB.

In the summer of 2010, Congress overhauled the financial services regulatory structure and passed the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"). Title X of the Dodd-Frank Act, the Consumer Financial Protection Act of 2010 (the "CFPA"), created the CFPB and gave it broad powers to engage in supervision, examination, rulemaking and enforcement of consumer financial services. 12 U.S.C. § 5301, *et seq.*, Dodd-Frank Act, Pub. L. 111-203, Tit. X, § 1021, 124 Stat. 1979 (2010). Specifically, the CFPB was given authority to:

> [P]rescribe rules applicable to a covered person or service provider identifying as unlawful unfair, deceptive, or abusive acts or practices in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service.

12 U.S.C. § 5531. On July 21, 2011, the FTC's rulemaking authority under the Omnibus Act was effectively transferred to the CFPB. 12 U.S.C. § 5581(b)(5); Dodd-Frank Act, Pub. L. No. 111-203, § § 1062, 1097(1), 124 Stat. 1376 (2010); 75 Fed. Reg. 57252 (Sept. 20, 2010) (designating the transfer date as July 21, 2011).

Congress was concerned that "the breadth of the authority being given to the [CFPB]" and the 'complexities of the practice of law" would create an overlap between CPFB regulation and

state court regulation of the conduct of attorneys. 156 Cong. Rec. E1347-01, 2010 WL 2788137 (Jun. 30, 2010). Thus, the CFPA expressly prohibits the CFPB from exercising "supervisory or enforcement authority with respect to an activity engaged in by an attorney as part of the practice of law under the laws of a State in which the attorney is licensed to practice law." 12 U.S.C. § 5517(e)(1). John Conyers, the congressional sponsor of the exclusion, "made clear that Congress did not intend to allow the Bureau to regulate the practice of law, which should be left to the state supreme courts and the ethical codes and disciplinary rules governing all aspects of the practice of law." *See Consumer Fin. Prot. Bureau v. Frederick J. Hanna & Assoc.*, 2015 WL 4282252 (N.D. Ga. July 14, 2015); *see also* 2010 WL 2788137 ("[O]ur Committee was determined to avoid any possible overlap between the [CPFB]'s authority and the practice of law.").

However, Congress did not completely exempt attorneys from the CFPB's purview. Rather, Section 5517 contains two limitations on the scope of the attorney exemption. *First,* the CFPB retains jurisdiction over an attorney's activities where (1) where the attorney's conduct does not constitute the practice of law; and (2) certain activities where the attorney's client is *not* a consumer. 12 U.S.C. § 5517(e)(2); *see also Frederick J. Hanna*, 2015 WL 4282252 at * 8 (finding that the CFPB was authorized regulate conduct of creditors' attorney under Section 5517(e)(2)(B)). *Second,* the CFPB is permitted to exercise authority "with respect to any attorney, to the extent that such attorney is otherwise subject to any of the enumerated consumer laws or the authorities transferred under subtitle F or H." 12 U.S.C. § 5517(e)(3). The "enumerated consumer laws" expressly include section 626 of the Omnibus Act, and subtitle F transferred the FTC's rulemaking authority to the CFPB. 12 U.S.C. § 5581. Thus, the CFPB's ability to regulate and take action against an attorney for a violation of the MARS Rule (or, as discussed below, its successor rule) was limited to the ability of the FTC to do so prior to the transfer date.

**E.      The CFPB Promulgates Regulation O (Which Essentially Mirrors The MARS Rule).**

On September 13, 2011, the CFPB promulgated a nearly-identical version of the MARS Rule, entitled Regulation O. 12 C.F.R. § 1015.  As a result, the FTC rescinded the MARS Rule on April 13, 2012.  Rescission of Rules, 77 Fed. Reg. 22200 (Apr. 13, 2012) (withdrawing 16 C.F.R. § 322).  Regulation O bars mortgage relief service providers from making certain representations to consumers, requires that such providers make certain disclosures to consumers, and bars providers from collecting advance fees. *See* 12 C.F.R. §§ 1015.3, 1015.5.

