**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br>Plaintiff,<br>v.<br><br>THE MORTGAGE LAW GROUP, LLP, (D/B/A THE LAW FIRM OF MACEY, ALEMAN & SEARNS), CONSUMER FIRST LEGAL GROUP, LLC, THOMAS G. MACEY, JEFFREY J. ALEMAN, JASON E. SEARNS, and HAROLD E. STAFFORD,<br>Defendants. | Case No. 3:14-cv-00513 |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ i

I. INTRODUCTION ........ 1

II. LEGAL ARGUMENT ........ 5

A. Movants Fail to Meet the Legal Standard Required for the Court to Grant Their Motion for Summary Judgment ........ 5

B. Regulation O Permissibly Regulates Mortgage Assistance Relief Service Providers Who Do Not Satisfy the Attorney Exemption in 12 C.F.R. § 1015.7 ........ 6

1. Background on the MARS Rule ........ 7

a. The Omnibus Act ........ 7

b. FTC Adoption of the MARS Rule ........ 8

c. The CFPA ........ 10

2. Standard of Review ........ 11

C. Regulation O's Attorney Exemption Is Valid under *Chevron* and the Administrative Procedure Act ........ 13

1. Congress's Grant of Authority is Unambiguous ........ 13

a. The Omnibus Act Authorizes Regulation of Mortgage Assistance Relief Service Providers ........ 13

b. Neither the FTCA nor the CFPA Precludes Regulation of Mortgage Assistance Relief Service Providers Who Are Attorneys ........ 17

2. The FTC Acted Reasonably in Rejecting a Wholesale Exclusion of Attorneys from Regulation O ........ 19

3. Regulation O's Criteria for the Attorney Exemption Are Reasonable ........ 21

D. Movants Fail to Demonstrate that Defendants Met the Requirements of Regulation O's Attorney Exemption ........ 26

1. Movants Have the Burden of Proof on Their Affirmative Defense Based on the Regulation O Attorney Exemption ........ 26

2. Defendants Were Mortgage Assistance Relief Service Providers under Regulation O and Do Not Dispute that Fact ........ 27

3. Movants Fail to Qualify for Regulation O's Attorney Exemption ........ 29

a. Defendants Did Not Provide Mortgage Loan Modification Services as Part of the Practice of Law ........ 30

b. Movants Fail to Show That Defendants Were Licensed to Practice Law in All of the States in Which Their Customers Resided ........ 38

c. Movants Fail to Show That Defendants Complied with State Laws and Regulations that Cover the Same Type of Conduct that Regulation O Requires ........ 40

d. Defendants Did Not Meet Regulation O's Advance Fee Exemption Requirements Concerning Client Trust Accounts ........ 43

E. Movants Fail to Demonstrate that Defendants Met the Requirements of the CFPA Attorney Exemption in Connection with Their Deception Violations ........ 45

1. Movants Have the Burden of Proof on Their Affirmative Defense Based on the CFPA Attorney Exemption ........ 45

2. Movants Fail to Qualify for the CFPA's Attorney Exemption ........ 45

F. Individual Defendants Macey and Stafford Are Liable for Their Actions and the Actions of TMLG and CFLG under Regulation O and the CFPA ........ 49

1. Macey's Liability for TMLG and CFLG ........ 50

2. Stafford's Liability for CFLG ........ 54

G. CONCLUSION ........ 57

**TABLE OF AUTHORITIES**

**Cases**

*American Bar Association v. FTC*, 430 F.3d 457 (2005) ................................................ 15, 16, 20

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................ 26

*Arnett v. C.I.R.*, 473 F.3d 790 (7th Cir. 2007) ........................................................................ 11, 12

*Ass'n of Private Sector Colleges & Universities v. Duncan*, 681 F.3d 427 (D.C. Cir. 2012) ...... 16

*Baron v. City of Los Angeles*, 469 P.2d 353 (Cal. 1970) ............................................................ 31

*Berndt v. Fairfield Resorts, Inc.*, 337 F. Supp. 2d 1120 (W.D. Wis. 2004) (Crabb, J.) ............... 27

*Big Ridge, Inc. v. Fed. Mine Safety & Health Review Comm'n*, 715 F.3d 631 (7th Cir. 2013) ... 12

*Black v. Educ. Credit Mgmt. Corp.*, 459 F.3d 796 (7th Cir. 2006)............................................. 12

*C&N Corp. v. Kane*, 953 F. Supp. 2d 903 (E.D. Wis. 2013)....................................................... 26

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ......................................................................... 5, 26

*Cf. Coal. of New York State Career Sch., Inc. v. Riley*, 129 F.3d 276 (2d Cir. 1997) .................. 18

*Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984) ............. 11, 12

*City of Abilene v. FCC*, 164 F.3d 49 (D.C. Cir. 1999) ............................................................... 20

*Consumer Sales Corp. v. FTC*, 198 F.2d 404 (2d Cir. 1952) ...................................................... 49

*Dale v. Lappin*, 376 F.3d 652 (7th Cir. 2004)........................................................... 50, 53, 54, 56

*Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557 (7th Cir. 1999) ................................................ 25

*Fed. Trade Comm'n v. Construct Data Publishers*, No. 13-CV-01999, 2014 WL 7004999 (N.D. Ill. Dec. 11, 2014) ........................................................................................................................ 49

*Freeman v. ABC Legal Servs., Inc.*, 827 F. Supp. 2d 1065 (N.D. Cal. 2011) ............................. 27

*FTC v. Amy Travel Svc., Inc.*, 875 F.2d 564 (7th Cir. 1989) ............................... 49, 50, 51, 52, 53

*FTC v. Bay Area Business Council, Inc.*, 423 F.3d 627 (7th Cir. 2005)...................................... 49

*FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611 (6th Cir. 2014).................................................. 28

*FTC v. Kitco of Nevada, Inc.*, 612 F. Supp. 1282 (D. Minn. 1985)............................................. 49

*FTC v. Pac. First Benefit, LLC*, 472 F. Supp. 2d 974 (N.D. Ill. 2007)......................................... 50

*Gadsen v. Newman*, 807 F. Supp. 1412 (C.D. Ill. 1992) ............................................................ 17

*Gmerek v. State Ethics Comm'n*, 751 A.2d 1241 (Pa. Cmwlth. 2000)........................................ 32

*Goldfarb v. Virginia State Bar*, 421 U.S. 773 (1975) .......... 13, 14

*Gonzales v. Oregon*, 546 U.S. 243 (2006) .......... 20, 21

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) .......... 16

*Harrell v. U.S. Postal Serv*., 445 F.3d 913 (7th Cir. 2006) .......... 5

*Harris N.A. v. Hershey*, 711 F.3d 794 (7th Cir. 2013) .......... 5

*Hartman v. Meridian Fin. Servs., Inc.*, 191 F. Supp. 2d 1031 (W.D. Wis. 2002) .......... 27

*Head Start Family Educ. Program, Inc. v. Coop. Educ. Serv. Agency 11*, 46 F.3d 629 (7th Cir. 1995) .......... 12

*Heintz v. Jenkins*, 514 U.S. 291 (1995) .......... 14, 15

*In re Wilson Chemical Co*., 64 F.T.C. 168 (1964) .......... 17

*Massachusetts Conveyancers Ass'n Inc. v. Colonial Title & Escrow, Inc.*, 2001 WL 669280 (Mass. Super. 2001) .......... 32

*McNeilly v. Kraklow*, 368 B.R. 769 (W.D. Wis. 2007) .......... 27, 45

*Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423 (1982) .......... 16

*Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229 (2010) .......... 15, 16

*People ex rel. Illinois State Bar Ass'n v. People's Stock Yards State Bank*, 176 N.E. 901 (1931) .......... 32

*Ptasznik v. St. Joseph Hospital*, 464 F.3d 691 (7th Cir. 2006) .......... 5

*State v. Foster*, 674 So. 2d 747 (Fla. Dist. Ct. App.), *as clarified* (Apr. 26, 1996), *cause dismissed*, 677 So. 2d 840 (Fla. 1996) .......... 31

*United States v. Mead Corp.*, 533 U.S. 218 (2001) .......... 12, 21

*Younger v. Harris*, 401 U.S. 37 (1971) .......... 16

**Statutes**

11 U.S.C. § 101(12)(A) .......... 15

11 U.S.C. § 362(a) .......... 1

11 U.S.C. § 362(b)(4) .......... 1

12 U.S.C. § 1015.2 .......... 6

12 U.S.C. § 5481(12) .......... 10

12 U.S.C. § 5481(12)(Q) .......... 10, 18

12 U.S.C. § 5481(14) .......... 21
12 U.S.C. § 5481(25)(B) .......... 49
12 U.S.C. § 5481(25)(C) .......... 49
12 U.S.C. § 5491(a) .......... 10
12 U.S.C. § 5517(e) .......... 18, 45
12 U.S.C. § 5517(e)(1) .......... 11, 45
12 U.S.C. § 5517(e)(2) .......... 11, 46
12 U.S.C. § 5517(e)(2)(A) .......... 46, 48
12 U.S.C. § 5517(e)(2)(B) .......... 48
12 U.S.C. § 5517(e)(3) .......... 11, 18
12 U.S.C. § 5531 .......... 2
12 U.S.C. § 5536 .......... 2
12 U.S.C. § 5538 .......... 7
12 U.S.C. § 5538(a)(1) .......... 6, 13, 19, 21
12 U.S.C. § 5581(5)(A) .......... 10
12 U.S.C. § 5581(b)(5) .......... 18
15 U.S.C. § 1 .......... 14
15 U.S.C. § 1012(b) .......... 25
15 U.S.C. § 1692 *et seq* .......... 14
15 U.S.C. § 1692a(6)(A) .......... 26
15 U.S.C. § 1692a(6)(B) .......... 26
15 U.S.C. § 1692a(6)(C) .......... 26
15 U.S.C. § 1692a(6)(D) .......... 26
15 U.S.C. § 1692a(6)(E) .......... 26
15 U.S.C. § 1692a(6)(F) .......... 26
15 U.S.C. § 45(a)(1) .......... 17
15 U.S.C. § 45(a)(2) .......... 8, 17
15 U.S.C. § 57(a) .......... 7
15 U.S.C. § 6809(3)(A) .......... 16

15 U.S.C. 41 et seq.) .......... 17

5 U.S.C. § 706(2)(A).......... 21

CFPA § 1097, 124 Stat. 2102 .......... 10

Credit CARD Act § 511(a)(1)(C), 123 Stat. 1764 .......... 17

N.C. Gen. Stat. Ann. § 84-2.1 .......... 32

Pub. L. No. 111-203, Title X, 124 Stat. 1955 (2010) .......... 10

Pub. L. No. 111-24, § 511(a)(1)(B), 123 Stat. 1764 .......... 7

Pub. L. No. 111-24, § 511(a)(1)(C), 123 Stat. 1764 .......... 7

Pub. L. No. 111-24, 123 Stat. 1734 (May 22, 2009) .......... 7

Pub. L. No. 111-8, § 626, 123 Stat. 678 .......... 7

Pub. L. No. 111-8, 123 Stat. 524 (Mar. 11, 2009) .......... 7

R.I. Gen. Laws Ann. § 11-27-2 .......... 32

Wis. R. App. P. REG UNAUTH PRAC LAW S. 23.01 .......... 32

**Regulations**

12 C.F.R. § 1015.2 .......... 13, 19, 28

12 C.F.R. § 1015.5 .......... 43

12 C.F.R. § 1015.7 .......... 26

12 C.F.R. § 1015.7(a) .......... 29

12 C.F.R. § 1015.7(a)(1) .......... 22, 30, 38, 43

12 C.F.R. § 1015.7(a)(2) .......... 23, 38, 39, 43

12 C.F.R. § 1015.7(a)(3) .......... 23, 40, 43

12 C.F.R. § 1015.7(b) .......... 29, 43, 44

12 C.F.R. § 1015.7(b)(2) .......... 23

12 C.F.R. pt. 1015 .......... 2, 6

16 C.F.R. pt. 322 .......... 9

**Rules**

Fed. R. Civ. P. 56(a) .......... 5, 27, 45

Fed. R. Civ. P. 56(c) .......... 5

**Other Authorities**


132 Cong. Rec. 30842 (1986) ..... 15

155 Cong. Rec. S2816 (Mar. 5, 2009) ..... 8, 17

156 Cong. Rec. E134 (July 15, 2010) ..... 18

74 Fed. Reg. 26130 (June 1, 2009) ..... 8

75 Fed. Reg. 10707 (Mar. 9, 2010) ..... 8, 9

75 Fed. Reg. 57252 (Sept. 20, 2010) ..... 11

76 Fed. Reg. 78130 (Dec. 16, 2011) ..... 11, 19

American Bar Association ("ABA") Model Rules of Professional Conduct R. 1.1 ("Competence") ..... 41, 42

American Bar Association ("ABA") Model Rules of Professional Conduct R. 1.15 ("Safekeeping Property") ..... 42

American Bar Association ("ABA") Model Rules of Professional Conduct R. 1.15(c) ..... 44

American Bar Association ("ABA") Model Rules of Professional Conduct R. 1.3 ("Diligence") ..... 41, 42

American Bar Association ("ABA") Model Rules of Professional Conduct R. 1.4 ("Communication") ..... 41

American Bar Association ("ABA") Model Rules of Professional Conduct R. 1.5 ("Fees") ..... 42

AMERICAN BAR ASSOCIATION http://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_professional_conduct/alpha_list_state_adopting_model_rules.html (last visited Oct. 16, 2015) ..... 42

Ill. Rules of Prof'l Conduct R. 1.15 ("Safekeeping Property") ..... 42

Ill. Rules of Prof'l Conduct R. 1.5 ("Fees") ..... 42

MARS Rule Statement, Mortgage Assistance Relief Services, Final Rule, 75 Fed. Reg. 75092 (December 1, 2010) ..... 9, 10, 13, 18, 19, 20, 22, 23, 24, 25, 29, 30, 31, 40, 41

