## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

CONSUMER FINANCIAL
PROTECTION BUREAU,

                              Plaintiff,

           v.

THE MORTGAGE LAW GROUP, LLP, (D/B/A          Case No. 3:14-cv-00513
THE LAW FIRM OF MACEY, ALEMAN &
SEARNS), CONSUMER FIRST LEGAL
GROUP, LLC, THOMAS G. MACEY,
JEFFREY J. ALEMAN, JASON E. SEARNS,
and HAROLD E. STAFFORD,

                              Defendants.

## PLAINTIFF'S RESPONSE TO DEFENDANTS' PROPOSED
## FINDINGS OF FACT

Plaintiff, the Consumer Financial Protection Bureau (the "Bureau"), hereby submits its

Response to Defendants' Proposed Findings of Fact:

1.      Defendant Jeffrey J. Aleman ("Aleman") is an individual and currently a

citizen of Illinois.  Deposition of Jeffrey J. Aleman, May 20, 2015 ("Aleman Dep. (Dkt. No.

76)") 9:9-11.

   **RESPONSE**:  No dispute.

2.      Defendant Thomas G. Macey ("Macey") is an individual and currently a

citizen of Florida.  Declaration of Thomas G. Macey, Oct. 9, 2015 ("Macey Decl. (Dkt. No. 97)")

¶ 1.

   **RESPONSE**:  No dispute.

3.      Defendant Jason E. Searns ("Searns") is an individual and currently a citizen

of Florida.  Deposition of Jason E. Searns, May 28, 2015 ("Searns Dep. (Dkt. No. 74)") 4:24-5:2.

   **RESPONSE**:  No dispute.

4.      Defendant Harold E. Stafford ("Stafford") is an individual and currently a

citizen of Wisconsin.  Rule 30(b)(6) Deposition of Harold E. Stafford on behalf of Consumer First Legal Group, LLC, Jun. 3, 2015 ("CFLG (Stafford) Dep. (Dkt. No. 64)") 5:14-16.

**RESPONSE**:  No dispute.

5. Defendant Consumer First Legal Group, LLC ("CFLG") is a defunct Wisconsin limited liability company that no longer operates.  Complaint ("Compl. (Dkt. No. 1)") ¶ 7; Rule 30(b)(6) Deposition of Jeffrey J. Aleman on behalf of Consumer First Legal Group, LLC, vol. I, May 19, 2015 ("CFLG (Aleman) Dep. I (Dkt. No. 66)") 34:6-35:22, 41:19-42:12; Declaration of Jeffrey J. Aleman, Oct. 9, 2015 ("Aleman Decl. (Dkt. No. 105)") ¶ 24; Declaration of Harold E. Stafford, Oct. 9, 2015 ("Stafford Decl. (Dkt. No. 98)") ¶ 7.

**RESPONSE**:  No dispute.

6. Defendant The Mortgage Law Group, LLP ("TMLG") is a defunct Nevada limited liability partnership that no longer operates.  Compl. (Dkt. No. 1) ¶ 6; Aleman Dep. (Dkt. No. 76) 16:5-8, 20:17-21:14; Aleman Decl. (Dkt. No. 105), ¶¶ 13, 14.

**RESPONSE**:  No dispute.

7. In March 2014, TMLG filed a Chapter 7 bankruptcy petition.  Aleman Decl. (Dkt. No. 105), ¶ 14; *see In re The Mortgage Law Group, LLP*, Chap. 7 Debtor, Case No. 14-2825 (N.D. Ill. Br., Mar. 7, 2014).

**RESPONSE**:  No dispute.

8. At all times relevant to this matter, Aleman was an attorney admitted to practice law in the States of Wisconsin and Illinois.  Aleman Decl. (Dkt. No. 105), ¶ 2.

**RESPONSE**:  No dispute.

9. At all times relevant to this matter, Macey was an attorney admitted to practice law in the State of Illinois.  Macey Decl. (Dkt. No. 97), ¶ 2.

**RESPONSE**:  No dispute.

10.     At all times relevant to this matter, Searns was an attorney admitted to practice law in the State of Colorado.  Searns Dep. (Dkt. No. 74) 26:1-8.

**RESPONSE**:  No Dispute.

11.     At all times relevant to this matter, Stafford was an attorney admitted to practice law in the State of Wisconsin.  Stafford Decl. (Dkt. No. 98), ¶ 2.

**RESPONSE**:  No Dispute.

12.     During the entire course of its operations, CFLG was a multijurisdictional law firm.  CFLG (Stafford) Dep. (Dkt. No. 64) 25:1-27:19; Stafford Decl. (Dkt. No. 98), ¶ 4; Aleman Decl. (Dkt. No. 105), ¶ 16.

**RESPONSE**:  Dispute.  CFLG was not a "law firm," but rather a provider of mortgage assistance relief services.  CFLG offered, provided or arranged for others to provide mortgage assistance relief services, including but not limited to, providing services to assist a consumer with modifying the terms of his or her mortgage.  Deposition of CFLG 30(b)(6) Corporate Representative Harold E. Stafford Part 1 ("Stafford CFLG 30(b)(6) Dep. Part 1"), June 3, 2015, ECF No. 64, at 20; Deposition of CFLG 30(b)(6) Corporate Representative Jeffrey John Aleman Part 1 ("Aleman CFLG 30(b)(6) Dep. Part 1"), May 19, 2015, ECF No. 66, at 35.  CFLG even identifies its principal business activity as "Mortgage Consulting" and its principal product or services as "Consulting" on the company's 2012 and 2013 Federal income tax returns. Exhibits H and I of Declaration of Jeffrey Aleman, ECF No. 105.

CFLG's marketing materials, welcome letters to consumers, retainer agreements with consumers, and sales representative calls with consumers, all demonstrated that the CFLG offered to provide and purportedly provided mortgage loan modification services.  Declaration of Tim Ledbetter, April 30, 2015 ("Ledbetter Decl."), ECF No. 92, ¶¶ 2-5; Declaration of Brett Peterson, April 24, 2015 ("Peterson Decl."), ECF. No. 84, ¶¶ 3, 5; Declaration of Daniel Teynor,

3

June 3, 2015 ("Teynor Decl."), ECF No. 85, ¶¶ 2-4; Declaration of Fadi Halwani, April 10, 2015 ("Halwani Decl."), ECF No. 86, ¶¶ 2-4; CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000198-000201; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154, TMLG.MO.LIT.000160; Deposition of Victor Matthew Anderson July 2, 2015 ("Anderson Dep."), ECF No. 79, at 130-134; CFLG Amended Answer to Complaint, Dec. 31, 2014, ECF No. 41, at ¶ 39; Jeffrey Aleman's Amended Answer to Complaint, ECF No. 40, at 6 (answer to ¶ 23); TMLG Response to U.S. Senate, Pl.'s Mot. Summ. J. Ex. 36 (filed under seal), at DEF.0003071; Thomas Macey's Amended Answer to Complaint, ECF No. 42, at 6 (answer to ¶ 23); Jason Searns's Amended Answer to Complaint, ECF No. 43, at 6 (answer to ¶ 23).

CFLG provided no legal services to consumers who sought modifications of their mortgages. Consumers never communicated with any attorney from headquarters or a local attorney after they enrolled for services. CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000198-000201; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154; Peterson Decl., ECF No. 84, ¶ 16; Halwani Decl., ECF No. 86, ¶ 16; Ledbetter Decl., ECF No. 92, ¶ 14. The only services in connection with mortgage loan modifications that local attorneys provided to consumers consisted of (1) comparing CFLG checklists with consumer financial information collected on a computer screen at intake to assure that a consumer met lender criteria to apply for a loan modification, and (2) comparing CFLG checklists with documents submitted by a consumer to assure that the package contained all of the lender-required mortgage loan modification documents. These tasks could be performed by non-attorneys, and in fact, were already performed by non-attorneys – salespersons and document processors - before the local attorneys duplicated those tasks. Sibert Dep., ECF No. 77, at 103-105, 236; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 27, 54;

Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 452-455; Aleman Dep., ECF No. 76, at 201-02, 215.

Based on Defendants' own data, none of the 1,116 consumers who enrolled in CFLG's services received foreclosure defense services, or services beyond the administrative tasks associated with mortgage loan modification services.  Declaration of Ryan Thomas, October 2, 2015 ("Thomas Decl."), ECF No. 116, at 3 ¶ 19.

13.      In 1994, Macey opened the law firm Legal Helpers, P.C. in Chicago, Illinois, which practiced in the area of consumer bankruptcy.  Macey Decl. (Dkt. No. 97), ¶ 2.

**RESPONSE**:  No dispute.

14.      In 1997, Aleman joined Legal Helpers, P.C.  Aleman Decl. (Dkt. No. 105), ¶ 2.

**RESPONSE**:  No Dispute.

15.      In early 2009, Macey and Aleman opened a new law firm, Legal Helpers Debt Resolution, LLC ("LHDR"), to provide debt settlement representation as an out-of-court alternative to bankruptcy.  Aleman Dep. (Dkt. No. 76) 23:1-5; Aleman Decl. (Dkt. No. 105), ¶ 2; Macey Decl. (Dkt. No. 97), ¶ 4.

**RESPONSE**:  Dispute.  LHDR was not a law firm.  It offered and provided debt settlement services to consumers, and later offered mortgage loan modification services to consumers. LHDR's business model mirrored that of TMLG, which was not a law firm, but rather a provider of mortgage loan modification services. Deposition of Thomas Macey, ECF No. 78, at 23, 54, 86-87.  In fact, the businesses were so similar that when LHDR later rebranded its mortgage loan modification services arm into TMLG in early 2011, the only change that took place was that LHDR's employees and local attorneys were told they were suddenly working for TMLG.  Sibert Dep., ECF No. 77, at 54; Deposition of Jacqueline Delgado, April 9, 2015 ("Delgado Dep."), ECF No. 73, at 27, 29, 32, 36.

16.     Searns also participated in the formation of LHDR and was a member thereof.  Searns Dep. (Dkt. No. 74) 22:6-23:6.

**RESPONSE**:  No Dispute.

17.     Throughout its operation, LHDR represented clients with unsecured credit card debt and structured out-of-court settlements of that debt through negotiations with the clients' creditors.  Aleman Dep. (Dkt. No. 76) 23:1-5; Aleman Decl. (Dkt. No. 105), ¶ 3.

**RESPONSE**:  Dispute.  The Bureau objects to the term "represented" on the ground that it is vague. The Bureau also disputes Defendants' proposed finding to the extent that the term "represented" suggests LHDR was providing legal services to consumers.  LHDR was not a law firm.  It offered and provided debt settlement services to consumers, and later offered mortgage loan modification services to consumers. LHDR's business model mirrored that of TMLG, which was not a law firm, but rather a provider of mortgage loan modification services.  Macey Dep., ECF No. 78, at 23, 54, 86-87.  In fact, the businesses were so similar that when LHDR later rebranded its mortgage loan modification services arm into TMLG in early 2011, the only change that took place was that LHDR's employees and local attorneys were told they were suddenly working for TMLG.  Sibert Dep., ECF No. 77, at 54; Delgado Dep., ECF No. 73, at 27, 29, 32, 36.

18.     By late 2010, in addition to its other legal services, LHDR represented clients in mortgage mitigation situations.  Deposition of Colin Banyon, May 1, 2015 ("Banyon Dep. (Dkt. No. 82)") 32:2-4; Deposition of Kelly Patrick Sibert, Apr. 23, 2015 ("Sibert Dep. (Dkt. No. 77)") 50:21-52:12; Aleman Decl. (Dkt. No. 105), ¶ 3.

**RESPONSE**:  Dispute.  The Bureau objects to the term "represented" on the ground that it is vague.  The Bureau disputes Defendants' proposed finding to the extent that the term "represented" suggests LHDR was providing legal services to consumers.  Attorneys in LHDR's

network checked mortgage loan modification submission packages for completeness and were paid $40 by LHDR for each consumer file reviewed.  LHDR Class B Agreement, Pl. Mot. Summ. J. Ex. 10, at CFPB-TMLG-0058218.  LHDR offered, provided, or arranged for others to provide mortgage assistance relief services, specifically, offering services to assist a consumer with modifying the terms of his or her mortgage.  Macey Dep., ECF No. 78, at 9-10.

19.     By late 2010, Aleman came to believe that a separate law firm should provide mortgage mitigation legal services.  Aleman Dep. (Dkt. No. 76) 23:6-16; Searns Dep. 24:20-25:8, 32:25-33:9; Deposition of Thomas Macey, May 27, 2015 ("Macey Dep. (Dkt. No. 78)") 9:11-10:7; Aleman Decl. (Dkt. No. 105), ¶ 3.

**RESPONSE**:  Dispute.  The Bureau disputes Defendants' proposed finding to the extent that it suggests TMLG is a "law firm."  TMLG's Chicago headquarters was comprised of mostly salespersons, who by far outnumbered any attorneys. Anderson Dep., ECF No. 79, at 47-48, 58, 65-66, 69-70; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 53, 54; Sibert Dep., ECF No. 77, at 123-124, 126.  TMLG provided no legal services to consumers who sought modifications of their mortgages.  Consumers never communicated with any attorney from headquarters or a local attorney after they enrolled for services. TMLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 4, at CFPB-TMLG-0037271-0037273; CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000198-000201; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154;  Declaration of Floy Johnson, May 26, 2015 ("Johnson Decl."), ECF No. 87, ¶ 17; Declaration of Mark Pultz, May 13, 2015 ("Pultz Decl."), ECF No. 90, ¶ 14; Declaration of Montez Saunders, June 22, 2015 ("Saunders Decl."), ECF No. 91, ¶ 16; Declaration of Veronica Bruce, May 21, 2015 ("Bruce Decl."), ECF No. 93, ¶ 17.

TMLG's marketing materials, retainer agreements with consumers, and sales representative calls with consumers, all demonstrate that TMLG offered to provide and

purportedly provided mortgage loan modification services.  Consumers who viewed TMLG's
websites believed that TMLG could help them modify their loan by helping them obtain a
mortgage loan modification.  Saunders Decl., ECF No. 91, ¶¶ 3-5.  The initial retainer and
subsequent recurring monthly payments that were collected by TMLG were specifically for
purported services relating only to obtaining a mortgage loan modification.  TMLG Retainer
Agreement, Pl.'s Mot. Summ. J. Ex. 4, at CFPB-TMLG-0037271-0037273; Salesperson Scripts,
Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154.  Salespeople
made statements to consumers to convince consumers that they would obtain mortgage loan
modifications if they enrolled with TMLG.  Salespersons also told consumers that using the free
services of a non-profit organization to gather documents and submit a mortgage loan
modification would not get them a loan modification, but that TMLG's services would get them
a mortgage loan modification.  Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal),
at TMLG.MO.LIT.000152-000154, TMLG.MO.LIT.000160; Anderson Dep., ECF No. 79, at
130-134; CFLG Amended Answer to Complaint, Dec. 31, 2014, ECF No. 41, at ¶ 39.

Out of TMLG's 5,265 consumers, a mere 30 paid additional fees to receive foreclosure
defense services, and in those instances TMLG referred those consumers to local attorneys who
provided legal services without assistance from TMLG or attorneys at headquarters.  Thomas
Decl., ECF No. 116, ¶ 18; Declaration of Edith Gray, August 31, 2015 ("Gray Decl."), ECF No.
115, ¶ 15.

The Bureau also disputes that Aleman alone decided to start a separate mortgage
mitigation company.  Aleman, Macey, and Searns, made the decision together to start TMLG.
Aleman Dep. (Dkt. No. 76) 23:1- 5.

20.     Aleman persuaded Macey and Searns to co-found such a firm.  *Id.*; Macey
Decl. (Dkt. No. 97), ¶ 5.

**RESPONSE**:  Dispute.  Aleman testified that Macey, Searns, and himself made the decision together to start TMLG. Aleman Dep. ECF No. 76, at 23:1- 5.

21.     That firm, The Mortgage Law Group, LLP ("TMLG") was formed in early 2011.  Macey Dep. (Dkt. No. 78) 9:22-10:7; Sibert Dep. (Dkt. No. 77) 49:9-14; Aleman Decl. (Dkt. No. 105), ¶ 3; Macey Decl. (Dkt. No. 97), ¶ 5.

**RESPONSE**:  Dispute.  The Bureau disputes this proposed finding to the extent that "the firm" suggests that TMLG was a law firm providing legal services.  Salespersons far outnumbered attorneys at the TMLG's Chicago headquarters. Anderson Dep., ECF No. 79, at 47-48, 58, 65-66, 69-70; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 53, 54; Sibert Dep., ECF No. 77, at 123-124, 126.  TMLG provided no legal services to consumers who sought modifications of their mortgages.  Consumers never communicated with any attorney from headquarters or a local attorney after they enrolled for services.  TMLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 4, at CFPB-TMLG-0037271-0037273; CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000198-000201; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154;  Johnson Decl., ECF No. 87, ¶ 17; Pultz Decl., ECF No. 90, ¶ 14; Saunders Decl., ECF No. 91, ¶ 16; Bruce Decl. , ECF No. 93, ¶ 17.

