**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

CONSUMER FINANCIAL PROTECTION BUREAU,

Plaintiff,

v.

Case No. 3:14-cv-00513

THE MORTGAGE LAW GROUP, LLP, (D/B/A THE LAW FIRM OF MACEY, ALEMAN & SEARNS), CONSUMER FIRST LEGAL GROUP, LLC, THOMAS G. MACEY, JEFFREY J. ALEMAN, JASON E. SEARNS, and HAROLD E. STAFFORD,

Defendants.

**DEFENDANTS' RESPONSE TO THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS


INTRODUCTION .......... 1

I. The CFPB Statement of Facts Is Deficient .......... 3

II. The CFPB's Motion Fails For The Reasons Set Forth In Defendants' Motion For Summary Judgment .......... 6

III. Counts I-VIII Fail Because Defendants Satisfy The Attorney Exemption Contained in Regulation O .......... 7

A. Defendants Were Engaged in the Practice of Law .......... 7

1. The CFPB Is Improperly Asking This Court To Create A New Federal Common Law Definition of the Practice of Law .......... 7

2. The Law Firms Were Engaged in the Practice of Law .......... 12

B. Defendants Were Properly Licensed .......... 17

C. Defendants Complied With Applicable State Laws .......... 18

D. Defendants Had Trust Accounts and Complied With State Law Regarding Those Trust Accounts .......... 18

IV. Counts IX-X Fail Because Defendants Are Attorneys .......... 19

V. Counts III-VIII Fail Because Defendants Did Not Violate Regulation O's Requirements Regarding Misleading Statements and Required Disclosures .......... 20

VI. Counts IX-X Fail Because TMLG and CFLG Did Not Engage in Deceptive Practices In Violation Of The CFPA .......... 24

VII. The Individual Defendants Cannot Be Held Individually Liable For Corporate Violations of Regulation O or the CFPA .......... 25

VIII. The CFPB Is Not Entitled To the Relief it is Seeking .......... 30

A. The CFPB Is Not Entitled To Disgorgement Or Restitution Of All Fees Paid By CFLG And TMLG Clients .......... 30

B. A Permanent Injunction Is Improper Where The Alleged Wrong Is Incapable Of Repetition .......... 32

CONCLUSION .......... 33

# TABLE OF AUTHORIES

## CASES

*Am. Bar Ass'n v. F.T.C.*, 430 F.3d 457 (D.D.C. 2005)....8

*Arkansas Bar Assn. v. Block*, 323 S.W. 2d 912 (Ark. 1959)....10, 14

*Bank v.* Ward, 100 U.S. 195 (1879)....4

*BASF v. Old World Trading Co. Inc.,* 41 F.3d 1081 (7th Cir. 1994)....30

*Clark v. Austin*, 101 S.W. 2d 977 (Mo. 1937)....14

*Drake v. Minnesota Min. & Mfg. Co.*, 134 F. 3d 87....3

*Fed. Trade Comm'n v. Amy Travel Serv., Inc.*, 875 F.2d 564 (7th Cir. 1989)....25, 26

*Fed. Trade Comm'n v. World Media Brokers*, 415 F.3d 758 (7th Cir. 2005)....25, 26

*Fought & Co., Inc. v. Steel Eng. and Erection, Inc.*, 951 P. 2d 487 (Haw. 1998)....14

*FTC v. Inc. 21. Com. Corp.,* No. C 10-00022 WHA, 2010 WL 4071664 (N.D. Cal., Oct. 18, 2010)....30

*FTC v. Tashman*, 318 F.3d 1273 (11th Cir. 2003)....24

*FTC v. Washington Data Resources*, 856 F. Supp. 2d 1247 (M.D. Fla. 2012)....30

*FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020 (7th Cir. 1988)....24

*Gmerek v. State Ethics Comm.,* 751 A. 2d 1241 (Pa. Cmwlth. 2000)....12,13,14

*Greenbrier Leasing Co. LLC v. Carroll*, 2008 WL 4866037 (N.D. Ill., Jun. 17, 2008)....30

*Health Cost Controls v. Skinner*, 44 F.3d 535 (7th Cir. 1995)....29

*Illinois v. Alta Colleges, Inc.,* No. 14 C 3786, 2014 WL 4377579 (N.D. Ill. Sep. 4, 2014)....22

*In Re Duncan*, 65 S.E. 210 (S.C. 1909)....14

*In Re Kowalski*, 402 B.R. 843 (N.D. Ill. 2009)....30

*In Re Andreas*, 373 B.R. 864 (N.D. Ill. 2007)....30

*In Re Town of Little Compton*, 37 A. 3d 85 (RI. 2012) ........ *11*

*J. Hanna & Assoc., P.C.,* 695 S.E. 2d 612 (Ga. 2010) ........ 11

*Koscove v. Bolte*, 30 P. 3d 784 (Colo. App. 2001) ........ 14

*Massachusetts Conveyancers Assn. Inc. v. Colonial title & Escrow, Inc.*
2001 WL 669280 (Mass. Super. 2001) ........ 12

*Middlesex Co. Ethics Comm. v. Garden St. Bar Assoc.*, 457 U.S. 423 (1982) ........ 8, 9

*Persels & Assoc., LLC v. Banking Commissioner*, 318 Conn. 652 (Conn. 2015) ........ 9

*Savings Bank v. Ward,* 100 U.S. 195 (1879) ........ 14

*Schroyer v. Frankel,* 197 F.3d 1170 (6th Cir. 1999) ........ 11

*SEC v. First City Fin. Corp.,* 890 F.2d 1215 (D.C. Cir 1989) ........ 29

*State Bar Ass'n of Conn. v. Conn. Bank & Trust Co.,* 140 A.2d 863 (1958) ........ 14

*State ex. rel. The Florida Bar v. Sperry*, 140 So. 2d 587 (Fla. 1962) ........ 14

*State ex rel. Doyle v. Frederick J. Hanna & Assoc., P.C.*, 695 S.E. 2d 612 (Ga. 2010) ........ 11

*Stocker v. Kalahari Dev.*, LLC, No. 06-C-366-C, 2007 WL 11400246 (Apr. 16, 2007) ........ 3

*Unauthorized Practice of Law Committee v. Dept. of Workers Comp.*
543 A. 2d 662 (R.I. 1988) ........ 15

*U. S. v. Andrews,* 600 F.3d 1167 (9th Cir. 2010) ........ 30

*U. S. v. Arutunoff,* 1 F.3d 1112 (10th Cir. 1993) ........ 30

*U. S. v. Beydoun,* 469 F.3d 102 (5th Cir. 2006) ........ 30

*U. S. v. Boscarino,* No. 02 CR 86, 2006 WL 2024250 (N.D. Ill. Jul. 13, 2006) ........ 30

