**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

CONSUMER FINANCIAL PROTECTION BUREAU,

Plaintiff,

v.

THE MORTGAGE LAW GROUP, LLP, (D/B/A THE LAW FIRM OF MACEY, ALEMAN & SEARNS), CONSUMER FIRST LEGAL GROUP, LLC, THOMAS G. MACEY, JEFFREY J. ALEMAN, JASON E. SEARNS, and HAROLD E. STAFFORD,

Defendants.

Case No. 3:14-cv-00513

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS


INTRODUCTION .......... 1

ARGUMENT .......... 2

I. As Shown By The Parties' Statements Of Facts, There Are No Disputed Material Facts .......... 2

II. Congress Never Authorized The FTC Or The CFPB To Regulate Attorneys, Or Define (Or Regulate) The Practice Of Law .......... 4

A. Regulation O's Attorney Exception Fails Under The First Prong Of *Chevron* .......... 5

B. Regulation O Fails Under The Second Prong of *Chevron* .......... 10

III. To The Extent It Seeks To Regulate Attorneys, Regulation O Fails Under APA .......... 13

IV. Defendants Satisfy The Attorney Exemption Contained In Regulation O .......... 14

V. Defendants Qualify Under The CFPA's Attorney Exemption .......... 18

VI. Summary Judgment Is Appropriate For Thomas Macey And Harold Stafford .......... 20

A. The CFPB's Claims Against Thomas Macey Fail As A Matter Of Law .......... 20

B. The CFPB's Claims Against Harold Stafford Fail As A Matter Of Law .......... 25

CONCLUSION .......... 26

# TABLE OF AUTHORITIES

## CASES


*Am. Bar Ass'n v. F.T.C.*, 430 F.3d 457 (D.C. Cir. 2005) ........ 8

*CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443 (7th Cir. 2010) ........ 10

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ........ 5, 9, 10

*Fed. Trade Comm'n v. Amy Travel Serv., Inc.*, 875 F.2d 564 (7th Cir. 1989) ........ 20, 24

*Fed. Trade Comm'n v. Construct Data Publishers*, No. 13-CV-1999, 2014 WL 7004999 (N.D. Ill. Dec. 11, 2014) ........ 21

*Fed. Trade Comm'n v. World Media Brokers*, 415 F.3d 758 (7th Cir. 2005). ........ 20

*Gadsen v. Newman*, 807 F. Supp 1412 (C.D. Ill. 1992) ........ 8

*Goldfarb v. Virginia State Bar*, 421 U.S. 773 (1975) ........ 8, 9, 10

*Heintz v. Jenkins*, 514 U.S. 291 (1995) ........ 8, 9

*In re Wilson Chemical Co.*, 64 F.T.C. 168 (1964) ........ 8

*Koscove v. Bolte*, 30 P.3d 784 (Colo. App. 2001) ........ 12

*Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229 (2010) ........ 8, 9

*State Bar Ass'n of Connecticut v. Connecticut Bank & Trust Co.*, 140 A.2d 863 (1958) ........ 12

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) ........ 1, 5


## STATUTES


12 U.S.C. § 5517(e) ........ 6

12 U.S.C. § 5538 ........ 5, 6

5 U.S.C. § 706(2)(A) ........ 13, 14

2009 Credit Card Accountability Responsibility and Disclosure Act, Pub. L. No. 11-24, § 511, 123 Stat. 524 (2009) ........ 6

2009 Omnibus Appropriations Act,
Pub. L. No. 111-8, § 626, 123 Stat. 524 (2009) ........ 6, 7

**RULES & REGULATIONS**

12 C.F.R. § 1015.1 ........ 4

12 C.F.R. § 1015.5 ........ 14. 15

12 C.F.R. § 1015.7 ........ 15, 16

12 C.F.R. § 1015.7(a) ........ 14, 15

12 C.F.R. § 1015.7(b) ........ 15

16 C.F.R. § 322 ........ 4

Fed. R. Civ. P. 56 ........ 26

ALA. CODE § 34-3-6 ........ 12

ALASKA STAT. § 09.08.230 ........ 12

**OTHER AUTHORITIES**

RM Hunt, *Whither Consumer Credit Counseling?* (2005) ........ 18

MODEL RULES OF PROF'L CONDUCT R. 1.1 (2013) ........ 17

MODEL RULES OF PROF'L CONDUCT R. 1.3 (2013) ........ 17

MODEL RULES OF PROF'L CONDUCT R. 1.4 (2013) ........ 17, 18

MODEL RULES OF PROF'L CONDUCT R. 1.5 (2013) ........ 17, 18

MODEL RULES OF PROF'L CONDUCT R. 1.15 (2013) ........ 17, 18

## INTRODUCTION

The CFPB is asking this Court to find that, in 2009, Congress authorized two federal executive branch agencies (the Federal Trade Commission ("FTC") and the CFPB) to create federal regulations that establish "certain criteria" to define and regulate the practice of law. (*See, e.g.*, Resp. at 13) If true, that would represent a dramatic departure from the typical Constitutional balance, in which the power to define and regulate the practice of law has been reserved to the states.

The problem with the CFPB's claim is that the CFPB cannot point to any statement by Congress that even remotely resembles a mandate to create federal regulations on this issue. There is no Congressional or statutory pronouncement that it wanted either agency to create or enforce rules regarding attorney conduct. Instead, the CFPB is asking this Court to believe that Congress made this bold gesture (*i.e.*, authorizing federal regulation in this area) in stealth, and without any express statement or finding. The Supreme Court has already stated that Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001). That holding has strong force in this case.

This Court should not be under any illusions regarding the extent to which the CFPB seeks to invade the area of attorney regulation. The CFPB has established "certain criteria relating to the practice of law" (*see* Pl. Resp. (Dkt. 118) at 6), and the CFPB is asserting that it has the right to enforce Regulation O against any attorney who "fail[s] to work diligently and competently on behalf of clients," "neglect[s] to keep clients reasonably informed as to the status of their matters," and "misrepresent[s] any material aspect of the legal services." (Pl. Resp. (Dkt. 118) at 41) In practical terms, that means the CFPB is arrogating to itself the power to determine whether attorneys are "diligent enough" or whether attorneys "communicate enough" with their clients.

