# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

|  |  |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>                 Plaintiff,<br><br>   v.<br><br>THE MORTGAGE LAW GROUP, LLP, (D/B/A THE LAW FIRM OF MACEY, ALEMAN & SEARNS), CONSUMER FIRST LEGAL GROUP, LLC, THOMAS G. MACEY, JEFFREY J. ALEMAN, JASON E. SEARNS, and HAROLD E. STAFFORD,<br>                 Defendants. | Case No. 3:14-cv-00513 |

## DEFENDANTS' ANSWERS TO FACTS DISPUTED BY PLAINTIFF

Defendants Consumer First Legal Group, LLC, Thomas G. Macey, Jeffrey J. Aleman, Jason E. Searns and Harold E. Stafford (collectively, "Defendants") state as follows as their answers to Plaintiff Consumer Financial Protection Bureau's ("CFPB") disputes to Defendants' Proposed Findings Of Fact (Dkt. 112) ("PFOF"):

## UNDISPUTED FACTS

The CFPB did not dispute the following facts in Defendants' PFOF:

1. Defendant Jeffrey J. Aleman ("Aleman") is an individual and currently a citizen of Illinois. Deposition of Jeffrey J. Aleman, May 20, 2015 ("Aleman Dep. (Dkt. No. 76)") 9:9-11.

**CFPB'S RESPONSE:** No dispute.

2. Defendant Thomas G. Macey ("Macey") is an individual and currently a citizen of Florida. Declaration of Thomas G. Macey, Oct. 9, 2015 ("Macey Decl. (Dkt. No. 97)") ¶ 1

**CFPB'S RESPONSE:** No dispute.

3. Defendant Jason E. Searns ("Searns") is an individual and currently a citizen of Florida. Deposition of Jason E. Searns, May 28, 2015 ("Searns Dep. (Dkt. No. 74)") 4:24-5:2.

**CFPB'S RESPONSE:** No dispute.

4.      Defendant Harold E. Stafford ("Stafford") is an individual and currently a citizen of Wisconsin.  Rule 30(b)(6) Deposition of Harold E. Stafford on behalf of Consumer First Legal Group, LLC, Jun. 3, 2015 ("CFLG (Stafford) Dep. (Dkt. No. 64)") 5:14-16.

**CFPB'S RESPONSE:**  No dispute.

5.      Defendant Consumer First Legal Group, LLC ("CFLG") is a defunct Wisconsin limited liability company that no longer operates.  Complaint ("Compl. (Dkt. No. 1)") ¶ 7; Rule 30(b)(6) Deposition of Jeffrey J. Aleman on behalf of Consumer First Legal Group, LLC, vol. I, May 19, 2015 ("CFLG (Aleman) Dep. I (Dkt. No. 66)") 34:6-35:22, 41:19-42:12; Declaration of Jeffrey J. Aleman, Oct. 9, 2015 ("Aleman Decl. (Dkt. No. 105)") ¶ 24; Declaration of Harold E. Stafford, Oct. 9, 2015 ("Stafford Decl. (Dkt. No. 98)") ¶ 7.

**CFPB'S RESPONSE:**  No dispute.

6.      Defendant The Mortgage Law Group, LLP ("TMLG") is a defunct Nevada limited liability partnership that no longer operates.  Compl. (Dkt. No. 1) ¶ 6; Aleman Dep. (Dkt. No. 76) 16:5-8, 20:17-21:14; Aleman Decl. (Dkt. No. 105), ¶¶ 13, 14.

**CFPB'S RESPONSE:**  No dispute.

7.      In March 2014, TMLG filed a Chapter 7 bankruptcy petition.  Aleman Decl. (Dkt. No. 105), ¶ 14; *see In re The Mortgage Law Group, LLP*, Chap. 7 Debtor, Case No. 14-2825 (N.D. Ill. Br., Mar. 7, 2014).

**CFPB'S RESPONSE:**  No dispute.

8.      At all times relevant to this matter, Aleman was an attorney admitted to practice law in the States of Wisconsin and Illinois.  Aleman Decl. (Dkt. No. 105), ¶ 2.

**CFPB'S RESPONSE:**  No dispute.

9.      At all times relevant to this matter, Macey was an attorney admitted to practice law in the State of Illinois.  Macey Decl. (Dkt. No. 97), ¶ 2.

**CFPB'S RESPONSE:**  No dispute.

10.     At all times relevant to this matter, Searns was an attorney admitted to practice law in the State of Colorado.  Searns Dep. (Dkt. No. 74) 26:1-8.

**CFPB'S RESPONSE:**  No Dispute.

11.     At all times relevant to this matter, Stafford was an attorney admitted to practice law in the State of Wisconsin.  Stafford Decl. (Dkt. No. 98), ¶ 2.

**CFPB'S RESPONSE:**  No Dispute.

13.    In 1994, Macey opened the law firm Legal Helpers, P.C. in Chicago, Illinois, which practiced in the area of consumer bankruptcy. Macey Decl. (Dkt. No. 97), ¶ 2.

**CFPB'S RESPONSE:** No dispute.

14.    In 1997, Aleman joined Legal Helpers, P.C. Aleman Decl. (Dkt. No. 105), ¶ 2.

**CFPB'S RESPONSE:** No Dispute.

16.    Searns also participated in the formation of LHDR and was a member thereof. Searns Dep. (Dkt. No. 74) 22:6-23:6.

**CFPB'S RESPONSE:** No Dispute.

22.    Macey contributed over $600,000 to capitalize the firm and became a 76% owner. Macey Decl. (Dkt. No. 97), ¶ 5; Macey Dep. (Dkt. No. 78) 11:17-12:1.

**CFPB'S RESPONSE:** No Dispute.

23.    Aleman contributed over $100,000 to the initial capitalization of TMLG and became a 14% owner. Aleman Decl. (Dkt. No. 105), ¶ 3; Aleman Dep. (Dkt. No. 76) 29:19-23.

**CFPB'S RESPONSE:** No Dispute.

24.    Searns became a 9% owner. Searns Dep. (Dkt. No. 74) 33:16-34:1; Aleman Decl. (Dkt. No. 105), ¶ 3.

**CFPB'S RESPONSE:** No Dispute.

25.    Searns (who lived in Colorado at the time) assisted in creating the structure for TMLG with respect to regulatory and ethics issues. Searns Dep. (Dkt. No. 74) 25:9-19, 37:17-19.

**CFPB'S RESPONSE:** No Dispute.

26.    TMLG was headquartered in Chicago, out of which office Aleman managed the firm's day-to-day business. Aleman Dep. (Dkt. No. 76) 58:6-10; Aleman Decl. (Dkt. No. 105), ¶ 5.

**CFPB'S RESPONSE:** No Dispute.

34.    TMLG's short sale services included working with the client, a potential buyer, and the client's lender to do a short sale whereby the property would be sold to the third party potential buyer based on an agreed fair market value ("FMV") for the home, with the lender's agreement. Aleman Decl. (Dkt. No. 105), ¶ 6.

**CFPB'S RESPONSE:** No dispute.

35. "Cash for keys" involved working with the client and the client's lender to get the client cash from the lender if the client was willing to effectively surrender his or her property in a timely manner – such a service was generally a last resort when all other measures were exhausted. Aleman Decl. (Dkt. No. 105), ¶ 6.

**CFPB'S RESPONSE:** No dispute.

37. That support staff included people in TMLG's support facility in Delray Beach, Florida. Rule 30(b)(6) Deposition of Jeffrey J. Aleman on behalf of Consumer First Legal Group, LLC, vol. II, Jun. 3, 2015 ("CFLG (Aleman) Dep. II (Dkt. No. 67)") 461:20-22; Aleman Decl. (Dkt. No. 105), ¶ 8.

**CFPB'S RESPONSE:** No dispute.

38. Some of the people working in the Delray Beach facility were TMLG employees and others were not. Aleman Decl. (Dkt. No. 105), ¶ 8.

**CFPB'S RESPONSE:** No dispute.

39. The people who were not TMLG employees were contract workers employed by Client Attorney Processing Solutions ("CAPS"), a company that signed a contract with TMLG to provide certain support services. Deposition of Jay L. Gerst, Jun. 24, 2015 ("Gerst Dep. (Dkt. No.75)") 14:11-16:15; Aleman Decl. (Dkt. No. 105), ¶ 8.

**CFPB'S RESPONSE:** No dispute.

40. TMLG signed contracts with other companies, including Accurate Professional Services, LLC and Underwater Property Solutions, LLC, to provide additional support services. Aleman Decl. (Dkt. No. 105), ¶ 8.

**CFPB'S RESPONSE:** No dispute.

42. The support staff would work with the clients to gather the information and documentation necessary to secure a loan modification or for one of the other services provided by TMLG. Sibert Dep. (Dkt. No. 77) 91:21-92:24; Gerst Dep. (Dkt. No. 75) 29:6-19, 33:19-34:3, 35:6-36:5, 59:11-64:2; Aleman Decl. (Dkt. No. 105), ¶ 10.

**CFPB'S RESPONSE:** No Dispute.

45. TMLG did not do its own advertising. Aleman Dep. (Dkt. No. 76) 80:15-81:15; Aleman Decl. (Dkt. No. 105), ¶ 11.

**CFPB'S RESPONSE:** No dispute.

47.     When TMLG was provided with a lead, its intake personnel (who were employees of the firm) would speak with the prospective client over the telephone and gather certain information regarding the prospective client (*e.g.*, contact information, name of mortgage lender, personal financial information, etc.). Aleman Dep. (Dkt. No. 76) 83:1-7, 91:16-92:5, 97:11-19; Aleman Decl. (Dkt. No. 105), ¶ 11.

**CFPB'S RESPONSE:**  No dispute.

53.     To facilitate the processing of those payments, each client set up an account with the payment processing service company NoteWorld (later known as Meracord), with which TMLG had accounts as well.  Aleman Dep. (Dkt. No. 76) 193:23-195:8, 200:17-25, 224:24-225:6, 227:15-228:8; Aleman Decl. (Dkt. No. 105), ¶ 12.

**CFPB'S RESPONSE:**  No dispute.

61.     During the first quarter of 2013, TMLG stopped taking on new clients and went into a wind-down.  Banyon Dep. (Dkt. No. 82) 34:21-35:6; Aleman Decl. (Dkt. No. 105), ¶ 14.

**CFPB'S RESPONSE:**  No dispute.

63.     In early 2012, Stafford formed CFLG.  CFLG (Stafford) Dep. (Dkt. No. 64) 19:7-17; Stafford Decl. (Dkt. No. 98), ¶ 3.

**CFPB'S RESPONSE:**  No dispute.

65.     Prior to 2012, Stafford had worked with several multijurisdictional and national consumer law firms.  CFLG (Stafford) Dep. (Dkt. No. 67) 38:11-14; Stafford Decl. (Dkt. No. 98), ¶ 2.

**CFPB'S RESPONSE:**  No dispute.

66.     Until July 2012, Stafford was the sole manager of CFLG.  CFLG (Stafford) Dep. (Dkt. No. 64) 22:24-23:1, 29:7-16; Stafford Decl. (Dkt. No. 98), ¶ 3.

**CFPB'S RESPONSE:**  No dispute.

67.     It was Stafford's intention that CFLG grow into a nationwide law firm providing mortgage-related legal services to consumers in states across the country.  CFLG (Stafford) Dep. (Dkt. No. 64) 21:9-22:13, 38:11-14; Stafford Decl. (Dkt. No. 98), ¶ 3.

**CFPB'S RESPONSE:**  No dispute.

73.     In mid-2012, Stafford was introduced to Aleman in Chicago.  CFLG (Stafford) Dep. (Dkt. No. 64) 35:21-23; Stafford Decl. (Dkt. No. 98), ¶ 5; Aleman Decl. (Dkt. No. 105), ¶ 15.

**CFPB'S RESPONSE:** No dispute.

74. Thereafter, Aleman approached Stafford with the proposition that Macey and Aleman buy a majority interest in CFLG. CFLG (Macey) Dep., May 27, 2015 (Dkt. No. 68) 12:17-14:5; CFLG (Stafford) Dep. (Dkt. No. 64) 35:21-23; Stafford Decl. (Dkt. No. 98), ¶ 5; Aleman Decl. (Dkt. No. 105), ¶ 15.

**CFPB'S RESPONSE:** No dispute.

76. Stafford agreed to Macey and Aleman purchasing interests in CFLG. Stafford Decl. (Dkt. No. 98), ¶ 5; Aleman Decl. (Dkt. No. 105), ¶ 15; Macey Decl. (Dkt. No. 97), ¶ 8.

**CFPB'S RESPONSE:** No dispute.

77. In July 2012, Macey acquired a 78% interest in the firm and Aleman acquired a 17% interest. CFLG (Aleman) Dep. I (Dkt. No. 66) 33:21-34:5, 90:12-92:16; CFLG (Macey) Dep., May 27, 2015 (Dkt. No. 68) 16:5-7, 17:15-18:9; Aleman Decl. (Dkt. No. 105), ¶ 15; Macey Decl. (Dkt. No. 97), ¶ 8.

**CFPB'S RESPONSE:** No dispute.

78. Stafford maintained a 5% minority interest. Stafford Decl. (Dkt. No. 98), ¶ 5.

**CFPB'S RESPONSE:** No dispute.

79. After July 2012, Aleman took over the day-to-day management of the firm from a new CFLG office in Chicago. CFLG (Aleman) Dep. I (Dkt. No. 66) 12:24-14:21, 51:19-54:24, 64:14-25; CFLG (Macey) Dep., May 27, 2015 (Dkt. No. 68) 18:10-15; Aleman Decl. (Dkt. No. 105), ¶ 15.

**CFPB'S RESPONSE:** No dispute.

92. Prior to July 2012, it accepted referrals. CFLG (Stafford) Dep. (Dkt. No. 64) 39:22 - 41:12; Stafford Decl. (Dkt. No. 98), ¶ 4.

**CFPB'S RESPONSE:** No dispute.

93. After July 2012, like TMLG, CFLG acquired leads from third party lead generators. CFLG (Aleman) Dep. II (Dkt. No. 67) 412:12-18 Aleman Decl. (Dkt. No. 105), ¶ 20.

**CFPB'S RESPONSE:** No dispute.

99. CFLG also imposed policies and procedures – crafted and approved of by CFLG's managing attorneys – on the support staff employees for them to follow. CFLG (Aleman) Dep. I (Dkt. No. 66) 85:9-18; Aleman Decl. (Dkt. No. 105), ¶ 21.

**CFPB'S RESPONSE:** No dispute.

103. Fees paid by CFLG's clients were processed through Meracord, with which CFLG had accounts. CFLG (Aleman) Dep. II (Dkt. No. 67) 381:17-383:7, 396:2-8, 411:6-412:10; Aleman Decl. (Dkt. No. 105), ¶ 22.

**CFPB'S RESPONSE:** No dispute.

105. Those Meracord accounts were not controlled by CFLG or anyone on its behalf. CFLG (Aleman) Dep. II (Dkt. No. 67) 381:17-383:7, 396:2-8, 411:6-412:10; Aleman Decl. (Dkt. No. 105), ¶ 22.

**CFPB'S RESPONSE:** No dispute.

106. Those accounts were established by and held in the clients' names, and the clients had signature authority over those accounts. CFLG (Aleman) Dep. II (Dkt. No. 67) 381:17-383:7, 396:2-8, 411:6-412:10; Aleman Decl. (Dkt. No. 105), ¶ 22.

**CFPB'S RESPONSE:** No dispute.

111. In November 2012, after only a few months of operation, Macey directed that CFLG be wound-up. CFLG (Aleman) Dep. I (Dkt. No. 66) 34:16-37:12; Aleman Decl. (Dkt. No. 105), ¶ 24; Macey Decl. (Dkt. No. 97), ¶ 10.

**CFPB'S RESPONSE:** No dispute.

116. On July 22, 2014, Plaintiff Consumer Financial Protection Bureau ("CFPB") filed this action. Compl. (Dkt. No. 1).

**CFPB'S RESPONSE:** No dispute.

117. The CFPB is an independent agency of the United States charged with regulating the offering and provision of consumer financial products or services under federal consumer financial laws. Compl. (Dkt. No. 1) ¶ 4.

**CFPB'S RESPONSE:** No dispute.

118. In the complaint, the CFPB alleges that, during the years TMLG and CLFG were in operation (2011-2013), various aspects of their operations violated the Mortgage Assistance Relief Services Code, 12 C.F.R. § 1015.1, *et seq.* ("Regulation O") and the Consumer Financial Protection Act ("CFPA"). *See generally*, Compl. (Dkt. No. 1).

**CFPB'S RESPONSE:** No dispute.

119. Generally speaking, the CFPB is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the CFPA and Regulation O. Compl. (Dkt. No. 1) ¶ 5.

**CFPB'S RESPONSE:** No dispute.

120. This Court has subject-matter jurisdiction over this action because it has been brought under federal consumer financial law, presents a federal question, and was brought by an agency of the United States, 28 U.S.C. § 1345. Compl. (Dkt. No. 1) ¶ 2.

**CFPB'S RESPONSE:** No dispute.

121. Venue is not improper in this District based on the CFPB's allegations. *See* Compl. (Dkt. No. 1) ¶ 3.

**CFPB'S RESPONSE:** No dispute.

122. The CFPB claims that all Defendants are liable for those violations. *See generally*, Compl. (Dkt. No. 1).

**CFPB'S RESPONSE:** No dispute.

123. The CFPB's complaint does not mention any TMLG or CFLG clients by name. *See generally*, Compl. (Dkt. No. 1).

**CFPB'S RESPONSE:** No dispute.

## DISPUTED FACTS AND DEFENDANTS' ANSWERS THERETO

12. During the entire course of its operations, CFLG was a multijurisdictional law firm. CFLG (Stafford) Dep. (Dkt. No. 64) 25:1-27:19; Stafford Decl. (Dkt. No. 98), ¶ 4; Aleman Decl. (Dkt. No. 105), ¶ 16.

**CFPB'S RESPONSE:** Dispute. CFLG was not a "law firm," but rather a provider of mortgage assistance relief services. CFLG offered, provided or arranged for others to provide mortgage assistance relief services, including but not limited to, providing services to assist a consumer with modifying the terms of his or her mortgage. Deposition of CFLG 30(b)(6) Corporate Representative Harold E. Stafford Part 1 ("Stafford CFLG 30(b)(6) Dep. Part 1"), June 3, 2015, ECF No. 64, at 20; Deposition of CFLG 30(b)(6) Corporate Representative Jeffrey John Aleman Part 1 ("Aleman CFLG 30(b)(6) Dep. Part 1"), May 19, 2015, ECF No. 66, at 35. CFLG even

identifies its principal business activity as "Mortgage Consulting" and its principal product or services as "Consulting" on the company's 2012 and 2013 Federal income tax returns. Exhibits H and I of Declaration of Jeffrey Aleman, ECF No. 105.

CFLG's marketing materials, welcome letters to consumers, retainer agreements with consumers, and sales representative calls with consumers, all demonstrated that the CFLG offered to provide and purportedly provided mortgage loan modification services.  Declaration of Tim Ledbetter, April 30, 2015 ("Ledbetter Decl."), ECF No. 92, ¶¶ 2-5; Declaration of Brett Peterson, April 24, 2015 ("Peterson Decl."), ECF. No. 84, ¶¶ 3, 5; Declaration of Daniel Teynor, June 3, 2015 ("Teynor Decl."), ECF No. 85, ¶¶ 2-4; Declaration of Fadi Halwani, April 10, 2015 ("Halwani Decl."), ECF No. 86, ¶¶ 2-4; CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000198-000201; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154, TMLG.MO.LIT.000160; Deposition of Victor Matthew Anderson July 2, 2015 ("Anderson Dep."), ECF No. 79, at 130-134; CFLG Amended Answer to Complaint, Dec. 31, 2014, ECF No. 41, at ¶ 39; Jeffrey Aleman's Amended Answer to Complaint, ECF No. 40, at 6 (answer to ¶ 23); TMLG Response to U.S. Senate, Pl.'s Mot. Summ. J. Ex. 36 (filed under seal), at DEF.0003071; Thomas Macey's Amended Answer to Complaint, ECF No. 42, at 6 (answer to ¶ 23); Jason Searns's Amended Answer to Complaint, ECF No. 43, at 6 (answer to ¶ 23).

CFLG provided no legal services to consumers who sought modifications of their mortgages.  Consumers never communicated with any attorney from headquarters or a local attorney after they enrolled for services.  CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000198-000201; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154; Peterson Decl., ECF No. 84, ¶ 16; Halwani Decl., ECF No. 86, ¶ 16; Ledbetter Decl., ECF No. 92, ¶ 14.  The only services in connection with mortgage loan

modifications that local attorneys provided to consumers consisted of (1) comparing CFLG checklists with consumer financial information collected on a computer screen at intake to assure that a consumer met lender criteria to apply for a loan modification, and (2) comparing CFLG checklists with documents submitted by a consumer to assure that the package contained all of the lender-required mortgage loan modification documents. These tasks could be performed by non-attorneys, and in fact, were already performed by non-attorneys – salespersons and document processors - before the local attorneys duplicated those tasks. Sibert Dep., ECF No. 77, at 103-105, 236; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 27, 54; Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 452-455; Aleman Dep., ECF No. 76, at 201-02, 215.

Based on Defendants' own data, none of the 1,116 consumers who enrolled in CFLG's services received foreclosure defense services, or services beyond the administrative tasks associated with mortgage loan modification services. Declaration of Ryan Thomas, October 2, 2015 ("Thomas Decl."), ECF No. 116, at 3 ¶ 19.

**DEFENDANTS' ANSWER:**

This should be deemed undisputed. CFLG was a national law firm. At its peak, CFLG had approximately 37 attorneys serving in approximately 39 states. Aleman Decl. (Dkt. 105) at ¶ 19. All of those attorneys were Class B Members of CFLG, were licensed in their respective states, and they signed Class B Member Agreements. *Id.*; *see also* Pl. Mot. Summ. J. Ex. 18 (Dkt. 101-18).

CFLG had approximately 1,100 clients, all of whom signed retention agreements with CFLG. Aleman Decl. (Dkt. No. 105), ¶ 19; *see also* Pl. Mot. Summ. J. Ex. 17 (Dkt. 101-17). The CFLG Retainer Agreement specifically provides that the client is engaging CFLG to provide certain legal services with respect to the client's real estate. Pl. Mot. Summ. J. Ex. 17 (Dkt. 101-17) at §§ I, III. CFLG performed those tasks on behalf of its clients, and it secured loan

modifications for approximately 200 clients. Aleman Decl. (Dkt. No. 105), ¶ 19.

The CFPB's quibble with the fact that non-attorneys performed certain work in the context of CFLG's representation of its clients does not change CFLG's status as a law firm. CFLG processes were developed by attorneys, instituted at the direction of attorneys, monitored by attorneys, and changed by the attorneys where necessary. Gerst Dep. (Dkt. 75) at 113-19; CFLG (Aleman) Dep. (Dkt. 66) at 53-54, 137-38, 160; Aleman Decl. (Dkt. 105) at ¶¶ 16, 21. All of the non-attorneys' work was reviewed by attorneys. CFLG (Aleman) Dep. (Dkt. 66) 10, 14-16, 19-23, 53-54, 71, 142-43, 149, 162; Aleman Decl. (Dkt. 105) at ¶ 21. All client files were reviewed twice by both a CFLG headquarters attorney and a CFLG Class B Attorney prior to the client's enrollment and prior to the submission of a loan modification application to the client's lender, and attorneys were available to speak with clients regarding their files. CLFG (Aleman Dep.) (Dkt. 66) at 110-111, 140-42, 149-50, 160-63; Delgado Dep. (Dkt. 73) at 33-34, 45-51, 72-73, 81-84, 115-17; Pl. Mot. Summ. J. Ex. 18 (Dkt. 101-18).

Moreover, the CFPB's claim that none of CFLG's clients received foreclosure defense services is incorrect. A number of Class B Attorneys provided foreclosure litigation defense and other services to CFLG clients. Gray Decl. (Dkt. 94) at ¶ 15; Ruggiero Dep. (Dkt. 70) at 58; Banyon Dep. (Dkt. 82) at 38-39; Delgado Dep. (Dkt. 73) at 45-51; Aleman Decl. II (Dkt. 125) at ¶ 19. Based on the available data, approximately 309 CFLG clients either had scheduled foreclosure sale dates or other notes in the data that indicate that foreclosure defense services were provided. Aleman Decl. II (Dkt. 125) at ¶ 19. It is impossible to tell how many clients actually received foreclosure defense services without reviewing the detailed client files for each particular client. *Id.* However, the available data makes clear that CFLG clients received foreclosure defense services. *Id.*

15.     In early 2009, Macey and Aleman opened a new law firm, Legal Helpers Debt Resolution, LLC ("LHDR"), to provide debt settlement representation as an out-of-court alternative to bankruptcy.  Aleman Dep. (Dkt. No. 76) 23:1-5; Aleman Decl. (Dkt. No. 105), ¶ 2; Macey Decl. (Dkt. No. 97), ¶ 4.

