**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br>Plaintiff,<br>v.<br><br>THE MORTGAGE LAW GROUP, LLP, (D/B/A THE LAW FIRM OF MACEY, ALEMAN & SEARNS), CONSUMER FIRST LEGAL GROUP, LLC, THOMAS G. MACEY, JEFFREY J. ALEMAN, JASON E. SEARNS, and HAROLD E. STAFFORD,<br>Defendants. | Case No. 3:14-cv-00513 |

**PLAINTIFF'S MEMORANDUM OF LAW IN REPLY TO DEFENDANTS' RESPONSE TO THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ... ii

I. INTRODUCTION ... 1

II. LEGAL ARGUMENT ... 2

A. The Federal Trade Commission and Bureau Had the Authority to Promulgate the MARS Rule and Regulation O, and Regulation O Is Not Arbitrary and Capricious ... 2

B. Responding Defendants' Effort to Discredit the Evidence Against Them Lacks Merit ... 3

C. Defendants Do Not Satisfy the Regulation O Attorney Exemption and, Therefore, Are Liable under Counts I-VIII ... 6

1. The Bureau Is Not Asking the Court to Create a New Federal Common Law Definition of the Practice of Law ... 7

2. TMLG and CFLG Were Not Engaged in the Practice of Law in Offering and Providing Mortgage Loan Modification Services ... 8

3. Defendants Did Not Comply with State Law Regarding Client Trust Accounts or Meet Regulation O's Attorney Exemption Requirements for Those Accounts ... 9

D. Defendants Made Prohibited Misrepresentations and Failed to Make Required Disclosures in Violation of Regulation O and, Therefore, Are Liable under Counts III-VIII ... 12

E. TMLG and CFLG Engaged in Deceptive Acts and Practices in Violation of the CFPA, and, Therefore, Defendants are Liable under Counts IX and X ... 17

F. The Four Individual Defendants Had Managerial Responsibilities and Knowledge of the Companies' Deceptive and Other Violative Acts and Practices, and, Therefore, Are Individually Liable on Counts I-X ... 17

G. The Bureau's Requests for Disgorgement, Restitution, and Injunctive Relief Are Appropriate and Justified under the Law and Facts ... 19

III. CONCLUSION ... 22

# TABLE OF AUTHORITIES

**Cases**

*Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984) ...................... 3

*Cleveland Bar Assn. v. Slavin*, 121 Ohio St. 3d 618 (2009) ....................................................... 11

*Consumer Financial Protection Bureau v. Jalan*, No. 12-02088 (C.D. Cal. July 23, 2013).. 20, 21

*FTC v. 1st Guar. Mortg. Corp*., No. 09-61840-CIVO'SULLIVAN, 2011 WL 1233207 (S.D. Fla. Mar. 30, 2011)........................................................................................................ 20

*FTC v. 1st Guar. Mortg. Corp*., No. 09-61840-CIV-O'SULLIVAN, 2011 WL 1233207 (S.D. Fla. Mar. 30, 2011) ...................................................................................................... 22

*FTC v. Amy Travel Svc., Inc.*, 875 F.2d 564 (7th Cir. 1989) ...................................................... 18

*FTC v. Bay Area Business Council, Inc.*, 423 F.3d 627 (7th Cir. 2005)...................................... 18

*FTC v. Figgie Int'l*, 994 F.2d 595 (9th Cir. 1993) ....................................................................... 20

*FTC v. Think Achievement Corp*, 144 F. Supp. 2d 1013 (N.D. Ind. 2000), *aff'd* 312 F.3d 259 (7th Cir. 2002) ........................................................................................................................ 22

*FTC v. Wolf*, No. 94-8119-CIV-FERGUSON, 1996 WL 812940 (S.D. Fla. Jan. 31, 1996)....... 20

*Jackson v. State Bar*, 25 Cal. 3d 398 (1979)................................................................................ 11

*McGregor v. Chierico*, 206 F.3d 1378 (11th Cir. 2000)............................................................. 20

*Trans World Accounts v. F.T.C.*, 594 F.2d 212 (9th Cir. 1979) ................................................. 22

**Statutes**

12 U.S.C. § 5565.......................................................................................................................... 19

12 U.S.C. § 5531.................................................................................................................... 2, 17

12 U.S.C. § 5536............................................................................................................................ 2

12 U.S.C. § 5655(a)(2)(B) ............................................................................................................. 19

12 U.S.C. § 5655(a)(2)(C) ............................................................................................................. 19

12 U.S.C. § 5655(a)(2)(D) ............................................................................................................. 19

**Regulations**

12 C.F.R. § 1015.3(a)..................................................................................................................... 15

12 C.F.R. § 1015.3(b)(1) ........ 13

12 C.F.R. § 1015.3(b)(4) ........ 14

12 C.F.R. § 1015.3(b)(8) ........ 16

12 C.F.R. § 1015.3(b)(9) ........ 15

12 C.F.R. § 1015.4(b)(1) ........ 17

12 C.F.R. § 1015.5(a) ........ 20, 21

12 C.F.R. § 1015.7 ........ 6

12 C.F.R. pt. 1015 ........ 2

**Rules**

Fed. R. Civ. P. 56(a) ........ 2

## I. INTRODUCTION

Plaintiff, the Consumer Financial Protection Bureau ("Bureau"), hereby submits this Plaintiff's Memorandum of Law in Reply to Defendants' Response to the Plaintiff's Motion for Summary Judgment. Defendants Consumer First Legal Group, LLC ("CFLG"), Thomas G. Macey ("Macey"), Jeffrey J. Aleman ("Aleman"), Jason E. Searns ("Searns"), and Harold E. Stafford ("Stafford") (collectively "Responding Defendants") filed Defendants' Response to the Plaintiff's Motion for Summary Judgment ("Defendants' Response" or "Def. Response"). Defendant The Mortgage Law Group, LLP ("TMLG"), which as previously noted filed a voluntary Chapter 7 bankruptcy petition, did not move for summary judgment or file any response. The Bureau refers to Responding Defendants and TMLG collectively as "Defendants."

