IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CONSUMER FINANCE
PROTECTION BUREAU,                                       OPINION and ORDER

           Plaintiff,                                    14-cv-513-bbc

      v.

THE MORTGAGE LAW GROUP, LLP,
CONSUMER FIRST LEGAL GROUP, LLC,
THOMAS G. MACEY, JEFFREY J. ALEMAN,
JASON E. SEARNS and HAROLD E. STAFFORD,

           Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Consumer Finance Protection Bureau brought this action against two defunct companies and four lawyers associated with those companies, alleging violations of the Consumer Financial Protection Act of 2010 and 12 C.F.R. part 215, which is commonly called Regulation O.  Specifically, plaintiff alleges that while providing mortgage relief services to more than 6,000 consumers in 39 states, defendants The Mortgage Legal Group, LLP and Consumer First Legal Group, LLC made misrepresentations about their services, in violation of Regulation O and the Consumer Financial Protection Act; failed to make certain disclosures required by Regulation O; and collected advance fees in violation of Regulation O.  Plaintiff  contends that defendants Thomas G. Macey, Jeffrey J. Aleman, Jason E. Searns and Harold E. Stafford may be held liable because they either participated directly in the illegal acts or had the authority to control the actions of the corporate

1

defendants.  Plaintiff and defendants Consumer First Legal Group, LLC, Thomas G. Macey, Jeffrey J. Aleman, Jason E. Searns and Harold E. Stafford have filed cross motions for summary judgment.  Dkt. ##83 and 96.  (Defendant The Mortgage Law Group, LLC has not filed an answer to the complaint or taken any other action in its defense.)

Although the court has entered orders on many issues that the parties raised in their motions, including the validity of Regulation O, dkt. #144, and defendants' qualification for the statutory and regulatory exemption for attorneys, dkt. #187, there are a few remaining issues related to liability and available remedies that are now before the court. Dkt. #190 (order reinstating parties' motion for summary judgment with respect to these remaining issues).  Specifically, plaintiff has moved for summary judgment with respect to defendants' violations of Regulation O and the Consumer Protection Act, the liability of the individual defendants and available remedies.  Defendants have moved for summary judgment with respect to the individual liability of defendants Macey and Stafford.

Plaintiff's motion for summary judgment will be granted with respect to certain matters.  I conclude that:

1)  The initial and monthly retainer fees charged by The Mortgage Law Group and Consumer First Legal Group qualify as advance fees under 12 C.F.R. § 1015.5(a).

2)  The companies failed to make the disclosure required under 12 C.F.R. § 1015.4(b)(1) in the manner required under § 1015.4(b)(4) in either their telephonic communications with potential clients or the written retainer agreements sent to newly enrolled clients.

2

3)   The companies implied in their welcome letter that consumers should not communicate with their lenders.

4)   The companies' intake specialists implied that consumers who were current on their mortgage should stop making payments on their mortgage loans.

5)   The companies told consumers during intake calls and in retainer agreements and welcome letters that they would receive services from an attorney and legal representation in seeking a loan modification.  Consumer First Legal Group also made this representation on its website.

6)   The companies' intake specialists misrepresented the performance of nonprofit housing counselor agencies or programs.

7)   Aleman may be held individually liable for any violations of the Act or regulation on the part of The Mortgage Law Group at any time during its operations and of Consumer First Legal Group beginning in July 2012 related to the receipt of advance fees, misrepresentations made by the companies in oral and written communications to consumers (not in advertising) and any failures to disclose a consumer's right to reject services.

8)   Searns may be held individually liable for any violations of the Act or regulation on the part of The Mortgage Law Group at any time during its operations related to the receipt of advance fees, misrepresentations made by the company in oral and written communications to consumers (not in advertising) and any failure to disclose a consumer's right to reject services.

9)  Macey may be held individually liable for any violations of the Act or regulation on the part of The Mortgage Law Group at any time during its operations and of Consumer First Legal Group beginning in July 2012 related to the receipt of advance fees, misrepresentations made in the retainer agreement about consumers' receipt of legal services and any failures to disclose a consumer's right to reject services in the retainer agreement.

10)  The appropriate measure for restitution or disgorgement in this case is defendants' net revenues, which includes the amount of advance fees collected from their clients minus any refunds made to those clients.  The Mortgage Law Group received total net revenues in the amount of $18,331,737 and Consumer First Legal Group received total net revenues in the amount of $2,992,296.

Plaintiff's motion will be denied with respect to the following issues, which will be resolved at trial:

1)  Whether the companies' welcome letter failed to make the disclosure required by 12 C.F.R. § 1015.4(b).

2)  Whether the television and internet advertisements placed by third parties on behalf of the companies contained misrepresentations that consumers would receive legal services and obtain a loan modification in violation of 12 C.F.R. §§ 1015.3(b)(1) and (8).

3)  Whether the companies' intake specialists told consumers not to communicate with their lenders in violation of 12 C.F.R. § 1015.3(a).

4

4) Whether the companies' direct communications with consumers misrepresented their likelihood of obtaining a mortgage loan modification in violation of 12 C.F.R. § 1015.3(b)(1).

5) Whether the companies' welcome letters misrepresented the amount of time it would take to obtain a loan modification in violation of 12 C.F.R. § 1015.3(b)(2).

6) The individual liability of defendants Aleman and Searns for any misrepresentations made in television and internet advertisements placed by third parties on behalf of the companies.

7) Defendant Macey's individual liability for any of the companies' violations involving their telephonic communications with consumers, television or internet advertising (including company websites) or welcome letters.

8) Defendant Stafford's individual liability.

Defendants' motion for summary judgment will be granted with respect to the individual liability of defendant Stafford and plaintiff's claims against him will be dismissed. Also, defendants' motion will be granted with respect to Macey's individual liability for any of the companies' violations involving their telephonic communications with consumers, television or internet advertising (including company websites) or welcome letters. Defendants' motion for summary judgment will be denied in all other respects as it relates to the individual liability of defendant Macey.

In addition to the disputed liability issues that will be resolved at trial, the court must address the parties' disputes concerning whether defendants qualify for the statutory and

5

regulatory exemption for attorneys engaged in the practice of law.  In my April 21, 2016 order, dkt. #187, I determined that to qualify for the exemption, defendants must prove that they were licensed to practice law (or were affiliated legally with licensed attorneys) and provided mortgage relief services as part of the practice of law in every state in which their clients resided.  This means that defendants must show that they met the licensing requirements and the definition of the practice of law for each state in which they provided services.  The parties dispute the legal standard applicable in some states and the type of services that they provided to consumers.  Although the legal standard must be determined on a state-by-state basis, the parties seem to rely on uniform evidence of defendants' services, such as their general practice of reviewing consumers' financial information and documents.

In light of these disputes and the number of states involved, it will be important to develop a full record in an efficient and organized manner at trial, which is likely to take place in October or November of 2016.  It seems that it would be most efficient to develop the evidentiary record on all of the remaining issues related to the attorney exemption, defendants' liability and damages in one trial before the court.  This would allow each witness to exhaust his or testimony on all issues in one appearance versus requiring the witnesses to take the stand in multiple trials.  I also anticipate that there are some areas on which the parties may be able to reach an agreement and stipulate to certain facts or applicable legal standard.  In addition, because the parties seem to rely on common evidence of defendants' practices, it may be possible to develop a factual record for all states or at least

groups of states.  In light of these considerations, I would like some input from the parties before deciding how this case will proceed.

The parties shall have until August 2, 2016 to meet, confer and submit a proposed trial plan in writing that shall address:  (1) whether the parties' disputes concerning the legal definition of the practice of law in certain states should be resolved in motions in limine before trial or in post trial briefing; (2) the pros and cons of holding one trial versus bifurcating or trifurcating the trial to resolve the attorney exemption issue first and then proceeding on the remaining disputed issues relating to liability and damages if necessary; (3) the amount of time the parties anticipate for presenting evidence on each of the remaining issues in dispute:  exemption, liability and damages; (4) whether it is possible to develop one factual record for all states or at least for a group of states with substantially similar legal standards; (5) whether it would be beneficial to use five or six states as a representative example of a particular group of states; (6) evidentiary issues on which the parties can reach agreement; (7) how to proceed against defendant The Mortgage Law Group, which has not appeared in this case; and (8) any other suggestions that the parties may have for structuring the trial in an efficient and organized manner.  The parties should highlight areas on which they agree and if necessary submit individual responses to address any issues on which they were unable to reach agreement.  The parties should understand, however, that the court will make any final decision on how this case will proceed.  The court will schedule a telephonic conference after August 2, 2016 to set deadlines for any

additional briefing, Rule 26(a)(3) disclosures, motions in limine, the final pretrial conference and the court trial.

## UNDISPUTED FACTS

### A. Background and Formation of Corporate Defendants

Defendants Thomas Macey, Jason Searns, Jeffrey Aleman and Harold Stafford are all attorneys with a background in consumer law. At all times relevant to this lawsuit, Macey was licensed to practice law in Illinois, Searns was licensed to practice law in Colorado, Stafford was licensed to practice law in Wisconsin and Aleman was licensed to practice law in Wisconsin and Illinois. In the 1990s, Macey and Aleman worked together at the law firm Legal Helpers, P.C. in Chicago, Illinois, which practiced in the area of consumer bankruptcy. They later operated Legal Helpers Debt Resolution, LLC, which provided debt relief services to consumers. Searns joined Legal Helpers Debt Resolution in 2009. Stafford worked with several national consumer law firms before meeting the other defendants in 2012.