Regulation O contains an attorney exemption that is substantively identical to the attorney exemption under the MARS Rule.  12 C.F.R. § 1015.7.  The first part exempts attorneys from all provisions of Regulation O except the advance-fee ban, *provided* the attorney meets three criteria: (1) the attorney provides mortgage assistance relief services as part of the practice of law; (2) the attorney is licensed in the jurisdiction where the client and/or the client's house is located; and (3) the attorney complies with "state laws and regulations that cover the same type of conduct the rule requires." 12 C.F.R. § 1015.7(a).  The second part of attorney exemption provides that an attorney is exempt from the advance fee ban if:  (1) the attorney satisfies the three criteria listed above; (2) deposits funds received from clients in a trust account prior to performing legal work; and (3) the attorney "[c]omplies with all state laws and regulations, including licensing regulations, applicable to client trust accounts." 12 C.F.R. § 1015.7(b).

**III.      Counts I-VIII Fail Because Congress Did Not Authorize The Regulation Of Attorneys Under The MARS Rule (Or Its Successor, Regulation O).**

**A.      The *Chevron* Standard.**

To analyze an agency's authority to promulgate a particular rule, courts employ the two-part test announced by the Supreme Court in *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,

467 U.S. 837 (1984). The *Chevron* test "is designed to help courts determine the validity of a challenged agency regulation by determining two things: first, whether Congress expressly or implicitly delegated authority to the agency to fill in any gaps in the statute that the agency administers; and second, whether the agency's rule is based on a reasonable construction of that statute." *CE Design Ltd. v. Prism Business Media, Inc.*, 606 F.3d 443, 447 (7th Cir. 2010).

The first step in the *Chevron* analysis is to determine whether the intention of Congress is clear from the statute, as "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron* at 842-43. The agency is afforded no deference on the question of whether the statute is ambiguous. *Chevron* at 843 at n. 9; *see also Akram v. Holder*, 721 F.3d 853 (7th Cir. 2013). The court's determination as to ambiguity is made considering the provisions at issue in context, using traditional tools of statutory construction and legislative history. *Id.* If the statute is not ambiguous, then the analysis ends and the statutory mandate must prevail.

If, however, the court "determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute." *Chevron* at 843. "Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* "The power of an administrative agency to administer a congressionally created...program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Id.* (internal quotations and citations omitted). If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to make regulations. *Id.* at 843-44. Such regulations "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844. If the gap in the legislative

scheme is implicit, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.*

**B.    To The Extent It Seeks To Regulate Attorneys, Regulation O Fails Under the First Prong Of *Chevron.***

The first step in the *Chevron* analysis is to determine whether Congress has "directly spoken to the precise question at issue" and "unambiguously expressed [its] intent." *Chevron* at 843-44.  Even if a statute is silent as to the existence of a claimed administrative power, that does not make it ambiguous so as to provide an administrative agency with *carte blanche* authority. *Am. Bar Ass'n v. F.T.C.*, 430 F.3d 457, 468 (D.D.C. 2005).  Rather, where "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.*

Here, it is clear that Congress did not intend for the MARS Rule (or its successor, Regulation O) to be applied to attorneys.  With respect to Regulation O, there are two possible sources of Congressional authorization: (1) the Omnibus Act (as amended by the Credit Card Act) which expressly invokes the FTC Act; and (2) the CFPA.[3]  Neither provides any authority, however, to regulate attorneys such as Defendants.

**1.    The Omnibus Act, Credit Card Act, And FTC Act Do Not Authorize The Regulation Of Attorneys.**

As set forth above, when it enacted Section 511 of the Credit Card Act (which amended the Omnibus Act), Congress declared that the FTC's new rule (which subsequently became the MARS Rule, which was then transferred to the CFPB and re-cast as Regulation O) was limited to those entities that were already subject to the FTC's enforcement authority under the FTC Act.

---

[3] The original rule was authorized by the Omnibus Act.  The subsequent CFPA simply transferred pre-existing rules and rulemaking authority to the CFPB.  Accordingly, Defendants respectfully submit that any Congressional authorization must be found in the Omnibus Act.

Nothing in the Omnibus Act, Credit Card Act, or FTC Act even remotely suggest that Congress intended for those acts (or the subsequently-enacted MARS Rule or Regulation O) to be applied to attorneys, or to displace the states' power to define and regulate the practice of law. In short, there is nothing "unmistakeably clear in the language of the statute" that suggests Congress wanted the FTC to get involved in the regulation of attorneys, or to attempt to craft rules defining the practice of law. *See Amer. Bar. Assoc.*, 430 F.3d at 471 (internal cites omitted).