Mich. Rules of Prof'l Conduct R. 1.15 ("Safekeeping Property") ..... 42

Mich. Rules of Prof'l Conduct R. 1.5 ("Fees") ..... 42

Nev. Rules of Prof'l Conduct R. 1.1 ("Competence") ..... 42

Nev. Rules of Prof'l Conduct R. 1.3 ("Diligence") ..... 42

Nev. Rules of Prof'l Conduct R. 1.4 ("Communication") .......... 42

S. Rep. No. 97-451 (1982) (accompanying S. 2499) .......... 17

S. Rep. No. 98-215, (1983) (accompanying S. 1714) .......... 17

S.C. Rules of Prof'l Conduct R. 1.15 ("Safekeeping Property") .......... 42

S.C. Rules of Prof'l Conduct R. 1.5 ("Fees") .......... 42

# I. INTRODUCTION

Plaintiff, the Consumer Financial Protection Bureau (the "Bureau"), hereby submits this Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Bureau's Memorandum in Opposition"). Defendants' Motion for Summary Judgment ("Defendants' Motion" or "Def. Motion") was filed by defendants Consumer First Legal Group, LLC ("CFLG"), Thomas G. Macey ("Macey"), Jeffrey J. Aleman ("Aleman"), Jason E. Searns ("Searns"), and Harold E. Stafford ("Stafford") (collectively, "Movants"). Defendant The Mortgage Law Group, LLP ("TMLG") did not move for summary judgment.[1] (The Bureau refers to Movants and TMLG collectively as "Defendants".)[2]

As set forth in detail in the Bureau's Memorandum in Support of Plaintiff's Motion for Summary Judgment filed on October 9, 2015 ("Bureau's Memorandum"), filed simultaneously with the Plaintiff's Motion for Summary Judgment ("Bureau's Motion"), the Bureau brought this action against Defendants—two mortgage assistance relief services providers and their principals—who violated consumer financial protection laws and took advantage of financially distressed and desperate homeowners struggling to make their mortgage payments. TMLG and CFLG (collectively, the "Companies") induced more than 6,000 consumers nationwide to enroll in the Companies' programs and to pay on an automated basis millions of dollars in illegally-

[1] On April 7, 2014, TMLG filed a voluntary Chapter 7 bankruptcy petition. That petition is pending in the United States Bankruptcy Court for the Northern District of Illinois, *In re The Mortgage Law Group, LLP*, Case Number 14-12825. Plaintiff's Statement of Proposed Findings of Fact in support of the Plaintiff's Motion for Summary Judgment, ECF No. 101 ("*SF*") 5. The automatic stay of the Bankruptcy Code does not stay the Bureau's action against TMLG because the action falls within the police and regulatory power exception to the stay. 11 U.S.C. § 362(a), (b)(4). TMLG did not file an answer, take any other action in its defense, or participate in discovery.

[2] The Bureau has filed, simultaneously herewith, Plaintiff's Response to Defendants' Proposed Findings of Fact, and Plaintiff's Statement of Additional Proposed Findings of Fact in Support of Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("ASF").

charged advance fees—large sums that the Companies charged and collected before obtaining any mortgage loan modification agreements for these consumers. In reality, for the vast majority of these consumers, the Companies did not obtain any loan modifications whatsoever at any point in time.

Defendants induced the consumers to enroll and pay by making prohibited representations and misrepresentations to consumers, and by failing to provide required disclosures to consumers. In violation of law, the Companies discouraged consumers from communicating with their lenders or servicers, and the Companies repeatedly misrepresented that consumers would receive legal representation, as well as the likelihood that consumers would obtain mortgage loan modifications, and the timeframe in which the Companies would obtain such modifications for consumers. In fact, the Companies' operations—held out to consumers as "national law firms"—were nothing but shams. Non-attorneys performed nearly all of the mortgage loan modification work, with attorneys merely duplicating the non-legal work performed by the non-attorneys. Next to no consumers received any purported "foreclosure defense services," and in those rare instances in which they did, the Companies required the consumers to pay fees on top of those that the Companies already required them to pay for mortgage loan modification work.

Defendants' conduct violated the Mortgage Assistance Relief Services Rule, 12 C.F.R. pt. 1015 ("Regulation O"). In addition, Defendants' deceptive acts and practices violated Sections 1031 and 1036 of the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5531, 5536. These numerous and repeated violations harmed thousands of vulnerable consumers.

In Defendants' Motion, CFLG, Macey, Aleman, Searns, and Stafford ask the Court to grant them summary judgment on the Bureau's Regulation O-based claims relying on their assertions that the Bureau does not have Congressional authorization to assert such claims, that the Bureau lacks authority to regulate attorneys and the practice of law, and that Regulation O is invalid because it is arbitrary and capricious to the extent it seeks to regulate attorneys. In addition, and in the alternative, Movants contend that they are entitled to summary judgment on the Bureau's Regulation O-based claims because Regulation O's attorney exemption applies to them, and on the Bureau's CFPA-based deception claims because the CFPA's attorney exemption applies to them. Finally, Macey and Stafford argue that they are entitled to summary judgment on all claims asserted against them because they did not directly participate in any of the Companies' acts or practices, and they did not control or have the authority to control the Companies' day-to-day operations. Def. Motion at 2-4; Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("Defendants' Memorandum" or "Def. Mem.") at 9-34, citing Defendants' Proposed Findings of Fact in Support of Their Motion for Summary Judgment, ECF No. 112 ("Defendants' PFOF" or "Def. PFOF").

Neither the undisputed evidence nor the law supports any of Movants' claims. Movants both misstate and mischaracterize the relevant facts, and misapply the law. Congress granted first the Federal Trade Commission ("FTC") and then the Bureau express authority to regulate the offering and providing of mortgage assistance relief services. As the Supreme Court has made clear in multiple contexts, attorneys who fall within the general terms of a statute are not exempt from federal regulation simply because they are attorneys. In this case, however, Regulation O does not automatically regulate attorneys who provide mortgage assistance relief services. Rather, Regulation O exempts such attorneys if they meet certain criteria. Those

criteria, which were developed after careful consideration of the attorney exemption based on an extensive notice-and-comment rulemaking record, easily pass muster under deferential arbitrary-and-capricious review.

Movants fail to meet their burden of identifying evidence on which the Court could find in their favor on each element of the affirmative defenses addressed in Defendants' Motion, namely each element of the Regulation O attorney exemption and the CFPA attorney exemption. First, Defendants did not provide mortgage assistance relief services to consumers as part of the practice of law. Instead, they contracted with local attorneys, in states where the Companies did business, to duplicate ministerial tasks and basic financial review already performed by the Companies' non-legal staff. Except for a small fraction of cases out of more than 6,000 consumers enrolled, local attorneys had zero contact with either consumers or with any lenders on consumers' behalf. Second, Movants have not established that Defendants or their local attorneys were licensed to practice law in the states where the Companies had their operations; Movants make conclusory assertions but provide the Court with absolutely no evidence. Third, Defendants did not comply with state laws and regulations that cover the same type of conduct that Regulation O requires. Movants offer the Court only assertions as to this element, but no competent evidence to counter the overwhelming factual record that their purported "law firms" were shams that deceived and misled consumers, violating at least several rules of professional conduct for lawyers adopted by states in which the Companies operated. Finally, Defendants' acts and practices relating to the Companies' so-called "client trust accounts" violated state professional conduct rules because Defendants automatically took consumer funds from those accounts each month regardless of any expenses incurred, fees earned, or results obtained on behalf of any particular consumer.

For the same reasons described above, Movants also fail to meet their burden of proof on the CFPA attorney exemption. Finally, the attempt by Movants Macey and Stafford to escape liability for the acts of the Companies should be soundly rebuffed. The record evidence is overwhelming that Macey exerted control over both Companies and knew about their deceptive practices. Similarly, Stafford was the founder of CFLG and the record shows his continuing significant involvement in the company after he sold his majority stake in it.

In short, Movants fail to demonstrate that they are entitled to summary judgment, and the Court should deny Defendants' Motion. Further, the evidence and legal authorities on which Movants have relied in Defendants' Motion do not refute the material facts and legal arguments supporting the Bureau's Motion or the Bureau's Memorandum, and the Bureau reiterates its request that the Court grant the Bureau's Motion and its requested relief.

## II. LEGAL ARGUMENT

### A. Movants Fail to Meet the Legal Standard Required for the Court to Grant Their Motion for Summary Judgment

Summary judgment should be granted only if the movant shows from materials in the record "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c); *Harrell v. U.S. Postal Serv*., 445 F.3d 913, 918 (7th Cir. 2006) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). As the Bureau demonstrates below, Movants fail to demonstrate that the facts on which they rely are not in dispute, and there is considerable evidence based on which the Court should rule in the Bureau's favor. *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013) (citing *Ptasznik v. St. Joseph Hospital*, 464 F.3d 691, 694 (7th Cir. 2006)) (there must be "evidence on which the [finder of fact] could reasonably find for the non-moving party"). Movants also fail to demonstrate that those facts and the law on which they rely entitle them to judgment as a matter

of law. Moreover, as demonstrated in the Bureau's Motion and the Bureau's Memorandum, it is the *Bureau* that meets the legal standard for summary judgment and is entitled to judgment as a matter of law on all of its claims.

### B. Regulation O Permissibly Regulates Mortgage Assistance Relief Service Providers Who Do Not Satisfy the Attorney Exemption in 12 C.F.R. § 1015.7

In 12 U.S.C. § 5538(a)(1), Congress authorized the Bureau (and previously the FTC) to "prescribe rules with respect to mortgage loans" that "relate to unfair or deceptive acts or practices," including those "involving loan modification and foreclosure rescue services." Pursuant to that express grant of congressional authority, the agencies have prescribed regulations governing the offering and provision of "mortgage assistance relief services" ("MARS") and have defined that term to cover a variety of loan modification and foreclosure relief services sold to consumers. *See* 12 U.S.C. § 1015.2 (defining "Mortgage Assistance Relief Service"). The regulations, now codified at 12 C.F.R. pt. 1015 as Regulation O ("MARS Rule"), do not automatically regulate attorneys who provide mortgage assistance relief services. Rather, Regulation O *exempts* attorneys who provide mortgage assistance relief services if they meet certain criteria relating to the practice of law. This broad exemption was crafted after a thorough notice-and-comment rulemaking proceeding at the FTC in which a diverse set of interested parties participated. No bar association has ever challenged Regulation O on the basis that the exemption impermissibly impinges on state regulation of the practice of law.

Movants now contend, however, that the attorney exemption in Regulation O should encompass even those attorneys who flout applicable state laws. Def. Mem. 20-27. That contention is baseless. As numerous Supreme Court cases make clear, attorneys are not immunized from federal law simply because Congress has not made an "express . . . statement" (Def. Mem. 1, 10) that they be covered. In addition, as the rulemaking record for the MARS

Rule makes clear, attorneys who disregard state law in their provision of mortgage assistance relief services to consumers contribute significantly to the harm that Congress wanted Regulation O to address. Given this record, it was not arbitrary to confine the attorney exemption only to those attorneys who not only are engaged in the practice of law in the state where the consumer or the property is located, but who also comply with relevant state law when they provide mortgage assistance relief services to consumers.

### 1. Background on the MARS Rule

#### a. The Omnibus Act

Congress initially enacted 12 U.S.C. § 5538 as Section 626 of the Omnibus Appropriations Act ("Omnibus Act"), 2009, Pub. L. No. 111-8, 123 Stat. 524 (Mar. 11, 2009). Section 626 directed the FTC to "initiate a rulemaking proceeding with respect to mortgage loans" and provided that "[a]ny violation of [the prescribed rule] shall be treated as a violation of a rule under section 18 of the Federal Trade Commission Act ["FTCA"] (15 U.S.C. § 57(a)) regarding unfair and deceptive acts or practices." Pub. L. No. 111-8, § 626, 123 Stat. at 678. Two months later, Congress enacted the Credit CARD Act of 2009, Pub. L. No. 111-24, 123 Stat. 1734 (May 22, 2009), which clarified Section 626 in two relevant respects. First, the amendment specified that the FTC's rulemaking "shall relate to unfair or deceptive acts or practices regarding mortgage loans, which may include unfair or deceptive acts or practices involving loan modification and foreclosure rescue services." Pub. L. No. 111-24, § 511(a)(1)(B), 123 Stat. at 1764. Second, the amendment provided that Section 626 did not authorize the FTC to "promulgate a rule with respect to an entity that is not subject to enforcement of the Federal Trade Commission Act (15 U.S.C. 41 et seq.) by the [FTC]." Pub. L. No. 111-24, § 511(a)(1)(C), 123 Stat. at 1764. The purpose of this provision was to ensure that Section 626 did not inadvertently authorize the FTC to regulate "banks, thrifts, and credit unions" that had long been expressly excluded from the FTC's

jurisdiction under the FTCA. *See* 155 Cong. Rec. S2816 (Mar. 5, 2009) (statement of Sen. Dodd); *see also* 15 U.S.C. § 45(a)(2) (listing entities excluded from the FTC's jurisdiction under the FTCA). As explained below, attorneys are not among the persons who have been expressly excluded from the FTC's jurisdiction.

**b. FTC Adoption of the MARS Rule**

On June 1, 2009, the FTC published an advance notice of proposed rulemaking ("ANPRM") seeking comment on a variety of issues relating to loan modification and foreclosure relief services. 74 Fed. Reg. 26130 (June 1, 2009). The ANPRM noted that "[s]ome for-profit loan modification and foreclosure rescue operations have partnered with attorneys" to take advantage of state foreclosure consultant laws that "exempt state-licensed attorneys" from their reach. *Id.* at 26137. The ANPRM sought comment on whether the FTC's proposed rule should "include an exemption for attorneys or any other class of persons or entities." *Id.* at 26138.

After receiving 46 comments in response to the ANPRM, including comments from "[f]orty-six state attorneys general," "consumer advocacy groups," and "for-profit MARS providers," the FTC issued a notice of proposed rulemaking ("NPRM") on March 9, 2010. 75 Fed. Reg. 10707, 10708 (Mar. 9, 2010). The NPRM observed that "a growing number of MARS providers are employing or affiliating with lawyers" and "often tout the expertise of these attorneys in negotiating with lenders and servicers." *Id.* at 10710. "Providers also may use their relationship with attorneys to assert that they are not covered by state laws that prohibit non-attorneys from collecting advance fees for loan modification services." *Id.* The NPRM also found that "a growing number of attorneys themselves are engaged in deceptive and unfair practices in the marketing and sale of MARS." *Id.* at 10712. For instance, the Illinois Attorney General "reported that '33 percent of the MARS companies we have dealt with are owned by attorneys, while 38 percent have some link to the legal profession.'" *Id.* at 10723 (brackets removed).