TMLG's marketing materials, retainer agreements with consumers, and sales representative calls with consumers, all demonstrate that TMLG offered to provide and purportedly provided mortgage loan modification services.  Consumers who viewed TMLG's websites believed that TMLG could help them modify their loan by helping them obtain a mortgage loan modification.  Saunders Decl., ECF No. 91, ¶¶ 3-5.  The initial retainer and subsequent recurring monthly payments that were collected by TMLG were specifically for purported services relating only to obtaining a mortgage loan modification.  TMLG Retainer

Agreement, Pl.'s Mot. Summ. J. Ex. 4, at CFPB-TMLG-0037271-0037273; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154.  Salespeople made statements to consumers to convince consumers that they would obtain mortgage loan modifications if they enrolled with TMLG.  Salespersons also told consumers that the free services of a non-profit organization to gather documents and submit a mortgage loan modification would not get them a loan modification, but that TMLG's services would get them a mortgage loan modification.  Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154, TMLG.MO.LIT.000160; Anderson Dep., ECF No. 79, at 130-134; CFLG Amended Answer to Complaint, Dec. 31, 2014, ECF No. 41, at ¶ 39.

Out of TMLG's 5,265 consumers, a mere 30 paid additional fees to receive foreclosure defense services, and in those instances TMLG referred those consumers to local attorneys who provided legal services without assistance from TMLG or attorneys at headquarters.  Thomas Decl., ECF No. 116, ¶ 18; Gray Decl., ECF No. 115, ¶ 15.

22.     Macey contributed over $600,000 to capitalize the firm and became a 76% owner.  Macey Decl. (Dkt. No. 97), ¶ 5; Macey Dep. (Dkt. No. 78) 11:17-12:1.

**RESPONSE**:  No Dispute.

23.     Aleman contributed over $100,000 to the initial capitalization of TMLG and became a 14% owner.  Aleman Decl. (Dkt. No. 105), ¶ 3; Aleman Dep. (Dkt. No. 76) 29:19-23.

**RESPONSE**:  No Dispute.

24.     Searns became a 9% owner.  Searns Dep. (Dkt. No. 74) 33:16-34:1; Aleman Decl. (Dkt. No. 105), ¶ 3.

**RESPONSE**:  No Dispute.

25.     Searns (who lived in Colorado at the time) assisted in creating the structure for TMLG with respect to regulatory and ethics issues.  Searns Dep. (Dkt. No. 74) 25:9-19,

37:17-19.

**RESPONSE**:  No Dispute.

26.     TMLG was headquartered in Chicago, out of which office Aleman managed the firm's day-to-day business.  Aleman Dep. (Dkt. No. 76) 58:6-10; Aleman Decl. (Dkt. No. 105), ¶ 5.

**RESPONSE**:  No Dispute.

27.     Aleman made the day-to-day decisions regarding TMLG's operations with the assistance of other attorneys in the Chicago office.  Aleman Dep. (Dkt. No. 76) 31:5-12, 260:21- 261:15; Banyon Dep. (Dkt. No. 82) 45:23-46:22; Sibert Dep. (Dkt. No. 77) 58:19-61:7.

**RESPONSE**:  Dispute.  The citations provided by Defendants do not support Defendants' proposed finding.  The Defendants' evidence provides that Aleman made the day-to-day decisions regarding TMLG's operations and that he oversaw the two managing attorneys in TMLG's headquarters in Chicago, not that he made decisions with their assistance.  Aleman Dep. (Dkt. No. 76) 31:5-12, 260:21-261:15.

28.     Macey (who lived in Florida at the time) did not participate in the management, control, or direction of TMLG.  Macey Dep. (Dkt. No. 76) 48:3-24; Aleman Dep. (Dkt. No. 76) 39:5-11, 48:1-16, 50:15-21, 75:5-8; Macey Decl. (Dkt. No. 97), ¶ 6; Aleman Decl. (Dkt. No. 105), ¶ 5.

**RESPONSE**:  Dispute.  Macey had managerial responsibility for and was familiar with certain aspects, if not all, of TMLG's operations.  Thomas Macey's Amended Answer to Complaint, ECF No. 42, at 5 (answers to ¶¶ 17 and 18).  Macey served as a managing partner of TMLG and had final decision-making authority on issues regarding the company.  Thomas Macey Answers to Interrogatories, Pl.'s Mot. Summ. J., Ex. 29, at 9 (Response to Interrogatory No. 7); Macey Dep., ECF No. 78, at 33-35. Under the TMLG LLP Agreement, Macey was

designated to receive all communications and notices on behalf of TMLG.  TMLG Partnership Agreement, Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Opp. to Def. Mot.  Summ. J."), Ex. 1, ¶ 10.13.   Macey was aware as early as January 2012 that TMLG was "under scrutiny" by state regulators.  Macey Email January 24, 2012, Pl.'s Opp. to Def. Mot. Summ. J., Ex. 13 at DEF.0006020.  Also, Macey was the majority shareholder of TMLG and could weigh in on decisions whenever he desired.  Aleman Dep., ECF No. 76, at 46-48; Jeffrey Aleman Answers to Interrogatories, Pl.'s Mot. Summ. J. Ex. 32, at 8 (Response to Interrogatory 7).

Specifically, Macey exerted his control and direction over TMLG's affairs by:

a.  Creating or changing policy for running TMLG and setting up the company. Macey Dep., ECF No. 78, at 24-25, 37-38.

b.  Overseeing the development of and reviewing retainer agreements that TMLG entered into with its consumers.  Macey Dep., ECF No. 78, at 27; Macey Email January 24, 2012, Pl.'s Opp. to Def. Mot.  Summ. J., Ex. 13 at DEF.0006020.

c.  Directing settlement negotiations with a state attorney general that sued TMLG, including how much TMLG was willing to settle for, what specific terms Macey wanted in the settlement, and how to instruct outside counsel. Macey Email July 10, 2012, Pl.'s Opp. to Def. Mot.  Summ. J., Ex. 5 at DEF.0003644-0003645; Macey Email June 28, 2012 (1), Pl.'s Opp. to Def. Mot.  Summ. J., Ex. 6 at DEF.9854-.9855; Macey Email June 28, 2012 (2), Pl.'s Opp. to Def. Mot.  Summ. J., Ex. 7 at DEF.9840; Macey Email June 28, 2012 (3), Pl.'s Opp. to Def. Mot. Summ. J., Ex. 8 at DEF.9969-.9970; Macey Email June 28, 2012 (4), Pl.'s Opp. to Def. Mot.  Summ. J., Ex. 9 at DEF.10010.

d. Instructing the managers who were in charge of client support, processing, and document collection, and providing them with instructions on procedures, thereby creating policy and protocol for them. Macey Dep., ECF No. 78, at 9-11, 42-44; Aleman Dep., ECF No. 76, at 46-48; Jeffrey Aleman Answers to Interrogatories, Pl.'s Mot. Summ. J. Ex. 32, at 8 (Response to Interrogatory 7).

e. Determining TMLG's strategy to obtain consumer leads. Macey Email April 27, 2012, Pl.'s Opp. to Def. Mot. Summ. J., Ex. 12.

f. Participating in the decision of TMLG to have independent contractors who handled loan modification processing, often referred to as "strategic alliance partners." Macey Dep., ECF No. 78, at 16-17; Aleman Dep., ECF No. 76, at 253.

g. Participating in the decision of TMLG to file for bankruptcy. Macey Dep., ECF No. 78, at 71.

Furthermore, the Bureau objects that where Macey was living at the time of TMLG's operations is not relevant. Additionally, Defendants' citations do not support Defendants' proposed finding that Macey was living in Florida. None of Defendants' citations contain language showing that Macey "lived in Florida."

29. At its peak, TMLG had approximately 100 partner attorneys in 40 different states providing TMLG's legal services to the firm's clients. Aleman Dep. (Dkt. No. 76) 56:3-23; Aleman Decl. (Dkt. No. 105), ¶ 5.

**RESPONSE**: Dispute. The Bureau disputes the characterization of TMLG's local attorneys as "partner attorneys." These attorneys were not in any way "partners" of a law firm, but rather attorneys who were local to the states where consumers who enrolled in TMLG's program were located. These attorneys were, in fact, "local attorneys" and not "partners." These local attorneys received no equity in the company, health insurance, or retirement

13

benefits.  Some local attorneys even testified that the term "partner" mischaracterized their relationship with TMLG.  Deposition of William P. Harrington, Jr. June 17, 2015 ("Harrington Dep."), ECF No. 81, at 48, 62-64, 115, 117-18, 153-54, 157, 220-21; Delgado Dep., ECF No. 73, at 105-108; Deposition of Daniel Goldsmith Ruggiero, July 8, 2015 ("Ruggiero Dep."), ECF No. 70, at 64-65; Gray Decl., ECF No. 94, ¶¶ 4-5.  At least one local attorney stated that she did not believe she had an attorney-client relationship with TMLG's consumers.  Gray Decl., ECF No. 115, ¶ 9.

Local attorneys only performed financial review and ministerial tasks in connection with mortgage modification services.  These tasks consisted of looking at a consumer's basic financial information that was previously collected by a TMLG salesperson to determine whether there was a financial benefit to the consumer if he or she enrolled in TMLG's program, and checking mortgage loan modification submission packages for completeness against a checklist provided by TMLG.  Sibert Dep., ECF No. 77, at 103-105, 236; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 27, 54; Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 452-455; Aleman Dep., ECF No. 76, at 201-02, 215; Sibert Jan. 23, 2012 Email, Pl.'s Mot. Summ. J. Ex. 11, at CFPB-TMLG-0061123.  Non-attorneys at TMLG performed these tasks before the headquarters attorneys and local attorneys performed these same tasks. Harrington Dep., ECF No. 81, at 48, 62-64, 115, 117-18, 153-54, 157, 220-21; Delgado Dep., ECF No. 73, at 105-108; Ruggiero Dep., ECF No. 70, at 64-65; Gray Decl., ECF No. 115, ¶¶ 4-5.

Local attorneys were paid a paltry $25 to $40 for each of those tasks. TMLG Class B Agreement, Pl.'s Mot. Summ. J. Ex. 12, at CFPB-TMLG-0061205.

30.     Those attorneys were not retained "local counsel," but were partners in the LLP.  Aleman Dep. (Dkt. No. 76) 260:6-20; Banyon Dep. (Dkt. No. 82) 42:4-20; Aleman Decl. (Dkt. No. 105), ¶ 5.

**RESPONSE**:  Dispute.  TMLG's local attorneys were not in any way "partners in the LLP," but rather attorneys who were local to the states where consumers who enrolled in TMLG's program were located.  These attorneys were, in fact, "local attorneys" and not "partners in the LLP." The local attorneys received no equity in the company, health insurance, or retirement benefits.  Some local attorneys even testified that the term "partner" mischaracterized their relationship with TMLG.  Harrington Dep., ECF No. 81, at 48, 62-64, 115, 117-18, 153-54, 157, 220-21; Delgado Dep., ECF No. 73, at 105-108; Ruggiero Dep., ECF No. 70, at 64-65; Gray Decl., ECF No. 115, ¶¶ 4-5.  At least one local attorney stated that she did not believe she had an attorney-client relationship with TMLG's consumers.  Gray Decl., ECF No. 115, ¶ 9.

Local attorneys only performed financial review and ministerial tasks in connection with mortgage modification services. These tasks consisted of looking at a consumer's basic financial information that was previously collected by a TMLG salesperson to determine whether there was a financial benefit to the consumer if he or she enrolled in TMLG's program, and checking mortgage loan modification submission packages for completeness against a checklist provided by TMLG.  Sibert Dep., ECF No. 77, at 103-105, 236; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 27, 54; Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 452-455; Aleman Dep., ECF No. 76, at 201-02, 215; Sibert Jan. 23, 2012 Email, Pl.'s Mot. Summ. J. Ex. 11, at CFPB-TMLG-0061123.  Non-attorneys at TMLG performed these tasks before the headquarters attorneys and local attorneys performed these same tasks.  Harrington Dep., ECF No. 81, at 48, 62-64, 115, 117-18, 153-54, 157, 220-21; Delgado Dep., ECF No. 73, at 105-108; Ruggiero Dep., ECF No. 70, at 64-65; Gray Decl., ECF No. 115, ¶¶ 4-5.

TMLG paid local attorneys a paltry $25 to $40 for each consumer file on which they performed these administrative tasks and ultimately, approved.  TMLG Class B Agreement,

Pl.'s Mot. Summ. J. Ex. 12, at CFPB-TMLG-0061205.

31.     TMLG represented clients in mortgage mitigation.  The goal of such legal services was to keep a client in his or her home for as long as possible or permanently.  Aleman Dep. (Dkt. No. 76) 52:6-10; Aleman Decl. (Dkt. No. 105), ¶ 6.

**RESPONSE**:  Dispute.  The Bureau objects to the term "represented" as vague.  The Bureau disputes Defendants' proposed finding to the extent that it suggests TMLG provided legal representation.  TMLG did not provide legal representation to consumers in connection with obtaining a loan modification.

Consumers who enrolled in TMLG's program never communicated with an attorney at TMLG after the initial enrollment telephone call even though TMLG represented to consumers that an attorney would represent them.  Johnson Decl., ECF No. 87, ¶¶ 6, 17; Pultz Decl., ECF No. 90, ¶¶ 5, 14; Saunders Decl., ECF No. 91, ¶¶ 5, 16.  At least one local attorney stated that she did not believe she had an attorney-client relationship with TMLG's consumers. Gray Decl., ECF No. 115, ¶ 9.

Out of TMLG's 5,265 consumers, a mere 30 paid additional fees to receive foreclosure defense services, and in those instances TMLG referred those consumers to local attorneys who provided legal services without assistance from TMLG or attorneys at headquarters.  Declaration of Ryan Thomas, ECF No. 116, ¶ 18; Gray Decl., ECF No. 115, ¶ 15.

32.     That goal was accomplished through foreclosure defense, mortgage mitigation, short sales and other possible remedies for a client's hardship, including "cash for keys" programs. Aleman Dep. (Dkt. No. 76) 51:18-25; Aleman Decl. (Dkt. No. 105), ¶ 6.

**RESPONSE**:  Dispute.  Of the 5,265 consumers who TMLG enrolled in its mortgage modification program, only 26% of consumers received loan modifications, and a meager 30 consumers received foreclosure defense services.  Thomas Decl., ECF No. 116, ¶¶ 13, 18.  Local

attorneys testified that they were never asked by TMLG to perform deed-in-lieu of foreclosure, short sales, cash for keys, or consent foreclosures.  Ruggiero Dep., ECF No. 70, at 151-152; Harrington Dep., ECF No. 81, at 72, 87-90, 130, 142-43, 230-233, 242.

33.    "Foreclosure defense" involved TMLG attorneys reviewing a client's circumstances and working with the client to create strategies for defending against a foreclosure action (whether judicial or non-judicial); strategies could include appearing in court, filing an answer to a complaint of foreclosure and affirmative defenses, as well as propounding discovery. Banyon Dep. (Dkt. No. 82) 38:7-39-5; Aleman Decl. (Dkt. No. 105), ¶ 6.

**RESPONSE**:  Dispute. The Bureau objects to the term "TMLG attorneys" as vague. Defendants fail to distinguish whether they are referencing local attorneys or headquarters attorneys. The Bureau disputes Defendants' proposed finding to the extent it suggests that TMLG's attorneys at headquarters who were not also local attorneys performed foreclosure defense services.   In the rare instances when TMLG referred a consumer to the local attorney for the local attorney's services to delay or stop a foreclosure sale, the local attorney performed all the services. TMLG headquarters performed no services to delay or stop foreclosure after the referral was made. Gray Decl., ECF No. 115, ¶ 15.

34.    TMLG's short sale services included working with the client, a potential buyer, and the client's lender to do a short sale whereby the property would be sold to the third party potential buyer based on an agreed fair market value ("FMV") for the home, with the lender's agreement.  Aleman Decl. (Dkt. No. 105), ¶ 6.

**RESPONSE**:  No dispute.

35.    "Cash for keys" involved working with the client and the client's lender to get the client cash from the lender if the client was willing to effectively surrender his or her property in a timely manner – such a service was generally a last resort when all other measures

17

were exhausted.  Aleman Decl. (Dkt. No. 105), ¶ 6.