*U. S. v. Elson,* 577 F.3d 713 (6th Cir. 2009) ........ 30

*U. S. v. W.T. Grant Co.,* 345 U.S. 629 (1953) ........ 31

*William Elec. Games v. Garrity*, 366 F. 3d 569 (7th Cir. 2004) ........ 31

**STATUTES**

12 U.S.C. § 5301. .......... 2

12 U.S.C. § 5517 .......... 1, 2, 20

12 U.S.C. § 5565 .......... 29

N.C. Gen. Stat. Ann. § 84.2.1 .......... 11

R.I. Gen. Laws Ann. § 11-27-2 .......... 11

**RULES & REGULATIONS**

12 C.F.R. § 1015.1 .......... 6

12 C.F.R. § 1015.2 .......... 23

12 C.F.R. § 1015.7 .......... 18

12 C.F.R. § 1015.7(a) .......... 7

12 C.F.R. § 1015.7(b). .......... 7

16 C.F.R. § 322 .......... 6

75 F.R. 10707 (Mar. 9, 2010) .......... 6

75 F.R. 75092 (Dec. 1, 2010) .......... 8

**OTHER AUTHORITIES**

Ala. Code § 34-3-6 .......... 10

Alaska Stat. § 09.08.230 .......... 10

Ala. Rules of Prof'l Conduct R. 1.15(f) (2009) .......... 18

Ark. Rules of Prof'l Conduct R. 1.15(a)(1)(2005) .......... 18

Ark. Rules of Prof'l Conduct R. 5.5 (2005) .......... 18

Colo. Rules of Prof'l Conduct R. 1.15(a) (2014) .......... 18

Conn. Rules of Prof'l Conduct R. 5.3 (2015) .......... 15

Conn. Rules of Prof'l Conduct R. 5.5(c)(4) cmt. (2015) .......... 13

D.C. Rules of Prof'l Conduct R. 5.5 (2007) .......... 18

Del. Rules of Prof'l Conduct R. 5.3 (2013) .......... 15

Del. Rules of Prof'l Conduct R.1.15(a) (2015) .......... 18

Haw. Rules of Prof'l Conduct R. 1.15(a) (2014) .......... 18

Ill. Rules of Prof'l Conduct of 2010 R. 5.5(c)(4) cmt (2015) .......... 13

Ill. Rules of Prof'l Conduct 1.15(a)(2015) .......... 18

Idaho Rules of Prof'l Conduct R. 5.3 (2014) .......... 15

Ind. Rules of Prof'l Conduct R. 6.7 .......... 9

Ind. Rules of Prof'l Conduct R. 1.15(a) (2015) .......... 18

Ind. Rules of Prof'l Conduct R. 5.5(c) (4) cmt. (2015) .......... 13

Iowa Sup. Ct. R. 32:5.5 .......... 18

La. Rules of Prof'l Conduct R. 5.3 (2015) .......... 15

Mass. Rules of Prof'l Conduct R. 1.15(b) (2015) .......... 18

Mass. Rules of Prof'l Conduct R. 5.5 (2015) .......... 18

Me. Rules of Prof'l Conduct R. 1.15(b)(1) (2012) .......... 18

Mich. Rules of Prof'l Conduct R. 6.6 .......... 9

Model Rules of Prof'l Conduct R. 5.5 cmt. (2013) .......... 9

Model Rules of Prof'l Conduct R. 5.5(c)(4) cmt. (2013) .......... 13

Model Rules of Prof'l Conduct R. 5.7(b) (amended 2013) .......... 10

Neb. Rules of Prof'l Conduct R. 1.15(a) (2005) .......... 19

Nev. 9Rules of Prof'l Conduct R. 7.2a (2012) .......... 9

Nev. R18ules of Prof'l Conduct R. 1.15(a) (2006) ....................18

Ohio Rul10es of Prof'l Conduct R. 5.7 (2007)....................10

Or. Rules o18f Prof'l Conduct R. 1.15(a) (2014)....................18

Pa. Rules of P10rof'l Conduct R. 5.7 (2014)....................10

R.I. Rules of Prof'l Conduct R. 1.15(a) (2007)....................19

S.C. Rules of Prof'l Conudct 1.19 (amended 2013)....................9

Va. Rules of Prof'l Conduct R. 5.8....................9

W. Va. Rules of Prof'l Conduct R. 5.3 (2015)....................15

Wash. Rules of Prof'l Conduct R. 5.8 (2015)....................9

Wash. Rules of Prof'l Conduct R. 5.9 (2015)....................9

Wash. Rules of Prof'l Conduct R. 5.10 (2015)....................9

Wis. SCR 20:5.5 cmt....................13

RM Hunt, *Whither Consumer Credit Counseling? (2005)*....................17

W. Li, *What Do We Know About Chapter 13 Personal Bankruptcy Filings?* (2007)....................17

K. Porter, *Assessing Failure In Bankruptcy* (2010)....................17

J. Skiba, *When Bankruptcy Goes Bad: Why Chapter 13's Fail* (2012)....................17

Defendants Consumer First Law Group, LLC ("CFLG"), Thomas Macey, Jason Searns, Jeffrey Aleman and Harold Stafford (collectively, "Defendants") respectfully submit this memorandum in opposition to the motion for summary judgment filed by the Consumer Financial Protection Bureau ("CFPB").

## INTRODUCTION

The CFPB's motion for summary judgment simply underscores the main point raised in Defendants' motion for summary judgment: without any Congressional authorization whatsoever, the CFPB is improperly attempting to establish itself as ***the*** federal authority empowered to define and regulate the "practice of law" throughout the United States. As its motion for summary judgment makes clear, the CFPB is attempting to establish new federal law governing what is (and is not) the "practice of law," the manner in which attorneys and law firms may (and may not) operate, and what conduct does (and does not) comply with the ethics canons governing the legal practice. In its motion, the CFPB asks this Court to make findings (*e.g.*, that the Defendant attorneys were not engaged in the "practice of law") that have historically been reserved to state authorities. Tellingly, the CFPB makes that request with scant reference to the state laws that govern the practice of law. The Court should not be under any illusions: the CFPB is not attempting to enforce existing state law on this issue, rather, it is attempting to create new federal law in this area. There are several significant problems with the CFPB's arguments.

***First***, as set forth in Defendants' motion for summary judgment, Congress never authorized the CFPB (or the Federal Trade Commission "FTC") to regulate attorneys, or craft regulations to identify which attorneys are "practicing law" and which are not. Rather, Congress did just the opposite: Congress instructed the CFPB to respect the state law regulation of attorneys. *See* 12

U.S.C. § 5517(e). The States have defined and regulated the practice of law for over 200 years, and Congress did not invite the CFPB to interpose itself into that arena.

***Second***, the undisputed facts show that Defendants were, in fact, practicing law when they represented clients in their dealings with their mortgage lenders. The CFPB criticizes virtually every aspect of CFLG and The Mortgage Law Group ("TMLG"). The CFPB derisively suggests their attorneys did "too little," their paralegals did "too much," and their success rate was "too low." However, there is no legal authority behind the CFPB's rhetoric. The CFPB does not cite any legal authority to even remotely suggest that such criticisms (even if true, which they are not) would somehow remove a law firm from the "practice of law." Between them, TMLG and CFLG represented over 6000 clients. They submitted completed mortgage modification materials for approximately 50% of those clients, and secured successful re-financings for approximately 25% of those clients. (Def. Resp. to Pl. Stat. of Prop. Find. of Fact ("Pl. PFOF") at ¶ 62 In many instances, CFLG and TMLG permitted their clients to stay in their homes for weeks or months beyond originally scheduled foreclosure dates. *Id.* Such advocacy on behalf of clients is the essence of the practice of law. Moreover, contrary to the CFPB's claims that TMLG and CFLG fleeced their clients, the undisputed record shows that TMLG and CFLG actually lost money. Their principal owners, Macey and Aleman, were not able to recover their original investment in the companies. (Defs' Prop. Find. of Fact ("Defs' PFOF") (Dkt. 112) at ¶¶ 55, 56, 57, 114, 115)

***Third*** there is no basis for summary judgment against any of the individual Defendants. Macey and Stafford were not involved in the daily management or operation of either firm. With respect to Searns and Aleman, even if corporate violations of Regulation O and the Consumer Financial Protection Act, 12 U.S.C. § 5301, *et seq.,* could be shown (and they cannot), there are

disputed facts regarding the extent of their management and their roles in the operations of the firms.

## I. The CFPB Statement of Facts Is Deficient.

Defendants have concurrently filed a paragraph-by-paragraph response to the CFPB's proposed statement of facts. There are, however, a number of specific issues raised by the CFPB's "facts" that merit specific responses.

***First***, the CFPB has not properly authenticated its exhibits. The CFPB's counsel, Seth Popkin, attempts to authenticate every exhibit filed in support of the motion for summary judgment. (*See* Popkin Decl. (Dkt. 104); Pl. Mot. Summ. J. Exs. 1-37 (Dkt. 101-1-101-37; Dkt. 103-1-103-5)) But that is not proper because Mr. Popkin does not have personal knowledge regarding the generation and content of those documents. *See* Fed. R. Evid. 602; *see also Stocker v. Kalahari Dev., LLC*, No. 06-C-366-C, 2007 WL 1140246, at *1 (W.D. Wis. Apr. 16, 2007) (noting that "the court will disregard proposed findings of fact not supported by admissible evidence); *Drake v. Minnesota Min. & Mfg. Co.*, 134 F. 3d 878, 887 (Statements of facts lacking foundation of personal knowledge are insufficient on a motion for summary judgment). For example, Mr. Popkin purports to authenticate Exhibits 10-12, 18, 23 and 30, which are documents produced in response to subpoenas issued to Kelly Sibert, Daniel Ruggiero and William Harrington. Mr. Popkin has no personal knowledge with respect to those documents. Similarly, Mr. Popkin has no personal knowledge with respect to Exhibits 20, 26 and 27, which are documents produced by Meracord, a third-party payment processor.

***Second,*** the CFPB has filed a proposed statement of facts that is improperly argumentative. Indeed, the CFPB's proposed statement of facts is littered with references to "so-called national law firms," "national law firm schemes," "national law firm ruses," "boiler room sales tactics,"

"pressure" on attorneys to approve files, and TMLG and CFLG "failing." Such argumentative terms have no place in a statement of facts. The "so-called national law firms" were in fact national law firms, and they obtained loan modifications for many of their clients. *See, e.g.*, Def. Resp. Pl. PFOF ¶¶ 31-37, 39, 41, 46, 53, 62, 70, 71, 126.

***Third,*** the CFPB has mischaracterized the evidence and the testimony of certain witnesses. A few examples make the point:

- Throughout the CFPB's proposed statement of facts, the CFPB repeatedly references TMLG and CFLG "salespeople." *See, e.g.*, Pl. PFOF (Dkt. 101) at ¶ 19, 67. None of the witnesses referred to TMLG or CFLG as having employed "salespeople." Rather, TMLG and CFLG employed client intake specialists, whose role was to explain the firms' representation and program to a prospective client, answer any initial questions, gather information from the client, and forward the information to an attorney for review. *See, e.g.*, Def. Resp. Pl. PFOF ¶ 19.

- The CFPB states that Macey had managerial responsibility for TMLG and CFLG, and that Stafford had managerial responsibility for CFLG after July 2012. *See* Pl. PFOF (Dkt. 101) ¶¶ 12, 19. Those statements are not supported by the evidence. Both Macey and Stafford testified that they did not have ***any*** managerial responsibilities with respect to those entities. *See, e.g.*, Def. Resp. Pl. PFOF ¶¶ 12, 29, 216, 242-43, 245-46.