Those attorneys who do not meet the CFPB's standards on such subjective issues are subject to expensive enforcement proceedings. That results in the federal regulation of the practice of law, plain and simple. [1]

## ARGUMENT

### I. As Shown By The Parties' Statements Of Facts, There Are No Disputed Material Facts.

In their motion for summary judgment, Defendants asserted that the key facts in this case were undisputed. The CFPB's response to the Defendants' proposed findings of fact ("Def. PFOF" (Dkt. 112)) shows that Defendants were correct. Indeed, the CFPB did not dispute the following:

- Aleman, Macey, Searns and Stafford were attorneys admitted to practice law. (Pl. Resp. to Def. PFOF (Dkt. 119) ("Pl. Resp. PFOF") at ¶¶ 8-11)
- Defendants provided certain legal services to its clients, including short sale services and cash for keys. (*Id.* at ¶¶ 34-35)
- Defendants did not do any advertising. (*Id.* at ¶¶ 45)
- Defendants' managing attorneys created policies and procedures to guide the work of support staff. (*Id.* at ¶ 99)
- Defendants' clients' Meracord accounts were not controlled by those firms or anyone on behalf of those firms, and the clients maintained signatory authority over those accounts. (*Id.* at ¶¶ 105-106)

In an effort to avoid summary judgment, the CFPB resorts to mischaracterizing evidence, making misleading statements, and quibbling over minor points. A few examples make the point:

- Despite admitting that the individual Defendants were licensed attorneys and that the corporate Defendants provided legal services to their clients, the CFPB repeatedly takes issue with Defendants calling TMLG and CFLG "law firms." (*See, e.g.,* Pl. Resp.

[1] Defendants incorporate herein by reference their Motion for Summary Judgment (Dkt. 96), their Memorandum of Law and supporting materials (Dkt. 113; Dkts. 97, 98, 100, 102, 105, 105-1-105-9, 106-110), their Proposed Findings of Fact (Dkt. 112) and their Answer to the CFPB's disputes thereto (filed concurrently with this reply brief), their Response to the CFPB's Motion for Summary Judgment (Dkt. 126); and their Response to the CFPB's Proposed Findings of Fact (Dkt. 124).

PFOF (Dkt. 119) at ¶¶ 12, 19) However, the CFPB does not actually cite any evidence to support its claim that TMLG and CFLG were ***not*** law firms. *Id.* Rather, the overwhelming evidence demonstrates that TMLG and CFLG were law firms that provided legal services to their clients in the area of mortgage relief. (Def. Ans. to Pl. Resp. PFOF at ¶¶ 12, 19)

- Similarly, the CFPB repeatedly disputes that the Class B Attorneys were partners or members of TMLG and CFLG, respectively. *See, e.g.,* Again, the CFPB does not cite to any evidence to support that contention, and it ignores the fact that every Class B Attorney signed a Class B Membership or Partnership Agreement with the respective firms. (*See* Pl. Resp. PFOF (Dkt. 119) at ¶¶ 29, 30, 87; *see also* Def. Ans. Pl. Resp. PFOF at ¶¶ 29, 30, 87)

- The CFPB disputes Defendants' proposed finding that "Upon attorney approval, the package would be sent to the mortgage lender to secure a refinance or other type of loan modification." (*See* Pl. Resp. PFOF (Dkt. 119) at ¶ 44) The CFPB goes on to state that it was actually a document processor, not a Class B Attorney who sent the package. *Id.* That is the effective equivalent of claiming that courtesy copies were never sent to a judge because a legal secretary, not an attorney, physically put them in the mail. That is absurd.

- The CFPB disputes a number of proposed findings in which Defendants reference the approximate numbers of clients and loan modifications obtained. (*See* Pl. Resp. PFOF (Dkt. 119) at ¶¶ 59, 60 71) The CFPB apparently does so because Defendants did not use exact numbers. However, the CFPB fails to explain why Defendants' use of "approximately 1,300 clients" is a material deviation from the exact number of 1,296 for purposes of the summary judgment motion. (*See* Def. Ans. Pl. Resp. PFOF at ¶ 60)

- The CFPB disputes Defendants' contentions that TMLG and CFLG were not profitable. (*See* Pl. Resp. PFOF (Dkt. 119) at ¶¶ 55-58, 72, 89, 90, 110, 114, 115) The CFPB does so on the grounds that those firms collected approximately $21 million from their clients after accounting for client refunds. *Id.* However, the CFPB fails to note the distinction between revenue (*i.e.*, money received) and profits (*i.e.*, money remaining after ordinary business expenses have been paid). The numbers referenced by the CFPB are the firms' gross and net revenues, and the CFPB has not provided any other evidence that TMLG and CFLG were ***profitable.*** (*See id;* Def. Ans. Pl. Resp. PFOF at same paragraphs)

- Finally, in a number of other places, Defendants set forth a concise, straightforward fact (*e.g.,* "The intake person (using scripts prepared by TMLG) described TMLG's services and TMLG's fee structure."). (*See, e.g.,* Def. PFOF (Dkt. 112) at ¶ 48) In response, the CFPB does not actually dispute the concise, straightforward fact. (*See, e.g.,* Pl. Resp. PFOF (Dkt. 119) at ¶ 48) Rather, the CFPB uses its response to those concise, straightforward facts as an opportunity to recite lengthy, cut and paste narrative answers contesting TMLG and CFLG's status as law firms, the roles of local attorneys, the "misrepresentations" purportedly made by client intake personnel, the

> fee structure, and the nature of legal services provided – most of which have little, if anything, to do with the stated proposed fact. (*See, e.g.,* Pl. Resp. PFOF (Dkt. 119) at ¶ 48; *see also id.* at ¶¶ 21, 27, 31, 32, 33, 36, 43, 44, 48, 49, 50, 51, 54, 95, 100, 101, 102, 104, and Def. Ans. Pl. Resp. PFOF at same paragraphs) That is improper, and those proposed findings of fact should be deemed undisputed.

Thus, the material facts in this case are undisputed, either by virtue of the CFPB admitting that such facts are undisputed, or by virtue of the CFPB failing to provide a direct response to Defendants' proposed findings of fact supported by record evidence.

## II. Congress Never Authorized The FTC Or The CFPB To Regulate Attorneys, Or Define (Or Regulate) The Practice Of Law.

When the FTC promulgated the MARS Rule, 16 C.F.R. § 322 (2011), the FTC made an express decision to include attorneys within its scope of coverage. However, the FTC went even further. The FTC chose to wade into the arena of attorney regulation by creating a limited exemption based on certain "criteria" that (in the FTC's view) would parse out those attorneys who were practicing law from those who were not. When it promulgated Regulation O, 12 C.F.R. § 1015.1 *et seq.*, the CFPB followed suit. However, neither agency had Congressional authority to regulate attorneys (much less to craft rules to define the "practice of law").

It is clear that the CFPB does not understand the nature of the issue raised by Defendants on this point. In its response brief, the CFPB repeatedly attempts to defend Regulation O by claiming that Regulation O "exempts attorneys…if they meet ***certain criteria*** relating to the practice of law." (*See e.g.* Resp. at 6; emph. added) With respect, those criteria are the problem. The FTC and CFPB were not authorized to establish new, nationally-applicable federal standards (*i.e.*, "***certain criteria***") to determine who is (and is not) practicing law. Moreover, the "***certain criteria***" are highly arbitrary and bear no rational relationship to the state Rules of Professional Conduct that govern the practice of law in the various states (which is not surprising given the FTC and CFPB's lack of experience and expertise in this area).

Neither the FTC nor the CFPB had authority from Congress to create such standards or craft such regulations, and Regulation O is invalid under *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984) to the extent it seeks to regulate attorneys.