**CFPB'S RESPONSE:**  Dispute.  LHDR was not a law firm.  It offered and provided debt settlement services to consumers, and later offered mortgage loan modification services to consumers. LHDR's business model mirrored that of TMLG, which was not a law firm, but rather a provider of mortgage loan modification services. Deposition of Thomas Macey, ECF No. 78, at 23, 54, 86-87.  In fact, the businesses were so similar that when LHDR later rebranded its mortgage loan modification services arm into TMLG in early 2011, the only change that took place was that LHDR's employees and local attorneys were told they were suddenly working for TMLG.  Sibert Dep., ECF No. 77, at 54; Deposition of Jacqueline Delgado, April 9, 2015 ("Delgado Dep."), ECF No. 73, at 27, 29, 32, 36.

**DEFENDANTS' ANSWER:**

As a preliminary matter, Defendants note that the operations of LHDR are not particularly material to the instant proceedings, and thus, the proposed finding set forth in Paragraph 15 is not material.

The CFPB does not cite any authority at all to support its contention that LHDR was not a law firm.  LHDR was a national law firm that provided debt relief legal services to consumers struggling with debt and, for a very brief time, mortgage relief assistance legal services.  Macey Dep. (Dkt. 78) at 23; Aleman Decl. (Dkt. 105) at ¶¶ 15, 17; Aleman Decl. II (Dkt. 125) at ¶¶ 3-19. LHDR provided legal advice to thousands of clients and helped many of those clients reduce their overall debt.  Aleman Decl. II (Dkt. 125) at ¶¶ 4, 12; Aleman Decl. (Dkt. 105) at ¶ 17; Aleman Decl. II at ¶¶ 3-19.

17.     Throughout its operation, LHDR represented clients with unsecured credit card debt and structured out-of-court settlements of that debt through negotiations with the clients' creditors. Aleman Dep. (Dkt. No. 76) 23:1-5; Aleman Decl. (Dkt. No. 105), ¶ 3.

**CFPB'S RESPONSE:** Dispute. The Bureau objects to the term "represented" on the ground that it is vague. The Bureau also disputes Defendants' proposed finding to the extent that the term "represented" suggests LHDR was providing legal services to consumers. LHDR was not a law firm. It offered and provided debt settlement services to consumers, and later offered mortgage loan modification services to consumers. LHDR's business model mirrored that of TMLG, which was not a law firm, but rather a provider of mortgage loan modification services. Macey Dep., ECF No. 78, at 23, 54, 86-87. In fact, the businesses were so similar that when LHDR later rebranded its mortgage loan modification services arm into TMLG in early 2011, the only change that took place was that LHDR's employees and local attorneys were told they were suddenly working for TMLG. Sibert Dep., ECF No. 77, at 54; Delgado Dep., ECF No. 73, at 27, 29, 32, 36.

**DEFENDANTS' ANSWER:**

As a preliminary matter, Defendants note that the operations of LHDR are not particularly material to the instant proceedings, and thus, the proposed finding set forth in Paragraph 17 is not material.

The CFPB does not cite any authority at all to support its contentions. LHDR was a national law firm that provided debt relief legal services to consumers struggling with debt and, for a very brief time, mortgage relief assistance legal services. Macey Dep. (Dkt. 78) at 23; Aleman Decl. (Dkt. 105) at ¶¶ 15, 17); Aleman Decl. II (Dkt. 125) at ¶¶ 3-19. LHDR provided legal advice to thousands of clients and helped many of those clients reduce their overall debt. Aleman Decl. II (Dkt. 125) at ¶¶ 4, 12; Aleman Decl. (Dkt. 105) at ¶ 17; Aleman Decl. II (Dkt. 125) at ¶¶ 3-19.

In addition, Sibert did not characterize the formation of TMLG as a "rebranding" of LHDR. *See* Sibert Dep. (Dkt. 77) at 54-55. Rather, Sibert testified that TMLG was a separate law firm

that was set up to handle mortgage assistance relief services. *Id.* The LHDR attorneys did not "suddenly learn" that they were working for TMLG in January 2011. Rather, all of the Class B LHDR Attorneys who did work for TMLG (including the two cited attorneys, Sibert and Delgado) executed Class B Partner Agreements with TMLG, and they could have declined to work for TMLG if they wished. Sibert Dep. (Dkt. 77) at 55-56; Delgado Dep. (Dkt. 73) at 36.

    18.    By late 2010, in addition to its other legal services, LHDR represented clients in mortgage mitigation situations. Deposition of Colin Banyon, May 1, 2015 ("Banyon Dep. (Dkt. No. 82)") 32:2-4; Deposition of Kelly Patrick Sibert, Apr. 23, 2015 ("Sibert Dep. (Dkt. No. 77)") 50:21-52:12; Aleman Decl. (Dkt. No. 105), ¶ 3.

**CFPB'S RESPONSE:** Dispute. The Bureau objects to the term "represented" on the ground that it is vague. The Bureau disputes Defendants' proposed finding to the extent that the term "represented" suggests LHDR was providing legal services to consumers. Attorneys in LHDR's network checked mortgage loan modification submission packages for completeness and were paid $40 by LHDR for each consumer file reviewed. LHDR Class B Agreement, Pl. Mot. Summ. J. Ex. 10, at CFPB-TMLG-0058218. LHDR offered, provided, or arranged for others to provide mortgage assistance relief services, specifically, offering services to assist a consumer with modifying the terms of his or her mortgage. Macey Dep., ECF No. 78, at 9-10.

**DEFENDANTS' ANSWER:**

    This should be deemed undisputed. The CFPB's contentions are not supported by the cited testimony. *See also* Def. Ans. ¶¶ 15, 17, *supra*, incorporated herein by reference.

    19.    By late 2010, Aleman came to believe that a separate law firm should provide mortgage mitigation legal services. Aleman Dep. (Dkt. No. 76) 23:6-16; Searns Dep. 24:20-25:8, 32:25-33:9; Deposition of Thomas Macey, May 27, 2015 ("Macey Dep. (Dkt. No. 78)") 9:11-10:7; Aleman Decl. (Dkt. No. 105), ¶ 3.

**CFPB'S RESPONSE:** Dispute. The Bureau disputes Defendants' proposed finding to the extent that it suggests TMLG is a "law firm." TMLG's Chicago headquarters was comprised of mostly salespersons, who by far outnumbered any attorneys. Anderson Dep., ECF No. 79, at 47-48, 58,

65-66, 69-70; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 53, 54; Sibert Dep., ECF No. 77, at 123-124, 126. TMLG provided no legal services to consumers who sought modifications of their mortgages. Consumers never communicated with any attorney from headquarters or a local attorney after they enrolled for services. TMLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 4, at CFPB-TMLG-0037271-0037273; CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000198-000201; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154; Declaration of Floy Johnson, May 26, 2015 ("Johnson Decl."), ECF No. 87, ¶ 17; Declaration of Mark Pultz, May 13, 2015 ("Pultz Decl."), ECF No. 90, ¶ 14; Declaration of Montez Saunders, June 22, 2015 ("Saunders Decl."), ECF No. 91, ¶ 16; Declaration of Veronica Bruce, May 21, 2015 ("Bruce Decl."), ECF No. 93, ¶ 17.

TMLG's marketing materials, retainer agreements with consumers, and sales representative calls with consumers, all demonstrate that TMLG offered to provide and purportedly provided mortgage loan modification services. Consumers who viewed TMLG's websites believed that TMLG could help them modify their loan by helping them obtain a mortgage loan modification. Saunders Decl., ECF No. 91, ¶¶ 3-5. The initial retainer and subsequent recurring monthly payments that were collected by TMLG were specifically for purported services relating only to obtaining a mortgage loan modification. TMLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 4, at CFPB-TMLG-0037271-0037273; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154. Salespeople made statements to consumers to convince consumers that they would obtain mortgage loan modifications if they enrolled with TMLG. Salespersons also told consumers that using the free services of a non-profit organization to gather documents and submit a mortgage loan modification would not get them a loan modification, but that TMLG's services would get them a mortgage loan modification. Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at

TMLG.MO.LIT.000152-000154, TMLG.MO.LIT.000160; Anderson Dep., ECF No. 79, at 130-134; CFLG Amended Answer to Complaint, Dec. 31, 2014, ECF No. 41, at ¶ 39.

Out of TMLG's 5,265 consumers, a mere 30 paid additional fees to receive foreclosure defense services, and in those instances TMLG referred those consumers to local attorneys who provided legal services without assistance from TMLG or attorneys at headquarters. Thomas Decl., ECF No. 116, ¶ 18; Declaration of Edith Gray, August 31, 2015 ("Gray Decl."), ECF No. 115, ¶ 15.

The Bureau also disputes that Aleman alone decided to start a separate mortgage mitigation company. Aleman, Macey, and Searns, made the decision together to start TMLG. Aleman Dep. (Dkt. No. 76) 23:1- 5.

**DEFENDANTS' ANSWER:**

This should be deemed undisputed. The CFPB has not cited any evidence to support its contention that TMLG was not a law firm. TMLG *was* a national law firm. At its peak, TMLG had approximately 100 attorneys serving in many states. Aleman Decl. (Dkt. 105) at ¶ 5. All of those attorneys were Class B Partners of TMLG, and they signed Class B Partner Agreements. *See* Pl. Mot. Summ. J. Ex. 12 (Dkt. 101-12).

TMLG had approximately 5,000 clients, all of whom signed retention agreements with TMLG. Aleman Decl. (Dkt. No. 105), ¶ 14; *see also* Pl. Mot. Summ. J. Ex. 4 (Dkt. 101-4). The TMLG Retainer Agreement specifically provides that the client is engaging TMLG to provide certain legal services with respect to the client's real estate. Pl. Mot. Summ. J. Ex. 4 (Dkt. 101-4) at §§ I, III. TMLG performed those tasks on behalf of its clients, and it secured loan modifications for approximately 1,300 clients. Aleman Decl. (Dkt. No. 105), ¶ 14.

The CFPB's quibble with the fact that non-attorneys performed certain work in the context of TMLG's representation of its clients does not change CFLG's status as a law firm. CFLG

processes were developed by attorneys, instituted at the direction of attorneys, monitored by attorneys, and changed by the attorneys where necessary. Gerst Dep. (Dkt. 75) at 56-59, 106; Sibert Dep. (Dkt. 77) 59, 62-63, 93-94; Aleman Dep. (Dkt. 76) at 96-97, 133, 141; Aleman Decl. (Dkt. 105) at ¶¶ 9-10. All of the non-attorneys' work was reviewed by attorneys. Sibert Dep. (Dkt. 77) at 75, 91-92, 171, 202-03; Banyon Dep. (Dkt. 82) at 138; Aleman Dep. (Dkt. 76) at 57-58, 65, 74-75, 91-93, 96-97, 103, 178, 256-57, 280-81; Aleman Decl. (Dkt. 105) at ¶¶ 9, 11; Gerst Dep. (Dkt. 75) at 29, 33-36, 59-64. All client files were reviewed twice by both a TMLG headquarters attorney and a TMLG Class B Attorney prior to the client's enrollment and prior to the submission of a loan modification application to the client's lender, and attorneys were available to speak with clients regarding their files. Aleman Dep. (Dkt. 76) at 76-78, 91-93, 132-36; Aleman Decl. (Dkt. 105) at ¶ 11; Delgado Dep. (Dkt. 73) at 45-51, 72-73, 81-84; Sibert Dep. (Dkt. 77) at 93-100, 202-03, 248-51.

Moreover, the CFPB's claim that only 30 of TMLG's clients received foreclosure defense services is incorrect. A number of Class B Attorneys provided foreclosure litigation defense and other services to CFLG clients. Gray Decl. (Dkt. 94) at ¶ 15; Ruggiero Dep. (Dkt. 70) at 58; Banyon Dep. (Dkt. 82) at 38-39; Delgado Dep. (Dkt. 73) at 45-51; Aleman Decl. II (Dkt. 125) at ¶ 19. Based on the available data, approximately 1,442 TMLG clients either had scheduled foreclosure sale dates or other notes in the data that indicate that foreclosure defense services were provided. Aleman Decl. II (Dkt. 125) at ¶ 19. It is impossible to tell how many clients actually received foreclosure defense services without reviewing the detailed client files for each particular client. *Id.* However, the available data makes clear that far more than 30 clients received foreclosure defense services. *Id.*

20. Aleman persuaded Macey and Searns to co-found such a firm. *Id.*; Macey Decl. (Dkt. No. 97), ¶ 5.

**CFPB'S RESPONSE:** Dispute. Aleman testified that Macey, Searns, and himself made the decision together to start TMLG. Aleman Dep. ECF No. 76, at 23:1- 5.

**DEFENDANTS' ANSWER:**

This should be deemed undisputed. While Macey and Searns agreed to start TMLG with Aleman, Aleman "basically came up with the idea and the proposal or framework for conducting this new business." Macey Dep. (Dkt. 78) at 9-11.

21. That firm, The Mortgage Law Group, LLP ("TMLG") was formed in early 2011. Macey Dep. (Dkt. No. 78) 9:22-10:7; Sibert Dep. (Dkt. No. 77) 49:9-14; Aleman Decl. (Dkt. No. 105), ¶ 3; Macey Decl. (Dkt. No. 97), ¶ 5.

**CFPB'S RESPONSE:** Dispute. The Bureau disputes this proposed finding to the extent that "the firm" suggests that TMLG was a law firm providing legal services. Salespersons far outnumbered attorneys at the TMLG's Chicago headquarters. Anderson Dep., ECF No. 79, at 47-48, 58, 65-66, 69-70; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 53, 54; Sibert Dep., ECF No. 77, at 123-124, 126. TMLG provided no legal services to consumers who sought modifications of their mortgages. Consumers never communicated with any attorney from headquarters or a local attorney after they enrolled for services. TMLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 4, at CFPB-TMLG-0037271-0037273; CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000198-000201; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154; Johnson Decl., ECF No. 87, ¶ 17; Pultz Decl., ECF No. 90, ¶ 14; Saunders Decl., ECF No. 91, ¶ 16; Bruce Decl. , ECF No. 93, ¶ 17.

TMLG's marketing materials, retainer agreements with consumers, and sales representative calls with consumers, all demonstrate that TMLG offered to provide and purportedly provided mortgage loan modification services. Consumers who viewed TMLG's websites believed that TMLG could help them modify their loan by helping them obtain a mortgage loan modification. Saunders Decl., ECF No. 91, ¶¶ 3-5. The initial retainer and

subsequent recurring monthly payments that were collected by TMLG were specifically for purported services relating only to obtaining a mortgage loan modification. TMLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 4, at CFPB-TMLG-0037271-0037273; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154. Salespeople made statements to consumers to convince consumers that they would obtain mortgage loan modifications if they enrolled with TMLG. Salespersons also told consumers that the free services of a non-profit organization to gather documents and submit a mortgage loan modification would not get them a loan modification, but that TMLG's services would get them a mortgage loan modification. Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154, TMLG.MO.LIT.000160; Anderson Dep., ECF No. 79, at 130-134; CFLG Amended Answer to Complaint, Dec. 31, 2014, ECF No. 41, at ¶ 39.

Out of TMLG's 5,265 consumers, a mere 30 paid additional fees to receive foreclosure defense services, and in those instances TMLG referred those consumers to local attorneys who provided legal services without assistance from TMLG or attorneys at headquarters. Thomas Decl., ECF No. 116, ¶ 18; Gray Decl., ECF No. 115, ¶ 15.

**DEFENDANTS' ANSWER:**

This should be undisputed. The CFPB does not dispute that TMLG was formed in early 2011. Rather, the CFPB takes issue with Paragraph 21 because TMLG calls itself a "law firm." However, the proposed fact does not use the term "law firm." Thus, Paragraph 21 is not truly disputed. Moreover, TMLG *was* a law firm. *See* Def. Ans. ¶ 19.

> 27. Aleman made the day-to-day decisions regarding TMLG's operations with the assistance of other attorneys in the Chicago office. Aleman Dep. (Dkt. No. 76) 31:5-12, 260:21- 261:15; Banyon Dep. (Dkt. No. 82) 45:23-46:22; Sibert Dep. (Dkt. No. 77) 58:19-61:7.

**CFPB'S RESPONSE:** Dispute. The citations provided by Defendants do not support Defendants' proposed finding. The Defendants' evidence provides that Aleman made the day-to-

day decisions regarding TMLG's operations and that he oversaw the two managing attorneys in TMLG's headquarters in Chicago, not that he made decisions with their assistance. Aleman Dep. (Dkt. No. 76) 31:5-12, 260:21-261:15.

**DEFENDANTS' ANSWER:**

This is not materially disputed. Aleman testified that the Class B Attorneys for TMLG directly reported to Sibert and Banyon, and that Sibert and Banyon "handle[d] questions and issues that were brought to their attention by the…Class B Members[.]" Aleman Dep. (Dkt. 76) at 260-61. Sibert was responsible for the loan modification matters, and Banyon was responsible for the foreclosure defense matters. *Id.* Aleman further testified that Sibert and Banyon approved certain documents. *Id.* at 113-14.

28. Macey (who lived in Florida at the time) did not participate in the management, control, or direction of TMLG. Macey Dep. (Dkt. No. 76) 48:3-24; Aleman Dep. (Dkt. No. 76) 39:5-11, 48:1-16, 50:15-21, 75:5-8; Macey Decl. (Dkt. No. 97), ¶ 6; Aleman Decl. (Dkt. No. 105), ¶ 5.

**CFPB'S RESPONSE:** Dispute. Macey had managerial responsibility for and was familiar with certain aspects, if not all, of TMLG's operations. Thomas Macey's Amended Answer to Complaint, ECF No. 42, at 5 (answers to ¶¶ 17 and 18). Macey served as a managing partner of TMLG and had final decision-making authority on issues regarding the company. Thomas Macey Answers to Interrogatories, Pl.'s Mot. Summ. J., Ex. 29, at 9 (Response to Interrogatory No. 7); Macey Dep., ECF No. 78, at 33-35. Under the TMLG LLP Agreement, Macey was designated to receive all communications and notices on behalf of TMLG. TMLG Partnership Agreement, Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Opp. to Def. Mot. Summ. J."), Ex. 1, ¶ 10.13. Macey was aware as early as January 2012 that TMLG was "under scrutiny" by state regulators. Macey Email January 24, 2012, Pl.'s Opp. to Def. Mot. Summ. J., Ex. 13 at DEF.0006020. Also, Macey was the majority shareholder of TMLG and could weigh in on decisions whenever he desired. Aleman Dep., ECF No. 76, at 46-48; Jeffrey Aleman Answers

to Interrogatories, Pl.'s Mot. Summ. J. Ex. 32, at 8 (Response to Interrogatory 7).

Specifically, Macey exerted his control and direction over TMLG's affairs by:

a. Creating or changing policy for running TMLG and setting up the company. Macey Dep., ECF No. 78, at 24-25, 37-38.

b. Overseeing the development of and reviewing retainer agreements that TMLG entered into with its consumers. Macey Dep., ECF No. 78, at 27; Macey Email January 24, 2012, Pl.'s Opp. to Def. Mot. Summ. J., Ex. 13 at DEF.0006020.

c. Directing settlement negotiations with a state attorney general that sued TMLG, including how much TMLG was willing to settle for, what specific terms Macey wanted in the settlement, and how to instruct outside counsel. Macey Email July 10, 2012, Pl.'s Opp. to Def. Mot. Summ. J., Ex. 5 at DEF.0003644-0003645; Macey Email June 28, 2012 (1), Pl.'s Opp. to Def. Mot. Summ. J., Ex. 6 at DEF.9854-.9855; Macey Email June 28, 2012 (2), Pl.'s Opp. to Def. Mot. Summ. J., Ex. 7 at DEF.9840; Macey Email June 28, 2012 (3), Pl.'s Opp. to Def. Mot. Summ. J., Ex. 8 at DEF.9969-.9970; Macey Email June 28, 2012 (4), Pl.'s Opp. to Def. Mot. Summ. J., Ex. 9 at DEF.10010.

d. Instructing the managers who were in charge of client support, processing, and document collection, and providing them with instructions on procedures, thereby creating policy and protocol for them. Macey Dep., ECF No. 78, at 9-11, 42-44; Aleman Dep., ECF No. 76, at 46-48; Jeffrey Aleman Answers to Interrogatories, Pl.'s Mot. Summ. J. Ex. 32, at 8 (Response to Interrogatory 7).

e. Determining TMLG's strategy to obtain consumer leads. Macey Email April 27, 2012, Pl.'s Opp. to Def. Mot. Summ. J., Ex. 12.

f. Participating in the decision of TMLG to have independent contractors who handled loan modification processing, often referred to as "strategic alliance partners." Macey Dep., ECF No. 78, at 16-17; Aleman Dep., ECF No. 76, at 253.

g. Participating in the decision of TMLG to file for bankruptcy. Macey Dep., ECF No. 78, at 71.

Furthermore, the Bureau objects that where Macey was living at the time of TMLG's operations is not relevant. Additionally, Defendants' citations do not support Defendants' proposed finding that Macey was living in Florida. None of Defendants' citations contain language showing that Macey "lived in Florida."

**DEFENDANTS' ANSWER:**

Macey's role in TMLG was primarily that of an investor and limited partner. Macey Dep. (Dkt. 78) at 13, 15. Macey's involvement with the operations of TMLG were very limited, and he did not serve as "managing partner" of TMLG. Rather, Aleman was the sole managing partner in charge of operations for TMLG. Aleman Dep. (Dkt. 76) at 46.

While Macey, as the majority shareholder of TMLG, had the ability to make decisions, Macey never exercised that authority. Macey was not involved in the day-to-day-operations, did not sign off on day-to-day decisions, and "did not directly engage in the daily management or activities of the firm." Pl. Mot. Summ. J. Ex. 29 (Dkt. 101-29) at 9; *see also* Aleman Dep. (Dkt. 76) at 46, 50, 101-02, 147; Macey Decl. (Dkt. 97) at ¶ 9; Macey Dep. (Dkt. 78) at 24.

Macey was not involved in creating policies or procedures for TMLG and he did not participate in reviewing or changing any policies or procedures. Macey Dep. (Dkt. 78) at 10, 37-38. While Macey did review the general business plan for TMLG and some of the processes and procedures that were developed at the inception of the firm, he did so only on a "macro level at the outset of the firm." *Id.* Macey testified that he did not review any policies or procedures that were created after TMLG began operations. *Id.* at 38. Macey had no involvement in developing training materials, policies or procedures for TMLG staff. Macey Dep. (Dkt. 78) at 19.

Macey did not review individual TMLG Retainer Agreements. Macey Dep. (Dkt. 78) at 27-28. Macey reviewed the form TMLG retainer agreement, but did not review any changes to that agreement over time. *Id.* Macey had no role in determining the content of the client Welcome Packets, or other materials provided to TMLG clients. Aleman Dep. (Dkt. 76) at 115.

Macey did not hire or fire employees of TMLG. Aleman Dep. (Dkt. 76) at 39. Macey did not supervise TMLG support staff or paralegals, and he was not responsible for training those employees. Aleman Dep. (Dkt. 76) at 75. Macey had no role in developing training materials for

TMLG staff. Macey Dep. (Dkt. 78) at 17. Macey did not instruct TMLG employees and contractors how to perform their jobs, and he did not direct their daily work. Macey Dep. (Dkt. 78) at 13, 15, 42-44, 46-48. Aleman Dep. (Dkt. 76) at 46, 147; Banyon Dep. (Dkt. 82) at 62; Delgado Dep. (Dkt. 73) at 164.

Macey had limited knowledge regarding TMLG's specific strategic alliance partners, and he was not involved in selecting those partners. Macey Dep. (Dkt. 78) at 16. To the extent it was part of the set up and formation of TMLG, Macey's involvement was limited to a macro level review. Macey Dep. (Dkt. 78) at 25, 37.

Macey did not review or work on individual client files for TMLG and he did not have direct contact with TMLG clients. Macey Dep. (Dkt. 78) at 17; Aleman Dep. (Dkt. 76) at 80.

29.  At its peak, TMLG had approximately 100 partner attorneys in 40 different states providing TMLG's legal services to the firm's clients. Aleman Dep. (Dkt. No. 76) 56:3-23; Aleman Decl. (Dkt. No. 105), ¶ 5.