As described in the Bureau's previous summary judgment filings, the Bureau brought this action against two mortgage loan modification companies—TMLG and CFLG (collectively, the "Companies")—and their principals for violations of consumer financial protection laws and for harming thousands of financially distressed homeowners who were unable to make their mortgage payments. *See* Plaintiff's Motion for Summary Judgment, ECF No. 83 ("Bureau's Motion"); Memorandum in Support of Plaintiff's Motion for Summary Judgment, ECF No. 99 ("Bureau's Memorandum" or "Bureau's Mem."); Plaintiff's Statement of Proposed Findings of Fact, ECF No. 101 ("Bureau's SF"); Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, ECF No. 118 ("Bureau's Opposition Memorandum" or "Bureau's Opp. Mem."); Plaintiff's Response to Defendants' Proposed Findings of Fact, ECF No. 119; and Plaintiff's Statement of Additional Proposed Findings of

Fact in Support of Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, ECF No. 120.

Defendants' conduct violated the Mortgage Assistance Relief Services Rule, 12 C.F.R. pt. 1015 ("Regulation O") (Complaint Counts I-VIII) and Sections 1031 and 1036 of the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5531, 5536 (Complaint Counts IX and X). For the reasons set forth below, as well as in the accompanying Plaintiff's Reply to Defendants' Responses to Plaintiff's Statement of Proposed Findings of Fact ("Bureau's Reply SF") and the Bureau's other summary judgment motion filings, there is no genuine issue as to any material fact, and the Bureau is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

## II. LEGAL ARGUMENT

### A. The Federal Trade Commission and Bureau Had the Authority to Promulgate the MARS Rule and Regulation O, and Regulation O Is Not Arbitrary and Capricious

Responding Defendants reiterate their contentions that the Federal Trade Commission ("FTC") promulgated the MARS Rule (which the Bureau recodified as Regulation O) "without any Congressional authority to regulate attorneys or the practice of law," and that the Regulation O attorney exemption is arbitrary and capricious. Def. Response 6, 7. As the Bureau fully described in the Bureau's Memorandum (Bureau's Mem. 6-26), Congress granted the FTC and then the Bureau express authority to regulate the offering and providing of *mortgage assistance relief services*, and attorneys who fall within the general terms of a statute are not exempt from federal regulation merely because they are attorneys. Instead, Regulation O *exempts* such attorneys if they meet the specified criteria.

Regulation O's attorney exemption is valid under *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984), and under the Administrative Procedure Act. Bureau's Opp. Mem. 13-26.

### B. Responding Defendants' Effort to Discredit the Evidence Against Them Lacks Merit

Responding Defendants attack certain aspects of the Bureau's evidence as "mischaracterized" (Def. Response 4), but the record amply supports the Bureau's statements of fact, as discussed further below. By stipulation dated November 3, 2015, Responding Defendants have withdrawn their improper authentication objection (Def. Response 3) and stipulated that Exhibits 1-37 to the Bureau's Motion are properly authenticated and admissible for purposes of the parties' cross-motions for summary judgment. *See* Stipulation as to Authenticity and Admissibility of Documents for Purposes of Cross-Motions for Summary Judgment Only, ECF No. 128.

<u>Witnesses Referred Specifically to "Salespeople"</u>

Defendants' contention that "none of the witnesses referred to [the Companies] as having employed 'salespeople'" (Def. Response 4) is directly contradicted by the evidence. For example, at least two former employees of the Companies referred multiple times to intake personnel as "salespeople." *Bureau's Reply SF 66*. Moreover, Aleman himself testified that "sales is also known as the intake people" (*id.*), and TMLG's compliance officer described his role as "the compliance person for the sales floor" and agreed that "client intake" and "sales" were the same thing. *Id.* Another employee described—and even drew a detailed diagram of

what he referred to as—the "sales floor" where "salespeople," whom he also described variously as "fronters" and "closers," worked the phones to enroll consumers. *Bureau's Reply SF 66, 72*.[1]

Local Attorneys Misleadingly Held Out As Partners

Responding Defendants contend that the local attorneys "were ***full*** partners and/or members of" the Companies (Def. Response 4, emphasis in original), but their argument elevates form over substance. By describing local attorneys as "full partners" in TMLG and CFLG, and listing all of their names as "partners" on correspondence with consumers such as the retainer letter (*Bureau's SF 94, 95; Bureau's Reply SF 37, 73*), Defendants deliberately created the false impression of a shared common enterprise and a certain level of consultation among the lawyers. Instead, the local attorneys were mere appendages to Defendants' enterprise, exemplified by, among other things, the fact that they were paid merely per consumer file approved, with no salary or benefits. *Bureau's SF 94*.

Attorney Review of Files Was Duplicative

Responding Defendants insist that the Bureau's characterization of the local attorneys' reviews as "duplicative" is wrong. Def. Response 4. The Bureau's description is apt and strongly supported by the record. Bureau's Mem. 8-10; Bureau's Opp. Mem. 34. Responding Defendants' insistence that local attorneys' review of consumers' files "was essential to the operation of the law firm" is unpersuasive. Def. Response 4. While local attorney review of consumers' files was undoubtedly "essential" to Defendants' law firm *façade*, their review was neither substantive nor meaningful. The Bureau has demonstrated extensive facts showing that the local attorneys added nothing to the process and were such a rubber stamp that they signed off on a review if they were told to do so even if they had previously declined to approve.