In early 2011, Macey, Searns and Aleman formed defendant The Mortgage Law Group, LLP, a Nevada limited liability partnership with its principal place of business in Chicago, Illinois. (The parties dispute whether the mortgage assistance relief services arm of Legal Helpers Debt Resolution became The Mortgage Law Group.) Macey held a 76 percent interest, Aleman held a 14 percent interest and Searns held a nine percent interest in the company. Aleman served as the managing partner and Searns served as general counsel and ethics counsel. The Mortgage Law Group offered and provided mortgage

8

assistance relief and financial advisory services, including assisting consumers with modifying the terms of an extension of credit. It ceased operations by approximately November 2013, and in March or April 2014, it filed a voluntary Chapter 7 bankruptcy petition. (The parties allege conflicting dates for the filing of the bankruptcy petition.)

In January 2012, Stafford formed defendant Consumer First Legal Group, LLC, a Wisconsin limited liability company that offered and provided mortgage assistance relief and financial advisory services to consumers. Stafford's intention was that Consumer First Legal Group would become a nationwide law firm that provided mortgage-related legal services to consumers. Later in 2012, Stafford met Aleman, who proposed that he and Macey buy a majority interest in the company. In July 2012, Macey purchased a 78 percent interest in the company, Aleman purchased a 17 percent interest and Stafford retained a five percent interest. Aleman took over the day-to-day management of the company from a new office in Chicago, Illinois. By July 2013, Consumer First Legal Group ceased operations and did not have any clients.

### B. Role of Individual Defendants

#### 1. Macey

As the majority partner of The Mortgage Law Group, Macey had the legal authority to exert control over the company's policies, procedures and practices and weigh in on decisions for the company. He had final decision-making authority with respect to a number of issues (including financial matters and new ventures), reviewed and negotiated most of

the vendor contracts (including the company's lease and payment processing service) and reviewed and approved some corporate policies, processes and procedures.

Similarly, as the majority shareholder of Consumer First Legal Group, Macey had the authority to make large decisions for the company.  He involved himself in financial matters for the company if there was a dispute between the other shareholders, received weekly financial updates on matters such as the number of enrollments and employee compensation issues and had the authority to get an employee fired (though he never exercised his firing authority).

2. Aleman

Aleman managed the day-to-day business and operations for The Mortgage Law Group during its existence and for Consumer First Legal Group after July 2012.  Aleman was intimately familiar with the operations of The Mortgage Law Group.  All company personnel and local attorneys answered to him on daily matters, issues and policies.  He developed and approved The Mortgage Law Group's mortgage assistance relief services, directed client processing managers and third-party vendors, approved expenditures (including marketing), addressed client matters and created policies and protocols related to client support, processing and document collection.  After July 2012, Aleman reviewed and approved Consumer First Legal Group's processes, procedures, expenditures and resource purchases; approved the contents of the company's website; hired, fired and managed all company personnel; reviewed and approved the company's retainer agreements, Class B member

10

agreements and contracts related to the management of the company (including third-party vendors).

### 3.  Searns

As the minority shareholder and general counsel of The Mortgage Law Group, Searns oversaw the company's compliance with regulatory requirements and offered opinions on ethical issues.  Among other things, he reviewed the company's retainer agreement and call scripts for compliance with applicable legal and ethical requirements.  Searns also instructed managers in charge of client support, processing, and document collection on company procedures; supervised and audited paralegals and other support staff; and investigated and responded to complaints from consumers and regulatory authorities.

### 4.  Stafford

Between January and July 2012, Stafford oversaw the operation of Consumer First Legal Group, managing its day-to-day activities and making all business decisions for the company.  After selling most of his ownership interest in the company in July 2012, Stafford's involvement in the company became more limited.  He participated in the recruitment of local attorneys and drafted some written responses to consumer complaints from the Better Business Bureau and state regulators.  Stafford received an annual salary of $50,000.  Under the company's operating agreement, the salary stopped on the first of the

following to occur:  a period of two years or when the company stopped providing services to consumers.

For a number of months, Stafford spoke with Aleman for five to 10 minutes once a week about the enrollment process (numbers, forecasting and whether the company was attracting new clients).  Stafford also reviewed case notes related to clients who filed a complaint.  He visited the Chicago office three times after he sold his ownership interest in the company.

## C.  Advertising and Enrollment Process

Consumer First Legal Group's website described the company as "one of the most sophisticated consumer protection law firms in the country" with more than 100 associate attorneys "insuring the best possible outcome during uncertain times."  Dkt. #41 at 9-10.  The website also made representations about the quality of services that Consumer First Legal Group would provide, such as "[w]hile foreclosure scams are rampant, our mortgage relief specialists are some of the highest rated professionals in the field;" and "[our attorneys] have years of experience keeping people in their homes and have a long list of testimonials from people who were on the brink of disaster."  Id.

The Mortgage Law Group and Consumer First Legal Group did not place or run any television advertisements in their own names or contract with anyone to do so.  Instead, they paid marketing companies to provide them with "qualified leads" on consumers.  These third-party "lead generators" ran generic advertisements for mortgage loan modification

services on television and online websites and for a fee, provided information about consumers who responded to the advertisements to companies like The Mortgage Law Group and Consumer First Legal Group. The Mortgage Law Group always used third-party lead generators, and Consumer First Legal Group began this practice in July 2012.

The Mortgage Law Group and Consumer First Legal Group employed client intake specialists to field calls from potential consumers, gather information about the consumer and explain the services offered by the companies. (Plaintiff calls these employees "salespeople," a characterization to which defendants object.) The companies provided their intake specialists with "scripts" to help them answer questions and resolve any issues that the consumers might have, including what to tell consumers if they wanted to talk with their spouse before enrolling in the program, asked about negotiating with lenders themselves, objected to the cost of the program or wanted to cancel their enrollment. The script contained the following instructions and sample language to aid the intake specialists:

- All clients must be advised that they have "the right to reject any offer from their lender." Dkt. #103, exh. #1 at TMLG.MO.LIT.000177-78.

- Do not tell a client not to talk with their lender, to stop paying their mortgage or otherwise to breach the contract with their lender. Id. at TMLG.MO.LIT.000152.

- Tell consumers that "[i]f you are able to stay current we would recommend you contact your lender because most programs are hardship based so the clients that retain us are behind on their payments or are in imminent default of doing so." Id.

- If a consumer is unable to stay current, tell them that "The first thing that I want you to understand is that if you do fall behind on your mortgage it will damage your credit and could lead to foreclosure. That being said if you can't pay you can't pay. The one thing we ask of people that are

13

current is that they put in the proper amount of effort in working with us to find the proper resolution for you. We find the person who is a year behind is much more helpful that some who is current. Does that make sense? . . . Will you be helpful during this process if we decide to bring you in as a client?" Id.

- If the consumer asks about free mortgage loan modification services: "That makes a lot of sense to me, why pay for something if you don't have to right? How exactly are you planning on getting this service for free? (Let them answer) If things only worked that way in the REAL world! The service you are talking about are non-profits that will tell you what paper work you'll need to gather to submit to your bank to attempt a modification. Heck, I can do that in 30 seconds by sending you a document checklist and I'll even do it for free, but that isn't going to get the result you're really after, which is mortgage relief. You see, we employ a very definitive strategy in an attempt to achieve the BEST possible outcome for you and that involves lawyers tying up the foreclosure process, holding your lenders feet to the fire, A LOT of back and forth negotiating, and if need be filing a formal complaint to the authorities if we find any wrong doing on the part of your lender. Believe me _____ what you're talking about getting "for free" and what we're offering are miles apart and at the end of the day I think all you're REALLY after is getting the relief you so desperately need, not necessarily getting someone to work for free for you, am I right? Great! Here's what we need to get you started!!" Id. at TMLG.MO.LIT.000160.

(Although the parties agree that intake specialists followed these scripts during telephone calls with consumers, they dispute whether the intake specialists made additional representations that went "off script." For example, the parties dispute whether intake specialists expressly told consumers that they would get a mortgage loan modification if they enrolled in the company's services or that they should stop paying their mortgage.)

If a consumer expressed interest in defendants' services, the intake specialist transferred the consumer to an attorney at company headquarters who reviewed defendants' services with the consumer. The attorneys also worked from a script and read the consumer

14

statements about the program and fees.  If the consumer answered yes to these statements, he or she was transferred back to an intake specialist who had the consumer sign a retainer agreement.