## 2. The CFPA Does Not Authorize The Regulation Of Attorneys.

It is clear that Congress did not intend for the CFPA to apply to the practice of law generally. Section 5517 of the CFPA specifically excludes the practice of law from the CFPB's authority. In general, the CFPB "may not exercise any supervisory or enforcement authority with respect to an activity engaged in by an attorney as part of the practice of law[.]" 12 U.S.C. § 5517. There are only three exceptions to that broad exclusion. The CFPB may exercise regulatory authority over attorneys who: (1) provide services outside of the practice of law and the scope of an attorney-client relationship; (2) provide services with respect to a consumer who is not receiving legal services or advice from the attorney; or (3) were otherwise subject to the "enumerated consumer laws" and the authorities transferred from the FTC to the CFPB. 12 U.S.C. § 5517(e).

That is consistent with the purpose and legislative history of the CFPA. As noted by the chair of the House Judiciary Committee:

> Conceptually, the activities Congress intends to give the Bureau authority to regulation – the offering or provision of a financial product or service – *are distinguishable from the practice of law.* But because of the breadth of the authority being given the Bureau...and the complexities of the practice of law, there was concern about potential overlap. And giving the new Bureau authority to regulate the practice of law could materially interfere with and jeopardize sensitive aspects of the attorney-client relationship[.]

> It could also undermine the authority of the State supreme courts to effectively oversee and discipline lawyers. There are carefully developed ethical codes and

disciplinary rules governing all aspects of the practice of law. Any regulation from a new source would unavoidably conflict with the existing rules and lines of accountability[.]

Even if the Bureau's authority could be reliably confined to legal representation in financial matters, the result would be material harm to consumer clients of bankruptcy lawyers, consumer lawyers, and real estate lawyers – the very consumers the Bureau is being created to protect. But the harm would inevitably be far broader, extending into unrelated aspects of legal practice.

***For those reasons, our Committee was determined to avoid any possible overlap between the Bureau's authority and the practice of law.***

            \*                          \*                        \*

Accordingly, our Committee worked to make clear that ***the new Consumer Financial Protection Bureau established in the bill is not being given authority to regulate the practice of law***, which is regulated by the State or States in which the attorney in question is licensed to practice.

156 Cong. Rec. E1347-01, 2010 WL 2788137 (Jun. 30, 2010) (emphasis added). Accordingly, the intent of Congress is clear. Congress unequivocally did not intend for the CFPA to apply to the practice of law, save for three very narrow circumstances, two of which are not present here (and the third of which simply results in Regulation O being subject to the limitations of the FTC Act, as discussed above).[4]

## C.    Regulation O Is Invalid Under *Chevron's* Second Prong.

Under the second prong of *Chevron*, the Court must determine whether an agency action is a valid exercise of agency's authority. Under some circumstances, courts afford great deference to an agency's actions. However, no deference is due in this case. That is because neither the CFPB nor the FTC has special expertise in regulating and defining the practice of law. Courts

---

[4] As discussed in greater detail in Section VI, *infra*, the exceptions to the CFPA's attorney exemption in Paragraph 2 do not apply. *First,* Defendants provided mortgage assistance relief services as part of the practice of law in the context of an attorney-client relationship. 12 U.S.C. § 5517(e)(2). *Second,* the consumers to whom Defendants provided such services received legal advice and services from Defendants.

have held that "[n]ot all agency interpretations of ambiguous statutes are entitled to full *Chevron* deference; some are treated as persuasive only, based upon the form, content, circumstances, and reflected expertise of the interpretation." *White v. Scibana*, 390 F.3d 997, 1000 (7th Cir. 2004); *see also United States v. Mead Corp.*, 533 U.S. 218, 227-228 (2001) (The level of deference afforded to the agency's authority may vary depending on "the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position."). *Chevron* deference is limited to cases in which it "appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority. *Gonzales v. Oregon*, 546 U.S. 243, 255-56 (2006). "Otherwise, the interpretation is entitled to respect only to the extent it has the power to persuade." *Id.* at 256.

*Gonzales v. Oregon* is instructive. In that case, the Attorney General promulgated a regulation pursuant to the Controlled Substances Act, 21 U.S.C. § 801, *et seq.* requiring that prescriptions for controlled substances "be used for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 546 U.S. 243, 268 (2006). Thereafter, the Attorney General issued an interpretative rule determining that the use of controlled substances to assist suicide was not a "legitimate medical purpose" and that dispensing or prescribing them for that purpose was unlawful under the Controlled Substances Act. *Id.* at 254. The State of Oregon's laws expressly permitted physician-assisted suicide, and the State and others raised a challenge to that interpretative rule.