In response to these concerns, the FTC explained that "[i]ncluding attorneys within the proposed Rule is necessary to ensure that the rule is effective in preventing [deceptive and unfair] conduct." *Id.* at 10723. The FTC accordingly proposed a "narrowly-tailored exemption" that would "strike a balance that would protect consumers from unfair or deceptive conduct by attorneys" who offer mortgage assistance relief services "while at the same time preserve the ability of attorneys to provide bona fide legal services to homeowners." *Id.* at 10723-24. Under the proposed rule, attorneys would be exempt from the "ban on instructing consumers not to communicate with their lenders or servicers, so long as the attorneys are licensed to practice in the state where the consumer resides." *Id.* at 10730. Attorneys would also be exempt "from the advance fee ban if the attorney: (a) provides MARS in connection with a bankruptcy petition or other court proceeding; (b) is licensed to practice in the state where the consumer resides; and (c) is in compliance with applicable state laws, including licensing regulations." *Id.* The NPRM sought comment on the proposed exemption. *Id.*

On December 1, 2010, after receiving 75 comments from various stakeholders, including 30 comments from attorneys or entities representing attorneys, the FTC issued its final rule on mortgage assistance relief services. MARS Rule Statement, Mortgage Assistance Relief Services, Final Rule, 75 Fed. Reg. 75092 (December 1, 2010) (to be codified at 16 C.F.R. pt. 322) (Final Rule). "[T]he proposed rule's treatment of attorneys was the issue most addressed in the comments." *Id.* at 75125.

In response to these comments, the FTC "broadened the attorney exemption" in the final rule. *Id.* at 75128. The final rule exempts all attorneys from the entire rule (except the advance fee ban) if the attorney "[p]rovides MARS as part of the practice of law; (2) is licensed to practice law in the state where the client or the client's dwelling is located; and (3) complies with

applicable state laws and regulations relating to the same general types of conduct the Rule addresses." *Id.* To be exempt from the advance fee ban, the attorney must also "deposit[] any advance fees in a client trust account and compl[y] with all state laws and licensing regulations relating to the use of those accounts." *Id.* The FTC rejected calls that it exempt attorneys entirely from the MARS Rule because the "record show[ed] that a substantial number of attorneys have engaged in the types of deceptive and unfair conduct that the Rule prohibits," *Id.*, and that "MARS providers have used state law exemptions for attorneys to circumvent the law and harm consumers." *Id.* at 75129. At the same time, the FTC recognized that "attorneys may provide a host of valuable services for consumers unable to pay their mortgages." *Id.* at 75130. The FTC explained that its goal was "to craft an exemption that enables attorneys to engage in the bona fide practice of law, but does not create a loophole for unscrupulous attorneys who themselves engage in unfair or deceptive acts and practices in selling MARS or lend their credentials to others who do so." *Id.* No bar association or other party sought judicial review of the FTC's final MARS Rule.

### c. The CFPA

On June 21, 2010, while the FTC's rulemaking on the MARS Rule was still pending, Congress enacted the Consumer Financial Protection Act ("CFPA"), Pub. L. No. 111-203, Title X, 124 Stat. 1955 (2010), which created the Consumer Financial Protection Bureau, 12 U.S.C. § 5491(a). The CFPA transferred authority over various existing laws—called "enumerated consumer laws," 12 U.S.C. § 5481(12)—from other agencies to the Bureau. Among the transferred laws was Section 626 of the Omnibus Act. *See* 12 U.S.C. § 5481(12)(Q); *see also* CFPA § 1097, 124 Stat. at 2102 (amending Section 626 to reflect the transfer of authority). That transfer of authority took effect on July 21, 2011. *See* 12 U.S.C. § 5581(5)(A) (stating that transfer of authority would occur on the "designated transfer date"); 75 Fed. Reg. 57252 (Sept. 20,

2010) (establishing designated transfer date of July 21, 2011). On December 16, 2011, the Bureau republished the FTC's final MARS Rule as Regulation O. 76 Fed. Reg. 78130 (Dec. 16, 2011).

The CFPA also expressly addressed the Bureau's authority over attorneys engaged in the practice of law. The CFPA provides that "the Bureau may not exercise any supervisory or enforcement authority with respect to an activity engaged in by an attorney as part of the practice of law under the laws of a State in which the attorney is licensed to practice law." 12 U.S.C. § 5517(e)(1). But Congress also made clear that this prohibition does not apply "so as to limit the authority of the Bureau with respect to any attorney, to the extent that such attorney is otherwise subject to any of the enumerated consumer laws or the authorities transferred" to the Bureau. 12 U.S.C. § 5517(e)(3). The attorney exemption in the CFPA accordingly does not extend to enforcement actions under Regulation O brought against attorneys who are also mortgage assistance relief services providers.[3]

**2. Standard of Review**

Movants' challenge to the Bureau's authority to promulgate Regulation O's attorney exemption invokes the two-step test set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984). Def. Mem. 18-24. Under *Chevron* Step 1, a court first asks "whether Congress has *directly spoken* to the precise question at issue." *Arnett v. C.I.R.*, 473 F.3d 790, 793 (7th Cir. 2007) (quoting *Chevron*, 467 U.S. at 842–43) (emphasis in original). If congressional intent on the question is clear, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467

[3] The CFPA's attorney exemption also does not apply to deception claims brought, as in the instant case, under the CFPA involving a consumer financial product or service "(A) that is not offered or provided as part of, or incidental to, the practice of law, occurring exclusively within the scope of the attorney-client relationship; or (B) that is otherwise offered or provided by the attorney in question with respect to any consumer who is not receiving legal advice or services from the attorney in connection with such financial product or service." 12 U.S.C. § 5517(e)(2). The Bureau addresses this exception below in Part II.E.

U.S. at 842–43. However, if the statute is "silent or ambiguous with respect to the *specific issue*," the court proceeds to the second step of the analysis to determine whether the agency's interpretation is permissible. *Arnett*, 473 F.3d at 793 (emphasis in original). Where, as here, Congress has expressly delegated to an agency the authority "to elucidate a specific provision of [a] statute by regulation," the agency's interpretation of the statute "is permissible, and the regulation will be controlling, unless the regulation is 'arbitrary, capricious, or manifestly contrary to the statute.'" *Id.* (quoting *Chevron*, 467 U.S. at 843–44) (alteration in original).[4] *See also Big Ridge, Inc. v. Fed. Mine Safety & Health Review Comm'n*, 715 F.3d 631, 640–41 (7th Cir. 2013).

Determination of whether an agency's interpretation is arbitrary or capricious is a "narrow standard of review," under which a court's task is "only to determine whether the agency's action 'was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Black v. Educ. Credit Mgmt. Corp.*, 459 F.3d 796, 799–800 (7th Cir. 2006) (quoting *Head Start Family Educ. Program, Inc. v. Coop. Educ. Serv. Agency 11*, 46 F.3d 629, 633 (7th Cir. 1995)). If the agency articulates a "rational connection between the facts and the agency's action, then [the court's] inquiry is at an end." *Id.* (quoting *Head Start*, 46 F.3d at 633).

[4] Even if a statute does not explicitly delegate rulemaking authority, statutory ambiguities will be deemed "implicit delegations to the agency administering the statute to interpret the statute through its rulemaking authority." *Arnett*, 473 F.3d at 793 (citing *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001); *Chevron*, 467 U.S. at 844). An agency's interpretation of such ambiguities will be deemed both permissible and entitled to deference "so long as the interpretation is a reasonable construction of the statute." *Id.* (citing *Chevron*, 467 U.S. at 844).

### C. Regulation O's Attorney Exemption Is Valid under *Chevron* and the Administrative Procedure Act

#### 1. Congress's Grant of Authority is Unambiguous

##### a. The Omnibus Act Authorizes Regulation of Mortgage Assistance Relief Service Providers

Congress has authorized first the FTC and then the Bureau to "prescribe rules with respect to mortgage loans" that "relate to unfair or deceptive acts or practices," including those "involving loan modification and foreclosure rescue services." 12 U.S.C. § 5538(a)(1). Movants do not dispute that this statutory charge authorizes the regulation of providers of mortgage assistance relief services, as defined in Regulation O, 12 C.F.R. § 1015.2. Nor do Movants dispute the extensive record evidence, compiled in the course of the FTC's rulemaking, that demonstrates that attorneys provide mortgage assistance relief services and that some of those attorneys have engaged in the deceptive and unfair practices that Regulation O is intended to prevent. *See*, *e.g.*, Mortgage Assistance Relief Services, 75 Fed. Reg. at 75125-130. In light of these concessions, Movants' suggestion that Congress "did not authorize any regulation of attorneys" under any circumstances (Def. Mem.1) has no basis in the text or purpose of the statute.

Movants' argument instead rests on their view that "[c]ourts have typically declined to construe statutes to apply to attorneys absent an express Congressional statement that it intends to supplant state regulation of the practice of law." Def. Mem. 10. Even if that principle were correct, it would not apply to Regulation O, which exempts attorneys who meet certain criteria relating to the practice of law. But that principle is not correct. To the contrary, it has been roundly rejected by the Supreme Court.

In *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 775 (1975), the Supreme Court considered whether "a minimum-fee schedule for lawyers published by the Fairfax County Bar

Association and enforced by the Virginia State Bar violates § 1 of the Sherman Act," which declares illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations," 15 U.S.C. § 1. The bar association argued that the Sherman Act did not cover "learned professions" and sought an exemption based not on an "explicit exemption [in the statute] or legislative history" but on "the existence of state regulation." *Goldfarb*, 421 U.S. at 786. The Supreme Court rejected that argument, noting that it would allow lawyers "to adopt anticompetitive practices with impunity." *Id.* at 787. As the Supreme Court explained, the "nature of an occupation, standing alone, does not provide sanctuary from the Sherman Act, nor is the public-service aspect of professional practice controlling in determining whether § 1 includes professions." *Id.* (citations omitted).

Likewise, in *Heintz v. Jenkins*, 514 U.S. 291, 294 (1995), the Supreme Court held that the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq*., "applies to the litigating activities of lawyers." The Supreme Court did not find an express statement in the FDCPA that lawyers should be regulated. Rather, the Supreme Court explained that, "[i]n ordinary English, a lawyer who regularly tries to obtain payment of consumer debts through legal proceedings is a lawyer who regularly 'attempts' to 'collect' those consumer debts," as those terms are used in the statute's definition of "debt collector." *Heintz*, 514 U.S. 291, 294. Moreover, and in stark contrast to Movants' claim that an "express Congressional statement" in the statute is always required before an attorney may be regulated, *Heintz* found support for its conclusion that attorneys were subject to the FDCPA in Congress's decision to *repeal* a prior statutory exemption for attorneys. *Id.* at 294-95. The Supreme Court rejected a statement by one of the legislative sponsors of the repeal that purported to clarify that the FDCPA would not apply to the "practice of law" even after the express exemption was removed. *Id.* at 297 (quoting 132

Cong. Rec. 30842 (1986) (statement of Rep. Annunzio)). As the Supreme Court explained, the sponsor's statement was not persuasive because, among other things, "the plain language of the Act itself says nothing about retaining the exemption in respect to litigation" and because the "line the statement seeks to draw between 'legal' activities and 'debt collection' activities was not necessarily apparent to those who debated the legislation, for litigating, at first blush, seems simply one way of collecting a debt." *Id.*

The Supreme Court applied a similar analysis in *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 231 (2010), which concluded that "attorneys are debt relief agencies when they provide qualifying services" under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA). Akin to Regulation O, the BAPCPA established "several rules of professional conduct for persons qualifying as debt relief agencies" and required "qualifying professionals to include certain disclosures in their advertisements." *Id.* at 233. Although the statute's definition of "debt relief agency"—"'any person who provides any bankruptcy assistance to an assisted person' in return for payment"—did not expressly refer to attorneys, the Supreme Court noted that the term "bankruptcy assistance" "includes several services commonly performed by attorneys" (and some that may be provided only by attorneys). *Id.* at 236 (quoting 11 U.S.C. § 101(12)(A)). The Supreme Court also rejected the argument that "reading [the BAPCPA] to include attorneys impermissibly trenches on an area of traditional state regulation," explaining that "Congress and the bankruptcy courts have long overseen aspects of attorney conduct in this area of substantial federal concern." *Id.* at 237.

Ignoring these Supreme Court cases,[5] Movants attempt to rely on the D.C. Circuit's decision in *American Bar Association v. FTC*, 430 F.3d 457 (2005) ("*ABA*"). The issue in *ABA*

---

[5] The only Supreme Court case that Movants claim (Def. Mem. 9) supports their call for an express statement addressing attorneys—*Middlesex Cnty. Ethics Comm. v. Garden State Bar*

was whether "attorneys engaged in the practice of law are covered by the Gramm-Leach-Bliley Act [(GLBA)]," which imposed consumer privacy safeguards on "financial institutions." *Id.* at 458-59. Applying the two-step *Chevron* framework, the D.C. Circuit concluded that the FTC erred in concluding that the GLBA applied to attorneys. As the court explained, the GLBA defined "financial institutions" as an "institution the business of which is engaging in financial activities," as specified in the statute. *Id.* at 459 (quoting 15 U.S.C. § 6809(3)(A)). Applying *Chevron* Step 1, the court concluded that "attorneys and law firms, even if viewed as 'institutions,' are not institutions 'the business of which is engaging in financial activities,'" and, therefore, are not subject to the GLBA. *Id.* at 470. At no point in its Step 1 analysis did the court invoke the express statement rule that Movants now urge.

To be sure, the D.C. Circuit did invoke the "plain statement rule" of *Gregory v. Ashcroft*, 501 U.S. 452 (1991), in concluding that the FTC's interpretation of the GLBA would be unreasonable even under a *Chevron* Step 2 analysis. *Id.* at 472 (quoting *Gregory*, 501 U.S. at 461). But the D.C. Circuit invoked the *Gregory* rule as only one of several reasons for rejecting the FTC's interpretation under *Chevron*'s second step, *see id. at 471-72*, rather than as a bright-line principle always applicable to federal statutes. Indeed, citing the Supreme Court's decision in *Milavetz, Gallop & Milavetz*, the D.C. Circuit has since made clear that the "*Gregory* rule is not inviolate" and only "*might* apply in instances in which an agency regulates in an area of state oversight." *Ass'n of Private Sector Colleges & Universities v. Duncan*, 681 F.3d 427, 459 (D.C. Cir. 2012) (emphasis added). In any event, as explained below, *ABA*'s *Chevron* Step 2 analysis

---

*Ass'n*, 457 U.S. 423 (1982)—is not a case about the meaning of a federal statute at all. Rather, the issue presented in that case was "whether a federal court should abstain [under *Younger v. Harris*, 401 U.S. 37 (1971)] from considering a challenge to the constitutionality of disciplinary rules that are the subject of pending state disciplinary proceedings." *Middlesex Cnty,* 457 U.S. at 425.

does not apply here because, unlike the regulation in that case, Regulation O *exempts* attorneys who meet its exemption requirements.