**RESPONSE**:  No dispute.

36.     In a typical mortgage modification, a TMLG client would then work with non-attorney support staff, who operated under the supervision of TMLG's attorneys.  Aleman Dep. (Dkt. No. 76) 57:7-58:20, 65:7-15.

**RESPONSE**:  Dispute.  Local attorneys did not supervise any TMLG staff.  Harrington Dep., ECF No. 81, at 162-63, 182-183, 231, 238; Ruggiero Dep., ECF No. 70, at 163-165; Delgado Dep., ECF No. 73, at 59-60, 70.

37.     That support staff included people in TMLG's support facility in Delray Beach, Florida.  Rule 30(b)(6) Deposition of Jeffrey J. Aleman on behalf of Consumer First Legal Group, LLC, vol. II, Jun. 3, 2015 ("CFLG (Aleman) Dep. II (Dkt. No. 67)") 461:20-22; Aleman Decl. (Dkt. No. 105), ¶ 8.

**RESPONSE**:  No dispute.

38.     Some of the people working in the Delray Beach facility were TMLG employees and others were not.  Aleman Decl. (Dkt. No. 105), ¶ 8.

**RESPONSE**:  No dispute.

39.     The people who were not TMLG employees were contract workers employed by Client Attorney Processing Solutions ("CAPS"), a company that signed a contract with TMLG to provide certain support services.   Deposition of Jay L. Gerst, Jun. 24, 2015 ("Gerst Dep. (Dkt. No.75)") 14:11-16:15; Aleman Decl. (Dkt. No. 105), ¶ 8.

**RESPONSE**:  No dispute.

40.     TMLG signed contracts with other companies, including Accurate Professional Services, LLC and Underwater Property Solutions, LLC, to provide additional support services. Aleman Decl. (Dkt. No. 105), ¶ 8.

**RESPONSE**:  No dispute.

41.     TMLG's employees and contract workers were directly supervised by the firm's attorneys – either through the presence of a TMLG attorney on-site, or through the policies, procedures, scripts, and training implemented, and the reviews conducted, by TMLG attorneys in Chicago and across the country.   Gerst Dep. (Dkt. No. 75) 56:9-59:10, 106:4-20; Sibert Dep. (Dkt. No. 77) 62:2163:7; Aleman Dep. (Dkt. No. 76) 96:5-97:7, 103:10-16; Aleman Decl. (Dkt. No. 105), ¶ 9.

**RESPONSE**:  Dispute.  Headquarters attorneys were based out of the Chicago office, and could not have directly supervised employees and contract workers who were located off-site.  Local attorneys did not supervise any TMLG staff.  Harrington Dep., ECF No. 81, at 162-63, 182-183, 231, 238; Ruggiero Dep., ECF No. 70, at 163-165; Delgado Dep., ECF No. 73, at 59-60, 70.  Even a local attorney who worked on-site at a TMLG processing office in Florida for two months testified that she did not supervise anyone.  Delgado Dep., ECF No. 73, at 59-60, 70.

42.     The support staff would work with the clients to gather the information and documentation necessary to secure a loan modification or for one of the other services provided by TMLG.  Sibert Dep. (Dkt. No. 77) 91:21-92:24; Gerst Dep. (Dkt. No. 75) 29:6-19, 33:19-34:3, 35:6-36:5, 59:11-64:2; Aleman Decl. (Dkt. No. 105), ¶ 10.

**RESPONSE**:  No Dispute.

43.     With respect to loan modifications, once the appropriate information and documents were gathered, a loan modification package would be prepared by the support staff, and then reviewed by a TMLG attorney in the state where the client lived to confirm that the package was complete and appropriate.  Aleman Dep. (Dkt. No. 76) 133:15-18, 141:12-22; Sibert Dep. (Dkt. No. 77) 59:12-19, 93:19-94:17; Aleman Decl. (Dkt. No. 105), ¶ 10.

**RESPONSE**:  Dispute.  Defendants' proposed finding mischaracterizes the loan modification submission review process at TMLG.  TMLG only asked the local attorney to review a loan modification package for completeness after non-attorney support staff and a headquarters attorney already reviewed and pre-approved the loan modification submission package for completeness.  Harrington Dep., ECF No. 81, at 79-80, 150, 173; Sibert Dep., ECF No. 77, at 99-100; Gerst Dep., ECF No. 75, at 60-62.

44.     Upon attorney approval, the package would be sent to the mortgage lender to secure a refinance or other type of loan modification.  Sibert Dep. (Dkt. No. 77) 94:13-96:10.

**RESPONSE**:  Dispute. The Bureau objects to Defendants' proposed finding as vague as to who sent the loan modification package to the lender. The Bureau disputes Defendants' proposed finding to the extent it suggests that the local attorney submitted the loan modification package to the lender. The document processors, not the local attorney, forwarded the loan modification packages to the mortgage lender after the local attorney checked the package for completeness.  Harrington Dep., ECF No. 81, at 86, 190-91; Sibert Dep., ECF No. 77, at 95, 216-217; Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 300-301.

45.     TMLG did not do its own advertising.  Aleman Dep. (Dkt. No. 76) 80:15-81:15; Aleman Decl. (Dkt. No. 105), ¶ 11.

**RESPONSE**:  No dispute.

46.     It contracted with various companies that would provide TMLG with "qualified leads" that those companies had developed.  Aleman Dep. (Dkt. No. 76) 81:16-82:25, 83:8-87:17; 37:4-9; Aleman Decl. (Dkt. No. 105), ¶ 11.

**RESPONSE**:  The Bureau objects that the term "qualified leads" is vague. Defendants fail to explain the meaning of "qualified leads."  The Bureau disputes Defendants' proposed finding to the extent it suggests that leads were pre-screened or pre-qualified in any way before

20

they were sold to TMLG.  Defendants' citations do not contain language supporting the proposed finding that such pre-screening or pre-qualification took place.

47.     When TMLG was provided with a lead, its intake personnel (who were employees of the firm) would speak with the prospective client over the telephone and gather  certain information regarding the prospective client (*e.g.*, contact information, name of mortgage lender, personal financial information, etc.).  Aleman Dep. (Dkt. No. 76) 83:1-7, 91:16-92:5, 97:11-19; Aleman Decl. (Dkt. No. 105), ¶ 11.

**RESPONSE**:  No dispute.

48.     The intake person (using scripts prepared by TMLG) described TMLG's services and TMLG's fee structure.  Aleman Dep. (Dkt. No. 76) 92:6-13, 96:5-97:1, 103:10-16; Sibert Dep. (Dkt. No. 77) 87:25-90:2; Aleman Decl. (Dkt. No. 105), ¶ 11.

**RESPONSE**:  Dispute.  Defendants' proposed finding mischaracterizes the tasks of the person who spoke to the consumer at the time of intake.  TMLG's intake personnel were salespersons who often made representations outside of the scripted language in order to secure a sale.  Anderson Dep., ECF No. 79, at 68-69, 93, 99-106, 113; Murphy Dep., ECF No. 80, at 56-57.  These representations included:

a.  promising consumers that TMLG could provide them with modifications of their mortgages. Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000153; Declaration of George Halpin, ECF No. 88, ¶ 4; Pultz Decl., ECF No. 90, ¶ 4; Saunders Decl., ECF No. 91, ¶ 4; Bruce Decl. , ECF No. 93, ¶ 3; Anderson Dep., ECF No. 79, at 103-105, 113, 123-124.

b.  telling consumers that they would receive attorney services.  Aleman Dep., ECF No. 76, at 105; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154; Anderson Dep., ECF No. 79, at 110-111.

   c.   telling consumers they could not receive loan modifications unless they were behind on their mortgage payments. Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154.

   d.   telling consumers that they did not have to make any payments to their lenders until their mortgage loan was modified, and that the lender would incorporate all past due payments into the loan modification. Pultz Decl. ECF No. 90, ¶ 11.

   49.   If the person wanted to retain TMLG, a TMLG attorney then spoke with the person to confirm his or her understanding of TMLG, its structure and fees, the services it provided, and the risks associated with those services.  Aleman Dep., May 20, 2015, (Dkt. No. 76) 92:13-93:4; Aleman Decl. (Dkt. No. 105), ¶ 11.

   **RESPONSE**:  Dispute.  Defendants' proposed finding mischaracterizes the conversation between the consumer and TMLG headquarters attorney.   After the consumer spoke with a TMLG salesperson, TMLG transferred the consumer to speak with an attorney at TMLG headquarters. That attorney read the consumer a script that repeated the same points made by the salesperson's script and repeated the intake process.  Aleman Dep., ECF No. 76, at 28, 92; Sibert Dep., ECF No. 77, at 134-136.  The headquarters attorney's script consisted of statements about TMLG's services, and the consumer was required to answer "yes" after each statement to indicate he or she understood what was being read to him or her. Sibert Dep., ECF No. 77, at 134-136; TMLG Verification and Sales Scripts, Pl.'s Mot. Summ. J. Ex. 30, at KS.00014-KS.00016, KS.00020-KS.00031.  The consumer, desperate to save his or her home, could not enroll in TMLG's program for a loan modification unless he or she answered "yes" after each statement that the headquarters attorney read to him or her. Sibert Dep., ECF No. 77, at 135-136.

   The headquarters attorney's script contained no language explaining to the consumer that if the consumer was able to successfully obtain a loan modification from his or her lender, it

would take significantly longer than the 90 to 120 days that TMLG advertised, and the script

contained no language explaining to the consumer the risk that the consumer may not be able to

obtain a loan modification even with TMLG's services.  TMLG Verification and Sales Scripts,

Pl.'s Mot. Summ. J. Ex. 30, at KS.00014-KS.00016, KS.00020-KS.00031.

50.     Once the person spoke with a TMLG attorney and signed a retainer agreement,

the person's information and retainer agreement were packaged into a file and sent to a TMLG

partner in the person's home state for review.  Aleman Dep. (Dkt. No. 76) 93:5-8; Sibert Dep.

(Dkt. No. 77) 47:8-19, 60:11-61:3; Gerst Dep. (Dkt. No. 75) 35:3-36:5; Aleman Decl. (Dkt. No.

105), ¶ 11.

**RESPONSE**:  Dispute.  Attorneys in TMLG's network were not in any way "partners in

the LLP," but rather attorneys who were local to the states where consumers who enrolled in

TMLG's program were located.  These attorneys were, in fact, "local attorneys" and not "law

firm partners."

The local attorneys received no equity in the company, health insurance, or retirement

benefits.  Some local attorneys even testified that the term "partner" mischaracterized their

relationship with TMLG.  Harrington Dep., ECF No. 81, at 48, 62-64, 115, 117-18, 153-54, 157,

220-21; Delgado Dep., ECF No. 73, at 105-108; Ruggiero Dep., ECF No. 70, at 64-65; Gray

Decl., ECF No. 115, ¶¶ 4-5.  At least one local attorney stated that she did not believe she had an

attorney-client relationship with TMLG's consumers.  Gray Decl., ECF No. 115, ¶ 9.

Local attorneys only performed financial and ministerial tasks in connection with

mortgage modification services. These tasks consisted of looking at a consumer's basic financial

information that was previously collected by a TMLG salesperson to determine whether there

was a financial benefit to the consumer if he or she enrolled in TMLG's program, and checking

mortgage loan modification submission packages for completeness with the use of a TMLG

23

provided checklist.  Non-attorneys at TMLG performed these financial and ministerial tasks

before the headquarters attorneys and local attorneys performed these same tasks.  Sibert Dep.,

ECF No. 77, at 103-105, 236; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 27, 54;

Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 452-455; Aleman Dep., ECF No. 76, at

201-02, 215; Sibert Jan. 23, 2012 Email, Pl.'s Mot. Summ. J. Ex. 11, at CFPB-TMLG-0061123.

TMLG paid local attorneys a paltry $25 to $40 for each consumer file on which they

performed these administrative tasks and ultimately, approved.  TMLG Class B Agreement,

Pl.'s Mot. Summ. J. Ex. 12, at CFPB-TMLG-0061205.

Additionally, Defendants' proposed finding mischaracterizes the consumer intake review

process.  Local attorneys were only asked to look at a consumer's intake information, which

consisted of basic financial information collected on a computer screen by a salesperson, after

the salespersons and headquarters attorney both already reviewed and pre-approved the

consumer for TMLG's program.  Sibert Jan. 23, 2012 Email, Pl.'s Mot. Summ. J. Ex. 11, at

CFPB-TMLG-0061123; Ruggiero Dep., ECF No. 70, at 60, 110-111.  A headquarters attorney

communicated to local attorneys that they would "rarely decline" consumers for intake.  Sibert

Jan. 23, 2013 Email, Pl.'s Mot. Summ. J. Ex. 11, at CFPB-TMLG-0061123.

Local attorneys approved 100%, or close to 100%, of the mortgage loan modification

intake files that they reviewed.  Harrington Dep., ECF No. 81, at 109-110, 139, 236; Ruggiero

Dep., ECF No. 70, 115-116.  If a local attorney did not approve the mortgage loan modification

intake review file, then TMLG did not pay the local attorney for that service.  Aleman CFLG

30(b)(6) Dep. Part 1, ECF No. 66, at 135-136; Harrington Dep., ECF No. 81, at 150-51, 218-19;

CFLG Class B Agreement, Pl.'s Mot. Summ. J. Ex. 18, at CFPB-TMLG-0052829.

The local attorney's task was simply to determine – by just looking at financial

information and criteria – if there would be a financial benefit to the consumer.  For example, if

the consumer had an interest rate above the market interest rate, then the consumer was considered a good candidate for TMLG's services.  Harrington Dep., ECF No. 81, at 39-40, 79, 173-74.  Local attorneys spent as little as 1-2 minutes reviewing TMLG mortgage loan modification intake review files.  Ruggiero Dep., ECF No. 70, at 114; Harrington Dep., ECF No. 81, at 175-77, 235.  One local attorney described the review of intake files as "a quick glance" and work that he could do "in a heartbeat." Harrington Dep., ECF No. 81, at 176-177.

51.    As compensation to TMLG for the legal services it provided, clients made retainer payments to the firm, out of which TMLG withdrew its fees.  Aleman Dep. (Dkt. No. 76) 165:11-166:12; Aleman Decl. (Dkt. No. 105), ¶ 12.

**RESPONSE**:  Dispute.  Exhibit B of the retainer agreement that TMLG signed with consumers provides that the initial retainer payment and subsequent monthly payments are compensation for services in connection with mortgage loan modification services, and none of those services are legal services.  Exhibit B to TMLG Retainer Agreement, Pl.'s Mot. For Summ. J., Ex. 4.

52.    Upon enrolling with TMLG, a client would make an initial flat-fee retainer payment, and would then make monthly flat-fee retainer payments for a set amount of time. Aleman Dep. (Dkt. No. 76) 185:5-10; Aleman Decl. (Dkt. No. 105), ¶ 12.

**RESPONSE**:  Dispute.  Consumers signed up to have monthly payments automatically taken out of their bank account until they dropped out of the program or received a loan modification, not for a "set amount of time."  Exhibit B to TMLG Retainer Agreement, Pl.'s Mot. For Summ. J., Ex. 4, ¶ 5; NoteWorld Sign-Up Agreement contained in TMLG Response to US Senate, Pl.'s Mot. Summ. J. Ex. 36 (filed under seal), at DEF.0003090- DEF.0003092.

53.    To facilitate the processing of those payments, each client set up an account with the payment processing service company NoteWorld (later known as Meracord), with

which TMLG had accounts as well.  Aleman Dep. (Dkt. No. 76) 193:23-195:8, 200:17-25, 224:24-225:6, 227:15-228:8; Aleman Decl. (Dkt. No. 105), ¶ 12.

**RESPONSE**:  No dispute.

54.     In general terms, the processing of client payments went as follows:

(i)     clients made their payments into their individual NoteWorld/Meracord accounts;

(ii)     NoteWorld/Meracord distributed the funds pursuant to its contracts, including to TMLG's IOLTA trust accounts, and to itself for its account fees; and

(iii)     TMLG transferred funds to cover its fees from the trust accounts into its NoteWorld/Meracord account and then to its operating account(s).

Aleman Dep. (Dkt. No. 76) 186:11-188:1, 189:22-195:8, 283:13-21; Aleman Decl. (Dkt. No. 105), ¶ 12.

**RESPONSE**:  Dispute.  The Bureau disputes Defendants' proposed finding to the extent it suggests that TMLG's contracts with Noteworld/ Meracord instructed Noteworld/ Meracord to distribute funds to TMLG's IOLTA account.  TMLG's agreement with Noteworld/ Meracord does not contain language showing the distribution of funds to an IOLTA account.  TMLG Noteworld Agreement, Pl.'s Mot. Summ. J., Ex. 26.