- The CFPB states that calling certain attorneys "partners" or "Class B members" of TMLG is misleading, that they did not "serve in a traditional attorney role," and that they were nothing more than "local counsel" *See* Pl. PFOF (Dkt. 101) at ¶¶ 37, 47, 90, 94. That statement of "fact" is not only argumentative, but it is just flat wrong. All of the Class B Attorneys for the firms signed partnership or membership agreements with those firms, and they ***were*** full partners and/or members of the respective firms. *See* Def. Resp. Pl. PFOF ¶¶ 37, 46, 90, 94.

- The CFPB characterizes the attorney review of client files as "duplicative." *See* Pl. PFOF (Dkt. 101) at ¶¶ 38, 90, 114. Again, this statement of "fact" is not only argumentative, but it is wrong. The attorney review was essential to the operation of the law firm, and the attorneys were responsible for reviewing and supervising non-attorneys' work in that regard. *See* Def. Resp. Pl. PFOF ¶¶ 38, 90, 114.

- The CFPB characterizes certain consent orders between the law firms and certain states as "prohibiting the companies from doing business in those states." *See* Pl. PFOF (Dkt. 101) at ¶¶ 51, 61. However, three of the four consent orders were entered after the firms stopped taking new clients (and the fourth permits TMLG to

continue to service existing clients). Two of the four were entered after the firms stopped doing business altogether. *See* Def. Resp. Pl. PFOF ¶¶ 51, 61.

- The CFPB claims that Class B Attorneys approved close to 100% of the client intake and loan modification files that were sent to them for review (and, as discussed below, improperly cites to a single attorney for that proposition). *See* Pl. PFOF (Dkt. 101) ¶¶ 107, 126. However, that attorney noted that he "was the second set of attorney eyes on [the file and] if there was a really fatal problem with either the intake or submission, they may not even have been sent over to me." *See* Def. Resp. Pl. PFOF ¶¶ 107, 126.

- The CFPB claims that one attorney testified that "each time" he declined to approve a loan modification submission, headquarters attorneys directed him to approve it anyway. *See* Pl. PFOF (Dkt. 101) at ¶ 125. That is ***not*** what that attorney said. Rather, the attorney testified that, on occasion, he was told to approve a file where the firm was simply waiting on a particular document, and it was expected to have that document prior to the file's submission to the lender. *See* Def. Resp. Pl. PFOF ¶ 125

***Fourth,*** the CFPB frequently cites to a single Class B Attorney's testimony and then applies that testimony to ***all*** Class B Attorneys. That is improper. For example, the CFPB states that "local attorneys did not agree to or approve of being listed as a partner, and did not know they were listed as a partner[.]" Pl. PFOF (Dkt. 101) at ¶ 95. The CFPB cites only to the testimony of Jacqueline Delgado for that statement. However, the Class B Agreements specifically state that the Class B Attorney agrees to be listed as a partner of the firm. *See* Def. Resp. Pl. PFOF ¶ 95. Similarly, the CFPB cites to two attorneys for the proposition that intake files were reviewed in 1-2 minutes and submission files were reviewed in five minutes. *See* Pl. PFOF (Dkt. 101) at ¶¶ 104, 121. However, other Class B Attorneys testified that a proper review of an intake file in accordance with the guidelines took approximately 30-45 minutes, and a proper review of a submission file could take up to 90 minutes. *See* Def. Resp. Pl. PFOF ¶¶ 104, 121.

***Fifth,*** the CFPB has not complied with this Court's standing order that requires each fact to be "proposed in a separately numbered paragraph, limited as nearly as possible to a single factual proposition." J. Crabb Standing Procedure on Mot. Summ. J. at § I(B)(1). The CFPB has filed a

proposed statement of facts that contains many "facts" that are compound, and the statement of facts contains a great deal of duplication throughout. Consequently, Defendants have been forced to parse through an unnecessarily long and confusing statement of "facts" to provide this Court with a response.

## II. The CFPB's Motion Fails For The Reasons Set Forth In Defendants' Motion For Summary Judgment.

The CFPB's motion for summary judgment fails for the reasons set forth in Defendants' motion for summary judgment, accompanying memorandum and statement of facts. (Dkt. 96, 98, 100, 102, 105-10, 112, 113) Rather than re-state the points and authorities set forth in those materials at length in this brief, Defendants simply incorporate them by reference herein. One point, however, bears particular emphasis, *i.e.*, the FTC (and the CFPB) promulgated the MARS Rule, 16 C.F.R. § 322 (2011), and Regulation O, 12 C.F.R. § 1015.1 *et seq.*, without any Congressional authority to regulate attorneys or the practice of law. When it promulgated the MARS Rule, the FTC explained the rationale behind its decision to expand the regulation to apply to some (but not all) attorneys. *See* 75 F.R. 10707, 10723-25. It is noteworthy that the FTC's explanation on that point made absolutely no mention of any Congressional authority. *Id.* On the contrary, the FTC candidly acknowledged that the idea to regulate attorneys came not from Congress, but from ***other regulators.*** According to the FTC, state regulators were frustrated that their own state assemblies had exempted attorneys from the coverage of various state statutes (likely because, under the laws of most states, neither the general assembly nor executive branch agencies had the power to regulate attorneys). *Id.* Those state regulators urged the FTC to draft the MARS Rule to encompass attorneys. Such pressure, however, is not a substitute for Congressional authority.

## III. Counts I-VIII Fail Because Defendants Satisfy The Attorney Exemption Contained In Regulation O.

Regulation O contains a two-part attorney exemption. Section 1015.7(a) provides that an attorney is exempt from all parts of Regulation O except Section 1015.5 if the attorney:

> (1) Provides mortgage assistance relief services a part of the practice of law;
>
> (2) Is licensed to practice law in the state in which the consumer for whom the attorney is providing mortgage assistance relief services resides or in which the consumer's dwelling is located; and
>
> (3) Complies with state laws and regulations that cover the same type of conduct the rule requires.

12 C.F.R. § 1015.7(a). An attorney is also exempt from Section 1015.5 if the attorney:

> (1) Deposits any funds received from the consumer prior to performing legal services in a client trust account;
>
> (2) Complies with all state laws and regulations, including licensing regulations, applicable to client trust accounts.

12 C.F.R. § 1015.7(b). As set forth in Defendants' motion for summary judgment and accompanying materials (incorporated herein by reference), Defendants are not required to satisfy the criteria in Section 1015.7 because that provision was promulgated without Congressional authorization and is arbitrary and capricious. (Def. Mem. (Dkt. 113) at 16-27) However, the undisputed evidence shows that Defendants do satisfy those criteria. (*Id.* at 27-30)

### A. Defendants Were Engaged In The Practice Of Law.

In its motion for summary judgment, the CFPB asserts that Defendants were not engaged in the practice of law. The CFPB is wrong on this point.

#### 1. The CFPB Is Improperly Asking This Court To Create A New Federal Common Law Definition Of The Practice Of Law.

As the CFPB acknowledges, TMLG and CFLG represented clients in at least 35 different states. Thus, to determine whether Defendants were "practicing law" in those states, one must

analyze the law in each of those states. That is because the states – not the federal government – have been charged with defining and regulating the practice of law for over 200 years. *See Middlesex Co. Ethics Committee v. Garden State Bar Association*, 457 U.S. 423 (1982); *Amer. Bar. Assoc. v. Fed. Trade Comm.*, 430 F.3d 457, 471 (D.C. Cir. 2005).

The CFPB pays lip service to that fact, and correctly notes that defining and regulating the "practice of law" is an issue of state law that "may vary based on state laws and licensing regulations, as interpreted by state courts and state bars." (Pl. Mem. at 6; citing 75 Fed. Reg. 75092, 75130-31) Incredibly, however, the CFPB does not follow that statement with any meaningful analysis of state law. Instead, the CFPB devotes a total of only one (1) paragraph to discussing state law on this issue. (*See* Pl. Mem. (Dkt. 99) at 6-7) In that lone paragraph, the CFPB cites only a handful of authorities (some of which relate to the unauthorized practice of law, which is irrelevant here).[1] Those authorities are utterly beside the point: when examining the "practice of law," the starting point must be the Rules of Professional Conduct as adopted in each state, as interpreted by the relevant bar authorities and state supreme courts.

On the basis of that handful of authorities, the CFPB offers this Court a single, amalgamated definition of what constitutes "the practice of law." (Pl. Mem. (Dkt. 99) at 6-7) Simply put, the CFPB is trying to take a short cut: the CFPB is attempting to avoid the burden of addressing at least 35 different state laws by asking this Court to adopt a single definition of the "practice of law" for use nationally. In other words, the CFPB is asking this Court to establish a

[1] Authorities discussing the unauthorized practice of law by non-attorneys are not helpful in this context. That is because there are some tasks (*e.g.*, drafting a contract) that are not considered the practice of law when undertaken by a non-lawyer, but which are considered the practice of law when undertaken by an attorney (or a non-attorney working at the direction of an attorney). *See Persels & Assoc., LLC v. Banking Comm.*, 318 Conn. 652, *13 (Conn. 2015) ("Rather, it is well established that there are a number of services that may legally be provided by laypeople but, when performed by attorneys, constitute the practice of law.").

federal common law standard for what constitutes the "practice of law." This is improper, and seeks to upset state control over this issue. *See Middlesex Co. Ethics Committee*, 457 U.S. 423; *Amer. Bar. Assoc.*, 430 F.3d 457.