**A. Regulation O's Attorney Exception Fails Under The First Prong Of *Chevron*.**

As set forth in Defendants' motion for summary judgment, the power to define and regulate the practice of law has historically resided with the states – not the federal government. Congress is well aware of this fact and does not lightly intrude into this area of state regulation. Courts have typically declined to construe statutes to apply to attorneys engaged in the practice of law absent a clear and express Congressional pronouncement that it intends to supplant state regulation of the practice of law. As the Supreme Court has admonished, "Congress, as we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions – it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001). Simply put, if Congress wants to regulate the practice of law, it will state so clearly and plainly.

That is fatal to the CFPB's claims in this case. That is because Congress never stated (much less plainly, clearly, or expressly stated) that it wanted attorneys to be included within the scope of coverage for the MARS Rule and Regulation O.[2] In fact, on two occasions, Congress did just the opposite: it set clear boundaries on those agencies' ability to regulate under the MARS Rule or Regulation O. Those Congressionally-set boundaries plainly forbade those agencies from regulating attorneys.

---

[2] Regulation O was not drafted by the CFPB. Rather, it was adopted almost verbatim from the FTC's MARS Rule. Accordingly, the statutory authorization for Regulation O is Section 626 of the Omnibus Budget Act (as amended by Section 511 of the Credit Card Act) – not 12 U.S.C. § 5538 as suggested by the CFPB. (*See* Pl. Resp. (Dkt. 118) at 6)

***First***, in Section 511 of the Credit Card Act of 2009, Pub. L. No. 11-24, § 511, 123 Stat. 524 (2009), Congress narrowed the scope of rulemaking authority provided to the FTC under Section 626 of the Omnibus Act and made it clear that Section 626 could not be "construed to authorize the [FTC] to promulgate a rule with respect to an entity that is not subject to enforcement of the [FTC Act]." 2009 Credit Card Act, Pub. L. No. 11-24, § 511(a)(2), 123 Stat. 524 (2009). That is fatal to the CFPB's position, because attorneys were not subject to enforcement of the FTC Act. The FTC Act was originally enacted in 1914 and has been amended many times since then. The statute has never made any mention of attorneys or the practice of law, and Defendants are not aware of any pre-2009 reported decisions wherein a court applied the FTC Act to attorneys engaged in the practice of law. Indeed, it appears that the FTC itself recognized that it had no authority to regulate attorneys.

***Second***, when Congress authorized the creation of the CFPB in 2010, it made it clear that it did not want the CFPB to regulate attorneys (with the exception of certain "grandfathered" powers that were conveyed under pre-existing statutes).[3] 12 U.S.C. § 5517(e). The CFPA expressly prohibits the CFPB from exercising "supervisory or enforcement authority with respect to an activity engaged in by an attorney as part of the practice of law under the laws of a State in which the attorney is licensed to practice law." 12 U.S.C. § 5517(e)(1).

[3] The CFPB correctly notes that the CFPA is ***not*** the source of rulemaking authority for Regulation O. Rather, the source of rulemaking authority for Regulation O is Section 626 of the Omnibus Act. 2009 Omnibus Appropriations Act, Pub. L. No. 111-8, § 626, 123 Stat. 524 (2009). Defendants cite to this provision because, in several places in its brief, the CFPB notes that Section 626 was re-adopted in the CFPA as 12 U.S.C. § 5538. To the extent the Court considers 12 U.S.C. § 5538 as a source of rulemaking authority, then Congress's decision to broadly exempt attorneys from the scope of the CFPA, *see* 12 U.S.C. §5517(e), is relevant to consideration of whether Congress authorized the regulation of attorneys.

In the face of such Congressional pronouncements, it seems clear that Regulation O fails to the extent it purports to regulate attorneys engaged in the practice of law. In its response, however, the CFPB disagrees.

***First***, the CFPB claims that Section 626 of the Omnibus Act implicitly provides Congressional authorization to regulate attorneys. In Section 626, Congress authorized the FTC to create a rule regarding "unfair or deceptive practices and acts regarding mortgage loans [including] mortgage modification and foreclosure rescue services." 2009 Omnibus Appropriations Act, Pub. L. No. 111-8, § 626, 123 Stat. 524 (2009). The CFPB argues that such language, coupled with Congress's failure to expressly mandate an exception for attorneys demonstrates Congressional intent that the FTC's rule could encompass attorneys. In short, the CFPB is raising precisely the argument that was rejected in *American Bar Association v. FTC*, 430 F.3d 457 (D.C. Cir. 2005). In that case, the FTC argued that it had a right to regulate attorneys under the Gramm-Leach-Bliley Act because, *inter alia*: (1) Congress intended for the statute to govern "financial institutions and other persons;" and (2) the Act did not contain an express attorney exemption. *Id.* at 468-70. The D.C. Circuit decisively rejected that argument:

> It is undisputed that the regulation of the practice of law is traditionally the province of the states. Federal law may not be interpreted to reach into areas of State sovereignty unless the language of the federal law compels the intrusion. Otherwise put, if Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakeably clear in the language of the statute.

*Id.* at 471 (internal cites omitted). The same reasoning applies here. If *American Bar Association v. FTC* stands for anything, it stands for the proposition that Congress does not lightly invade into this particular area of state regulation. If Congress really wanted a federal agency to craft new federal regulations regarding the practice of law, it would have said ***something***. Mere silence,

coupled with the absence of an express exception is not enough to "alter the usual constitutional balance." *Id.*; *see also Whitman*, 531 U.S. at 468.

***Second***, the CFPB contends that, by 2009, it was "already well established that attorneys were subject" to the FTC Act. (Pl. Resp. at 17) In support of its claim the issue was "well established," the CFPB cites a smattering of authorities, none of which addresses the issue before this Court. For example, the CFPB cites an FTC administrative order from 1964, *In re Wilson Chemical Co.*, 64 F.T.C. 168. There are two problems with *In re Wilson Chemical*: (1) it is an FTC administrative order rather than a court judgment; and (2) the order does not actually address the issue in this case. The defendant attorney in that case did not argue that he was exempt from the FTC Act's coverage because he was an attorney engaged in the practice of law. Instead, he raised a different argument (*i.e.*, that he was not engaged in interstate commerce). The CFPB's citation to *Gadsen v. Newman*, 807 F. Supp 1412, 1419-20 (C.D. Ill. 1992), is similarly unavailing. That case involved claims against a physician under an Illinois state statute. Any discussion of the FTC Act and its application to "learned professions" was purely *dicta.* The two Senate Committee reports cited by the CFPB are also inapposite. Those reports do not expressly address attorney regulation (or shed light on whether the legal profession is or is not subject to the FTC Act). Rather, those reports simply detail an effort (which ultimately failed) to create an express exception for all state-regulated professions. The FTC Act has existed for over 100 years. It speaks volumes that the CFPB was not able to locate any statutory language or court decisions that were squarely on point. The fact that the CFPB had to resort to authorities such as *In re Wilson Chemical* simply underscores Defendants' argument.