**CFPB'S RESPONSE:** Dispute. The Bureau disputes the characterization of TMLG's local attorneys as "partner attorneys." These attorneys were not in any way "partners" of a law firm, but rather attorneys who were local to the states where consumers who enrolled in TMLG's program were located. These attorneys were, in fact, "local attorneys" and not "partners." These local attorneys received no equity in the company, health insurance, or retirement benefits. Some local attorneys even testified that the term "partner" mischaracterized their relationship with TMLG. Deposition of William P. Harrington, Jr. June 17, 2015 ("Harrington Dep."), ECF No. 81, at 48, 62-64, 115, 117-18, 153-54, 157, 220-21; Delgado Dep., ECF No. 73, at 105-108; Deposition of Daniel Goldsmith Ruggiero, July 8, 2015 ("Ruggiero Dep."), ECF No. 70, at 64-65; Gray Decl., ECF No. 94, ¶¶ 4-5. At least one local attorney stated that she did not believe she had an attorney-client relationship with TMLG's consumers. Gray Decl., ECF No. 115, ¶ 9.

Local attorneys only performed financial review and ministerial tasks in connection with mortgage modification services. These tasks consisted of looking at a consumer's basic financial information that was previously collected by a TMLG salesperson to determine whether there was a financial benefit to the consumer if he or she enrolled in TMLG's program, and checking mortgage loan modification submission packages for completeness against a checklist provided by TMLG. Sibert Dep., ECF No. 77, at 103-105, 236; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 27, 54; Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 452-455; Aleman Dep., ECF No. 76, at 201-02, 215; Sibert Jan. 23, 2012 Email, Pl.'s Mot. Summ. J. Ex. 11, at CFPB-TMLG-0061123. Non-attorneys at TMLG performed these tasks before the headquarters attorneys and local attorneys performed these same tasks. Harrington Dep., ECF No. 81, at 48, 62-64, 115, 117-18, 153-54, 157, 220-21; Delgado Dep., ECF No. 73, at 105-108; Ruggiero Dep., ECF No. 70, at 64-65; Gray Decl., ECF No. 115, ¶¶ 4-5.

Local attorneys were paid a paltry $25 to $40 for each of those tasks. TMLG Class B Agreement, Pl.'s Mot. Summ. J. Ex. 12, at CFPB-TMLG-0061205.

**DEFENDANTS' ANSWER:**

The CFPB does not cite any evidence to show that Class B Attorneys for TMLG were not partners in that firm. All of the Class B Attorneys signed partnership agreements with TMLG, and the Class B Attorneys were entitled to participate in certain TMLG benefits plans and receive distributions in accordance with the amended schedule. *See, e.g.,* Pl. Mot. Summ. J. Ex. 12 (Dkt. 101-12 at §§ 3-4.

Moreover, Class B Attorneys did not merely "duplicate" the non-legal work of the support personnel and TMLG headquarters attorneys. Aleman testified that the Class B Attorneys were responsible for both "checking [the staff member's] work" ***and*** "making sure there isn't something more that needs to be done based on the servicer, based on…whether it's in foreclosure or not in

24

foreclosure[.]" CFLG (Aleman) Dep. (Dkt. 66) at 127-28. Indeed, the Class B Attorneys reviewed loan modification packages for a number of considerations, and to ensure that all required documentation was present, that the application was complete and accurate, and that a loan modification request was the client's best option. Delgado Dep. (Dkt. 73) at 33-34, 81-84, 115-17; Sibert Dep. (Dkt. 77) at 202-03; *see also* Def. Ans. ¶ 19, *supra*, incorporated herein by reference. An attorney, with years of experience, was necessary and valuable to that process. Ruggiero Dep. (Dkt. 70) at 169-72.

While Ms. Gray stated that she did not "believe" that she had an attorney-client relationship with TMLG clients, she is incorrect. The Class B Attorneys were required to "provide legal representation with respect to firm clients, cases, debt resolution settlements and matters" assigned to them by the law firms. Pl. Mot. Summ. J. Exs. 12 (Dkt. 101-12) at § 1(a). Other Class B Attorneys confirmed that the nature of the relationship was that of attorney-client. Powell Dep. (Dkt. 71) at 239-43; Ruggiero Dep. (Dkt. 70) at 131; Delgado Dep. (Dkt. 73) at 92. Indeed, Delgado testified that although she considered the client to be that of TMLG, she was providing legal advice to that client as a partner of TMLG. Delgado Dep. (Dkt. 73) at 46.

30.   Those attorneys were not retained "local counsel," but were partners in the LLP. Aleman Dep. (Dkt. No. 76) 260:6-20; Banyon Dep. (Dkt. No. 82) 42:4-20; Aleman Decl. (Dkt. No. 105), ¶ 5.

**CFPB'S RESPONSE:** Dispute. TMLG's local attorneys were not in any way "partners in the LLP," but rather attorneys who were local to the states where consumers who enrolled in TMLG's program were located. These attorneys were, in fact, "local attorneys" and not "partners in the LLP." The local attorneys received no equity in the company, health insurance, or retirement benefits. Some local attorneys even testified that the term "partner" mischaracterized their relationship with TMLG. Harrington Dep., ECF No. 81, at 48, 62-64, 115, 117-18, 153-54, 157, 220-21; Delgado Dep., ECF No. 73, at 105-108; Ruggiero Dep., ECF No. 70, at 64-65; Gray Decl.,

ECF No. 115, ¶¶ 4-5. At least one local attorney stated that she did not believe she had an attorney-client relationship with TMLG's consumers. Gray Decl., ECF No. 115, ¶ 9.

Local attorneys only performed financial review and ministerial tasks in connection with mortgage modification services. These tasks consisted of looking at a consumer's basic financial information that was previously collected by a TMLG salesperson to determine whether there was a financial benefit to the consumer if he or she enrolled in TMLG's program, and checking mortgage loan modification submission packages for completeness against a checklist provided by TMLG. Sibert Dep., ECF No. 77, at 103-105, 236; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 27, 54; Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 452-455; Aleman Dep., ECF No. 76, at 201-02, 215; Sibert Jan. 23, 2012 Email, Pl.'s Mot. Summ. J. Ex. 11, at CFPB-TMLG-0061123. Non-attorneys at TMLG performed these tasks before the headquarters attorneys and local attorneys performed these same tasks. Harrington Dep., ECF No. 81, at 48, 62-64, 115, 117-18, 153-54, 157, 220-21; Delgado Dep., ECF No. 73, at 105-108; Ruggiero Dep., ECF No. 70, at 64-65; Gray Decl., ECF No. 115, ¶¶ 4-5.

TMLG paid local attorneys a paltry $25 to $40 for each consumer file on which they performed these administrative tasks and ultimately, approved. TMLG Class B Agreement, Pl.'s Mot. Summ. J. Ex. 12, at CFPB-TMLG-0061205.

**DEFENDANTS' ANSWER:**

*See* Def. Ans. ¶ 29, *supra*, incorporated herein by reference

31.     TMLG represented clients in mortgage mitigation. The goal of such legal services was to keep a client in his or her home for as long as possible or permanently. Aleman Dep. (Dkt. No. 76) 52:6-10; Aleman Decl. (Dkt. No. 105), ¶ 6.

**CFPB'S RESPONSE:** Dispute. The Bureau objects to the term "represented" as vague. The Bureau disputes Defendants' proposed finding to the extent that it suggests TMLG provided legal representation. TMLG did not provide legal representation to consumers in connection with

obtaining a loan modification.

Consumers who enrolled in TMLG's program never communicated with an attorney at TMLG after the initial enrollment telephone call even though TMLG represented to consumers that an attorney would represent them. Johnson Decl., ECF No. 87, ¶¶ 6, 17; Pultz Decl., ECF No. 90, ¶¶ 5, 14; Saunders Decl., ECF No. 91, ¶¶ 5, 16. At least one local attorney stated that she did not believe she had an attorney-client relationship with TMLG's consumers. Gray Decl., ECF No. 115, ¶ 9.

Out of TMLG's 5,265 consumers, a mere 30 paid additional fees to receive foreclosure defense services, and in those instances TMLG referred those consumers to local attorneys who provided legal services without assistance from TMLG or attorneys at headquarters. Declaration of Ryan Thomas, ECF No. 116, ¶ 18; Gray Decl., ECF No. 115, ¶ 15.

**DEFENDANTS' ANSWER:**

This should be deemed undisputed. The only "facts" disputed by the CFPB are the use of the terms "represented" and "legal representation." The remaining portions of Paragraph 31 are not disputed. Moreover, TMLG was a law firm, and it did provide legal representation to its approximately 5,000 clients. In addition, far more than 30 of those clients received foreclosure litigation defense services. *See* Def. Ans. ¶¶ 19, 29, *supra*, incorporated herein by reference.

> 32.    That goal was accomplished through foreclosure defense, mortgage mitigation, short sales and other possible remedies for a client's hardship, including "cash for keys" programs. Aleman Dep. (Dkt. No. 76) 51:18-25; Aleman Decl. (Dkt. No. 105), ¶ 6.

**CFPB'S RESPONSE:** Dispute. Of the 5,265 consumers who TMLG enrolled in its mortgage modification program, only 26% of consumers received loan modifications, and a meager 30 consumers received foreclosure defense services. Thomas Decl., ECF No. 116, ¶¶ 13, 18. Local attorneys testified that they were never asked by TMLG to perform deed-in-lieu of foreclosure,

short sales, cash for keys, or consent foreclosures.  Ruggiero Dep., ECF No. 70, at 151-152; Harrington Dep., ECF No. 81, at 72, 87-90, 130, 142-43, 230-233, 242.

**DEFENDANTS' ANSWER:**

This should be deemed undisputed.  The CFPB does not dispute that TMLG obtained loan modifications for many of its clients, and that other clients received foreclosure litigation defense services.

Rather, the CFPB apparently takes issue with the ***numbers*** of clients who received certain services and results.  The CFPB's conclusions are based on total enrollment numbers and do not account for clients who cancelled their retainers, stopped using TMLG's services, or obtained refunds from TMLG, thus skewing the percentage-based analysis.  In addition, the CFPB's conclusions do not account for the fact that the ultimate decision to modify a client's loan was made by the client's lender, and a client could have been denied a loan modification for any number of reasons having nothing to do with the quality of the services provided by the law firms to the client.  TMLG prepared and submitted loan modification packages on behalf of approximately 50% of its clients.  Aleman Decl. II (Dkt. 125) at ¶ 19; Pl. Mot. Summ. J. Ex. 4 (Dkt. 101-4) at § XV(b); Pl. Mot. Summ. J. Ex. 17 (Dkt. 101-17) at § XV(b); *see also* CFLG (Aleman) Dep. (Dkt. 67) at 321-22; Pl. Mot. Summ. J. Ex. 33 at TMLG.MO.LIT.000159.  Far more than 30 TMLG clients received foreclosure litigation defense services.  *See* Def. Ans. ¶ 19, *supra*, incorporated herein by reference.

> 33.  "Foreclosure defense" involved TMLG attorneys reviewing a client's circumstances and working with the client to create strategies for defending against a foreclosure action (whether judicial or non-judicial); strategies could include appearing in court, filing an answer to a complaint of foreclosure and affirmative defenses, as well as propounding discovery. Banyon Dep. (Dkt. No. 82) 38:7-39-5; Aleman Decl. (Dkt. No. 105), ¶ 6.

**CFPB'S RESPONSE:**  Dispute. The Bureau objects to the term "TMLG attorneys" as vague. Defendants fail to distinguish whether they are referencing local attorneys or headquarters

attorneys. The Bureau disputes Defendants' proposed finding to the extent it suggests that TMLG's attorneys at headquarters who were not also local attorneys performed foreclosure defense services. In the rare instances when TMLG referred a consumer to the local attorney for the local attorney's services to delay or stop a foreclosure sale, the local attorney performed all the services. TMLG headquarters performed no services to delay or stop foreclosure after the referral was made. Gray Decl., ECF No. 115, ¶ 15.

**DEFENDANTS' ANSWER:**

This should be deemed undisputed. The CFPB is attempting to create a dispute by drawing an immaterial distinction between a TMLG attorney in Chicago and those in other locations. That distinction is immaterial because all TMLG attorneys, whether in Chicago or other locations, were **partners of that law firm.** *See* Resp. ¶¶ 12, 29, *supra*, incorporated herein by reference.

When a TMLG or CFLG client required additional legal services such as foreclosure defense, TMLG and CFLG headquarters attorneys would assign a Class B Attorney to provide such services to the client. Ruggerio Dep. (Dkt. 70) at 58. Sometimes that Class B Attorney was also a "headquarters attorney." Banyon, a TMLG headquarters attorney, testified that he appeared in Illinois cases on behalf of TMLG clients who were in foreclosure. Banyon Dep. (Dkt. 82) at 38. His duties included filing appearances, filing answers to complaints, appearing in court, opposing motions for summary judgment, and issuing and responding to discovery requests. *Id.* In addition, TMLG attorneys frequently spoke with clients regarding a wide range of issues, including foreclosure defense. Sibert Dep. (Dkt. 77) at 67, 248-51, Banyon Dep. (Dkt. 82) at 38-39; 44-45, 150-51; Aleman Dep. (Dkt. 76) at 28, 133-34, 152; Delgado Dep. (Dkt. 73) at 45-51.

      36.      In a typical mortgage modification, a TMLG client would then work with non-attorney support staff, who operated under the supervision of TMLG's attorneys. Aleman Dep. (Dkt. No. 76) 57:7-58:20, 65:7-15.

**CFPB'S RESPONSE:** Dispute. Local attorneys did not supervise any TMLG staff. Harrington Dep., ECF No. 81, at 162-63, 182-183, 231, 238; Ruggiero Dep., ECF No. 70, at 163-165; Delgado Dep., ECF No. 73, at 59-60, 70.

**DEFENDANTS' ANSWER:**

The CFPB does not dispute that TMLG clients typically worked with non-attorney support staff. Rather, the CFPB only disputes that those non-attorney support staff were supervised by attorneys. *See* Def. Ans. ¶ 19, *supra*, incorporated herein by reference.

>  41. TMLG's employees and contract workers were directly supervised by the firm's attorneys – either through the presence of a TMLG attorney on-site, or through the policies, procedures, scripts, and training implemented, and the reviews conducted, by TMLG attorneys in Chicago and across the country. Gerst Dep. (Dkt. No. 75) 56:9-59:10, 106:4-20; Sibert Dep. (Dkt. No. 77) 62:2163:7; Aleman Dep. (Dkt. No. 76) 96:5-97:7, 103:10-16; Aleman Decl. (Dkt. No. 105), ¶ 9.

**CFPB'S RESPONSE:** Dispute. Headquarters attorneys were based out of the Chicago office, and could not have directly supervised employees and contract workers who were located off-site. Local attorneys did not supervise any TMLG staff. Harrington Dep., ECF No. 81, at 162-63, 182-183, 231, 238; Ruggiero Dep., ECF No. 70, at 163-165; Delgado Dep., ECF No. 73, at 59-60, 70. Even a local attorney who worked on-site at a TMLG processing office in Florida for two months testified that she did not supervise anyone. Delgado Dep., ECF No. 73, at 59-60, 70.

**DEFENDANTS' ANSWER:**

The CFPB's assertion that TMLG headquarters and Class B Attorneys "could not have directly supervised" support staff is meritless. As discussed extensively above, TMLG attorneys personally reviewed the work product of TMLG's support staff, including staff in other locations. Moreover, TMLG developed policies and procedures for streamlining the process of providing legal mortgage relief assistance services. Those policies and procedures were used by support staff in collecting documents from the client, compiling modification packages, and communications with the client and the client's servicer. All of the support staff's work was supervised and

reviewed by virtue of the two-step attorney review at both the client intake phase and at the loan modification package submission phase.  *See also* Def. Ans. ¶ 19, *supra*, incorporated herein by reference.

43.     With respect to loan modifications, once the appropriate information and documents were gathered, a loan modification package would be prepared by the support staff, and then reviewed by a TMLG attorney in the state where the client lived to confirm that the package was complete and appropriate.  Aleman Dep. (Dkt. No. 76) 133:15-18, 141:12-22; Sibert Dep. (Dkt. No. 77) 59:12-19, 93:19-94:17; Aleman Decl. (Dkt. No. 105), ¶ 10.

**CFPB'S RESPONSE:**  Dispute.  Defendants' proposed finding mischaracterizes the loan modification submission review process at TMLG.  TMLG only asked the local attorney to review a loan modification package for completeness after non-attorney support staff and a headquarters attorney already reviewed and pre-approved the loan modification submission package for completeness.  Harrington Dep., ECF No. 81, at 79-80, 150, 173; Sibert Dep., ECF No. 77, at 99-100; Gerst Dep., ECF No. 75, at 60-62.

**DEFENDANTS' ANSWER:**

This should be deemed undisputed.  The CFPB does not seriously dispute this proposed finding (*i.e.*, that a Class B Attorney reviewed the loan modification package to ensure that it was correct and complete).  Rather, the CFPB complains that Defendants omitted the intervening review by a TMLG headquarters attorney.  As set forth above, a client's loan modification package was reviewed for a number of considerations by both a TMLG headquarters attorney **and** a Class B Attorney.  *See* Def. Ans. ¶ 19, *supra*, incorporated herein by reference. Thus, this proposed finding is not materially disputed.

44.     Upon attorney approval, the package would be sent to the mortgage lender to secure a refinance or other type of loan modification.  Sibert Dep. (Dkt. No. 77) 94:13-96:10.

**CFPB'S RESPONSE:**  Dispute. The Bureau objects to Defendants' proposed finding as vague as to who sent the loan modification package to the lender. The Bureau disputes Defendants'

proposed finding to the extent it suggests that the local attorney submitted the loan modification package to the lender. The document processors, not the local attorney, forwarded the loan modification packages to the mortgage lender after the local attorney checked the package for completeness. Harrington Dep., ECF No. 81, at 86, 190-91; Sibert Dep., ECF No. 77, at 95, 216-217; Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 300-301.

**DEFENDANTS' ANSWER:**

This should be deemed undisputed. Here, again, the CFPB does not raise a genuine issue of fact. Indeed, the CFPB does not cite any evidence that loan modification packages ***were not*** sent to the client's lender. Rather, the CFPB agrees that loan modification packages, after attorney review and approval, were sent to the lender by support staff. However, the CFPB complains that Paragraph 44 is "vague" as to who actually sent the package and thus disputes it. This proposed finding is not materially disputed.

> 46.   It contracted with various companies that would provide TMLG with "qualified leads" that those companies had developed. Aleman Dep. (Dkt. No. 76) 81:16-82:25, 83:8-87:17; 37:4-9; Aleman Decl. (Dkt. No. 105), ¶ 11.

**CFPB'S RESPONSE:** The Bureau objects that the term "qualified leads" is vague. Defendants fail to explain the meaning of "qualified leads." The Bureau disputes Defendants' proposed finding to the extent it suggests that leads were pre-screened or pre-qualified in any way before they were sold to TMLG. Defendants' citations do not contain language supporting the proposed finding that such pre-screening or pre-qualification took place.

**DEFENDANTS' ANSWER:**

Aleman testified that the marketing companies did pre-qualify client leads:

Q   And when the marketing company gets that call from the consumer, what does it do with it?

A   I mean, in times it would take the call and, you know, make sure the client…could do a prequalification, you know, to make sure that it's a good [lead], and then they could transfer it to TMLG.

*        *        *

Q      Were there criteria by which the marketing company would give you those 100 calls or give you any calls?

A      Like I said, I think some might have been what's called pre-qualified, you know, where it actually goes to them first and they say, you know, Are you calling with regard to the commercial? Yes, I am. Okay. Great. So you're struggling with – so they would make sure the client is serious and interested and things like that, and then they would send the call on to us.

Aleman Dep. (Dkt. 76) at 86-87. The CFPB cites no contrary evidence. Accordingly, Paragraph 46 is undisputed.

> 48.      The intake person (using scripts prepared by TMLG) described TMLG's services and TMLG's fee structure. Aleman Dep. (Dkt. No. 76) 92:6-13, 96:5-97:1, 103:10-16; Sibert Dep. (Dkt. No. 77) 87:25-90:2; Aleman Decl. (Dkt. No. 105), ¶ 11.

**CFPB'S RESPONSE:** Dispute. Defendants' proposed finding mischaracterizes the tasks of the person who spoke to the consumer at the time of intake. TMLG's intake personnel were salespersons who often made representations outside of the scripted language in order to secure a sale. Anderson Dep., ECF No. 79, at 68-69, 93, 99-106, 113; Murphy Dep., ECF No. 80, at 56-57. These representations included:

a. promising consumers that TMLG could provide them with modifications of their mortgages. Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000153; Declaration of George Halpin, ECF No. 88, ¶ 4; Pultz Decl., ECF No. 90, ¶ 4; Saunders Decl., ECF No. 91, ¶ 4; Bruce Decl. , ECF No. 93, ¶ 3; Anderson Dep., ECF No. 79, at 103-105, 113, 123-124.

b. telling consumers that they would receive attorney services. Aleman Dep., ECF No. 76, at 105; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154; Anderson Dep., ECF No. 79, at 110-111.

c. telling consumers they could not receive loan modifications unless they were behind on their mortgage payments. Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154.

d. telling consumers that they did not have to make any payments to their lenders until their mortgage loan was modified, and that the lender would incorporate all past due payments into the loan modification. Pultz Decl. ECF No. 90, ¶ 11.

33

**DEFENDANTS' ANSWER:**

This should be deemed undisputed. The CFPB does not dispute that the client intake personnel described TMLG's services and fees to potential clients using scripts prepared by TMLG attorneys. Rather, the CFPB claims that client intake personnel made representations outside those scripts to secure "sales" and cites four examples. But the evidence that the CFPB cites to support three of its four examples is the TMLG Script itself, and that Script, standing alone, does not tend to show that TMLG intake personnel made representations outside the Scripts. Therefore, the CFPB's evidence is not material to the proposed facts in Paragraph 48.

Client intake specialists were expressly instructed ***not*** to promise or guarantee any particular result. Aleman Dep. (Dkt. 76) at 105; Anderson Dep. (Dkt. 79) at 103-04. In fact, the use of "the word 'guarantee' was not allowed." Anderson Dep. (Dkt. 79) at 103-04. Client intake specialists were given scripts to guide their discussions with potential clients, and TMLG employed a compliance officer to ensure that nothing was promised or guaranteed to a potential client. Anderson Dep. (Dkt. 79) at 104-05. In addition, all TMLG clients executed retainer agreements with the respective firms, which expressly and repeatedly stated that the law firms were not promising a particular result:

- "TMLG makes no specific guarantee regarding the outcome of any foreclosure action, mortgage relief services, loan modification, short sale, or other negotiation with a mortgage workout solution[.]" Pl. Mot. Summ. J. Ex. 4 (Dkt. 101-4) at § VII.

- "The outcome of any foreclosure action and TMLG's negotiation of any mortgage workout solution is uncertain. Each case is unique and results may vary[.]" *Id.* at § X(c).

- "Client's mortgage workout solution may be limited to a Forebearance Plan, Repayment Plan, Short Sale, Deed-in-Lieu or Cash for Keys program." *Id.* at § X(d).

- "While TMLG will negotiate with the servicer to stop or postpone the sale date while the mortgage workout is under review, TMLG cannot guarantee that such postponement will occur or that Litigation Services or Mortgage Relief Services will be successful[.]" *Id.* at § X(g).

34

- "Client's lender may not agree to change the terms of Client's loan." *Id.* at § XV(b).

- "TMLG cannot and does not make any guarantee of any kind regarding the outcome of any foreclosure case or the success of any negotiation for a mortgage workout." *Id.* at § XV(d).

Consumers who called TMLG and CFLG and were current on their mortgage were told that they should contact their lender directly, as the TMLG and CFLG programs only work for those who are already behind in their mortgage payments. Pl. Mot. Summ. J. at Ex. 33 (Dkt. 101-33); Aleman Decl. (Dkt. 105) at ¶ 21; Anderson Dep. (Dkt. 79) at 68. TMLG did not tell clients to stop paying their mortgages. Aleman Dep. (Dkt. 76) at 105-06; *see also* Pl. Mot. Summ. J. Ex. 33 at TMLG.MO.LOT.000152-54. The training materials expressly provide that TMLG employees should ***not*** advise clients to stop paying their mortgages. Pl. Mot. Summ. J. Ex. 33 (Dkt. 103-1) at TMLG.MO.LIT.000177-78; *see also* Pl. Mot. Summ. J. Ex. 30 (Dkt. 101-30) at KS.00014 ("[W]e strongly advise if you can afford your mortgage payments you should continue to pay them.").

49.     If the person wanted to retain TMLG, a TMLG attorney then spoke with the person to confirm his or her understanding of TMLG, its structure and fees, the services it provided, and the risks associated with those services. Aleman Dep., May 20, 2015, (Dkt. No. 76) 92:13-93:4; Aleman Decl. (Dkt. No. 105), ¶ 11.