[1] Responding Defendants' argument that there is no evidence that Macey and Stafford had managerial responsibility (Def. Response 4) can be quickly dismissed. *See infra*, Part II.F.

Bureau's Mem. 8-10; Bureau's Opp. Mem. 34. The Bureau's evidence further demonstrates that local attorneys did not "supervise" the non-attorneys in any way. Bureau's Mem. 10; Bureau's Opp. Mem. 36.

Bureau's Discussion of Local Attorneys' Testimony
Is Supported by the Record

Responding Defendants complain that the Bureau cites to local attorney testimony improperly (Def. Response 5), but the Bureau has accurately cited the testimony. The local attorney depositions taken by the Bureau constitute the evidence of local attorneys' roles and practices. Responding Defendants took no depositions, were represented by counsel at all depositions that the Bureau took, and were free to conduct questioning. They are not in a position now to complain that the Bureau cites to the local attorney testimony that the Bureau took.[2]

[2] Responding Defendants' further argument that the Bureau's factual statement that the Companies "directed" a local attorney to approve files even after he had declined to approve them "is ***not*** what that attorney said" (Def. Response 5 (emphasis in original)) is another misrepresentation of testimony:

> Q. But based on your testimony earlier, you don't ever recall ever having declined a submission packet review that you weren't then directed to approve by Mr. Sibert or Banyon?
> A. That's correct. That's correct. *Bureau's SF 125-26.*
> * * *
> Q. And were there times that you, in reviewing either intake files or submission packages for CFLG, that you would have declined a review or did decline a review and then informed CFLG, either Mr. Sibert or Mr. Banyon, and they directed you to approve it for one reason or another?
> A. That would have been the case, yes, the dynamic was the same. *Bureau's SF 125.*

In addition, Responding Defendants' explanation that a local attorney's approval of incomplete files was because "headquarters" expected to receive the documents that were missing from the file (Def. Response 5) is irrelevant. In short, the Bureau accurately recounted the testimony, and Defendants directed the local attorney to approve incomplete files.

### C. Defendants Do Not Satisfy the Regulation O Attorney Exemption and, Therefore, Are Liable under Counts I-VIII

Responding Defendants contend that Defendants satisfied the attorney exemption criteria in Regulation O, which are set forth at 12 C.F.R. § 1015.7, and that, as a result, Complaint Counts I-VIII fail. Def. Response 7-19. The Bureau contends, however, that Defendants were mortgage assistance relief service providers who failed to meet Regulation O's attorney exemption criteria. Bureau's Mem. 4-12; Bureau's Opp. Mem. 26-43. Moreover, as the Bureau has previously demonstrated, having asserted the Regulation O attorney exemption as an affirmative defense, Responding Defendants have the burden to demonstrate that they meet each element of the exemption and are exempt; it is not the Bureau's burden to prove that they are *not* exempt. Bureau's Opp. Mem. 26-27. Moreover, Responding Defendants must meet this burden for *each of the up to 40 states in which they operated their businesses*. Yet, they have not met that burden for even one of those states. Bureau's Mem. 4-12; Bureau's Opp. Mem. 26-43.

First, Defendants did not provide mortgage loan modification services to consumers as part of the practice of law. Bureau's Mem. 7-11; Bureau's Opp. Mem. 30-38. Second, Responding Defendants have not established that Defendants or their local attorneys were licensed to practice law in the 39-40 states in which the Companies operated. Bureau's Mem. 11-12; Bureau's Opp. Mem. 38-39. Third, Defendants did not comply with state laws and regulations that cover the same type of conduct that Regulation O requires. Bureau's Opp. Mem. 40-43. Fourth, Defendants' acts and practices relating to the Companies' so-called "client trust accounts" violated state professional conduct rules. Bureau's Mem. 11-12; Bureau's Opp. Mem. 43, 45.

Having previously submitted to the Court extensive arguments on these Regulation O attorney exemption criteria (Bureau's Mem. 4-12; Bureau's Opp. Mem. 29-45), the Bureau

responds only to new arguments or issues that Responding Defendants raise relating to their Regulation O attorney exemption affirmative defense.

**1.The Bureau Is Not Asking the Court to Create a New Federal Common Law Definition of the Practice of Law**

Responding Defendants contend that the Bureau "is attempting to avoid the burden of addressing at least 35 different state laws by asking this Court to adopt a single definition of the 'practice of law' for use nationally." Def. Response 8. Responding Defendants also argue that the Bureau is asking the Court "to establish a federal common law standard for what constitutes the 'practice of law.'" Def. Response 8-9. Responding Defendants are wrong on both claims.

First, Responding Defendants attempt to shift to the Bureau the burden of proof on the Regulation O attorney exemption requirement that Defendants provided mortgage assistance relief services as part of the practice of law. Def. Response 8. Responding Defendants have the burden to prove that they provided mortgage loan modification services as part of the practice of law, and to do so for *each of the 40 states in which they operated*. Bureau's Mem. 7-11; Bureau's Opp. Mem. 30-38. Yet, they have not met that burden for even 1 of those states, let alone all 40. *Id*.

Second, the Bureau's submissions to the Court do not ask the Court to establish a "federal common law" for what constitutes the "practice of law," as Responding Defendants argue. Def. Response 8-9. To the extent that Defendants operated in many states, Responding Defendants must demonstrate that they engaged in the practice of law under the law of each of those states. The Bureau presented evidence to the Court to show not only that Defendants have *not* shown, but that they *cannot* show, that they have engaged in the practice of law under any state's approach to that concept.