The retainer agreements for both companies stated the following with respect to the consumer's obligations and right to engage in and terminate defendants' services:

> **IV.  Term:** The term of this Agreement shall commence on the effective date and continue until the negotiated resolution of a successful mortgage workout disclosed by Client in Exhibit A of this Agreement [which defines what qualifies as a mortgage workout] or until termination of this Agreement as provided in Paragraph XII.
>
> \*     \*     \*
>
> **VI.  Client Obligations:** The Client will perform the following obligations:
>
> \*     \*     \*
>
> > f.   If a servicer contacts Client, Client will not engage in negotiation or workout discussions with servicer. Rather, Client will inform servicer that Client is represented by CFLG as Client's attorney, provide the servicer with CFLG's contact information, and advise servicer that all future communications shall be directed through CFLG. If the servicer engages in harassing or abusive conduct, the Client will promptly notify CFLG and provide complete and accurate information regarding such contacts.
>
> \*     \*     \*
>
> **VII.   [The Company's]  Obligations:** In consideration for Client's obligations as slated in Section VI, [the company] agrees to use its best efforts to defend the foreclosure action and, where appropriate, obtain a successful mortgage workout solution for Client by providing basic legal services on an efficient and cost-effective basis.
>
> **CLIENT EXPRESSLY AGREES THAT [THE COMPANY] MAKES NO SPECIFIC GUARANTEE REGARDING THE OUTCOME OF ANY**

15

**FORECLOSURE ACTION, MORTGAGE RELIEF SERVICES, LOAN MODIFICATION, SHORT SALE OR OTHER NEGOTIATION FOR A MORTGAGE WORKOUT SOLUTION CONSISTENT WITH THE OBJECTIVES OF THE CLIENT.**

\*   \*   \*

**VIII.   Fees and Costs**: In consideration for all services to be rendered hereunder, Client agrees upon execution of this Agreement to pay [the company] the Initial Flat Fee Retainer and monthly Recurring Flat Fee Retainer, as set forth in the Payment Schedule attached as Exhibit B to this Agreement. Client acknowledges that this Agreement is based on a Flat Fee earned, not billed by the hour. However, for accounting of earned and unearned fees only, fees are calculated in six minute intervals, with six (6) minutes being the minimum time billed for any one project as provided for in the attached Payment Schedule.

Client also agrees that if the Client's initial or ongoing payments fail for any reason, [the company] is under no obligation to provide any legal or law-related services under this Agreement until such time the Client successfully recompenses [the company] and brings all amounts owed hereunder current.

\*   \*   \*

**X.   Client Acknowledgment:** Client hereby acknowledges, consents and agrees that:

\*   \*   \*

**c. The outcome of any foreclosure action and CFLG's negotiation of any mortgage workout solution is uncertain. Each case is unique and results may vary**

\*   \*   \*

**XII. Termination and Severability**: Client agrees that both parties may sever the relationship at any time. The party choosing to terminate the Agreement will document the decision by sending written notice to the other party. The termination will occur upon receipt of such notice.

If such termination occurs and within 30 days of the date of said termination, the Client will be provided with an accounting of fees earned. Client shall only be responsible for fees incurred through the date of cancellation and in accordance with the Payment Schedule listed in Exhibit B. [The company] may cancel this Agreement if the Client fails to make payments as previously agreed upon or for any violation of the Client Obligations listed in section VI. If any legal action is brought regarding this Agreement, the prevailing party shall be entitled to legal fees and court costs.

*   *   *

**XV.  Disclosures and Disclaimers**: Client acknowledges and understands that:

*   *   *

d.  [The company] cannot and does not make any guarantee of any kind regarding the outcome of any foreclosure case or the success of any negotiation for a mortgage workout;

e.  Client may accept or decline any mortgage workout solution achieved by [the company];

f.  It is not necessary to pay a third party to arrange for a loan modification or other form of forbearance from your mortgage lender or servicer. You may call your lender directly to ask for a change in your loan terms. Nonprofit housing counseling agencies also offer these and other forms of borrower assistance free of charge. A list of nonprofit housing counseling agencies approved by the United States Department of Housing and Urban Development (HUD) is available from your local HUD office or by visiting www.hud.gov.

Dkt. #101, exh. ## 4 and 17.

After the client signed a retainer agreement, the companies sent the client a welcome

packet that included a cover letter that made the following statements:

- Currently we are seeing many workouts take anywhere from 90-120 days; however, every case is unique based upon each client's servicer and circumstances.  Fortunately by using an attorney you have a significant

17

advantage over homeowners who attempt workouts on their own because we are familiar with the process and expedite it through our contacts.

- While we will not tell you not to speak to your servicer, we must advise you that to do so is risky. We have seen several clients hurt by deceptive practices when their servicer calls.

Dkt. #103, exh. #2 at 2 and 4.

Consumers who enrolled in the services offered by The Mortgage Law Group and Consumer First Legal Group believed that they would be represented by an attorney. Intake specialists, headquarter attorneys, the retainer agreement and the welcome letter told potential customers that they would receive legal representation and services from an attorney specifically assigned to their file.

### D. Consumer Payments and Receipt of Services

After a consumer agreed to enroll, an intake specialist gathered the consumer's bank account information to set up payments for an initial retainer fee and recurring monthly payments. The Mortgage Law Group required $1,195 for its "Stage I" services and a monthly flat fee retainer of approximately $500. (The parties dispute whether The Mortgage Law Group charged additional fees for other services as part of an initial flat fee retainer.) The "Payment Schedule" (Exhibit B) of The Mortgage Law Group's retainer agreement defined the stages of services as follows:

- Stage I: Completion of financial statement questionnaire and consultation; review and analysis of the financial questionnaire to evaluate a client's difficulty in paying current loan and the likelihood of repayment of a modified loan; evaluation of the client's hardship; analysis of preliminary financial data and mortgage loan terms; analysis of the client's existing loan terms as

18

compared to market conditions; determining the client's lender's requirements for a loan application; attorney analysis of preliminary underwriting; communications with client regarding the preliminary assessment; document preparation; documentation requests to client; development of financial summary; assistance in drafting a hardship affidavit; and confirmation of lender submission requirements;

• Stage II:   Follow up with the client regarding documentation; completion of lender and federal forms; compilation of client's financial documents; preparation of file and rview of financial documents by underwriter; underwriting client file in light of federal and investor guided options; underwriting analysis and creation of loan modification submission package; final underwriting analysis and review of completed loan modification package by TMLG attorneys.

• Stage III:  Transmission of loan modification package to client's lender; verification of lender's receipt of the package; continued monitoring of loan modification process with the lender; assisting the client with compiling additional documentation requested by the lender; and proposing alternative loan solutions where necessary.

Dkt. #101, exh. #4 at CFPB-TMLG-0037271-73.

The Consumer First Legal Group charged an initial flat fee retainer of varying amounts but it required $1,195 as an initial fee for "Stage I" services and a continuing monthly flat fee retainer of $895 upon completion of the earlier of each subsequent stage of services or 30 days of work.  The Consumer First Legal Group's retainer agreement identified nine stages of services, culminating with the company's review and discussion of the loan modification document with the consumer.  Its Stage I services were substantially similar to the Stage I services provided by The Mortgage Law Group.

Intake specialists were encouraged to call consumers to ask them to make their initial retainer payment earlier than the scheduled date and the script instructed the intake specialists to say:

19

> We have been seeing very strong results from the lenders we have been
> working with and I can only attribute that to the fact that foreclosures are
> skyrocketing and maybe they're finally starting to realize they have to start
> working with homeowners.  Everything is ready to go on our end, the next
> step is to get your first payment in to complete the process and get this
> underway.

Dkt. #103, exh. #1 at TMLG.MO.LIT.000157.

The Mortgage Law Group enrolled at least 5,265 consumers who made one or more

payments between May 2011 and January 2013, and Consumer First Legal Group enrolled

at least 1,116 consumers who made one or more payments between May 2012 and January

2013.  The Mortgage Law Group collected $18,454,222 from its clients and issued

$122,485 in refunds, resulting in a net revenue  of $18,331,737.  Consumer First Legal

Group collected $3,082,055 from its clients and issued $89,759 in refunds, resulting in a net

revenue of $2,992,296.  The companies did not start working on a consumer's behalf until

the consumer made the initial retainer payment, and they requested and received initial and

monthly payments from consumers before those consumers had executed written loan

modification agreements with their lenders or mortgage servicers.

The Mortgage Law Group obtained loan modifications for 26 percent (or about

1,369) of its 5,265 clients.  Consumer First Legal Group enrolled at least 1,116 consumers

in its loan modification program but obtained loan modifications for only 17 percent (or

about 190) of those clients.  (The parties dispute whether these percentages reflect the

companies' success rate.  Defendants offer the affidavit of Aleman, dkt. #125 at ¶ 18, to

show that the percentages are misleading because they do not account for consumers who

canceled their retainer agreements, stopped using the companies' services or obtained a

refund.  Aleman avers that The Mortgage Law Group submitted competed loan applications for only 50 percent of its clients and Consumer First Law Group for only 47 percent of its clients.)  The Mortgage Law Group took an average of 211 days and Consumer First Legal Group took an average of 165-170 days to obtain a mortgage loan modification for a client.