The Court noted that, although "legitimate medical purpose is...ambiguous in the relevant sense[,]" the Attorney General was not entitled to *Chevron* deference. *Id.* at 258, 269 ("The deference here is tempered by the Attorney General's lack of expertise in this area and the apparent

absence of any consultation with anyone outside the Department of Justice who might aid in a reasoned judgment."). The Court noted that the CSA gave "the Attorney General limited powers, to be exercised in specific ways" and that the Attorney General did not have authority to carry out all provisions of the CSA. *Id.* at 260.

> Just as the conventions of expression indicate that Congress is unlikely to alter a statute's obvious scope and division of authority through muffled hints, the background principles of our federal system also belie the notion that Congress would use such an obscure grant of authority to regulate areas traditionally supervised by the States' police power.

*Id.* at 275. The Court concluded that, "[i]n the face of the CSA's silence on the practice of medicine generally and its recognition of state regulation of the medical profession[,]" the "structure of the CSA...conveys unwillingness to cede medical judgments to an executive official who lacks medical expertise." *Id.* at 266, 272. Thus, the "delegation [of authority under the CSA] cannot sustain the Interpretative Rule's attempt to define standards of medical practice."

Such is the case here. Under Section 5511, the Bureau was granted the authority to enforce *Federal consumer financial law* to ensure that consumers have access to fair, transparent and competitive consumer financial services. 12 U.S.C. § 5511(a). To that end, the Bureau was authorized to make rules necessary to "enable the Bureau to administer and carry out the purposes and objectives of the *Federal consumer financial laws.*" 12 U.S.C. § 5512 (emphasis added). However, Section 5531 of the CFPA provides the specific rulemaking authorities of the Bureau. Under that section, the Bureau is authorized to, *inter alia*, make rules "identifying as unlawful unfair, deceptive, or abusive acts or practices in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service." 12 U.S.C. § 5531.

Nothing in Sections 5511, 5512 and 5531 make any mention of the practice of law. Rather,

the CFPB has clearly overstepped both the bounds of its authority *and* the bounds of its expertise in wading into areas of State attorney regulatory regimes. *See Gonzales* at 267 ("[T]he authority claimed by the Attorney General is both beyond his expertise and incongruous with the statutory purposes and design."). Similarly, nothing in the Omnibus Act, the Credit Card Act, or the FTC Act addresses or indicates Congress' desire to regulate the practice of law. Just as in *Gonzales*, it is unlikely that Congress used such an "obscure grant of authority" to regulate an area traditionally supervised by the States so as to permit the CFPB to regulate the practice of law. *Id.* at 267 ("Congress...does not...hide elephants in mouseholes.").

Regardless of the level of deference paid, however, Regulation O fails because it is arbitrary, capricious and contrary to the statute(s) to the extent it purports to regulate any attorneys.

*First*, nothing in the Omnibus Act, Credit CARD Act, or FTC Act suggests any intent by Congress (must less an "unmistakeably clear" intent) to cover attorneys. Accordingly, any attempt to expand the coverage of those statutes through the promulgation of regulations that purport to regulate attorneys is arbitrary and contrary to the intent of Congress.

*Second*, when it enacted the CFPA, Congress made it clear (with certain narrow exceptions) that it did not want to regulate attorneys or the practice of law. However, Regulation O goes well beyond that, and impermissibly establishes arbitrary criteria for determining which attorneys are (and are not) subject to Regulation O. In so doing, it is clear that the FTC and CFPB went well beyond any authority they had. Congress did not authorize those agencies to craft or enforce rules regarding attorney-client trust accounts, or compliance with state rules of professional conduct.

*Third*, the portion of Regulation O's attorney exemption that conditions the applicability of the exemption upon whether an attorney abides by the Rules of Professional Conduct is arbitrary

and capricious. *See* 16 C.F.R. § 1015.7 The underlying premise behind that portion of the rule (*i.e.*, that an attorney who violates by the Rules of Professional Conduct somehow stops functioning as an attorney) has no basis in law. An attorney does not stop being an attorney (or practicing law) simply because he or she violates a Rule of Professional Conduct, and the CFPB has cited no authority to the contrary. In addition, making the attorney exemption dependent upon compliance with the Rules of Professional Conduct can create the possibility of draconian *ex post facto* regulation. For example, an attorney may properly charge a retainer fee to a client for mortgage foreclosure defense. If the attorney provides successful representation, the attorney may not fall within the ambit of Regulation O. If, however, the attorney subsequently misses a filing deadline, fails to communicate with the client, or fails to exercise due diligence on the case (which may violate the Rules of Professional Conduct), then the attorney may be subject to Regulation O. If that occurs, the retainer payment (which was appropriate at the time it was paid) would become illegal after the fact, solely by virtue of the attorney's subsequent conduct.