**b. Neither the FTCA nor the CFPA Precludes Regulation of Mortgage Assistance Relief Service Providers Who Are Attorneys**

Movants place unjustified weight (Def. Mem. 11, 18) on a now-repealed provision of the Omnibus Act, which provided that Section 626 "shall not be construed to authorize the [FTC] to promulgate a rule with respect to an entity that is not subject to enforcement of the Federal Trade Commission Act (15 U.S.C. 41 et seq.) by the Commission." Credit CARD Act § 511(a)(1)(C), 123 Stat. at 1764. As the legislative history makes clear, that provision ensured that the FTC did not exercise authority over entities that had long been statutorily excluded from the FTC's jurisdiction. *See* 155 Cong. Rec. at S2816 (remarks of Sen. Dodd) ("Section 626 is not intended to apply to institutions including banks, thrifts and credit unions that are outside the FTC's jurisdiction."). Those statutory exclusions are set forth in Section 5 of the FTC Act, which otherwise grants the FTC broad authority to regulate "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1), (2).

Attorneys, however, are not expressly excluded from the FTC's Section 5 authority. To the contrary, by the time Congress had enacted the 2009 Omnibus Act, it was already well established that attorneys were subject to the FTC's Section 5 jurisdiction. *In re Wilson Chemical Co.*, 64 F.T.C. 168, 186–87 (1964) (holding attorney liable for preparing letter used to violate Section 5). Indeed, in the mid-1980s, Congress considered whether to remove state-licensed professionals, including attorneys, from the scope of the FTC's jurisdiction, but declined to do so. *See, e.g.*, S. Rep. No. 97-451, at 6, 18, 34 (1982) (accompanying S. 2499); S. Rep. No. 98-215, at 6, 10, 31-32 (1983) (accompanying S. 1714); *see generally Gadsen v. Newman*, 807 F. Supp. 1412, 1419-20 (C.D. Ill. 1992). Accordingly, because the FTC's authority under Section 5

extends to attorneys, the FTC's authority under Section 626 of the Omnibus Act extended to attorneys as well. *See* Mortgage Assistance Relief Services, 75 Fed. Reg. 75092 (discussing the FTC's jurisdiction).

Movants also erroneously invoke the attorney exemption in the CFPA, 12 U.S.C. § 5517(e), in their challenge to Regulation O. Def. Mem.15, 19. The CFPA expressly states that the attorney exemption does not apply to "enumerated consumer laws" or to certain "authorities transferred" to the Bureau. *Id.* § 5517(e)(3). Congress classified Section 626 of the Omnibus Act as an enumerated consumer law and as transferred authority, so the CFPA attorney exemption simply does not apply to Regulation O. 12 U.S.C. §§ 5481(12)(Q); 5581(b)(5). Indeed, given that Congress enacted the CFPA *after* the FTC had issued its NPRM on the MARS Rule, Congress's decision to classify the Omnibus Act as an enumerated consumer law suggests, if anything, that Congress approved of the limited attorney exemption that the FTC had initially proposed in the NPRM. *Cf. Coal. of New York State Career Sch., Inc. v. Riley*, 129 F.3d 276, 280–81 (2d Cir. 1997) (upholding regulations where Congress had amended the statute "after the [agency] had proposed regulations," where "neither the terms of the statutory amendments nor their legislative history assert a Congressional intent at odds with the proposed regulations.").

Movants' reliance (Def. Mem.15, 19-20) on Representative Conyers' statement is also misplaced. Representative Conyers made clear in his statement that "*existing federal regulatory authority* over activities of attorneys, *either under enumerated consumer laws* as defined in the bill, or *transferred to the new Bureau* from existing agencies . . . *is not diminished*." 156 Cong. Rec. E134 (July 15, 2010) (emphasis added). Representative Conyers thus fully understood that the CFPA's attorney exemption would not apply to Regulation O.[6]

[6] Movants incorrectly contend that the Bureau's authority under the Omnibus Act is coextensive with that of the FTC's prior to the transfer of authority. Def. Mem. 15, 20. The CFPA expanded

### 2. The FTC Acted Reasonably in Rejecting a Wholesale Exclusion of Attorneys from Regulation O

Even if Regulation O's application to attorneys who provide mortgage assistance relief services were not unambiguously authorized by Congress, the FTC's decision not to wholly exempt attorneys from the scope of the rule was a reasonable interpretation of the Omnibus Act. As discussed above, Congress authorized the promulgation of rules that "relate to unfair or deceptive acts or practices," including those "involving loan modification and foreclosure rescue services." 12 U.S.C. § 5538(a)(1). The rulemaking record before the FTC demonstrated "significant (and increasing) attorney involvement in MARS, both in affiliation with non-attorney providers or as providers themselves." Mortgage Assistance Relief Services, 75 Fed. Reg. at 75125. The record further showed "that a substantial number of attorneys have engaged in the types of deceptive and unfair conduct the Rule prohibits." *Id.* at 75128. For instance, attorneys partnered with non-attorney mortgage assistance relief services providers, who then "tout[ed] the expertise of these attorneys in negotiating with lenders and servicers," even though the "attorneys [did] little or no bona fide legal work." *Id.* at 75095. These partnerships also enabled mortgage assistance relief services providers to circumvent state mortgage assistance relief services laws that allowed for exemptions for attorneys. *Id.* at 75096; *see also id.* at 75129 ("MARS providers have used state law exemptions for attorneys to circumvent the law and harm consumers"). As the FTC reasonably found, an "across-the-board" exemption for attorneys "would open a large loophole to the Rule that MARS providers would exploit to the detriment of consumers." *Id.* at 75103.

---

the scope of Regulation O to "include persons excluded from coverage under the FTC's existing [rule] due to the fact that they are not subject to the FTC's enforcement jurisdiction." 76 Fed. Reg. 78130, 78131 (Dec. 16, 2011). Because the Bureau has not yet implemented the CFPA amendment, however, the exclusion of such persons remains in effect. *See id.*; *see also* 12 C.F.R. § 1015.2 (definition of "person").

To the extent that concerns about impinging on state regulation of the practice of law are relevant under a *Chevron* Step 2 analysis, *see ABA*, 430 F.3d at 471-72, Regulation O fully accommodates those concerns. It bears repeating that, unlike the rule at issue in *ABA*, Regulation O generally *exempts* from federal mortgage assistance relief services regulation attorneys who provide mortgage assistance relief services as part of the practice of law in the state where the consumer or the property is located and act in accordance with such state's law. Thus, this is not a situation in which federal law has "reach[ed] into areas of State sovereignty," *id.* at 471 (quoting *City of Abilene v. FCC*, 164 F.3d 49, 52 (D.C. Cir. 1999), or "altered the usual constitutional balance between the States and the Federal Government," *id.* (internal quotation marks omitted). As the FTC made clear, it remains up to the states to determine the "activities that constitute the 'practice of law'" (Mortgage Assistance Relief Services, 75 Fed. Reg. at 75131), and the FTC encouraged states to undertake "[v]igorous state monitoring and enforcement" to "reduc[e] the incidence of unfair and deceptive conduct by attorneys involved in the provision of MARS." *Id.* at 75132. Regulation O, unlike the rule at issue in *ABA*, leaves state authority over the practice of law and the regulation of attorneys wholly intact.[7]

Finally, Movants are flat wrong in contending that deference under *Chevron* Step 2 is not warranted because "neither the CFPB nor the FTC has special expertise in regulating and defining the practice of law." Def. Mem. 20. First, as just discussed, Regulation O does not regulate or define the practice of law—it regulates the provision of mortgage assistance relief services. More fundamentally, however, even the case on which Movants rely (Def. Mem. 21), *Gonzales v. Oregon*, 546 U.S. 243 (2006), makes abundantly clear that *Chevron* deference is warranted "when it appears that Congress delegated authority to the agency generally to make

[7] Notably, Movants have not identified any provision of Regulation O that, if applied to attorneys, would conflict with state bar or ethics rules.

rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *Id.* at 255-56 (quoting *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001)). In *Gonzales*, the Supreme Court did not defer to the Attorney General's Interpretive Rule governing physician-assisted suicide because Congress had not given him "broad power to enforce all provisions of the statute." *Id.* at 258.

By contrast, Congress expressly delegated first to the FTC and then to the Bureau the "authority to prescribe rules with respect to mortgage loans," including those relating to "unfair or deceptive acts or practices involving loan modification and foreclosure rescue services." 12 U.S.C. § 5538(a)(1). And because the CFPA defines "Federal consumer financial law" to include the Omnibus Act and its implementing regulation, 12 U.S.C. § 5481(14), Movants' assertion (Def. Mem. 22) that the Bureau's authority extends only to federal consumer financial law gets them nowhere. For all of these reasons, to the extent the Court applies a *Chevron* Step 2 analysis in this case, it should uphold Regulation O as a reasonable interpretation of Congress's grant of authority.

### 3. Regulation O's Criteria for the Attorney Exemption Are Reasonable

Movants also challenge Regulation O's attorney exemption as arbitrary and capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A).[8] As Movants admit, a court reviewing agency action under the APA "will give great deference" to the agency. Def. Mem. 25. Movants offer no valid reason for not extending that deference in this case.

The scope of the attorney exemption in Regulation O was an issue that received significant attention in the FTC's mortgage assistance relief services rulemaking. The FTC received 75

[8] Movants make arbitrary-and-capricious arguments as part of their *Chevron* Step 2 argument (Def. Mem. 23-25) and as a separate APA claim (Def. Mem. 25-27). The Bureau addresses both sets of arguments in this section.

comments, including 30 from "attorneys who provide MARS or entities representing attorneys, including the American Bar Association and several state bar associations." Mortgage Assistance Relief Services, 75 Fed. Reg. at 75093 (footnote reference omitted). The attorney exemption was, in fact, "the issue most addressed in the comments." *Id.* at 75125. Some commenters such as the National Association of Attorneys General argued in favor of the limited attorney exemption in the proposed rule and against "a broad, status-based exemption that categorically excludes attorneys from its coverage." Ex. A to Winters Decl., ECF No. 102, at MARS.000293; *see also* comments of New York City Department of Consumer Affairs, *id*. at MARS.000135 . Based on the entire record, however, the FTC decided to "broaden[] the attorney exemption" in order to "strike[] a balance between allowing consumers to continue to have access to bona fide legal assistance, while at the same time preventing or deterring unfair or deceptive practices by attorneys." Mortgage Assistance Relief Services, 75 Fed. Reg. at 75128 (footnote omitted). No party to the rulemaking proceeding sought judicial review of the FTC's determination.

Against this backdrop, Movants' contention that the attorney exemption is arbitrary and capricious cannot withstand scrutiny. Several of their arbitrary-and-capricious arguments simply rehash their erroneous claim that Congress did not authorize Regulation O to cover attorneys under any circumstances. Def. Mem. 23, 27. Because Movants' challenge to the agencies' statutory authority is incorrect for the reasons stated above, their related arbitrary-and-capricious challenge necessarily fails as well.

Movants' remaining challenges to the attorney exemption focus on the specific criteria that attorneys must satisfy to qualify for the exemption. First, Movants contend that the first criterion—that the attorney provide mortgage assistance relief services "as part of the practice of law" (12 C.F.R. § 1015.7(a)(1))—arbitrarily requires federal agencies and courts, rather than state

bar authorities, to determine what constitutes the "practice of law." Def. Mem. 1 n.l, 24, 27. But *any* rational attorney exemption will necessarily incorporate the criterion that the attorney be practicing law. Even Movants do not argue that attorneys should be exempt from Regulation O even when they are not practicing law, and any such rule would be nonsensical.[9] As the FTC observed, because "individuals with law licenses frequently engage in deceptive or unfair MARS practices or assist others who do, . . . merely possessing a law degree or a license to practice law is not an adequate basis for an exemption from the Rule." Mortgage Assistance Relief Services, 75 Fed. Reg. at 75130.[10]

Movants next contend that the attorney exemption should not consider whether the attorney invoking the exemption complies with relevant state laws and regulations governing attorney conduct and client trust accounts. Def. Mem. 23-25, 26-27. *See* 12 C.F.R. § 1015.7(a)(3), (b)(2). The FTC, however, rationally explained why attorneys seeking an exemption based on state regulation should be required to comply with those regulations. As the FTC explained, "many attorneys involved in the provision of MARS have engaged in practices that violate one or more aspects of the applicable state laws or licensing regulations." Mortgage Assistance Relief Services, 75 Fed. Reg. at 75131. Although "[s]ome state bars [had] initiated an increasing number of investigations of attorneys who provide MARS," the record demonstrated that "many state bars have limited resources for investigating and taking action against unethical attorneys involved in providing MARS." *Id.*

[9] Even the broad exemption proposed by the American Bar Association in the MARS rulemaking would have exempted only a "licensed attorney *engaged in the practice of law*." 3/29/10 ABA comments at 11 (emphasis added).

[10] Movants do not challenge the criterion that an attorney invoking the exemption be licensed in the state where the consumer or the property is located. 12 C.F.R. § 1015.7(a)(2).

As a result, "numerous attorneys have engaged and continue to engage in unfair or deceptive practices in the provision of MARS without states taking action against them," and "the threat of bar sanctions has not been a sufficient deterrent to attorney misconduct in the sale or provision of MARS, and thus it is necessary to cover certain conduct of attorneys under the Final Rule." *Id.* at 75132; *see also id.* at 75133 ("Given the frequency with which attorneys, and those affiliated with attorneys, have engaged in unfair and deceptive practices in connection with MARS, the Commission believes that a blanket exemption from the advance fee ban for attorneys is unwarranted and would not adequately protect consumers"). In light of the record evidence that many attorneys were purportedly "offering traditional legal services" while doing "little or no *bona fide* legal work," the FTC reasonably declined to exempt attorneys who fail to adhere to relevant state attorney regulations from the requirements of the MARS Rule.