55.     TMLG was not a profitable business and neither Macey not Aleman were able to fully recover their investment.  Aleman Dep. (Dkt. No. 76) 59:10-64:23; Macey Dep. (Dkt. No. 78) 69:14-23; Aleman Decl. (Dkt. No. 105), ¶ 13; Macey Decl. (Dkt. No. 97), ¶ 7.

**RESPONSE**:  Dispute.   Defendants' records show that TMLG collected $18,454,222 and issued $122,485 in refunds, resulting in TMLG receiving a net amount of $18,331,737 from consumers.  Thomas Decl., ECF No. 116, at 3 ¶ 21.

56.     In total, Macey lost over $100,000 in cash from his capital investments and loans to the firm.  Macey Decl., Oct. 8, 2015, ¶ 7.

26

**RESPONSE**: Dispute.   Defendants' records show that TMLG collected $18,454,222 and issued $122,485 in refunds, resulting in TMLG receiving a net amount of $18,331,737 from consumers.  Thomas Decl., ECF No. 116, at 3 ¶ 21.

57.    In total, Aleman lost over $30,000 in cash from his capital investments and loans to the firm.  Aleman Dep. (Dkt. No. 76) 61:3-63:18; Aleman Decl. (Dkt. No. 105), ¶ 13.

**RESPONSE**: Dispute.   Defendants' records show that TMLG collected $18,454,222 and issued $122,485 in refunds, resulting in TMLG receiving a net amount of $18,331,737 from consumers.  Thomas Decl., ECF No. 116, at 3 ¶ 21.

58.    Overall the firm lost approximately $300,000, of which Macey's share was  a $230,000 loss and Aleman's share was a $43,000 loss.  Aleman Decl. (Dkt. No. 105), ¶ 13; Macey Decl. (Dkt. No. 97), ¶ 7.

**RESPONSE**: Dispute.   Defendants' records show that TMLG collected $18,454,222 and issued $122,485 in refunds, resulting in TMLG receiving a net amount of $18,331,737 from consumers.  Thomas Decl., ECF No. 116, at 3 ¶ 21.

59.    TMLG operated into 2013 and over the course of its operations, TMLG had approximately 5,000 clients.  Aleman Dep. (Dkt. No. 76) 130:9-13; Aleman Decl. (Dkt. No. 105), ¶ 14.

**RESPONSE**: Dispute.  Based on data provided by Defendants to the Bureau, 5,265 consumers made payments to TMLG. Thomas Decl., ECF No. 116, at ¶ 13.

60.    Of those clients, TMLG secured bank-approved loan modifications for nearly 1,300 of them.  Aleman Decl. (Dkt. No. 105), ¶ 14.

**RESPONSE**: Dispute. Data from Defendants to the Bureau demonstrates that TMLG obtained loan modifications for only 1,296 out of 5,265 consumers who enrolled in TMLG's program and made payments to TMLG.  Thomas Decl., ECF No. 116, at ¶ 13.

61.     During the first quarter of 2013, TMLG stopped taking on new clients and went into a wind-down.  Banyon Dep. (Dkt. No. 82) 34:21-35:6; Aleman Decl. (Dkt. No. 105), ¶ 14.

**RESPONSE**:  No dispute.

62.     By the third quarter of 2013, TMLG no longer had any clients.  Aleman Dep. (Dkt. No. 76) 16:5-8, 20:17-21.14; Aleman Decl. (Dkt. No. 105), ¶ 14.

**RESPONSE**:  Dispute.  Data from Defendants to the Bureau demonstrates that TMLG serviced consumers until at least November 5, 2013.  Thomas Decl., ECF No. 116, Exhibit A.

63.     In early 2012, Stafford formed CFLG.  CFLG (Stafford) Dep. (Dkt. No. 64) 19:7-17; Stafford Decl. (Dkt. No. 98), ¶ 3.

**RESPONSE**:  No dispute.

64.     CFLG was a law firm, which provided mortgage mitigation legal services for homeowners in distress with the goal of keeping clients in their homes as long as possible.  CFLG (Stafford) Dep. (Dkt. No. 64) 21:17-20; Stafford Decl. (Dkt. No. 98), ¶ 3; CFLG (Aleman) Dep. II (Dkt. No. 67) 438:12-439:16.

**RESPONSE**:  Dispute.  CFLG was not a "law firm," but rather a provider of mortgage assistance relief services.  CFLG offered, provided or arranged for others to provide mortgage assistance relief services, including but not limited to, providing services to assist a consumer with modifying the terms of his or her mortgage.  Deposition of CFLG 30(b)(6) Corporate Representative Harold E. Stafford Part 1 ("Stafford CFLG 30(b)(6) Dep. Part 1"), June 3, 2015, ECF No. 64, at 20; Deposition of CFLG 30(b)(6) Corporate Representative Jeffrey John Aleman Part 1 ("Aleman CFLG 30(b)(6) Dep. Part 1"), May 19, 2015, ECF No. 66, at 35. CFLG even identifies its principal business activity as "Mortgage Consulting" and its principal product or services as "Consulting" on the company's 2012 and 2013 Federal income tax returns. Exhibits

H and I of Declaration of Jeffrey Aleman, ECF No. 105.

CFLG's marketing materials, welcome letters to consumers, retainer agreements with consumers, and sales representative calls with consumers, all demonstrated that the CFLG offered to provide and purportedly provided mortgage loan modification services. Declaration of Tim Ledbetter, ECF No. 92, ¶¶ 2-5; Peterson Decl., ECF. No. 84, ¶¶ 3, 5; Teynor Decl., ECF No. 85, ¶¶ 2-4; Halwani Decl., ECF No. 86, ¶¶ 2-4; CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000198-000201; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154, TMLG.MO.LIT.000160; Anderson Dep., ECF No. 79, at 130-134; CFLG Amended Answer to Complaint, Dec. 31, 2014, ECF No. 41, at ¶ 39; Jeffrey Aleman Amended Answer to Complaint, ECF No. 40, at 6 (answer to ¶ 23); TMLG Response to US Senate, Pl.'s Mot. Summ. J. Ex. 36 (filed under seal), at DEF.0003071; Thomas Macey Amended Answer to Complaint, ECF No. 42, at 6 (answer to ¶ 23); Jason Searns Amended Answer to Complaint, ECF No. 43, at 6 (answer to ¶ 23).

CFLG provided no legal services to consumers who sought modifications of their mortgages. Consumers never communicated with any attorney from headquarters or a local attorney after they enrolled for services. CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000198-000201; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154; Peterson Decl., ECF No. 84, ¶ 16; Halwani Decl., ECF No. 86, ¶ 16; Declaration of Tim Ledbetter, ECF No. 92, ¶ 14.

At least one local attorney stated that she did not have an attorney-client relationship with CFLG's consumers. Gray Decl., ECF No. 115, ¶ 9. The Virginia State Bar found that a local attorney in Virginia had no attorney-client relationship with a CFLG consumer who resided in Virginia. Gray Decl., ECF No. 115, ¶ 19 and Exhibit C.

The only services in connection with mortgage loan modifications that local attorneys

provided to consumers consisted of (1) comparing CFLG checklists with consumer financial information collected on a computer screen at intake to assure that a consumer met lender criteria to apply for a loan modification, and (2) comparing CFLG checklists against documents submitted by a consumer to assure that the package contained all of the lender-required mortgage loan modification documents.  These tasks could be performed by non-attorneys, and in fact, were already performed by non-attorneys – salespersons and document processors - before the local attorneys took them on.  Sibert Dep., ECF No. 77, at 103-105, 236; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 27, 54; Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 452-455; Aleman Dep., ECF No. 76, at 201-02, 215.

Based on Defendants' own data, none of the 1,116 consumers who enrolled in CFLG's services received foreclosure defense services, or services beyond the financial and ministerial tasks associated with mortgage loan modification services.  Thomas Decl., ECF No. 116, at 3 ¶ 19.

65.    Prior to 2012, Stafford had worked with several multijurisdictional and national consumer law firms.  CFLG (Stafford) Dep. (Dkt. No. 67) 38:11-14; Stafford Decl. (Dkt. No. 98), ¶ 2.

**RESPONSE**:  No dispute.

66.    Until July 2012, Stafford was the sole manager of CFLG.  CFLG (Stafford) Dep. (Dkt. No. 64) 22:24-23:1, 29:7-16; Stafford Decl. (Dkt. No. 98), ¶ 3.

**RESPONSE**:  No dispute.

67.    It was Stafford's intention that CFLG grow into a nationwide law firm providing mortgage-related legal services to consumers in states across the country.  CFLG (Stafford) Dep. (Dkt. No. 64) 21:9-22:13, 38:11-14; Stafford Decl. (Dkt. No. 98), ¶ 3.

**RESPONSE**:  No dispute.

68.     In order to accomplish its goal, CFLG entered into contracts with various attorneys in states across the country in order to provide CFLG's legal services to clients in those states.  CFLG (Stafford) Dep. (Dkt. No. 64) 25:1-27:19; Stafford Decl. (Dkt. No. 98), ¶ 4.

**RESPONSE**:  Dispute.  CFLG provided no legal services to consumers who sought modifications of their mortgages.  Consumers stated that they never communicated with any attorney from headquarters or a local attorney after they enrolled for services.  CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000198-000201; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154; Peterson Decl., ECF No. 84, ¶ 16; Halwani Decl., ECF No. 86, ¶ 16; Declaration of Tim Ledbetter, ECF No. 92, ¶ 14.

At least one local attorney stated that she did not have an attorney-client relationship with CFLG's consumers. Gray Decl., ECF No. 115, ¶ 9.  The Virginia State Bar found that a local attorney in Virginia had no attorney-client relationship with a CFLG consumer who resided in Virginia. Gray Decl., ECF No. 115, ¶ 19 and Exhibit C.

The only services in connection with mortgage loan modifications that local attorneys provided to consumers consisted of (1) comparing CFLG checklists with consumer financial information collected on a computer screen at intake to assure that a consumer met lender criteria to apply for a loan modification, and (2) comparing CFLG checklists with documents submitted by a consumer to assure that the package contained all of the lender-required mortgage loan modification documents.  These tasks could be performed by non-attorneys, and in fact, were already performed by non-attorneys – salespersons and document processors - before the local attorneys performed these same tasks.  Sibert Dep., ECF No. 77, at 103-105, 236; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 27, 54; Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 452-455; Aleman Dep., ECF No. 76, at 201-02, 215.

Based on Defendants' own data, none of the 1,116 consumers who enrolled in CFLG's

services received foreclosure defense services, or services beyond the financial and ministerial tasks associated with mortgage loan modification services. Thomas Decl., ECF No. 116, at 3 ¶ 19.

69.     CFLG also contracted with a third-party vendor to provide certain client support services under Stafford's supervision. CFLG (Stafford) Dep. (Dkt. No. 64) 30:6-32:22; Stafford Decl. (Dkt. No. 98), ¶ 4.

**RESPONSE**: Dispute. The Bureau objects to the term "client support services" as vague. To the extent "client support services" means sales and intake services or document processing services, the citations provided by Defendants do not support the proposed finding asserted by Defendants. A non-attorney supervised CFLG's third-party vendor, Sharpe Processing. Stafford CFLG 30(b)(6) Dep. at 94.

70.     Between January 2012 and July 2012, CFLG accepted referrals from a Florida law firm, Consumer Defense Attorneys, for potential clients residing in states in which Consumer Defense Attorneys did not practice but CFLG did. CFLG (Stafford) Dep. (Dkt. No. 64) 30:6-31:22; Stafford Decl. (Dkt. No. 98), ¶ 4.

**RESPONSE**: Dispute. The Bureau disputes Defendants' characterization of Consumer Defense Associates as a "law firm." Consumer Defense Associates was a mortgage assistance relief services provider with a network of attorneys, similar to the business model of CFLG. Stafford CFLG 30(b)(6) Dep. Part 1, ECF No. 64, at 20-21, 25-26, 29-32;

71.     Between January 2012 and July 2012, CFLG enrolled approximately 26 clients. CFLG (Stafford) Dep. (Dkt. No. 64) 27:20-28:8; Stafford Decl. (Dkt. No. 98), ¶ 4.

**RESPONSE**: Dispute. Defendants' citations do not support Defendants' proposed finding. Stafford testified that CFLG enrolled 27 consumers before July 2012. Stafford CFLG 30(b)(6) Dep. Part 1, ECF No. 64 at 27-28.

72.     Because TMLG was proving unprofitable, and because Searns wanted to leave TMLG, Aleman convinced Macey to invest in a new mortgage mitigation law firm.  Macey Dep. (Dkt. No. 78) 83:11-17; Searns Dep. (Dkt. No. 74) 36:24-37:1; Aleman Decl. (Dkt. No. 105), ¶ 15; Macey Decl. (Dkt. No. 97), ¶ 8.

**RESPONSE**:  Dispute.  The Bureau objects to Defendants' proposed finding on the ground that the proposed finding is a conclusory statement.

The Bureau also disputes Defendants' proposed finding that TMLG was unprofitable, and that Aleman convinced Macey to invest in CFLG.  Defendants' records show that TMLG collected $18,454,222 and issued $122,485 in refunds, resulting in TMLG receiving a net amount of $18,331,737 from consumers.  Thomas Decl., ECF No. 116, at 3 ¶ 21.

Defendants' citations do not support Defendants' proposed finding that Aleman "convinced" Macey to invest in CFLG.  Rather, Defendants' citations merely demonstrate that Aleman talked to Macey about a proposition to invest in CLFG. Macey Decl. (Dkt. No. 97), ¶ 8.

73.     In mid-2012, Stafford was introduced to Aleman in Chicago.  CFLG (Stafford) Dep. (Dkt. No. 64) 35:21-23; Stafford Decl. (Dkt. No. 98), ¶ 5; Aleman Decl. (Dkt. No. 105), ¶ 15.

**RESPONSE**:  No dispute.

74.     Thereafter, Aleman approached Stafford with the proposition that Macey and Aleman buy a majority interest in CFLG.  CFLG (Macey) Dep., May 27, 2015 (Dkt. No. 68) 12:17-14:5; CFLG (Stafford) Dep. (Dkt. No. 64) 35:21-23; Stafford Decl. (Dkt. No. 98), ¶ 5; Aleman Decl. (Dkt. No. 105), ¶ 15.

**RESPONSE**:  No dispute.

75.     Stafford was informed that Aleman and Macey were involved with TMLG, which also provided mortgage-related legal services, and had the resources to expand CFLG's

practice. Stafford Decl. (Dkt. No. 98), ¶ 5.

**RESPONSE**:  Dispute.  The Bureau disputes that TMLG provided legal services. TMLG provided no legal services to consumers who sought modifications of their mortgages. Consumers never communicated with any attorney from headquarters or a local attorney after they enrolled for services.  TMLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 4, at CFPB-TMLG-0037271-0037273; CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000198-000201; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154; Johnson Decl., ECF No. 87, ¶ 17; Pultz Decl., ECF No. 90, ¶ 14; Saunders Decl., ECF No. 91, ¶ 16; Bruce Decl., ECF No. 93, ¶ 17.

TMLG's marketing materials, retainer agreements with consumers, and sales representative calls with consumers, all demonstrate that TMLG offered to provide and purportedly provided mortgage loan modification services.  Consumers who viewed TMLG's websites believed that TMLG could help them modify their loan by helping them obtain a mortgage loan modification.  Saunders Decl., ECF No. 91, ¶¶ 3-5.  The initial retainer and subsequent recurring monthly payments that were collected by TMLG were specifically for purported services relating only to obtaining a mortgage loan modification.  TMLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 4, at CFPB-TMLG-0037271-0037273; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154.  Salespeople made statements to consumers to convince consumers that they would obtain mortgage loan modifications if they enrolled with TMLG.  Salespersons also told consumers that using the free services of a non-profit organization to gather documents and submit a mortgage loan modification would not get them a loan modification, but that TMLG's services would get them a mortgage loan modification.  Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154, TMLG.MO.LIT.000160; Anderson Dep., ECF No. 79, at

130-134; CFLG Amended Answer to Complaint, Dec. 31, 2014, ECF No. 41, at ¶ 39.

Out of TMLG's 5,265 consumers, a mere 30 paid additional fees to receive foreclosure defense services, and in those instances TMLG referred those consumers to local attorneys who provided legal services without assistance from TMLG or attorneys at headquarters.  Thomas Decl., ECF No. 116, ¶ 18; Gray Decl., ECF No. 115, ¶ 15.

The Bureau also disputes that Aleman alone decided to start a separate mortgage mitigation company.  Aleman, Macey, and Searns, made the decision together to start TMLG. Aleman Dep. (Dkt. No. 76) 23:1- 5.