In addition to reasons of federalism, this Court should also refrain from creating a new national federal standard on this issue because there are substantial differences in state law with respect to the definition and regulation of the practice of law. Many states courts have adopted some version of the ABA Model Rules of Professional Conduct ("Model Rules"), either entirely or in part, which serve as a general guide for attorney conduct. However, the Model Rules are non-binding, and state courts have modified them considerably. Indeed, as the Model Rules themselves note, "[t]he practice of law is established by law and varies from one jurisdiction to another." MODEL RULES OF PROF'L CONDUCT R. 5.5 cmt. (2013). In total, there are 58 different Model Rules. Several states, however, have gone beyond that and issued rules for which there is no comparable Model Rule.[2] As such, an attempt to create a uniform definition of the practice of

[2] *See* IND. RULES OF PROF'L CONDUCT R. 6.7 (stating that lawyers must report annual pro bono hours and financial contributions to the state bar foundation and legal services organizations); NEV. RULES OF PROF'L CONDUCT R. 7.2a (2012) (requiring that a copy or recording of an advertisement must be filed with the state bar); MICH. RULES OF PROF'L CONDUCT R. 6.6 (amended 2011) (maintaining that lawyers are not subject to certain state ethics rules when rendering short-term limited legal services for a non-profit or court program without the expectation of continuing representation); S.C. RULES OF PROF'L CONDUCT R. 1.19 (amended 2013) (providing that lawyers must keep detailed, written succession plans in the event of their death and register their successor with the South Carolina Bar); VA. RULES OF PROF'L CONDUCT R. 5.8 (describing specific procedures that lawyers must follow when leaving or dissolving a law firm) (amended 2015). Washington incorporates limited license legal technicians ("LLLT"), which are individuals that are trained to provide limited legal services in approved practice areas, into its state ethics rules. WASH. RULES OF PROF'L CONDUCT R. 5.9 (2015) (outlining rules for a lawyer and LLLT doing business together); WASH. RULES OF PROF'L CONDUCT R. 5.8 (2015) (describing that lawyers and LLLT's may not engage in the practice of law while inactive or suspended); WASH. RULES OF PROF'L CONDUCT R. 5.10 (2015) (providing that a lawyer who employs and LLLT has the duty to supervise the LLT to ensure compliance with state ethics rules).

law ignores substantial differences in state law and the ultimate power of state courts to regulate the legal profession. Two examples make the point.

***First***, under Model Rule 5.7, law-related services are those performed in conjunction with legal services and are not prohibited as the unauthorized practice of law when completed by a non-lawyer. MODEL RULE OF PROF'L CONDUCT R. 5.7(b) (amended 2013). However, Model Rule 5.7 has not been adopted by 11 states.[3] Moreover, Ohio (which has adopted Model Rule 5.7) adopted a modified version that requires lawyers owning an interest in a law-related services business to disclose it to clients and advise them of their right to seek legal services elsewhere. OHIO RULE OF PROF'L CONDUCT R. 5.7 (2007). Similarly, Pennsylvania adopted Model Rule 5.7, but mandates that a lawyer affiliated with a non-legal services entity comply with ethics rules if a client may believe that an attorney-client relationship exists. PA. RULES OF PROF'L CONDUCT R. 5.7 (2014). Therefore, even in states that adopt a Model Rule, additional modifications create further variation in the regulation of the practice of law.

***Second***, states vary widely in their definition of the practice of law. For instance, in Alabama, the practice of law encompasses appearing in court, giving legal advice, drafting documents that affect legal rights, preventing wrongs, enforcing rights, and settling disputed accounts. ALA. CODE § 34-3-6. However, in Alaska, the practice of law is limited to those who hold themselves out as attorneys, and either appear in court or prepare documents affecting a person's legal rights for compensation. ALASKA STAT. § 09.08.230. Arkansas declines to proffer an opinion on the practice of law whatsoever because it finds a comprehensive definition impossible to define. *See Arkansas Bar Assn. v. Block*, 323 S.W.2d 912, 914 (Ark. 1959). Another

[3] *See Rules of Prof'l Conduct for* Alabama, Connecticut, Kentucky, Louisiana, Montana, Nevada, New Jersey, New York, Texas, Wisconsin, and Hawaii).

example of variation appears in the context of debt collection. Debt collection is considered the practice of law in some jurisdictions, but not in others. *Compare State ex rel. Doyle v. Frederick J. Hanna & Associates, P.C.*, 695 S.E.2d 612, 615 (Ga. 2010) *with Schroyer v. Frankel*, 197 F.3d 1170, 1176-77 (6th Cir. 1999).

The handful of authorities cited by the CFPB for its definition of the "practice of law" do not help it. Those authorities do not provide a firm (much less uniform) definition for the "practice of law." On the contrary, those authorities simply underscore the difficulty of defining the "practice of law." For instance, the CFPB cites a Rhode Island statute, R.I. Gen. Laws Ann. § 11-27-2, for the proposition that the practice of law includes "the preparation of an instrument that 'requires legal knowledge and capacity.'" However, in its entirety, the statute takes a much broader view, and states that the practice of law:

> means the doing of any act for another person usually done by attorneys at law in the course of their profession, and *without limiting the generality of the definitions in this section*, includes the following
> ...
> (4) The preparation or drafting for another person of a will, codicil, corporation organization, amendment, or qualification papers, or any instrument which requires legal knowledge and capacity and is usually prepared by attorneys at law.

R.I. Gen. Laws Ann. § 11-27-2 (emphasis added). Moreover, the Rhode Island Supreme Court addressed this statute in *In re Town of Little Compton*, 37 A.3d 85 (RI. 2012) stating that, "[w]e are aware of the Legislature's efforts in attempting to codify a concept that is inherently difficult to define," and that "[the statute] may serve to aid this Court in its duty to regulate such activity, but may not in and of itself 'grant the right to anyone to practice law save in accordance with standards enunciated by this [C]ourt.'" 37 A.3d 85, 91-92 (R.I. 2012).

Similarly, the CFPB cites a North Carolina statute, N.C. Gen. Stat. Ann. § 84.2.1, for the proposition that the practice of law is limited to "actual legal services." However, that statute

includes a non-exhaustive list of examples, and provides that "the above reference to particular acts which are specifically included within the definition of the phrase 'practice of law' shall not be construed to limit the foregoing general definition of the term, but shall be construed to include the foregoing particular acts, as well as all other acts within the general definition." *Id.* The CFPB does not cite or address that additional language.[4]

### 2. The Law Firms Were Engaged In The Practice Of Law.

In its motion for summary judgment, the CFPB takes great issue with the manner in which TMLG and CFLG operated. The CFPB contends those firms performed work that was "too simple" to be legal in nature, delegated "too much" work to paralegals, exercised "too little" supervision over those paralegals, and achieved "too little" in the way of results for their clients. On the basis of those claims, the CFPB asks this Court to find that Defendants were not attorneys engaged in the "practice of law." None of those arguments have any legal merit.

***First***, the CFPB suggests that renegotiating or modifying a mortgage is a simple process that may be performed by non-lawyers, and is, therefore, not the practice of law. (*See*, *e.g.*, Mem. at 6-11) The CFPB is wrong. An attorney's representation of a client in restructuring a secured debt obligation (which is what a home mortgage is) is unquestionably the practice of law. Every day, attorneys throughout the country engage in that task. They range from solo practitioners who

[4] As a rule, the CFPB cites authority too narrowly. Virtually every authority cited by the CFPB on page 7 of its memorandum contains language (which is uniformly omitted by the CFPB) that emphasizes the broad, vague and fact-specific nature of the practice of law. *Massachusetts Conveyancers Assn. Inc. v. Colonial Title & Escrow, Inc.*, 2001 WL 669280, at *5 (Mass. Super. 2001) ("Whether a particular activity constitutes the practice of law is fact specific," and a "comprehensive definition would be impossible to frame."); *Gmerek v. State Ethics Commission*, 751 A.2d 1241, 1255 (Pa. Cmwlth. 2000) ("[t]here is no need for present purposes to venture upon a comprehensive survey of the boundaries—necessarily somewhat obscure—which limit the practice of law. An attempt to formulate a precise definition would be more likely to invite criticism than achieve clarity.").

represent individual homeowners, to the bankruptcy, banking, and corporate finance departments of firms such as Kirkland & Ellis, Perkins & Coie, and Foley & Lardner which represent corporations in negotiating commercial mortgage transactions. No doubt, all would be equally surprised to learn that the CFPB believes they are not engaged in the practice of law. Not surprisingly, the CFPB cites no authority, and no principled basis, for the proposition that an attorney who represents a client in restructuring a mortgage (even something as "simple" as a residential mortgage) is not practicing law.