***Third***, the CFPB relies on three Supreme Court decisions, *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 775 (1975), *Heintz v. Jenkins*, 514 U.S. 291 (1995), and *Milavetz, Gallop &*

*Milavetz, P.A. v. United States*, 559 U.S. 229 (2010). According to the CFPB, these three decisions stand for the proposition that Congress can authorize federal agencies to regulate attorneys even without express authorization from Congress. However, none of those decisions involved the issue of Congressional authorization for executive branch rulemaking. None of them involved a challenge to rulemaking under *Chevron* or the Administrative Procedures Act. Moreover, in those cases, the Supreme Court did not simply presume that Congress intended to regulate attorneys. Rather, in each of those cases, the Supreme Court found specific evidence of Congressional intent to regulate attorneys.

For example, in *Heintz*, the Supreme Court noted that Congress had previously excluded attorneys from the 1977 version of the Fair Debt Collection Practices Act. *Heintz v. Jenkins*, 514 U.S. 291 (1995). But in 1986, Congress repealed the attorney exemption from the statute. *Heintz*, at 294. Thus, the Court had a "strong reason" for believing that the act applied to attorneys.

In *Milavetz, Gallop & Milavetz, PA v. U.S.*, 599 U.S. 299 (2010), the Court focused on whether attorneys constituted "debt relief agencies" within the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. In finding that they did, the Court observed that the definition of debt relief agency contained many exceptions, but there was no exception for attorneys. Further, the Act contained an instruction that the Act did not "limit or curtail" a State's authority to regulate the practice of law. *Milavetz, Gallop & Milavetz, PA*, at 237. This disclaimer would serve no purpose if attorneys could not qualify as debt relief agencies. Finally and most importantly, the Court based its finding on the fact that Bankruptcy is a specialized area in which Congress has "long overseen aspects of attorney conduct." *Id.* at 237. That is not the case here.

In *Goldfarb v. Virginia State Bar*, 421 U.S. 773 (1975), the Court assessed whether the Sherman Act applied to professionals such as attorneys. Looking solely to the Sherman Act itself,

the Court held that "Congress intended to strike as broadly as it could in Section 1 of the Sherman Act, and to read into it so wide an exemption as urged on us would be at odds with that purpose." 421 U.S. 773, 787 (1975) Nevertheless, the Court also held that "in holding that certain anticompetitive conduct by lawyers is within the reach of the Sherman Act we intend no diminution of the authority of the State to regulate its professionals." *Goldfarb* at 793. Thus, the Court did not find an intent by Congress to regulate the practice of law.

None of the cases cited by the CFPB involved anything as invasive to the practice of law as the MARS Rule or Regulation O. In crafting the MARS Rule, the FTC did not simply make a generic decision to include or exclude attorneys from coverage. Instead, the FTC went further and crafted regulations to parse out those attorneys who (in the FTC's view) were practicing law from those attorneys who (again, in the FTC's view) were not. No doubt, the FTC believed that such regulations would reduce the impact on attorneys, and thus make the FTC's decision to expand the regulation to cover attorneys more defensible. In fact, it does just the opposite. In establishing such rules, the FTC created new federal administrative law regarding the practice of law and arrogated to itself (and its successor, the CFPB) the power to enforce those new federal rules. It also means that the federal courts will necessarily be called upon to interpret and apply those rules. In short, the ability to define and regulate the practice of law has effectively been transferred to the federal government. That is simply not what Congress had in mind when it enacted Section 626 or the CFPA.

### B. Regulation O Fails Under The Second Prong of *Chevron*.

Under the second prong of *Chevron*, the Court determines whether an agency's rule is based on a reasonable construction of that statute. *CE Design, Ltd. v. Prism Business Media, Inc.*, 606 F.3d 443, 447 (7th Cir. 2010). Thus, this Court must determine whether the limited attorney

exemption in Regulation O is based on a reasonable construction of Section 626 of the Omnibus Act. In reply to the CFPB's brief, Defendants make the following points.

As a threshold matter, the FTC and CFPB are not entitled to any deference on this issue. Neither has any experience, qualifications or authorization when it comes to regulating attorneys or the practice of law. Accordingly, when it comes to promulgating (and enforcing) regulations regarding the practice of law, they have no experience or qualifications that would entitle them to deference. In its response, the CFPB vigorously contests this point. (Pl. Resp. (Dkt. 118) at 20-21) However, the CFPB does not actually cite to any relevant experience. Instead the CFPB argues that: (1) Congress authorized the CFPB to enact rules regarding "mortgage loans;" (2) the CFPB concluded that attorneys should be subject to the rules regarding "mortgage loans;" and (3) therefore, the CFPB is entitled to deference regarding rules it promulgates regarding attorneys. That argument is circular and ultimately meritless. Under that reasoning, the CFPB would entitled to endless deference regarding ***any*** profession it chose to regulate.

In its effort to defend the reasonableness of the limited attorney exemption in Regulation O, the CFPB simply underscores the main point of Defendants' argument. In its response, the CFPB contends that:

> Regulation O generally exempts . . . attorneys who provide mortgage assistance relief services ***as part of the practice of law*** in the state where the consumer or property is located ***and act in accordance with such state's law***.

(Pl. Resp. (Dkt. 118) at 20; emphasis added). The two highlighted portions of that sentence are both problematic.

***First***, each state has its own definition of what constitute the "practice of law."[4] The relevant authorities in each state (typically agencies of the state supreme courts) interpret, apply and adjudicate questions regarding what does (and does not) fall within the practice of law. The problem with Regulation O is that it makes the CFPB – not the state – the enforcement agency charged with determining (in the first instance) whether an attorney's conduct is "part of the practice of law." Thus, the CFPB will be charged with determining whether an attorney exercises sufficient "diligence" or communicates sufficiently with his or her clients. Similarly, it means that the federal courts – not the state supreme courts – will be the adjudicators of such disputes. That effectively "federalizes" questions regarding the scope of the practice of law. It also creates the real possibility (or, more accurately, a probability) that diverging lines of authority regarding the practice of law will develop between federal authorities (applying Regulation O) and state authorities (enforcing the Rules of Professional Conduct).