**CFPB'S RESPONSE:** Dispute. Defendants' proposed finding mischaracterizes the conversation between the consumer and TMLG headquarters attorney. After the consumer spoke with a TMLG salesperson, TMLG transferred the consumer to speak with an attorney at TMLG headquarters. That attorney read the consumer a script that repeated the same points made by the salesperson's script and repeated the intake process. Aleman Dep., ECF No. 76, at 28, 92; Sibert Dep., ECF No. 77, at 134-136. The headquarters attorney's script consisted of statements about TMLG's services, and the consumer was required to answer "yes" after each statement to indicate he or she understood what was being read to him or her. Sibert Dep., ECF No. 77, at 134-136; TMLG Verification and Sales Scripts, Pl.'s Mot. Summ. J. Ex. 30, at KS.00014-KS.00016, KS.00020-

KS.00031. The consumer, desperate to save his or her home, could not enroll in TMLG's program for a loan modification unless he or she answered "yes" after each statement that the headquarters attorney read to him or her. Sibert Dep., ECF No. 77, at 135-136.

The headquarters attorney's script contained no language explaining to the consumer that if the consumer was able to successfully obtain a loan modification from his or her lender, it would take significantly longer than the 90 to 120 days that TMLG advertised, and the script contained no language explaining to the consumer the risk that the consumer may not be able to obtain a loan modification even with TMLG's services. TMLG Verification and Sales Scripts, Pl.'s Mot. Summ. J. Ex. 30, at KS.00014-KS.00016, KS.00020-KS.00031.

**<u>DEFENDANTS' ANSWER:</u>**

This should be deemed undisputed. The CFPB does not raise a genuine dispute of material fact with respect to the proposed finding that a TMLG attorney spoke with a potential client to confirm his understanding of TMLG's services, its fees and the risks associated with those services. Rather, the CFPB complains that Defendants have "mischaracterized" the attorney verification process.

After the client indicated that he wanted to sign up for the firms' services, but prior to the client's execution of a retainer agreement, an attorney would contact the client, review whether the client met the legal specifications for the firms' services, and make sure the client understood the program and fees. Aleman Dep. (Dkt. 76) at 91-92. Potential clients were not required to answer "yes" to the attorneys' questions. They were free to answer "no." In that event, the potential client was routed back to TMLG personnel to answer any other questions the potential client had. The purpose of requiring a potential client to answer "yes" to all questions during the verification call *before* enrolling a client was to ensure that the client understood the nature and terms of TMLG's program *before* he was enrolled. Sibert Dep. (Dkt. 77) at 134-135. If a potential client was

ultimately not able to answer "yes" to all questions, TMLG did not enroll that client.  *Id.*

In addition, the CFPB is wrong in its claim that the cited script does not contain language explaining to the consumer that a loan modification may take longer than 90 to 120 days, or that the consumer may not be able to obtain a loan modification even with TMLG's services.  That script provides:

- "TMLG cannot and does not make any specific guarantee regarding the outcome of any foreclosure action, mortgage modification, or other negotiation."  Pl. Mot. Summ. J. Ex. 30 (Dkt. 101-30) at KS.00015, 00021, 00024, 00027, 00030.

- In response to a question about how long the process takes: "[T]he banks move slow…we move fast…a lot depends on how quickly you move as far as getting us all the documents we need.  Usually the clients that get us the documents the fastest get their modifications the fastest."  *Id.* at KS.00017 (ellipses in original).

Those points were confirmed in the TMLG Retainer Agreement.  *See* Pl. Mot. Summ. J. Ex. 4 (Dkt. 101-4) at §§ VI(b), VII, X, XV; *see also* Def. Ans. ¶ 48, *supra*, incorporated herein by reference.

50.     Once the person spoke with a TMLG attorney and signed a retainer agreement, the person's information and retainer agreement were packaged into a file and sent to a TMLG partner in the person's home state for review.  Aleman Dep. (Dkt. No. 76) 93:5-8; Sibert Dep. (Dkt. No. 77) 47:8-19, 60:11-61:3; Gerst Dep. (Dkt. No. 75) 35:3-36:5; Aleman Decl. (Dkt. No. 105), ¶ 11.

**CFPB'S RESPONSE:**  Dispute.  Attorneys in TMLG's network were not in any way "partners in the LLP," but rather attorneys who were local to the states where consumers who enrolled in TMLG's program were located.  These attorneys were, in fact, "local attorneys" and not "law firm partners."

The local attorneys received no equity in the company, health insurance, or retirement benefits.  Some local attorneys even testified that the term "partner" mischaracterized their relationship with TMLG.  Harrington Dep., ECF No. 81, at 48, 62-64, 115, 117-18, 153-54, 157, 220-21; Delgado Dep., ECF No. 73, at 105-108; Ruggiero Dep., ECF No. 70, at 64-65; Gray Decl., ECF No. 115, ¶¶ 4-5.  At least one local attorney stated that she did not believe she had an attorney-

client relationship with TMLG's consumers. Gray Decl., ECF No. 115, ¶ 9.

Local attorneys only performed financial and ministerial tasks in connection with mortgage modification services. These tasks consisted of looking at a consumer's basic financial information that was previously collected by a TMLG salesperson to determine whether there was a financial benefit to the consumer if he or she enrolled in TMLG's program, and checking mortgage loan modification submission packages for completeness with the use of a TMLG provided checklist. Non-attorneys at TMLG performed these financial and ministerial tasks before the headquarters attorneys and local attorneys performed these same tasks. Sibert Dep., ECF No. 77, at 103-105, 236; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 27, 54; Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 452-455; Aleman Dep., ECF No. 76, at 201-02, 215; Sibert Jan. 23, 2012 Email, Pl.'s Mot. Summ. J. Ex. 11, at CFPB-TMLG-0061123.

TMLG paid local attorneys a paltry $25 to $40 for each consumer file on which they performed these administrative tasks and ultimately, approved. TMLG Class B Agreement, Pl.'s Mot. Summ. J. Ex. 12, at CFPB-TMLG-0061205.

Additionally, Defendants' proposed finding mischaracterizes the consumer intake review process. Local attorneys were only asked to look at a consumer's intake information, which consisted of basic financial information collected on a computer screen by a salesperson, after the salespersons and headquarters attorney both already reviewed and pre-approved the consumer for TMLG's program. Sibert Jan. 23, 2012 Email, Pl.'s Mot. Summ. J. Ex. 11, at CFPB-TMLG-0061123; Ruggiero Dep., ECF No. 70, at 60, 110-111. A headquarters attorney communicated to local attorneys that they would "rarely decline" consumers for intake. Sibert Jan. 23, 2013 Email, Pl.'s Mot. Summ. J. Ex. 11, at CFPB-TMLG-0061123.

Local attorneys approved 100%, or close to 100%, of the mortgage loan modification intake files that they reviewed. Harrington Dep., ECF No. 81, at 109-110, 139, 236; Ruggiero Dep., ECF

No. 70, 115-116. If a local attorney did not approve the mortgage loan modification intake review file, then TMLG did not pay the local attorney for that service. Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 135-136; Harrington Dep., ECF No. 81, at 150-51, 218-19; CFLG Class B Agreement, Pl.'s Mot. Summ. J. Ex. 18, at CFPB-TMLG-0052829.

The local attorney's task was simply to determine – by just looking at financial information and criteria – if there would be a financial benefit to the consumer. For example, if the consumer had an interest rate above the market interest rate, then the consumer was considered a good candidate for TMLG's services. Harrington Dep., ECF No. 81, at 39-40, 79, 173-74. Local attorneys spent as little as 1-2 minutes reviewing TMLG mortgage loan modification intake review files. Ruggiero Dep., ECF No. 70, at 114; Harrington Dep., ECF No. 81, at 175-77, 235. One local attorney described the review of intake files as "a quick glance" and work that he could do "in a heartbeat." Harrington Dep., ECF No. 81, at 176-177.

**DEFENDANTS' ANSWER:**

This should be deemed undisputed. The CFPB does not dispute that a Class B Attorney in the client's home state reviewed the client's intake file. Rather, the CFPB lists a number of complaints with the Class B Attorneys' functions and performance that are not material to the proposed finding and therefore do not create a genuine dispute of proposed fact.

Moreover, the CFPB incorrectly characterizes the role of Class B Attorneys. The role of Class B Attorneys in the representation of TMLG clients is set forth above. *See* Def. Ans. ¶¶ 19, 29, *supra*, incorporated herein by reference. The Class B Attorneys reviewed client intake files for a number of considerations, using guidelines provided by TMLG. Delgado Dep. (Dkt. 73) at 81. A proper intake file review under those guidelines took approximately 30-45 minutes. *Id.* One Class B Attorney noted that, although he approved nearly every intake file, "keep in mind, I was the second set of attorney's eyes on [the file]. So they may not have even gotten to me, if

there was a really fatal problem with either the intake or submission, they may not even have been sent over to me." Harrington Dep. (Dkt. 81) at 109-110. In addition, at least one attorney testified that that she only approved approximately 70-80% of client intake files. Delgado Dep. (Dkt. 73) at 84-85.

51.    As compensation to TMLG for the legal services it provided, clients made retainer payments to the firm, out of which TMLG withdrew its fees. Aleman Dep. (Dkt. No. 76) 165:11-166:12; Aleman Decl. (Dkt. No. 105), ¶ 12.

**CFPB'S RESPONSE:** Dispute. Exhibit B of the retainer agreement that TMLG signed with consumers provides that the initial retainer payment and subsequent monthly payments are compensation for services in connection with mortgage loan modification services, and none of those services are legal services. Exhibit B to TMLG Retainer Agreement, Pl.'s Mot. For Summ. J., Ex. 4.

**DEFENDANTS' ANSWER:**

This should be deemed undisputed. The CFPB does not dispute that TMLG clients made retainer payments to TMLG, and that TMLG withdrew its fees from those payments. Rather, the CFPB takes issue with the term "legal services." TMLG provided legal services to its clients, and the fees paid were compensation for those services. *See* Def. Ans. ¶ 19; *see also* Pl. Mot. Summ. J. Ex. 4 (Dkt. 101-4). This does not create a genuine dispute of the proposed fact.

52.    Upon enrolling with TMLG, a client would make an initial flat-fee retainer payment, and would then make monthly flat-fee retainer payments for a set amount of time. Aleman Dep. (Dkt. No. 76) 185:5-10; Aleman Decl. (Dkt. No. 105), ¶ 12.

**CFPB'S RESPONSE:** Dispute. Consumers signed up to have monthly payments automatically taken out of their bank account until they dropped out of the program or received a loan modification, not for a "set amount of time." Exhibit B to TMLG Retainer Agreement, Pl.'s Mot. For Summ. J., Ex. 4, ¶ 5; NoteWorld Sign-Up Agreement contained in TMLG Response to US Senate, Pl.'s Mot. Summ. J. Ex. 36 (filed under seal), at DEF.0003090- DEF.0003092.

**DEFENDANTS' ANSWER:**

The CFPB'S response is misleading in that it suggests that payments were automatically withdrawn from a client's bank account into a TMLG account. That is not what the undisputed evidence shows. Both TMLG required the initial retainer payment to be deposited into the client's account with the third-party payment processor (Meracord). Aleman Dep. (Dkt. 76) at 180, 229. That account was controlled by the client, not TMLG. Aleman Dep. (Dkt. 76) at 186. From there, the client's funds were transferred into a TMLG IOLTA account at US Bank. Kesterson Dep. (Dkt. 69) at 64-65, 68. The client's funds remained in the IOLTA account until a payment request was made by the law firm, at which point the funds would be transferred into TMLG's Meracord account. *Id.*; Aleman Dep. (Dkt. 76) at 283; *see also* Aleman Decl. (Dkt. 105) at ¶¶ 12, 22.

In addition, the TMLG Retainer Agreement permitted the client to terminate the representation at any time, for any reason. Pl. Mot. Summ. J. Ex. 4 (Dkt. 101-4) at §§ IV, XII. The Retainer Agreement further provides for fee accountings and refunds in the event the representation is terminated. *Id*. at § XII. Accordingly, there is no genuine dispute of the proposed fact.

54.     In general terms, the processing of client payments went as follows:

    (i)    Clients made their payments into their individual NoteWorld/Meracord accounts;

    (ii)    NoteWorld/Meracord distributed the funds pursuant to its contracts, including to TMLG's IOLTA trust accounts, and to itself for its account fees; and

    (iii)    TMLG transferred funds to cover its fees from the trust accounts into its NoteWorld/Meracord account and then to its operating account(s).

    Aleman Dep. (Dkt. No. 76) 186:11-188:1, 189:22-195:8, 283:13-21; Aleman Decl. (Dkt. No. 105), ¶ 12.

**CFPB'S RESPONSE:** Dispute. The Bureau disputes Defendants' proposed finding to the extent it suggests that TMLG's contracts with Noteworld/ Meracord instructed Noteworld/ Meracord to

distribute funds to TMLG's IOLTA account. TMLG's agreement with Noteworld/ Meracord does not contain language showing the distribution of funds to an IOLTA account. TMLG Noteworld Agreement, Pl.'s Mot. Summ. J., Ex. 26.

**DEFENDANTS' ANSWER:**

This should be deemed undisputed. The CFPB's only dispute to Paragraph 54 is that the Noteworld/Meracord contract does not reference an IOLTA account. The referenced Noteworld/Meracord contract does not reference **any** bank accounts. *See* Pl. Mot. Summ. J. Ex. 26 (Dkt. 101-26). The CFPB has not offered any other evidence to dispute the flow of funds described in Paragraph 54. Accordingly, there is no genuine dispute of the proposed fact.

55. TMLG was not a profitable business and neither Macey not Aleman were able to fully recover their investment. Aleman Dep. (Dkt. No. 76) 59:10-64:23; Macey Dep. (Dkt. No. 78) 69:14-23; Aleman Decl. (Dkt. No. 105), ¶ 13; Macey Decl. (Dkt. No. 97), ¶ 7.

**CFPB'S RESPONSE:** Dispute. Defendants' records show that TMLG collected $18,454,222 and issued $122,485 in refunds, resulting in TMLG receiving a net amount of $18,331,737 from consumers. Thomas Decl., ECF No. 116, at 3 ¶ 21.

**DEFENDANTS' ANSWER:**

The CFPB fails to note the distinction between revenue (*i.e.*, money received) and profits (*i.e.*, money remaining after the ordinary business expenses have been paid). The numbers referenced by the CFPB are TMLG's gross and net **revenues.** The CFPB has not cited any evidence that TMLG was **profitable.** Accordingly, Paragraph 55 is undisputed.

56. In total, Macey lost over $100,000 in cash from his capital investments and loans to the firm. Macey Decl., Oct. 8, 2015, ¶ 7.

**CFPB'S RESPONSE:** Dispute. Defendants' records show that TMLG collected $18,454,222 and issued $122,485 in refunds, resulting in TMLG receiving a net amount of $18,331,737 from consumers. Thomas Decl., ECF No. 116, at 3 ¶ 21.

**DEFENDANTS' ANSWER:**

This should be deemed undisputed.  The CFPB has not cited any evidence that Macey did **not** lose over $100,000 from his capital investments and loans to TMLG.  Rather, the CFPB simply cites to TMLG's gross and net revenues, and does not address profits.  *See* Def. Ans. ¶ 55.

> 57.  In total, Aleman lost over $30,000 in cash from his capital investments and loans to the firm.  Aleman Dep. (Dkt. No. 76) 61:3-63:18; Aleman Decl. (Dkt. No. 105), ¶ 13.

**CFPB'S RESPONSE:**  Dispute.  Defendants' records show that TMLG collected $18,454,222 and issued $122,485 in refunds, resulting in TMLG receiving a net amount of $18,331,737 from consumers.  Thomas Decl., ECF No. 116, at 3 ¶ 21.

**DEFENDANTS' ANSWER:**

This should be deemed undisputed.  The CFPB has not cited any evidence that Aleman did **not** lose over $30,000 from his capital investments and loans to TMLG.  Rather, the CFPB simply cites to TMLG's gross and net revenues, and does not address profits.  *See* Def. Ans. ¶ 55.

> 58.  Overall the firm lost approximately $300,000, of which Macey's share was a $230,000 loss and Aleman's share was a $43,000 loss.  Aleman Decl. (Dkt. No. 105), ¶ 13; Macey Decl. (Dkt. No. 97), ¶ 7.

**CFPB'S RESPONSE:**  Dispute.  Defendants' records show that TMLG collected $18,454,222 and issued $122,485 in refunds, resulting in TMLG receiving a net amount of $18,331,737 from consumers.  Thomas Decl., ECF No. 116, at 3 ¶ 21.

**DEFENDANTS' ANSWER:**

This should be deemed undisputed.  The CFPB has not cited any evidence that TMLG, Macey and Aleman did not experience such losses.  Rather, the CFPB simply cites to TMLG's gross and net revenues, and does not address profits.  *See* Def. Ans. ¶ 55.

> 59.  TMLG operated into 2013 and over the course of its operations, TMLG had approximately 5,000 clients.  Aleman Dep. (Dkt. No. 76) 130:9-13; Aleman Decl. (Dkt. No. 105), ¶ 14.

**CFPB'S RESPONSE:** Dispute. Based on data provided by Defendants to the Bureau, 5,265 consumers made payments to TMLG. Thomas Decl., ECF No. 116, at ¶ 13.

**DEFENDANTS' ANSWER:**

This is not materially disputed. Defendants note that the original statement provided that TMLG had "***approximately*** 5,000 clients." Defendants do not dispute that the exact number was 5,265.

      60.     Of those clients, TMLG secured bank-approved loan modifications for nearly 1,300 of them. Aleman Decl. (Dkt. No. 105), ¶ 14.

**CFPB'S RESPONSE:** Dispute. Data from Defendants to the Bureau demonstrates that TMLG obtained loan modifications for only 1,296 out of 5,265 consumers who enrolled in TMLG's program and made payments to TMLG. Thomas Decl., ECF No. 116, at ¶ 13.

**DEFENDANTS' ANSWER:**

This is not materially disputed. Defendants note that the original statement provided that TMLG obtained loan modifications for "***approximately*** 1,300 clients." The CFPB, noting that the number of loan modifications was 1,296 (*i.e.*, four less than the approximation referenced by Defendants) disputes the statement.

      62.     By the third quarter of 2013, TMLG no longer had any clients. Aleman Dep. (Dkt. No. 76) 16:5-8, 20:17-21.14; Aleman Decl. (Dkt. No. 105), ¶ 14.

**CFPB'S RESPONSE:** Dispute. Data from Defendants to the Bureau demonstrates that TMLG serviced consumers until at least November 5, 2013. Thomas Decl., ECF No. 116, Exhibit A.

**DEFENDANTS' ANSWER:**

This should be deemed undisputed. The cited Exhibit does not support the CFPB's assertion. Exhibit A to the Thomas Declaration (Dkt. 117-1) is an email dated October 19, ***2012*** and does not address the point in time at which TMLG stopped providing services to its clients. Thus, this proposed finding is undisputed. TMLG stopped enrolling new clients in the first quarter

of 2013 and went into a wind down. Aleman Decl. (Dkt. 105) at ¶ 14. TMLG continued to provide legal services to then-current clients until that representation of such clients ran its course. *Id.* By the third quarter of 2013, TMLG no longer had any clients or operations. *Id.*

64.     CFLG was a law firm, which provided mortgage mitigation legal services for homeowners in distress with the goal of keeping clients in their homes as long as possible. CFLG (Stafford) Dep. (Dkt. No. 64) 21:17-20; Stafford Decl. (Dkt. No. 98), ¶ 3; CFLG (Aleman) Dep. II (Dkt. No. 67) 438:12-439:16.

**CFPB'S RESPONSE:** Dispute. CFLG was not a "law firm," but rather a provider of mortgage assistance relief services. CFLG offered, provided or arranged for others to provide mortgage assistance relief services, including but not limited to, providing services to assist a consumer with modifying the terms of his or her mortgage. Deposition of CFLG 30(b)(6) Corporate Representative Harold E. Stafford Part 1 ("Stafford CFLG 30(b)(6) Dep. Part 1"), June 3, 2015, ECF No. 64, at 20; Deposition of CFLG 30(b)(6) Corporate Representative Jeffrey John Aleman Part 1 ("Aleman CFLG 30(b)(6) Dep. Part 1"), May 19, 2015, ECF No. 66, at 35. CFLG even identifies its principal business activity as "Mortgage Consulting" and its principal product or services as "Consulting" on the company's 2012 and 2013 Federal income tax returns. Exhibits H and I of Declaration of Jeffrey Aleman, ECF No. 105.

CFLG's marketing materials, welcome letters to consumers, retainer agreements with consumers, and sales representative calls with consumers, all demonstrated that the CFLG offered to provide and purportedly provided mortgage loan modification services. Declaration of Tim Ledbetter, ECF No. 92, ¶¶ 2-5; Peterson Decl., ECF. No. 84, ¶¶ 3, 5; Teynor Decl., ECF No. 85, ¶¶ 2-4; Halwani Decl., ECF No. 86, ¶¶ 2-4; CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000198-000201; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154, TMLG.MO.LIT.000160; Anderson Dep., ECF No. 79, at 130-134; CFLG Amended Answer to Complaint, Dec. 31, 2014, ECF No. 41, at ¶ 39; Jeffrey Aleman Amended Answer to Complaint, ECF No. 40, at 6 (answer to ¶ 23); TMLG Response to US Senate,

Pl.'s Mot. Summ. J. Ex. 36 (filed under seal), at DEF.0003071; Thomas Macey Amended Answer to Complaint, ECF No. 42, at 6 (answer to ¶ 23); Jason Searns Amended Answer to Complaint, ECF No. 43, at 6 (answer to ¶ 23).

CFLG provided no legal services to consumers who sought modifications of their mortgages. Consumers never communicated with any attorney from headquarters or a local attorney after they enrolled for services. CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000198-000201; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154; Peterson Decl., ECF No. 84, ¶ 16; Halwani Decl., ECF No. 86, ¶ 16; Declaration of Tim Ledbetter, ECF No. 92, ¶ 14.

At least one local attorney stated that she did not have an attorney-client relationship with CFLG's consumers. Gray Decl., ECF No. 115, ¶ 9. The Virginia State Bar found that a local attorney in Virginia had no attorney-client relationship with a CFLG consumer who resided in Virginia. Gray Decl., ECF No. 115, ¶ 19 and Exhibit C.

The only services in connection with mortgage loan modifications that local attorneys provided to consumers consisted of (1) comparing CFLG checklists with consumer financial information collected on a computer screen at intake to assure that a consumer met lender criteria to apply for a loan modification, and (2) comparing CFLG checklists against documents submitted by a consumer to assure that the package contained all of the lender-required mortgage loan modification documents. These tasks could be performed by non-attorneys, and in fact, were already performed by non-attorneys – salespersons and document processors - before the local attorneys took them on. Sibert Dep., ECF No. 77, at 103-105, 236; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 27, 54; Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 452-455; Aleman Dep., ECF No. 76, at 201-02, 215.

Based on Defendants' own data, none of the 1,116 consumers who enrolled in CFLG's services received foreclosure defense services, or services beyond the financial and ministerial tasks associated with mortgage loan modification services. Thomas Decl., ECF No. 116, at 3 ¶ 19.

**DEFENDANTS' ANSWER:**

This should be deemed undisputed. The CFPB's only dispute is that CFLG called itself a "law firm." CFLG was a law firm. *See* Def. Ans. ¶ 12, *supra*, incorporated herein by reference.

In addition, while Ms. Gray stated that she did not "believe" that she had an attorney-client relationship with CFLG clients, she is incorrect. The Class B Attorneys were required to "provide legal representation with respect to firm clients, cases, debt resolution settlements and matters" assigned to them by the law firms. Pl. Mot. Summ. J. Ex. 18 (Dkt. 101-18) at § 1(a). Other Class B Attorneys confirmed that the nature of the relationship was that of attorney-client. Powell Dep. (Dkt. 71) at 239-43; Ruggiero Dep. (Dkt. 70) at 131; Delgado Dep. (Dkt. 73) at 92, 98.

68. In order to accomplish its goal, CFLG entered into contracts with various attorneys in states across the country in order to provide CFLG's legal services to clients in those states. CFLG (Stafford) Dep. (Dkt. No. 64) 25:1-27:19; Stafford Decl. (Dkt. No. 98), ¶ 4.

**CFPB'S RESPONSE:** Dispute. CFLG provided no legal services to consumers who sought modifications of their mortgages. Consumers stated that they never communicated with any attorney from headquarters or a local attorney after they enrolled for services. CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000198-000201; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154; Peterson Decl., ECF No. 84, ¶ 16; Halwani Decl., ECF No. 86, ¶ 16; Declaration of Tim Ledbetter, ECF No. 92, ¶ 14.