### 2. TMLG and CFLG Were Not Engaged in the Practice of Law in Offering and Providing Mortgage Loan Modification Services

In response to the Bureau's demonstration that Defendants did not provide their mortgage loan modification services as part of the practice of law (Bureau's Mem. 7-11; Bureau's Opp. Mem. 30-38), Responding Defendants make a variety of inapposite assertions. Def. Response 12-17. They bear the burden to prove that they provided their mortgage loan modification services as part of the practice of law, and to do so for each of the 40 states in which they operated, yet their effort falls well short of meeting that burden.[3]

First, although Responding Defendants attempt to equate the Companies' mortgage loan modification businesses with the practices of attorneys who negotiate commercial mortgage transactions (Def. Response 13), their attempt is irrelevant and has no factual support. Second, Responding Defendants suggest that the Bureau argues that "practice of law" can be determined in a dispositive manner by looking at whether or not the tasks could be performed by non-attorneys. *Id*. The Bureau, however, does not argue that; instead, it demonstrates, among other things, that the Companies' non-attorneys had performed tasks before the Companies' headquarters and local attorneys performed the *identical* tasks, and that those *tasks* were financial and other *non-legal* tasks. Bureau's Mem. 8-10; Bureau's Opp. Mem. 34.

Third, Responding Defendants' contention that the focus should be on the nature of the "overall representation" (Def. Response 14) does not alter the factual record demonstrating that their mortgage loan modification services did not constitute the practice of law.[4] Fourth,

---

[3] Responding Defendants' quoted phrases of "too simple," "too much," and "too little" attributed to the Bureau (Def. Response 12, 15) are fabrications. Relying on these nonexistent phrases, Responding Defendants misstate the Bureau's claims and arguments (*id*.), thereby discrediting their own associated contentions.

[4] Responding Defendants assert that one Class B attorney testified that she made calls to "about five clients per day." Def. Response 16. To the extent that Responding Defendants suggest that

although Responding Defendants contend (without any support) that the Bureau "suggests that TMLG and CFLG were not practicing law because their success rates were "'too low'" (Def. Response 16), this contention is another fabrication. In addition, Responding Defendants' associated arguments about success rates (*id.*) have no bearing on their burden to prove that they were engaged in the practice of law. Finally, Responding Defendants contend (yet again without any support) that the Bureau suggests that TMLG and CFLG are "not attorneys" because they failed to abide by the Rules of Professional Conduct. Def. Response 17. The Bureau does not make this claim.[5]

### 3. Defendants Did Not Comply with State Law Regarding Client Trust Accounts or Meet Regulation O's Attorney Exemption Requirements for Those Accounts

Responding Defendants fall well short in their effort to portray their treatment of consumers' funds as compliant with state law. Def. Response 18-19. *See* Bureau's Mem. 11-12; Bureau's Opp. Mem. 43, 45. Instead of establishing how their treatment of client funds and client trust accounts satisfied the regulatory requirements of each state in which they operated, which is their burden to do (Bureau's Opp. Mem. 26-27), Responding Defendants claim, without citation, that they "only accepted earned fees." Def. Response 19. That is demonstrably false.

Responding Defendants' citations to various states' rules of professional conduct (Def. Response 18-19) merely establish that those states require the maintenance of client trust accounts for unearned client fees. Their citations do not explain what constitutes "earned fees"

---

this attorney made these calls in her capacity as a *local attorney*, they mischaracterize her testimony. The referenced attorney worked for the Companies in two different capacities: one as a local attorney, and the other as the Companies' in-house attorney in their Delray Beach, Florida location. It was only in the latter capacity that this attorney made these calls to consumers; as a local attorney, she did not communicate with any consumers. *Bureau's Reply SF 90.*

[5] Responding Defendants' unsupported contentions that Defendants were properly licensed (Def. Response 17) and complied with applicable state laws (Def. Response 18) also fail to meet their burden of proof. *See* Bureau's Mem. 11-12; Bureau's Opp. Mem. 38-39, 40-43.

and Responding Defendants do not explain why or how the moneys that the Companies took from consumers were "earned." Rather, as factual support, they cite only to their Response to Plaintiff's Proposed Finding of Fact 89, in which they claim that "the client's funds remained in the IOLTA accounts until a payment request was made by the law firm, at which point the funds would be transferred into TMLG and CFLG's Meracord accounts." That statement still does not explain at what point Defendants determined that those funds were "earned," and on what basis. Further, they point to no evidence about specific "payment requests" made by TMLG and CFLG as to a specific consumer's funds, or again, on what basis those requests were made.

Rather, the overwhelming evidence shows an automated process of harvesting consumers' funds each month regardless of what fees had been earned, expenses incurred, or stages of progress or services accomplished. Both the TMLG and CFLG retainer agreements required consumers not only to provide a large initial retainer payment, but also to consent to automatic monthly payments with no end date. *Bureau's SF 84*. In these agreements, the Companies misrepresented to consumers that the payments were keyed to the accomplishment of "stages" of progress for each client and the costs incurred[6] (*see id.*), but, in reality, they were not. As the Bureau has shown, the witness who was in charge of bookkeeping for the Companies testified that the process of transferring consumers' money in and out of the IOLTA accounts and the operating accounts was entirely automated. *Bureau's SF 160-61, 168*. Two witnesses who worked for the Companies testified that no one monitored the accounts to ensure compliance with state regulations or to ensure that money was transferred into the Companies'

---

[6] The CFLG Retainer Agreement states that $895 of the consumers' money would be disbursed to CFLG "upon completion of each Stage or thirty (30) days of work associated with the file, whichever happens sooner" (*Bureau's SF 84)*, but, as described below, no one monitored to ensure that 30 days of work was actually performed on a consumer's file before CFLG disbursed the consumer's money to itself. Moreover, Responding Defendants have not pointed to any evidence establishing what even constituted "30 days of work;" in fact, that term is not only ambiguous, but meaningless.

operating accounts only after expenses were incurred or tasks performed with respect to the consumers' matters. *Bureau's SF 169-70, 172-73*.