OPINION

## I.  STATUTORY AND REGULATORY VIOLATIONS

Plaintiff alleges that defendants have made misrepresentations about their services, in violation of Regulation O and the Consumer Financial Protection Act; failed to make certain disclosures required by Regulation O; and collected advance fees in violation of Regulation O.  As I have discussed in my previous orders, defendants contend that none of these provisions apply to them because they were attorneys engaged in the practice of law and therefore exempt.  That issue remains in dispute and will be resolved at the court trial on a state-by-state basis.  In light of the possibility that not every individual or corporate defendant will qualify for the attorney exemption in all of the jurisdictions relevant in this case, I will address the parties' arguments with respect to liability in an effort to streamline the issues for trial.

### A.  Advance Fees

Regulation O prohibits a mortgage assistance relief service provider from "request[ing] or receiv[ing] payment of any fee or other consideration until the consumer has executed a

written agreement between the consumer and the consumer's dwelling loan holder or servicer incorporating the offer of mortgage assistance relief that the provider obtained from the consumer's dwelling loan holder or servicer." 12 C.F.R. § 1015.5(a).  Plaintiff contends that defendants The Mortgage Law Group and Consumer First Legal Group repeatedly violated this provision with respect to thousands of consumers by requesting and receiving payment of initial and monthly retainer fees before the consumers had executed mortgage loan modification agreements with their lenders or servicers that incorporated modification offers that the corporate defendants obtained.  According to plaintiff, all of the fees charged and collected by the corporate defendants violated the advance fee provision of Regulation O. Defendants do not dispute plaintiff's contentions that the initial and monthly flat fees charged by the companies qualify as advance payments from consumers.  Therefore, plaintiff is entitled to summary judgment with respect to this issue.  I note, however, that plaintiff has not yet established whether any of the defendants are subject to the advance fee provision because their entitlement to an exemption remains in dispute.

B.  Failure to Make Disclosures

Regulation O requires mortgage service providers to disclose the following in all commercial communications to consumers in a clear and prominent manner:

> You may stop doing business with us at any time.  You may accept or reject the offer of mortgage assistance we obtain from your lender [or servicer].  If you reject the offer, you do not have to pay us.  If you accept the offer, you will have to pay us (insert amount or method for calculating the amount) for our services.

12 C.F.R. § 1015.4(b)(1) and (4).  Section 1015.2 defines a "commercial communication" as any statement, illustration or depiction in any medium that is designed to effect a sale or create interest in purchasing any service, plan or program.  A "consumer-specific commercial communication" by definition "occurs prior to the consumer agreeing to permit the provider to seek offers of mortgage assistance relief on behalf of the consumer, or otherwise agreeing to use the mortgage assistance relief service, and that is directed at a specific consumer."  Id.

The regulation requires that to be "clear and prominent," the disclosure in an oral communication must be "delivered in a slow and deliberate manner and in a reasonably understandable volume and pitch."  In a written communication, the disclosure must be "easily readable; in a high degree of contrast from the immediate background on which it appears; in the same languages that are substantially used in the commercial communication; in a format so that the disclosure is distinct from other text, such as inside a border; in a distinct type style, such as bold; parallel to the base of the commercial communication, and, except as otherwise provided in this rule, each letter of the disclosure shall be, at a minimum, the larger of 12–point type or one-half the size of the largest letter or numeral used in the name of the advertised Web site or telephone number to which consumers are referred to receive information relating to any mortgage assistance relief service." § 1015.2.  Further, "[i]n textual communications the disclosures must appear together and be preceded by the heading, 'IMPORTANT NOTICE,' which must be in bold face font that is two point-type larger than the font size of the required disclosures."  § 1015.4(b)(i).  In oral communications, "the audio component of the required disclosures must be preceded by the

statement 'Before using this service, consider the following information' and, in telephone communications, must be made at the beginning of the call." § 1015.4(b)(ii).

Plaintiff contends that the script, welcome letter and retainer agreements used by The Mortgage Law Group and Consumer First Legal Group did not contain the required disclosure, much less utilize a clear and prominent form. In addition, plaintiff has submitted affidavits from nine of defendants' former clients who state that they were never told that they could stop doing business with the company at any time or that they would not have to pay the company if they rejected a loan modification offer. Dkt. ##84-88, 90-93 and 117.

As an initial matter, defendants argue that the welcome letter, which was sent to clients after they hired defendants, does not qualify as a commercial communication because it did not occur "prior to the consumer agreeing to use the mortgage assistance relief service." § 1015.2. Defendants make a good point, and plaintiff does not challenge their assertion in its reply brief. Accordingly, I find that defendants' welcome letter does not qualify as a consumer-specific commercial communication and is not subject to the disclosure requirement in § 1015.4(b). Because defendants do not make the same argument with respect to the script or retainer agreement, I construe their silence as a concession that these communications qualify as commercial communications subject to the disclosure requirements set out above. C & N Corp. v. Gregory Kane & Illinois River Winery, Inc., 756 F.3d 1024, 1026 (7th Cir. 2014) (failure to make argument in response to summary judgment motion constitutes waiver of that argument); Dexia Credit Local v. Rogan, 629

24

F.3d 612, 626 (7th Cir. 2010) (holding that failure to argue specific statute of limitations, even if others are argued, constitutes waiver).

In a brief response to plaintiff's other contentions, defendants argue only that the script followed by intake specialists and the retainer agreement sent to clients provided the required disclosure. However, a review of those documents shows otherwise. Dkt. #103, exh. #1 (script); dkt. #101, exh. ##4 and 17 (retainer agreements).

Defendants point out that the script "specifically addressed [the] required disclosures" by prohibiting intake personnel from telling a client not to communicate with his lender. Dkt. #126 at 23 (citing Dfts.' Resp. to Plf.'s Prop. Find. of Fact No. 208). I also note that the script instructed company personnel to advise clients that they could reject any offer from their lender. However, a consumer's communication with a lender and his or her decision to accept a lender's offer are not the same thing as the consumer's having the right to stop doing business with defendants.

Defendants point out that the companies' retainer agreements state that "Client agrees that both parties may sever the relationship at any time" and "Client may accept or decline any mortgage workout solution achieved by [the law firm]" and that they contain provisions related to an accounting of fees, a refund for unearned fees and a payment structure. Dkt. #126 at 23. Although these statements may address the consumer's right to sever his or her relationship with defendants, the retainer agreements do not contain all of the required text of the disclosure in the form required by the regulation. For example, there is no heading entitled "IMPORTANT NOTICE" and the agreements do not make clear

25

that if the consumers reject the offer, they do not have to pay the company or that if they accept the offer, they will have to pay a specifically identified amount for the company's services. Office of the Attorney General v. Berger Law Group, P.A., 2015 WL 5922933, at *3 (M.D. Fla. Oct. 9, 2015) (entering default judgment in part on this ground). The retainer agreements for both companies provide a fee structure for consumers based on "stages" of services leading up to the arrangement of a loan modification or other mortgage relief service. However, defendants fail to point to any provision that states that consumers do not have to pay these fees if they decide to reject the mortgage workout solution. In fact, the agreements appear to require consumers to pay for any services performed by defendants regardless whether defendants arrange a mortgage workout solution on their behalf.

Accordingly, I find that plaintiff has adduced sufficient evidence from which I can conclude as a matter of law that defendants failed to make the disclosure required under § 1015.4(b)(1) in the manner required under § 1015.4(b)(4) in either their telephonic communications with potential clients or the written retainer agreements sent to newly enrolled clients. Federal Trade Commission v. E.M.A. Nationwide, Inc., 767 F.3d 611, 635 (6th Cir. 2014) (affirming grant of summary judgment in favor of commission because consumers' declarations and defendants' scripts showed that defendants failed to make required disclosures). Plaintiff's motion for summary judgment will be granted with respect to this issue.

## C.  Misrepresentations

Regulation O prohibits mortgage assistance relief providers from "[r]epresenting, expressly or by implication, in connection with the advertising, marketing, promotion, offering for sale, sale, or performance of any mortgage assistance relief service, that a consumer cannot or should not contact or communicate with his or her lender or servicer." 12 C.F.R. § 1015.3(a).  Further, § 1015.3(b) prohibits mortgage assistance relief providers from "[m]isrepresenting expressly or by implication, any material aspect of any mortgage assistance relief service, including":

> (1) The likelihood of negotiating, obtaining, or arranging any represented service or result, such as those set forth in the definition of Mortgage Assistance Relief Service in § 1015.2;
>
> (2) The amount of time it will take the mortgage assistance relief service provider to accomplish any represented service or result, such as those set forth in the definition of Mortgage Assistance Relief Service in § 1015.2;
>
> *     *     *
>
> (4) The consumer's obligation to make scheduled periodic payments or any other payments pursuant to the terms of the consumer's dwelling loan;
>
> *     *     *
>
> (8) That the consumer will receive legal representation; and
>
> (9) The availability, performance, cost, or characteristics of any alternative to for-profit mortgage assistance relief services through which the consumer can obtain mortgage assistance relief, including negotiating directly with the dwelling loan holder or servicer, or using any nonprofit housing counselor agency or program. . .

With respect to these provisions, plaintiff alleges that  (1) representatives of The Mortgage Law Group and Consumer First Legal Group violated all of the regulatory provisions set out

27

above in their oral and written communications with consumers; and (2) defendants'
television and internet advertising misled consumers about the likelihood of obtaining a loan
modification, in violation of § 1015.3(1), and being represented by an attorney, in violation
of § 1015.3(8).