*Fourth*, to the extent Regulation O's attorney exemption requires an analysis of whether attorneys properly maintain trust accounts, or otherwise abide by the Rules of Professional Conduct, it directly conflicts with the well-established notion that such issues must be regulated by the states. Under Regulation O, the CFPB is now charged with deciding (in the first instance) whether attorneys are "practicing law" and whether they are abiding by the various states' Rules of Professional Conduct. However, Congress did not authorize the FTC or CFPB to act as a federal version of the state bar authorities, or enact any rules regarding attorney conduct. Moreover, it makes the federal courts the arbiters of issues (*e.g.*, whether a particular practice area is the "bona fide practice of law," or whether a client trust account has been properly maintained) that should be decided by state authorities. If that were permitted, it would create two competing lines of

authority: (1) one line of authority in cases prosecuted by the CFPB and adjudicated by federal courts; and (2) another line of authority in matters prosecuted by state bars (*e.g.*, the OLR) and adjudicated by the state supreme courts. The possibility of conflict looms large.

In *Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557 (7th Cir. 1999), the Seventh Circuit considered whether the federal courts were a proper forum for determining whether a provision in an insurance policy violated the Americans with Disabilities Act. The Seventh Circuit expressed grave reservations about adjudicating such issues in the federal courts.

> Even if the formal criteria are the same under federal and state law, displacing their administration into federal court – requiring a *federal* court to decide whether an insurance policy is consistent with *state* law – obviously would interfere with the administration of the state law. The states are not indifferent to who enforces their laws.

*Id.* at 564. The Seventh Circuit's reasoning resonates in this case. The states – not the CFPB or the federal courts – should have sole responsibility for defining and regulating the practice of law. Congress has not seen fit to upset that balance, and the CFPB should not be permitted to do so either.

## IV.    Counts I-VIII Fail Because Regulation O Is Invalid Under The APA's Arbitrary And Capricious Standard To The Extent It Purports To Regulate Attorneys.

### A.    The Arbitrary And Capricious Standard Under The Administrative Procedures Act.

Review of the CFPB's regulation is also governed by the "arbitrary and capricious standard" of Section 706 of the Administrative Procedures Act. 5 U.S.C. § 706(2)(A) ("APA"). Under the APA, a reviewing court will give great deference to agency action and will only set aside the action where it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). As interpreted by the Supreme Court, arbitrary and capricious means that an administrative agency failed to engage in "reasoned decision making" and that its processes were not "logical and rational." *Michigan v. EPA*, 135 S. Ct. 2699, 2706,

(2015) (internal quotations omitted); *see also Judulang v. Holder*, 132 S.Ct. 476, 483 (2011).

In reaching this determination, a court must consider relevant facts and whether there was a clear error in judgment. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, (1971); *see also Michigan*, 135 S. Ct. at 2706; *Judulang*, 132 S. Ct. at 483; *Motor Vehicle Mfrs. Assn. of United States v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43, (1983). "That task involves examining the reasons for agency decisions—or, as the case may be, the absence of such reasons." *Judulang*, 132 S.Ct. at 483. Specifically, this requires an administrative agency to "articulate a satisfactory explanation for its action." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009); *see also State Farm Mut. Automobile Ins. Co.*, 463 U.S. at 43. Notably, an agency decision falls short of this standard where it:

> Relie[s] on factors which Congress had not intended it to consider, entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*U.S. v. P.H. Glatfelter Co.*, 768 F.3d 662, 670 (7th Cir. 2014) (internal quotations omitted); *see also Adventist GlenOaks Hosp. v. Sebelius*, 663 F.3d 939, 942 (7th Cir. 2011) (*citing State Farm Mut. Automobile Ins. Co.*, 463 U.S. at 43)).

### B. Regulation O Is Arbitrary And Capricious.

Regulation O is arbitrary and capricious under Section 706 of the APA. The administrative records for the MARS Rule and Regulation O do not show any rational basis for an attorney exemption that is based on an attorney's conduct (*e.g.*, whether the attorney complies with state ethical rules, and/or properly maintains trust accounts). It appears that the FTC (and then, subsequently, the CFPB) crafted those requirements out of whole cloth.