Movants contend that predicating the attorney exemption on compliance with state law was not supported by the rulemaking record (Def. Mem. 27), but that is incorrect. The Illinois Office of the Attorney General, for instance, filed comments explaining that the "problem of attorney mortgage consultants . . . has grown so large that it is already straining the resources of state bar commissions." Ex. A to Winters Decl., ECF No. 102, at MARS.000020. It accordingly warned that the FTC should not "categorically exempt[] attorneys or contain[] an exemption for 'the practice of law' without defining what that is." *Id.* at MARS.000021. The National Consumer Law Center observed that "a broad exemption for attorneys could further encourage scammers," and it urged the FTC to condition any exemption on compliance with Rule 5.4 of the ABA's Model Rules of Professional Conduct and "compliance with local ethical requirements." *Id*. at MARS.000399; *see also* comments of Sargent Shriver National Center on Poverty Law, *id*. at MARS.000046 (advocating ban on partnerships involving lawyers that "violate state bar

associations' codes of conduct."); comments of Mortgage Bankers Association, *id*. at MARS.000502 (supporting exemption for debtor's attorneys whose "conduct complies with state law.").

Movants' suggestion that an attorney exemption could result in "draconian ex post facto regulation" also misses the mark. Def. Mem. 24. There is nothing in Regulation O or the rulemaking commentary about the attorney exemption suggesting that its requirements apply "ex post facto," *i.e.*, that the Bureau would apply a *later* state rule violation *retroactively*. Movants do not point to any case, enforcement action, or other occurrence involving the type of "ex post facto" scenario about which they speculate. In addition, Movants cite no law or facts suggesting that any regulator would interpret the regulation to apply to past, proper conduct by an attorney. Movants' contention is a red herring.

Finally, Movants raise the specter that state bar authorities' regulation of lawyers will conflict with the federal agencies and courts applying the attorney exemption in Regulation O enforcement actions. Def. Mem. 24-25. That concern is baseless. Regulation O looks to applicable *state* law to determine what constitutes the practice of law and the rules governing attorney conduct, so there is no possibility that federal authorities or courts will impose a different standard from the states. Mortgage Assistance Relief Services, 75 Fed. Reg. at 75131. Movants' suggestion (Def. Mem. 25) that federal courts are not capable of adjudicating issues that touch upon state attorney regulation has no basis in law, and, indeed, would necessarily foreclose any exemption based on the "practice of law."[11] Nor is it unusual for federal courts to

[11] Contrary to Movants' contention, *Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557 (7th Cir. 1999), is inapposite. *Doe* involved the McCarran-Ferguson Act, 15 U.S.C. § 1012(b), which the Seventh Circuit explained precludes federal courts from "stepping on the toes of state insurance commissioners" by interpreting federal law to allow courts to decide whether "limitations on coverage are actuarially sound and consistent with state law." *Id.* at 564. The McCarran-Ferguson Act's "reverse preemption" regime (*id.*) has no relevance here.

adjudicate issues arising out of state law; federal courts sitting in diversity have long applied state law without any injury to the authority of state courts to be the final arbiters of the laws of their respective states. Indeed, the MARS Rule has been in effect for nearly five years, and Movants fail to cite a single example in which the criteria for the attorney exemption have interfered with a state's regulation of its licensed attorneys. Given this history and the FTC's sound rationale, Movants' claim that Regulation O's attorney exemption is arbitrary and capricious should be rejected, and Defendants' Motion should be denied.

### D. Movants Fail to Demonstrate that Defendants Met the Requirements of Regulation O's Attorney Exemption

#### 1. Movants Have the Burden of Proof on Their Affirmative Defense Based on the Regulation O Attorney Exemption

Movants contend that Defendants met the requirements of Regulation O's attorney exemption set forth at 12 C.F.R. § 1015.7, and they assert that "the undisputed evidence demonstrates that the attorney exemption of Regulation O operates to bar the CFPB's claims." Def. Mem. 27-29. Movants have pled the Regulation O attorney exemption as an affirmative defense (Plaintiff's Statement of Additional Proposed Findings of Fact in Support of Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("*ASF*") *25-29),* and, therefore, they bear the burden of proof on it.[12] "Defendants have the burden of identifying evidence on which a jury could find in its favor on each element of their affirmative defenses." *C&N Corp. v. Kane*, 953 F. Supp. 2d 903, 911 (E.D. Wis. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) and *Celotex*, 477 U.S. at 322-23)). Although the courts have not yet addressed the burden of proof in asserting Regulation O's exemptions, the FDCPA provides a useful analogy. In defining the term "debt collector," the FDCPA lists a number of exemptions. 15 U.S.C. § 1692a(6)(A)- (F). As the Court has found, "[i]t is

[12] Since TMLG did not file an answer, it has not pled any affirmative defenses.

defendant's burden to prove that it qualifies for one of these exemptions." *Berndt v. Fairfield Resorts, Inc.*, 337 F. Supp. 2d 1120, 1130 (W.D. Wis. 2004) (Crabb, J.). Additional cases support the proposition that a defendant has the burden to assert and prove that it qualifies for an FDCPA exemption. *See, e.g.*, *Hartman v. Meridian Fin. Servs., Inc.*, 191 F. Supp. 2d 1031, 1041-42 (W.D. Wis. 2002); *Freeman v. ABC Legal Servs., Inc.*, 827 F. Supp. 2d 1065, 1073 (N.D. Cal. 2011). Likewise, Movants bear the burden of proving that Defendants qualify for Regulation O's attorney exemption.

Furthermore, "[t]o prevail on a motion for summary judgment, the party with the burden of proof must establish each element of [its affirmative defense] as a matter of law." *McNeilly v. Kraklow*, 368 B.R. 769, 779-80 (W.D. Wis. 2007) (Crabb, J.) (citation omitted). To meet that burden, Movants must show that there are no genuine issues of material fact, and that they have met—and are entitled to judgment as a matter of law on—each element of the Regulation O exemption. Fed. R. Civ. P. 56(a). The record demonstrates that Movants did not meet the exemption's requirements. Rather, the Companies were "law firms" in name only, with the principals using their bar licenses—and even the bar licenses of the Companies' local attorneys scattered around the country—as an end run around the prohibitions in Regulation O, and as enticements to unwitting consumers.

### 2. Defendants Were Mortgage Assistance Relief Service Providers under Regulation O and Do Not Dispute that Fact

Regulation O applies to persons providing "mortgage assistance relief services" to homeowners, and it prohibits mortgage assistance relief service providers from, among other things: (1) charging advance fees for negotiating loan modifications with consumers' lenders; (2) making certain misrepresentations and representations to consumers; and (3) failing to make specific written disclosures in their advertisements or other material directed to consumers. *See*

*FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611 (6th Cir. 2014) (affirming summary judgment against the marketers and sellers of mortgage loan modification services for violations of the MARS Rule, including requesting and receiving advance fees, making prohibited representations, and making prohibited misrepresentations).

Pursuant to Regulation O, "mortgage assistance relief service" means "any service, plan, or program, offered or provided to the consumer in exchange for consideration, that is represented, expressly or by implication, to assist or attempt to assist the consumer with . . . [n]egotiating, obtaining, or arranging a modification of any term of a dwelling loan, including a reduction in the amount of interest, principal balance, monthly payments, or fees." 12 C.F.R. § 1015.2. A "mortgage assistance relief service provider" is any person—including an individual, partnership, or other business entity—"that provides, offers to provide, or arranges for others to provide, any mortgage assistance relief service." 12 C.F.R. § 1015.2.

The Companies offered to provide or provided these services—including mortgage loan modification services in exchange for fees—and were, therefore, mortgage assistance relief service providers under Regulation O. Plaintiff's Statement of Proposed Findings of Fact in support of the Plaintiff's Motion for Summary Judgment, ECF No. 101 ("*SF*") *3, 7, 31, 47, 48, 55, 63, 129, 154-56, 158-59, 182-83, 194-95.* In addition, the Companies' marketing materials, welcome letters to consumers, retainer agreements with consumers, and sales representative calls with consumers, all demonstrated that the Companies offered to provide and purportedly provided mortgage loan modification services, all of which Regulation O covers. *SF 63, 159, 182-83, 188-92, 204*. Moreover, Movants admit that "Defendants were providing mortgage assistance relief services." Def. Mem. 28. As a result, it is undisputed that Defendants were mortgage assistance relief service providers.

### 3. Movants Fail to Qualify for Regulation O's Attorney Exemption

Under 12 C.F.R. § 1015.7(a), an attorney is exempt from all provisions of Regulation O other than the prohibition on advance fees, if the attorney meets all three of the following requirements:

> (1) Provides mortgage assistance relief services as part of the practice of law;
>
> (2) Is licensed to practice law in the state in which the consumer for whom the attorney is providing mortgage assistance relief services resides or in which the consumer's dwelling is located; and
>
> (3) Complies with state laws and regulations that cover the same type of conduct the rule requires.

12 C.F.R. § 1015.7(a). If an attorney fails to meet even one of these requirements, then the attorney is not exempt from any of Regulation O's prohibitions or requirements.[13]

As discussed above in Parts II.B and C, the origin of these stringent exemption requirements is instructive. The FTC found that substantial numbers of attorneys had engaged in the very types of deceptive and unfair conduct that the MARS Rule prohibited and had specifically used exemptions in comparable state laws to circumvent those laws. Mortgage Assistance Relief Services, 75 Fed. Reg. 75128-29. In identifying and framing the exemption's strict requirements, the FTC sought to stop such practices:

> [I]ndividuals with law licenses frequently engage in deceptive or unfair MARS practices or assist others who do. As with other services sold routinely through deceptive or unfair means, a broad attorney exemption can become an easy way for fraud artists to ply their trade without fear of law enforcement. Thus, the Commission concludes that merely possessing a law degree or a license to practice law is not an adequate basis for an exemption from the Rule. The Commission's goal is to craft an exemption that enables attorneys to engage in the bona fide practice of law, but does not create a loophole for unscrupulous

[13] If pursuant to 12 C.F.R. § 1015.7(a), an attorney meets all of the requirements for an exemption with the exception of the prohibition on advance fees, then the attorney will also be exempt from that prohibition only if the attorney meets the requirements of 12 C.F.R. § 1015.7(b).

attorneys who themselves engage in unfair or deceptive acts and practices in selling MARS or lend their credentials to others who do so.

*Id.* at 75130. Regulation O is designed to ensure that a license to practice law does not become a license to cheat. The Court should not permit Defendants to hide behind their law licenses or the law licenses of the local attorneys, the very practice that the MARS Rule—now Regulation O—sought to prevent. As demonstrated below, Defendants do not meet *any* of these three exemption requirements.

**a. Defendants Did Not Provide Mortgage Loan Modification Services as Part of the Practice of Law**

For an attorney to be exempt from Regulation O, the attorney must demonstrate, among other things, that he provided mortgage assistance relief services as part of the practice of law. 12 C.F.R. § 1015.7(a)(1). Movants contend that "it is undisputed that Defendants were providing mortgage assistance relief services as part of the practice of law." Def. Mem. 28. In support, Movants rely only on testimony that consumers hired the Companies—which Movants contend were law firms—for mortgage relief services that included loan modifications, short sales, and foreclosure defense services, and that TMLG and CFLG attorneys reviewed consumers' financial packages at least twice before submitting the packages to lenders. *Id.* These few contentions and the negligible evidence on which they are based, however, do not come even *close* to Movants meeting their burden of proof concerning their allegation that Defendants met the practice-of-law exemption requirement for their mortgage loan modification services—services that, as shown below, comprised nearly 100% of the Companies' mortgage assistance relief services.

In the context of Regulation O, what constitutes "the practice of law" turns not on form—namely whether a business is characterized as a "law firm" or not—but on substance, namely whether *legal services* are provided to consumers. This Court is inherently well-versed in what

constitutes the practice of law, which is commonly understood to mean legal knowledge, judgment, or skill. The FTC, however, provided important guidance in the Supplementary Information section accompanying the Final MARS Rule:

> [T]he services that attorneys may deliver to consumers with mortgage problems can be legal or non-legal in nature. Limiting the exemption to attorneys engaged in the ''practice of law'' is intended to draw the distinction between legal and non-legal services, even though performed or supervised by an attorney. The ''practice of law'' generally encompasses providing advice or counsel that requires knowledge of the law and preparing documents, including court pleadings and contracts, to secure clients' legal rights. The activities that constitute the ''practice of law,'' however, may vary based on state laws and licensing regulations, as interpreted by state courts and state bars. The Final Rule only allows an exemption for attorneys who are engaged in the ''practice of law,'' as interpreted by the jurisdiction where the consumer or the consumer's dwelling is located.

Mortgage Assistance Relief Services, 75 Fed. Reg. 75092, 75130-31. In turn, state law and state courts have determined that the practice of law includes, *inter alia*, the following: giving advice to clients that required the use of legal knowledge or skill, including regarding the law, their legal rights, or the legal rights or responsibilities of others; conducting legal or other research; drafting agreements or other legal documents that required familiarity with legal principles beyond the ken of the ordinary layman; appearing for consumers before public tribunals; representing consumers in formal adjudicative proceedings; negotiating legal rights and responsibilities; or rendering any other service to consumers that required the use of legal knowledge or skill. *See, e.g.*, *State v. Foster*, 674 So. 2d 747, 752 (Fla. Dist. Ct. App.), *as clarified* (Apr. 26, 1996), *cause dismissed*, 677 So. 2d 840 (Fla. 1996) (noting that the practice of law requires the possession of legal skill and knowledge greater than that of the average citizen) (internal citation omitted); *Baron v. City of Los Angeles*, 469 P.2d 353, 358 (Cal. 1970) ("resolution of legal questions for another by advice and action is practicing law if difficult or doubtful legal questions are involved which, to safeguard the public, reasonably demand the

application of a trained legal mind") (internal citation omitted); *Massachusetts Conveyancers Ass'n Inc. v. Colonial Title & Escrow, Inc.*, 2001 WL 669280 at *5 (Mass. Super. 2001) (noting the necessity of using "legal methods" as an element of the practice of law); *People ex rel. Illinois State Bar Ass'n v. People's Stock Yards State Bank*, 176 N.E. 901, 908 (1931) (finding that the practice of law requires more than the knowledge of the layman); *Gmerek v. State Ethics Comm'n*, 751 A.2d 1241 (Pa. Cmwlth. 2000) (requiring a familiarity with legal principles beyond the ken of the ordinary layman); N.C. Gen. Stat. Ann. § 84-2.1 (limiting the practice of law to actual legal services); R.I. Gen. Laws Ann. § 11-27-2 (defining the practice of law to include the preparation of an instrument that "requires legal knowledge and capacity"); Wis. R. App. P. REG UNAUTH PRAC LAW S. 23.01 (the practice of law requires the knowledge, judgment, and skill of a person trained as a lawyer).