76.     Stafford agreed to Macey and Aleman purchasing interests in CFLG. Stafford Decl. (Dkt. No. 98), ¶ 5; Aleman Decl. (Dkt. No. 105), ¶ 15; Macey Decl. (Dkt. No. 97), ¶ 8.

**RESPONSE**: No dispute.

77.     In July 2012, Macey acquired a 78% interest in the firm and Aleman acquired a 17% interest.  CFLG (Aleman) Dep. I (Dkt. No. 66) 33:21-34:5, 90:12-92:16; CFLG (Macey) Dep., May 27, 2015 (Dkt. No. 68) 16:5-7, 17:15-18:9; Aleman Decl. (Dkt. No. 105), ¶ 15; Macey Decl. (Dkt. No. 97), ¶ 8.

**RESPONSE**:  No dispute.

78.     Stafford maintained a 5% minority interest.  Stafford Decl. (Dkt. No. 98), ¶ 5.

**RESPONSE**:  No dispute.

79.     After July 2012, Aleman took over the day-to-day management of the firm from a new CFLG office in Chicago.  CFLG (Aleman) Dep. I (Dkt. No. 66) 12:24-14:21, 51:19-54:24, 64:14-25; CFLG (Macey) Dep., May 27, 2015 (Dkt. No. 68) 18:10-15; Aleman Decl. (Dkt. No. 105), ¶ 15.

**RESPONSE**:  No dispute.

80.     After July 2012, Stafford continued to practice as an attorney of CFLG in Madison, but he had no operational control, management, or direction over CFLG.  CFLG (Aleman) Dep. I (Dkt. No. 66) 24:7-16; Stafford Decl. (Dkt. No. 98), ¶ 6.

**RESPONSE**:  Dispute.  Stafford had managerial responsibility for and was familiar with certain aspects, if not all, of CFLG's operations.  Harold Stafford's Amended Answer to Complaint, ECF No. 44, at 9 (answers to ¶¶ 34 and 35).  The Operating Agreement that governs the management, finances, and business of CFLG provides for "a salary of $50,000 per year" to Stafford, which obligation expires on the earlier of (a) two years from the date of the Operating Agreement or (b) the date the LLC stops providing services to consumers.  CFLG Operating Agreement, Pl.'s Mot. Summ. J., Ex. 3, at DEF.000158, ¶ 8.1.

Stafford exerted control over the screening of new local attorneys after July 2012, and over CFLG's formal written responses to the BBB and state regulators.  Specifically, Stafford drafted written responses with very specific details of CFLG's business practices to the Better Business Bureau ("BBB") and state regulators on behalf of CFLG.  The signature block on those written responses contained Stafford's name and his title, "managing member."  Exhibit A to Gray Decl., ECF No. 115; Stafford CFLG 30(b)(6) Dep. Part 2, ECF No. 65, at 144-145, 148-149, 182-183.

81.     Macey took no operational control, management, or direction of CFLG. Macey Decl. (Dkt. No. 97), ¶ 9; CFLG (Macey) Dep., May 27, 2015 (Dkt. No. 68) 29:20-31:25.

**RESPONSE**:  Dispute.  Macey had managerial responsibility for and was familiar with certain aspects, if not all, of CFLG's operations.  Thomas Macey's Amended Answer to Complaint, ECF No. 42, at 9 (answers to ¶¶ 34 and 35).  Under the CFLG Operating Agreement, Macey had duties and responsibilities to CFLG.  CFLG Operating Agreement Section 8.5. Those responsibilities included devoting to CFLG "such time as may be reasonably necessary for

36

the performance of [Macey's] duties hereunder." *Id.* ¶ 8.5(b).

Additionally, as majority shareholder, Macey could weigh in on decisions whenever he desired and had final decision-making authority.  Macey CFLG 30(b)(6) Dep., ECF No. 68, at 31; Aleman Dep., ECF No. 76, at 46-48; Jeffrey Aleman Answers to Interrogatories, Pl.'s Mot. Summ. J. Ex. 32, at 8 (Response to Interrogatory 7).  Under the CFLG Operating Agreement, Macey was empowered at his "sole discretion," to hire and dismiss employees of the company, approve all contracts entered into by CFLG, receive all communications and notices on behalf of CFLG, and commence, defend, or settle any litigation pertaining to CFLG.  CFLG Operating Agreement, Pl.'s Mot. Summ. J., Ex. 3 at ¶¶ 8.4(b)(i)-(iii),(vi), 10.14.  Macey was also empowered to control the company's financial affairs, including dispositions of assets, lending by CFLG, borrowing by CFLG, and pledges of assets by CFLG.  *Id* ¶ 8.4(b)(ii).  Macey was also empowered to control CFLG's bank accounts.  *Id.* ¶ 8.4(b)(iii).

Macey exercised his ability to control, manage, and direct through:

   a.   creating or changing policy for running CFLG.  Macey CFLG 30(b)(6) Dep., ECF No. 68, at 24, 28-29, 31.

   b.   monitoring new consumer enrollments and the financials of CFLG.  Macey CFLG 30(b)(6) Dep., ECF No. 68, at 28-29.

   c.   participating in the decision of CFLG to have non-attorneys who handled loan modification processing. Macey CFLG 30(b)(6) Dep., ECF No. 68, at 36, 38-39.

82.   CFLG provided legal services that included representation of clients with regard to mortgage mitigation matters and alleviation of mortgage-related hardships, including foreclosure defense and ancillary mortgage relief services. CFLG (Aleman) Dep. I (Dkt. No. 66) 44:3-23; Aleman Decl. (Dkt. No. 105), ¶ 16.

**RESPONSE**:  Dispute.  CFLG provided no legal services to consumers who sought

modifications of their mortgages.  Consumers never communicated with any attorney from

headquarters or a local attorney after they enrolled for services.  CFLG Retainer Agreement,

Pl.'s Mot. Summ. J. Ex. 17, at DEF.000198-000201; Salesperson Scripts, Pl.'s Mot. Summ. J.

Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154; Peterson Decl., ECF No. 84, ¶ 16;

Halwani Decl., ECF No. 86, ¶ 16; Declaration of Tim Ledbetter, ECF No. 92, ¶ 14.

At least one local attorney stated that she did not have an attorney-client relationship with

CFLG's consumers. Gray Decl., ECF No. 115, ¶ 9.  The Virginia State Bar found that a CFLG

local attorney in Virginia had no attorney-client relationship with a CFLG consumer who resided

in Virginia.  Gray Decl., ECF No. 115, ¶ 19 and Exhibit C.

The only services in connection with mortgage loan modifications that local attorneys

provided to consumers consisted of (1) comparing CFLG checklists with consumer financial

information collected on a computer screen at intake to assure that a consumer met lender

criteria to apply for a loan modification, and (2) comparing CFLG checklists with documents

submitted by a consumer to assure that the package contained all of the lender-required

mortgage loan modification documents.  These tasks could be performed by non-attorneys, and

in fact, were already performed by non-attorneys – salespersons and document processors -

before the local attorneys took them on.  Sibert Dep., ECF No. 77, at 103-105, 236; Aleman

CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 27, 54; Aleman CFLG 30(b)(6) Dep. Part 2, ECF

No. 67, at 452-455; Aleman Dep., ECF No. 76, at 201-02, 215.

Based on Defendants' own data, none of the 1,116 consumers who enrolled in CFLG's

services received foreclosure defense services, or services beyond the financial and ministerial

tasks associated with mortgage loan modification services.  Thomas Decl., ECF No. 116, at 3 ¶

19.

83.    CFLG provided clients with legal counseling regarding potential mortgage

38

workout solutions.  Aleman Decl. (Dkt. No. 105), ¶ 17.

**RESPONSE**:  Dispute.  CFLG provided no legal counseling. CFLG was a mortgage assistance relief services provider that only provided services in connection with mortgage loan modifications.  Consumers never communicated with any attorney from headquarters or a local attorney after they enrolled for services.  CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000198-000201; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154; Peterson Decl., ECF No. 84, ¶ 16; Halwani Decl., ECF No. 86, ¶ 16; Declaration of Tim Ledbetter, ECF No. 92, ¶ 14.

At least one local attorney stated that she did not have an attorney-client relationship with CFLG's consumers.  Gray Decl., ECF No. 115, ¶ 9.  The Virginia State Bar found that a local attorney in Virginia had no attorney-client relationship with a CFLG consumer who resided in Virginia.  Gray Decl., ECF No. 115, ¶ 19 and Exhibit C.

The only services in connection with mortgage loan modifications that local attorneys provided to consumers consisted of (1) comparing CFLG checklists with consumer financial information collected on a computer screen at intake to assure that a consumer met lender criteria to apply for a loan modification, and (2) comparing CFLG checklists with documents submitted by a consumer to assure that the package contained all of the lender-required mortgage loan modification documents.  These tasks could be performed by non-attorneys, and in fact, were already performed by non-attorneys – salespersons and document processors - before the local attorneys performed these same tasks.  Sibert Dep., ECF No. 77, at 103-105, 236; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 27, 54; Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 452-455; Aleman Dep., ECF No. 76, at 201-02, 215.

Based on Defendants' own data, none of the 1,116 consumers who enrolled in CFLG's services received foreclosure defense services, or services beyond the financial and ministerial

tasks associated with mortgage loan modification services.  Thomas Decl., ECF No. 116, at 3 ¶ 19.

84.     That often included, but was not limited to, loan modifications, repayment plans, forbearances, resolution of issues involving junior liens, as well as an appropriate exit from the property, including deed-in-lieu of foreclosure, consent foreclosure, or short sale alternatives.  Aleman Decl. (Dkt. No. 105), ¶ 17; CFLG (Aleman) Dep. II (Dkt. No. 67) 319:3-320:2, 332:1- 333:14.

**RESPONSE**:  Dispute.  CFLG provided no legal counseling.  CFLG was a mortgage assistance relief services provider that only provided services in connection with mortgage loan modifications.  Consumers never communicated with any attorney from headquarters or a local attorney after they enrolled for services.  CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000198-000201; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154; Peterson Decl., ECF No. 84, ¶ 16; Halwani Decl., ECF No. 86, ¶ 16; Declaration of Tim Ledbetter, ECF No. 92, ¶ 14.

At least one local attorney stated that she did not have an attorney-client relationship with CFLG's consumers.  Gray Decl., ECF No. 115, ¶ 9.  The Virginia State Bar found that a local attorney in Virginia had no attorney-client relationship with a CFLG consumer who resided in Virginia.  Gray Decl., ECF No. 115, ¶ 19 and Exhibit C.

The only services in connection with mortgage loan modifications that local attorneys provided to consumers consisted of (1) comparing CFLG checklists with consumer financial information collected on a computer screen at intake to assure that a consumer met lender criteria to apply for a loan modification, and (2) comparing CFLG checklists with documents submitted by a consumer to assure that the package contained all of the lender-required mortgage loan modification documents.  These tasks could be performed by non-attorneys, and

in fact, were already performed by non-attorneys – salespersons and document processors - before the local attorneys performed these same tasks.  Sibert Dep., ECF No. 77, at 103-105, 236; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 27, 54; Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 452-455; Aleman Dep., ECF No. 76, at 201-02, 215.

Based on Defendants' own data, none of the 1,116 consumers who enrolled in CFLG's services received foreclosure defense services, or services beyond the financial and ministerial tasks associated with mortgage loan modification services.  Thomas Decl., ECF No. 116, at 3 ¶ 19.

85.    CFLG attorneys tailored its representation of each client to meet that client's goals with respect to their cases and real property.  Aleman Decl. (Dkt. No. 105), ¶ 17; CFLG (Aleman) Dep. I (Dkt. No. 66) 55:11-25.

**RESPONSE**:  Dispute.  CFLG provided no legal representation to consumers, and thus no tailoring of any representation.  Consumers never communicated with any attorney from headquarters or a local attorney after they enrolled for services.  CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000198-000201; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154; Peterson Decl., ECF No. 84, ¶ 16; Halwani Decl., ECF No. 86, ¶ 16; Declaration of Tim Ledbetter, ECF No. 92, ¶ 14.

Although CFLG retainer agreements with consumers state that CFLG "will counsel Client regarding mortgage workout solutions," which can include "deed-in-lieu of foreclosure, cash for keys, consent foreclosure, or short sale," local attorneys never performed or were asked to perform such services by CFLG.  At least two local attorneys testified that they never performed, and were never asked by CFLG to perform, deeds in lieu of foreclosure, short sales, cash for keys, or consent foreclosures.  Ruggiero Dep., ECF No. 70, at 151-152; Harrington Dep., ECF No. 81, at 72, 87-90, 130, 142-43, 230-233, 242; CFLG Retainer Agreement, Pl.'s

Mot. Summ. J. Ex. 17, at DEF.000188.

Local attorneys also did not conduct any assessment at the time of consumer intake review of whether or not consumers needed any services beyond loan modification services or whether the consumer was in active foreclosure.  Harrington Dep., ECF No. 81, at 72, 87-90, 130, 142-43, 230-33, 242; Ruggiero Dep., ECF No. 70, at 137-138.

At least one local attorney stated that she did not have an attorney-client relationship with CFLG's consumers. Gray Decl., ECF No. 115, ¶ 9.  The Virginia State Bar found that a CFLG local attorney in Virginia had no attorney-client relationship with a CFLG consumer who resided in Virginia. Gray Decl., ECF No. 115, ¶ 19 and Exhibit C.

The only services in connection with mortgage loan modifications that local attorneys provided to consumers consisted of (1) comparing CFLG checklists with consumer financial information collected on a computer screen at intake to assure that a consumer met lender criteria to apply for a loan modification, and (2) comparing CFLG checklists with documents submitted by a consumer to assure that the package contained all of the lender-required mortgage loan modification documents. These tasks could be performed by non-attorneys, and in fact, were already performed by non-attorneys – salespersons and document processors - before the local attorneys performed these same tasks.  Sibert Dep., ECF No. 77, at 103-105, 236; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 27, 54; Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 452-455; Aleman Dep., ECF No. 76, at 201-02, 215.

Based on Defendants' own data, none of the 1,116 consumers who enrolled in CFLG's services received foreclosure defense services, or services beyond the financial and ministerial tasks associated with mortgage loan modification services.  Thomas Decl., ECF No. 116, at 3 ¶ 19.

86.    Each client was involved in one or more consultations where the client's consent

42

to the proposed action was gained after the client provided information regarding the action the client wanted the firm to take.  Aleman Decl. (Dkt. No. 105), ¶ 17.

**RESPONSE**:  Dispute.  The Bureau objects to Defendants' proposed finding on the ground that Defendants' use of the term "consultations" is vague.  The Bureau disputes Defendants' proposed finding to the extent that it suggests consumers received legal consultations from CFLG.  CFLG provided no legal consultations.

Consumers never communicated with any attorney from headquarters or a local attorney after they enrolled for services. CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000198-000201; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154; Peterson Decl., ECF No. 84, ¶ 16; Halwani Decl., ECF No. 86, ¶ 16; Declaration of Tim Ledbetter, ECF No. 92, ¶ 14.

Although CFLG retainer agreements with consumers state that CFLG "will counsel Client regarding mortgage workout solutions," which can include "deed-in-lieu of foreclosure, cash for keys, consent foreclosure, or short sale," local attorneys never performed or were asked to perform such services by CFLG.  At least two local attorneys testified that they never performed, and were never asked by CFLG to perform, deeds in lieu of foreclosure, short sales, cash for keys, or consent foreclosures.  Ruggiero Dep., ECF No. 70, at 151-152; Harrington Dep., ECF No. 81, at 72, 87-90, 130, 142-43, 230-233, 242; CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000188.

Local attorneys also did not conduct any assessment at the time of consumer intake review of whether or not consumers needed any services beyond loan modification services or whether the consumer was in active foreclosure.  Harrington Dep., ECF No. 81, at 72, 87-90, 130, 142-43, 230-33, 242; Ruggiero Dep., ECF No. 70, at 137-138.

At least one local attorney stated that she did not have an attorney-client relationship with

43

CFLG's consumers.  Gray Decl., ECF No. 115, ¶ 9.  The Virginia State Bar found that a CFLG

local attorney in Virginia had no attorney-client relationship with a CFLG consumer who resided

in Virginia.  Gray Decl., ECF No. 115, ¶ 19 and Exhibit C.

The only services in connection with mortgage loan modifications that local attorneys

provided to consumers consisted of (1) comparing CFLG checklists with consumer financial

information collected on a computer screen at intake to assure that a consumer met lender

criteria to apply for a loan modification, and (2) comparing CFLG checklists with documents

submitted by a consumer to assure that the package contained all of the lender-required

mortgage loan modification documents.  These tasks could be performed by non-attorneys, and

in fact, were already performed by non-attorneys – salespersons and document processors -

before the local attorneys performed these same tasks.  Sibert Dep., ECF No. 77, at 103-105,

236; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 27, 54; Aleman CFLG 30(b)(6) Dep.