***Second***, the CFPB's claim that many of the tasks performed by TMLG and CFLG (*e.g.*, filling out forms, contacting clients to obtain financial records, reviewing guidelines provided by bank lenders) could also be performed by non-lawyers proves too much. The truth is that ***many*** – if not ***all*** – of the tasks performed by attorneys could also be performed by non-lawyers. For example, non-lawyers can draft contracts, interview witnesses, draft legal briefs and even (if they are *pro se*) examine witnesses in a courtroom. That is why courts (and bar authorities) have expressly found that the standard posed by the CFPB (*i.e.* "could a task be done by a non-attorney") is ***not*** the proper standard to use in determining whether an attorney is practicing law. Indeed, it is well-settled that many tasks that do not constitute the practice of law (when performed by non-lawyers) do constitute the practice of law (when performed by lawyers, or by non-lawyers working under the supervision of lawyers). *See* MODEL RULES OF PROF'L CONDUCT R. 5.5(c)(4) cmt. (2013); CONN. RULES OF PROF'L CONDUCT R. 5.5(c)(4) cmt. (2015); WIS. SCR 20:5.5 cmt.; ILL. RULES OF PROF'L CONDUCT OF 2010 R. 5.5(c)(4) cmt. (2015); IND. RULES OF PROF'L CONDUCT R. 5.5(c)(4) cmt. 2015); *see also Gmerek*, 751 A.2d at 1255-56 ("[I]n determining whether the activities…constitute the 'practice of law' when performed by lawyers, it is not dispositive that non-lawyers may also perform such activities.").

***Third***, in determining whether an attorney is practicing law, state bar authorities and courts have focused on the nature of the overall representation rather than the nature of each individual task performed in furtherance of that representation. *See Savings Bank v. Ward*, 100 U.S. 195, 199 (1879) ("Persons acting professionally in legal formalities, negotiations, or proceedings by the warrant or authority of their clients may be regarded as attorneys at law within the meaning of that designation as employed in this country."). In short, if a client retains a firm to handle a task that is legal in nature (*e.g.*, defending a speeding ticket, securing a divorce, enforcing a note, or modifying a mortgage), ***all*** of the work performed on that engagement constitutes the practice of law – regardless of whether it is complex (*e.g.*, preparing an appellate brief) or simple (*e.g.*, obtaining a police report, or assembling a loan application). That is why authorities – including those cited by the CFPB – have universally found that "the practice of law" cannot be narrowly limited to certain defined types of activities. *See Gmerek*, 751 A.2d at 1255 ("[I]t is important to stress that the 'practice of law' is not limited to a lawyer's appearance in court."). As the South Carolina Supreme Court has explained:

> it is too obvious for discussion that the practice of law is not limited to the conduct of cases in courts. According to the generally understood definition of the practice of law in this country, it embraces the preparation of pleadings, and other papers incident to actions and special proceedings, and the management of such actions and proceedings on behalf of clients before judges and courts, and in addition, conveyancing, the preparation of legal instruments of all kinds, and, in general, all advice to clients, and all action taken for them in matters connected with the law. An attorney at law is one who engages in any of these branches of the practice of law.

*In re Duncan* 65 S.E.210, 211 (S.C. 1909); *see also Clark v. Austin*, 101 S.W.2d. 977, 982 (Mo. 1937).[5]

---

[5] *See also Arkansas Bar Assn. v. Block*, 323 S.W.2d 912, 914 (Ark. 1959); *Koscove v. Bolte*, 30 P.3d 784, 786 (Colo. App. 2001); *State Bar Association of Connecticut v. Connecticut Bank & Trust Co.*, 140 A.2d 863, 870 (Conn. 1958); *State ex rel. The Florida Bar v. Sperry*, 140 So.2d 587, 591 (Fla. 1962); *Fought & Co., Inc. v. Steel Engineering and Erection, Inc.*, 951 P.2d 487,

***Third***, the CFPB urges this Court to find that TMLG and CFLG were not engaged in the practice of law because the lawyers at those firms did "too little" and the paralegals at those firms did "too much." The CFPB does not present the Court with any authority for the proposition that attorneys somehow stop "practicing law" if they are assisted by non-lawyers. In fact, the law says just the opposite. The Rules of Professional Conduct in every state expressly permit attorneys to use non-attorneys to assist in their practices. *See* CONN. RULES OF PROF'L CONDUCT R. 5.3 (2015); DEL. RULES OF PROF'L CONDUCT R. 5.3 (2013); LA. RULES OF PROF'L CONDUCT R. 5.3 (2015); IDAHO RULES OF PROF'L CONDUCT R. 5.3 (2014); W. VA. RULES OF PROF'L CONDUCT R. 5.3 (2015). Non-attorneys are permitted to perform work provided they are adequately supervised by attorneys. *See Unauthorized Practice of Law Committee v. Department of Worker's Compensation*, 543 A.2d 662 (R.I. 1988) (recognizing that actions of nonlawyer employee assistants would generally fall within the definition of the practice of law). The CFPB's memorandum does not contain any discussion of any iteration of Rule 5.3, or any argument that TMLG or CFLG failed to comply with that Rule. Nor can the CFPB credibly make such an argument. The undisputed evidence shows that attorneys (both in Chicago and in the clients' home states) reviewed all of the mortgage refinance packets prepared by the firms' paralegals before they were sent to lenders. Def. Resp. Pl. PFOF ¶¶ 90, 113, 114, 144. Such supervision is no different from what happens every day in virtually every law firm, judge's chambers or prosecutor's office in the country: a senior attorney reviews work product generated by a junior attorney or non-attorney to check its accuracy and completeness.

---

495 (Haw. 1998) ("Attempts to define the practice of law in terms of enumerating the specific types of services that come within the phrase are fruitless because new developments in society, whether legislative, social, or scientific in nature, continually create new concepts and new legal problems.'").

***Fourth***, the CFPB suggests that TMLG and CFLG were not practicing law because (according to the CFPB) their attorneys seldom spoke to the firms' clients. With respect, the CFPB is simply wrong on this. Def. Resp. Pl. PFOF ¶ 90. One Class B attorney testified that she frequently made calls to clients (about five clients per day) to answer questions, troubleshoot concerns, and provide legal advice over her tenue with TMLG. *Id.*

***Fifth***, the CFPB suggests that TMLG and CFLG were not practicing law because their success rates were "too low." As a threshold matter, the CFPB has not cited – and cannot cite – any authority for the proposition that an attorney stops "practicing law" if he or she fails to achieve a good result for his or her client. If that were the case, many attorneys who fail to achieve complete success for their clients would not (at least according to the CFPB) be "practicing law." Indeed, the CFPB apparently fails to appreciate that many consumer attorneys (including firms such as TMLG and CFLG) represent clients who seek representation only after placing themselves in positions of financial and legal jeopardy. Success in such circumstances is hardly assured. Moreover, TMLG and CFLG did not have a low success rate. They had a very good success rate. Those firms collectively had over 6000 clients. Def. Resp. Pl. PFOF ¶ 62. The firms submitted mortgage modification requests for 50% of those clients. *Id.* Approximately 1500 clients (about 25%) received successful loan modifications.[6] *Id.* Many more were allowed to stay in their homes for extended time periods due to ongoing negotiations between the firms and their mortgage

---

[6] Many of the remaining clients dropped out of the program, or failed to provide the information necessary to permit the firms to seek a loan modification.

lenders. *Id.* Compared to success rates for other types of consumer advocacy their rate is success is good, indeed.[7]

***Sixth***, the CFPB generally suggests that TMLG and CFLG failed to abide by the applicable Rules of Professional Conduct, and, therefore, are not attorneys. The only specific ethics rules raised by the CFPB are those relating to client trust accounts. As discussed below, TMLG and CFBP complied with those rules. More to the point, however, the CFPB does not cite – and cannot cite – any authority for the proposition that an attorney who violates a rule of professional conduct somehow stops "practicing law." There is no such authority. An attorney that violates a rule of professional conduct may be subject to sanction and discipline by an appropriate state bar authority. However, absent suspension by the bar authority, the attorney does not stop practicing law simply by virtue of having violated a rule.

**B. Defendants Were Properly Licensed.**

There is no dispute that Defendants were properly licensed to practice law in various states (Macey in Illinois, Aleman in Illinois and Wisconsin, Stafford in Wisconsin, and Searns in Colorado) during the time TMLG and CFLG were in business. (Pl. PFOF (Dkt. 101) at ¶¶ 13, 20, 25, 30) Similarly, there is no dispute that TMLG and CFLG were properly organized multi-jurisdictional firms with members/partners in the states where they represented clients. *See*

[7] Consumer debt solutions generally have very low success rates. The success rates for consumer bankruptcies is between 20-33% and mortgage loan modification plans have failure rates from 60-80%. *See e.g.*, RM Hunt, *Whither Consumer Credit Counseling?* (2005); W. Li, *What Do We Know About Chapter 13 Personal Bankruptcy Filings?* (2007), http://www.philadelphiafed.org/research-anddata/publications/business-review/2007/q4/li_chapter-13-filings.pdf; K. Porter, *Assessing Failure in Bankruptcy*, (2010), https://www.law.berkeley.edu/files/PorterBankruptcyCSLS19Apr10.pdf; J. Skiba, *When Bankruptcy Goes Bad: Why Chapter 13s Fail*, (2012); http://skibalaw.com/1278/when-bankruptcy-goes-bad-why-chapter-13s-fail/. David John & Ronald Utt, *12 Problems with the Obama Mortgage Stability Initiative Plan*, (Feb. 27, 2009), http://www.heritage.org/research/reports/2009/02/12-problems-with-the-obama-mortgage-stability-initiative-plan.