***Second***, while the CFPB pays lip service to respecting and enforcing state law with respect to the "practice of law," the CFPB's conduct belies any notion that it will rely on state law in pursuing its enforcement authority under Regulation O. In its response to Defendants' motion for summary judgment (Dkt. 118), the CFPB cited a mere handful of state cases and did not rely on

[4] *See, e.g.*, ALA. CODE § 34-3-6 (finding that the practice of law encompasses appearing in court, giving legal advice, drafting documents that affect legal rights, preventing wrongs, enforcing rights, and settling disputed accounts); ALASKA STAT. § 09.08.230 (stating that the practice of law is limited to those who hold themselves out as attorneys, and either appear in court or prepare documents affecting a person's legal rights for compensation); *Koscove v. Bolte*, 30 P.3d 784, 786 (Colo. App. 2001) ("[w]e believe that generally one who acts in a representative capacity in protecting, enforcing, or defending the legal rights and duties of another and in counseling, advising and assisting him in connection with these rights and duties is engaged in the practice of law"); *State Bar Association of Connecticut v. Connecticut Bank & Trust Co.*, 140 A.2d 863, 870 (1958) (providing that "[t]he practice of law consists in no small part of work performed outside of any court and having no immediate relation to proceedings in court. It embraces the giving of legal advice on a large variety of subjects and the preparation of legal instruments covering an extensive field.")

any state Rules of Professional Conduct on the point of whether Defendants were "practicing law." *See* Pl. Resp. Mot. Summ. J. (Dkt. 118) at 29-48. Similarly, in this case, the CFPB has made it clear that its "criteria" in assessing whether an attorney is practicing law (*e.g.*, an attorney's success rate, whether an attorney employs non-attorney support staff, whether a firm provides its member with retirement benefits) are entirely unrelated to any criteria used by state authorities. In short, the CFPB is seeking to create new federal standards regarding the practice of law.

***Third***, Regulation O creates a link between full compliance with the Rules of Professional Conduct and an attorney's ability to claim that he or she is engaged in the "practice of law." That is arbitrary and contrary to state law. As set forth in Defendants' motion and memorandum (Dkt. 96, 113), no state makes compliance with the Rules of Professional Conduct a predicate for determining whether an attorney is practicing law. Even attorneys who violate a rule are still deemed to be engaged in the practice of law (pending, of course, any disciplinary action that may ensue). The CFPB's requirement becomes more onerous if the Court accepts the CFPB's invitation to place the burden of proof on any attorney seeking the benefit of the exemption. Under such circumstances, the CFPB's position would be: an attorney is subject to Regulation O unless he or she can demonstrate that he or she has never violated any Rule of Professional Conduct. The CFPB could presumably obtain jurisdiction over any attorney that has arguably violated any Rule on any engagement – even a Rule that is unrelated to the requirements of Regulation O.

## III. To The Extent It Seeks To Regulate Attorneys, Regulation O Fails Under APA.

Review of the CFPB's regulation is also governed by the "arbitrary and capricious standard" of Section 706 of the Administrative Procedures Act. 5 U.S.C. § 706(2)(A) ("APA"). Under the APA, a reviewing court will give great deference to agency action and will only set aside the action where it is "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with the law." 5 U.S.C. § 706(2)(A). For the reasons set forth above (in Section II), the limited attorney exemption in Regulation O is arbitrary and capricious.

In its response, the CFPB points out that the FTC received many comments regarding whether attorneys should be regulated under the MARS Rule. The CFPB also points out that the final MARS Rule reflected a compromise between various state regulators (who wanted a blanket inclusion of attorneys) and various bar associations and practitioners (who wanted a blanket attorney exclusion). The CFPB appears to suggest that the limited attorney exemption in the MARS Rule (and, by extension, the same provision in Regulation O) can survive scrutiny under the APA solely because it represented a compromise between competing interests. With respect, however, the CFPB is wrong. The fact that the limited attorney exemption represents a compromise is not enough. To survive scrutiny under the APA, the CFPB must show that the specific compromise is one that makes sense. In this case, the CFPB has not explained – and cannot explain – how the limited attorney exemption, in its final form, has a rational and reasonable basis. Indeed, the CFPB has not shown any basis for the final exemption. As set forth in Defendants' motion, no state makes the "practice of law" contingent upon compliance with the Rules of Professional Conduct.

## IV. Defendants Satisfy The Attorney Exemption Contained In Regulation O.

Regulation O contains a two-part attorney exemption. Section 1015.7(a) provides that an attorney is exempt from all parts of Regulation O except Section 1015.5 if the attorney:

> (1) Provides mortgage assistance relief services a part of the practice of law;
>
> (2) Is licensed to practice law in the state in which the consumer for whom the attorney is providing mortgage assistance relief services resides or in which the consumer's dwelling is located; and
>
> (3) Complies with state laws and regulations that cover the same type of conduct the rule requires.

12 C.F.R. § 1015.7(a). An attorney is also exempt from Section 1015.5 if the attorney:

> (1) Deposits any funds received from the consumer prior to performing legal services in a client trust account;
>
> (2) Complies with all state laws and regulations, including licensing regulations, applicable to client trust accounts.

12 C.F.R. § 1015.7(b). As set forth in Defendants' motion for summary judgment and accompanying materials (Dkts. 96, 112, 113, incorporated herein by reference), Defendants are not required to satisfy the criteria in Section 1015.7 because that provision was promulgated without Congressional authorization and is arbitrary and capricious. (Def. Mem. (Dkt. 113) at 16-27) However, the undisputed evidence shows that Defendants do satisfy those criteria. (*Id.* at 27-30)

Courts have never addressed the burden of proof with respect to an exemption under Regulation O. In its response, the CFPB seizes on this fact to argue that Defendants have the burden of proof to establish they satisfy each of the criteria in Regulation O's limited attorney exemption. Given the nature of those criteria, the CFPB's position is a cynical one, indeed. Under the CFPB's position, every attorney would be presumptively subject to Regulation O unless the attorney could first demonstrate that he or she complies with all "state laws and regulations that cover the same type of conduct the rule requires" and also complies with all "state laws and regulations, including licensing regulations, applicable to client trust accounts." 12 C.F.R. § 1015.7(b).

In short, the CFPB seeks to place the burden on each attorney to prove a negative, *i.e.*, that he or she has never violated a Rule of Professional Conduct (or any other state law or rule that is deemed appropriate). While placing the burden on the proponent of the exemption might make sense in other contexts, it does not make sense here. If the CFPB chooses to bring an enforcement

action against an attorney, it should be required to articulate – in the first instance – a good faith basis for showing that the attorney has failed to satisfy the criteria under Section 1015.7. The CFPB is incorrect to assert that the FDCPA "provides a useful analogy" for the burden of proof. (*See* Pl. Resp. (Dkt. 118) at 26) The exemption under the FDCPA regarding debt-collectors does not involve state-regulated professionals nor does it place an insurmountable burden upon individuals asserting the exemption to conclusively prove that they have never violated a state law or regulation. As such, the exemption under the FDCPA is factually distinct from the exemption under Regulation O, and it does not make sense to apply the same burden of proof.

In this case, the undisputed evidence shows Defendants have satisfied the criteria in Section 1015.7. Defendants discussed this issue at length in their response to Plaintiff's motion for summary judgment and supporting materials. (Def. Resp. Pl. Motion Summ. J. (Dkt. 126)) Rather than re-state those points and authorities, Defendants incorporate them by reference herein, and offer the following additional points.