At least one local attorney stated that she did not have an attorney-client relationship with CFLG's consumers. Gray Decl., ECF No. 115, ¶ 9. The Virginia State Bar found that a local attorney in Virginia had no attorney-client relationship with a CFLG consumer who resided in Virginia. Gray Decl., ECF No. 115, ¶ 19 and Exhibit C.

47

The only services in connection with mortgage loan modifications that local attorneys provided to consumers consisted of (1) comparing CFLG checklists with consumer financial information collected on a computer screen at intake to assure that a consumer met lender criteria to apply for a loan modification, and (2) comparing CFLG checklists with documents submitted by a consumer to assure that the package contained all of the lender-required mortgage loan modification documents. These tasks could be performed by non-attorneys, and in fact, were already performed by non-attorneys – salespersons and document processors - before the local attorneys performed these same tasks. Sibert Dep., ECF No. 77, at 103-105, 236; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 27, 54; Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 452-455; Aleman Dep., ECF No. 76, at 201-02, 215.

Based on Defendants' own data, none of the 1,116 consumers who enrolled in CFLG's services received foreclosure defense services, or services beyond the financial and ministerial tasks associated with mortgage loan modification services. Thomas Decl., ECF No. 116, at 3 ¶ 19.

**DEFENDANTS' ANSWER:**

This should be deemed undisputed. Here, again, the CFPB's only dispute is to the use of the term "legal services." The CFPB does not dispute that CFLG entered into contracts with attorneys around the country to assist in the provision of services to CFLG clients. Moreover, CFLG was a law firm. *See* Def. Ans. ¶ 12, 64, *supra*, incorporated herein by reference.

69. CFLG also contracted with a third-party vendor to provide certain client support services under Stafford's supervision. CFLG (Stafford) Dep. (Dkt. No. 64) 30:6-32:22; Stafford Decl. (Dkt. No. 98), ¶ 4.

**CFPB'S RESPONSE:** Dispute. The Bureau objects to the term "client support services" as vague. To the extent "client support services" means sales and intake services or document processing services, the citations provided by Defendants do not support the proposed finding asserted by Defendants. A non-attorney supervised CFLG's third-party vendor, Sharpe

Processing.  Stafford CFLG 30(b)(6) Dep. at 94.

**DEFENDANTS' ANSWER:**

Stafford testified that Sharpe Processing collected and compiled the client's documents for a loan modification package, but that the client's file was "underwritten," or reviewed and assessed for a number of considerations by either Stafford or Arne Skatrud, another attorney.  CFLG (Stafford) Dep. (Dkt. 64) at 32-34.

70.     Between January 2012 and July 2012, CFLG accepted referrals from a Florida law firm, Consumer Defense Attorneys, for potential clients residing in states in which Consumer Defense Attorneys did not practice but CFLG did.  CFLG (Stafford) Dep. (Dkt. No. 64) 30:6-31:22; Stafford Decl. (Dkt. No. 98), ¶ 4.

**CFPB'S RESPONSE:**  Dispute.  The Bureau disputes Defendants' characterization of Consumer Defense Associates as a "law firm."  Consumer Defense Associates was a mortgage assistance relief services provider with a network of attorneys, similar to the business model of CFLG.  Stafford CFLG 30(b)(6) Dep. Part 1, ECF No. 64, at 20-21, 25-26, 29-32.

**DEFENDANTS' ANSWER:**

This should be deemed undisputed.  The CFPB's only dispute appears to be that Defendants call Consumer Defense Attorneys ("CDA") a "law firm."  The CFPB does not cite any evidence to support its claim that CDA was ***not*** a law firm.  Rather, the only evidence is that Consumer Defense Attorneys was a Florida-based law firm that specialized in mortgage mitigation services, with contract attorneys licensed in various states.  CFLG (Stafford) Dep. (Dkt. 64) at 29-32.  In any event, the proposed finding in Paragraph 70 is not material for purposes of the motion for summary judgment.

71.     Between January 2012 and July 2012, CFLG enrolled approximately 26 clients. CFLG (Stafford) Dep. (Dkt. No. 64) 27:20-28:8; Stafford Decl. (Dkt. No. 98), ¶ 4.

**CFPB'S RESPONSE:** Dispute. Defendants' citations do not support Defendants' proposed finding. Stafford testified that CFLG enrolled 27 consumers before July 2012. Stafford CFLG 30(b)(6) Dep. Part 1, ECF No. 64 at 27-28.

**DEFENDANTS' ANSWER:**

This is not materially disputed. Defendants note that the original statement provided that, prior to July 2012, CFLG enrolled "***approximately*** 26 clients." The CFPB, noting that the number of pre-July 2012 clients (*i.e.*, one less than the approximation referenced by Defendants) disputes the statement. Defendants submit that the CFPB's dispute to Paragraph 71 is neither genuine nor material.

> 72.   Because TMLG was proving unprofitable, and because Searns wanted to leave TMLG, Aleman convinced Macey to invest in a new mortgage mitigation law firm. Macey Dep. (Dkt. No. 78) 83:11-17; Searns Dep. (Dkt. No. 74) 36:24-37:1; Aleman Decl. (Dkt. No. 105), ¶ 15; Macey Decl. (Dkt. No. 97), ¶ 8.

**CFPB'S RESPONSE:** Dispute. The Bureau objects to Defendants' proposed finding on the ground that the proposed finding is a conclusory statement.

The Bureau also disputes Defendants' proposed finding that TMLG was unprofitable, and that Aleman convinced Macey to invest in CFLG. Defendants' records show that TMLG collected $18,454,222 and issued $122,485 in refunds, resulting in TMLG receiving a net amount of $18,331,737 from consumers. Thomas Decl., ECF No. 116, at 3 ¶ 21.

Defendants' citations do not support Defendants' proposed finding that Aleman "convinced" Macey to invest in CFLG. Rather, Defendants' citations merely demonstrate that Aleman talked to Macey about a proposition to invest in CLFG. Macey Decl. (Dkt. No. 97), ¶ 8.

**DEFENDANTS' ANSWER:**

The CFPB fails to note the distinction between revenue (*i.e.*, money received) and profits (*i.e.*, money remaining after the ordinary business expenses have been paid). The numbers

referenced by the CFPB are TMLG's gross and net **_revenues._** The CFPB has not cited any

evidence that TMLG was **_profitable._** Accordingly, Paragraph 71 is undisputed in that regard.

With respect to Macey's entry into CFLG, Macey testified that Aleman "came to [him]

with an idea, with a proposal on starting this business." CFLG (Macey) Dep. at 12-13. Macey

further testified that it was Aleman's idea for Macey to purchase an interest in CFLG, and that it

was "sort of Jeff's brainchild, his baby[.]" *Id.* at 13-14.

> 75. Stafford was informed that Aleman and Macey were involved with TMLG, which
> also provided mortgage-related legal services, and had the resources to expand
> CFLG's practice. Stafford Decl. (Dkt. No. 98), ¶ 5.

**CFPB'S RESPONSE:** Dispute. The Bureau disputes that TMLG provided legal services. TMLG

provided no legal services to consumers who sought modifications of their mortgages. Consumers

never communicated with any attorney from headquarters or a local attorney after they enrolled

for services. TMLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 4, at CFPB-TMLG-0037271-

0037273; CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000198-000201;

Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-

000154; Johnson Decl., ECF No. 87, ¶ 17; Pultz Decl., ECF No. 90, ¶ 14; Saunders Decl., ECF

No. 91, ¶ 16; Bruce Decl., ECF No. 93, ¶ 17.

TMLG's marketing materials, retainer agreements with consumers, and sales

representative calls with consumers, all demonstrate that TMLG offered to provide and

purportedly provided mortgage loan modification services. Consumers who viewed TMLG's

websites believed that TMLG could help them modify their loan by helping them obtain a

mortgage loan modification. Saunders Decl., ECF No. 91, ¶¶ 3-5. The initial retainer and

subsequent recurring monthly payments that were collected by TMLG were specifically for

purported services relating only to obtaining a mortgage loan modification. TMLG Retainer

Agreement, Pl.'s Mot. Summ. J. Ex. 4, at CFPB-TMLG-0037271-0037273; Salesperson Scripts,

Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154. Salespeople made statements to consumers to convince consumers that they would obtain mortgage loan modifications if they enrolled with TMLG. Salespersons also told consumers that using the free services of a non-profit organization to gather documents and submit a mortgage loan modification would not get them a loan modification, but that TMLG's services would get them a mortgage loan modification. Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at TMLG.MO.LIT.000152-000154, TMLG.MO.LIT.000160; Anderson Dep., ECF No. 79, at 130-134; CFLG Amended Answer to Complaint, Dec. 31, 2014, ECF No. 41, at ¶ 39.

Out of TMLG's 5,265 consumers, a mere 30 paid additional fees to receive foreclosure defense services, and in those instances TMLG referred those consumers to local attorneys who provided legal services without assistance from TMLG or attorneys at headquarters. Thomas Decl., ECF No. 116, ¶ 18; Gray Decl., ECF No. 115, ¶ 15.

The Bureau also disputes that Aleman alone decided to start a separate mortgage mitigation company. Aleman, Macey, and Searns, made the decision together to start TMLG. Aleman Dep. (Dkt. No. 76) 23:1- 5.

**DEFENDANTS' ANSWER:**

This should be deemed undisputed. Here again, the CFPB's only disputes are the use of the term "legal services" and who decided to start TMLG. The CFPB does not dispute the proposed finding that Stafford learned that Macey and Aleman were involved with TMLG or that they had the resources to expand CFLG's practice. The CFPB cites no contrary evidence on those points.

Moreover, as discussed above, TMLG was a law firm, and Aleman came up with the idea to start TMLG. *See* Def. Resp. ¶¶ 12, 20, *supra*, incorporated herein by reference.

80.    After July 2012, Stafford continued to practice as an attorney of CFLG in Madison, but he had no operational control, management, or direction over CFLG. CFLG (Aleman) Dep. I (Dkt. No. 66) 24:7-16; Stafford Decl. (Dkt. No. 98), ¶ 6.

**CFPB'S RESPONSE:** Dispute. Stafford had managerial responsibility for and was familiar with certain aspects, if not all, of CFLG's operations. Harold Stafford's Amended Answer to Complaint, ECF No. 44, at 9 (answers to ¶¶ 34 and 35). The Operating Agreement that governs the management, finances, and business of CFLG provides for "a salary of $50,000 per year" to Stafford, which obligation expires on the earlier of (a) two years from the date of the Operating Agreement or (b) the date the LLC stops providing services to consumers. CFLG Operating Agreement, Pl.'s Mot. Summ. J., Ex. 3, at DEF.000158, ¶ 8.1.

Stafford exerted control over the screening of new local attorneys after July 2012, and over CFLG's formal written responses to the BBB and state regulators. Specifically, Stafford drafted written responses with very specific details of CFLG's business practices to the Better Business Bureau ("BBB") and state regulators on behalf of CFLG. The signature block on those written responses contained Stafford's name and his title, "managing member." Exhibit A to Gray Decl., ECF No. 115; Stafford CFLG 30(b)(6) Dep. Part 2, ECF No. 65, at 144-145, 148-149, 182-183.

**DEFENDANTS' ANSWER:**

After the majority interests in CFLG were sold to Macey and Aleman in July 2012, Stafford was not involved in the day-to-day operational decisions with respect to CFLG, and he did not have any managerial responsibility (nor did he inquire as to the management or operations of the firm). CFLG (Stafford) Dep. (Dkt. 65) at 156-57, 169-172; Stafford Dep. (Dkt. 72) at 12. After the sale, the extent of Stafford's involvement was to refer Class B Attorneys to attorneys at CFLG's Chicago headquarters, refer prospective Class B Attorneys to Colin Banyon, and respond to some consumer complains. *Id.*

Stafford's role with respect to hiring CFLG Class B Attorneys was limited to providing referrals to Colin Banyon. CFLG (Stafford) Dep. (Dkt. 65) at 154, 156-57, 169-72, 177-84. While

Stafford drafted some responses to consumer complaints, he was not a managing member of CFLG. *Id.* at 156-57, 169-72, 177-78, 182-83.

> 81. Macey took no operational control, management, or direction of CFLG. Macey Decl. (Dkt. No. 97), ¶ 9; CFLG (Macey) Dep., May 27, 2015 (Dkt. No. 68) 29:20-31:25.

**CFPB'S RESPONSE:** Dispute. Macey had managerial responsibility for and was familiar with certain aspects, if not all, of CFLG's operations. Thomas Macey's Amended Answer to Complaint, ECF No. 42, at 9 (answers to ¶¶ 34 and 35). Under the CFLG Operating Agreement, Macey had duties and responsibilities to CFLG. CFLG Operating Agreement Section 8.5. Those responsibilities included devoting to CFLG "such time as may be reasonably necessary for the performance of [Macey's] duties hereunder." *Id.* ¶ 8.5(b).

Additionally, as majority shareholder, Macey could weigh in on decisions whenever he desired and had final decision-making authority. Macey CFLG 30(b)(6) Dep., ECF No. 68, at 31; Aleman Dep., ECF No. 76, at 46-48; Jeffrey Aleman Answers to Interrogatories, Pl.'s Mot. Summ. J. Ex. 32, at 8 (Response to Interrogatory 7). Under the CFLG Operating Agreement, Macey was empowered at his "sole discretion," to hire and dismiss employees of the company, approve all contracts entered into by CFLG, receive all communications and notices on behalf of CFLG, and commence, defend, or settle any litigation pertaining to CFLG. CFLG Operating Agreement, Pl.'s Mot. Summ. J., Ex. 3 at ¶¶ 8.4(b)(i)-(iii),(vi), 10.14. Macey was also empowered to control the company's financial affairs, including dispositions of assets, lending by CFLG, borrowing by CFLG, and pledges of assets by CFLG. *Id* ¶ 8.4(b)(ii). Macey was also empowered to control CFLG's bank accounts. *Id.* ¶ 8.4(b)(iii).

Macey exercised his ability to control, manage, and direct through:

    a. creating or changing policy for running CFLG. Macey CFLG 30(b)(6) Dep., ECF No. 68, at 24, 28-29, 31.

    b. monitoring new consumer enrollments and the financials of CFLG. Macey CFLG 30(b)(6) Dep., ECF No. 68, at 28-29.

    c. participating in the decision of CFLG to have non-attorneys who handled loan modification processing. Macey CFLG 30(b)(6) Dep., ECF No. 68, at 36, 38-39.

## DEFENDANTS' ANSWER:

Macey's role in CFLG was primarily that of an investor and limited partner. CFLG (Aleman) Dep. (Dkt. 66) at 101-02; CFLG (Macey) Dep. (Dkt. 68) at 29-31, 41-43; Macey Decl. (Dkt. 91) at ¶ 9. Macey's involvement with the operations of CFLG were very limited, and he did not serve as "managing partner" of CFLG. Rather, Aleman was the sole managing partner in charge of operations for CFLG. Aleman Dep. (Dkt. 76) at 46.

While Macey, as the majority shareholder of CFLG, had the ability to make decisions, Macey never exercised that authority. Macey was not involved in the day-to-day-operations, did not sign off on day-to-day decisions, and "did not directly engage in the daily management or activities of the firm." Pl. Mot. Summ. J. Ex. 29 (Dkt. 101-29) at 9; *see also* Macey Decl. (Dkt. 97) at ¶ 9; CFLG (Aleman) Dep. (Dkt. 66) at 48; CFLG (Macey) Dep. (Dkt. 68) at 28-31, 41-43.

Macey was not involved in creating policies or procedures for CFLG, and he did not participate in reviewing or changing any policies or procedures. CFLG (Macey) Dep. (Dkt. 68) at 24, 51-52. Macey had no involvement in developing training materials, policies or procedures for CFLG staff. CFLG (Aleman) Dep. (Dkt. 66) at 23-24; CFLG (Macey) Dep. (Dkt. 68) at 30-31.

Macey did not review individual CFLG Retainer Agreements. Macey Dep. (Dkt. 78) at 27-28. Macey reviewed the form CFLG retainer agreement, but did not review any changes to that agreement over time. *Id.* Macey had no role in determining the content of the client Welcome Packets, or other materials provided to CFLG clients. Aleman Dep. (Dkt. 76) at 115.

Macey did not hire or fire employees of CFLG.  CFLG (Aleman) Dep. (Dkt. 66) at 23-24; CFLG (Macey) Dep. (Dkt. 68) at 30-31.  Macey did not supervise CFLG support staff or paralegals, and he was not responsible for training those employees.  CFLG (Aleman) Dep. (Dkt. 66) at 23-24; CFLG (Macey) Dep. (Dkt. 68) at 30-31.  Macey had no role in developing training materials for CFLG staff.  CFLG (Aleman) Dep. (Dkt. 66) at 23-24; CFLG (Macey) Dep. (Dkt. 68) at 30-31.  Macey did not instruct CFLG employees and contractors how to perform their jobs, and he did not direct their daily work.  Macey Dep. (Dkt. 78) at 13, 15, 42-44, 46-48.  Aleman Dep. (Dkt. 76) at 46, 147; Banyon Dep. (Dkt. 82) at 62; Delgado Dep. (Dkt. 73) at 164.

Macey did not review or work on individual client files for CFLG and he did not have direct contact with CFLG's clients.  CFLG (Aleman) Dep. (Dkt. 66) at 23-24; CFLG (Macey) Dep. (Dkt. 68) at 30-31.

82.     CFLG provided legal services that included representation of clients with regard to mortgage mitigation matters and alleviation of mortgage-related hardships, including foreclosure defense and ancillary mortgage relief services. CFLG (Aleman) Dep. I (Dkt. No. 66) 44:3-23; Aleman Decl. (Dkt. No. 105), ¶ 16.

**CFPB'S RESPONSE:**  Dispute.  CFLG provided no legal services to consumers who sought modifications of their mortgages.  Consumers never communicated with any attorney from headquarters or a local attorney after they enrolled for services.  CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000198-000201; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at CFLG.MO.LIT.000152-000154; Peterson Decl., ECF No. 84, ¶ 16; Halwani Decl., ECF No. 86, ¶ 16; Declaration of Tim Ledbetter, ECF No. 92, ¶ 14.

At least one local attorney stated that she did not have an attorney-client relationship with CFLG's consumers. Gray Decl., ECF No. 115, ¶ 9.  The Virginia State Bar found that a CFLG local attorney in Virginia had no attorney-client relationship with a CFLG consumer who resided in Virginia.  Gray Decl., ECF No. 115, ¶ 19 and Exhibit C.

The only services in connection with mortgage loan modifications that local attorneys provided to consumers consisted of (1) comparing CFLG checklists with consumer financial information collected on a computer screen at intake to assure that a consumer met lender criteria to apply for a loan modification, and (2) comparing CFLG checklists with documents submitted by a consumer to assure that the package contained all of the lender-required mortgage loan modification documents. These tasks could be performed by non-attorneys, and in fact, were already performed by non-attorneys – salespersons and document processors - before the local attorneys took them on. Sibert Dep., ECF No. 77, at 103-105, 236; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 27, 54; Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 452-455; Aleman Dep., ECF No. 76, at 201-02, 215.

Based on Defendants' own data, none of the 1,116 consumers who enrolled in CFLG's services received foreclosure defense services, or services beyond the financial and ministerial tasks associated with mortgage loan modification services. Thomas Decl., ECF No. 116, at 3 ¶ 19.

**DEFENDANTS' ANSWER:**

This should be deemed undisputed. Here, again, the CFPB's only dispute is to the use of the term "legal services." As set forth above, CFLG provided legal services. *See* Def. Ans. ¶ 12, *supra*, incorporated herein by reference.

83.     CFLG provided clients with legal counseling regarding potential mortgage workout solutions. Aleman Decl. (Dkt. No. 105), ¶ 17.

**CFPB'S RESPONSE:** Dispute. CFLG provided no legal counseling. CFLG was a mortgage assistance relief services provider that only provided services in connection with mortgage loan modifications. Consumers never communicated with any attorney from headquarters or a local attorney after they enrolled for services. CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000198-000201; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at CFLG.MO.LIT.000152-000154; Peterson Decl., ECF No. 84, ¶ 16; Halwani Decl., ECF No. 86, ¶

16; Declaration of Tim Ledbetter, ECF No. 92, ¶ 14.

At least one local attorney stated that she did not have an attorney-client relationship with CFLG's consumers. Gray Decl., ECF No. 115, ¶ 9. The Virginia State Bar found that a local attorney in Virginia had no attorney-client relationship with a CFLG consumer who resided in Virginia. Gray Decl., ECF No. 115, ¶ 19 and Exhibit C.

The only services in connection with mortgage loan modifications that local attorneys provided to consumers consisted of (1) comparing CFLG checklists with consumer financial information collected on a computer screen at intake to assure that a consumer met lender criteria to apply for a loan modification, and (2) comparing CFLG checklists with documents submitted by a consumer to assure that the package contained all of the lender-required mortgage loan modification documents. These tasks could be performed by non-attorneys, and in fact, were already performed by non-attorneys – salespersons and document processors - before the local attorneys performed these same tasks. Sibert Dep., ECF No. 77, at 103-105, 236; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 27, 54; Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 452-455; Aleman Dep., ECF No. 76, at 201-02, 215.

Based on Defendants' own data, none of the 1,116 consumers who enrolled in CFLG's services received foreclosure defense services, or services beyond the financial and ministerial tasks associated with mortgage loan modification services. Thomas Decl., ECF No. 116, at 3 ¶ 19.

**DEFENDANTS' ANSWER:**

This should be deemed undisputed. The CFPB's only dispute is to the use of the term "legal counseling." CFLG did provide legal counseling to its clients. *See* Def. Ans. ¶ 12, *supra*, incorporated herein by reference.

58

84. That often included, but was not limited to, loan modifications, repayment plans, forbearances, resolution of issues involving junior liens, as well as an appropriate exit from the property, including deed-in-lieu of foreclosure, consent foreclosure, or short sale alternatives. Aleman Decl. (Dkt. No. 105), ¶ 17; CFLG (Aleman) Dep. II (Dkt. No. 67) 319:3-320:2, 332:1- 333:14.

**CFPB'S RESPONSE:** Dispute. CFLG provided no legal counseling. CFLG was a mortgage assistance relief services provider that only provided services in connection with mortgage loan modifications. Consumers never communicated with any attorney from headquarters or a local attorney after they enrolled for services. CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000198-000201; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at CFLG.MO.LIT.000152-000154; Peterson Decl., ECF No. 84, ¶ 16; Halwani Decl., ECF No. 86, ¶ 16; Declaration of Tim Ledbetter, ECF No. 92, ¶ 14.

At least one local attorney stated that she did not have an attorney-client relationship with CFLG's consumers. Gray Decl., ECF No. 115, ¶ 9. The Virginia State Bar found that a local attorney in Virginia had no attorney-client relationship with a CFLG consumer who resided in Virginia. Gray Decl., ECF No. 115, ¶ 19 and Exhibit C.

The only services in connection with mortgage loan modifications that local attorneys provided to consumers consisted of (1) comparing CFLG checklists with consumer financial information collected on a computer screen at intake to assure that a consumer met lender criteria to apply for a loan modification, and (2) comparing CFLG checklists with documents submitted by a consumer to assure that the package contained all of the lender-required mortgage loan modification documents. These tasks could be performed by non-attorneys, and in fact, were already performed by non-attorneys – salespersons and document processors - before the local attorneys performed these same tasks. Sibert Dep., ECF No. 77, at 103-105, 236; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 27, 54; Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 452-455; Aleman Dep., ECF No. 76, at 201-02, 215.

Based on Defendants' own data, none of the 1,116 consumers who enrolled in CFLG's services received foreclosure defense services, or services beyond the financial and ministerial tasks associated with mortgage loan modification services. Thomas Decl., ECF No. 116, at 3 ¶ 19.

**DEFENDANTS' ANSWER:**

This should be deemed undisputed. The CFPB's only dispute is to the use of the term "legal counseling." CFLG did provide legal counseling to its clients. *See* Def. Ans. ¶ 12, *supra*, incorporated herein by reference.

> 85. CFLG attorneys tailored its representation of each client to meet that client's goals with respect to their cases and real property. Aleman Decl. (Dkt. No. 105), ¶ 17; CFLG (Aleman) Dep. I (Dkt. No. 66) 55:11-25.

**CFPB'S RESPONSE:** Dispute. CFLG provided no legal representation to consumers, and thus no tailoring of any representation. Consumers never communicated with any attorney from headquarters or a local attorney after they enrolled for services. CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000198-000201; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at CFLG.MO.LIT.000152-000154; Peterson Decl., ECF No. 84, ¶ 16; Halwani Decl., ECF No. 86, ¶ 16; Declaration of Tim Ledbetter, ECF No. 92, ¶ 14.