Indeed, Defendants essentially admitted in deposition that consumer funds were transferred into the Companies' accounts before they were "earned." Aleman testified: "We just set up a payment plan initially where they paid 1195 the first month basically and then 895 after every other month, okay, and we just let that go." *Bureau's Reply SF 173*. He further admitted:

> Q. So whether or not all the services in the stages after Stage I are actually completed, a consumer is charged $895 every 30 days?
> A. Yes.
> Q. Is that correct?
> A. As long as they're a client of the law firm.

*Id*. In short, Defendants created an automated system to harvest consumer funds on a monthly basis, regardless of progress made, work performed, or expenses incurred, using a fig-leaf IOLTA account through which to pass the money. Responding Defendants have not established that these fees were "earned."

Moreover, as Responding Defendants themselves point out, attorneys are barred from commingling client funds and firm funds. Def. Response 18. Therefore, even if Responding Defendants had shown that the advance fees that they accepted were "earned" fees (which they have not), their depositing of those "earned" fees into their client trust accounts would have violated state laws and regulations that prohibited just such commingling. *See, e.g. Cleveland Bar Assn. v. Slavin*, 121 Ohio St. 3d 618, 620 (2009) (attorney violated state professional conduct rule by depositing earned fees into client trust account, thereby commingling his personal funds with client funds); *Jackson v. State Bar*, 25 Cal. 3d 398, 404 (1979) (same).

Responding Defendants' complaint that "Regulation O created an anomaly" for them (Def. Response 19) makes no sense. Either way—whether the advance fees that the Companies

collected were deemed earned fees or not—Defendants failed to comply with all state laws and regulations applicable to client trust accounts.[7]

### D. Defendants Made Prohibited Misrepresentations and Failed to Make Required Disclosures in Violation of Regulation O and, Therefore, Are Liable under Counts III-VIII

Responding Defendants contend that Defendants are not liable under Complaint Counts III-VIII because they did not make misleading statements in violation of Regulation O, and made the required disclosures under Regulation O. Def. Response 20-23. The evidence shows that Defendants made misleading statements to consumers about the Companies' loan modification services and that Defendants failed to make disclosures required under Regulation O. These violations occurred in, and in part because of, an atmosphere that pushed sales. Few salespeople stayed on script; rather, they often said whatever was necessary to get consumers to sign up, including false statements. *Bureau's Reply SF 66.* These practices occurred while the Companies had a compliance officer, but after the Companies terminated that compliance officer, the conduct worsened: no one reviewed calls and the sales floor become the "wild, wild west." *Id.* Responding Defendants do not and cannot effectively refute the evidence that the Bureau has presented against them in support of Counts III-VIII.[8]

The Companies' Controlled the
<u>Marketing Content of Lead Generators</u>

Responding Defendants also attempt to divert the Court's attention from the many avenues through which they made misleading statements to consumers. As the Bureau has

[7] Although Responding Defendants assert that they also fall within the CFPA's attorney exemption (Def. Response 19-20), they do not. *See* Bureau's Mem 12-13; Bureau's Opp. Mem. 45-48.

[8] For example, Responding Defendants accuse the Bureau of making "serial characterizations of 'boiler room' tactics." Def. Response 20. The term "boiler room," however, is not the *Bureau's* term. Rather, it is how one of the Companies' former employees (who sold the Companies' services over the phone) described the Companies' sales operations. *Bureau's SF 70*.

demonstrated, Defendants made misleading statements to consumers through their salespeople, websites, written communications, marketing, and other methods. Bureau Mem. 15-20. Responding Defendants contend that because the Companies did not do any advertising on their own, but, rather, used third-party lead generators, any statements made in the advertising by the lead generators to consumers cannot be attributed to the Companies. Def. Response 20-21. Emails show, however, that the Companies' managing attorneys reviewed and approved all marketing before the lead generators used them, and that the Companies controlled the "messaging" done by the lead generators to market the Companies' mortgage assistance relief services. *Bureau's Reply SF 189.* Furthermore, as the managing partner in charge of expenditures to third parties, Aleman controlled the type of advertising and leads to pay for, and which lead generators to pay for those advertisements. *Bureau's SF 227(j); 233(h).*

Defendants Expressly and by Implication Promised
<u>Consumers Loan Modifications</u>

Responding Defendants contend that Defendants did not violate 12 C.F.R. § 1015.3(b)(1) because they did not expressly promise or guarantee consumers loan modifications. Def. Response 21. Responding Defendants' argument fails. A promise or a guarantee is not required; Defendants made both express and implied misrepresentations to consumers about the likelihood of obtaining a loan modification, thereby violating 12 C.F.R. § 1015.3(b)(1).