In addition, plaintiff contends that the alleged misrepresentations by defendants also
violate the more general prohibition in the Consumer Protection Act concerning "unfair,
deceptive, or abusive act[s] or practice[s] in connection with any transaction with a
consumer for a consumer financial product or service." 12 U.S.C. §§ 5531 and 5536(1)(B).
Although the Act does not define a "deceptive" practice, the parties agree that the
requirements are the same as those for a deceptive practices claim under the Federal Trade
Commission Act: (1) a representation, omission or practice, (2) that likely would mislead
a consumer acting reasonably under the circumstances and (3) that the representation,
omission or practice is material.  Federal Trade Commission v. Tashman, 318 F.3d 1273,
1277 (11th Cir. 2003) (setting forth elements of deceptive practice claim under Federal
Trade Commission Act); Federal Trade Commission v. World Travel Vacation Brokers, Inc.,
861 F.2d 1020, 1029 (7th Cir. 1988) (same).  See also United States v. Patel, 778 F.3d 607,
613 (7th Cir. 2015) (citing Sanders v. Jackson, 209 F.3d 998, 1000 (7th Cir. 2000) (noting
that in absence of statutory definition, courts consider similar terms in other statutes, as well
as purpose of statute being interpreted)); Illinois v. Alta Colleges, Inc., 2014 WL 4377579,
at *4 (N.D. Ill. Sept. 4, 2014) (holding that prohibitions against deceptive practices in
Consumer Protection Act and Federal Trade Commission Act are "virtually identical").  A

statement or practice is material if it is "likely to affect a consumer's decision to buy a product or service." Federal Trade Commission v. American Tax Relief LLC, 751 F. Supp. 2d 972, 978 (N.D. Ill. 2010); see also Federal Trade Commission v. Bay Area Business Council, Inc., 2004 WL 769388, at *10 (N.D. Ill. Apr. 9, 2004). There is no requirement that the misrepresentations or practices be made with an intent to deceive to be actionable. World Travel, 861 F.2d at 1029.

Defendants assume that the statutory and regulatory standards are the same, arguing that plaintiff's claims fail for the same reasons under both the Act and Regulation O. Because the parties agree on this point, I will follow their lead and construe a violation of 12 C.F.R. § 1015.3 as a violation of the general statutory prohibition against deceptive practices under 12 U.S.C. §§ 5531 and 5536(1)(B). This means that the parties have forfeited their right to raise a contrary argument at trial. I will address the parties' arguments concerning the specific instances of defendants' alleged illegal conduct separately.

1.  Advertisements made in violation of § 1015.3(b)(1) and (8)

Plaintiff alleges generally that defendants' television and internet advertising were designed to convince consumers that they would receive a loan modification and the representation of an attorney. In support of its claim, plaintiff has submitted the affidavits of a few of defendants' former clients who aver that the companies' websites led them to believe that the companies could help them obtain a mortgage loan modification and make their mortgage payments more affordable. Some of those former clients also aver that they

29

viewed television commercials that led them to believe that the companies could help them obtain loan modification, but it is unclear from their statements whether they formed this belief about the companies from the commercial alone or only after speaking with a company representative.

Apart from a statement made on Consumer First Legal Group's website about providing clients the services of an attorney, plaintiff has not identified the specific content of any other advertising that allegedly misled consumers about their likelihood of obtaining a mortgage loan modification. As a result, it is impossible to reach a conclusion about whether the advertising would have misled a reasonable consumer. Further, it is undisputed that The Mortgage Law Group and Consumer First Legal Group did not do any of their own advertising and relied on third-party lead generators to solicit potential clients. As defendants point out, plaintiff must show that any misrepresentations made by third parties in advertising defendants' services can be attributed to defendants.

With respect to this last point, plaintiff argues that as the managing partner in charge of the companies' expenditures to third parties, Aleman determined what type of advertising and leads to pay for and which lead generators to pay. However, plaintiff has not produced any evidence showing that Aleman actually reviewed or controlled the messaging or content of the advertising. Along with its reply brief, plaintiff submitted copies of an email that *Searns* wrote to an employee of a lead generator, stating that "I need to review and approve any marketing of any kind for TMLG before it is used. Please show me what you want to use and how you plan to use it." Dkt. #136. Although I can infer from this email that

30

Searns may have had control over the content of the advertising performed for The Mortgage Law Group, defendants have not had the opportunity to refute this evidence.

In sum, because plaintiff has not adduced undisputed evidence establishing what representations the television and internet advertisements made to consumers or whether defendants even controlled the content of those statements, I must deny its motion for summary judgment with respect to its claim that defendants' television and internet advertisements violated § 1015.3.  (The alleged misrepresentation about attorney services made on Consumer First Legal Group's website is discussed below.)


2.  <u>No communication with lender, § 1015.3(a)</u>

In support of its claim that defendants implied that consumers should not communicate with their lenders, plaintiff points to the undisputed fact that defendants' welcome letter told consumers that "[w]hile we will not tell you not to speak to your servicer, we must advise you that to do so is risky. We have seen several clients hurt by deceptive practices when their servicer calls."  (Although plaintiff also relies on the affidavits of a few of defendants' former customers who aver that defendants' representatives told them over the telephone not to speak with their lenders, defendants dispute this with evidence that they instructed their intake specialists not to make such statements.)

I agree that a reasonable consumer would conclude from the statements in defendants' welcome letter that defendants were implying that they should not communicate with their lender.  Stating that it was risky for a consumer to talk with their lender and

31

describing how others have been hurt would discourage consumers facing mortgage default from talking with their lenders directly.  Accordingly, I am granting plaintiff's motion for summary judgment with respect to its claim that defendants represented by implication in their welcome letter that consumers should not communicate with their lenders.  The motion is denied with respect to plaintiff's claim that defendants' intake specialists made similar representations in telephone calls to consumers because the parties dispute whether this occurred.  (The parties dispute whether intake specialists ever went "off script" and told consumers not to speak with their lenders as a few former clients claim.)

3.  Likelihood of obtaining mortgage loan modification, § 1015.3(b)(1)

Plaintiff contends that statements that the intake specialists made over the telephone and that defendants made in their welcome letter led consumers to believe that they were eligible for and would obtain a mortgage loan modification with the company's help, even though many of defendants' clients did not obtain one.  (There is a dispute concerning the exact percentage of clients who failed to obtain a mortgage loan modification.)  As evidence of this misrepresentation, plaintiff relies on (1) the affidavits of a few of defendants' former clients who state that company representatives told them that they could get a mortgage loan modification if they hired the company; (2) the script's instruction that intake specialists encourage consumers to pay their initial retainer fee by telling consumers that "we have been seeing very strong results from the lenders we've been working with"; and (3) the statement

in the companies' welcome letter that "you have a significant advantage because we are familiar with the process and expedite it through our contacts."

Without more, I am not persuaded that plaintiff has met its burden of showing misrepresentation as a matter of law.  Plaintiff has not explained why the vague and isolated references to "very strong results" and having "a significant advantage" would lead a reasonable consumer to believe that he or she would qualify for and obtain a loan modification, especially in light of the fact that the retainer agreement  expressly stated that the companies were not promising a particular result.  Both of the cited statements were made to consumers *after* they agreed to defendants' services and signed the retainer agreement with this disclaimer.

The affidavits of the former consumers are more troubling but not necessarily conclusive.  None of the affidavits contain any details about what type of statements were made, who made them or at what point in the process they were made.  Further, defendants have adduced evidence that intake specialists were trained not to guarantee or promise any particular result and that the companies employed a compliance officer to insure that nothing was promised or guaranteed to a client.  The parties also appear to dispute whether intake specialists ever went "off script" and promised consumers a loan modification and whether the compliance officer was effective at ensuring no misrepresentations were made. In light of the sparse evidence offered by plaintiff and the disputed factual issues, I am denying plaintiff's motion for summary judgment with respect to whether any of defendants' oral or written communications with consumers violated § 1015.3(1).

4.  Amount of time, § 1015.3(b)(2)

Plaintiff contends that the companies misled consumers by telling them in the welcome letter that mortgage workouts were taking "anywhere from 90-120 days," when in practice many clients did not receive a loan modification, and if they did, it took The Mortgage Law Group an average of 211 days to achieve that result and Consumer First Legal Group an average of 165 to 170 days.  Defendants argue that plaintiff takes the cited language out of context because the welcome letter explains that "we are seeing many workouts take anywhere from 90-120 days; however, every case is unique based on each client's servicer and circumstances."  They contend that "the use of the word 'however' is a qualifier that a reasonable person could not interpret as a guarantee" of the 90 to 120 day estimate.  Dkt. #126 at 22-23.  I agree with defendants.

A reasonable reading of the cited language is that even though defendants anticipated that the mortgage workout would take somewhere between 90 to 120 days, it could take longer in some circumstances.   Neither company guaranteed that they would obtain a loan modification within 90 to 120 days.