***First***, the CFPB's leap from the task assigned to it from Congress to the regulation of

attorneys is neither logical nor rational. Indeed, the CFPB's decision to regulate the practice of law in Regulation O (and the FTC's decision to do so by virtue of the MARS Rule) was not intended by Congress, runs counter to the comments received by the FTC in response to the proposed MARS Rule, and is most certainly *not* the product of the agency's expertise. *See, e.g., U.S. v. P.H. Glatfelter Co.*, 768 F.3d 662, 670 (7th Cir. 2014). The administrative records for the MARS Rule and Regulation O are devoid of any evidence or support for the proposition that Congress had actually authorized the FTC or CFPB to regulate attorneys. (Winters Decl. Dkt. No. 102 at Ex. A) Indeed, it appears that neither agency ever engaged in a meaningful analysis of whether it had such authority.

*Second*, there is no evidence in the administrative record to suggest that either the FTC or the CFPB had (or have) any experience or specialized knowledge in regulating attorneys or in defining and regulating the practice of law. Numerous state bar authorities (which presumably have such knowledge and experience) commented on the proposed MARS Rule. However, those authorities all urged the FTC to enact a broader exemption that generally covered attorneys. None of them supported those agencies' foray into crafting an exemption that was based on attorney *conduct.* Indeed, Defendants were not able to find any comments (or other basis) in the administrative record that suggested the applicability of the attorney exemption could (or should) properly be based upon an attorney's conduct, or an attorney's compliance with the Rules of Professional Conduct. (Winters Decl. Dkt. No. 102 at Ex. A) Simply put, there is no basis (or rationale) for the portion of the rule that purports to make the exemption applicable only to attorneys who abide by those rules. It is arbitrary and without basis in fact or law.

## V. In The Alternative, Counts I-VIII Fail Because Regulation O's Attorney Exemption Applies To Defendants.

Even assuming *arguendo* that Regulation O's attorney exemption is a valid exercise of the

CFPB's authority (and it is not), Defendants meet the requirements for that exemption. Section 1015.7(a) provides that an attorney is exempt from all parts of Regulation O except Section 1015.5 if the attorney:

(1) Provides mortgage assistance relief services a part of the practice of law;

(2) Is licensed to practice law in the state in which the consumer for whom the attorney is providing mortgage assistance relief services resides or in which the consumer's dwelling is located; and

(3) Complies with state laws and regulations that cover the same type of conduct the rule requires.

12 C.F.R. § 1015.7(a). An attorney is also exempt from Section 1015.5 if the attorney:

(1) Deposits any funds received from the consumer prior to performing legal services in a client trust account;

(2) Complies with all state laws and regulations, including licensing regulations, applicable to client trust accounts.

12 C.F.R. § 1015.7(b). Here, the undisputed evidence demonstrates that the attorney exemption of Regulation O operates to bar the CFPB's claims.

*First,* it is undisputed that the Defendants were providing mortgage assistance relief services as part of the practice of law. Multiple witnesses, including Aleman, Sibert, Banyon, and Gerst testified that TMLG and CFLG clients retained those law firms for mortgage relief services, that those services ranged from loan modifications to short sales to foreclosure defense services, and that TMLG and CFLG attorneys reviewed the client's financial package at least twice before submitting the package to the client's lender. (*See* Defs' PFOF ¶¶ 43, 50, 85-86, 100-02.) Accordingly, it is undisputed that the Defendants were engaged in the practice of law, and Defendants meet the first requirement for the exemption. (*See also* Defs' PFOF ¶¶ 131-32.)

*Second,* Defendants were licensed to practice law in all of the states in which TMLG and CFLG serviced clients. It is undisputed that TMLG had approximately 100 partner attorneys in

40 states and that CFLG had 37 member attorneys licensed to practice in 39 states. (Defs' PFOF ¶¶ 29, 88.) The CFPB does not contend that TMLG or CFPB provided legal services in states in which they were not authorized to do so. Nor does the CFPB contend that any of the Individual Defendants ever directly provided legal services to clients in jurisdictions in which they were not licensed.[5]

*Third,* Defendants complied with state laws and regulations governing lawyers. Indeed, the CFPB has not identified any state law or regulation with which it contends that Defendants did not comply.