As demonstrated in detail below, the record contains a staggering amount of evidence demonstrating that Defendants did not provide mortgage loan modification services *as part of the practice of law*. Indeed, the Companies engaged in no "practice of law," other than in the extremely rare instances of 30 TMLG consumers (out of the more than 6,000 who enrolled with the Companies) who received foreclosure defense services from local attorneys. *SF 138, 186-87*. For those 30 TMLG consumers, the local attorneys provided such services without any input from TMLG, which in those instances acted more as a referral service. *SF 139*. To deny Defendants' Motion on the Regulation O practice-of-law element, however, the Court need only find that there is a genuine *dispute* as to *any* material fact regarding whether the Companies' loan modification services constituted the practice of law. The facts elicited by the Bureau

concerning Defendants' use of attorneys as a front for purely financial and ministerial activities are sufficient in and of themselves for the Court to deny Defendants' Motion.[14]

The overriding principles in determining whether services constitute the practice of law is whether or not those services required the use of legal knowledge or skill, or knowledge of legal principles beyond the ken of the ordinary layman. Defendants' mortgage loan modification services did not require such knowledge or skill. Defendants operated their businesses in as many as 35-40 states, having contracted with local attorneys in those states for mortgage loan modification review work. *SF 46-49, 54; Def. PFOF 29 and 88.* Defendants have claimed that these relationships with local attorneys rendered TMLG and CFLG "national law firms." *SF 33-37, 39, 40, 46, 53, 54, 93*. Neither the Companies' attorneys nor the local attorneys, however, provided legal services to consumers in connection with mortgage loan modification services—the attorneys were merely window-dressing. In fact, the undisputed evidence in the case demonstrates that the Companies operated not as law firms, but as the very type of mortgage assistance relief services entities intended to be under the auspices of Regulation O's dictates and prohibitions.

*Sales and Processing Operations*

The Companies' operations used high-pressure, boiler-room style sales tactics to reel in consumers, and they had a sales floor operation with routine processes for gathering basic consumer information and setting up automated monthly payments. *SF 66, 70-72, 75-77, 80-85.* The Companies' sales and administrative operations were so extensive that the salespeople alone—who were not supervised by attorneys—vastly outnumbered the attorneys. *SF 73.* In

[14] As set forth in the Bureau's Motion, based on the material facts established by the record, there is no genuine dispute that Defendants' mortgage loan modification services did *not* constitute the practice of law.

addition to the numerous sales and administrative personnel, the Companies used document processors to do the primary work of the business: gather consumers' documents and communicate with lenders. *SF 44-45, 54, 109-12, 129-30.*

*Triple-Level Non-Legal Reviews*

Defendants set up the Companies to have three levels of *identical* review of consumers' basic financial information and mortgage loan modification documents: the first level by non-attorney salespeople or document processors; the second level by one of the Companies' two headquarters attorneys; and the third level by local attorneys who were independent contractors managed by the headquarters attorneys. *SF 38, 91, 97, 113-14, 117-18*. The non-attorneys and attorneys at each of the three levels reviewed and approved the same consumer information in conjunction with the same criteria, using checklists that the Companies provided, ensuring that the consumers met the lender-required mortgage loan requirements and provided all of the lender-required documents. *SF 38, 91-92, 97-99, 101, 113-14, 117-18, 120, 122*. All of the information reviewed was *financial* or other non-legal consumer information that the lenders required; such information was as straightforward as, for example, determining by how many months a consumer was behind in payments. *SF 91, 97-98, 100, 116*. These reviews involved no use of legal knowledge or skill. *SF 98, 145*. In fact, headquarters attorneys even followed a script when speaking to consumers to confirm their basic *financial* and related information. *SF 80, 81, 83.* Aleman himself characterized the duplicative work of attorneys as "belt and suspenders," a telling admission of the redundant processes and lack of legal skill needed. *SF 117*. Moreover, even in moving for summary judgment on this Regulation O attorney exemption, Movants admit that the attorneys' reviews were of a consumer's "*financial* package" (emphasis added). Def. Mem. 28.

*Quick Reviews by Local Attorneys*

The Companies built these redundant financial, non-legal reviews into two stages of their process: first, at intake, and, second, before submitting documents to a mortgage lender or servicer. *SF 91, 97, 113-14.* Local attorneys, who were the third in line, spent as little as one or two minutes conducting the intake-stage review, a step that one local attorney described as something he could do "in a heartbeat" by looking at the information in a short email from the Companies; the local attorneys reviewed no documents from the consumer. *SF 99, 104-05.* Similarly, local attorneys spent as little as five minutes or less reviewing loan modification submission packages before the Companies submitted them to mortgage lenders or servicers. *SF 121*. The local attorneys merely checked to make sure that the document processors had put the required consumer residence and *financial* information and documents in the submission packet; if so, the local attorneys approved it. *SF 115-16*. This attorney submission-stage review also did not require any legal judgment. *SF 115-16, 145.*

*Local Attorneys Paid Only for Approvals*

Indeed, the local attorneys served as no more than rubber stamps. The Companies paid them only if they *approved* the consumer information or files they reviewed. *SF 46, 106, 123*. As a result, local attorneys approved 100% or close to 100% of the consumers' intake and submission files. *SF 107, 126*. Moreover, because this information and these documents had already been reviewed and approved twice before, the Companies directed the local attorneys that they would "rarely decline" to approve, and, indeed, that was the case. *SF 97, 107, 126.* One local attorney testified that on the rare occasions that he declined a loan modification submission package, the Companies always directed him to approve the file anyway, and the attorney always complied. *SF 125.*

*No Local Attorney Communications with Consumers or Lenders*

The intake and submission reviews for mortgage loan modification services comprised the entirety of the local attorneys' duties under their contracts with the Companies. Those two reviews were also the only local attorney services tied to the retainer and monthly fees agreed to and paid for by consumers to the Companies. *SF 128, 157-58, 182-83*. In performing these services, local attorneys did not give legal advice to consumers, have any communication with consumers or lenders, manage or supervise anyone, provide any services unique to their own state, or do any work that a non-attorney could not also do—and did, in fact, do—when reviewing intake or submission packages. *SF 38, 91, 119, 128, 132-33, 145-47*.[15] Even emails to consumers that *appeared* to be from the local attorneys were really just emails automatically generated by the Companies; the local attorneys had no part in writing or sending those emails. *SF 108, 127, 134-35*. One local attorney testified that she was not even aware that the Companies had sent such emails under her name. *SF 135*. Most importantly, with respect to these mortgage loan modification services, neither the headquarters attorneys nor the local attorneys used legal knowledge or skills, or applied a knowledge of legal principles beyond the ken of the ordinary layman. *SF 38, 98, 113, 115-16, 145*.

*A Façade—Not the Practice of Law*

Neither the headquarters attorneys nor the local attorneys were necessary for the Companies' mortgage loan modification services—services that were entirely non-legal. Rather, Defendants used those two levels of unnecessary and duplicative attorney review simply as

[15] After an investigation of a local attorney in connection with her work for CFLG, one state bar found that the local attorney did not have an attorney-client relationship with a CFLG consumer who sought mortgage loan modification services. *ASF 3*.

window dressing to create the law firm façades that they hoped would allow them to circumvent Regulation O's prohibitions and entice consumers with the promise of legal representation.

As noted above, there were isolated instances in which consumers who signed up with TMLG obtained legal representation in connection with foreclosures on their homes. *SF 136, 138, 142, 186*. This representation took place, however, outside the context of the initial fee and the monthly fee paid to the Companies by these consumers, who had to specially request this assistance and pay an additional $800 to obtain this representation from local attorneys. *SF 185*. Moreover, out of the more than 6,000 consumers who sought help from the Companies, *no* CFLG consumers and only *30* TMLG consumers were thus represented. *SF 138, 186-87*. This is less than 0.5% of the Companies' customers. For these actual legal services, the Companies separately compensated the local attorneys who handled them, and the Companies served not as representing law firms, but more as referral services. *SF 137, 139-41*.

Moreover, CFLG, in describing itself to the federal government on its tax returns, identified its *principal business activity* as "Mortgage Consulting"—not as a law firm—and its *principal product or service* as "Consulting"—not legal services. *ASF 4*. In addition, Defendants modeled CFLG after TMLG *(SF 50)*, meaning that that description should have applied to TMLG as well. Further undermining Movants' claims that the Companies were law firms, in the CFLG Operating Agreement that governed CFLG's management and business, CFLG, Macey, Aleman, and Stafford agreed that they were *not partners* for non-tax purposes. *ASF 7*.

All told, therefore, with their high-pressured and routinized sales and document-processing systems, and the triple-level non-legal review process of the salespeople, processors, and attorneys, the Companies were not "law firms" as they claimed to consumers and are now claiming to the Court in moving for summary judgment, but, rather, mere mortgage loan

modification companies. Most importantly, the Companies did not provide any of their mortgage loan modification services as part of the practice of law. Rather, those services entailed no legal knowledge or judgment, no legal analysis or advice, and no legal skill or services. As a result, they do not meet the requirements of 12 C.F.R. § 1015.7(a)(1) and, on that basis alone, do not qualify for the attorney exemption under Regulation O.

**b. Movants Fail to Show That Defendants Were Licensed to Practice Law in All of the States in Which Their Customers Resided**

For an attorney to be exempt from Regulation O, the attorney must also demonstrate that he is licensed to practice law in the state in which the consumer for whom the attorney is providing mortgage assistance relief services resides or in which the consumer's dwelling is located. 12 C.F.R. § 1015.7(a)(2). Movants contend that "Defendants were licensed to practice law in all of the states in which TMLG and CFLG serviced clients." Def. Mem. 28. Yet Movants have provided negligible support—and certainly no *reliable* support—for this broad and critical assertion. Rather, they merely contend that "TMLG had approximately 100 partner attorneys in 40 states and that CFLG had 37 member attorneys licensed to practice in 39 states." Def. Mem. 28-29.

None of the deposition or declaration references cited in Defendants' PFOF paragraphs 29 and 88 (the paragraphs on which Movants rely) state that the any of the local attorneys were *licensed* in *any* of their states, let alone in *all* of the 39-40 states that Movants have asserted. Def. Mem. 29. As to CFLG, although Aleman states in his declaration that "CFLG's legal services were provided . . . by the LLC's attorney-members who were licensed to practice law in the states in which the clients resided" (Def. PFOF at 16), Aleman provides no foundation or corroboration for this broad assertion, and Movants do not even cite to his statement in

Defendants' Memorandum. As to TMLG, Movants cite no evidence that TMLG's local attorneys were licensed in the relevant states.

Further, even if Movants could prove to this Court that its local attorneys were licensed in all of the states in which the Companies did business, that would not end the inquiry as to whether *the Companies themselves* satisfied the Regulation O exemption. Despite the law firm façades that Defendants created in part by referring to the local attorneys as "partners," the local attorneys were not partners in TMLG or CFLG in any contractual, legal, or other sense. Rather, the Companies inaccurately and misleadingly listed the local attorneys as "partners" on their letterhead, and they did so without local attorneys' knowledge or consent. *SF 37, 94, 95.* The Companies did not compensate the local attorneys as if they were partners, and the Companies did not provide them with any equity, health benefits, or retirement benefits. *SF 94.* The Companies merely paid the local attorneys a minimal flat fee for each review they did of consumers' financial or other loan modification-related information. *SF 123; ASF 1.* Moreover, in the CFLG Operating Agreement, Macey, Aleman and CFLG covenanted and represented that they did not intend to form a partnership in the non-tax sense with anyone, thereby completely undercutting Defendants' purported partnerships with local attorneys. *ASF 7.* At best, the local attorneys were nothing more than independent contractors whose purported licenses would not establish that *Defendants* complied with the Regulation O attorney exemption requirement that they be licensed to practice law in all of the states in which their customers resided. 12 C.F.R. § 1015.7(a)(2). As a result, Movants do not meet the requirements of 12 C.F.R. § 1015.7(a)(2) and, on that basis alone, do not qualify for the attorney exemption under Regulation O.

#### c. Movants Fail to Show That Defendants Complied with State Laws and Regulations that Cover the Same Type of Conduct that Regulation O Requires

For an attorney to be exempt from Regulation O, the attorney must further demonstrate that he complied with state laws and regulations that cover the same type of conduct that Regulation O requires. 12 C.F.R. § 1015.7(a)(3). As part of this demonstration, Movants must show that they met this requirement for *all* of the states in which they operated the Companies. Movants contend generally that "Defendants complied with state laws and regulations governing lawyers," Def. Mem. 29, but they do not contend that they complied with the laws and regulations that the *exemption* requires, *i.e.*, the state laws and regulations that cover the same type of conduct that Regulation O requires. 12 C.F.R. § 1015.7(a)(3); see Mortgage Assistance Relief Services, 75 Fed. Reg. 75092, 75131-32. Moreover, Movants provided *zero* support for the proposition that Defendants complied with the relevant laws and regulations—neither legal authorities nor evidence from the factual record. Def. Mem. 29.

In addition, Movants claim that "the CFPB has not identified any state law or regulation with which it contends that Defendants did not comply" (*Id.*), but Movants have it backwards. As discussed above in Part II.D, as Movants pled the Regulation O attorney exemption as an affirmative defense, *Movants*—not the Bureau—bear the burden of proof on each of the regulation's requirements. Their burden is clear, as the FTC has explained what compliance with state laws and regulations means in the context of this provision of the Regulation O exemption:

> In addition to being licensed, attorneys must comply with all relevant state laws and licensing regulations governing their conduct for the state in which the client or the client's dwelling is located to qualify for the exemption. Specifically, those attorneys must abide by all such laws and regulations relating to the following subject matters: (1) Competent and diligent representation of clients; (2) disclosure of material information regarding their services to clients; (3) the accuracy of representations of material aspects of their legal services; (4) the request, receipt, handling and distribution of fees from clients; and (5) prohibitions on fee splitting with non-attorneys . . . .

Mortgage Assistance Relief Services, 75 Fed. Reg. 75092, 75131. Further, the FTC provided specific and concrete examples of potential violations that directly relate to mortgage assistance relief services and that would render attorneys ineligible for the exemption, including the following:

> (1) Failing to work diligently and competently on behalf of clients, *i.e.*, not taking reasonable efforts to obtain mortgage assistance relief; (2) neglecting to keep clients reasonably informed as to the status of their matters . . . ; [and] (3) misrepresenting any material aspect of the legal services, including the likelihood they will achieve a favorable result . . . .