Part 2, ECF No. 67, at 452-455; Aleman Dep., ECF No. 76, at 201-02, 215.

Based on Defendants' own data, none of the 1,116 consumers who enrolled in CFLG's

services received foreclosure defense services, or services beyond the financial and ministerial

tasks associated with mortgage loan modification services.  Thomas Decl., ECF No. 116, at 3 ¶

19.

87.    CFLG's legal services were provided to clients across the country by the

LLC's attorney-members who resided in and were licensed to practice law in the states in which

the clients resided.  Aleman Decl. (Dkt. No. 105), ¶ 16.

**RESPONSE**:  Dispute.  The Bureau objects to Defendants' proposed finding for lack of

foundation as to personal knowledge.  Aleman's declaration merely asserts, but does not

establish any foundation, that he has personal knowledge that the 37 local attorneys were

actually licensed in 39 states.  The Bureau also disputes that CFLG provided legal services to

consumers. CFLG provided no legal services to consumers who sought modifications of their

mortgages.  Consumers never communicated with any attorney from headquarters or a local

attorney after they enrolled for services.  CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex.

17, at DEF.000198-000201; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal),

at TMLG.MO.LIT.000152-000154; Peterson Decl., ECF No. 84, ¶ 16; Halwani Decl., ECF No.

86, ¶ 16; Declaration of Tim Ledbetter, ECF No. 92, ¶ 14.

At least one local attorney stated that she did not have an attorney-client relationship with

CFLG's consumers.  Gray Decl., ECF No. 115, ¶ 9.  The Virginia State Bar found that a local

attorney in Virginia had no attorney-client relationship with a CFLG consumer who resided in

Virginia.  Gray Decl., ECF No. 115, ¶ 19 and Exhibit C.

The only services in connection with mortgage loan modifications that local attorneys

provided to consumers consisted of (1) comparing CFLG checklists with consumer financial

information collected on a computer screen at intake to assure that a consumer met lender

criteria to apply for a loan modification, and (2) comparing CFLG checklists with documents

submitted by a consumer to assure that the package contained all of the lender-required

mortgage loan modification documents.  These tasks could be performed by non-attorneys, and

in fact, were already performed by non-attorneys – CFLG's salespersons and document

processors - before the local attorneys performed these same tasks.  Sibert Dep., ECF No. 77, at

103-105, 236; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 27, 54; Aleman CFLG

30(b)(6) Dep. Part 2, ECF No. 67, at 452-455; Aleman Dep., ECF No. 76, at 201-02, 215.

Based on Defendants' own data, none of the 1,116 consumers who enrolled in CFLG's

services received foreclosure defense services, or services beyond the financial and ministerial

tasks associated with mortgage loan modification services.  Thomas Decl., ECF No. 116, at 3 ¶

19.

88.     At its peak, CFLG had approximately 37 member attorneys licensed in 39 states.  CFLG (Aleman) Dep. I (Dkt. No. 66) 47:33-48:7; Aleman Decl. (Dkt. No. 105), ¶ 19.

**RESPONSE**:  Dispute.  The Bureau objects to Defendants' proposed finding for lack of foundation as to personal knowledge. Aleman's declaration merely asserts, but does not establish any foundation, that he has personal knowledge that the 37 local attorneys were actually licensed in 39 states.

89.     During the course of its operations, CFLG provided mortgage mitigation legal representation to approximately 1100 clients nationally.  Aleman Decl. (Dkt. No. 105), ¶ 19.

**RESPONSE**:  Dispute.  CFLG provided no legal representation to consumers. Consumers never communicated with any attorney from headquarters or a local attorney after they enrolled for services.  CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000198-000201; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154; Peterson Decl., ECF No. 84, ¶ 16; Halwani Decl., ECF No. 86, ¶ 16; Declaration of Tim Ledbetter, ECF No. 92, ¶ 14.

Although CFLG retainer agreements with consumers state that CFLG "will counsel Client regarding mortgage workout solutions," which can include "deed-in-lieu of foreclosure, cash for keys, consent foreclosure, or short sale," local attorneys never performed or were asked to perform such services by CFLG.  At least two local attorneys testified that they never performed, and were never asked by CFLG to perform, deeds in lieu of foreclosure, short sales, cash for keys, or consent foreclosures.  Ruggiero Dep., ECF No. 70, at 151-152; Harrington Dep., ECF No. 81, at 72, 87-90, 130, 142-43, 230-233, 242; CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000188.

Local attorneys also did not conduct any assessment at the time of consumer intake review of whether or not consumers needed any services beyond loan modification services or

whether the consumer was in active foreclosure.  Harrington Dep., ECF No. 81, at 72, 87-90, 130, 142-43, 230-33, 242; Ruggiero Dep., ECF No. 70, at 137-138.

At least one local attorney stated that she did not have an attorney-client relationship with CFLG's consumers.  Gray Decl., ECF No. 115, ¶ 9.  The Virginia State Bar found that a local attorney in Virginia had no attorney-client relationship with a CFLG consumer who resided in Virginia.  Gray Decl., ECF No. 115, ¶ 19 and Exhibit C.

The only services in connection with mortgage loan modifications that local attorneys provided to consumers consisted of (1) comparing CFLG checklists with consumer financial information collected on a computer screen at intake to assure that a consumer met lender criteria to apply for a loan modification, and (2) comparing CFLG checklists with documents submitted by a consumer to assure that the package contained all of the lender-required mortgage loan modification documents.  These tasks could be performed by non-attorneys, and in fact, were already performed by non-attorneys – salespersons and document processors - before the local attorneys performed these same services.  Sibert Dep., ECF No. 77, at 103-105, 236; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 27, 54; Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 452-455; Aleman Dep., ECF No. 76, at 201-02, 215.

Based on Defendants' own data, none of the 1,116 consumers who enrolled in CFLG's services received foreclosure defense services, or services beyond the financial and ministerial tasks associated with mortgage loan modification services.  Thomas Decl., ECF No. 116, at 3 ¶ 19.

90.     CFLG secured bank-approved loan modifications for nearly 200 of its clients. Aleman Decl. (Dkt. No. 105), ¶ 19.

**RESPONSE**:  Dispute.  Based on data provided by Defendants to the Bureau, only 193 of CFLG's 1,116 consumers received mortgage loan modifications.  Thomas Decl., ECF No.

116, at 2 ¶ 14.

91.    CFLG did not do any advertising.  CFLG (Stafford) Dep. (Dkt. No. 64) 39:22- 41:12; Stafford Decl. (Dkt. No. 98), ¶ 4; CFLG (Aleman) Dep. II (Dkt. No. 67) 412:12-18 Aleman Decl. (Dkt. No. 105), ¶ 20.

**RESPONSE**:  Dispute.  CFLG paid lead generators to advertise mortgage loan modification services through television commercials and online websites, and to refer consumers who responded to those advertisements by phone or online to CFLG. Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 412-415; Anderson Dep., ECF No. 79, at 93.

92.    Prior to July 2012, it accepted referrals.  CFLG (Stafford) Dep. (Dkt. No. 64) 39:22 - 41:12; Stafford Decl. (Dkt. No. 98), ¶ 4.

**RESPONSE**:  No dispute.

93.    After July 2012, like TMLG, CFLG acquired leads from third party lead generators. CFLG (Aleman) Dep. II (Dkt. No. 67) 412:12-18 Aleman Decl. (Dkt. No. 105), ¶ 20.

**RESPONSE**:  No dispute.

94.    CFLG did not contract with third parties to provide client support services after July 2012.  CFLG (Aleman) Dep. I (Dkt. No. 66) 76:17-79:3.

**RESPONSE**:  The Bureau objects to the term "client support services" as vague.  The Bureau does not dispute Defendants' proposed finding to the extent that "client support services" refers to sales and intake services or document processing services.

95.    All client support services were provided by CFLG employees, many of whom worked out of CFLG's Delray Beach, Florida office.  CFLG (Aleman) Dep. I (Dkt. No. 66) 65:7- 72:15; Aleman Decl. (Dkt. No. 105), ¶ 20.

**RESPONSE**:  The Bureau objects to the term "client support services" as vague.  The Bureau does not dispute Defendants' proposed finding to the extent that "client

support services" refers to sales and intake services or document processing services.

96.     Those employees reported to the CFLG attorneys in Chicago and/or Jay

Gerst in Florida.  CFLG (Aleman) Dep. I (Dkt. No. 66) 65:7-72:15; Aleman Decl. (Dkt. No.

105), ¶ 20.

**RESPONSE**:  Dispute.  CFLG employees who performed the back-office document

processing work reported directly to Jay Gerst, a non-attorney in CFLG's Florida office, and not

to the CFLG attorneys in Chicago.  Jay Gerst managed CFLG's processing and document

collection teams.  Aleman CFLG 30(b)(6) Dep., ECF No. 67, at 301; Gerst Dep., ECF No. 75, at

10.  The Bureau's evidence also demonstrates that CFLG employees who were salespersons

speaking to consumers during intake reported to non-attorneys.  Anderson Dep., ECF No. 79, at

47-48, 69-70.  Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 53, 54; Sibert Dep., ECF No.

77, at 123-124, 126; Anderson Dep., ECF No. 79, at 58, 65-66, 69-70.

97.     CFLG's attorneys monitored, directed, and supervised the work of those

employees.  Banyon Dep. (Dkt. No. 82) 114:24-115:24; Aleman Decl. (Dkt. No. 105), ¶ 21.

**RESPONSE**:  Dispute.  Jay Gerst, a non-attorney located in CFLG's office in Florida

managed CFLG's processing and document collection teams.  Aleman CFLG 30(b)(6) Dep.,

ECF No. 67, at 301; Gerst Dep., ECF No. 75, at 10.  The Bureau's evidence also demonstrates

that CFLG employees who were salespersons speaking to consumers during intake were

supervised by non-attorneys.  Anderson Dep., ECF No. 79, at 47-48, 69-70. Aleman CFLG

30(b)(6) Dep. Part 1, ECF No. 66, at 53, 54; Sibert Dep., ECF No. 77, at 123-124, 126;

Anderson Dep., ECF No. 79, at 58, 65-66, 69-70.

98.     CFLG attorneys (who transferred from TMLG to CFLG) and Aleman, had regular

meetings with Gerst and the other support staff employees, either through in-person meetings or

by teleconference.  CFLG (Aleman) Dep. I (Dkt. No. 66) 70:24-72:24, 73:15-74:6, 74:18-

75:1; Aleman Decl. (Dkt. No. 105), ¶ 21.

**RESPONSE**:  Dispute. The Bureau objects to the term "CFLG attorneys" as vague. The Bureau disputes Defendants' proposed finding to the extent that it suggests CFLG's local attorneys had regular meetings with Gerst and support staff.  Local attorneys did not manage or supervise any CFLG paralegals, intake personnel, processors, other employees, other contractors, or other persons associated CFLG. Harrington Dep., ECF No. 81, at 162-63, 182-183, 231, 238; Ruggiero Dep., ECF No. 70, at 163-165.

99.    CFLG also imposed policies and procedures – crafted and approved of by CFLG's managing attorneys – on the support staff employees for them to follow.  CFLG (Aleman) Dep. I (Dkt. No. 66) 85:9-18; Aleman Decl. (Dkt. No. 105), ¶ 21.

**RESPONSE**:  No dispute.

100.    Support staff employees were also given scripts for use during the intake process and each prospective client went through a "quality control" telephone interview with a CFLG attorney.  CFLG (Aleman) Dep. I (Dkt. No. 66) 143:17-146:12; Aleman Decl. (Dkt. No. 105), ¶ 21; Banyon Dep. (Dkt. No. 82) 80:20-22.

**RESPONSE**:  Dispute.  The Bureau objects to the term "quality control" and "CFLG attorney" as vague. The Bureau disputes Defendants' proposed finding to the extent that it suggests attorneys other than CFLG's attorneys at headquarters spoke to consumers during intake, and suggests that the conversation with the consumer by the CFLG headquarters attorney consisted of anything beyond following a script that did not cover legal matters.

The CFLG headquarters attorney read the consumer a script during the initial intake call that repeated the same points made by the salesperson's script and repeated the qualification process.  Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 145-146, 149-150.  The headquarters attorney's script consisted of statements about CFLG's services, and the consumer

50

was required to answer "yes" after each statement to indicate he or she understood what was being read to him or her.  Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 150-151; CFLG Verification Script, Pl.'s Mot. Summ. J. Ex. 19.  The consumer, desperate to save her home from foreclosure, could not be enrolled in CFLG's program until she answered "yes" after each statement.  Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 150-152, 154-155.

101.    The information from each prospective CFLG client was reviewed by a CFLG member attorney to make sure that CFLG would be able to provide that client with services that were in the client's best interest.  CFLG (Aleman) Dep. I (Dkt. No. 66) 110:5-112:17; Banyon Dep. (Dkt. No. 82) 163:22-164:7.

**RESPONSE**:  Dispute.  The Bureau objects to the term "information" as vague.  The Bureau also disputes Defendants' proposed finding.  The only information looked at by CFLG local attorneys at the intake stage consisted of a consumer's basic mortgage loan and financial information that was previously collected by CFLG's salespersons. This basic information consisted of the following: general consumer information, address, amount of time behind on the mortgage, the servicer/mortgage company, budget and real estate information, debt-to-income ratio, and hardship and related financial information.  Sibert Jan. 23, 2012 Email, Pl.'s Mot. Summ. J. Ex. 11, at CFPB-TMLG-0061123; Aleman Dep., ECF No. 76, at 76-78, 132-33, 137, 141, 201-02; Ruggiero Dep., ECF No. 70, at 60, 110-111.

There was no review of any documents. Local attorneys were only asked to look at a consumer's intake information after the salespersons and headquarters attorney both already reviewed and pre-approved the consumer for CFLG's program.  Sibert Jan. 23, 2012 Email, Pl.'s Mot. Summ. J. Ex. 11, at CFPB-TMLG-0061123; Ruggiero Dep., ECF No. 70, at 60, 110-111. A headquarters attorney communicated to local attorneys that they would "rarely decline" consumers for intake. Sibert Jan. 23, 2013 Email, Pl.'s Mot. Summ. J. Ex. 11, at CFPB-TMLG-

0061123.

Local attorneys approved 100%, or close to 100%, of the mortgage loan modification intake files that they reviewed.  Harrington Dep., ECF No. 81, at 109-110, 139, 236; Ruggiero Dep., ECF No. 70, 115-116.  If a local attorney did not approve the mortgage loan modification intake review file, then CFLG did not pay the local attorney for that service.  Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 135-136; Harrington Dep., ECF No. 81, at 150-51, 218-19; CFLG Class B Agreement, Pl.'s Mot. Summ. J. Ex. 18, at CFPB-TMLG-0052829.

Contrary to Defendants' proposed finding, it was not the role of the local attorney to make sure that CFLG would be able to provide that client with services that were in the client's best interest.  The local attorney's task was simply to determine – by just looking at financial information and criteria – if there would be a financial benefit to the consumer.  For example, if the consumer had an interest rate above the market interest rate, then the consumer was considered a good candidate for TMLG's services.  Harrington Dep., ECF No. 81, at 39-40, 79, 173-74.  Local attorneys spent as little as 1-2 minutes reviewing TMLG and CFLG mortgage loan modification intake review files.  Ruggiero Dep., ECF No. 70, at 114; Harrington Dep., ECF No. 81, at 175-77, 235.  One local attorney described the review of intake files as "a quick glance" and work that he could do "in a heartbeat." Harrington Dep., ECF No. 81, at 176-177.

102.   With respect to mortgage loan modification services, every loan modification package was reviewed and approved by a CFLG attorney in the state in which the client resided. CFLG (Aleman) Dep. I (Dkt. No. 66) 125:19-128:3; Banyon Dep. (Dkt. No. 82) 165:7-16, 212:2-16.

**RESPONSE**:  Dispute. Defendants' proposed finding mischaracterizes the role of the local attorney in CFLG's mortgage loan modification package review process. The local attorney only received the mortgage loan modification package to check for completeness after

the document processing staff and headquarters attorneys both previously reviewed and pre-approved the mortgage loan modification package as complete.

CFLG's document processing offices gathered and assembled documents from consumers, and checked to make sure consumers provided all required documentation. Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 160-161; Gerst Dep., ECF No. 75, at 60-62. Next, a headquarters attorney simply reviewed consumers' mortgage loan modification packets for completeness, like the document processors had, before notifying the local attorneys that the packages were ready for the same duplicative review. Harrington Dep., ECF No. 81, at 79-80, 150, 173; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 162-163. The local attorney simply ensured that the submission package contained the required consumer residence and financial information and documents, and if it did, the local attorney approved it.  Harrington Dep., ECF No. 81, at 43, 82-84; Ruggiero Dep., ECF No. 70, at 67-68; Gray Decl., ECF No. 115, ¶ 10; Delgado Dep., ECF No. 73, at 33-34.