MODEL RULES OF PROF'L CONDUCT R. 5.5 (2013); ARK. RULES OF PROF'L CONDUCT R. 5.5 (2005); D.C. RULES OF PROF'L CONDUCT R. 5.5 (2007); IOWA SUP. CT. R. 32:5.5; MASS. RULES OF PROF'L CONDUCT R. 5.5 (2015). Accordingly, there is no dispute that this factor is satisfied.

### C. Defendants Complied With Applicable State Laws.

Defendants complied with all applicable laws, and the CFPB does not contend otherwise, except to the extent the CFPB contends that Defendants violated state ethics rules regarding the opening and maintenance of client trust accounts. That issue is addressed below.

### D. Defendants Had Trust Accounts And Complied With State Law Regarding Those Trust Accounts.

Under 12 C.F.R. 1015.7, a law firm must: (1) [d]eposit[] any funds received from the consumer prior to performing legal services in a client trust account; and (2) [c]ompl[y] with all state laws and regulations, including licensing regulations, applicable to client trust accounts. The CFPB claims TMLG and CFLG did not meet those requirements. The CFPB is wrong.

To understand this issue, an analysis of state law (which is missing from the CFPB's memorandum) is necessary. Virtually every state bars law firms from co-mingling client funds and firm funds. *See, e.g.*, ARK. RULES OF PROF'L CONDUCT R. 1.15(a)(1) (2005); COLO. RULES OF PROF'L CONDUCT R. 1.15(a) (2014); MASS. RULES OF PROF'L CONDUCT R. 1.15(b) (2015); OR. RULES OF PROF'L CONDUCT R. 1.15-1(a) (2014). To prevent such co-mingling, virtually every state requires attorneys to maintain client trust accounts. *See, e.g.*, ALA. RULES OF PROF'L CONDUCT R. 1.15(f) (2009); HAW. RULES OF PROF'L CONDUCT R. 1.15(a) (2014); IND. RULES OF PROF'L CONDUCT R. 1.15(a) (2015); KAN. RULES OF PROF'L CONDUCT R. 1.15(a) (2007); ME. RULES OF PROF'L CONDUCT R. 1.15(b)(1) (2012). Similarly, virtually every state requires attorneys to deposit unearned fees into its client trust account. *See, e.g.*, DEL. RULES OF PROF'L CONDUCT R. 1.15(a) (2015); ILL. RULES OF PROF'L CONDUCT R. 1.15(a) (2015); NEV. RULES OF

PROF'L CONDUCT R. 1.15(a) (2006); NEB. RULES OF PROF'L CONDUCT R. 1.15(a) (2005); R.I. RULES OF PROF'L CONDUCT R. 1.15(a) (2007). In other words, if a law firm is holding funds that belong to the client (*e.g.*, unearned retainer fees, settlement proceeds, escrow funds), such funds must be held in the firm's client trust account. However, a law firm does not need to deposit earned fees into its client trust account. That is because earned fees are the property of the firm – not the client.

TMLG and CFLG did not hold client funds, or accepted unearned fees. Rather, TMLG and CFLG only accepted earned fees. Client fee payments were not transferred to TMLG or CFLG until a payment request was made. Def. Resp. Pl. PFOF ¶ 89. In short, there was no need (at least not under the applicable state laws) for either firm to deposit any funds into their client trust accounts. In short, Regulation O created an anomaly for TMLG and CFLG. It required them to: (1) deposit fees into a client trust account; and (2) to do so in conformance with state laws (which did not require that any earned fees be deposited into a client trust account). TMLG and CFLG complied with that requirement: they deposited earned fees into their trust accounts (which they were ***not*** required to maintain in those accounts) and then transferred those fees to the firms' operating accounts (where they could have been deposited in the first place).

**IV. Count IX-X Fail Because Defendants Are Attorneys.**

Counts IX and X arise under the CFPA. Therein, the CFPB alleges that Defendants engaged in deceptive practices by making certain representations to consumers. The CFPA contains an attorney exemption, which is far broader than the attorney exemption under Regulation O. Section 5517(e)(1) of the CFPA provides that: "Except as provided in Paragraph 2, the Bureau may not exercise any supervisory or enforcement authority with respect to an activity engaged in by an attorney as part of the practice of law under the laws of a State in which the attorney is

licensed to practice law." 12 U.S.C. § 5517(e)(1). Thus, attorneys are generally exempt from the CFPA. For the reasons set forth above, and in Defendants' motion for summary judgment, Defendants fall within that exemption.

## V. Counts III-VIII Fail Because Defendants Did Not Violate Regulation O's RequirementsRegarding Misleading Statements And Required Disclosures.

In Counts III-VIII, the CFPB, asserts that TMLG and CFLG engaged in a pattern of misstatements and omissions in their dealings with clients. In Counts IX-X, the CFPB asserts that the same conduct also violates the Consumer Financial Protection Act, 12 U.S.C. § 5301 *et seq.* In its memorandum, the CFPB complains that the following conduct constituted misrepresentations in violation of Regulation O:

- Intake coordinators of TMLG and CFLG told potential clients that lawyers would work on their behalf. (Pl. Mem. (Dkt. 99) at 15)
- TMLG and CFLG told potential clients that the modification process could take between 90 and 120 days. (*Id.* at 16)
- Intake coordinators of TMLG and CFLG either instructed or told potential clients to stop paying their mortgages. (*Id.* at 16-17)
- TMLG and CFLG advertised that clients would receive legal representation. (*Id.* at 17-18)
- TMLG and CFLG claimed their legal services were preferable to nonprofit housing counselors. (*Id.* at 18)
- TMLG and CFLG told clients not to speak with their lenders or servicers. *Id.* at 18
- TMLG and CFLG failed to make required disclosures to clients prior to entering into the retainer agreement as required by Regulation O. *Id.* at 19-20

Setting aside CFPB's serial characterizations of "boiler-room" tactics, the CFPB's allegations fail because they are not supported by the record.

***First***, despite its claims that TMLG and CFLG advertised their services on television and the internet, the CFPB does not cite to any actual advertisements to support this claim. In fact, the

undisputed facts show that neither TMLG nor CFLG did any advertising. Rather, they obtained clients in two ways: (1) direct contact by the client; or (2) via leads provided by third-party marketing and lead generation companies. Def. Resp. Pl. PFOF ¶ 63. Moreover, to the extent the CFPB's claims are based on statements made in advertisements or made orally by third party lead generators, such statements cannot be attributed to either TMLG or CFLG. Similarly, there is no evidence that any Defendants managed or controlled any lead generators, and they cannot be liable for their conduct.

***Second***, there is no evidence that TMLG or CFLG clients were ever promised or guaranteed they would receive a loan modification. In fact, the opposite is true. All TMLG and CFLG clients executed retainer agreements which repeatedly and expressly stated that the firms were not promising or guaranteeing a particular result. Def. Resp. Pl. PFOF ¶ 66. In its brief, the CFPB relies on declarations and "scripts" used by intake processors of TMLG and CFLG to support its claim that clients were misled as to the likelihood of obtaining loan modifications. (Pl. PFOF (Dkt. 101) ¶¶188-191) (Pl. Mem. (Dkt. 99) at 15, 21) However, client intake specialists were told ***not*** to promise or guarantee any particular result. Def. Resp. Pl. PFOF ¶ 66. In fact, the use of "the word 'guarantee' was not allowed." *Id.* TMLG and CFLG employed a compliance officer to ensure that nothing was promised or guaranteed to a potential client. *Id.*

***Third***, the CFPB's claim that clients were misled about the length of time required to obtain a mortgage modification is based on an incomplete sentence. The language cited by the CFPB is taken out of context, and states as follows when read in full: "[c]urrently, we are seeing many workouts take anywhere from 90-120 days; however, every case is unique based upon each client's servicer and circumstances." Def. Resp. Pl. PFOF ¶¶ 196, 197. The use of the word "however" is a qualifier that a reasonable person could not interpret as a guarantee either expressed or by

implication. As described in *Illinois v. Alta Colleges, Inc.*, No. No. 14 C 3786, 2014 WL 4377579, at *4 (N.D. Ill., Sep. 4, 2014), a statement is misleading when it "is 'likely to mislead the consumer,' and '[t]he consumer's interpretation…is reasonable under the circumstances.'"

The word "however" is a clear qualifier to the general statement that from experience, loan modifications may take between 90 to 120 days. The only reasonable interpretation of this language is that while it is possible that the modification can be accomplished within 90 to 120 days, it depends on the lender and other circumstances.

***Fourth***, the CFPB wrongly claims that clients were told to stop paying their mortgages. Def. Resp. Pl. PFOF ¶ 69. The undisputed evidence shows that nearly all (if not all) of TMLG and CFLG's clients had already stopped timely paying their mortgages before retaining those firms. Def. Resp. Pl. PFOF ¶ 212. Both TMLG and CFLG expressly advised their clients of the risks associated with not paying their mortgage. Def. Resp. Pl. PFOF ¶ 212. In addition, potential clients who were current on their mortgage were told to contact their lenders directly. Def. Resp. Pl. PFOF ¶ 68. More to the point, consumers who called TMLG and CFLG and were current on their mortgage were told to contact their lender directly, as the TMLG and CFLG programs only work for those who are already behind in their mortgage payments. *Id.*

***Fifth***, the CFPB argues that the services that TMLG and CFLG provided were not legal in nature and did not constitute the practice of law. On this point, Defendants direct the Court to the arguments set forth in Sections I and III of this response brief.