***First***, Defendants have presented substantial evidence that they provided mortgage assistance relief services as a part of the practice of law. An attorney's representation of a client in restructuring a secured debt obligation (which is what a home mortgage is) is unquestionably the practice of law. Multiple witnesses, including Aleman, Sibert, Banyon, and Gerst testified that TMLG and CFLG clients retained those law firms for mortgage relief services, that those services ranged from loan modifications to short sales to foreclosure defense services, and that TMLG and CFLG attorneys reviewed the client's financial package at least twice before submitting the package to the client's lender. (*See* Defs' Prop. Findings of Fact (" ¶¶ 43, 50, 85-86, 100-02)

***Second***, the CFPB demands that Defendants provide proof that each and every CFLG and TMLG attorney was properly licensed to practice law in his or her respective state. On this point,

the CFPB is simply trying to create hoops through which Defendants must jump. If the CFPB has some evidence that CFLG or TMLG were operating improperly in a particular state, it should produce that evidence; rather than demanding Defendants prove a negative. In any event, Defendants have provided admissible evidence on this point. Aleman testified that CFLG attorneys were licensed in their respective states, and all Class B Attorneys executed Class B Agreements in which they warranted that they were licensed in their respective states and in good standing. (Aleman Decl. (Dkt. 105) at ¶ 16; Def. PFOF (Dkt. 112) at ¶¶ 87, 88; Pl. Mot. Summ. J. Exs. 12, 18 (Dkt. 101-12, 101-18))

***Third***, the CFPB claims that TMLG and CFLG were not really "firms" because the Class B members and partners of those firms were not (at least in the CFPB's view) adequately compensated, or provided with appropriate benefits. With respect, the CFPB's position on this issue is utterly meritless. TMLG was a duly created partnership under Nevada state law; CFLG was a duly created limited liability company under Wisconsin state law. (Def. PFOF (Dkt. 112) at ¶¶ 5-6; *see also* Pl. Resp. to Def. PFOF (Dkt. 119) at ¶¶ 5-6) All TMLG and CFLG attorneys executed written agreements memorializing their membership or partnership. (Pl. Mot. Summ. J. Exs. 12, 18 (Dkts. 101-12, 101-18)) The CFPB's contention that those agreements were a "sham" because the Class B attorneys were not paid "enough." Not surprisingly, the CFPB does not cite any authority in support of its argument on this point.

***Fourth***, the CFPB incorrectly asserts that Defendants failed to comply with certain ethical rules. The CFPB points to ABA Model Rules of Professional Conduct 1.1, 1.3, 1.4, 1.5 and 1.15 ("Model Rules"), while neglecting to specify any behavior that violated these rules. As such, their conclusory allegation is without merit. Moreover, the CFPB is wrong.

- Defendants provided competent and diligent representation. Model Rules 1.1 and 1.3. TMLG and CFLG submitted mortgage modification requests for 50% of their 6000

clients, and approximately 1500 clients (about 25%) received successful loan modifications. (Def. Resp. Pl. PFOF (Dkt. 124) ¶ 62) In addition, numerous clients were able to stay in their homes for extended time periods due to ongoing negotiations between the firms and their mortgage lenders. *Id.* The success rate for TMLG and CFLG was also very good compared with the success rates for other types of consumer advocacy.[5]

- Defendants communicated with their clients. Model Rule 1.4. Class B Attorneys for TMLG and CFLG checked the CRM to review the progress of the file, responded to inquiries from clients, and spoke with lenders. (Def. Resp. Pl. PFOF (Dkt. 124) ¶¶ 128, 132) Class B Attorneys supervised the loan modification process and became involved in the final stages when necessary. *Id.* In addition, Class B Attorneys communicated with lenders and servicers in those instances where the lender or servicer would only speak with an attorney. *Id.*

- Defendants complied with the rules regarding fees. Model Rule 1.5 As a law practice, the initial flat fee retainer of $1,195 and monthly flat fee retainers of approximately $500 per month that TMLG and CFLG charged were reasonable considering the time, labor, and difficulty of the various matters, and the nature and length of each professional relationship. (Def. Resp. Pl. PFOF (Dkt. 124) ¶ 155) In addition, these fees were communicated to clients in writing before commencing the representation. *Id.* Therefore, Defendants did not charge unreasonable fees in violation of Model Rule 1.5.

- Defendants satisfied the rules with respect to trust accounts. Model Rule 1.15. Model Rule 1.15 states that, "[a] lawyer shall hold property of clients or third persons *that is* ***in a lawyer's possession*** in connection with a representation separate from the lawyer's own property." Model Rule 1.15 (emphasis added). Both TMLG and CFLG required the initial retainer payment to be deposited into the client's account with the third-party payment processor prior to beginning work on behalf of that client. (Def. Resp. Pls. PFOF (Dkt. 124) ¶ 154) That account was controlled by the client, not TMLG or CFLG. *Id.* As such, these fees were not in Defendants possession.

## V. Defendants Qualify Under The CFPA's Attorney Exemption.

Defendants have set forth the authority and arguments for why they meet the standard for the CFPA's attorney exemption in their motion for summary judgment (Dkt. 96) and accompanying memorandum (Dkt. 113), as well as in their response to the CFPB's motion for

[5] Consumer debt solutions generally have very low success rates. The success rates for consumer bankruptcies is between 20-33% and mortgage loan modification plans have failure rates from 60-80%. *See e.g.*, RM Hunt, *Whither Consumer Credit Counseling?* (2005)

summary judgment (Dkt. 126). Rather than re-state those arguments, Defendants refer the Court to their briefs on this point. However, the CFPB raises two points that merit attention herein.

***First,*** the CFPB contends that Defendants "tricked" consumers into believing that they would receive legal services that would improve their chances of receiving a loan modification. TMLG and CFLG clients ***did*** receive legal services. Those clients signed retainer agreements with the law firms. (Pl. Mot. Summ. J. Exs. 4, 17 (Dkts. 101-4, 101-17)) Attorneys reviewed client files for a number of considerations, including "to see if the client would qualify for other legal benefits or defenses, including bankruptcy [and] foreclosure litigation." (Delgado Dep. (Dkt. 73) at 82-84) Moreover, Defendants made it very clear to clients that they were not guaranteeing a particular result and that the decision to modify a loan was entirely up to the client's lender. (Def. Resp. to Pl. PFOF (Dkt. 124) at ¶ 34; *see also* Pl. Mot. Summ. J. Ex. 4 (Dkt. 101-4) at §§ VII, X(c), X(d), X(g), XV(b), XV(d); Ex. 17 (Dkt. 101-17) at §§ VII, X(c), X(d), X(g), XV(b), XV(d)) Between the two firms, TMLG and CFLG represented over 6000 clients. They submitted completed mortgage modification materials for approximately 50% of those clients and secured successful re-financings for approximately 25% of those clients. (Def. Resp. to Pl. PFOF (Dkt. 126) at ¶ 62)

***Second,*** the CFPB argues that because TMLG and CFLG's services were financial in nature and non-complex, and because non-attorneys performed much of the work, those services somehow fall outside the scope of the practice of law. The CFPB is wrong. An attorney's representation of a client in restructuring a secured debt obligation is unquestionably the practice of law. Moreover, it is well-settled that many tasks that do not constitute the practice of law (when performed by non-lawyers) do constitute the practice of law (when performed by lawyers, or by

non-lawyers working under the supervision of lawyers). *See, e.g.*, MODEL RULES OF PROF'L CONDUCT R. 5.5(c)(4) cmt. (2013).