Although CFLG retainer agreements with consumers state that CFLG "will counsel Client regarding mortgage workout solutions," which can include "deed-in-lieu of foreclosure, cash for keys, consent foreclosure, or short sale," local attorneys never performed or were asked to perform such services by CFLG. At least two local attorneys testified that they never performed, and were never asked by CFLG to perform, deeds in lieu of foreclosure, short sales, cash for keys, or consent foreclosures. Ruggiero Dep., ECF No. 70, at 151-152; Harrington Dep., ECF No. 81, at 72, 87-90, 130, 142-43, 230-233, 242; CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000188.

Local attorneys also did not conduct any assessment at the time of consumer intake review of whether or not consumers needed any services beyond loan modification services or whether the consumer was in active foreclosure. Harrington Dep., ECF No. 81, at 72, 87-90, 130, 142-43, 230-33, 242; Ruggiero Dep., ECF No. 70, at 137-138.

At least one local attorney stated that she did not have an attorney-client relationship with CFLG's consumers. Gray Decl., ECF No. 115, ¶ 9. The Virginia State Bar found that a CFLG local attorney in Virginia had no attorney-client relationship with a CFLG consumer who resided in Virginia. Gray Decl., ECF No. 115, ¶ 19 and Exhibit C.

The only services in connection with mortgage loan modifications that local attorneys provided to consumers consisted of (1) comparing CFLG checklists with consumer financial information collected on a computer screen at intake to assure that a consumer met lender criteria to apply for a loan modification, and (2) comparing CFLG checklists with documents submitted by a consumer to assure that the package contained all of the lender-required mortgage loan modification documents. These tasks could be performed by non-attorneys, and in fact, were already performed by non-attorneys – salespersons and document processors - before the local attorneys performed these same tasks. Sibert Dep., ECF No. 77, at 103-105, 236; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 27, 54; Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 452-455; Aleman Dep., ECF No. 76, at 201-02, 215.

Based on Defendants' own data, none of the 1,116 consumers who enrolled in CFLG's services received foreclosure defense services, or services beyond the financial and ministerial tasks associated with mortgage loan modification services. Thomas Decl., ECF No. 116, at 3 ¶ 19.

**DEFENDANTS' ANSWER:**

This should be deemed undisputed. The CFPB's only dispute is to the use of the term "representation." CFLG did provide representation to its clients. *See* Def. Ans. ¶ 12, *supra*, incorporated herein by reference.

86.   Each client was involved in one or more consultations where the client's consent to the proposed action was gained after the client provided information regarding the action the client wanted the firm to take. Aleman Decl. (Dkt. No. 105), ¶ 17.

**CFPB'S RESPONSE:**  Dispute. The Bureau objects to Defendants' proposed finding on the ground that Defendants' use of the term "consultations" is vague. The Bureau disputes Defendants' proposed finding to the extent that it suggests consumers received legal consultations from CFLG. CFLG provided no legal consultations.

Consumers never communicated with any attorney from headquarters or a local attorney after they enrolled for services. CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000198-000201; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at CFLG.MO.LIT.000152-000154; Peterson Decl., ECF No. 84, ¶ 16; Halwani Decl., ECF No. 86, ¶ 16; Declaration of Tim Ledbetter, ECF No. 92, ¶ 14.

Although CFLG retainer agreements with consumers state that CFLG "will counsel Client regarding mortgage workout solutions," which can include "deed-in-lieu of foreclosure, cash for keys, consent foreclosure, or short sale," local attorneys never performed or were asked to perform such services by CFLG. At least two local attorneys testified that they never performed, and were never asked by CFLG to perform, deeds in lieu of foreclosure, short sales, cash for keys, or consent foreclosures. Ruggiero Dep., ECF No. 70, at 151-152; Harrington Dep., ECF No. 81, at 72, 87-90, 130, 142-43, 230-233, 242; CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000188.

Local attorneys also did not conduct any assessment at the time of consumer intake review of whether or not consumers needed any services beyond loan modification services or whether the consumer was in active foreclosure. Harrington Dep., ECF No. 81, at 72, 87-90, 130, 142-43, 230-33, 242; Ruggiero Dep., ECF No. 70, at 137-138.

At least one local attorney stated that she did not have an attorney-client relationship with CFLG's consumers. Gray Decl., ECF No. 115, ¶ 9. The Virginia State Bar found that a CFLG local attorney in Virginia had no attorney-client relationship with a CFLG consumer who resided in Virginia. Gray Decl., ECF No. 115, ¶ 19 and Exhibit C.

The only services in connection with mortgage loan modifications that local attorneys provided to consumers consisted of (1) comparing CFLG checklists with consumer financial information collected on a computer screen at intake to assure that a consumer met lender criteria to apply for a loan modification, and (2) comparing CFLG checklists with documents submitted by a consumer to assure that the package contained all of the lender-required mortgage loan modification documents. These tasks could be performed by non-attorneys, and in fact, were already performed by non-attorneys – salespersons and document processors - before the local attorneys performed these same tasks. Sibert Dep., ECF No. 77, at 103-105, 236; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 27, 54; Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 452-455; Aleman Dep., ECF No. 76, at 201-02, 215.

Based on Defendants' own data, none of the 1,116 consumers who enrolled in CFLG's services received foreclosure defense services, or services beyond the financial and ministerial tasks associated with mortgage loan modification services. Thomas Decl., ECF No. 116, at 3 ¶ 19.

**DEFENDANTS' ANSWER:**

This should be deemed undisputed. The CFPB's only dispute is to the use of the term "consultation." CFLG did consult with its clients, and CFLG's attorneys were available to speak

with CFLG clients regarding any issues or concerns they had.  *See* Def. Ans. ¶ 12, *supra*, incorporated herein by reference.

        87.     CFLG's legal services were provided to clients across the country by the LLC's attorney-members who resided in and were licensed to practice law in the states in which the clients resided.  Aleman Decl. (Dkt. No. 105), ¶ 16.

**CFPB'S RESPONSE:**  Dispute.  The Bureau objects to Defendants' proposed finding for lack of foundation as to personal knowledge.  Aleman's declaration merely asserts, but does not establish any foundation, that he has personal knowledge that the 37 local attorneys were actually licensed in 39 states.  The Bureau also disputes that CFLG provided legal services to consumers. CFLG provided no legal services to consumers who sought modifications of their mortgages.  Consumers never communicated with any attorney from headquarters or a local attorney after they enrolled for services.  CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000198-000201; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at CFLG.MO.LIT.000152-000154; Peterson Decl., ECF No. 84, ¶ 16; Halwani Decl., ECF No. 86, ¶ 16; Declaration of Tim Ledbetter, ECF No. 92, ¶ 14.

      At least one local attorney stated that she did not have an attorney-client relationship with CFLG's consumers.  Gray Decl., ECF No. 115, ¶ 9.  The Virginia State Bar found that a local attorney in Virginia had no attorney-client relationship with a CFLG consumer who resided in Virginia.  Gray Decl., ECF No. 115, ¶ 19 and Exhibit C.

      The only services in connection with mortgage loan modifications that local attorneys provided to consumers consisted of (1) comparing CFLG checklists with consumer financial information collected on a computer screen at intake to assure that a consumer met lender criteria to apply for a loan modification, and (2) comparing CFLG checklists with documents submitted by a consumer to assure that the package contained all of the lender-required mortgage loan modification documents.  These tasks could be performed by non-attorneys, and in fact, were

already performed by non-attorneys – CFLG's salespersons and document processors - before the local attorneys performed these same tasks. Sibert Dep., ECF No. 77, at 103-105, 236; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 27, 54; Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 452-455; Aleman Dep., ECF No. 76, at 201-02, 215.

Based on Defendants' own data, none of the 1,116 consumers who enrolled in CFLG's services received foreclosure defense services, or services beyond the financial and ministerial tasks associated with mortgage loan modification services. Thomas Decl., ECF No. 116, at 3 ¶ 19.

**DEFENDANTS' ANSWER:**

The CFPB does not cite any evidence that any of CFLG's Class B Members were ***not*** licensed to practice law in their respective states. Further, Aleman does have the foundation to make such statement. Aleman was the managing member in charge of CFLG's operations, and all Class B Members signed member agreements. *See* Pl. Mot. Summ. J. Ex. 18 (Dkt. 101-18). Therein, the signatory represented that "Member is duly licensed in good standing to practice law in the State, and, except for illness, accident, time spent in the armed services, on vacations, and on leaves of absence not exceeding one year, is actively engaged in the practice of law in the State." *Id.* at § 9(d).

The CFPB's only other dispute is to the use of the term "legal services." As set forth above, CFLG provided legal services to its clients. *See* Def. Ans. ¶ 12, *supra*, incorporated herein by reference.

> 88. At its peak, CFLG had approximately 37 member attorneys licensed in 39 states. CFLG (Aleman) Dep. I (Dkt. No. 66) 47:33-48:7; Aleman Decl. (Dkt. No. 105), ¶ 19.

**CFPB'S RESPONSE:** Dispute. The Bureau objects to Defendants' proposed finding for lack of foundation as to personal knowledge. Aleman's declaration merely asserts, but does not establish any foundation, that he has personal knowledge that the 37 local attorneys were actually licensed in 39 states.

**DEFENDANTS' ANSWER:**

    *See* Def. Ans. ¶¶ 12, 87, *supra*, incorporated herein by reference.

    89.    During the course of its operations, CFLG provided mortgage mitigation legal representation to approximately 1100 clients nationally. Aleman Decl. (Dkt. No. 105), ¶ 19.

**CFPB'S RESPONSE:** Dispute. CFLG provided no legal representation to consumers. Consumers never communicated with any attorney from headquarters or a local attorney after they enrolled for services. CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000198-000201; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at CFLG.MO.LIT.000152-000154; Peterson Decl., ECF No. 84, ¶ 16; Halwani Decl., ECF No. 86, ¶ 16; Declaration of Tim Ledbetter, ECF No. 92, ¶ 14.

Although CFLG retainer agreements with consumers state that CFLG "will counsel Client regarding mortgage workout solutions," which can include "deed-in-lieu of foreclosure, cash for keys, consent foreclosure, or short sale," local attorneys never performed or were asked to perform such services by CFLG. At least two local attorneys testified that they never performed, and were never asked by CFLG to perform, deeds in lieu of foreclosure, short sales, cash for keys, or consent foreclosures. Ruggiero Dep., ECF No. 70, at 151-152; Harrington Dep., ECF No. 81, at 72, 87-90, 130, 142-43, 230-233, 242; CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000188.

Local attorneys also did not conduct any assessment at the time of consumer intake review of whether or not consumers needed any services beyond loan modification services or whether

the consumer was in active foreclosure.  Harrington Dep., ECF No. 81, at 72, 87-90, 130, 142-43, 230-33, 242; Ruggiero Dep., ECF No. 70, at 137-138.

At least one local attorney stated that she did not have an attorney-client relationship with CFLG's consumers.  Gray Decl., ECF No. 115, ¶ 9.  The Virginia State Bar found that a local attorney in Virginia had no attorney-client relationship with a CFLG consumer who resided in Virginia.  Gray Decl., ECF No. 115, ¶ 19 and Exhibit C.

The only services in connection with mortgage loan modifications that local attorneys provided to consumers consisted of (1) comparing CFLG checklists with consumer financial information collected on a computer screen at intake to assure that a consumer met lender criteria to apply for a loan modification, and (2) comparing CFLG checklists with documents submitted by a consumer to assure that the package contained all of the lender-required mortgage loan modification documents.  These tasks could be performed by non-attorneys, and in fact, were already performed by non-attorneys – salespersons and document processors - before the local attorneys performed these same services.  Sibert Dep., ECF No. 77, at 103-105, 236; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 27, 54; Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 452-455; Aleman Dep., ECF No. 76, at 201-02, 215.

Based on Defendants' own data, none of the 1,116 consumers who enrolled in CFLG's services received foreclosure defense services, or services beyond the financial and ministerial tasks associated with mortgage loan modification services.  Thomas Decl., ECF No. 116, at 3 ¶ 19.

**DEFENDANTS' ANSWER:**

This should be deemed undisputed.  The CFPB's only dispute is to the term "legal services."  However, CFLG provided legal services to its clients.  *See* Def. Ans. ¶ 12, *supra*, incorporated herein by reference.

90. CFLG secured bank-approved loan modifications for nearly 200 of its clients. Aleman Decl. (Dkt. No. 105), ¶ 19.

**CFPB'S RESPONSE:** Dispute. Based on data provided by Defendants to the Bureau, only 193 of CFLG's 1,116 consumers received mortgage loan modifications. Thomas Decl., ECF No. 116, at 2 ¶ 14.

**DEFENDANTS' ANSWER:**

This is not materially disputed. Defendants note that the original statement provided that CFLG obtained loan modifications for "***nearly*** 200 clients." The CFPB, noting that the number of loan modifications was 193 (*i.e.*, seven less than the approximation referenced by Defendants) disputes the statement. There is no genuine, material dispute as to the proposed fact.

91. CFLG did not do any advertising. CFLG (Stafford) Dep. (Dkt. No. 64) 39:22-41:12; Stafford Decl. (Dkt. No. 98), ¶ 4; CFLG (Aleman) Dep. II (Dkt. No. 67) 412:12-18 Aleman Decl. (Dkt. No. 105), ¶ 20.

**CFPB'S RESPONSE:** Dispute. CFLG paid lead generators to advertise mortgage loan modification services through television commercials and online websites, and to refer consumers who responded to those advertisements by phone or online to CFLG. Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 412-415; Anderson Dep., ECF No. 79, at 93.

**DEFENDANTS' ANSWER:**

The CFPB's response is misleading. CFLG never placed or ran any television advertisements or contracted with other entities to place or run television advertisements. CFLG did ***no*** branded advertising or marketing whatsoever. CFLG (Aleman) Dep. (Dkt. 67) at 412, 415. The advertisements run by third-party lead generators were ***generic*** advertisements for mortgage relief services and did not bear CFLG's name. *Id.* at 412-15. CFLG did not pay the third-party lead generators to "run advertisements." Rather, CFLG paid the third-party lead generators for the information of potential clients gathered by those lead generators. *Id.* Accordingly, there is no genuine, material dispute as to the proposed fact.

94.     CFLG did not contract with third parties to provide client support services after July 2012.  CFLG (Aleman) Dep. I (Dkt. No. 66) 76:17-79:3.

**CFPB'S RESPONSE:**  The Bureau objects to the term "client support services" as vague.  The Bureau does not dispute Defendants' proposed finding to the extent that "client support services" refers to sales and intake services or document processing services.

**DEFENDANTS' ANSWER:**

This proposed finding is undisputed.  CFLG did not utilize third-party client support vendors (such as CAPS) for client intake, document processing, client support and communications, and negotiation functions after July 2012.  CFLG (Aleman) Dep. (Dkt. 66) 76-79.

95.     All client support services were provided by CFLG employees, many of whom worked out of CFLG's Delray Beach, Florida office.  CFLG (Aleman) Dep. I (Dkt. No. 66) 65:7- 72:15; Aleman Decl. (Dkt. No. 105), ¶ 20.

**CFPB'S RESPONSE:**  The Bureau objects to the term "client support services" as vague.  The Bureau does not dispute Defendants' proposed finding to the extent that "client support services" refers to sales and intake services or document processing services.

**DEFENDANTS' ANSWER:**

This proposed finding is undisputed.  CFLG employees performed all client intake, document processing, client support and communications, and negotiation functions after July 2012.  CFLG (Aleman) Dep. (Dkt. 66) 65-72; Aleman Decl. (Dkt. 105) at ¶ 20.

96.     Those employees reported to the CFLG attorneys in Chicago and/or Jay Gerst in Florida.  CFLG (Aleman) Dep. I (Dkt. No. 66) 65:7-72:15; Aleman Decl. (Dkt. No. 105), ¶ 20.

**CFPB'S RESPONSE:**  Dispute.  CFLG employees who performed the back-office document processing work reported directly to Jay Gerst, a non-attorney in CFLG's Florida office, and not to the CFLG attorneys in Chicago.  Jay Gerst managed CFLG's processing and document collection teams.  Aleman CFLG 30(b)(6) Dep., ECF No. 67, at 301; Gerst Dep., ECF No. 75, at

10.   The Bureau's evidence also demonstrates that CFLG employees who were salespersons speaking to consumers during intake reported to non-attorneys.  Anderson Dep., ECF No. 79, at 47-48, 69-70.  Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 53, 54; Sibert Dep., ECF No. 77, at 123-124, 126; Anderson Dep., ECF No. 79, at 58, 65-66, 69-70.

**DEFENDANTS' ANSWER:**

CFLG did not employ "salespeople."  Rather, the employees referenced in the cited testimony were client intake specialists.  CFLG (Aleman) Dep. (Dkt. 66) at 111, 151-52.  Moreover, Aleman testified that he and Colin Banyon supervised the CFLG client intake personnel and Gerst.  Aleman Dep. (Dkt. 66) at 70-71, 74-75.  Gerst also supervised those employees, and he reported to Aleman.  *Id.* at 71-72.  Issues that were brought to Gerst's attention by CFLG support staff were addressed by Gerst with Aleman and Banyon.  *Id.*  Accordingly, there is no genuine, material dispute as to the proposed fact.

97.   CFLG's attorneys monitored, directed, and supervised the work of those employees.  Banyon Dep. (Dkt. No. 82) 114:24-115:24; Aleman Decl. (Dkt. No. 105), ¶ 21.

**CFPB'S RESPONSE:**  Dispute.  Jay Gerst, a non-attorney located in CFLG's office in Florida managed CFLG's processing and document collection teams.  Aleman CFLG 30(b)(6) Dep., ECF No. 67, at 301; Gerst Dep., ECF No. 75, at 10.  The Bureau's evidence also demonstrates that CFLG employees who were salespersons speaking to consumers during intake were supervised by non-attorneys.  Anderson Dep., ECF No. 79, at 47-48, 69-70. Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 53, 54; Sibert Dep., ECF No. 77, at 123-124, 126; Anderson Dep., ECF No. 79, at 58, 65-66, 69-70.

**DEFENDANTS' ANSWER:**

*See* Def. Ans. ¶¶ 12, 96, *supra*, incorporated herein by reference.

98.   CFLG attorneys (who transferred from TMLG to CFLG) and Aleman, had regular meetings with Gerst and the other support staff employees, either through in-person

meetings or by teleconference. CFLG (Aleman) Dep. I (Dkt. No. 66) 70:24-72:24, 73:15-74:6, 74:18-75:1; Aleman Decl. (Dkt. No. 105), ¶ 21.

**CFPB'S RESPONSE:** Dispute. The Bureau objects to the term "CFLG attorneys" as vague. The Bureau disputes Defendants' proposed finding to the extent that it suggests CFLG's local attorneys had regular meetings with Gerst and support staff. Local attorneys did not manage or supervise any CFLG paralegals, intake personnel, processors, other employees, other contractors, or other persons associated CFLG. Harrington Dep., ECF No. 81, at 162-63, 182-183, 231, 238; Ruggiero Dep., ECF No. 70, at 163-165.

**DEFENDANTS' ANSWER:**

While the referenced meetings with Gerst and certain support staff were generally with CFLG headquarters attorneys, Class B Attorneys supervised other CFLG employees by virtue of their review of client intake files and client loan modification packages. *See* Def. Ans. ¶ 12.

100. Support staff employees were also given scripts for use during the intake process and each prospective client went through a "quality control" telephone interview with a CFLG attorney. CFLG (Aleman) Dep. I (Dkt. No. 66) 143:17-146:12; Aleman Decl. (Dkt. No. 105), ¶ 21; Banyon Dep. (Dkt. No. 82) 80:20-22.

**CFPB'S RESPONSE:** Dispute. The Bureau objects to the term "quality control" and "CFLG attorney" as vague. The Bureau disputes Defendants' proposed finding to the extent that it suggests attorneys other than CFLG's attorneys at headquarters spoke to consumers during intake, and suggests that the conversation with the consumer by the CFLG headquarters attorney consisted of anything beyond following a script that did not cover legal matters.

The CFLG headquarters attorney read the consumer a script during the initial intake call that repeated the same points made by the salesperson's script and repeated the qualification process. Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 145-146, 149-150. The headquarters attorney's script consisted of statements about CFLG's services, and the consumer was required to answer "yes" after each statement to indicate he or she understood what was being read to him

or her. Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 150-151; CFLG Verification Script, Pl.'s Mot. Summ. J. Ex. 19. The consumer, desperate to save her home from foreclosure, could not be enrolled in CFLG's program until she answered "yes" after each statement. Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 150-152, 154-155.

**DEFENDANTS' ANSWER:**

The CFPB does not dispute the proposed facts that support staff were given scripts to use during the intake process, and a CFLG attorney conducted a pre-retention interview with a potential client, nor does the CFPB cite any evidence to the contrary.

CFLG did not employ "salespeople." Rather, the employees referenced in the cited testimony were client intake specialists. CFLG (Aleman) Dep. (Dkt. 66) at 111, 151-52. The role of a client intake specialist was, using scripts provided by CFLG, to gather information from a potential client, make a preliminary determination regarding qualification for CFLG's services, transfer the potential client to an attorney for the verification call, and, if approved by the attorneys, collect additional information from the client. CFLG (Aleman) Dep. (Dkt. 66) at 136-37, 140, 143-46; *see also* Anderson Dep. (Dkt. 79) at 83-84, 87-88, 94-96.

With respect to the verification interview performed by the CFLG attorneys, potential clients were not required to answer "yes" to every question. They were free to answer "no." In that event, the potential client was routed back to TMLG or CFLG personnel to answer any other questions the potential client had. The purpose of the verification interview and requiring a potential client to answer "yes" to all questions *before* enrolling a client was to ensure that the client understood the nature and terms of CFLG's program *before* he was enrolled. CFLG (Aleman) Dep. (Dkt. 66) at 150-152. Accordingly, there is no genuine, material dispute as to the proposed facts.

101.     The information from each prospective CFLG client was reviewed by a CFLG member attorney to make sure that CFLG would be able to provide that client with services that were in the client's best interest.  CFLG (Aleman) Dep. I (Dkt. No. 66) 110:5-112:17; Banyon Dep. (Dkt. No. 82) 163:22-164:7.

**CFPB'S RESPONSE:**  Dispute.  The Bureau objects to the term "information" as vague.  The Bureau also disputes Defendants' proposed finding.  The only information looked at by CFLG local attorneys at the intake stage consisted of a consumer's basic mortgage loan and financial information that was previously collected by CFLG's salespersons. This basic information consisted of the following: general consumer information, address, amount of time behind on the mortgage, the servicer/mortgage company, budget and real estate information, debt-to-income ratio, and hardship and related financial information.  Sibert Jan. 23, 2012 Email, Pl.'s Mot. Summ. J. Ex. 11, at CFPB-CFLG-0061123; Aleman Dep., ECF No. 76, at 76-78, 132-33, 137, 141, 201-02; Ruggiero Dep., ECF No. 70, at 60, 110-111.

There was no review of any documents. Local attorneys were only asked to look at a consumer's intake information after the salespersons and headquarters attorney both already reviewed and pre-approved the consumer for CFLG's program.  Sibert Jan. 23, 2012 Email, Pl.'s Mot. Summ. J. Ex. 11, at CFPB-CFLG-0061123; Ruggiero Dep., ECF No. 70, at 60, 110-111.  A headquarters attorney communicated to local attorneys that they would "rarely decline" consumers for intake. Sibert Jan. 23, 2013 Email, Pl.'s Mot. Summ. J. Ex. 11, at CFPB-CFLG-0061123.

Local attorneys approved 100%, or close to 100%, of the mortgage loan modification intake files that they reviewed.  Harrington Dep., ECF No. 81, at 109-110, 139, 236; Ruggiero Dep., ECF No. 70, 115-116.  If a local attorney did not approve the mortgage loan modification intake review file, then CFLG did not pay the local attorney for that service.  Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 135-136; Harrington Dep., ECF No. 81, at 150-51, 218-19; CFLG Class B Agreement, Pl.'s Mot. Summ. J. Ex. 18, at CFPB-CFLG-0052829.

Contrary to Defendants' proposed finding, it was not the role of the local attorney to make sure that CFLG would be able to provide that client with services that were in the client's best interest. The local attorney's task was simply to determine – by just looking at financial information and criteria – if there would be a financial benefit to the consumer. For example, if the consumer had an interest rate above the market interest rate, then the consumer was considered a good candidate for CFLG's services. Harrington Dep., ECF No. 81, at 39-40, 79, 173-74. Local attorneys spent as little as 1-2 minutes reviewing TMLG and CFLG mortgage loan modification intake review files. Ruggiero Dep., ECF No. 70, at 114; Harrington Dep., ECF No. 81, at 175-77, 235. One local attorney described the review of intake files as "a quick glance" and work that he could do "in a heartbeat." Harrington Dep., ECF No. 81, at 176-177.