A mortgage assistance relief services provider violates 12 C.F.R. § 1015.3(b)(1) if it misrepresents, expressly or by implication, the likelihood of obtaining mortgage loan modifications. The Companies' salespeople told consumers that they were eligible for and could obtain a loan modification, and made statements in accordance with the sales scripts provided to them by the Companies, that strongly implied consumers would obtain a loan modification if they enrolled in the Companies' services. Bureau's Mem. 15-16; *Bureau's Reply SF 66.*

Defendants Misled Consumers About the
Length of Time for Obtaining a Loan Modification

Responding Defendants contend that consumers could not have been misled about the length of time required to obtain a mortgage loan modification because the statement found on welcome letters provided the qualifying language "however, every case is unique based upon each client's servicer and circumstances" immediately after the phrase "[c]urrently, we are seeing many workouts take anywhere from 90-120 days." Def. Response 21. That statement, however, appeared on welcome letters to consumers *that the consumers received only after they had already enrolled in the Companies' programs*. *Bureau's SF 90.* Indeed, Responding Defendants themselves point out that the welcome packet was only sent to the consumer "after retention." Def. Resp. Mem. 23. By the time the consumer received the welcome letter, he or she had already been subjected to the high pressure sales pitch for mortgage loan modification services from a TMLG or CFLG salesperson, had his or her basic financial information gathered by the salesperson, was told by the salesperson that he or she could obtain a loan modification, and agreed to enroll in the Companies' mortgage loan modification services. *Bureau's SF 190, 191; Bureau's Reply SF 66, 71*. Having previously been vetted by the salesperson and enrolled in the Companies' programs, a consumer could reasonably have concluded that they would receive the modification in what was represented as the common time: three to four months.

Responding Defendants Do Not Dispute and
Cannot Dispute that They Told Consumers to
Stop Paying Their Mortgages

Responding Defendants argue that the Bureau was wrong in alleging that the Companies, in violation of 12 C.F.R. § 1015.3(b)(4), told consumers to stop paying their mortgages. Responding Defendants do not and cannot dispute the Bureau's evidence that the Companies' salespeople told consumers to stop paying their mortgages. The scripts provided by the

Companies to their salespeople contained statements that the salespeople were to read to consumers, telling them that they could not receive loan modifications unless they were behind on their mortgage payments. Bureau's Mem. 16-17. Moreover, consumers reported being told by the Companies' salespeople that they were not required to make any payments to their lenders until their mortgages had been modified, and that the lenders would incorporate all past due payments into the loan modifications. *Id*. Responding Defendants do not dispute that the Companies told consumers to stop paying their mortgages, but, rather, introduce a red herring—that consumers had already stopped paying their mortgages before enrolling in the Companies' services—as if that somehow negates the fact that the Companies told consumers to stop paying. Def. Response 29. It does not.

Defendants Told Consumers Not to Speak to
Their Mortgage Servicers or Lenders

Responding Defendants contend that they never told consumers to not speak with their servicers and, therefore, did not violate 12 C.F.R. § 1015.3(a). Salespeople, however, told consumers not to contact their servicers or lenders. Bureau Mem. 18-19. In addition, the welcome packets stated: "[w]hile we will not tell you not to speak with your servicer, we must advise you that to do so is risky. We have seen several clients hurt by deceptive practices when their servicer calls." *Bureau's SF 210*. These warnings, dissuading consumers from speaking with lenders, were tantamount to telling consumers not to do so.

Defendants Misrepresented the Effectiveness of
Non-profit Counseling and Other Free Services

Responding Defendants attempt to evade liability under 12 C.F.R. § 1015.3(b)(9) by contending that consumers could not have been misled as to the availability or effectiveness of non-profit counseling and other free services, and in support, point to language in the

Companies' retainer agreements. Def. Response 22-23. Salespeople and the Companies' websites made statements that strongly implied to consumers that they would not be able to obtain loan modifications with free services from a non-profit, but that they could obtain loan modifications by paying the Companies and because there are attorneys that will fight for them. *Bureau's SF 192*. The script that the Companies provided to salespeople to read to consumers who asked about free mortgage loan modification services from non-profits read as follows:

> That makes a lot of sense to me, why pay for something you don't have to right? How exactly are you planning on getting this service for free? (Let them answer) If things only worked that way in the **REAL** world! The service you are talking about are non-profits that will tell you what paper work you'll need to gather to submit to your bank to attempt a modification. Heck, I can do that in 30 seconds by sending you a document checklist and I'll even do it for free, but that isn't going to get the result you're really after, which is mortgage relief.

*Bureau's Reply SF 34, 192* (emphasis in original). Similarly, the CFLG website contained the following language:

> There may be non-profit organizations that can assist you in your quest to stop foreclosure proceedings, but that kind of mortgage relief might involve a long wait. In addition, by not paying you may not have any leverage when something goes wrong or the process drags on for a dangerously long time.

*Id*.

Defendants Misrepresented to Consumers that
<u>They Would Receive Legal Services</u>

Responding Defendants argue that TMLG and CFLG provided legal services that constituted the practice of law. Def. Response 22. Responding Defendants' argument fails for a myriad of reasons already addressed in the Bureau's filings. Bureau's Mem. 7-11, 17-18; Bureau's Opp. Mem. 26-43. Therefore all representations that the Companies made to consumers that they would receive legal representation for mortgage loan modification services violated 12 C.F.R. § 1015.3(b)(8).

Defendants Failed to Make Disclosures
Required Under Regulation O

Finally, Responding Defendants contend that they provided certain disclosures in retainer agreements and, therefore, complied with Regulation O. Def. Response 23. They did not. As the Bureau has demonstrated (Bureau's Mem. 19-20), Regulation O requires that in *all* of their "consumer-specific commercial communications," the Companies must tell consumers in a clear and prominent manner, the following:

> You may stop doing business with us at any time. You may accept or reject the offer of mortgage assistance we obtain from your lender [or servicer]. If you reject the offer, you do not have to pay us. If you accept the offer, you will have to pay us (insert amount or method for calculating the amount) for our services. 12 C.F.R. § 1015.4(b)(1).