In practice, the Mortgage Law Group took an average of 211 days and Consumer First Legal Group took an average of 165-170 days to obtain a mortgage loan modification for a client.  Defendants' statement that  "every case is unique based on each client's servicer and circumstances" reasonably accounts for the fact that defendants took 50 to 90 days longer than they estimated to obtain loan modifications.  Because I cannot find as a matter of law consumer would find the statement in the companies' welcome letter to be misleading in

34

light of the actual amount of time that defendants were taking to arrange loan modifications on behalf of clients, I am denying plaintiff's motion for summary judgment with respect to this issue.

5.  Obligation to pay, § 1015.3(b)(4)

Plaintiff contends that, at the least, the companies' representatives strongly implied to consumers that they should stop making payments on their mortgage loans.  In support of this contention, plaintiff points to the following:  (1) undisputed evidence that the script instructed intake specialists to tell consumers who were able to stay current on their payments that "we would recommend you contact your lender because most programs are hardship based so the clients that retain us are behind on their payments or are in imminent default of doing so"; (2) undisputed evidence that the script instructed intake specialists to tell consumers who are not able to stay current on their mortgage payments that "[w]e find the person who is a year behind is much more helpful than someone who is current. . . Will you be helpful during this process if we decide to bring you in as a client?"; and (3) affidavits of three of defendants' former customers, dkt. ##84, 85 and 90, who aver that the company either told them to stop paying their mortgage and that it would take care of the consequences or implied that any late payments would be rolled into the modification. Defendants dispute the affidavits and plaintiff's interpretation of the script with evidence that the companies expressly instructed their intake specialists not to tell clients to stop paying their mortgages.

35

Although the undisputed statements in the script are confusing and seem carefully worded to avoid saying explicitly that consumers should stop paying their mortgage, I find that a reasonable consumer would interpret them as strong encouragement to stop making mortgage payments.  Telling a consumer that most mortgage relief programs like those offered by defendants are "hardship based" and that their clients are usually "behind on their payments" certainly implies that to get help and qualify for relief, the consumer should be behind on his or her payments.  The script goes as far as to tell intake specialists to ask consumers whether they will be "helpful" like the clients who are a year behind on their payments.  Accordingly, I will grant plaintiff's motion for summary judgment with respect to this issue on the sole basis of the undisputed content of the script.

6.  Legal representation, § 1015.3(b)(8)

It is undisputed that The Mortgage Law Group and Consumer First Legal Group told consumers during intake calls and in the retainer agreement and welcome letter that they would receive services from an attorney and legal representation in seeking a loan modification.  It is also undisputed that Consumer First Legal Group made a similar representation on its website.  However, as discussed at length in the April 2016 order, dkt. #187, the parties dispute whether defendants actually provided legal services or legal representation to their clients.  As a result, I cannot determine as a matter of law whether defendants' statements regarding legal representation qualify as misrepresentations and a deceptive practice.

7.  Success of nonprofit alternatives, § 1015.3(b)(9)

It is undisputed that the companies' script told intake specialists to respond to consumers' questions about free mortgage loan modification services with the following statements:

> That makes a lot of sense to me, why pay for something if you don't have to right? How exactly are you planning on getting this service for free? (Let them answer) If things only worked that way in the REAL world! The service you are talking about are non-profits that will tell you what paper work you'll need to gather to submit to your bank to attempt a modification. Heck, I can do that in 30 seconds by sending you a document checklist and I'll even do it for free, but that isn't going to get the result you're really after, which is mortgage relief. You see, we employ a very definitive strategy in an attempt to achieve the BEST possible outcome for you and that involves lawyers tying up the foreclosure process, holding your lenders feet to the fire, A LOT of back and forth negotiating, and if need be filing a formal complaint to the authorities if we find any wrong doing on the part of your lender. Believe me _____ what you're talking about getting "for free" and what we're offering are miles apart and at the end of the day I think all you're REALLY after is getting the relief you so desperately need, not necessarily getting someone to work for free for you, am I right? Great! Here's what we need to get you started!!

A former intake specialist who worked with both companies confirmed that intake specialists discouraged consumers from using free mortgage loan modification services.  Dkt. #79 at 130-34.  Relying on this evidence, plaintiff contends that intake specialists misrepresented the performance of a nonprofit housing counselor agency or program through which consumers could have obtained loan modification services free of charge.

I agree that a reasonable consumer would conclude from the above statements that free services are less effective than those provided by defendants for a fee.  In fact, the script goes as far as to state that the free service will not get the result that the consumer is "really after, which is mortgage relief."  In response, defendants argue only that consumers would

37

not be misled about the availability or effectiveness of free services because their retainer agreements stated that "[n]on-profit counseling agencies also offer these and other forms of borrower assistance free of charge."   However, a client would have received the retainer agreement only after having an initial conversation with an intake specialist and being told that the free services were not really what the consumer needed.   Further, the retainer agreement informs consumers of the *availability* of non-profit alternatives and does not say anything to counter statements made about the *effectiveness* of such services.   Therefore, in the absence of any further objection or argument from defendants, I find that plaintiff is entitled to summary judgment with respect to this issue.

## II.  INDIVIDUAL DEFENDANTS' LIABILITY

Plaintiff argues that it is entitled to summary judgment with respect to whether Aleman, Searns, Macey and Stafford may be held individually liable for any violations of the act and regulation committed by The Mortgage Law Group and Consumer First Legal Group.  Defendants have filed a cross motion for summary judgment with respect to the individual liability of Aleman and Searns.

The parties agree that to hold any of the individual defendants liable for the corporate defendants' violations of the Act or Regulation O, plaintiff must show that the individuals: (1) participated directly in the illegal practices or acts or had the authority to control them; and (2) knew or should have known about the illegal practices.  <u>Federal Trade Commission v. Bay Area Business Council, Inc.</u>, 423 F.3d 627, 636 (7th Cir. 2005) (discussing individual

liability for corporate violations of Federal Trade Commission Act); <u>Federal Trade Commission v. Amy Travel Service, Inc.</u>, 875 F.2d 564, 573 (7th Cir. 1989) (same).  The knowledge requirement "may be fulfilled by showing that the individual had 'actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth.'"  <u>Amy Travel</u>, 875 F.2d at 574 (quoting <u>Federal Trade Commission v. Kitco of Nevada, Inc.</u>, 612 F. Supp. 1282, 1292 (D. Minn. 1985)).  In addition, the degree to which the individual participates in business affairs is probative of knowledge.  <u>Id.</u>

## A.  <u>Aleman and Searns</u>

Plaintiff has adduced undisputed evidence that Aleman managed and had intimate knowledge of all of the day-to-day operations related to The Mortgage Law Group at all times and Consumer First Legal Group after he purchased an interest in the company in July 2012.  It is also undisputed that Searns served as general and ethics counsel for The Mortgage Law Group.  Although Searns testified at his deposition that he was not responsible for business management or day-to-day operations, he reviewed the company's retainer agreement and call scripts for compliance with regulatory and ethical requirements. Dkt. #74 at 45 and 81-82.

Defendants do not refute plaintiff's contentions that Aleman and Searns had the authority to control the actions of the corporate defendants and knew or should have known about the companies' receipt of advance fees, misrepresentations by company representatives

39

about their services and the companies' failure to disclose a consumer's right to reject services.  However, defendants contend in a one-sentence argument that there is no evidence that either Aleman or Searns had any involvement in the advertising for either firm.  As discussed above, I agree that plaintiff has failed to show that either Aleman or Searns had the ability to control the content of the advertising performed by third-party lead generators on behalf of the corporate defendants or that they even knew of it.  (Although plaintiff offered some evidence that Searns had knowledge and control over the advertising performed for The Mortgage Law Group, that issue remains in dispute because defendant has not had the opportunity to refute it.)

Accordingly, I am granting plaintiff's motion for summary judgment with respect to the following issues related to individual liability:

> 1.  Aleman may be held individually liable for any violations of the Act or regulation related to the receipt of advance fees, misrepresentations by company representatives and the failure to disclose a consumer's right to reject services that were committed by The Mortgage Law Group at any time during its operations and by Consumer First Legal Group beginning in July 2012.

> 2.  Searns may be held individually liable for any violations of the Act or regulation related to the receipt of advance fees, misrepresentations by company representatives and the failure to disclose a consumer's right to reject services that were committed by The Mortgage Law Group at any time during its operations.

Plaintiff's motion for summary judgment will be denied with respect to Aleman's and Searns's individual liability for any misrepresentations made in third-party advertising for The Mortgage Law Group or Consumer First Legal Group.

### B. Macey

It is undisputed that as the majority shareholder of The Mortgage Law Group and Consumer First Legal Group, Macey had the legal authority to control the companies and make final decisions on their behalf. However, defendants contend that because there is no evidence that Macey ever exercised this authority with respect to the companies' day-to-day operations or played an active role in their management, Macey cannot be held individually liable for the companies' alleged violations of the advance fee, consumer misrepresentation and disclosure requirements.

Plaintiff contends that Macey actively participated in the companies' affairs by approving their business plans and operational structure, reviewing and negotiating their vendor contracts, reviewing and approving some corporate processes and procedures, reviewing reports and suggesting changes to company operations when appropriate. Without further explanation, it offers the following evidence in support of these contentions:

- Macey made decisions about the setup and formation of The Mortgage Law Group, including what the company was going to do, how the company proposed to do it and what and how the company would charge for its services. Macey dep., dkt. #78 at 24-25.