*Fourth,* Defendants complied with the trust account requirements necessary for an exemption from 12 C.F.R. § 1015.5. Both TMLG and CFLG maintained client trust accounts at Chase Bank, into which funds were deposited prior to completing legal work. In general terms, each TMLG or CFLG client set up an account with NoteWorld (later known as Meracord), with which TMLG, and then CFLG, had accounts as well. When clients paid their fees to their law firm: (1) clients deposited their payments into their individual NoteWorld/Meracord accounts; (2) NoteWorld/Meracord distributed the funds pursuant to its contracts, including to the firms' IOLTA trust accounts (at Chase Bank and/or US Bank), and to itself for its account fees; and (3) the firms transferred funds to cover its fees from the trust account into its NoteWorld/Meracord account and then to its operating account(s). (*See* Defs' PFOF ¶¶ 51-54, 103-09.) Accordingly, Defendants meet the requirements, and are exempt from *all* provisions of Regulation O. The CFPB's claims in Counts I-VIII thus fail as a matter of law.

---

[5] On this point, it is important to note that the CFPB does not allege that the individual Defendants were personally involved in any client representation. Rather, the CFPB claims they face liability because the two firms (TMLG and CFLG) violated Regulation O. Accordingly, for the purpose of assessing this factor, the relevant inquiry is whether the *firms* – not the individuals – were duly authorized to practice law in those jurisdictions.

## VI.    Counts IX-X Fail As A Matter Of Law Because Defendants Are All Attorneys.

Counts IX and X arise under the CFPA.  Therein, the CFPB alleges that Defendants engaged in deceptive practices by making certain representations to consumers.   The CFPA contains an attorney exemption, which is far broader than the attorney exemption under Regulation O.  Section 5517(e)(1) of the CFPA provides that: "Except as provided in Paragraph 2, the Bureau may not exercise any supervisory or enforcement authority with respect to an activity engaged in by an attorney as part of the practice of law under the laws of a State in which the attorney is licensed to practice law." 12 U.S.C. § 5517(e)(1).  Thus, attorneys are generally exempt from the CFPA.

However, the CFPA's general practice of law exclusion "also contemplates that some activities engaged in by attorneys as part of the practice of law may nonetheless be regulated by the Bureau." *Frederick J. Hanna*, 2015 WL 4282252 at * 4.  However, those activities are very limited.  Specifically, Paragraph 2 of Section 5517 carves out two exceptions to the practice of law exclusion: (1) consumer financial services that are not offered or provided as part of or incidental to the practice of law, occurring exclusively within the attorney-client relationship; and (2) consumer financial services that are otherwise offered or provided by the attorney in question with respect to any consumer who is not receiving legal advice or services from the attorney in connection with such consumer financial services.  12 U.S.C. § 5517(e)(2).  Neither of the exceptions apply here.

***First,*** as discussed above, the services rendered by Defendants clearly fall within the scope of "the practice of law."  Clients engaged the law firms for the purpose of receiving legal advice with respect to their mortgages, attorneys constructed the guidelines and procedures for processing client files, and attorneys reviewed a client's financial package at least twice prior to submission

to a lender. (*See* Defs' PFOF ¶¶ 31-35, 43, 50, 64, 82-87, 100-02.) Moreover, the CFPB does not

dispute that the Defendants were engaged in the practice of law. (*See* Defs' PFOF ¶ 131.)

*Second,* the second exception to the general attorney exemption is clearly inapplicable

here. That exception removes attorneys who are providing consumer financial services, when the

consumer is not the client. (*e.g.,* when an attorney represents a creditor). Here, the services

rendered by Defendants were rendered directly to the client, who received legal advice and services

from Defendants. (*See* Defs' PFOF ¶¶ 31-35, 43, 50, 64, 82-87, 100-02.) As neither exception to

Section 5517(e)'s general attorney exemption applies, Defendants are exempt from the provisions

of the CFPA, and Counts IX and X.

## VII.   All Claims Fail With Respect To Macey And Stafford.

The CFPB cannot meet its burden to hold certain of the individual defendants liable for

actions of the corporations. The CFPB's ability to seek personal liability against individuals for

corporate violations of Regulation O mirrors the FTC's ability to seek personal liability for

corporate violations of the FTC Act. (*See* Credit Card Act at § 511) Under the FTC Act, a multi-

step test is employed to determine whether an individual may be liable for the actions of a

corporation:

> An individual may be held liable under the FTCA for corporate practices if the FTC
> first can prove the corporate practices were misrepresentations or omissions of a
> kind usually relied on by reasonably prudent persons and that consumer injury
> resulted. Once corporate liability is established, the FTC must show that the
> individual defendants participated directly in the practices or acts or had authority
> to control them. Authority to control the company can be evidenced by active
> involvement in business affairs and the making of corporate policy, including
> assuming the duties of a corporate officer. The FTC must then demonstrate that
> the individual had some knowledge of the practices. The knowledge requirement
> is the key issue in this case.