*Id*. at 75132. If attorneys do not comply with all of these state requirements, they would not be exempt and must comply with *all* of Regulation O's requirements. *Id.*

In numerous instances affecting more than 6,000 consumers, while conducting their mortgage assistance relief service businesses, TMLG and CFLG violated state regulations governing lawyers. Though the Bureau does not have the burden to prove any element of the exemption, the Bureau provides the Court with several examples of Defendants' failures to comply with these state requirements. For example, 74% of the time TMLG failed to obtain mortgage loan modifications for consumers, and 83% of the time CFLG failed to obtain mortgage loan modifications for consumers, demonstrating that the Companies failed to work diligently and competently on behalf of consumers. *SF 194-95.* In addition, the Companies told consumers not to communicate with their lenders or servicers, and Defendants misrepresented to consumers: (1) the likelihood of obtaining loan modifications; (2) the amount of time it would take to receive loan modifications; (3) consumers' obligations to make mortgage loan payments; and (4) that consumers would receive legal representation and that such representation would give consumers an advantage in obtaining modifications. *SF 190-92, 196-205.* Each of these acts and practices violated the American Bar Association ("ABA") Model Rules of Professional Conduct R. 1.1 ("Competence"), 1.3 ("Diligence"), and 1.4 ("Communication"), and the

regulations of all states that have adopted those rules. Indeed, all states except California have adopted the ABA Model Rules of Professional Conduct in whole or in part.[16] As the Bureau does not bear the burden of proving Defendants' noncompliance with the rules of every state in which the Companies did business, the Bureau does not reproduce or address all of the relevant states' codes of professional conduct here. Instead, the Bureau provides select examples from relevant states to direct the Court's attention to some of Defendants' specific violations. *See* ABA Model Rules of Prof'l Conduct R.1.1, R.1.3 and R. 1.4; Ala. Rules of Prof'l Conduct R. 1.1 ("Competence"), 1.3 ("Diligence"), and 1.4 ("Communication"); Nev. Rules of Prof'l Conduct R. 1.1 ("Competence"), 1.3 ("Diligence") , and 1.4 ("Communication") .

The Companies' collection of advance fees from consumers, which the Companies required consumers to pay automatically on a monthly schedule without regard to expenses incurred, services rendered, or progress made with respect to consumers' modifications, and which the Companies did not monitor *(SF 161, 172, 173)*, violated the Model Rules of Professional Conduct 1.5 ("Fees") and 1.15 ("Safekeeping Property") and the regulations of all states that have adopted those rules. *See* ABA Model Rules of Prof'l Conduct R 1.5 and R. 1.15; *see, e.g.*, Ill. Rules of Prof'l Conduct R. 1.5 ("Fees") and 1.15 ("Safekeeping Property"); Mich. Rules of Prof'l Conduct R. 1.5 ("Fees") and 1.15 ("Safekeeping Property"); S.C. Rules of Prof'l Conduct R. 1.5 ("Fees") and 1.15 ("Safekeeping Property") .[17]

---

[16] AMERICAN BAR ASSOCIATION http://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_professional_conduct/alpha_list_state_adopting_model_rules.html (last visited Oct. 16, 2015).

[17] Several state attorneys general sued TMLG, and one sued CFLG, alleging that the Companies did not comply with those states' laws and regulations covering the same type of conduct that Regulation O requires. Those states entered into consent orders prohibiting the Companies from doing business in those states. *SF 51, 61.*

Despite the undisputed facts showing Defendants' violations of these state regulations, Movants have made no effort to demonstrate to the Court their compliance, nor could they. As a result, Movants do not meet the requirements of 12 C.F.R. § 1015.7(a)(3) and, on that basis alone, do not qualify for the attorney exemption under Regulation O.

#### d. Defendants Did Not Meet Regulation O's Advance Fee Exemption Requirements Concerning Client Trust Accounts

Even if Defendants could establish that they were entitled to the exemption under 12 C.F.R. § 1015.7(a)(1) concerning the practice of law, and under subsections (a)(2) and (a)(3) concerning licensing and compliance with state laws, Regulation O provides that an attorney may only be exempt from the prohibition on advance fees if the attorney: "(1) [d]eposits any funds received from the consumer prior to performing legal services in a client trust account; and (2) [c]omplies with all state laws and regulations, including licensing regulations, applicable to client trust accounts." 12 C.F.R. § 1015.7(b). As discussed above in Part II.D.1, since Movants pled the Regulation O attorney exemption as an affirmative defense, they bear the burden of proof on each of the regulation's requirements, including those relating to client trust accounts. Furthermore, client trust account rules differ from state to state, and in order to sustain a contention that TMLG and CFLG complied with client trust account rules, Movants bear the burden of proving that Defendants did so in each of the approximately 35-40 states in which they operated. *SF 49; Def. PFOF at 29, 88*.

Movants contend that "Defendants complied with the trust account requirements necessary for an exemption from [the advance fee prohibition under] 12 C.F.R. § 1015.5." Def. Mem. 29. In support of this contention, Movants outline what they claim to be the systems that they set up involving their payment processor and banks. *Id.* Movants' presentation omits crucial facts that doom their argument.

From January to July 2012, CFLG had no client trust accounts, and, therefore, failed outright to meet this exemption requirement. *ASF 5.* With respect to CFLG after July 2012, and TMLG at all times, simply having or maintaining accounts that purported to be "IOLTA" client trust accounts is not enough to satisfy the exemption. The Model Rules of Professional Conduct specify that client funds paid into a trust account may be withdrawn by a lawyer "only as fees are earned or expenses incurred." ABA Model Rule of Prof'l Conduct 1.15(c) ("Safekeeping Property"). CFLG and TMLG violated that rule—and, therefore, the regulations of all states that have adopted that rule—because their system of automatically harvesting funds from client accounts each month did not involve, and could not have involved, any individual assessment of whether the Companies had earned a fee or incurred expenses as to any individual consumer.

Although the Companies set up processes to make it appear as if consumer payments were disbursed to the Companies as stages of services were completed and costs were incurred, the facts do not bear that out. Rather, the payment processors disbursed the consumers' payments to the Companies' operating accounts *automatically*, regardless of what, if any, services the Companies rendered or costs the Companies incurred. *SF 168, 172-73*. The accounts essentially served as pass-through accounts as consumers' payments cleared at a payment processor. *SF 164-66, 169-70*. Indeed, the entire process for consumers' payments to be transferred from their accounts to TMLG's and CFLG's operating accounts at Chase Bank took only *two to four days*. *SF 167*. No one from TLMG or CFLG monitored those accounts; in fact, nobody monitored them at all. *Id.* Therefore, no one at TMLG or CFLG, or anyone on their behalf, could have ensured compliance with the relevant state's client trust account rules. *SF 169-70*. As a result, Movants have not demonstrated, and cannot demonstrate, that they met the requirements of 12 C.F.R. § 1015.7(b) concerning client trust accounts, and, on that basis

alone, did not qualify for the attorney exemption under Regulation O concerning the advance fee prohibition.

### E. Movants Fail to Demonstrate that Defendants Met the Requirements of the CFPA Attorney Exemption in Connection with Their Deception Violations

#### 1. Movants Have the Burden of Proof on Their Affirmative Defense Based on the CFPA Attorney Exemption

Movants contend that, although the Bureau has alleged that Defendants engaged in deceptive acts and practices prohibited by the CFPA, Defendants met the requirements of the CFPA's attorney exemption set forth at 12 U.S.C. § 5517(e). Def. Mem. 30-31. Movants have pled the CFPA attorney exemption as an affirmative defense. *ASF 30-34.* As discussed in Part II.D.1 above in the context of their affirmative defense based on Regulation O, Movants bear the burden of proof on their affirmative defenses, including their defense based on the CFPA attorney exemption. *McNeilly v. Kraklow*, 368 B.R. 769, 779-80 (W.D. Wis. 2007) (Crabb, J.) They must establish that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law on each element of the CFPA attorney exemption. Fed. R. Civ. P. 56(a).[18] Inasmuch as TMLG and CFLG were nothing more than sham law practices, Movants cannot meet the exemption's requirements.

#### 2. Movants Fail to Qualify for the CFPA's Attorney Exemption

Under the CFPA's attorney exemption, "the Bureau may not exercise any . . . enforcement authority with respect to an activity engaged in by an attorney as part of the practice of law under the laws of a State in which an attorney is licensed to practice law." 12 U.S.C. § 5517(e)(1). This exemption, however, has two exceptions. The Bureau may exercise

[18] As noted previously, since TMLG did not file an answer, it has not pled any affirmative defenses.

enforcement authority over an attorney regarding the offering or provision of a consumer financial product or service:

> (A) that is not offered or provided as part of, or incidental to, the practice of law, occurring exclusively within the scope of the attorney-client relationship; or
>
> (B) that is otherwise offered or provided by the attorney in question with respect to any consumer who is not receiving legal advice or services from the attorney in connection with such financial product or service.

12 U.S.C. § 5517(e)(2). If the facts demonstrate that either of these exceptions applies, then the CFPA attorney exemption does not apply. Although Movants contend that neither of these exceptions applies in the instant case (Def. Mem. 30), the record belies their contention; each of these exceptions applies. Based on the same facts that doom their qualification for the Regulation O exemption, Movants similarly fail to meet their summary judgment burden to prove their qualification for this CFPA exemption.

Movants contend that Defendants' services "clearly fall within the scope of 'the practice of law,'" and, therefore, outside of the first exception found at 12 U.S.C. § 5517(e)(2)(A). Def. Mem. 30. In support, Movants point to consumers having engaged the Companies "for the purpose of receiving legal advice with respect to their mortgages," attorneys having "constructed the guidelines and procedures for processing client files," and attorneys having reviewed a consumer's "financial package at least twice prior to submission to a lender." Def. Mem. 30-31. These claims, however, do not establish that Defendants' mortgage loan modification activities were the practice of law. To the contrary, they support the *Bureau's* claims.

First, as demonstrated in the Bureau's Motion, Bureau's Memorandum, and above in Part II.D.3, through their misrepresentations, the Companies *tricked consumers into believing that they would receive legal advice and services*, including legal advice and services that would improve their chances of obtaining modifications, but the Companies provided no such legal

advice or services. *SF 190-207*. Second, as the Bureau has demonstrated, even if attorneys "constructed" guidelines for processing consumer files, those guidelines and the associated file processing related entirely to *financial and other non-legal information and services*. *SF 38, 91-92, 97-99, 100, 101, 113-14,116, 117-18, 120, 122, 145; see supra* Part II.D.3.a. Third, as the Bureau has also demonstrated, the Companies restricted attorneys' duplicate reviews of mortgage loan modification files to reviewing only *financial and other non-legal information*. *SF 38, 91-92, 97-99, 100, 101, 113-14,116, 117-18, 120, 122, 145; see supra* Part II.D.3.a.

Disingenuously, Movants also contend that "the CFPB does not dispute that the Defendants were engaged in the practice of law." Def. Mem. 31. In support, Movants claim that the Complaint "acknowledges . . . that CFLG and TMLG were law firms." Def. Mem. 31; Defs' PFOF 131. The Complaint, however, neither acknowledges nor otherwise states anything of the sort. *See* Complaint, ECF No. 1. Moreover, and most importantly, the Bureau has cited to the overwhelming amount of evidence demonstrating that the Companies' mortgage loan modification services did not constitute the practice of law. *SF 38, 91-92, 97-99, 100, 101, 113-19, 120, 122, 128, 132-33, 145-47; see supra* Part II.D.3.a. Defendants' mortgage loan modification services consisted primarily of the gathering and review of basic lender-required consumer financial information and documents that non-attorneys not only *could* easily review and process, but *did*, in fact, review and process. *SF 38, 91-92, 97-99, 100, 101, 113-14, 116-18, 120, 122*. In a triple-level repetitious review process, the headquarters attorneys and then local attorneys merely duplicated the work of the salespeople and document processors without doing anything that required the use of legal knowledge or skills, and without having any relationship with consumers, let alone a relationship that included advising them about the law or legal rights, or providing any other legal services. *SF 38, 91-92, 97-99, 101, 113-19, 120, 122, 128, 132-33,*

*145-47*. Thus, because the Companies' mortgage loan modification services were not offered or provided as part of, or incidental to, the practice of law, occurring exclusively within the scope of the attorney-client relationship, the first exemption *exception* applies, and the Bureau may exercise enforcement authority over Defendants. 12 U.S.C. § 5517(e)(2)(A). On that basis alone, therefore, Defendants cannot avail themselves of the CFPA attorney exemption and are subject to the CFPA's prohibition on deceptive acts and practices.

Movants also contend that their activities fall outside the scope of the second exception, at 12 U.S.C. § 5517(e)(2)(B), because, they contend, "[t]hat exception removes attorneys who are providing consumer financial services, when the consumer is not the client (*e.g.*, when an attorney represents a creditor)." Def. Mem. 31. Movants base this contention on their further claim that in the instant case, Defendants rendered services directly to consumers "who received legal advice and services from Defendants." *Id.* The record again does not support Movants' contention. As the Bureau has demonstrated above, in the context of providing mortgage loan modification services to consumers, Defendants offered or provided a *financial* service but did not provide *legal advice or services* to those consumers. *SF 38, 91-92, 97-99, 100, 101, 113-14,116, 117-18, 120, 122, 145; see supra* Part II.D.3.a. Thus, because the Companies did not provide legal advice or services in connection with the loan modification services that Defendants offered or provided, the second exemption *exception* applies, and the Bureau may exercise enforcement authority over Defendants. 12 U.S.C. § 5517(e)(2)(B). Therefore, on this additional basis—alone or combined with the basis under section 5517(e)(2)(B)—Defendants cannot avail themselves of the CFPA attorney exemption and are subject to the CFPA's prohibition on deceptive acts and practices.

### F. Individual Defendants Macey and Stafford Are Liable for Their Actions and the Actions of TMLG and CFLG under Regulation O and the CFPA

Movants claim that Macey and Stafford are entitled to summary judgment on the issue of whether or not they are liable for the actions of TMLG and CFLG. Def. Mem. 31-33. Movants do not dispute the relevant legal standard governing whether Macey and Stafford are liable for the actions of TMLG and CFLG under Regulation O. *See* Def. Mem. 32. Courts in the Seventh Circuit hold individuals liable for the acts of companies under the FTCA (which previously governed Regulation O) when the individuals have (1) "participated directly" in the company's acts or had the "authority to control" them, and (2) either "knew or should have known" about the deceptive practices. *FTC v. Bay Area Business Council, Inc.*, 423 F.3d 627, 636 (7th Cir. 2005) (citing *FTC v. Amy Travel Svc., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989)). Under the CFPA, "related persons" are "covered persons" for purposes of the CFPA's prohibition of unfair, deceptive, or abusive acts or practices. 12 U.S.C. § 5481(25)(B). Related persons, in turn, are defined to include directors, officers, or employees who "materially participate" in the conduct of an entity's affairs and are "charged with managerial responsibility for" an entity. 12 U.S.C. § 5481(25)(C).