In fact, the local attorney review was merely "belt and suspenders" in a duplicative process. Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 127.  Local attorneys did not receive files for review until the mortgage loan modification package was in a condition that was ready for local attorney approval. Sibert Dep., ECF No. 77, at 99.  At least two local attorneys testified that they spent as little as five minutes or less to review the mortgage modification submission packages. Ruggiero Dep., ECF No. 70, at 90; Harrington Dep., ECF No. 81, at 141, 235.

103.    Fees paid by CFLG's clients were processed through Meracord, with which CFLG had accounts.   CFLG (Aleman) Dep. II (Dkt. No. 67) 381:17-383:7, 396:2-8, 411:6-412:10; Aleman Decl. (Dkt. No. 105), ¶ 22.

**RESPONSE**:  No dispute.

104.    Upon retention of CFLG, each client set up his or her own account at Meracord into which he or she deposited the fee set out in the client's retention agreement with the law firm. CFLG (Aleman) Dep. II (Dkt. No. 67) 381:17-383:7, 396:2-8, 411:6-412:10; Aleman Decl. (Dkt. No. 105), ¶ 22.

**RESPONSE**:  Dispute.  After a consumer answered "yes" after each of the headquarters attorney's scripted statements during intake, the consumer was transferred back to a CFLG salesperson who had the consumer sign the CFLG retainer agreement.  After the consumer signed the CFLG retainer agreement, the salesperson gathered consumers' bank account information and set up payments of a purported "initial retainer fee" of at least $1,195 per month and recurring monthly payments averaging $895 per month through Meracord.  Murphy Dep., ECF No. 80, at 75-76; Consumer Contract with Meracord, Pl.'s Mot. Summ. J. Ex. 20, at CFPB-TMLG-0036972; Exhibit B to CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000188; Halwani Decl., ECF No. 86,¶ 7. Often during the same telephone call, the consumer completed and executed an agreement with Meracord authorizing the payment processor to withdraw the "initial retainer" and the subsequent monthly payments. Consumer Contract with Meracord, Pl.'s Mot. Summ. J. Ex. 20, at CFPB-TMLG-0036972; Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 453-454; Declaration of Linda White, ECF No. 117, ¶ 9-10; Pultz Decl., ECF No. 90, ¶ 8; Saunders Decl., ECF No. 91, ¶ 8; Bruce Decl., ECF No. 93, ¶ 7.

The Bureau also disputes Defendants' proposed finding to the extent it asserts that CFLG was a law firm. CFLG was not a "law firm," but rather a provider of mortgage assistance relief services. CFLG offered, provided or arranged for others to provide mortgage assistance relief services, including but not limited to, providing services to assist a consumer with modifying the terms of his or her mortgage.  Deposition of CFLG 30(b)(6) Corporate Representative Harold E.

Stafford Part 1 ("Stafford CFLG 30(b)(6) Dep. Part 1"), June 3, 2015, ECF No. 64, at 20;

Deposition of CFLG 30(b)(6) Corporate Representative Jeffrey John Aleman Part 1 ("Aleman

CFLG 30(b)(6) Dep. Part 1"), May 19, 2015, ECF No. 66, at 35. CFLG even identifies its

principal business activity as "Mortgage Consulting" and its principal product or services as

"Consulting" on the company's 2012 and 2013 Federal income tax returns. Exhibits H and I of

Declaration of Jeffrey Aleman, ECF No. 105.

 CFLG's marketing materials, welcome letters to consumers, retainer agreements with

consumers, and sales representative calls with consumers, all demonstrated that the CFLG

offered to provide and purportedly provided mortgage loan modification services.  Declaration of

Tim Ledbetter, ECF No. 92, ¶¶ 2-5; Peterson Decl., ECF. No. 84, ¶¶ 3, 5; Teynor Decl., ECF No.

85, ¶¶ 2-4; Halwani Decl., ECF No. 86, ¶¶ 2-4; CFLG Retainer Agreement, Pl.'s Mot. Summ. J.

Ex. 17, at DEF.000198-000201; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under

seal), at TMLG.MO.LIT.000152-000154, TMLG.MO.LIT.000160; Anderson Dep., ECF No. 79,

at 130-134; CFLG Amended Answer to Complaint, Dec. 31, 2014, ECF No. 41, at ¶ 39; Jeffrey

Aleman Amended Answer to Complaint, ECF No. 40, at 6 (answer to ¶ 23); TMLG Response to

US Senate, Pl.'s Mot. Summ. J. Ex. 36 (filed under seal), at DEF.0003071; Thomas Macey

Amended Answer to Complaint, ECF No. 42, at 6 (answer to ¶ 23); Jason Searns Amended

Answer to Complaint, ECF No. 43, at 6 (answer to ¶ 23).

 CFLG provided no legal services to consumers who sought modifications of their

mortgages.  Consumers never communicated with any attorney from headquarters or a local

attorney after they enrolled for services.  CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17,

at DEF.000198-000201; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at

TMLG.MO.LIT.000152-000154; Peterson Decl., ECF No. 84, ¶ 16; Halwani Decl., ECF No. 86,

¶ 16; Declaration of Tim Ledbetter, ECF No. 92, ¶ 14.

At least one local attorney stated that she did not have an attorney-client relationship with CFLG's consumers. Gray Decl., ECF No. 115, ¶ 9.  The Virginia State Bar found that a local attorney in Virginia had no attorney-client relationship with a CFLG consumer who resided in Virginia. Gray Decl., ECF No. 115, ¶ 19 and Exhibit C.

The only services in connection with mortgage loan modifications that local attorneys provided to consumers consisted of (1) comparing CFLG checklists with consumer financial information collected on a computer screen at intake to assure that a consumer met lender criteria to apply for a loan modification, and (2) comparing CFLG checklists against documents submitted by a consumer to assure that the package contained all of the lender-required mortgage loan modification documents. These tasks could be performed by non-attorneys, and in fact, were already performed by non-attorneys – salespersons and document processors - before the local attorneys performed these same tasks.  Sibert Dep., ECF No. 77, at 103-105, 236; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 27, 54; Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 452-455; Aleman Dep., ECF No. 76, at 201-02, 215.

Based on Defendants' own data, none of the 1,116 consumers who enrolled in CFLG's services received foreclosure defense services, or services beyond the financial and ministerial tasks associated with mortgage loan modification services.  Thomas Decl., ECF No. 116, at 3 ¶ 19.

105.    Those Meracord accounts were not controlled by CFLG or anyone on its behalf. CFLG (Aleman) Dep. II (Dkt. No. 67) 381:17-383:7, 396:2-8, 411:6-412:10; Aleman Decl. (Dkt. No. 105), ¶ 22.

**RESPONSE**:  No dispute.

106.    Those accounts were established by and held in the clients' names, and the clients had signature authority over those accounts.  CFLG (Aleman) Dep. II (Dkt. No. 67)

56

381:17-383:7, 396:2-8, 411:6-412:10; Aleman Decl. (Dkt. No. 105), ¶ 22.

**RESPONSE**:  No dispute.

107.    When CFLG earned fees, Meracord transferred money out of the client's account into CFLG's account.  CFLG (Aleman) Dep. II (Dkt. No. 67) 381:17-383:7, 396:2-8, 411:6-412:10.

**RESPONSE**:  Dispute.  The Bureau objects that the phrase "[w]hen CFLG earned fees" is vague.  The Bureau disputes Defendants' proposed finding to the extent that it suggests that the transfer of money from a consumer's account into CFLG's account only took place after CFLG rendered certain services or achieved certain results.  Meracord automatically withdrew the consumer's initial retainer and subsequent monthly payments once a consumer signed up to make automated monthly payments.  Meracord disbursed the consumers' payments to CFLG's operating account automatically every month, regardless of what, if any, services CFLG rendered. CFLG Meracord Agreement, Pl.'s Mot. Summ. J. Ex. 27; Lanham Dep., ECF No. 63, at 69-70, 80, 130.  This entire process of withdrawing money from a consumer's bank account and disbursing the money to CFLG's operating account was entirely automated and took only two to four days. Lanham Dep., ECF No. 63, at 62-63.

108.    In short, no property of the clients or third parties was held by CFLG. Aleman Decl. (Dkt. No. 105), ¶ 22.

**RESPONSE**:  Dispute.  CFLG received money from consumers before certain services were rendered or results achieved.  Meracord automatically withdrew the consumer's initial retainer and subsequent monthly payments once a consumer signed up to make automated monthly payments.  Meracord disbursed the consumers' payments to CFLG's operating account automatically every month, regardless of what, if any, services CFLG rendered. CFLG Meracord Agreement, Pl.'s Mot. Summ. J. Ex. 27; Lanham Dep., ECF No. 63, at 69-70, 80, 130.

109.    In an abundance of caution, however, CFLG maintained a client trust account at US Bank into which client fee payments were deposited from the clients' accounts at Meracord. CFLG (Aleman) Dep. II (Dkt. No. 67) 381:17-383:7, 396:2-8, 411:6-412:10; Aleman Decl. (Dkt. No. 105), ¶ 22.

**RESPONSE**:  Dispute.  CFLG maintained no client trust account prior to July 2012. Stafford CFLG 30(b)(6) Dep. Part 2, ECF No. 65, at 115.

110.    CFLG was also not profitable.  CFLG (Aleman) Dep. I (Dkt. No. 66) 36:5-37:12; Aleman Decl. (Dkt. No. 105), ¶ 24; Macey Decl. (Dkt. No. 97), ¶ 10.

**RESPONSE**:  Dispute.  Data provided by Defendants to the Bureau demonstrates that CFLG collected $3,082,055 and CFLG issued $89,759 in refunds, resulting in CFLG receiving a net amount of $2,992,296 from consumers. Thomas Decl., ECF No. 116, at 3 ¶ 22.

111.    In November 2012, after only a few months of operation, Macey directed that CFLG be wound-up.  CFLG (Aleman) Dep. I (Dkt. No. 66) 34:16-37:12; Aleman Decl. (Dkt. No.105), ¶ 24; Macey Decl. (Dkt. No. 97), ¶ 10.

**RESPONSE**:  No dispute.

112.    Enrollment of new clients stopped in November 2012.  CFLG (Aleman) Dep. I (Dkt. No. 66) 34:16-35:22; Aleman Decl. (Dkt. No. 105), ¶ 24.

**RESPONSE**:  Dispute.  Data provided from the Defendants to the Bureau shows that CFLG enrolled consumers in December 2012 and January 2013.  Exhibit B (filed under seal) to Thomas Decl., ECF No. 116.

113.    By July 2013 the firm no longer had any clients or operations.  CFLG (Aleman) Dep. I (Dkt. No. 66) 41:19-42:12; Aleman Decl. (Dkt. No. 105), ¶ 24.

**RESPONSE**:  Dispute. Based on data provided by CFLG to the Bureau, the last date any service was performed to a consumer's file was on July 31, 2012. Exhibit B (filed under seal) to

Thomas Decl., ECF No. 116.

114.   Aleman lost approximately $100,000 in unreimbursed loans to CFLG. CFLG (Aleman) Dep. I (Dkt. No. 66) 94:2-99:4.

**RESPONSE**:  Dispute.  CFLG collected $3,082,055 and CFLG issued $89,759 in refunds, resulting in CFLG receiving a net amount of $2,992,296 from consumers. Thomas Decl., ECF No. 116, at 3 ¶ 22.

115.   Macey lost approximately $650,000 in unreimbursed loans to CFLG.  Macey Decl. (Dkt. No. 97), ¶ 10.

**RESPONSE**:  Dispute.  CFLG collected $3,082,055 and CFLG issued $89,759 in refunds, resulting in CFLG receiving a net amount of $2,992,296 from consumers. Thomas Decl., ECF No. 116, at 3 ¶ 22.

116.   On July 22, 2014, Plaintiff Consumer Financial Protection Bureau ("CFPB") filed this action.  Compl. (Dkt. No. 1).

**RESPONSE**:  No dispute.

117.   The CFPB is an independent agency of the United States charged with regulating the offering and provision of consumer financial products or services under federal consumer financial laws.  Compl. (Dkt. No. 1) ¶ 4.

**RESPONSE**:  No dispute.

118.   In the complaint, the CFPB alleges that, during the years TMLG and CLFG were in operation (2011-2013), various aspects of their operations violated the Mortgage Assistance Relief Services Code, 12 C.F.R. § 1015.1, *et seq.* ("Regulation O") and the Consumer Financial Protection Act ("CFPA").  *See generally*, Compl. (Dkt. No. 1).

**RESPONSE**:  No dispute.

119.   Generally speaking, the CFPB is authorized to initiate federal district court

proceedings, by its own attorneys, to enjoin violations of the CFPA and Regulation O. Compl. (Dkt. No. 1) ¶ 5.

**RESPONSE**:  No dispute.

120.    This Court has subject-matter jurisdiction over this action because it has been brought under federal consumer financial law, presents a federal question, and was brought by an agency of the United States, 28 U.S.C. § 1345. Compl. (Dkt. No. 1) ¶ 2.

**RESPONSE**:  No dispute.

121.    Venue is not improper in this District based on the CFPB's allegations. *See* Compl. (Dkt. No. 1) ¶ 3.

**RESPONSE**:  No dispute.

122.    The CFPB claims that all Defendants are liable for those violations. *See generally*, Compl. (Dkt. No. 1).

**RESPONSE**:  No dispute.

123.    The CFPB's complaint does not mention any TMLG or CFLG clients by name. *See generally*, Compl. (Dkt. No. 1).

**RESPONSE**:  No dispute.

124.    Nor does the complaint allege any specific misconduct in the handling of any particular client file. *See generally*, Compl. (Dkt. No. 1).

**RESPONSE**:  Dispute. The Complaint speaks for itself.  Defendants' proposed finding does not accurately reflect the language of the Complaint. Counts I through 10 of the Complaint allege specific misconduct in the handling of all TMLG and CFLG consumer files.

125.    Instead, the CFPB's complaint suggests that TMLG's and CFLG's general business practices – not its specific representation of any particular client(s) – violated both Regulation O and the CFPA. *See generally*, Compl. (Dkt. No. 1).

60

**RESPONSE**: Dispute. The Complaint speaks for itself.  Defendants' proposed finding does not accurately reflect the language of the Complaint.  Defendants' proposed finding is not supported by Defendants' citation. The Complaint does not contain language acknowledging any "representation" by TMLG or CFLG of a consumer in any legal service, nor does it acknowledge that consumers of TMLG and CFLG were law firm "clients."  Counts I through 10 of the Complaint allege that Defendants violated Regulation O and the CFPA.

126.    In Counts I and II, the CFPB alleges that Defendants violated Regulation O by collecting advanced fees for services provided by TMLG and CFPB.  Compl. (Dkt. No. 1) ¶¶ 66-69.

**RESPONSE**:  Dispute. The Complaint speaks for itself.  Defendants' proposed finding does not accurately reflect the language of the Complaint.  Count I of the Complaint alleges that in the course of providing, offering to provide, or arranging for others to provide mortgage assistance relief services, Defendants TMLG, Macey, Aleman, and Searns have requested or received payment from consumers before those consumers have executed a written agreement with their loan holder or servicer that incorporates any offer obtained by TMLG from the loan holder or servicer, in violation of Regulation O, 12 C.F.R. § 1015.5(a) (2011).

Count II of the Complaint alleges that in the course of providing, offering to provide, or arranging for others to provide mortgage assistance relief services, Defendants CFLG, Macey, Aleman, and Stafford have requested or received payment from consumers before those consumers have executed a written agreement with their loan holder or servicer that incorporates any offer obtained by CFLG, in violation of Regulation O, 12 C.F.R. § 1015.5(a) (2011).

127.    In Counts III and IV, the CFPB alleges that Defendants violated Regulation O by improperly advising clients not to communicate with their mortgage lenders.  Compl. (Dkt. No. 1) ¶¶ 70-73.

**RESPONSE**:  Dispute.  The Complaint speaks for itself.  Defendants' proposed finding does not accurately reflect the language of the Complaint.  Count III of the Complaint alleges that in the course of providing, offering to provide, or arranging for others to provide mortgage assistance relief services, Defendants TMLG, Macey, Aleman, and Searns have engaged in making, expressly or by implication, representations that a consumer should not contact or communicate with his or her lender or servicer, in violation of Regulation O, 12 C.F.R. § 1015.3(a) (2011).

Count IV of the Complaint alleges that in the course of providing, offering to provide, or arranging for others to provide mortgage assistance relief services, Defendants CFLG, Macey, Aleman, and Stafford have engaged in making, expressly or by implication, representations that a consumer should not contact or communicate with his or her lender or servicer, in violation of Regulation O, 12 C.F.R. § 1015.3(a) (2011).