***Sixth***, the CFPB cannot credibly claim that clients were misled as to the availability or effectiveness of nonprofit counseling and other free services. Indeed, both the TMLG and CFLG Retainer Agreements provided as follows:

> It is not necessary to pay a third party to arrange for a loan modification or other form of forbearance from your mortgage lender or servicer. You may call your

> lender directly to ask for a change in your loan terms. Nonprofit housing counseling agencies also offer these and other forms of borrower assistance free of charge. A list of nonprofit housing counseling agencies approved by the United States Department of Housing and Urban Development (HUD) is available from your local HUD office or by visiting www.hud.gov.

Def. Resp. Pl. PFOF ¶ 192.

***Seventh***, both the TMLG and CFLG Welcome Letters expressly state that "we will not tell you not to speak with your servicer." Def. Resp. Pl. PFOF ¶ 208. In addition, both the TMLG and CFLG Retainer Agreements expressly stated that a client "may call [the] lender directly to ask for a change in…loan terms." *Id.* The advice provided to clients was actually much narrower: if a servicer contacted the client directly, TMLG and CFLG did not want clients to "engage in negotiations or workout discussions with [the] servicer." *Id.* That was because the client was "represented by an attorney at that point, so the lender was supposed to talk to the law firm." *Id.*

***Finally***, both TMLG and CFLG complied with Regulation O by providing disclosures in a clear and prominent manner in the client's engagement letters.

- "Client agrees that both parties may sever the relationship at any time." Def. Resp. Pl. PFOF ¶ 214(a).
- "Client may accept or decline any mortgage workout solution achieved by [the law firm]." Def. Resp. Pl. PFOF ¶ 214(b).
- Both the TMLG and CFLG Retainer Agreements provide for an accounting of fees earned through the date of cancellation and a refund of fees unearned. Def. Resp. Pl. PFOF ¶ 214(c).
- Both the TMLG and CFLG Retainer Agreements expressly set forth the structure of the payments to be made by the client and the timing of such payments. Def. Resp. Pl. PFOF ¶ 214(d).

Similarly, the scripts specifically addressed required disclosures. Def. Resp. Pl. PFOF ¶ 208. The CFPB cannot base a claim on the Welcome Packets because those materials were sent to clients after retention, and cannot be "commercial communications." *See* 12 C.F.R. 1015.2.

## VI. Counts IX-X Fail Because TMLG and CFLG Did Not Engage in Deceptive Practices In Violation Of The CFPA.

In Counts IX and X, the CFPB contends that the foregoing statements were also deceptive practices that violate 12 U.S.C. § 5531. Those claims fail for the same reasons as Counts III-VIII. "In order to establish that an act or practice is deceptive, the [CFPB] must establish that the representations, omissions, or practices likely would mislead consumers, acting reasonably, to their detriment." *FTC v. World Travel Vacation Brookers, Inc.* 861 F.2d 1020, 1029 (7th Cir. 1988). To establish liability the CFPB must establish that "(1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances, and (3) the representation was material." *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003) *citing FTC v. World Travel Vacation Brookers, Inc.*

As described in detail above, TMLG and CFLG did not mislead or misrepresent to any of their clients in the following: (1) the likelihood of obtaining a loan modification; (2) the amount of time it would take; (3) client obligation to make continued mortgage payments; (4) providing legal representation; or (5) the performance of nonprofit services. Moreover, there is no evidence that Defendants engaged in any advertising. Indeed, it is undisputed that both TMLG and CFLG did not advertise their services. Def. Resp. Pl. PFOF ¶ 65.

## VII. The Individual Defendants Cannot Be Held Individually Liable For Corporate Violations Of Regulation O Or The CFPA.

The CFBP seeks to hold all four individual Defendants individually liable for any violations of Regulation O or the CFPA by TMLG and/or CFLG. Because neither firm violated Regulation O or the CFPA, none of the Defendants can be individually liable. Moreover, there is no evidence that either Searns or Aleman had any involvement in advertising for either firm. Def.

Resp. Pl. PFOF ¶¶ 63, 65. Similarly, Macey and Stafford cannot be held individually liable for the actions of TMLG and CFLG. The undisputed evidence does not support their active involvement in the conduct or day-to-day operations of either TMLG or CFLG.

The parties agree on the law on this issue: to hold an individual liable for a corporate violation of Regulation O or the CFPA, the CFPB must meet a multi-step test.[8]

> An individual may be held liable under the FTCA for corporate practices if the FTC first can prove the corporate practices were misrepresentations or omissions of a kind usually relied on by reasonably prudent persons and that consumer injury resulted. Once corporate liability is established, the FTC must show that the individual defendants participated directly in the practices or acts or had authority to control them. Authority to control the company can be evidenced by ***active involvement in business affairs and the making of corporate policy***, including assuming the duties of a corporate officer. The FTC must then demonstrate that the individual had some knowledge of the practices. The knowledge requirement is the key issue in this case.

*Fed. Trade Comm'n v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989) (emphasis added). Knowledge can be established by evidence of "actual knowledge, of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth." *Id.* at 574. The degree of participation in the business affairs also factors into to the court's analysis of knowledge. *Id.*; *see also see also Fed. Trade Comm'n v. World Media Brokers*, 415 F.3d 758, 763-64 (7th Cir. 2005).

In an attempt to meet this heavy burden, the CFPB grossly misrepresents the evidence with respect to Macey's involvement (or lack thereof) in TMLG and CFLG. The undisputed evidence shows that Macey had no involvement in business operations or the creation of corporate policy, much less an ***active*** role. Def. Resp. to Pl. PFOF ¶¶ 9, 12, 216, 217, 218 (a)-(d), 219, 220, 221, 222, 223, 224 (a)-(c). Macey's role at TMLG and CFLG was merely that of an investor and limited

---

[8] The CFPB's ability to seek personal liability against individuals for corporate violations of Regulation O mirrors the FTC's ability to seek personal liability for corporate violations of the FTC Act. (*See* Pub. L. No. 11-24 § 511, 123 Stat. 529 (2009)).

partner. Def. Resp. to Pl. PFOF ¶ 9. The CFPB places great weight on the fact that Macey was the majority owner of both CFLG and TMLG, and therefore had the ability to exercise corporate control if he desired to do so. That, however, is not enough to satisfy the *Amy Travel* standard. If it were, personal liability would be automatic for the majority owner of any corporate violation. Rather, the CFPB must go further and show that Macey, in fact, played an active role in corporate management. The CFPB cannot make that showing.

While Macey may have had the ability to offer input into corporate affairs (by the simple fact that without his investment, the firms would not exist), ***the undisputed evidence shows he never did.*** Def. Resp. to Pl. PFOF ¶¶ 9, 12, 216, 217, 218 (a)-(d), 219, 220, 221, 222, 223, 224 (a)-(c). He did not participate in decisions regarding the content of the marketing materials, directing client processing managers, directing third-party vendors, addressing client matters, hiring, firing or training employees, or supervising support staff or paralegals. Def. Resp. to Pl. PFOF, at ¶ 12. Macey did not work on individual consumer files or have ***any*** direct contact with clients. Resp. 12. He did not address any consumer complaints or respond to inquiries from state regulatory agencies. Def. Resp. to Pl. PFOF ¶ 12. Accordingly, the CFPB cannot establish individual liability as to Macey on Counts I-X.

The same is true for Harold Stafford. The CFPB mischaracterizes the evidence presented regarding Stafford's decision-making authority and involvement in the daily operations of CFLG. Def. Resp. to Pl. PFOF, at ¶ 29, Def. PFOF, at ¶ 80. In July 2012, Stafford transferred 95% of the company to Macey and Aleman. Def. PFOF, at ¶¶ 77-78. After the transfer, Aleman took over all of the day-to-day management of the firm from an office in Chicago. Stafford had no further involvement in the management of CFLG. Def. PFOF, at ¶¶ 79, 80. In fact, he only visited the CFLG Chicago headquarters on three occasions. Def. Resp. to Pl. PFOF, at ¶ 243.

The CFPB claims that Stafford remained actively involved in CFLG through his "wide-ranging knowledge, participation, and control." Pl. Mem. (Dkt. 99) at 26. Nothing could be further from the truth. The following segment from Stafford's deposition very clearly illustrates this point:

Q. Were you ever apprised at all in the conversations with Mr. Aleman about the day-to-day activities of CFLG? This is post-July 2012.

A. No.

Q. Did you provide any training to CFLG staff after the transfer of the company?

A. No.

Q. Were you able to observe how CFLG operated on a day-to-day basis after the transfer to Mr. Macey and Mr. Aleman?

A. No.

Q. Were you involved in determining what retainer agreement would be used with the new consumers after the transfer?

A. No.

Q. Were in involved with the use of—were you involved with any decisions relating to what agreements would be used between local attorneys and CFLG after the transfer?

A. No.

Q. Were you involved in the consumer intake process after the transfer?

A. No.

Q. Were you involved in any marketing of CFLG services after the transfer?

A. No.

Q. Were you involved at all with determining what information went on CFLG's website after the transfer?

A. No.

Q. Were you involved at all in determining what fees would be charged to consumers for CFLG services after the transfer?

A. No.

Q. Were you involved with decisions on what scripts to use by CFLG staff after the transfer?

A. No.

Def. Resp. Pl. PFOF ¶¶ 245, 246.