## VI. Summary Judgment Is Appropriate For Thomas Macey And Harold Stafford.

### A. The CFPB's Claims Against Thomas Macey Fail As A Matter Of Law.

The CFPB seeks to hold all four individual Defendants individually liable for TMLG's and CFLG's alleged violations of Regulation O and the CFPA. The parties agree on the law on this issue: to hold an individual liable for a corporate violation of Regulation O or the CFPA, the CFPB must meet a multi-step test.[6]

> An individual may be held liable under the FTCA for corporate practices if the FTC first can prove the corporate practices were misrepresentations or omissions of a kind usually relied on by reasonably prudent persons and that consumer injury resulted. Once corporate liability is established, the FTC must show that the individual defendants participated directly in the practices or acts or had authority to control them. Authority to control the company can be evidenced by ***active involvement in business affairs and the making of corporate policy***, including assuming the duties of a corporate officer. The FTC must then demonstrate that the individual had some knowledge of the practices. The knowledge requirement is the key issue in this case.

*Fed. Trade Comm'n v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989) (emphasis added). Knowledge can be established by evidence of "actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth." *Id.* at 574. The degree of participation in the business affairs also factors into to the court's analysis of knowledge. *Id.*; *see also see also Fed. Trade Comm'n v. World Media Brokers*, 415 F.3d 758, 763-64 (7th Cir. 2005).

The CFPB claims that Macey and Stafford can be held individually liable for the corporate actions of TMLG and CFLG because they "'participated directly in the practices or acts or had

---

[6] The CFPB's ability to seek personal liability against individuals for corporate violations of Regulation O mirrors the FTC's ability to seek personal liability for corporate violations of the FTC Act. (*See* Pub. L. No. 11-24 § 511, 123 Stat. 529 (2009)).

authority to control them.'" (Pl. Resp. (Dkt. 118) at 49 (*citing Fed. Trade Comm'n v. Construct Data Publishers*, No. 13-CV-01999, 2014 WL 7004999, at *7-8 (N.D. Ill. Dec. 11, 2014).) However, the "[a]uthority to control the company can be evidenced by ***active involvement in business affairs and the making of corporate policy***, including assuming the duties of a corporate officer." *Fed. Trade Comm'n v. Amy Travel Serv.*, 875 F.2d 564, 573 (7th Cir. 1989) (emphasis added).

The CFPB does not even come close to proving Macey's ***active involvement*** in the business affairs of TMLG and CFLG. In its Response, the CFPB greatly misrepresents the evidence in order to support its position. The CFPB relies heavily on the TMLG and CFLG Operating Agreements to argue that Macey was "empowered" to manage the day-to-day operational decisions, financial decisions, and policy decisions of TMLG and CFLG. (Pl. Resp. (Dkt. 118) at 50-51) However, the undisputed evidence shows that, while Macey (like any other majority owner of any other company) had the ability to offer input into corporate affairs, ***he never exercised that power.*** Instead, he left the management of the companies to Aleman (who, unlike Macey, was physically located at the firms' headquarters in Chicago).[7] (Def. Resp. to Pl. PFOF (Dkt. 124) ¶¶ 9, 12, 216, 217, 218 (a)-(d), 219, 220, 221, 222, 223, 224 (a)-(c)) The following segments from Macey's CFLG deposition highlight this point:

Q. Did you do any work on individual consumer files for CFLG?

A. No.

Q. Did you ever see any individual consumer files for CFLG?

A. No.

---

[7] With respect to remote management, the CFPB is trying to have it both ways. The CFPB vigorously argues that TMLG and CFLG attorneys could not possibly have supervised non-attorney staff in Florida. However, the CFPB simultaneously claims that Macey (who was located in Florida) could – and did – actively manage CFLG and TMLG.

Q. Did you ever have direct contact with consumers for CFLG?

A. No.

Q. Did you ever address complaints that consumers had about CFLG?

A. No.

Q. Did you ever address any inquiries from state regulatory agencies such as the attorneys general about CFLG?

A. When you say did I address them, did I respond?

Q. Did you ever respond, yes.

A. No.

Q. Was there anybody who reported directly to you besides Jeff Aleman?

A. No.

(Def. Resp. to Pl. PFOF, at ¶¶ 12, 216)

Q. Did you train anybody at CFLG?

A. No.

Q. Did you participate in creating training programs?

A. No.

Q. Did you participate in creating training documents used at trainings for employees or contractors?

A. No.

*Id.* The exact same colloquy occurred in his TMLG deposition. *Id.* Macey similarly did not participate in decisions regarding the content of the marketing materials, directing client processing managers, directing third-party vendors, addressing client matters, hiring, firing or training employees, or supervising support staff or paralegals. (Def. Resp. to Pl. PFOF (Dkt. 124) at ¶ 19) He also had no involvement in determining the content of TMLG's "Welcome Packet" or

other materials provided to TMLG's clients. *Id.* Macey had no involvement in developing training materials, policies or procedures for TMLG staff. *Id.*

The CFPB also tries to meet its burden by pointing to Macey's involvement in seminal business decisions such as deciding to open the firms, deciding to wind them up, agreeing on terms to settle certain lawsuits, and placing TMLG into bankruptcy. However, Macey's involvement in such decisions does not amount to "active involvement" in the company's operations. Rather, it simply underscores that certain landmark business decisions cannot be made without the approval of the firms' majority owner.

The CFPB further contends that Macey "knew or should have known" about the alleged deceptive practices of TMLG and CFLG because he was previously involved in "several shady operations." (Pl. Resp. (Dkt. 118) at 51) This is a smear tactic, and nothing more. The CFPB is hoping that the Court will view attacks on Macey's character and prior business dealings as a substitute for admissible evidence that Macey was actively involved in CFLG and TMLG. Indeed, nothing in the cited testimony supports the CFPB's statement that Macey was involved in "several shady operations" prior to forming TMLG. Macey testified that he and Aleman worked together at Macey Bankruptcy Law, P.C. (f/k/a Legal Helpers, P.C.) ("MBL"), a national consumer bankruptcy law firm, and Legal Helpers Debt Resolution, LLC ("LHDR"), a national law firm that provided debt mitigation services to its clients. (Def. Resp. to Pl. PFOF (Dkt. 124) at ¶ 32) The CFPB's characterization of those firms as "shady operations" is without merit or support. *Id.*