**DEFENDANTS' ANSWER:**

The CFPB does not genuinely dispute that Class B Attorneys reviewed CFLG client intake files.

CFLG provided the Class B Attorneys with training and guidelines regarding the review of client intake files, which required that the Class B Attorneys review the client's interest rate, loan-to-income ratio, expenses, prior loan modification and foreclosure history, and whether the client was in bankruptcy. Delgado Dep. (Dkt. 73) at 81. One of the purposes of the Class B Attorneys' review of client intake files was "to see if the client would qualify for other legal benefits or defenses, including bankruptcy [and] foreclosure litigation." Delgado Dep. (Dkt. 73) at 82-84. At least one attorney testified that that she only approved approximately 70-80% of client intake files. *Id*. at 84-85. *See* Def. Ans. ¶ 12, *supra*, incorporated herein by reference.

> 102. With respect to mortgage loan modification services, every loan modification package was reviewed and approved by a CFLG attorney in the state in which the client resided. CFLG (Aleman) Dep. I (Dkt. No. 66) 125:19-128:3; Banyon Dep. (Dkt. No. 82) 165:7-16, 212:2-16.

**CFPB'S RESPONSE:** Dispute. Defendants' proposed finding mischaracterizes the role of the local attorney in CFLG's mortgage loan modification package review process. The local attorney only received the mortgage loan modification package to check for completeness after the document processing staff and headquarters attorneys both previously reviewed and pre-approved the mortgage loan modification package as complete.

CFLG's document processing offices gathered and assembled documents from consumers, and checked to make sure consumers provided all required documentation. Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 160-161; Gerst Dep., ECF No. 75, at 60-62. Next, a headquarters attorney simply reviewed consumers' mortgage loan modification packets for completeness, like the document processors had, before notifying the local attorneys that the packages were ready for the same duplicative review. Harrington Dep., ECF No. 81, at 79-80, 150, 173; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 162-163. The local attorney simply ensured that the submission package contained the required consumer residence and financial information and documents, and if it did, the local attorney approved it. Harrington Dep., ECF No. 81, at 43, 82-84; Ruggiero Dep., ECF No. 70, at 67-68; Gray Decl., ECF No. 115, ¶ 10; Delgado Dep., ECF No. 73, at 33-34.

In fact, the local attorney review was merely "belt and suspenders" in a duplicative process. Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 127. Local attorneys did not receive files for review until the mortgage loan modification package was in a condition that was ready for local attorney approval. Sibert Dep., ECF No. 77, at 99. At least two local attorneys testified that they spent as little as five minutes or less to review the mortgage modification submission packages. Ruggiero Dep., ECF No. 70, at 90; Harrington Dep., ECF No. 81, at 141, 235.

**DEFENDANTS' ANSWER:**

This should be deemed undisputed. The CFPB does not dispute that Class B Attorneys reviewed loan modification packages prior to submission to a client's lender. *See* Def. Ans. ¶ 12, *supra*, incorporated herein by reference.

Moreover, any citations to the Sibert deposition are misplaced, as Sibert was not associated with CFLG. Sibert Dep. (Dkt. 77) at 22. While Harrington and Ruggiero did make the referenced statements, they both also testified that the amount of time to review a loan modification submission package would vary and could take 20 minutes. Ruggiero Dep. (Dkt. 70) at 90; Harrington Dep. (Dkt. 81) at 141. Other attorneys testified that it could take anywhere from 30-90 minutes to review a loan modification submission package. CFLG (Aleman) Dep. (Dkt. 66) at 170-71; Delgado Dep. (Dkt. 73) at 81; Powell Dep. (Dkt. 71) at 94.

> 104. Upon retention of CFLG, each client set up his or her own account at Meracord into which he or she deposited the fee set out in the client's retention agreement with the law firm. CFLG (Aleman) Dep. II (Dkt. No. 67) 381:17-383:7, 396:2-8, 411:6-412:10; Aleman Decl. (Dkt. No. 105), ¶ 22.

**CFPB'S RESPONSE:** Dispute. After a consumer answered "yes" after each of the headquarters attorney's scripted statements during intake, the consumer was transferred back to a CFLG salesperson who had the consumer sign the CFLG retainer agreement. After the consumer signed the CFLG retainer agreement, the salesperson gathered consumers' bank account information and set up payments of a purported "initial retainer fee" of at least $1,195 per month and recurring monthly payments averaging $895 per month through Meracord. Murphy Dep., ECF No. 80, at 75-76; Consumer Contract with Meracord, Pl.'s Mot. Summ. J. Ex. 20, at CFPB-CFLG-0036972; Exhibit B to CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000188; Halwani Decl., ECF No. 86,¶ 7. Often during the same telephone call, the consumer completed and executed an agreement with Meracord authorizing the payment processor to withdraw the "initial retainer" and the subsequent monthly payments. Consumer Contract with Meracord, Pl.'s Mot. Summ. J.

Ex. 20, at CFPB-CFLG-0036972; Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 453-454; Declaration of Linda White, ECF No. 117, ¶ 9-10; Pultz Decl., ECF No. 90, ¶ 8; Saunders Decl., ECF No. 91, ¶ 8; Bruce Decl., ECF No. 93, ¶ 7.

The Bureau also disputes Defendants' proposed finding to the extent it asserts that CFLG was a law firm. CFLG was not a "law firm," but rather a provider of mortgage assistance relief services. CFLG offered, provided or arranged for others to provide mortgage assistance relief services, including but not limited to, providing services to assist a consumer with modifying the terms of his or her mortgage. Deposition of CFLG 30(b)(6) Corporate Representative Harold E. Stafford Part 1 ("Stafford CFLG 30(b)(6) Dep. Part 1"), June 3, 2015, ECF No. 64, at 20; Deposition of CFLG 30(b)(6) Corporate Representative Jeffrey John Aleman Part 1 ("Aleman CFLG 30(b)(6) Dep. Part 1"), May 19, 2015, ECF No. 66, at 35. CFLG even identifies its principal business activity as "Mortgage Consulting" and its principal product or services as "Consulting" on the company's 2012 and 2013 Federal income tax returns. Exhibits H and I of Declaration of Jeffrey Aleman, ECF No. 105.

CFLG's marketing materials, welcome letters to consumers, retainer agreements with consumers, and sales representative calls with consumers, all demonstrated that the CFLG offered to provide and purportedly provided mortgage loan modification services. Declaration of Tim Ledbetter, ECF No. 92, ¶¶ 2-5; Peterson Decl., ECF. No. 84, ¶¶ 3, 5; Teynor Decl., ECF No. 85, ¶¶ 2-4; Halwani Decl., ECF No. 86, ¶¶ 2-4; CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000198-000201; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at CFLG.MO.LIT.000152-000154, CFLG.MO.LIT.000160; Anderson Dep., ECF No. 79, at 130-134; CFLG Amended Answer to Complaint, Dec. 31, 2014, ECF No. 41, at ¶ 39; Jeffrey Aleman Amended Answer to Complaint, ECF No. 40, at 6 (answer to ¶ 23); CFLG Response to US Senate, Pl.'s Mot. Summ. J. Ex. 36 (filed under seal), at DEF.0003071; Thomas Macey Amended Answer

to Complaint, ECF No. 42, at 6 (answer to ¶ 23); Jason Searns Amended Answer to Complaint, ECF No. 43, at 6 (answer to ¶ 23).

CFLG provided no legal services to consumers who sought modifications of their mortgages. Consumers never communicated with any attorney from headquarters or a local attorney after they enrolled for services. CFLG Retainer Agreement, Pl.'s Mot. Summ. J. Ex. 17, at DEF.000198-000201; Salesperson Scripts, Pl.'s Mot. Summ. J. Ex. 33 (filed under seal), at CFLG.MO.LIT.000152-000154; Peterson Decl., ECF No. 84, ¶ 16; Halwani Decl., ECF No. 86, ¶ 16; Declaration of Tim Ledbetter, ECF No. 92, ¶ 14.

At least one local attorney stated that she did not have an attorney-client relationship with CFLG's consumers. Gray Decl., ECF No. 115, ¶ 9. The Virginia State Bar found that a local attorney in Virginia had no attorney-client relationship with a CFLG consumer who resided in Virginia. Gray Decl., ECF No. 115, ¶ 19 and Exhibit C.

The only services in connection with mortgage loan modifications that local attorneys provided to consumers consisted of (1) comparing CFLG checklists with consumer financial information collected on a computer screen at intake to assure that a consumer met lender criteria to apply for a loan modification, and (2) comparing CFLG checklists against documents submitted by a consumer to assure that the package contained all of the lender-required mortgage loan modification documents. These tasks could be performed by non-attorneys, and in fact, were already performed by non-attorneys – salespersons and document processors - before the local attorneys performed these same tasks. Sibert Dep., ECF No. 77, at 103-105, 236; Aleman CFLG 30(b)(6) Dep. Part 1, ECF No. 66, at 27, 54; Aleman CFLG 30(b)(6) Dep. Part 2, ECF No. 67, at 452-455; Aleman Dep., ECF No. 76, at 201-02, 215.

Based on Defendants' own data, none of the 1,116 consumers who enrolled in CFLG's services received foreclosure defense services, or services beyond the financial and ministerial tasks associated with mortgage loan modification services. Thomas Decl., ECF No. 116, at 3 ¶ 19.

**DEFENDANTS' ANSWER:**

This should be deemed undisputed. The CFPB does not dispute the proposed fact that a client set up his own account at Meracord, into which the various retainer fees were deposited in accordance with the retainer agreement.

The CFPB cites a single client declaration for the general proposition that ***all*** CFLG clients made payments of at least $1,195 for an initial retainer and at least $895 monthly thereafter. That is not supported by the record evidence. *See, e.g.,* Pl. Mot. Summ. J. Ex. 17 (providing for payment by stages at the rate of $895 ***per stage***). All client payment authorizations were done after the retainer agreement was executed. Dep. CFLG (Aleman) (Dkt. 67) at 453-55.

In addition, the CFPB's response is misleading in that it suggests that CFLG required automatic payments from the client's account directly to CFLG. That is not established by the admissible record evidence. CFLG required the initial retainer payment to be deposited into the client's account with the third-party payment processor (Meracord). CFLG (Aleman) Dep. (Dkt. 67) at 378, 380. That account was controlled by the client, not CFLG. CFLG (Aleman) Dep. (Dkt. 67) at 384-87. From there, the client's funds were transferred into TMLG and CFLG IOLTA accounts at US Bank. Kesterson Dep. (Dkt. 69) at 64-65, 68. The client's funds remained in the IOLTA accounts until a payment request was made by the law firm, at which point the funds would be transferred into TMLG and CFLG's Meracord accounts. *Id.*; CFLG (Aleman) Dep. (Dkt. 67) at 380, 387-88; *see also* Aleman Decl. (Dkt. 105) at ¶¶ 12, 22.

With respect to the remainder of the CFPB's response to Paragraph 106 that disputes that CFLG was a law firm, *see* Def. Ans. ¶ 12, *supra*, incorporated herein by reference.

107.     When CFLG earned fees, Meracord transferred money out of the client's account
         into CFLG's account.  CFLG (Aleman) Dep. II (Dkt. No. 67) 381:17-383:7,
         396:2-8, 411:6-412:10.

**CFPB'S RESPONSE:**  Dispute.  The Bureau objects that the phrase "[w]hen CFLG earned fees"

is vague.  The Bureau disputes Defendants' proposed finding to the extent that it suggests that the

transfer of money from a consumer's account into CFLG's account only took place after CFLG

rendered certain services or achieved certain results.  Meracord automatically withdrew the

consumer's initial retainer and subsequent monthly payments once a consumer signed up to make

automated monthly payments.  Meracord disbursed the consumers' payments to CFLG's operating

account automatically every month, regardless of what, if any, services CFLG rendered. CFLG

Meracord Agreement, Pl.'s Mot. Summ. J. Ex. 27; Lanham Dep., ECF No. 63, at 69-70, 80, 130.

This entire process of withdrawing money from a consumer's bank account and disbursing the

money to CFLG's operating account was entirely automated and took only two to four days.

Lanham Dep., ECF No. 63, at 62-63.

**DEFENDANTS' ANSWER:**

        The Meracord Agreement does not reference any particular schedule for disbursements.

Rather, that Agreement states that fees "vary depending on consumer and the plan the consumer

chooses."  Pl. Mot. Summ. J. Ex. 27 (Dkt. 101-27) at p. 8 of 20.  Moreover, nothing in Lanham's

testimony references automatic monthly disbursements.  *See* Lanham Dep. (Dkt. 63) at 69-70, 80,

130.  The CFLG Retainer Agreement provides the schedule of payments to be made by the client

for each stage and the services to be rendered in each particular stage.  Pl. Mot. Summ. J. Ex. 17

(Dkt. 101-17).  *See also* Def. Ans. ¶¶ 104, 106, *supra*, incorporated herein by reference.

108.     In short, no property of the clients or third parties was held by CFLG.  Aleman
         Decl. (Dkt. No. 105), ¶ 22.

**CFPB'S RESPONSE:**  Dispute.  CFLG received money from consumers before certain services

were rendered or results achieved.  Meracord automatically withdrew the consumer's initial

retainer and subsequent monthly payments once a consumer signed up to make automated monthly payments. Meracord disbursed the consumers' payments to CFLG's operating account automatically every month, regardless of what, if any, services CFLG rendered. CFLG Meracord Agreement, Pl.'s Mot. Summ. J. Ex. 27; Lanham Dep., ECF No. 63, at 69-70, 80, 130.

**DEFENDANTS' ANSWER:**

> *See* Def. Ans. ¶¶ 104, 106, *supra*, incorporated herein by reference.

> 109. In an abundance of caution, however, CFLG maintained a client trust account at US Bank into which client fee payments were deposited from the clients' accounts at Meracord. CFLG (Aleman) Dep. II (Dkt. No. 67) 381:17-383:7, 396:2-8, 411:6-412:10; Aleman Decl. (Dkt. No. 105), ¶ 22.

**CFPB'S RESPONSE:** Dispute. CFLG maintained no client trust account prior to July 2012. Stafford CFLG 30(b)(6) Dep. Part 2, ECF No. 65, at 115.

**DEFENDANTS' ANSWER:**

> The CFPB does not dispute that, after July 2012, CFLG maintained a client trust account. *See also* Def. Ans. ¶¶ 104, 106, *supra*, incorporated herein by reference.

> 110. CFLG was also not profitable. CFLG (Aleman) Dep. I (Dkt. No. 66) 36:5-37:12; Aleman Decl. (Dkt. No. 105), ¶ 24; Macey Decl. (Dkt. No. 97), ¶ 10.

**CFPB'S RESPONSE:** Dispute. Data provided by Defendants to the Bureau demonstrates that CFLG collected $3,082,055 and CFLG issued $89,759 in refunds, resulting in CFLG receiving a net amount of $2,992,296 from consumers. Thomas Decl., ECF No. 116, at 3 ¶ 22.

**DEFENDANTS' ANSWER:**

> The CFPB fails to note the distinction between revenue (*i.e.*, money received) and profits (*i.e.*, money remaining after the ordinary business expenses have been paid). The numbers referenced by the CFPB are CFLG's gross and net *revenues.* The CFPB has not cited any evidence that CFLG was *profitable.* Accordingly, Paragraph 110 is undisputed.

> 112. Enrollment of new clients stopped in November 2012. CFLG (Aleman) Dep. I (Dkt. No. 66) 34:16-35:22; Aleman Decl. (Dkt. No. 105), ¶ 24.

**CFPB'S RESPONSE:** Dispute. Data provided from the Defendants to the Bureau shows that CFLG enrolled consumers in December 2012 and January 2013. Exhibit B (filed under seal) to Thomas Decl., ECF No. 116.

**DEFENDANTS' ANSWER:**

There is a single client on Exhibit B with a "CreatedTimeStamp" of January 4, 2013. *See* Decl. Thomas (Dkt. 116) at Ex. B. The CFPB has not produced any evidence that that client was actually *enrolled* on that date. All other clients on Exhibit B have a "CreatedTimeStamp" of November 30, 2012 or earlier, and Aleman testified that CFLG stopped enrolling clients in November 2012. *See id.*; CFLG (Aleman) Dep. (Dkt. 66) 34-35; Aleman Decl. (Dkt. No. 105), ¶ 24.

113. By July 2013 the firm no longer had any clients or operations. CFLG (Aleman) Dep. I (Dkt. No. 66) 41:19-42:12; Aleman Decl. (Dkt. No. 105), ¶ 24.

**CFPB'S RESPONSE:** Dispute. Based on data provided by CFLG to the Bureau, the last date any service was performed to a consumer's file was on July 31, 2012. Exhibit B (filed under seal) to Thomas Decl., ECF No. 116.

**DEFENDANTS' ANSWER:**

Defendants are uncertain what the CFPB relies on for its assertion that the last date of service to a CFLG client file was July 31, 2012. Even a cursory review of Exhibit B to the Thomas Declaration demonstrates that CFLG provided service to its clients well into 2013. *See* Thomas Decl. (Dkt. 116) at Ex. B.

114. Aleman lost approximately $100,000 in unreimbursed loans to CFLG. CFLG (Aleman) Dep. I (Dkt. No. 66) 94:2-99:4.

**CFPB'S RESPONSE:** Dispute. CFLG collected $3,082,055 and CFLG issued $89,759 in refunds, resulting in CFLG receiving a net amount of $2,992,296 from consumers. Thomas Decl., ECF No. 116, at 3 ¶ 22.

**DEFENDANTS' ANSWER:**

This should be deemed undisputed. The CFPB has not cited any evidence that Aleman did *not* lose over $100,000 from his loans to CFLG. Rather, the CFPB simply cites to CFLG's gross and net revenues, and does not address profits. *See* Def. Ans. ¶ 110.

115. Macey lost approximately $650,000 in unreimbursed loans to CFLG. Macey Decl. (Dkt. No. 97), ¶ 10.

**CFPB'S RESPONSE:** Dispute. CFLG collected $3,082,055 and CFLG issued $89,759 in refunds, resulting in CFLG receiving a net amount of $2,992,296 from consumers. Thomas Decl., ECF No. 116, at 3 ¶ 22.

**DEFENDANTS' ANSWER:**

This should be deemed undisputed. The CFPB has not cited any evidence that Macey did *not* lose over $650,000 from his loans to CFLG. Rather, the CFPB simply cites to CFLG's gross and net revenues, and does not address profits. *See* Def. Ans. ¶ 110.

124. Nor does the complaint allege any specific misconduct in the handling of any particular client file. *See generally*, Compl. (Dkt. No. 1).

**CFPB'S RESPONSE:** Dispute. The Complaint speaks for itself. Defendants' proposed finding does not accurately reflect the language of the Complaint. Counts I through 10 of the Complaint allege specific misconduct in the handling of all TMLG and CFLG consumer files.

**DEFENDANTS' ANSWER:**

The CFPB does not cite to any allegation in its complaint that Defendants mishandled a specific client file. That is because the CFPB cannot do so. Rather, the CFPB's complaint alleges generally that TMLG and CFLG's business practices violated certain statutes. *See generally,* Compl. (Dkt. 1) at ¶¶ 14-31 (captioned "TMLG's Business Practices"); ¶¶ 32-51 (captioned "CFLG's Business Practices"). Answering further, Defendants refer the Court to the Complaint.

125. Instead, the CFPB's complaint suggests that CFLG's and CFLG's general business practices – not its specific representation of any particular client(s) – violated both Regulation O and the CFPA. *See generally*, Compl. (Dkt. No. 1).

**CFPB'S RESPONSE:** Dispute. The Complaint speaks for itself. Defendants' proposed finding does not accurately reflect the language of the Complaint. Defendants' proposed finding is not supported by Defendants' citation. The Complaint does not contain language acknowledging any "representation" by TMLG or CFLG of a consumer in any legal service, nor does it acknowledge that consumers of TMLG and CFLG were law firm "clients." Counts I through 10 of the Complaint allege that Defendants violated Regulation O and the CFPA.

**DEFENDANTS' ANSWER:**

The CFPB does not cite to any allegation in its complaint that Defendants mishandled a specific client file, and the Complaint contains no such allegation. That is because the CFPB cannot do so. Rather, the CFPB's complaint alleges generally that TMLG and CFLG's business practices violated certain statutes. *See generally,* Compl. (Dkt. 1) at ¶¶ 14-31 (captioned "TMLG's Business Practices"); ¶¶ 32-51 (captioned "CFLG's Business Practices"). Answering further, Defendants refer the Court to the Complaint.

126. In Counts I and II, the CFPB alleges that Defendants violated Regulation O by collecting advanced fees for services provided by TMLG and CFLG. Compl. (Dkt. No. 1) ¶¶ 66-69.

**CFPB'S RESPONSE:** Dispute. The Complaint speaks for itself. Defendants' proposed finding does not accurately reflect the language of the Complaint. Count I of the Complaint alleges that in the course of providing, offering to provide, or arranging for others to provide mortgage assistance relief services, Defendants CFLG, Macey, Aleman, and Searns have requested or received payment from consumers before those consumers have executed a written agreement with their loan holder or servicer that incorporates any offer obtained by CFLG from the loan holder or servicer, in violation of Regulation O, 12 C.F.R. § 1015.5(a) (2011).

Count II of the Complaint alleges that in the course of providing, offering to provide, or arranging for others to provide mortgage assistance relief services, Defendants CFLG, Macey, Aleman, and Stafford have requested or received payment from consumers before those consumers have executed a written agreement with their loan holder or servicer that incorporates any offer obtained by CFLG, in violation of Regulation O, 12 C.F.R. § 1015.5(a) (2011).

**DEFENDANTS' ANSWER:**

Defendants do not disagree that Counts I and II of the Complaint contain the language identified above. However, it does not appear that the CFPB actually disputes the proposed fact that Counts I and II allege that Defendants collected advance fees. Answering further, Defendants refer the Court to the Complaint.

127.   In Counts III and IV, the CFPB alleges that Defendants violated Regulation O by improperly advising clients not to communicate with their mortgage lenders. Compl. (Dkt. No. 1) ¶¶ 70-73.

**CFPB'S RESPONSE:** Dispute. The Complaint speaks for itself. Defendants' proposed finding does not accurately reflect the language of the Complaint. Count III of the Complaint alleges that in the course of providing, offering to provide, or arranging for others to provide mortgage assistance relief services, Defendants CFLG, Macey, Aleman, and Searns have engaged in making, expressly or by implication, representations that a consumer should not contact or communicate with his or her lender or servicer, in violation of Regulation O, 12 C.F.R. § 1015.3(a) (2011).

Count IV of the Complaint alleges that in the course of providing, offering to provide, or arranging for others to provide mortgage assistance relief services, Defendants CFLG, Macey, Aleman, and Stafford have engaged in making, expressly or by implication, representations that a consumer should not contact or communicate with his or her lender or servicer, in violation of Regulation O, 12 C.F.R. § 1015.3(a) (2011).

**DEFENDANTS' ANSWER:**

Defendants do not disagree that Counts III and IV of the Complaint contain the language identified above. However, it does not appear that the CFPB actually disputes the proposed fact that Counts III and IV allege that Defendants improperly advised clients to not communicate with their lenders. Answering further, Defendants refer the Court to the Complaint.

128. In Counts V and VI, the CFPB alleges that Defendants violated Regulation O by making material representations to their clients regarding: (1) the likelihood of obtaining loan modifications; (2) the amount of time it would take to receive a modification; (3) the nature of any obligation to make periodic payments; and (4) the clients would receive legal representation. Compl. (Dkt. No. 1) ¶¶ 74-77.

**CFPB'S RESPONSE:** Dispute. The Complaint speaks for itself. Defendants' proposed finding does not accurately reflect the language of the Complaint. Counts V and VI of the Complaint allege that in the course of providing, offering to provide, or arranging for others to provide mortgage assistance relief services, Defendants have engaged in misrepresenting, expressly or by implication, material aspects of their services, including but not limited to:

a. the likelihood of obtaining mortgage loan modifications or accomplishing any other represented service or result, in violation of Regulation O, 12 C.F.R. § 1015.3(b)(1);

b. the amount of time it would take to obtain mortgage loan modifications or accomplish any other represented service or result, in violation of Regulation O, 12 C.F.R. § 1015.3(b)(2);

c. a consumer's obligation to make scheduled periodic payments or any other payments pursuant to the terms of the consumer's dwelling loan, in violation of Regulation O, 12 C.F.R. § 1015.3(b)(4); and

d. that consumers will receive legal representation, in violation of Regulation O, 12 C.F.R. § 1015.3(b)(8).