None of the four purported disclosures to which Responding Defendants point (Def. Response 23) match the required disclosures or comply with the above provision of Regulation O.

**E. TMLG and CFLG Engaged in Deceptive Acts and Practices in Violation of the CFPA, and, Therefore, Defendants are Liable under Counts IX and X**

Responding Defendants contend that they are not liable under Counts IX and X of the Complaint, and, therefore, are not in violation of 12 U.S.C. § 5531. Def. Response 24. As demonstrated in Part II.D, *supra*, and in the Bureau's Memorandum (20-22), Defendants engaged in deceptive acts and practices in violation of the CFPA. Responding Defendants' contentions otherwise (Def. Response 24) fail based on the law and the undisputed facts.

**F. The Four Individual Defendants Had Managerial Responsibilities and Knowledge of the Companies' Deceptive and Other Violative Acts and Practices, and, Therefore, Are Individually Liable on Counts I-X**

Responding Defendants' efforts to exculpate the four individual defendants from liability for the Companies' acts (Def. Response 24-29) should be rejected. First, Responding Defendants have essentially conceded the managerial roles and knowledge of Searns and Aleman, and the Bureau has described those roles in its filings. Bureau's Mem. 24-25.

Responding Defendants state only that Searns and Aleman had no involvement in one narrow area: "advertising." *Id.* 24. They make no other argument—legal or factual—that counters the Bureau's abundant evidence of Searns and Aleman's individual liability. *Id.*

Second, regarding Macey, Responding Defendants continue to cite almost exclusively to his own testimony as evidence that he supposedly knew almost nothing about the Companies. Def. Response 25-26. Yet the Bureau has pointed the Court to overwhelming contemporaneous documents and communications showing that Macey was deeply involved in the Companies' businesses and had knowledge about the Companies' operations and deceptions practiced on consumers. Bureau's Mem. 23-24; Bureau's Opp. Mem. 50-54. Moreover, as both the Bureau and Responding Defendants have noted, an individual's knowledge need not be actual knowledge; knowledge can be shown by evidence of reckless indifference to truth, or an awareness of a high probability of fraud combined with an intentional avoidance of the truth. A knew-or-should-have-known standard applies. *See FTC v. Bay Area Business Council, Inc.*, 423 F.3d 627, 636 (7th Cir. 2005); *FTC v. Amy Travel Svc., Inc.*, 875 F.2d 564, 573-74 (7th Cir. 1989). Def. Response 25; Bureau's Opp. Mem. 49-51. Thus, none of the individual defendants can be permitted to stick his head in the sand and thereby disclaim responsibility and liability, and this principle applies with great weight to Macey. Moreover, Macey's extensive involvement and knowledge demonstrate that he knew or should have known about the Companies' collection of advance fees.

Third, as to Stafford, Responding Defendants point to his own testimony at deposition as evidence that he had no significant involvement in CFLG after July 2012. Def. Response 27-29. But for the period after July 2012, the Bureau has established that Stafford was guaranteed a salary by CFLG—the company that he founded and managed out of the starting gate—and that

he took on work for the company that related to CFLG's deception of consumers, such as responding to consumer complaints through which he would have acquired considerable knowledge of CFLG's deceptive conduct. Bureau's Mem. 26; Bureau's Opp. Mem. 54-57. Indeed, Responding Defendants concede that Stafford continued to respond to consumer and regulatory agency complaints after July 2012. Def. Response 29. In addition, Responding Defendants fail to address or to explain to the Court why Stafford was guaranteed a salary by CFLG and why he was handling such important matters as regulatory complaints if he supposedly "had no further involvement in the management of CFLG." Def. Response 26. Further, the holdings and principles of *Bay Area Business Council* and *Amy Travel* apply equally to Stafford, such that he, too, should not be permitted to avoid liability by claiming that he—despite his significant position in the company—did not know what was taking place.

### G. The Bureau's Requests for Disgorgement, Restitution, and Injunctive Relief Are Appropriate and Justified under the Law and Facts

Responding Defendants contend that granting the remedies of disgorgement and restitution under 12 U.S.C. § 5565 would constitute an improper "windfall" (Def. Response 29), but their case citations for that proposition are inapposite to this litigation concerning violations of Regulation O and the CFPA. As discussed more fully in the Bureau's Memorandum (Bureau's Mem. 26-27), the CFPA authorizes the Court to grant relief, including refund of moneys, restitution, and disgorgement or compensation for unjust enrichment. 12 U.S.C. § 5655(a)(2)(B), (C), and(D). The Bureau has proved damages by establishing that approximately 6,300 consumers were victimized by and paid money to the Companies between May 2011 and January 2013, in the amounts of, respectively, $18,331,737 in unlawful advance fees paid to TMLG, and $2,992,296 in unlawful advance fees paid to CFLG. Bureau's Mem. 26-27.