- Macey reviewed and approved policies and procedures for The Mortgage Law Group on the "macro level" when the company first started, which included the business plan or "template" for how the company would run. Id. at 10-11, 37-38.

- Macey reviewed the retainer agreements for both companies before the business started. Id. at 27-28. See also dkt. #122, exh. #11 at 2 (Jan. 24, 2012 email from Macey to Searns and Aleman asking Searns to insure arbitration clause in retainer agreement was "as AIR TIGHT as possible.").

- Macey reviewed the companies' financial reports on new enrollments and attrition rates.  Dkt. #68 at 28-29; dkt. #78 at 42-43.

- Macey suggested changes to the direction of The Mortgage Law Group's overall operations, such as "pulling back" or "going slower" in certain areas.  Dkt. #78 at 43-44.

- Macey participated in the companies' decision to hire "strategic alliance partners" to handle some of the loan modification services.  Dkt. #68 at 36, 38-39; Aleman dep., dkt. #76 at 252-53.

- Macey may have expressed an occasional opinion about creating or changing a policy for The Mortgage Law Group.  Dkt. #76 at 47-48.  (Although plaintiff states in its response to defendants' proposed finding of fact no. 28 that Macey helped Aleman instruct managers in charge of client support, processing and document collection about corporate policy and procedures, dkt. #132 at 21, Aleman's testimony does not support such a finding.)

- In an April 27, 2012 email to Searns, Macey asked why Searns chose one out of two scenarios to use in obtaining non-profit leads on potential clients for The Mortgage Law Group.  Dkt. #122, exh. #10.

- Email communications showing Macey was aware of settlement negotiations with a state attorney general who sued The Mortgage Law Group.  Dkt. #122, exh. ##3-7.  (Neither plaintiff nor the emails make clear what the lawsuit was about.)

- Macey participated in the decision that The Mortgage Law Group file for bankruptcy.

Because plaintiff has offered evidence that Macey reviewed the companies' financial documents and initial retainer agreements and was aware of the general operations of the businesses, it is reasonable to conclude that he knew or should have known that the companies were charging advance fees, that the retainer agreement failed to make the disclosure required under § 1015.4(b)(1) and that the retainer agreement led consumers to believe that they would receive legal representation.  As discussed at length above, the

retainer agreement set forth the companies' fee structure and payment expectations, discussed services that the client would receive from an attorney and failed to disclose the client's right to terminate services without a cost.  Although Macey testified that he did not review changes to the retainer agreement over time or see the retainer agreements sent to individual clients, his review of the "form" retainer agreement would have put him on notice of its deficiencies.  Further, the parties have submitted only one copy of each company's retainer agreement on which they rely for their arguments in this case.  Defendants have not argued that the deficiencies did not appear in other versions of the retainer agreement or that any significant changes were made in the retainer agreements sent to individual clients.

Apart from reviewing and approving the retainer agreement, there is no evidence that Macey knew or should have known about the content of the companies' marketing materials, welcome letters or script used by employees or what information about the companies' services intake specialists or other personnel were giving to consumers.  Plaintiff also fails to explain in its briefs how Macey would have acquired this knowledge.  As defendants point out, Macey made it clear in his deposition testimony that he did not review or negotiate contracts related to advertising, review any materials provided to consumers except for the retainer agreement, have direct contact with clients, review client files or supervise, train, hire or fire employees.  Dkt. #78 at 17-19, 27-28, 36-38, 42-48.  Further, almost all of the evidence offered by plaintiff relates to Macey's role with The Mortgage Law Group rather than with Consumer First Legal Group.  In his declaration, Macey says that he had no involvement with the management or operations of Consumer First Legal Group.  Dkt. #97

43

at ¶ 9.  Plaintiff has not adduced sufficient evidence to refute this statement.  In light of these facts, I find that plaintiff has failed to meet its burden of showing that Macey can be held individually liable for any of the companies' violations involving their telephonic communications with consumers, television or internet advertising (including company websites) or welcome letters.

Accordingly, plaintiff's motion for summary judgment will be granted and defendants' motion for summary judgment will be denied with respect to Macey's individual liability for any violations of the Act or regulation related to the receipt of advance fees, misrepresentations made in the retainer agreement about consumers' receipt of legal services and the failure of the retainer agreement to disclose a consumer's right to reject services that were committed by The Mortgage Law Group at any time during its operations and by Consumer First Legal Group beginning in July 2012.  Plaintiff's motion for summary judgment will be denied and defendants' motion for summary judgment will be granted in all other respects to Macey's individual liability.


C.  Stafford

It is undisputed that Stafford oversaw all operations of Consumer First Legal Group and made all the decisions for it between January and July 2012.  However, after selling most of his ownership interest in the company in July 2012, Stafford's role in the company decreased significantly.  Nonetheless, plaintiff argues that Stafford should be held individually liable for the actions of Consumer First Legal Group after July 2012 because he

acquired "intimate knowledge" of Consumer First Legal Group and "actively participated" in its operations.

As evidence of Stafford's involvement, plaintiff relies primarily on Stafford's deposition testimony, in which he stated that he (1) had five-minute telephone calls with Aleman once a week for several months; (2) reviewed notes in the client management system related to client complaints; (3) made three visits to corporate headquarters; (4) "screened" attorneys for the company to bring on as Class B members; and (5) drafted responses to consumer complaints.  (Plaintiff has not identified the subject of these complaints.)  Plaintiff also offers evidence that Stafford identified himself as a "managing member" of Consumer First Legal Group in a May 13, 2013 letter to the Bureau of Financial Institutions regarding a consumer complaint and provided specific details about the company's business practices. Dkt. #115, exh. A.  However, it is not reasonable to conclude from these limited activities that Stafford had any authority to make decisions on behalf of Consumer First Legal Group after July 2012, or even had reason to know that Consumer First Legal Group was charging advance fees, making misrepresentations to consumers or failing to make required disclosures.

As defendants point out, a more complete review of Stafford's deposition testimony shows that although he maintained contact with the company after he sold the majority of his shares to Macey and Aleman, he was not involved in or informed of the company's day-to-day activities.  He testified that he did not review or approve the contents of the retainer agreement, call script or attorney agreements, determine what information the company put

on its website or in any marketing materials, provide services to consumers, supervise employees, or set the fees to be charged to consumers.  Dkt. #65 at 156-57, 169-72.  <u>See</u> <u>also</u> dkt. #98 at ¶ 6 (Stafford's declaration confirming no managerial control); dkt. #66 at 24 (Aleman testified Stafford did not manage anyone).

Plaintiff has shown only that Stafford received brief updates on the company's enrollment numbers, helped identify local attorneys for the company to hire and responded to some unidentified consumer complaints.  Without more, it is not reasonable to conclude that Stafford had the type of authority or knowledge required to hold him individually liable for the company's actions after July 2012.  Although plaintiff did not make the argument, it also is not reasonable to infer from the limited evidence offered by plaintiff that Stafford should have known about Consumer First Legal Group's practices after July 2012 solely because he created the company and ran it between January and July 2012.  Plaintiff has not offered any evidence showing that the company continued to operate in exactly the same manner after July 2012 as it had under Stafford's direction between January and July 2012.  In fact, Stafford testified that he was never asked to provide any documents that he used when he was responsible for providing services to consumers between January and July 2012.  Dkt. #65 at 170-71.  Accordingly, I am granting defendants' motion for summary judgment and denying plaintiff's motion for summary judgment with respect to Stafford's individual liability.

### III.  REMEDIES

The Consumer Protection Act authorizes courts to "grant any appropriate legal or equitable relief with respect to a violation of Federal consumer financial law, including a violation of a rule or order prescribed under a Federal consumer financial law."  12 U.S.C. § 5565(a)(1).   Among other things, relief may include restitution, disgorgement or compensation for unjust enrichment, civil money penalties and limits on the activities or functions of a person. § 5565(a)(2).  The statute establishes three tiers of civil penalties ranging from $5,000 to $1,000,000 for each day the violation continues, depending on the person's state of mind.  § 5565(c)(2) (establishing different penalties for violations, reckless violations and knowing violations).  In this case, plaintiff seeks restitution or disgorgement of "unlawful advance fees" in the total amount of $18,331,737 from defendants The Mortgage Law Group, Macey, Aleman and Searns and $2,992,296 from defendants Consumer First Legal Group, Macey and Aleman; a permanent injunction against all defendants; and civil penalties against defendants of up to $1,000,000 a day for knowingly violating the statute and Regulation O.  Although a ruling on damages is premature at this point, there is one issue that merits attention before this case proceeds to trial.

The parties disagree about how restitution or disgorgement should be calculated. Plaintiff argues that the companies' net revenue, that is the total amount of fees collected less any refunds made to clients, is the appropriate measure because all of the advance fees charged by defendants violated Regulation O regardless whether the consumer ultimately obtained a mortgage loan modification.  Defendants contend that the "typical" measure of

47

restitution is net profits, or the gross revenue generated from the wrongdoing reduced by business expenses incurred by the defendant.