*Fed. Trade Comm'n v. Amy Travel Serv.*, 875 F.2d 564, 573 (7th Cir. 1989) (imposing individual

liability on principals for corporate violations of the FTC Act's deceptive trade practices provisions

where the principals created the businesses, wrote the telemarketing scripts, hired personnel, controlled the financial affairs of the company and oversaw the daily operations of the business).

This standard must be met to hold an individual liable under the MARS Rule (and, by extension, Regulation O). *See F.T.C. v. Freecom Commc'ns,* 401 F. 3d 1192 (10th Cir. 2005); *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 636 (6th Cir. 2014) (applying the *Amy Travel* standard to violations of Section 5 of the FTCA and the MARS Rule); *see also* 12 C.F.R. § 1015. The Seventh Circuit has emphasized that an agency seeking to impose liability on individuals for corporate acts carries a heavy burden:

> The FTC is required to establish the defendants had or should have had knowledge or awareness of the misrepresentations, but that knowledge requirement may be fulfilled by showing that the individual had actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth. Also, the degree of participation in business affairs is probative of knowledge.

*Amy Travel Serv., Inc.*, 875 F.2d at 574; *see also Fed. Trade Comm'n v. World Media Brokers*, 415 F.3d 758, 763-64 (7th Cir. 2005). The CFPB cannot come even close to meeting that standard.

With respect to Thomas Macey, there is absolutely no evidence that he had any involvement in the conduct or operations of either TMLG or CFLG. In fact, just the opposite. It is clear from the evidence that Macey had virtually *no* involvement in the business operations of those entities. (Defs' PFOF ¶¶ 28, 81.) Indeed, Macey had no involvement in creating the businesses, drafting TMLG or CFLG marketing materials and scripts, hiring personnel, controlling the day-to-day financial affairs of the companies, or the daily operations of TMLG and CFLG. He did not direct or manage any employees of the law firms or its respective contractors. Aleman was the one who managed the firms. (Defs' PFOF ¶¶ 27-28, 79, 81.) Accordingly, the CFPB cannot establish individual liability as to Macey on Counts I-X.

The same is true for Harold Stafford. There is absolutely no evidence that he had any involvement in the conduct or operations of CFLG after July 2012. In July 2012, Stafford sold 95% of CFLG to Macey and Aleman. From that time forward, CFLG was operated out of Chicago, with Aleman managing all of the CFLG daily operations. (Defs' PFOF ¶ 79.) Stafford had no operational control, management, or direction over CFLG after July 2012. (Defs' PFOF ¶ 80.) Stafford had no involvement in drafting CFLG marketing materials and scripts, hiring personnel, controlling the day-to-day financial affairs of the companies, or the daily operations of CFLG. (Defs' PFOF ¶¶ 79-80.) Accordingly, the CFPB cannot establish individual liability as to Stafford on Counts I-X.

## CONCLUSION

WHEREFORE, for the reasons stated herein, Defendants respectfully move this Court pursuant to Federal Rule of Civil Procedure 56 to enter summary judgment in favor of Defendants and against the CFPB on every claim in the CFPB's complaint, and for the other relief requested herein and whatever other relief the Court deems appropriate.

Dated: October 9, 2015

/s/ Timothy D. Elliott
Douglas M. Poland (SBN 1055189)
GODFREY & KAHN, S.C.
1 East Main Street, Suite 500
Madison, WI 53703
Tel. 608-257-3911
Fax 608-257-0609
dpoland@gklaw.com

Timothy D. Elliott (*pro hac vice*)
Emily A. Shupe (*pro hac vice*)
Kaitlyn Anne Wild
Jordan R. Franklin (*pro hac vice*)
RATHJE & WOODWARD, LLC
300 E. Roosevelt Rd., Ste. 300
Wheaton, IL 60187
Tel. 630-668-8500
Fax 630-665-9218
telliott@rathjewoodward.com
eshupe@rathjewoodward.com
kwild@rathjewoodward.com
jfranklin@rathjewoodward.com