Macey and Stafford are liable under Regulation O and the CFPA because they "participated directly in the practices or acts or had authority to control them." *Fed. Trade Comm'n v. Construct Data Publishers*, No. 13-CV-01999, 2014 WL 7004999, at *7-8 (N.D. Ill. Dec. 11, 2014) (quoting *Amy Travel*, 875 F.2d at 573). Authority to control the Companies can be evidenced by active involvement in business affairs as well as the making of corporate policy, including the assumption of the duties of a corporate officer. *Amy Travel*, 875 F.2d at 573-74 (citing *FTC v. Kitco of Nevada, Inc.*, 612 F. Supp. 1282, 1292 (D. Minn. 1985)); *see, e.g.*, *Consumer Sales Corp. v. FTC*, 198 F.2d 404, 408 (2d Cir. 1952). In addition, the standard for

individual liability for officers of a corporation also applies to limited liability companies. *See FTC v. Pac. First Benefit, LLC*, 472 F. Supp. 2d 974 (N.D. Ill. 2007). Macey and Stafford were both attorneys who thus would have had even greater knowledge of and responsibility for what constituted Regulation O violations and deceptive practices than the average businessperson might have possessed. The evidence shows, in addition, that both men knew or should have known about the Companies' deceptive acts and practices. *See, e.g.*, *Amy Travel,* 875 F.2d at 574.

**1. Macey's Liability for TMLG and CFLG**

Movants contend that there is "absolutely no evidence that [Macey] had any involvement in the conduct or operations of either TMLG or CFLG" (Def. Mem. 32), when, in fact, the record is replete with evidence of his control and involvement. As support for their argument, Movants cite only Defendants' undetailed, nonspecific, and self-serving statements found in their own depositions and declarations, and these forms of support are neither competent nor persuasive. *See Dale v. Lappin*, 376 F.3d 652, 655 (7th Cir. 2004) (*per curiam*) (sworn affidavits that are detailed, specific, and based on personal knowledge are "competent evidence to rebut [a] motion for summary judgment"). The documents and correspondence contemporaneous with Defendants' acts and practices tell a far different story.

First, Macey was a founding member, managing partner, and majority owner in TMLG and CFLG, with a 76.6% ownership interest in TMLG and an approximately 78% ownership interest in CFLG after July 2012. *SF 9, 11, 13*. As the majority shareholder in the Companies, Macey had the ability to make day-to-day operational decisions, financial decisions, policy decisions, and large decisions for both entities. *SF 12; ASF 11-18*. Macey had managerial responsibility for the Companies' operations, had final decision-making authority on major decisions, and could weigh in on the Companies' operations whenever he desired. *ASF 11-18;*

*SF 12, 217-18*. The CFLG Operating Agreement empowered Macey, at his sole discretion, to hire and dismiss employees, including attorneys. *ASF 14*. The CFLG Operating Agreement also empowered Macey to, among other things, approve all CFLG contracts, control its dispositions of assets, control its bank accounts, and commence or defend any litigation involving the business. *ASF 15-18.* Both the TMLG and CFLG Operating Agreements designated Macey to receive notices on behalf of the Companies. *ASF 19-20.*

Second, that Macey used his control to participate actively in the Companies' operations is amply borne out by the factual record. Macey approved the Companies' business plans and the structure of the Companies' operations. *SF 12, 216, 219*. He reviewed and negotiated vendor contracts and reviewed and approved some of the Companies' policies, processes, and procedures. *SF 216; ASF 15.* He reviewed reports and suggested changes to operations when appropriate *(SF 216)*, and he participated in TMLG's strategy for receiving leads on consumers. *ASF 24.*

Third, the record establishes that Macey "knew or should have known" about the Companies' deceptive acts and practices. *See, e.g., Amy Travel*, 875 F.2d at 573. Like the defendants in *Amy Travel*, Macey was a controlling shareholder in the Companies who participated in forming the business and structure, as well as policies and procedures, of the Companies. *SF 216; 219.* Further, he was an attorney well versed in mortgage assistance relief services who had participated in several shady operations before he created TMLG. *SF 32.* Finally, even if one were to accept Movants' implication (which, notably, they do not state outright) that Macey did not know about the deceptive representations being made to consumers by his companies, as discussed below, the advent of several state attorney general investigations

put him on notice that there was a serious problem with the Companies' deceptive acts or practices.

In *Amy Travel*, the Seventh Circuit Court of Appeals upheld judgment against two controlling shareholders of a telemarketing firm and a travel firm who claimed on appeal that they did not know, and should not have been expected to know, that false statements were being made to consumers by their companies. *Amy Travel*, 875 F.2d 564. The court found that "[i]f [the shareholders] were unable to see trouble coming from the [sales] scripts, it is unlikely they missed the signals sent by the high volume of consumer complaints . . . ." *Id*. at 574-75. Here, Macey was not only aware of state investigations launched against TMLG, but he actively participated in responding to them and controlling the company's response to them. *ASF 21-22.* States alleged that the Companies did not comply with those states' laws and regulations covering the same type of conduct that Regulation O requires. *SF 51, 61.* Surely the advent of several state investigations is even more of a red flag than consumer complaints. The Arizona attorney general sued TMLG in February 2012, the Oregon Department of Justice investigated TMLG in July 2012, and the Indiana attorney general sued the company in October 2012. *ASF 21.* The Connecticut Department of Banking sued TMLG in April 2012, and Defendant Searns emailed with Macey about it. *ASF 21.*

Macey directed the settlement negotiations with the Arizona attorney general on behalf of TMLG, including the amount for which TMLG was willing to settle, the specific terms Macey wanted in the settlement, and how to instruct TMLG's outside counsel. *ASF 22.* As early as January 2012, Macey was aware that TMLG was "under scrutiny." *ASF 21.*

Fourth, Macey's knowledge applied to the business of CFLG as well. After Stafford sold the majority of his interest in CFLG to Macey and Aleman, they operated CFLG in almost the

identical fashion as Macey, Aleman, and Searns had operated TMLG. *SF 40, 58.* Indeed, the very purpose of the purchase was to continue the mortgage assistance relief services business with a less-tainted corporate entity than TMLG had become. *SF 50.* In short, even if Macey did not *know* that the two Companies he controlled were illegally deceiving and cheating consumers (which given all the circumstances is unlikely), he certainly *should have known*.

In support of his bid to escape liability, Macey points the Court to his declaration submitted in support of Defendants' Motion and to deposition testimony. Macey's declaration as it relates to his liability argument consists of a handful of bare assertions such as "I did not participate in the day-to-day operations of TMLG and I did not manage any aspect of the firm." *Def. PFOF 28, 81*. As discussed in detail above, however, his own emails and other documents produced flatly contradict these assertions. *SF 9, 11- 13, 216-19; ASF 11-24.* In addition, the relevant legal standard does not require "day-to-day" involvement in a business to establish liability. *See, e.g., Amy Travel*, 875 F.2d at 573 ("Authority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy . . . ."). As for the deposition excerpts that Macey cites, they consist of Macey denying that he exercised any "day to day" decision-making powers as to TMLG and CFLG, while, again, the contemporaneous record shows his control of critical aspects of forming and managing the Companies. *Def. PFOF 28, 81.* In short, his declaration and deposition testimony are not credible and do not create any genuine issue of material fact as to his liability. Movants cite only Defendants' undetailed, nonspecific, and self-serving statements found in their own depositions and declarations, and these forms of support are neither competent nor persuasive. *See Dale,* 376 F.3d at 655 (to be competent evidence for summary judgment purposes, sworn affidavits should be not only based on personal knowledge, but also detailed and specific).

In further support of his effort to escape liability, Macey cites to Aleman's declaration for the proposition that Aleman "managed" both TMLG and CFLG. *Def. PFOF 27, 79*. Yet the fact that Aleman admits to "managing" the Companies does not negate all of the evidence of Macey having control of the Companies' policies and operations, or mitigate Macey's liability based on that overwhelming evidence. *SF 9, 11- 13, 216-19; ASF 11-24.*

Movants, therefore, fail to account for or address any of the copious contemporaneous evidence demonstrating Macey's control and knowledge. The record demonstrates that Macey is individually liable for the actions of the Companies under Regulation O and the CFPA, as a related person, and as someone who had managerial responsibility for and was a controlling shareholder of the Companies, who materially and directly participated in the Companies' affairs, who had authority to control the Companies' conduct, and who knew or should have known about the Companies' deception and other violative acts. Defendants' Motion as to Macey's individual liability should be denied, and the Bureau's Motion seeking summary judgment against Macey for the Companies' acts should be granted.

**2. Stafford's Liability for CFLG**

Movants contend that there is "absolutely no evidence that [Stafford] had any involvement in the conduct or operations of CFLG after July 2012." Def. Mem. 33. Movants argue that Stafford sold 95% of CFLG to Macey and Aleman in July 2012, had no involvement in its operations after that, and consequently should escape liability for CFLG's violative acts and practices. Def. Mem. 33. Again, Movants cite only their own unsupported and self-serving statements to support their argument, all of which lack both reliability and competence. *See id*; *see also Dale*, 376 F.3d at 655 (sworn affidavits that are detailed, specific, and based on personal knowledge are "competent evidence to rebut [a] motion for summary judgment").

First, Movants do not contend that Stafford has no liability for CFLG's violative acts and practices during the period of CFLG's operations through July 2012. Def. Mem. 33. Indeed, Stafford admitted that he formed CFLG and had managerial responsibility for various aspects of CFLG's operations. *SF 26-27, 238-39; ASF 9; Def. PFOF 63.* While CFLG's sole owner from January to July 2012, Stafford had complete managerial authority over it, and he admitted to being its "sole manager" during that period. *SF 238; Def. PFOF 66*. In addition, during this period, Stafford made all business decisions and managed its day-to-day operations. *SF 27, 238-39*. The record demonstrates, therefore, that Stafford is individually liable under Regulation O and the CFPA for the actions of CFLG through July 2012, as a related person, and as someone who had managerial responsibility for and was the sole owner of CFLG, who materially and directly participated in CFLG's affairs, who had authority to control CFLG's conduct, and who knew or should have known about CFLG's deception and other unlawful acts. Therefore, the Court should deny Defendants' Motion—and grant the Bureau's Motion—as to Stafford's individual liability for all CFLG conduct through July 2012 that violated Regulation O and the CFPA's prohibition against deceptive acts and practices.

Second, the record belies Movants' assertion that there is "absolutely no evidence" that Stafford had any involvement in CFLG after July 2012. As noted above, Stafford admitted that he had managerial responsibility for various aspects of CFLG's operations. *ASF 9.* After July 2012, Stafford maintained a 5% partnership interest in CFLG. *SF 28, 241*. For a period of two years after the July 2012 sale, the CFLG Operating Agreement guaranteed Stafford "a salary of $50,000 per year," unless CFLG ceased to operate. *ASF 10.* After July 2012, Stafford screened new local attorneys, and in response to consumer complaints from the BBB or state regulators, he drafted detailed letters setting forth CFLG's business practices, with the letters showing his

name in the signature block with the designation of "managing member," thus indicating his managerial role. *SF 242, 244-45*. After July 2012, Stafford had intimate knowledge of CFLG's business through weekly phone calls with Aleman, notes on the client management system, and time that he spent at CFLG's headquarters in Chicago. *SF 243, 246*.

Defendants' Motion cites to Stafford's declaration in claiming that he bears no liability for CFLG's actions, but Stafford's declaration is conclusory, stating "[a]fter July 2012, I had no operational control, management, or direction over CFLG." *Def. PFOF 80*. *See Dale*, 376 F.3d at 655 (to be competent evidence for summary judgment purposes, sworn affidavits should be not only based on personal knowledge, but also detailed and specific). Indeed, Stafford's declaration omits important facts. Stafford fails to inform the Court that the CFLG Operating Agreement guaranteed him a "salary of $50,000 per year" for the two-year period *after* the July 2012 sale of 95% of CFLG, unless CFLG ceased operating. *ASF 10.* He also fails to counter his own pleadings and deposition testimony, cited above, in which he admits to participating in key aspects of CFLG's business, such as hiring decisions and responding to consumer complaints. *SF 242, 244-45*; *ASF 9.* As does Macey, Stafford cites to Aleman's declaration, and for the same and corresponding reasons—including that Aleman's admissions do not negate all of the evidence of Stafford's control—the citation is irrelevant and unpersuasive.

The record demonstrates, therefore, that Stafford is individually liable for the actions of CFLG during that post-July 2012 period under Regulation O and the CFPA, as a related person, and as someone who had managerial responsibility for CFLG, who materially and directly participated in CFLG's affairs, and who knew and should have known about CFLG's deception and other violative acts. Defendants' Motion as to Stafford's liability for the post-July 2012

period of CFLG's operations should be denied, and the Bureau's Motion seeking summary judgment against Stafford for the Companies' acts during that period should be granted.

### G. CONCLUSION

For the foregoing reasons, the Bureau respectfully requests that the Court deny Defendants' Motion in its entirety and enter judgment as requested in the Bureau's Motion, awarding disgorgement and restitution, enjoining specified acts and practices associated with mortgage assistance and debt relief services, and imposing civil money penalties.

Date: October 27, 2015

Respectfully submitted,

Anthony Alexis (DC Bar #384545)
*Enforcement Director*

David M. Rubenstein (DC Bar #458770)
*Deputy Enforcement Director*

Cynthia Gooen Lesser (NY Bar #2578045)
*Assistant Deputy Enforcement Director*

*/s/ Seth B. Popkin*___________
Seth B. Popkin, DC Bar #417365
Seth.Popkin@cfpb.gov
202-435-9496
Shirley Chiu, IL Bar #6296079
Shirley.Chiu@cfpb.gov
202-435-7592
*Enforcement Attorneys*

Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing and of the accompanying Plaintiff's Response to Defendants' Proposed Findings of Fact, and Plaintiff's Statement of Additional Proposed Findings of Fact in Support of Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, were served on October 27, 2015, via electronic mail, upon counsel of record in this action.

*/s/ Seth B. Popkin*
Seth B. Popkin