128.    In Counts V and VI, the CFPB alleges that Defendants violated Regulation O by making material representations to their clients regarding:  (1) the likelihood of obtaining loan modifications; (2) the amount of time it would take to receive a modification; (3) the nature of any obligation to make periodic payments; and (4) the clients would receive legal representation. Compl. (Dkt. No. 1) ¶¶ 74-77.

**RESPONSE**:  Dispute.  The Complaint speaks for itself.  Defendants' proposed finding does not accurately reflect the language of the Complaint.  Counts V and VI of the Complaint allege that in the course of providing, offering to provide, or arranging for others to provide mortgage assistance relief services, Defendants have engaged in misrepresenting, expressly or by implication, material aspects of their services, including but not limited to:

a. the likelihood of obtaining mortgage loan modifications or accomplishing

any other represented service or result, in violation of Regulation O, 12 C.F.R. §

1015.3(b)(1);

b. the amount of time it would take to obtain mortgage loan modifications or

accomplish any other represented service or result, in violation of Regulation O, 12

C.F.R. § 1015.3(b)(2);

c. a consumer's obligation to make scheduled periodic payments or any other

payments pursuant to the terms of the consumer's dwelling loan, in violation of

Regulation O, 12 C.F.R. § 1015.3(b)(4); and

d. that consumers will receive legal representation, in violation of Regulation

O, 12 C.F.R. § 1015.3(b)(8).

129.    In Counts VII and VIII, the CFPB alleges that Defendants violated Regulation

O by failing to include a required disclosure in their client communications.  Compl. (Dkt. No. 1)

¶¶ 78-81.

**RESPONSE**:  Dispute.  The Complaint speaks for itself.  Defendants' proposed finding

does not accurately reflect the language of the Complaint.  Counts VII and VIII of the Complaint

alleges that in the course of providing, offering to provide, or arranging for others to provide

mortgage assistance relief services, Defendants have failed to make the following disclosure in

all consumer-specific commercial communications in a clear and prominent manner: "You may

stop doing business with us at any time. You may accept or reject the offer of mortgage

assistance we obtain from your lender [or servicer]. If you reject the offer, you do not have to

pay us. If you accept the offer, you will have to pay us (insert amount or method for calculating

the amount) for our services," in violation of Regulation O, 12 C.F.R.§ 1015.4(b)(1).

130.    In Counts IX and X, the CFPB alleges that Defendants violated the CFPB Act

by falsely representing that TMLG and CFLG's clients would receive legal representation, and

that they could provide mortgage modification and foreclosure assistance within 90-120 days.

Compl. (Dkt. No. 1) ¶¶ 82-89.

**RESPONSE**: Dispute.  The Complaint speaks for itself.  Defendants' proposed finding does not accurately reflect the language of the Complaint.  Counts IX and X of the Complaint allege that in numerous instances in connection with the offering or provision of mortgage assistance relief services, Defendants have engaged in representing, expressly or by implication, that:

> a. they generally will obtain mortgage loan modifications for consumers or will help them avoid foreclosure;

> b. they generally will obtain such mortgage assistance relief within a certain time, such as 90-120 days; and

> c. they will provide consumers legal representation.

131.    In its complaint, the CFPB acknowledges that Macey, Aleman, Searns, and Stafford are all attorneys and that CFLG and TMLG were law firms offering "mortgage assistance relief services" to their clients.  Compl. (Dkt. No. 1) ¶¶ 13-17, 32, 34.

**RESPONSE**: Dispute. The Complaint speaks for itself.  Defendants' proposed finding does not accurately reflect the language of the Complaint. Additionally, Defendants' citations do not support Defendants' proposed finding. The Complaint contains no language acknowledging that CFLG or TMLG were ever "law firms."

132.    Further, according to the complaint, the clients of CFLG and TMLG were told that they were retaining a law firm when they enrolled.  Compl. (Dkt. No. 1) ¶¶ 20, 23, 37-38.

**RESPONSE**: Dispute.  The Complaint speaks for itself.  Defendants' proposed finding does not accurately reflect the language of the Complaint.  Defendants' citations do not support the Defendants' proposed finding.  The Complaint neither acknowledges consumers of TMLG or CFLG as law firm clients, nor acknowledges that TMLG or CFLG were ever law firms.

The paragraphs cited to by Defendants state the following:

▪ Consumers who contacted TMLG were connected with a company representative to discuss their mortgage and financial situation. The representative made statements aimed at convincing consumers that they were eligible for a loan modification, and that they would obtain a mortgage modification if they hired TMLG. TMLG staff also indicated to consumers during the intake call that they would be receiving the services of an attorney.  CFPB Complaint, ECF No. 1, ¶ 20.

▪ After the initial call, TMLG would send consumers a welcome packet with a cover letter and Retainer Agreement. These documents misleadingly suggested to consumers that they would be receiving the services of an attorney. For example, the cover letter begins by thanking the consumers for "entrusting their home to TMLG. . . a full service law firm that focuses on resolving all mortgage related issues." CFPB Complaint, ECF No. 1, ¶ 23.

▪ CFLG's advertisements deceptively suggested that CFLG enjoyed high rates of success in obtaining loan modifications and other foreclosure relief, and misled consumers into believing that they would receive the services of an attorney. For example, CFLG's website described CFLG as "one of the most sophisticated consumer protection law firms in the country" with over 100 associate attorneys "insuring the best possible outcome during uncertain times." CFPB Complaint, ECF No. 1, ¶ 37.

▪ The website also made representations about the quality of services CFLG would provide, such as: "[w]hile foreclosure scams are rampant, our mortgage relief specialists are some of the highest rated professionals in the field;" and "[CFLG attorneys] have years of experience keeping people in their homes and have a long list of testimonials from people who were on the brink of disaster." CFPB Complaint, ECF No. 1 ¶ 38.

133.    On March 11, 2009, Congress enacted the Omnibus Appropriations Act

("Omnibus Act").  2009 Omnibus Appropriations Act, Pub. L. No. 111-8, § 626, 123 Stat. 524 (2009) ("2009 Omnibus Act").

**RESPONSE:**   This statement is not a material fact for which a response is required under Rule 56 of the Federal Rules of Civil Procedure.

134.    The Omnibus Act granted the Federal Trade Commission ("FTC") the authority to initiate a rulemaking proceeding to address mortgage lending practices.  2009 Omnibus Act § 626.

**RESPONSE:**   This statement is not a material fact for which a response is required under Rule 56 of the Federal Rules of Civil Procedure.  In addition, this paragraph constitutes Defendants' characterization of the cited provision, to which the Court is respectfully referred for a full and accurate statement of its contents.

135.    On May 22, 2009, Congress passed the Credit Card Accountability Responsibility and Disclosure Act ("Credit Card Act"), which clarified portions of the Omnibus Act.  2009 Credit Card Accountability Responsibility and Disclosure Act, Pub. L. No. 11-24, § 511, 123 Stat. 524 (2009) ("2009 Credit Card Act").

**RESPONSE**:  Dispute. The Bureau disputes that Defendants' citation to the Credit Card Act is incorrect. The correct citation is 2009 Credit Card Accountability Responsibility and Disclosure Act, Pub. L. No. 111-24, § 511, 123 Stat. 1734 (2009) ("2009 Credit Card Act"). Furthermore, Defendants' proposed finding is not a material fact for which a response is required under Rule 56 of the Federal Rules of Civil Procedure.  In addition, this paragraph constitutes Defendants' characterization of the cited provisions, to which the Court is respectfully referred for a full and accurate statement of their contents.

136.    The Credit Card Act added a provision to the Omnibus Act to clarify that the FTC cannot promulgate a rule that applies to an entity that is not subject to the Federal Trade Commission Act.  2009 Credit Card Act § 511(a)(2).

66

**RESPONSE**:  This statement is not a material fact for which a response is required under Rule 56 of the Federal Rules of Civil Procedure.  In addition, this paragraph constitutes Defendants' characterization of the cited provisions, to which the Court is respectfully referred for a full and accurate statement of their contents.

137.     On June 1, 2010, the FTC issued an Advance Notice of Proposed Rulemaking for the MARS Rule.  74 F.R. 26130.

**RESPONSE**: Dispute. The FTC issued an Advance Notice of Proposed Rulemaking for the MARS Rule in 2009. Additionally, this statement is not a material fact for which a response is required under Rule 56 of the Federal Rules of Civil Procedure.

138.     The FTC requested comment on whether the "proposed rule [should] include an exemption for attorneys or any other class of persons or entities."  74 F.R. 26138.

**RESPONSE**:  This statement is not a material fact for which a response is required under Rule 56 of the Federal Rules of Civil Procedure.  In addition, this paragraph constitutes Defendants' selective quotation of a Federal Register notice, to which the Court is respectfully referred for a full and accurate statement of its contents.

139.     On March 9, 2010, the FTC published the proposed MARS Rule (the "Proposed Rule").  75 F.R. 10707.

**RESPONSE**:  This statement is not a material fact for which a response is required under Rule 56 of the Federal Rules of Civil Procedure.

140.     In response to the Proposed Rule, the FTC received 75 comments, many of which related to the proposed attorney exemption.  75 F.R. 75093.

**RESPONSE**:  This statement is not a material fact for which a response is required under Rule 56 of the Federal Rules of Civil Procedure.  In addition, this paragraph constitutes Defendants' characterization of a statement in the Federal Register, to which the Court is

respectfully referred for a full and accurate statement of its contents.

141.    Approximately 30 commenters (primarily attorneys and entities such as the State Bar of Wisconsin and the American Bar Association) proposed expanding the scope of the attorney exemption. *See, e.g.,* Declaration of Nicole Winters, Oct. 9, 2015 ("Winters Decl. (Dkt. No. 102)") at Ex. A thereto.

**RESPONSE**:   This statement is not a material fact for which a response is required under Rule 56 of the Federal Rules of Civil Procedure.  In addition, this paragraph constitutes Defendants' characterization of the comments submitted in the administrative record of the rulemaking that Defendants challenge, to which the Court is respectfully referred for a full and accurate statement of their contents.

142.    For example, the American Bar Association proposed to exempt any "licensed attorney engaged in the practice of law and those individuals acting under the direction of the attorney."  Winters Decl. at Ex. A at MARS.000329-340.

**RESPONSE**:   This statement is not a material fact for which a response is required under Rule 56 of the Federal Rules of Civil Procedure.  In addition, this paragraph constitutes Defendants' selective quotation and characterization of the comments submitted in the administrative record of the rulemaking that Defendants challenge, to which the Court is respectfully referred for a full and accurate statement of their contents.

143.    Other commenters (such as the National Association of Attorneys General) urged the FTC to maintain the exemption in the Proposed Rule. *See, e.g.,* Winters Decl. at Ex. A at MARS.000292-293.

**RESPONSE**:   This statement is not a material fact for which a response is required under Rule 56 of the Federal Rules of Civil Procedure.   In addition, this paragraph constitutes Defendants' characterization of the comments submitted in the administrative record of the

rulemaking that Defendants challenge, to which the Court is respectfully referred for a full and accurate statement of their contents.

144.    On December 1, 2010, pursuant to the Omnibus Act, as clarified by the Credit Card Act, the FTC issued a final rule regarding Mortgage Assistance Relief Services ("MARS Rule"). 16 C.F.R. § 322, 75 F.R. 75092.

**RESPONSE**:  This statement is not a material fact for which a response is required under Rule 56 of the Federal Rules of Civil Procedure.  In addition, this paragraph constitutes Defendants' characterization of the cited provisions, to which the Court is respectfully referred for a full and accurate statement of their contents.

145.    In the summer of 2010, Congress overhauled the financial services regulatory structure and passed the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act").  Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, §§ 1062, 1097(1), 124 Stat. 1376 (2010) ("Dodd-Frank Act").

**RESPONSE**:  This statement is not a material fact for which a response is required under Rule 56 of the Federal Rules of Civil Procedure.  In addition, this paragraph constitutes Defendants' characterization of the cited provisions, to which the Court is respectfully referred for a full and accurate statement of their contents.

146.    Title X of the Dodd-Frank Act, the Consumer Financial Protection Act of 2010 (the "CFPA"), created the CFPB and gave it broad powers to engage in supervision, examination, rulemaking and enforcement of consumer financial services. 12 U.S.C. § 5511, *et seq.*, Dodd- Frank Act, Pub. L. 111-203, Tit. X, § 1021, 124 Stat. 1979 (2010).

**RESPONSE**:  Dispute. Defendants' citation to the CFPA is incorrect. The correct citation is 12 U.S.C. § 5511, *et seq.*, Dodd- Frank Act, Pub. L. 111-203, Tit. X, § 1021, 124 Stat. 1376 (2010).  This statement is not a material fact for which a response is required under

Rule 56 of the Federal Rules of Civil Procedure.  In addition, this paragraph constitutes

Defendants' characterization of the cited provisions, to which the Court is respectfully referred

for a full and accurate statement of their contents.

147.    On July 21, 2011, the FTC's rulemaking authority under the Omnibus Act

was effectively transferred to the CFPB.  12 U.S.C. § 5581(b)(5); Dodd-Frank Act §§ 1062; 75

Fed. Reg. 57252 (Sept. 20, 2010) (designating the transfer date as July 21, 2011).

**RESPONSE**:  This statement is not a material fact for which a response is required

under Rule 56 of the Federal Rules of Civil Procedure.  In addition, this paragraph constitutes

Defendants' characterization of the cited provisions, to which the Court is respectfully referred

for a full and accurate statement of their contents.

148.    Congress was concerned that "the breadth of the authority being given to the

[CFPB]" and the 'complexities of the practice of law" would create an overlap between CPFB

regulation and state court regulation of the conduct of attorneys.  156 Cong. Rec. E1347-01,

2010 WL 2788137 (Jun. 30, 2010).

**RESPONSE**:  This statement is not a material fact for which a response is required

under Rule 56 of the Federal Rules of Civil Procedure.  In addition, this paragraph constitutes

Defendants' characterization and selective quotation of a speech by a member of Congress, to

which the Court is respectfully referred for a full and accurate statement of its contents.

149.    John Conyers, the congressional sponsor of the exclusion, made clear that

Congress did not intend to allow the Bureau to regulate the practice of law, which should be left

to the state supreme courts and the ethical codes and disciplinary rules governing all aspects of

the practice of law.  *See* 2010 WL 2788137.

**RESPONSE**:  This statement is not a material fact for which a response is required

under Rule 56 of the Federal Rules of Civil Procedure.  In addition, this paragraph constitutes

Defendants' characterization of a speech by a member of Congress, to which the Court is respectfully referred for a full and accurate statement of its contents.

150.    Conyers noted that "our Committee was determined to avoid any possible overlap between the [CPFB]'s authority and the practice of law." *Id.*

**RESPONSE**:  This statement is not a material fact for which a response is required under Rule 56 of the Federal Rules of Civil Procedure.  In addition, this paragraph constitutes Defendants' selective quotation of a speech by a member of Congress, to which the Court is respectfully referred for a full and accurate statement of its contents.

151.    On September 13, 2011, the CFPB promulgated a nearly-identical version of The MARS Rule, entitled Regulation O. 12 C.F.R. § 1015.

**RESPONSE**:  This statement is not a material fact for which a response is required under Rule 56 of the Federal Rules of Civil Procedure.  In addition, this paragraph constitutes Defendants' characterization of the cited provisions, to which the Court is respectfully referred for a full and accurate statement of their contents.

152.    As a result, the FTC rescinded the MARS Rule on April 13, 2012.  Rescission of Rules, 77 Fed. Reg. 22200 (Apr. 13, 2012) (withdrawing 16 C.F.R. § 322).

**RESPONSE**:  This statement is not a material fact for which a response is required under Rule 56 of the Federal Rules of Civil Procedure.  In addition, this paragraph constitutes Defendants' characterization of cited provision, to which the Court is respectfully referred for a full and accurate statement of its contents.

Date: October 27, 2015

Respectfully submitted,

Anthony Alexis (DC Bar #384545)
*Enforcement Director*

David M. Rubenstein (DC Bar #458770)
*Deputy Enforcement Director*

Cynthia Gooen Lesser (NY Bar #2578045)
*Assistant Deputy Enforcement Director*

*/s/ Shirley Chiu*
Seth B. Popkin, DC Bar #417365
Seth.Popkin@cfpb.gov
202-435-9496
Shirley Chiu, IL Bar #6296079
Shirley.Chiu@cfpb.gov
202-435-7592
Leanne Hartmann, MA Bar #667852
Leanne.Hartmann@cfpb.gov
202-435-7453
*Enforcement Attorneys*

Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552