Q. At the time that you transferred the company over to Mr. Macey and Mr. Aleman, did you provide them with any documents that were used in the provision of services to consumers before July 2012?

A. No.

Q. Were you ever asked to provide any documents that you had used prior to the transfer?

A. No, no.

Q. After the transfer, so after July of 2012, did you ever review consumer files at intake?

A. No.

Q. So all of my next questions are going to pertain to the period after July of 2012. Did you review consumer loan modification submission files?

A. No.

Q. Did you make any welcome calls to consumers?

A. No.

Q. Did you take calls from consumers?

A. No.

*Id.*

Clearly, the CFPB is grasping at straws to hold Stafford individually liable for CFLG's actions. However, after July 2012, Stafford did not monitor the firm's operations. He did not ask

about the management or operations of CFLG, and "assumed that they knew as attorneys how to operate their firm." Def. Resp. Pl. PFOF ¶ 245. To the extent Stafford was able to even observe company operations, he only participated in a few short conversations with Aleman regarding CFLG's enrollment process (all which occurred within the first six months of the firm being managed by Aleman). Def. Resp. to Pl. PFOF, at ¶ 243. The extent of Stafford's involvement ***at all*** in CFLG was limited to referring local attorneys to Colin Banyon and occasionally drafting letters to respond to client and regulatory agencies' complaints. Def. Resp. to Pl. PFOF, at ¶¶ 29, 238, 241, 246. Accordingly, the CFPB cannot establish individual liability as to Stafford on Counts I-X.

## VIII. The CFPB Is Not Entitled To The Relief It Is Seeking.

### A. The CFPB Is Not Entitled To Disgorgement Or Restitution Of All Fees Paid By CFLG And TMLG Clients.

CFPB requests this Court order disgorgement and restitution under 12 U.S.C. § 5565. (Mem. at 26-27) There are three significant problems with the CFPB's request for such relief.

***First***, the CFPB is seeking a windfall. The central purpose underlying disgorgement and restitution is to prevent unjust enrichment. *See SEC v. Frist City Fin. Corp*. Ltd., 890 F.2d 1215, 1230 (D.C. Cir. 1989) (stating that "[d]isgorgement is an equitable remedy designed to deprive a wrongdoer of his unjust enrichment."); *Health Cost Controls v. Skinner*, 44 F.3d 535, 538 n.7 (7th Cir. 1995) (providing that restitution is available "only when one party has been unjustly enriched at another's expense.") Here, many clients of TMLG and CFLG received mortgage loan modifications, and others received benefits in the form of extended tenancy, and in court defense. Accordingly, these clients will be unjustly enriched if compensated for benefits already incurred, contrary to the fundamental purpose of the respective remedies. Courts generally acknowledge that victims are not allowed to receive double compensation, or a windfall, for the same loss in the

case of restitution. *See e.g., U.S. v. Andrews*, 600 F.3d 1167, 1169 (9th Cir. 2010); *U.S. v. Elson*, 577 F.3d 713, 734 (6th Cir. 2009); *U.S. v. Beydoun*, 469 F.3d 102, 107–108 (5th Cir. 2006); *U.S. v. Arutunoff*, 1 F.3d 1112, 1121 (10th Cir. 1993); *U.S. v. Boscarino*, No. 02 CR 86, 2006 WL 2024250, at *1 (N.D. Ill., Jul. 13, 2006); *FTC v. Inc21.Com Corp.*, No. C 10-00022 WHA, 2010 WL 4071664, at *9 (N.D. Cal., Oct. 18, 2010). The same can be said for disgorgement. *See e.g., BASF Corp. v. Old World Trading Co.* Inc., 41 F.3d 1081, 1096 (7th Cir. 1994); *FTC v. Washington Data Resources*, 856 F.Supp. 2d 1247, 1281 (M.D. Fla. 2012) (stating that in order to obtain disgorgement the FTC bears the burden of proving "the 'reasonably approximate' amount of the defendant's unjust gain"); *In re Kowalski*, 402 B.R. 843, 849 (N.D. Ill. 2009); *In re Andreas*, 373 B.R. 864, 872 (N.D. Ill. 2007).

***Second***, the CFPB is incorrectly seeking restitution based upon the gross revenues received by TMLG and CFLG. Specifically, the CFPB demands restitution in the amount of $18,331,737 from TMLG, Macey, Aleman, and Searns, and $2,992,296 from CFLG, Macey, Aleman, and Stafford for "unlawful advance fees." (Mem. at 27) However, these amounts are improperly sought. As explained in *Greenbrier Leasing Co. LLC v. Carroll*:

> The use of a defendant's profits as a measure of restitution-a remedy analogous to consequential damages-is not the norm. As a noted treatise on remedies puts it, '[t]o require a defendant to give up profits may operate with particular severity because at least some of the profits would almost always be attributable to the defendant's efforts or investment.' Dan B. Dobbs, Law of Remedies § 4.1(4), 567 (2d ed.1993). Rather, 'the profit measure of restitution is extraordinary,' in the sense that it typically is found in cases of clear wrongdoing by the party unjustly enriched, such as breach of fiduciary duty. *Id.*
>
> Even when, for example, a court imposes a constructive trust on profits that a defendant has earned through wrongdoing, the appropriate measure typically is net profits, 'determined by reducing the gross revenues generated from the wrongfully-obtained business by those cost-of-sale items and other expenses which the court concludes were not fixed,' i.e., those costs that related directly to the wrongfully-obtained business.

2008 WL 4866037, at *9 (N.D. Ill., Jun. 17, 2008) (*quoting Hill v. Names & Addresses, Inc.*, 571 N.E.2d 1085, 1097 (Ill. 1991)); *see also William Elec. Games v. Garrity*, 366 F.3d 569, 576 (7th Cir. 2004) (finding in the commercial bribery context that "[t]he total profits would consist of the bribe itself…plus the revenue that the bribe generated for the briber, minus the cost of goods sold and any other variable costs incurred in making the sales that generated that revenue."). Accordingly, if this Court deems restitution a proper remedy, it should be calculated based upon net proceeds, instead of gross proceeds. This logically follows because gross proceeds do not reflect the actual profits received by Defendants because business expenses have not been deducted. If anything, any disgorgement or restitution from the individual Defendants should be based on their personal gains (or losses) from their involvement with these firms.

***Third***, the CFPB is wrongly claiming that all revenues received by TMLG and CFLG are advance fees. However, such is not the case. Each client paid an initial retainer, and then made subsequent periodic payments. While the initial retainer may qualify as an advance fee, the subsequent month payments would not, particularly in instances in which the fees were paid by clients who received a mortgage modification.

### B. A Permanent Injunction Is Improper Where The Alleged Wrong Is Incapable of Repetition.

CFPB asks this Court to permanently enjoin the Defendants from "marketing, selling, providing, offering to provide, or arranging for others to market, sell, or provide, any mortgage assistance relief services as defined in 12 C.F.R. 1015.2, and any debt relief products or services." (Mem. at 28) In seeking a permanent injunction, a case may be moot if the defendant can show that "there is no reasonable expectation that the wrong will be repeated." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953). Courts will consider such factors as "the effectiveness of the discontinuance" and "the bona fides of the expressed intent to comply" when determining

whether to grant such an injunction. *Id.* Here, it is impossible for the alleged wrongs to occur in the future. TMLG and CFLG no longer exist and there is no intent to revive them. Accordingly, CFPB's request for a permanent injunction should be denied. Moreover, an injunction that bars practicing attorneys from representing any client in any context in any future mortgage modification is speculative and overreaching. If, for example, Harold Stafford were to become a solo practitioner, and represent his neighbor in a mortgage modification (outside the structure of any firm such as CFLG), the CFPB would have no basis to bar him from such conduct.

**CONCLUSION**

For the reasons set forth above and in their response to Plaintiff's Statement of Facts Defendants respectively ask this Court to deny Plaintiff's Motion for Summary Judgment.

Dated: October 27, 2015

*/s/ Timothy D. Elliott*
Douglas M. Poland
Godfrey & Kahn, S.C.
1 East Main Street, Suite 500
Madison, WI 53703
608-257-3911
dpoland@gklaw.com

Timothy D. Elliott (*pro hac vice*)
Emily A. Shupe (*pro hac vice*)
Jordan R. Franklin (*pro hac vice*)
Rathje & Woodward, LLC
300 E. Roosevelt Rd., Ste. 300
Wheaton, IL 60187
telliott@rathjewoodward.com
eshupe@rathjewoodward.com
jfranklin@rathjewoodward.com
Telephone: (630) 668-8500

**COUNSEL FOR CONSUMER FIRST LEGAL GROUP, LLC, THOMAS MACEY, JEFFREY ALEMAN, JASON SEARNS, AND HAROLD STAFFORD**

**CERTIFICATE OF FILING & SERVICE VIA CM/ECF**

I, Timothy D. Elliott, an attorney, do hereby certify that on October 27, 2015, I electronically filed the above document with the clerk of the court by using the CM/ECF system. I further certify that a notice of electronic filing related to the above document was sent to all counsel of record.

Dated: October 27, 2015

/S/ Timothy D. Elliott