In another effort to cobble together a claim against Macey, the CFPB argues that Macey should have been put on notice of the firms' "deceptive practices" by state investigations of TMLG and CFLG. What the CFPB fails to note, however, is that with the exception of Arizona (which specifically allowed TMLG to continue representing existing clients), each of these investigations

were concluded ***after*** TMLG and CFLG had already stopped taking new clients and/or began winding up in those states. (Pl. Mot. Summ. J. Exs. 5 (Dkt. 101-5) (Arizona consent order entered August 2012), 7 (Dkt. 101-7) (Indiana consent order entered July 2013); Pl.'s Opp. to Def. Mot. Summ. J., Ex. 4 (Dkt. 122-2) (Oregon investigative demand filed in January 2013), Ex. 10 (Dkt. 122-8) (Connecticut investigation opened in April 2012; TMLG stopped taking new Connecticut clients in November 2011). TMLG stopped taking any clients in the first quarter of 2013 and ceased operations in November 2013. (Def. PFOF (Dkt. 112) at ¶¶ 61, 62) CFLG stopped taking clients in November 2013 and ceased operations in July 2013. (*Id.* at ¶¶ 112, 113)

Moreover, the CFPB's reliance on *Amy Travel Service*, 875 F. 2d 564 (7th Cir. 1989) is misplaced. In that case, the defendants were found individually liable where they personally wrote the telemarketing sales scripts and were aware of the high volume of consumer complaints. Here, unlike the defendants in *Amy Travel Service*, Macey was not involved in the creation or approval of the scripts for either TMLG or CFLG and was not apprised of nor responded to any consumer complaints. (Def. Resp. to Pl. PFOF (Dkt. 124) at ¶ 216) The CFPB also accuses Macey of purchasing CFLG for the purpose of continuing mortgage relief services under a "less-tainted corporate entity than TMLG had become." (Pl. Resp. (Dkt. 118) at 53) However, the testimony it cites for support does not reference any regulatory investigations or the reason for Macey and Aleman's purchase of CFLG. (Def.'s Resp. to Pl. PFOF (Dkt. 124) at ¶ 50) In fact, nothing that the CFPB cites supports their assertion that Macey had knowledge of material misrepresentations or controlled TMLG or CFLG's business operations. Therefore, the CFPB cannot establish individual liability as to Macey on Counts I-X.

### B. The CFPB's Claims Against Harold Stafford Fail As A Matter Of Law.

In July 2012, Harold Stafford sold 95% of CFLG to Macey and Aleman, and there is no evidence that he had any meaningful involvement in the conduct or operations of CFLG after July 2012.[8] From that time forward, CFLG was operated out of Chicago, with Aleman managing all of the CFLG daily operations. (Def. PFOF (Dkt. 112) ¶ 79)

In its response, the CFPB suggests that Stafford's receipt of a salary from CFLG after the sale to Macey and Aleman somehow evidences his active involvement and control of CFLG operations. This is nonsense. The record clearly demonstrates that Stafford had no operational control, management, or direction over CFLG after July 2012. (Def. PFOF (Dkt. 112) ¶ 80) Stafford had no involvement in drafting CFLG marketing materials and scripts, hiring personnel, controlling the day-to-day financial affairs of the companies, or the daily operations of CFLG. (Defs' PFOF (Dkt. 112) ¶¶ 79-80)

In addition, the CFPB claims that Stafford had intimate knowledge of CFLG operations through "weekly phone calls with Aleman, notes on the client management system, and time that he spent at CFLG's headquarters in Chicago." (Pl. Resp. (Dkt. 118) at 56) On this point, the CFPB is greatly misrepresenting the evidence to fit its arguments.

***First***, the "weekly conversations" between Aleman and Stafford were typically 5-10 minutes in length and consisted of discussions regarding the client enrollment process. (Def. Resp. to Pl. PFOF (Dkt. 124) at ¶ 243) ***Second***, Stafford made it clear that he reviewed notes in the client management system solely for the purpose of resolving a limited number of client complaints. *Id.*

[8] Prior to that date, CFLG had a grand total of 27 clients. Because the CFPB's evidence regarding CFLG's practices relates entirely to the post-July 2012 time period, there is no evidence that CFLG violated Regulation O or the CFPA with respect to its limited pre-July 2012 operations.

***Third***, Stafford testified that he visited CFLG's Chicago headquarters only two or three times. *Id.* These facts in no way supports the claim that he had "intimate knowledge" of CFLG operation.

Rather, the opposite is true. The evidence clearly shows that Stafford was not a managing partner of CFLG. He was not involved in conversations relating to the day-to-day activities of CFLG, did not provide training to CFLG staff, was not involved determining the CFLG retainer agreement with new clients, did not provide input into agreements with Class B partners, did not have knowledge or control of marketing materials (including content on the CFLG website), and had no direct contact with consumer files. (Def. Resp. Pl. PFOF (Dkt. 124) at ¶¶ 245-46). To the extent Stafford was able to even observe company operations, he only participated in a few short conversations with Aleman regarding CFLG's enrollment process (all which occurred within the first six months of the firm being managed by Aleman). (*Id.* at ¶ 243) The extent of Stafford's involvement ***at all*** in CFLG after 2012 was limited to referring local attorneys to Colin Banyon and occasionally drafting letters to respond to client and regulatory agencies' complaints. (*Id.* at ¶¶ 29, 238, 241, 246) Accordingly, the CFPB cannot establish individual liability as to Stafford on Counts I-X.

## CONCLUSION

For the reasons set forth herein, and in their summary judgment motion and supporting materials (Dkts. 96, 112, 113) in their response to the CFPB's motion for summary judgment and supporting materials (Dkts. 124, 126), and in their contemporaneously-filed answer to the CFPB's disputes to Defendants' proposed findings of fact and response to the CFPB's additional proposed findings of fact, Defendants respectfully move this Court pursuant to Fed. R. Civ. P. 56 to enter summary judgment in their favor and against the CFPB on all counts in the CFPB's complaint.

Dated: November 4, 2015

*/s/ Timothy D. Elliott*

Douglas M. Poland
Godfrey & Kahn, S.C.
1 East Main Street, Suite 500
Madison, WI 53703
608-257-3911
dpoland@gklaw.com

Timothy D. Elliott (*pro hac vice*)
Emily A. Shupe (*pro hac vice*)
Jordan R. Franklin (*pro hac vice*)
Rathje & Woodward, LLC
300 E. Roosevelt Rd., Ste. 300
Wheaton, IL 60187
telliott@rathjewoodward.com
eshupe@rathjewoodward.com
jfranklin@rathjewoodward.com
Telephone: (630) 668-8500

**CERTIFICATE OF FILING & SERVICE VIA CM/ECF**

I, Timothy D. Elliott, an attorney, do hereby certify that on November 4, 2015, I electronically filed the above document with the clerk of the court by using the CM/ECF system. I further certify that a notice of electronic filing related to the above document was sent to all counsel of record.

Dated: November 4, 2015 /S/ Timothy D. Elliott