**DEFENDANTS' ANSWER:**

Defendants do not disagree that Counts V and VI of the Complaint contain the language identified above. However, it does not appear that the CFPB actually disputes the proposed facts in Paragraph 128 with respect to the conduct alleged. Answering further, Defendants refer the Court to the Complaint.

129. In Counts VII and VIII, the CFPB alleges that Defendants violated Regulation O by failing to include a required disclosure in their client communications. Compl. (Dkt. No. 1) ¶¶ 78-81.

**CFPB'S RESPONSE:** Dispute. The Complaint speaks for itself. Defendants' proposed finding does not accurately reflect the language of the Complaint. Counts VII and VIII of the Complaint alleges that in the course of providing, offering to provide, or arranging for others to provide mortgage assistance relief services, Defendants have failed to make the following disclosure in all consumer-specific commercial communications in a clear and prominent manner: "You may stop doing business with us at any time. You may accept or reject the offer of mortgage assistance we obtain from your lender [or servicer]. If you reject the offer, you do not have to pay us. If you accept the offer, you will have to pay us (insert amount or method for calculating the amount) for our services," in violation of Regulation O, 12 C.F.R.§ 1015.4(b)(1).

**DEFENDANTS' ANSWER:**

Defendants do not disagree that Counts VII and VIII of the Complaint contain the language identified above. However, it does not appear that the CFPB actually disputes the proposed fact that Counts VII and VIII allege that Defendants failed to make a disclosure required by Regulation O in their communications with clients. Answering further, Defendants refer the Court to the Complaint.

130. In Counts IX and X, the CFPB alleges that Defendants violated the CFPB Act by falsely representing that TMLG and CFLG's clients would receive legal representation, and that they could provide mortgage modification and foreclosure assistance within 90-120 days. Compl. (Dkt. No. 1) ¶¶ 82-89.

**CFPB'S RESPONSE:** Dispute. The Complaint speaks for itself. Defendants' proposed finding does not accurately reflect the language of the Complaint. Counts IX and X of the Complaint allege that in numerous instances in connection with the offering or provision of mortgage assistance relief services, Defendants have engaged in representing, expressly or by implication, that:

      a.      they generally will obtain mortgage loan modifications for consumers or will help them avoid foreclosure;

      b.      they generally will obtain such mortgage assistance relief within a certain time, such as 90-120 days; and

      c.      they will provide consumers legal representation.

**DEFENDANTS' ANSWER:**

Defendants do not disagree that Counts IX and X of the Complaint contain the language identified above. However, it does not appear that the CFPB actually disputes the proposed facts in Paragraph 130 with respect to the conduct alleged. Answering further, Defendants refer the Court to the Complaint.

131.     In its complaint, the CFPB acknowledges that Macey, Aleman, Searns, and Stafford are all attorneys and that TMLG and CFLG were law firms offering "mortgage assistance relief services" to their clients. Compl. (Dkt. No. 1) ¶¶ 13-17, 32, 34.

**CFPB'S RESPONSE:** Dispute. The Complaint speaks for itself. Defendants' proposed finding does not accurately reflect the language of the Complaint. Additionally, Defendants' citations do not support Defendants' proposed finding. The Complaint contains no language acknowledging that TMLG or CFLG were ever "law firms."

**DEFENDANTS' ANSWER:**

The CFPB specifically alleges that Macey, Aleman, Searns and Stafford were licensed attorneys and that those individuals managed the provision of services to TMLG and CFLG consumers. *See* Compl. (Dkt. 1) at ¶¶ 13-17, 32, 34. Although the CFPB claims that TMLG and

CFLG were not "law firms," and those they serviced were not "clients," the CFPB cites no evidence to support those claims. Rather, the evidence is to the contrary. *See* Def. Ans. ¶¶ 12, 19, *supra*, incorporated herein by reference. Answering further, Defendants refer the Court to the Complaint.

132. Further, according to the complaint, the clients of TMLG and CFLG were told that they were retaining a law firm when they enrolled. Compl. (Dkt. No. 1) ¶¶ 20, 23, 37-38.

**CFPB'S RESPONSE:** Dispute. The Complaint speaks for itself. Defendants' proposed finding does not accurately reflect the language of the Complaint. Defendants' citations do not support the Defendants' proposed finding. The Complaint neither acknowledges consumers of TMLG or CFLG as law firm clients, nor acknowledges that TMLG or CFLG were ever law firms.

The paragraphs cited to by Defendants state the following:

- Consumers who contacted CFLG were connected with a company representative to discuss their mortgage and financial situation. The representative made statements aimed at convincing consumers that they were eligible for a loan modification, and that they would obtain a mortgage modification if they hired CFLG. CFLG staff also indicated to consumers during the intake call that they would be receiving the services of an attorney. CFPB Complaint, ECF No. 1, ¶ 20.

- After the initial call, CFLG would send consumers a welcome packet with a cover letter and Retainer Agreement. These documents misleadingly suggested to consumers that they would be receiving the services of an attorney. For example, the cover letter begins by thanking the consumers for "entrusting their home to CFLG. . . a full service law firm that focuses on resolving all mortgage related issues." CFPB Complaint, ECF No. 1, ¶ 23.

- CFLG's advertisements deceptively suggested that CFLG enjoyed high rates of success in obtaining loan modifications and other foreclosure relief, and misled consumers into believing that they would receive the services of an attorney. For example, CFLG's website described CFLG as "one of the most sophisticated consumer protection law firms in the country" with over 100 associate attorneys "insuring the best possible outcome during uncertain times." CFPB Complaint, ECF No. 1, ¶ 37.

- The website also made representations about the quality of services CFLG would provide, such as: "[w]hile foreclosure scams are rampant, our mortgage relief specialists are some of the highest rated professionals in the field;" and "[CFLG attorneys] have years of experience keeping people in their homes and have a long list of testimonials from people who were on the brink of disaster." CFPB Complaint, ECF No. 1 ¶ 38.

**DEFENDANTS' ANSWER:**

Defendants' do not disagree that the Complaint contains the language identified above. Although the CFPB claims that TMLG and CFLG were not "law firms," and those they serviced were not "clients," the CFPB cites no evidence to support those claims. Rather, the evidence is to the contrary. *See* Def. Ans. ¶¶ 12, 19, *supra*, incorporated herein by reference. Answering further, Defendants refer the Court to the Complaint.

133. On March 11, 2009, Congress enacted the Omnibus Appropriations Act ("Omnibus Act"). 2009 Omnibus Appropriations Act, Pub. L. No. 111-8, § 626, 123 Stat. 524 (2009) ("2009 Omnibus Act").

**CFPB'S RESPONSE:** This statement is not a material fact for which a response is required under Rule 56 of the Federal Rules of Civil Procedure.

**DEFENDANTS' ANSWER:**

As the CFPB's purported authority to bring this lawsuit against Defendants is derived from the Omnibus Act, as amended by the Credit Card Accountability Responsibility and Disclosure Act ("Credit Card Act"), Defendants submit that the proposed fact in Paragraph 133 is material. Answering further, the CFPB does not dispute that the Omnibus Act was enacted on March 11, 2009, and it does not provide any contrary evidence or citation to authority. Thus, Paragraph 133 is both material and undisputed.

134. The Omnibus Act granted the Federal Trade Commission ("FTC") the authority to initiate a rulemaking proceeding to address mortgage lending practices. 2009 Omnibus Act § 626.

**CFPB'S RESPONSE:** This statement is not a material fact for which a response is required under Rule 56 of the Federal Rules of Civil Procedure. In addition, this paragraph constitutes

Defendants' characterization of the cited provision, to which the Court is respectfully referred for a full and accurate statement of its contents.

**DEFENDANTS' ANSWER:**

This statement is material.  *See* Def. Ans. ¶ 133, *supra*, incorporated herein by reference. CFPB does not dispute that the Omnibus Act granted the FTC the authority to initiate a rulemaking proceeding to address mortgage lending practices, and it does not provide any contrary evidence or citation to authority.  Thus, Paragraph 134 is both material and undisputed.

135.     On May 22, 2009, Congress passed the Credit Card Accountability Responsibility and Disclosure Act ("Credit Card Act"), which clarified portions of the Omnibus Act.  2009 Credit Card Accountability Responsibility and Disclosure Act, Pub. L. No. 11-24, § 511, 123 Stat. 524 (2009) ("2009 Credit Card Act").

**CFPB'S RESPONSE:**  Dispute. The Bureau disputes that Defendants' citation to the Credit Card Act is incorrect. The correct citation is 2009 Credit Card Accountability Responsibility and Disclosure Act, Pub. L. No. 111-24, § 511, 123 Stat. 1734 (2009) ("2009 Credit Card Act").

Furthermore, Defendants' proposed finding is not a material fact for which a response is required under Rule 56 of the Federal Rules of Civil Procedure.  In addition, this paragraph constitutes Defendants' characterization of the cited provisions, to which the Court is respectfully referred for a full and accurate statement of their contents.

**DEFENDANTS' ANSWER:**

This statement is material.  *See* Def. Ans. ¶ 133, *supra*, incorporated herein by reference. The CFPB does not dispute that the Credit Card Act clarified portions of the Omnibus Act, and it does not provide any contrary evidence or citation to authority.  Thus, Paragraph 135 is both material and undisputed.

136.     The Credit Card Act added a provision to the Omnibus Act to clarify that the FTC cannot promulgate a rule that applies to an entity that is not subject to the Federal Trade Commission Act.  2009 Credit Card Act § 511(a)(2).

**CFPB'S RESPONSE:**  This statement is not a material fact for which a response is required

under Rule 56 of the Federal Rules of Civil Procedure. In addition, this paragraph constitutes Defendants' characterization of the cited provisions, to which the Court is respectfully referred for a full and accurate statement of their contents.

**DEFENDANTS' ANSWER:**

This statement is material. *See* Def. Ans. ¶ 133, *supra*, incorporated herein by reference. The CFPB does not dispute that the Credit Card Act clarified that the FTC cannot promulgate a rule that applies to an entity not subject to the FTC Act, and it does not provide any contrary evidence or citation to authority. Thus, Paragraph 136 is both material and undisputed.

137. On June 1, 2010, the FTC issued an Advance Notice of Proposed Rulemaking for the MARS Rule. 74 F.R. 26130.

**CFPB'S RESPONSE:** Dispute. The FTC issued an Advance Notice of Proposed Rulemaking for the MARS Rule in 2009. Additionally, this statement is not a material fact for which a response is required under Rule 56 of the Federal Rules of Civil Procedure.

**DEFENDANTS' ANSWER:**

This statement is material because the CFPB's claims are based on Regulation O's predecessor rule (*i.e.*, the MARS Rule). *See also* Def. Ans. ¶ 133, *supra*, incorporated herein by reference. Defendants note that the original proposed finding contains a typographical error, and the correct date of the Advance Notice of Proposed Rulemaking for the MARS Rule is 2009. However, the CFPB does not dispute that the FTC issued that Advance Notice of Proposed Rulemaking, and it does not provide any contrary evidence or citation to authority. Thus, Paragraph 137 is both material and undisputed.

138. The FTC requested comment on whether the "proposed rule [should] include an exemption for attorneys or any other class of persons or entities." 74 F.R. 26138.

**CFPB'S RESPONSE:** This statement is not a material fact for which a response is required under Rule 56 of the Federal Rules of Civil Procedure. In addition, this paragraph constitutes

Defendants' selective quotation of a Federal Register notice, to which the Court is respectfully referred for a full and accurate statement of its contents.

**DEFENDANTS' ANSWER:**

This statement is material. *See* Def. Ans. ¶¶ 133, 137, *supra*, incorporated herein by reference. The CFPB does not dispute that the FTC requested comments relating to attorney exemptions, and it does not provide any contrary evidence or citation to authority. Thus, Paragraph 138 is both material and undisputed.

139.   On March 9, 2010, the FTC published the proposed MARS Rule (the "Proposed Rule"). 75 F.R. 10707.

**CFPB'S RESPONSE:** This statement is not a material fact for which a response is required under Rule 56 of the Federal Rules of Civil Procedure.

**DEFENDANTS' ANSWER:**

This statement is material. *See* Def. Ans. ¶¶ 133, 137, *supra*, incorporated herein by reference. The CFPB does not dispute that the FTC published the proposed MARS Rule on March 9, 2010, and it does not provide any contrary evidence or citation to authority. Thus, Paragraph 139 is both material and undisputed.

140.   In response to the Proposed Rule, the FTC received 75 comments, many of which related to the proposed attorney exemption. 75 F.R. 75093.

**CFPB'S RESPONSE:** This statement is not a material fact for which a response is required under Rule 56 of the Federal Rules of Civil Procedure. In addition, this paragraph constitutes Defendants' characterization of a statement in the Federal Register, to which the Court is respectfully referred for a full and accurate statement of its contents.

**DEFENDANTS' ANSWER:**

This statement is material. *See* Def. Ans. ¶¶ 133, 137, *supra*, incorporated herein by reference. The CFPB does not dispute that the FTC received 75 comments to the proposed MARS

Rule, and it does not provide any contrary evidence or citation to authority. Thus, Paragraph 140 is both material and undisputed.

> 141. Approximately 30 commenters (primarily attorneys and entities such as the State Bar of Wisconsin and the American Bar Association) proposed expanding the scope of the attorney exemption. *See, e.g.,* Declaration of Nicole Winters, Oct. 9, 2015 ("Winters Decl. (Dkt. No. 102)") at Ex. A thereto.

**CFPB'S RESPONSE:**    This statement is not a material fact for which a response is required under Rule 56 of the Federal Rules of Civil Procedure. In addition, this paragraph constitutes Defendants' characterization of the comments submitted in the administrative record of the rulemaking that Defendants challenge, to which the Court is respectfully referred for a full and accurate statement of their contents.

**DEFENDANTS' ANSWER:**

This statement is material. *See* Def. Ans. ¶¶ 133, 137, *supra,* incorporated herein by reference. The CFPB does not dispute that the FTC received comments to the proposed MARS Rule relating to the scope of the attorney exemption, and it does not provide any contrary evidence or citation to authority. Thus, Paragraph 141 is both material and undisputed.

> 142. For example, the American Bar Association proposed to exempt any "licensed attorney engaged in the practice of law and those individuals acting under the direction of the attorney." Winters Decl. at Ex. A at MARS.000329-340.

**CFPB'S RESPONSE:** This statement is not a material fact for which a response is required under Rule 56 of the Federal Rules of Civil Procedure. In addition, this paragraph constitutes Defendants' selective quotation and characterization of the comments submitted in the administrative record of the rulemaking that Defendants challenge, to which the Court is respectfully referred for a full and accurate statement of their contents.

**DEFENDANTS' ANSWER:**

This statement is material. *See* Def. Ans. ¶¶ 133, 137, *supra,* incorporated herein by reference. The CFPB does not dispute that the American Bar Association proposed the foregoing

expansion of the attorney exemption, and it does not provide any contrary evidence or citation to authority. Thus, Paragraph 142 is both material and undisputed.

143. Other commenters (such as the National Association of Attorneys General) urged the FTC to maintain the exemption in the Proposed Rule. *See, e.g.,* Winters Decl. at Ex. A at MARS.000292-293.

**CFPB'S RESPONSE:** This statement is not a material fact for which a response is required under Rule 56 of the Federal Rules of Civil Procedure. In addition, this paragraph constitutes Defendants' characterization of the comments submitted in the administrative record of the rulemaking that Defendants challenge, to which the Court is respectfully referred for a full and accurate statement of their contents.

**DEFENDANTS' ANSWER:**

This statement is material. *See* Def. Ans. ¶¶ 133, 137, *supra*, incorporated herein by reference. The CFPB does not dispute that the FTC received other comments proposing a broad attorney exemption, and it does not provide any contrary evidence or citation to authority. Thus, Paragraph 143 is both material and undisputed.

144. On December 1, 2010, pursuant to the Omnibus Act, as clarified by the Credit Card Act, the FTC issued a final rule regarding Mortgage Assistance Relief Services ("MARS Rule"). 16 C.F.R. § 322, 75 F.R. 75092.

**CFPB'S RESPONSE:** This statement is not a material fact for which a response is required under Rule 56 of the Federal Rules of Civil Procedure. In addition, this paragraph constitutes Defendants' characterization of the cited provisions, to which the Court is respectfully referred for a full and accurate statement of their contents.

**DEFENDANTS' ANSWER:**

This statement is material. *See* Def. Ans. ¶¶ 133, 137, *supra*, incorporated herein by reference. The CFPB does not dispute that the FTC issued a final MARS Rule on December 1, 2010, and it does not provide any contrary evidence or citation to authority. Thus, Paragraph 144 is both material and undisputed.

> 145. In the summer of 2010, Congress overhauled the financial services regulatory structure and passed the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd- Frank Act"). Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, §§ 1062, 1097(1), 124 Stat. 1376 (2010) ("Dodd-Frank Act").

**CFPB'S RESPONSE:** This statement is not a material fact for which a response is required under Rule 56 of the Federal Rules of Civil Procedure. In addition, this paragraph constitutes Defendants' characterization of the cited provisions, to which the Court is respectfully referred for a full and accurate statement of their contents.

**DEFENDANTS' ANSWER:**

As the CFPB's purported authority to bring this lawsuit against Defendants is derived from the Dodd-Frank Act, and Defendants have moved for the entry of summary judgment against the CFPB because it lacks authority to bring this lawsuit, the proposed fact in Paragraph 145 is material. The CFPB does not dispute that Congress passed the Dodd-Frank Act in the summer of 2010, and it does not provide any contrary evidence or citation to authority. Thus, Paragraph 145 is both material and undisputed.

> 146. Title X of the Dodd-Frank Act, the Consumer Financial Protection Act of 2010 (the "CFPA"), created the CFPB and gave it broad powers to engage in supervision, examination, rulemaking and enforcement of consumer financial services. 12 U.S.C. § 5511, *et seq.*, Dodd- Frank Act, Pub. L. 111-203, Tit. X, § 1021, 124 Stat. 1979 (2010).

**CFPB'S RESPONSE:** Dispute. Defendants' citation to the CFPA is incorrect. The correct citation is 12 U.S.C. § 5511, *et seq.*, Dodd- Frank Act, Pub. L. 111-203, Tit. X, § 1021, 124 Stat.

1376 (2010). This statement is not a material fact for which a response is required under Rule 56 of the Federal Rules of Civil Procedure. In addition, this paragraph constitutes Defendants' characterization of the cited provisions, to which the Court is respectfully referred for a full and accurate statement of their contents.

**DEFENDANTS' ANSWER:**

This statement is material. *See* Def. Ans. ¶ 145, *supra*, incorporated herein by reference. The CFPB does not dispute that the Dodd-Frank Act created the CFPB and gave it certain powers, and it does not provide any contrary evidence or citation to authority. Thus, Paragraph 146 is both material and undisputed.

147. On July 21, 2011, the FTC's rulemaking authority under the Omnibus Act was effectively transferred to the CFPB. 12 U.S.C. § 5581(b)(5); Dodd-Frank Act §§ 1062; 75 Fed. Reg. 57252 (Sept. 20, 2010) (designating the transfer date as July 21, 2011).

**CFPB'S RESPONSE:** This statement is not a material fact for which a response is required under Rule 56 of the Federal Rules of Civil Procedure. In addition, this paragraph constitutes Defendants' characterization of the cited provisions, to which the Court is respectfully referred for a full and accurate statement of their contents.

**DEFENDANTS' ANSWER:**

This statement is material. *See* Def. Ans. ¶ 145, *supra*, incorporated herein by reference. The CFPB does not dispute that the FTC's authority under the Omnibus Act was transferred to the CFPB effective July 21, 2011, and it does not provide any contrary evidence or citation to authority. Thus, Paragraph 147 is both material and undisputed.

148. Congress was concerned that "the breadth of the authority being given to the [CFPB]" and the 'complexities of the practice of law" would create an overlap between CPFB regulation and state court regulation of the conduct of attorneys. 156 Cong. Rec. E1347-01, 2010 WL 2788137 (Jun. 30, 2010).

**CFPB'S RESPONSE:** This statement is not a material fact for which a response is required under Rule 56 of the Federal Rules of Civil Procedure. In addition, this paragraph constitutes Defendants' characterization and selective quotation of a speech by a member of Congress, to which the Court is respectfully referred for a full and accurate statement of its contents.

**DEFENDANTS' ANSWER:**

This statement is material. *See* Def. Ans. ¶ 145, *supra*, incorporated herein by reference. The CFPB does not dispute that the Congressional Record contains the quoted language, and it does not provide any contrary evidence or citation to authority. Thus, Paragraph 148 is both material and undisputed.

> 149. John Conyers, the congressional sponsor of the exclusion, made clear that Congress did not intend to allow the Bureau to regulate the practice of law, which should be left to the state supreme courts and the ethical codes and disciplinary rules governing all aspects of the practice of law. *See* 2010 WL 2788137.

**CFPB'S RESPONSE:** This statement is not a material fact for which a response is required under Rule 56 of the Federal Rules of Civil Procedure. In addition, this paragraph constitutes Defendants' characterization of a speech by a member of Congress, to which the Court is respectfully referred for a full and accurate statement of its contents.

**DEFENDANTS' ANSWER:**

This statement is material. *See* Def. Ans. ¶ 145, *supra*, incorporated herein by reference. The CFPB does not dispute that the Congressional Record contains the cited language, and it does not provide any contrary evidence or citation to authority. Thus, Paragraph 149 is both material and undisputed.

> 150. Conyers noted that "our Committee was determined to avoid any possible overlap between the [CPFB]'s authority and the practice of law." *Id.*

**CFPB'S RESPONSE:** This statement is not a material fact for which a response is required under Rule 56 of the Federal Rules of Civil Procedure. In addition, this paragraph constitutes

Defendants' selective quotation of a speech by a member of Congress, to which the Court is respectfully referred for a full and accurate statement of its contents.

**DEFENDANTS' ANSWER:**

This statement is material. *See* Def. Ans. ¶ 145, *supra*, incorporated herein by reference. The CFPB does not dispute that the Congressional Record contains the quoted language, and it does not provide any contrary evidence or citation to authority. Thus, Paragraph 150 is both material and undisputed.

151.    On September 13, 2011, the CFPB promulgated a nearly-identical version of The MARS Rule, entitled Regulation O. 12 C.F.R. § 1015.

**CFPB'S RESPONSE:** This statement is not a material fact for which a response is required under Rule 56 of the Federal Rules of Civil Procedure. In addition, this paragraph constitutes Defendants' characterization of the cited provisions, to which the Court is respectfully referred for a full and accurate statement of their contents.

**DEFENDANTS' ANSWER:**

As the CFPB's claims arise under Regulation O, the proposed fact in Paragraph 151 is material. The CFPB does not dispute that it promulgated Regulation O on September 13, 2011 or that Regulation O is nearly identical to the MARS Rule. The CFPB does not provide any contrary evidence or citation to authority. Thus, Paragraph 151 is both material and undisputed.

152.    As a result, the FTC rescinded the MARS Rule on April 13, 2012. Rescission of Rules, 77 Fed. Reg. 22200 (Apr. 13, 2012) (withdrawing 16 C.F.R. § 322).

**CFPB'S RESPONSE:** This statement is not a material fact for which a response is required under Rule 56 of the Federal Rules of Civil Procedure. In addition, this paragraph constitutes Defendants' characterization of cited provision, to which the Court is respectfully referred for a full and accurate statement of its contents.

**DEFENDANTS' ANSWER:**

This statement is material. *See* Def. Ans. ¶ 145, *supra*, incorporated herein by reference. The CFPB does not dispute that the FTC rescinded the MARS Rule on April 13, 2012, and the CFPB does not provide any contrary evidence or citation to authority. Thus, Paragraph 152 is both material and undisputed.

Dated: November 4, 2015

*/s/ Timothy D. Elliott*
Douglas M. Poland
Godfrey & Kahn, S.C.
1 East Main Street, Suite 500
Madison, WI 53703
608-257-3911
dpoland@gklaw.com

Timothy D. Elliott (*pro hac vice*)
Emily A. Shupe (*pro hac vice*)
Jordan R. Franklin (*pro hac vice*)
Rathje & Woodward, LLC
300 E. Roosevelt Rd., Ste. 300
Wheaton, IL 60187
telliott@rathjewoodward.com
eshupe@rathjewoodward.com
jfranklin@rathjewoodward.com
Telephone: (630) 668-8500

## <u>CERTIFICATE OF FILING & SERVICE VIA CM/ECF</u>

      I, Timothy D. Elliott, an attorney, do hereby certify that on November 4, 2015, I electronically filed the above document with the clerk of the court by using the CM/ECF system.  I further certify that a notice of electronic filing related to the above document was sent to all counsel of record.

Dated:  November 4, 2015                                 <u>/S/ Timothy D. Elliott        </u>