As shown in deception, mortgage relief, and telemarketing cases brought by the Bureau and the FTC, the proper measure of consumer redress is the total amount consumers paid to purchase goods or services, less refunds paid. *McGregor v. Chierico*, 206 F.3d 1378, 1389 (11th Cir. 2000); *Consumer Financial Protection Bureau v. Jalan*, No. 12-02088, at 12 (C.D. Cal. July 23, 2013) (attached as Exhibit A to Declaration of Seth Popkin, November 4, 2015, ECF No. 133); *FTC v. 1st Guar. Mortg. Corp*., No. 09-61840-CIVO'SULLIVAN, 2011 WL 1233207, *22 (S.D. Fla. Mar. 30, 2011); *FTC v. Wolf*, No. 94-8119-CIV-FERGUSON, 1996 WL 812940, *9 (S.D. Fla. Jan. 31, 1996). Contrary to Responding Defendants' contention, Defendants are liable for the entire amount spent by consumers, regardless of whether consumers received anything of value; the relevant factor is the "fraud in the selling, not the value of the thing sold." *Chierico*, 206 F.3d at 1389 (quoting *FTC v. Figgie Int'l*, 994 F.2d 595, 606 (9th Cir. 1993)). For the same reason, Responding Defendants' theory that restitution should be based on the Companies' net revenues instead of gross revenues (Def. Response 30) must also be rejected.

In addition, Responding Defendants contend that the Bureau "is wrongly claiming that all revenues received by TMLG and CFLG are advance fees." Def. Response 31. They argue that "[w]hile the initial retainer may qualify as an advance fee, the subsequent monthly payments would not." *Id*. As a matter of law, Responding Defendants are incorrect. As discussed in the Bureau's Memorandum (Bureau's Mem. 13-14), Regulation O prohibits any mortgage assistance relief service provider from "request[ing] or receiv[ing] payment of any fee or other consideration until the consumer has executed a written agreement between the consumer and the consumer's dwelling loan holder or servicer incorporating the offer of mortgage assistance relief that the provider obtained from the consumer's dwelling loan holder or servicer." 12 C.F.R. § 1015.5(a). In the course of providing, offering to provide, or arranging for others to

provide mortgage loan modifications, TMLG and CFLG requested and received payment of multiple fees from each consumer—both initial retainer payments and subsequent automatic monthly payments—before those consumers had executed mortgage loan modification agreements. 12 C.F.R. § 1015.5(a). *Bureau's SF 89, 154-56, 158, 173, 213.* Since consumers paid all of the monthly payments *before* they had executed mortgage modification agreements, all of those monthly payments were illegal advance fees, regardless of whether or not consumers received the modifications they sought.

Responding Defendants further argue that a permanent injunction is unwarranted because "TMLG and CFLG no longer exist and there is no intent to revive them." Def. Response 32. Responding Defendants cite to no supporting authority for the proposition that the Companies "no longer exist." Putting that aside, however, it would be absurd for the Bureau to take at face value their statement that "there is no intent to revive them," and the Court should not put any weight on such a claim.

In addition, TMLG and CFLG are only the latest incarnations of the individual defendants' efforts to skirt the requirements of Regulation O. First they formed LHDR. *Bureau's SF 41-38.* Then there was TMLG, followed by CFLG after TMLG was too tainted by consumer complaints, low BBB ratings, and state governmental investigations. *Bureau's SF 50-60.* CFLG followed the same downward spiral. *Id.* As far as the Bureau is aware, none of the individual Defendants has yet forfeited his license to practice law or has anything standing in his way of creating another sham "national law firm." In cases of this kind, involving elaborate, illegal schemes to defraud consumers, "broader 'fencing-in provisions are needed to prevent similar and related violations from occurring in the future.'" *Consumer Financial Protection Bureau v. Jalan,* No. 12-02088, at 11 (C.D. Cal. July 23, 2013) (attached as Exhibit A to

Declaration of Seth Popkin, November 4, 2015, ECF No. 133) (quoting *Trans World Accounts v. F.T.C.*, 594 F.2d 212, 215 (9th Cir. 1979)); *FTC v. 1st Guar. Mortg. Corp.*, No. 09-61840-CIV-O'SULLIVAN, 2011 WL 1233207, *19–21 (S.D. Fla. Mar. 30, 2011); *FTC v. Think Achievement Corp*, 144 F. Supp. 2d 1013, 1019 (N.D. Ind. 2000), *aff'd* 312 F.3d 259 (7th Cir. 2002) (injunctive relief is appropriate even where a corporation is defunct if the principals are likely to reform a similar company). Without a permanent injunction against both of the Companies and all four individual defendants, consumers will continue to be at risk of harm from the Companies and from the individual defendants' future ventures.[9]

## III. CONCLUSION

For the foregoing reasons, the Bureau respectfully requests that the Court deny Defendants' Motion in its entirety and enter judgment as requested in the Bureau's Motion,

(continued on next page)

[9] In Defendants' Response, Responding Defendants do not state any opposition to the Bureau's request for civil money penalties.

awarding disgorgement and restitution, enjoining specified acts and practices associated with mortgage assistance and debt relief services, and imposing civil money penalties.

Date: November 4, 2015

Respectfully submitted,

Anthony Alexis (DC Bar #384545)
*Enforcement Director*

David M. Rubenstein (DC Bar #458770)
*Deputy Enforcement Director*

Cynthia Gooen Lesser (NY Bar #2578045)
*Assistant Deputy Enforcement Director*

*/s/ Seth B. Popkin*___________
Seth B. Popkin, DC Bar #417365
Seth.Popkin@cfpb.gov
202-435-9496
Shirley Chiu, IL Bar #6296079
Shirley.Chiu@cfpb.gov
202-435-7592
Mary K .Warren, NY Bar
Mary.Warren@cfpb.gov
202-435-7815
*Enforcement Attorneys*

Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing and of the accompanying Plaintiff's Reply to Defendants' Responses to Plaintiff's Statement of Proposed Findings of Fact were served on November 4, 2015, via electronic mail, upon counsel of record in this action.

*/s/ Seth B. Popkin*
Seth B. Popkin