In support of their contention, defendants cite an unpublished opinion in a breach of contract case in which the district court noted that the appropriate measure for restitution "typically is net profits, 'determined by reducing the gross revenues generated from the wrongfully-obtained business by those cost-of-sale items and other expenses which the court concludes were not fixed,' i.e., those costs that related directly to the wrongfully-obtained business." Greenbrier Leasing Co. LLC v. Carroll, 2008 WL 4866037, at *9 (N.D. Ill. June 17, 2008). Defendants argue that the revenues plaintiff requests as restitution or disgorgement do not reflect their actual profits because business expenses have not been deducted. In addition, defendants are concerned that those clients who received mortgage loan modifications or other benefits (such as extended tenancy or a court defense) will be unjustly enriched if they are compensated for benefits that they already have received. (Although defendants make the general statement that "any disgorgement or restitution from the individual defendants should be based on their personal gains (or losses) from their involvement with their firms," dkt. #126 at 31, I am disregarding it because they fail to explain their argument or support it with any authority. United States v. Holm, 326 F.3d 872, 877 (7th Cir. 2003) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.")).

However, as plaintiff points out, federal courts have held that the appropriate measure for restitution in consumer cases is "the amount paid by the consumer victims of

an illegal scheme, less any amounts previously returned to the victims." Federal Trade Commission v. Think Achievement Corp., 144 F. Supp. 2d 1013, 1019 (N.D. Ind. 2000), aff'd, 312 F.3d 259 (7th Cir. 2002).  The Court of Appeals for the Seventh Circuit has explained that "[a] major purpose of the Federal Trade Commission Act is to protect consumers from economic injuries," and "courts have regularly awarded, as equitable ancillary relief, the full amount lost by consumers." Federal Trade Commission v. Febre, 128 F.3d 530, 536 (7th Cir. 1997) (citing Federal Trade Commission v. Gem Merchandising Corp., 87 F.3d 466 (11th Cir.1996) (affirming an award of damages as calculated by consumers' losses and an order of disgorgement to the Treasury); Amy Travel, 875 F.2d at 570 (affirming restitution award of $6,629,100, the amount consumers paid for travel certificates)).

I agree that the appropriate measure for restitution or disgorgement in this case is defendants' net revenue from the advance fees that they collected, less any refunds that the consumers have received.  Unless defendants are found exempt under the Act and Regulation O, their revenues all flow from their illegal practices of requesting and receiving advance fees, making certain misrepresentations to consumers and failing to make certain disclosures.  Their liability should not be reduced to account for consumers who received some form of benefit.  Federal Trade Commission v. John Beck Amazing Profits LLC, 888 F. Supp. 2d 1006, 1018 (C.D. Cal. 2012), aff'd, Federal Trade Commission v. John Beck Amazing Profits, LLC, 2016 WL 828339 (9th Cir. Mar. 3, 2016) (finding same in case involving violations of Federal Trade Commission Act and Telemarketing Sales Rule by sellers of

49

wealth-creation products).  Whether the consumer is lucky enough to obtain a mortgage loan modification is irrelevant to the question whether defendants collected fees illegally and made misleading or deceptive representations to consumers.  Id.  See also McGregor v. Chierico, 206 F.3d 1378, 1388 (11th Cir. 2000) ("While it may be true that the defrauded businesses received a useful product, and though less likely, they may have even received the product at a competitive price, the central issue here is whether the seller's misrepresentations tainted the customer's purchasing decisions."); Federal Trade Commission v. Figgie International, Inc., 994 F.2d 595, 606 (9th Cir. 1993) ("The fraud in the selling, not the value of the thing sold, is what entitles consumers in this case to full refunds or to refunds for each detector that is not useful to them.").

Finally, defendants make a conclusory argument that the monthly payments they collected from consumers are not advance fees, "particularly in instances in which the fees were paid by clients who received a mortgage modification."  Dkt. #126 at 31.  However, as discussed above, defendants did not challenge plaintiff's contentions with respect to liability that both the initial and monthly flat fees charged by the companies qualify as advance payments from consumers.  Moreover, they have not offered evidence that they requested and received any monthly payments *after* consumers had executed mortgage loan modification agreements with their lenders or servicers that incorporated modification offers obtained by the corporate defendants.  In fact, the retainer agreement provides for the payment of monthly retainer fees up until the point of a loan modification.

Accordingly, if I find that either restitution or disgorgement is an appropriate remedy in this case, the amount awarded will be based on the net revenues received by defendants, which includes the total fees collected from their clients minus any sums refunded to their clients. It is undisputed that The Mortgage Law Group received net revenues in the amount of $18,331,737 and Consumer First Legal Group received net revenues in the amount of $2,992,296.

ORDER

IT IS ORDERED that:

1. Plaintiff Consumer Financial Protection Bureau's motion for summary judgment, dkt. #83, is GRANTED with respect to the following issues:

    a. The initial and monthly retainer fees charged by The Mortgage Law Group and Consumer First Legal Group qualify as advance fees under 12 C.F.R. § 1015.5(a).

    b. The companies failed to make the disclosure required under 12 C.F.R. § 1015.4(b)(1) in the manner required under § 1015.4(b)(4) in either their telephonic communications with potential clients or the written retainer agreements sent to newly enrolled clients.

    c. The companies implied in their welcome letter that consumers should not communicate with their lenders.

    d. The companies' intake specialists implied that consumers who were current on their mortgage payments should stop making payments on their mortgage loans.

    e. The companies told consumers during intake calls and in retainer agreements and welcome letters that they would receive services from an attorney and legal representation in seeking a loan modification. Consumer First Legal Group also made this representation on its website.

f.   The companies' intake specialists misrepresented the performance of nonprofit housing counselor agencies or programs.

g.   Aleman may be held individually liable for any violations of the Act or regulation on the part of The Mortgage Law Group at any time during its operations and of Consumer First Legal Group beginning in July 2012 related to the receipt of advance fees, misrepresentations made by the companies in oral and written communications to consumers (not in advertising) and any failures to disclose a consumer's right to reject services.

h.   Searns may be held individually liable for any violations of the Act or regulation on the part of The Mortgage Law Group at any time during its operations related to the receipt of advance fees, misrepresentations made by the company in oral and written communications to consumers (not in advertising) and any failure to disclose a consumer's right to reject services.

i.   Macey may be held individually liable for any violations of the Act or regulation on the part of The Mortgage Law Group at any time during its operations and of Consumer First Legal Group beginning in July 2012 related to the receipt of advance fees, misrepresentations made in the retainer agreement about consumers' receipt of legal services and any failures to disclose a consumer's right to reject services in the retainer agreement.

j.   The appropriate measure for restitution or disgorgement in this case is defendants' net revenues, which include the amount of advance fees collected from their clients minus any refunds made to those clients.  The Mortgage Law Group received total net revenues in the amount of $18,331,737 and Consumer First Legal Group received total net revenues in the amount of $2,992,296.

2.   Plaintiff's motion is DENIED in all other respects as it relates to the liability of defendants The Mortgage Law Group and Consumer First Legal Group, the individual liability of Macey and Stafford and available remedies.

3.   The motion for summary judgment filed by defendants Consumer First Legal Group, LLC, Thomas G. Macey, Jeffrey J. Aleman, Jason E. Searns and Harold E. Stafford, dkt. #96, is GRANTED with respect to the following issues:

a.   The individual liability of defendant Stafford.   The complaint is DISMISSED as to plaintiff's claims against Stafford.

b.  Defendant Macey's individual liability for any of the companies' violations involving their telephonic communications with consumers, television or internet advertising (including company websites) or welcome letters.

4.  Defendants' motion for summary judgment is DENIED in all other respects as it relates to the individual liability of defendants Macey and Stafford.

5.  The parties shall have until August 2, 2016 to meet, confer and submit a proposed trial plan in writing that shall address:  (1) whether the parties' disputes concerning the legal definition of the practice of law in certain states should be resolved in motions in limine before trial or in post trial briefing; (2) the pros and cons of holding one trial versus bifurcating or trifurcating the trial to resolve the attorney exemption issue first and then proceeding on the remaining disputed issues relating to liability and damages if necessary; (3) the amount of time the parties anticipate for presenting evidence on each of the remaining issues in dispute:  exemption, liability and damages; (4) whether it is possible to develop one factual record for all states or at least for a group of states with substantially similar legal standards; (5) whether it would be beneficial to use five or six states as a representative example of a particular group of states; (6) evidentiary issues on which the parties can reach agreement; (7) how to proceed against defendant The Mortgage Law Group, which has not appeared in this case; and (8) any other suggestions that the parties may have for structuring the trial in an efficient and organized manner.  The parties should highlight areas on which they agree and if necessary, submit individual responses to address any issues on which they were unable to reach agreement.

53

6.  The clerk of court is directed to schedule a telephonic conference to be held after August 2, 2016 for the purpose of setting deadlines for any additional briefing, Rule 26(a)(3) disclosures, motions in limine, the final pretrial conference and the court trial.

Entered this 20th day of July, 2016.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge