IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 14-cv-00513-wmc |
| THE MORTGAGE LAW GROUP, LLP, CONSUMER FIRST LEGAL GROUP, LLC, THOMAS G. MACEY, JEFFREY J. ALEMAN, JASON E. SEARNS and HAROLD E. STAFFORD, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S BRIEF ON
KNOWING AND RECKLESS CIVIL MONEY PENALTY STANDARDS**

Dated: May 24, 2017

RATHJE & WOODWARD, LLC

By: */s/ Timothy D. Elliott*
Douglas M. Poland (SBN 1055189)
10 E. Doty St., Ste. 507
Madison, WI 53703
Tel.: (608) 960-7430
dpoland@rathjewoodward.com

Timothy D. Elliott (*pro hac vice*)
Emily A. Shupe (*pro hac vice*)
300 E. Roosevelt Rd., Ste. 300
Wheaton, IL 60187
Tel.: (630) 668-8500
telliott@rathjewoodward.com
eshupe@rathjewoodward.com

**COUNSEL FOR CONSUMER FIRST
LEGAL GROUP, LLC, THOMAS
MACEY, JEFFREY ALEMAN, JASON
SEARNS, AND HAROLD STAFFORD**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................... 1

ARGUMENT ..................................................................................................... 5

I.    The Legal Standards For Civil Monetary Penalties Under The CFPA.................................................................................................. 5

    A.    Burden Of Proof.................................................................. 5

    B.    The Legal Standard For Reckless Engagement In A Violation Of Federal Consumer Financial Law........................................ 6

    C.    The Legal Standard For A Knowing Violation Of Federal Consumer Financial Law. ......................................................... 8

II.    The CFPB Did Not Meet The Required Burden For Civil Money Penalties On Counts I, II, III, IV, VII and VIII. .................................... 12

    A.    The Claims Asserted In Counts I, II, III, IV, VII and VIII. ..................... 12

    B.    The Current State Of Counts I, II, III, IV, VII and VIII. ......................... 13

    C.    There Is No Evidence That Defendants Engaged In Reckless Or Knowing Violations Of Regulation O. The Evidence At Trial Establishes That TMLG and CFLG II Were Law Firms And That Defendants Had A Reasonable, Good Faith Basis For Believing They Were Exempt From Regulation O. ........................... 14

    D.    The Evidence At Trial Established That CFLG I Was A Law Firm Not Subject To Regulation O, Making Civil Penalties Inappropriate. ...................................................................... 20

III.    The CFPB Did Not Meet The Required Burden For Civil Money Penalties On Counts V and VI. ...................................................... 211

    A.    The Claims Asserted In Counts V and VI. ............................................ 211

    B.    The CFPB Did Not Meet Its Burden Of Showing Either Reckless Or Knowing Violations With Respect To The Claims In Counts V And VI. ................................................ 222

        1.    The CFPB Cannot Establish Any Basis For Civil Penalties Associated With Misrepresentations In Direct Communications With Potential Clients........................... 22

        2.    The CFPB Is Not Entitled To Civil Penalties Associated With Statements That Clients Would Receive Legal Services. ........................................... 25

CONCLUSION.................................................................................................. 26

i

## TABLE OF AUTHORITIES

**Cases**

*Boyce Motor Lines v. United States*, 342 U.S. 337 (1952) ............................................................ 12

*Bryan v. United States*, 524 U.S. 184 (1998)...................................................................... 11, 12

*Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179 (9th Cir. 2016) ..................................... 10

*Consumer Fin. Prot. Bureau v. ITT Educ. Services, Inc.*, 1:14-CV-00292-SEB, 2015 WL

    1013508 (S.D. Ind. Mar. 6, 2015) ........................................................................ 10

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976)......................................................................... 8

*Liparota v. United States,* 471 U.S. 419 (1985) ........................................................................ 11, 12

*Murray v. New Cingular Wireless Services, Inc.*, 523 F.3d 719 (7th Cir. 2008)...................... 8, 10

*S.E.C. v. Lyttle*, 538 F.3d 601 (7th Cir. 2008) ...................................................................... 5, 6, 8

*Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007)................................................................. 7, 10

*Sec. & Exch. Comm'n v. Ferrone*, 163 F. Supp. 3d 549 (N.D. Ill. 2016)................................. 8, 15

*Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033 (7th Cir. 1977)..................................... 8

*United States v. Dish Network, L.L.C.*, 667 F. Supp. 2d 952 (C.D. Ill. 2009) .......................... 9, 15

*United States v. Dotterweich,* 320 U.S. 277 (1943)...................................................................... 11

*United States v. Freed,* [401 U.S. 601 (1971).............................................................................. 11

*United States v. International Minerals & Chemical Corp.,* 402 U.S. 558 (1971) .... 11, 12, 13, 14

*United States v. Menasche*, 348 U.S. 528 (1955) ......................................................................... 10

*United States v. Novak,* 476 F.3d 1041 (9th Cir.2007)................................................................ 10

*United States v. O'Malley*, 739 F.3d 1001 (7th Cir. 2014)........................................................... 12

**<u>Statutes</u>**

12 U.S.C. § 5565(c)(2)(B) ................................................................................................ 7

12 U.S.C. § 5565(c)(2)(C) ............................................................................................ 9, 10

12 U.S.C. § 5565(c)(5)(B) ................................................................................................ 6

15 U.S.C. § 45(m)(1) ...................................................................................................... 10

15 U.S.C. § 45(m)(1)(A) .................................................................................................. 9

15 U.S.C. § 77t(d) ............................................................................................................ 6

7 U.S.C. § 2024(b)(1) ..................................................................................................... 11

**DEFENDANTS' RESPONSE TO PLAINTIFF'S BRIEF ON**
**KNOWING AND RECKLESS CIVIL MONEY PENALTY STANDARDS**

Defendants Consumer First Legal Group, LLC, Thomas G. Macey, Jeffrey J. Aleman, Jason E. Searns, and Harold E. Stafford (collectively, "Defendants") state as follows as their response to Plaintiff Consumer Financial Protection Bureau's ("CFPB") brief on the legal standards for knowing and reckless conduct subjecting a defendant to civil monetary penalties:

## INTRODUCTION

On April 28, 2017, the Court asked the parties to brief the *legal standards* that govern whether a violation of Regulation O is "knowing" or "reckless." The Court specifically asked the parties to address whether a "knowing violation" required the CFPB to prove that Defendants had general knowledge that they were engaged in particular conduct, or whether it must also prove that Defendants had knowledge that such conduct was illegal. (Dkt. #388 at 75-76) The Court also queried whether a finding of "recklessness" required objective or subjective recklessness. (Dkt. #388 at 102) Those were the relatively narrow issues that the Court asked the parties to brief.

The CFPB's brief (Dkt. #393) bears little resemblance to what this Court asked the parties to submit. The CFPB devoted scant attention to the applicable legal standards (*i.e.* about two pages), before launching into a 26-page closing argument that outlines why (at least in the CFPB's eyes) Defendants' conduct was "knowing." While Defendants do not believe the Court was asking for such argument in this briefing, Defendants must respond to the points raised by the CFPB. Several points merit mention at the outset.

*First*, the CFPB has not accurately cited the law with respect to the legal standard for a "knowing" violation of Regulation O. Contrary to the CFPB's contention, a "knowing violation" of Regulation O requires a finding that a defendant knew its conduct violated Regulation O.

1

Anything less would be contrary to existing law, and would not make sense. Indeed, the CFPB's formulation (if accepted) would run the risk of transforming virtually every violation of Regulation O into a "knowing" violation. That cannot be what Congress had in mind. If the three-tiered structure set forth in 12 U.S.C. § 5565 is to have any meaning at all, there must be a distinguishable and distinct difference between a "violation," a "reckless violation," and a "knowing violation." Not every violation can be a "reckless" or "knowing" violation. Indeed, the very onerous penalties of $25,000 per day (for "reckless" violations) and over $1 million per day (for "knowing" violations) suggests that Congress intended to set a high bar for the imposition of such penalties.

*Second*, the CFPB has directed this Court to decisions that are inapposite. The CFPB relies largely on decisions that involved criminal or quasi-criminal conduct that was, on its face, wrongful, dangerous, or illegal (*e.g.*, dumping asbestos material, selling firearms without a license, and illegally transporting dangerous and regulated material). A reasonable person would hardly be surprised to learn that such conduct is not an innocent act. This case is different. The type of conduct alleged in this case (*e.g.* requiring advanced retainers, failing to make certain required disclosures) is wrongful **only** if it is subject to regulation. For example, telling someone not to contact a bank is generally not unlawful conduct. However, doing so **may** be unlawful **if** such conduct (and the person engaging in such conduct) is subject to a regulation that bars such conduct. Under such circumstances, the proper standard for evaluating whether a party "knowingly violated" a regulation must necessary include knowledge of the conduct **and** knowledge that such conduct is unlawful.

*Third*, the CFPB has the burden of proof with respect to civil penalties. *S.E.C. v. Lyttle*, 538 F.3d 601, 603 (7th Cir. 2008). To be entitled to any civil penalties – much less penalties associated with "reckless" or "knowing" conduct – the CFPB has the burden of presenting

2

evidence that satisfies the applicable legal standards.  That point is important, because the CFPB's brief contains broad generalizations and sweeping rhetoric that are very similar to what the CFPB has alleged throughout three years of litigation in this case.  However, the CFPB's arguments bear little resemblance to the very limited evidence the CFPB chose to present at trial.  At trial, the CFPB did not even attempt to present the type of evidence that would be required to satisfy its burden of showing "reckless" or "knowing" conduct.  For example, the CFPB is asking this Court to make findings regarding Defendants' mental states (*i.e.*, that Defendants did not believe they were operating law firms engaged in the practice of law, and/or Defendants' belief on that point was not reasonable or justified).  But the CFPB (despite repeated suggestions from the Court) ***did not call any of Defendants to testify live at trial.***  The CFPB cross-examined Aleman and Stafford, but did so briefly.  In fact, the CFPB avoided asking them questions on the issues relevant to reckless or knowing conduct – likely because the CFPB feared such questions would elicit unfavorable responses.  Instead, the CFPB (as the Court pointed out) presented evidence that would be more appropriate in a malpractice case.

**Fourth**, the evidence at trial does not support any finding of knowing or reckless conduct. On the contrary, the undisputed evidence demonstrated that: (1) Defendants believed in good faith that they were engaged in the practice of law through two validly-constituted law firms; and (2) those beliefs were objectively and subjectively reasonable, based on years of managing a national bankruptcy firm, due diligence, review of applicable authority, and consultation with nationally known legal counsel.  The CFPB did not present any evidence to address (much less contradict) the those points.  The CFPB did not present any evidence to call into question Defendants' beliefs, or the reasonableness or foundation for those beliefs.  The CFPB's inability to present such evidence on those two points is fatal to its claim for civil penalties.

3

*Fifth*, with respect to the CPFB's claims regarding marketing and misrepresentations, the evidence at trial with respect to Stafford was non-existent because CFLG I did not have an intake department.   With respect to Aleman and Searns, the testimony demonstrated they acted reasonably and in good faith.   William Murphy (who was called by the CFPB) confirmed that Aleman and Searns took affirmative steps to put policies and procedures in place, and to monitor compliance with those policies and procedures.   Murphy's testimony concluded as follows:

> Q        Did you believe TMLG was making a good-faith effort to provide needed
>            services to its clients?
>
> A        Yes.  I wouldn't have stayed there if I didn't think that way.

> *                              *                              *

> THE COURT:  Just one question.  You used or agreed with the word *selective*, that
> Mortgage Law Group was selective in its customers.  What do   you   mean   by
> *selective*?
>
> THE WITNESS:  To the best of my ability, we wanted to only accept those that
> seemed to need the help and might qualify for it.

(Dkt. # 389 at 98-99) That testimony surely does not support the imposition of civil penalties.

*Sixth*, it must be noted that Defendants were navigating in uncharted regulatory waters. The MARS Rule and Regulation O were new, and there was (and still is) no well-established precedent to guide Defendants' path (except the well-established Rules of Professional Conduct). Defendants' belief that their conduct fell outside the parameters of Regulation O can hardly be called frivolous or unfounded.  This Court has already agreed with Defendants that approximately 60% of Regulation O's attorney exemption must be stricken (and the parties have just briefed the question of whether one of the two remaining provisions is similarly flawed).  Accordingly, even if the Court ultimately disagrees with Defendants' contention that they fall within the attorney exemption, their reliance on that exemption was hardly reckless or knowing.

4

In sum, the evidence does not support the imposition of any civil penalties.  Indeed, the undisputed evidence at trial demonstrates that Stafford made very little money from CFLG I, and that Macey, Searns and Aleman lost money on their investment in TMLG and/or CFLG II.  There is no evidence they profited in any way from this venture.[1]  If the CFPB prevails in this case, the Court has suggested it will require full restitution of approximately $20 million in fees.  That, in and of itself, is a harsh penalty and no further civil penalties are required (much less warranted).[2]

## ARGUMENT

**I.       The Legal Standards For Civil Monetary Penalties Under The CFPA.**

**A.       Burden Of Proof.**

Although the CFPA does not specifically address the burden of proof with respect to civil money penalties, it is clear the burden is on the CFPB to prove the requisite scienter necessary for the imposition of civil penalties.  As the Seventh Circuit explained in *S.E.C. v. Lyttle* (cited by the CFPB), a defendant's scienter under a civil penalty statutory scheme must be proven by the Government.  *See S.E.C. v. Lyttle*, 538 F.3d 601, 603 (7th Cir. 2008).  Like the CFPA, the Securities Act of 1933 (which was at issue in *Lyttle*) imposes a three-tier scheme for allowable civil penalties:

> **(1) Authority of Commission**
> Whenever it shall appear to the Commission that any person has violated any provision of this subchapter…the Commission may bring an action in a United States district court to seek, and the court shall have jurisdiction to impose, upon a

---

[1] The CFPB has, from time to time, suggested it does not believe Defendants lost money.  However, the CFPB (which has had three years to conduct discovery, which has combed through TMLG's and CFLG's bank statements and financials, and which has numerous accountants and financial experts at its disposal) has never produced any evidence to the contrary.  Thus, any suggestion to the contrary by the CFPB is simply unsupported speculation.

[2] Defendants agree with the CFPB that a discussion of mitigating factors for civil money penalties is premature, and that it goes beyond what was requested by the Court in this briefing.

proper showing, a civil penalty to be paid by the person who committed such
violation.

15 U.S.C. § 77t(d) (providing for three tiers of civil penalties).  Under the Securities Act, a penalty
is "proper only if the SEC proved that these defendants engaged in fraud—that is, if it proved
'scienter,' meaning that the defendants either knew that the representations they made to investors
were false or were reckless in disregarding a substantial risk that they were false."  *Lyttle*, 538 F.3d
at 603 (citations omitted).  In short, the application of one tier versus another is determined by the
Government's ability to prove each of the elements listed in the description of the tier.  The same
should be true under Section 5565 of the CFPA, 12 U.S.C. § 5565(c)(5)(B), and proof of the
applicability of one penalty versus another is part and parcel of the CFPB's overall burden of proof.

**B.      The Legal Standard For Reckless Engagement In A Violation Of Federal
Consumer Financial Law.**

The CFPA established large civil penalties for "reckless" violations, and the structure of
the statute, as well as decisions interpreting similar statutory schemes, makes it clear that there is
a very demanding standard for what constitutes "reckless conduct."  Under Section 5565(c)(2)(B)
of the CFPA, a civil penalty not to exceed $25,000 per day may be imposed "[n]otwithstanding
subparagraphs (A) [strict liability or negligent violation], for ***any person that recklessly engages
in a violation of a Federal consumer financial law***, a civil penalty may not exceed $25,000 for

each day during which such violation continues."  12 U.S.C. § 5565(c)(2)(B) (emphasis added).[3] The CFPA does not define "reckless," and no case interprets this provision of the CFPA specifically.  However, other similar regulatory contexts provide some guidance.

For example, in examining a "reckless" violation of the Fair Credit Reporting Act, the Supreme Court noted that "the common law has generally understood it in the sphere of civil liability as conduct violating an objective standard: action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known…It is this high risk of harm, objectively assessed, that is the essence of recklessness at common law."  *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68–69 (2007) (citations, quotations omitted).  Accordingly, "a company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless."  *Id.* As the Seventh Circuit explained, "recklessness" means "something more than negligence but less than knowledge of the law's requirements."  *Murray v. New Cingular Wireless Services, Inc.*, 523 F.3d 719, 725–26 (7th Cir. 2008) (FCRA claim).  The CFPB generally agrees with this standard. (Dkt. # 393 at 4)

_____

[3] It is unclear how the CFPB proposes to calculate any civil penalties.  Specifically, it is unclear whether the CFPB is advocating a one-time penalty per client, a penalty per client per day of operations, or some other method of calculation.  To the extent that the CFPB is advocating a per client per day of operation calculation (which would result in astronomical penalties even under the lowest tier), Defendants submit that such methodology is not supported by the evidence at trial, the claims as asserted in this case, or common sense.  **First,** the CFPB did not put on specific evidence of specific violations on a client-by-client basis, and there is no evidence that Defendants violated Regulation O with respect to every client or every day of operation.  Rather, the claims in this case are aimed at general business practices.  **Second,** the evidence at trial was that the intake call, the sending of the retainer agreement and welcome letter, and drawing of the first payment occurred on individual days, not during the entire course of representation.  **Third,** the evidence in this case is that Defendants lost money from these firms.  Astronomical civil penalties are not warranted.

Moreover, looking to the Securities Act of 1933 and related case law for additional guidance

> The Seventh Circuit has adopted the following definition of recklessness in the context of securities fraud: a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*See Sec. & Exch. Comm'n v. Ferrone*, 163 F. Supp. 3d 549, 569 (N.D. Ill. 2016) (ruling on pre-trial motions in limine in a case for violations of 15 U.S.C. § 78j(b)) (internal quotations and citations omitted).  In such cases, "the quantum of proof required to establish a defendant was reckless is quite high in the Seventh Circuit.  Recklessness 'should be viewed as the functional equivalent of intent' because it requires "something more egregious than even 'white heart/empty head' good faith." *Id.* (citing *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1045 (7th Cir. 1977)).  Accordingly, in the Seventh Circuit (at least with respect to Securities Act cases), "white heart/empty head good faith is inconsistent with a subjectively reckless state of mind." *Id.* (*citing Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 206 (1976), and noting that "[t]his is consistent with the Supreme Court's clear directive that actions taken in good faith do not violate Section 10(b).").

### C.    The Legal Standard For A Knowing Violation Of Federal Consumer Financial Law.

Under Section 5565(c)(2)(C) of the CFPA, "[n]otwithstanding subparagraphs (A) [strict liability or negligent violation] and (B) [reckless violation], for *any person that knowingly violates a Federal consumer financial law*, a civil penalty may not exceed $1,000,000 for each day during which such violation continues."  12 U.S.C. § 5565(c)(2)(C) (emphasis added).  The CFPA does not define "knowingly," and no case interprets this provision specifically.

However, Section 5565(c)(2)(C) is only susceptible to one interpretation that makes sense, *i.e.*, that "knowingly" requires ***both*** knowledge of the facts that constitute the violation ***and also*** requires knowledge that the conduct constitutes a violation. That interpretation is consistent with the structure and purpose of Section 5565 (and the CFPA generally) and is consistent with cases addressing other statutes. On this point, Section 5(m) of the FTC Act, 15 U.S.C. § 45(m), is analogous. Section 5(m) states in pertinent part:

> The Commission may commence a civil action to recover a civil penalty in a district court of the United States against any person, partnership, or corporation which violates any rule under this chapter respecting unfair or deceptive acts or practices . . . ***with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule***. In such action, such person, partnership, or corporation shall be liable for a civil penalty of not more than $10,000 for each violation.

15 U.S.C. § 45(m)(1)(A) (emphasis added). Courts have construed that provision to mean that "[a] person knowingly violates an FTC rule if, under the circumstances, a reasonable, prudent person would have known of the existence of the rule ***and*** that his or her acts or practices violated the rule." *United States v. Dish Network, L.L.C.*, 667 F. Supp. 2d 952, 961–62 (C.D. Ill. 2009) (emphasis added). To be sure, the language describing the "knowing" scienter standard required under the CFPA and that required under the FTC Act are different. However, to conclude that a "knowing" violation of the CFPA means something other than the knowledge that conduct was unlawful ***and*** knowledge of the facts that constitute the violation would undercut the purpose of Section 5565, and would not make sense.

***First,*** if "knowingly" were construed to mean anything less, the three-tier system of civil penalties under Section 5565(c) would be meaningless. If a "reckless" violation means "something more than negligence but less than knowledge of the law's requirements," *see Murray*, 523 F.3d at 725–26, a "knowing" violation ***must*** mean "knowledge of the law's requirements" or there would

9

be no distinction between Sections 5565(c)(2)(B) and 5565(c)(2)(C).  *See cf. Safeco Ins. Co.*, 551 U.S. at 59 ("[I]t would have made no sense for Congress to condition the higher damages under § 1681n(a) on knowingly obtaining a report without a permissible purpose if the general threshold of any liability under the section were knowing misconduct.").  The term "knowingly" in Section 5565(c)(2)(C) must be read so as to preserve a distinction between "knowing" and "reckless."  *See United States v. Menasche*, 348 U.S. 528, 538–39 (1955) ("The cardinal principle of statutory construction is to save and not to destroy. It is our duty to give effect, if possible, to every clause and word of a statute, rather than to emasculate an entire section[.]" (citations, quotations omitted)).

*Second,* interpreting "knowing" to require knowledge that a practice violates a rule or regulation would make Section 5565 of the CFPA consistent with Section 5(m) of the FTC Act. That is desirable because the FTC Act is the "organic statute [on which] a considerable portion of the CFPA's operative language is based."  *See Consumer Fin. Prot. Bureau v. ITT Educ. Services, Inc.*, 1:14-CV-00292-SEB, 2015 WL 1013508, at *10 (S.D. Ind. Mar. 6, 2015).  In addition, "courts generally interpret similar language in different statutes in a like manner when the two statutes address a similar subject matter."  *See Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1193 fn.7 (9th Cir. 2016) (quoting *United States v. Novak,* 476 F.3d 1041, 1051 (9th Cir.2007)) (court's alteration omitted).  As such, the language in 12 U.S.C. § 5565(c)(2)(C) should be interpreted the same way that 15 U.S.C. § 45(m)(1) is interpreted.

*Third,* the type of conduct alleged by the CFPB (*e.g.*, charging advanced fees, failing to make certain disclosures, making certain representations) is not *per se* or intuitively wrongful, dangerous, or illegal.  Rather, the conduct alleged is only ***potentially*** wrongful ***if*** it is prohibited under a statutory scheme.  For example, it is not necessarily illegal to tell someone not to speak

with his mortgage lender.  However, doing so may be illegal **if** it is done under certain, regulated circumstances.  Thus, knowledge of both the specific conduct **and** that the conduct was unlawful must be required.  *See Liparota v. United States,* 471 U.S. 419 (1985).

For example, in *Liparota*, the Court concluded that "both the term 'knowing' in 7 U.S.C. § 2024(c) and the term 'knowingly' in § 2024(b)(1) referred to knowledge of the law as well as knowledge of the relevant facts."  *Bryan*, 524 U.S. at 193 fn.15 (citations omitted).  The statute at issue in *Liparota* stated in pertinent part:

> whoever knowingly uses, transfers, acquires, alters, or possesses benefits in any manner contrary to this chapter or the regulations issued pursuant to this chapter shall, if such benefits are of a value of $5,000 or more, be guilty of a felony and shall be fined not more than $250,000 or imprisoned for not more than twenty years, or both[.]"

7 U.S.C. § 2024(b)(1) (pertaining to food stamps).  When interpreting the term "knowingly" in that statute, the Court acknowledged that,

> In most previous instances, Congress has rendered criminal a type of conduct that a reasonable person should know is subject to stringent public regulation and may seriously threaten the community's health or safety.  Thus, in *United States v. Freed,* [401 U.S. 601 (1971)], we examined the federal statute making it illegal to receive or possess an unregistered firearm.  In holding that the Government did not have to prove that the recipient of unregistered hand grenades knew that they were unregistered, we noted that "one would hardly be surprised to learn that possession of hand grenades is not an innocent act."  *Id.,* [at 609].  See also *United States v. International Minerals & Chemical Corp.,* [402 U.S. 558, 564–565] (1971).  Similarly, in *United States v. Dotterweich,* [320 U.S. 277, 284 (1943)], the Court held that a corporate officer could violate the Food, Drug, and Cosmetic Act when his firm shipped adulterated and misbranded drugs, even "though consciousness of wrongdoing be totally wanting."  [Citation.]  The distinctions between these cases and the instant case are clear.  A food stamp can hardly be compared to a hand grenade, see *Freed,* nor can the unauthorized acquisition or possession of food stamps be compared to the selling of adulterated drugs, as in *Dotterweich.*

> We hold that in a prosecution for violation of § 2024(b)(1), the Government must prove that the defendant knew that his acquisition or possession of food stamps was in a manner unauthorized by statute or regulations.

*Liparota*, 471 U.S. at 432–34.  That is precisely the issue that makes the decisions cited by the CFPB distinguishable.  The CFPB cited cases that involved criminal conduct and/or conduct that a "reasonable person should know is subject to stringent public regulation and may seriously threaten the community's health or safety."  *Liparota* at 432-34; *see United States v. O'Malley*, 739 F.3d 1001, 1006-07 (7th Cir. 2014) (criminal conviction for transporting and illegally dumping asbestos material); *Bryan v. United States*, 524 U.S. 184, 191-92 (1998) (criminal conviction for dealing firearms without a license); *Boyce Motor Lines v. United States*, 342 U.S. 337, 339 fn.3 (1952) (emphasis added) (prosecution for illegally transporting flammable substances); and *United States v. Int'l Minerals & Chem. Corp.*, 402 U.S. 558, 559 (1971) (prosecution for illegally transporting dangerous acidic materials).

## II.     The CFPB Did Not Meet The Required Burden For Civil Money Penalties On Counts I, II, III, IV, VII and VIII.

### A.     The Claims Asserted In Counts I, II, III, IV, VII and VIII.

Counts I (TMLG) and II (CFLG) allege that Defendants charged advance fees in violation of Regulation O.  Counts III (TMLG) and IV (CFLG) allege that Defendants told clients not to speak with their lenders in violation of Regulation O.  Counts VII (TMLG) and VIII (CFLG) allege that Defendants failed to make certain required disclosures in violation of Regulation O.  Those claims also allege that various individual Defendants (*i.e.*, Macey, Aleman and Searns for TMLG, Macey and Aleman for CFLG II, and Stafford for CFLG I) are liable for any corporate violations.  Importantly, **none** of the conduct alleged in those counts is *per se* wrongful.  Indeed, the **only** reason such conduct may be wrongful is because it is regulated by Regulation O.  Put another way, the conduct alleged is **only** problematic **if** Defendants are subject to Regulation O.

With respect to these claims, the CFPB has not carried its burden because the undisputed evidence shows that Defendants believed they were engaged in the lawful practice of law exempt

from Regulation O.  The undisputed evidence also showed that Defendants had a reasonable and good faith basis for that belief.  Accordingly, even if this Court were to disagree and find they were not exempt from Regulation O, there is no basis for finding that Defendants were either reckless or knowing in any violation of Regulation O.

**B.      The Current State Of Counts I, II, III, IV, VII and VIII.**

Counts I and II (Advance Fees).  On summary judgment, the Court ruled that TMLG, CFLG I and CFLG II charged advance fees.  (Dkt. # 191)  With respect to TMLG, the Court found that Aleman, Macey and Searns are individually liable for TMLG's conduct if the attorney exemption does not apply.  (*Id.*)  With respect to CFLG II, the Court found that if the attorney exemption does not apply, Aleman and Macey are individually liable.  With respect to CFLG I, the Court found that Stafford would be individually liable.  (*Id.*)

Counts III and IV (Speaking With Lender).  The Court previously ruled that the TMLG and CFLG II welcome letters implied clients should not communicate with lender.  (Dkt. # 191)  The Court reserved for trial the question of whether intake specialists told clients over the phone not to communicate with lenders.  On those points, if the attorney exemption does not apply, Aleman and Searns may be individually liable for TMLG violations, and Aleman may be liable for CFLG II violations.  (*Id.*)  During trial, the Court granted directed verdict in favor of Stafford on Count IV, because there was no evidence that Stafford or CFLG I told clients not to communicate with lenders.  (Dkt. # 377)

Count VII and VIII (Failure To Disclose).  On summary judgment, the Court ruled that Defendants failed to make required disclosures in TMLG and CFLG II telephone communications and retainer agreements.  (Dkt. # 191)  If the attorney exemption does not apply, Aleman and Searns are individually liable for any TMLG communications; Aleman is liable for CFLG II

telephone communications; and Macey is additionally liable for any failure to make disclosures in TMLG and CFLG retainer agreements.  (*Id.*)  Stafford would face liability for any pre-July 2012 failures to make disclosures associated with CFLG I.

      **C.**      **There Is No Evidence That Defendants Engaged In Reckless Or Knowing Violations Of Regulation O.  The Evidence At Trial Establishes That TMLG and CFLG II Were Law Firms And That Defendants Had A Reasonable, Good Faith Basis For Believing They Were Exempt From Regulation O.**

The key question in this case is whether Regulation O's attorney exemption extends to all attorneys of the law firm (*e.g.*, Defendants).  Defendants submit that because that is the key question, it is ***impossible*** for the CFPB to meet its burden that Defendants engaged in a knowing or reckless violation of Regulation O on Counts I, II, III, IV, VII, and VIII.

The evidence at trial demonstrated that TMLG and CFLG II were law firms (and thus, were not subject to Regulation O) and that Defendants had a good faith, reasonable basis for believing they were exempt from Regulation O.  At trial, the overwhelming evidence was that: (1) Defendants organized TMLG and CFLG as law firms; (2) Defendants conducted due diligence (including consultation with Searns and Steven Krane) to ascertain whether the "Class B" model complied with the ethical requirements;[4] (3) Defendants had proper affiliations with licensed attorneys in every state in which Defendants practiced; (4) firm attorneys (including local attorneys) were providing legal services to clients; and (5) Defendants and clients believed they had an attorney-client relationship, and acted accordingly.

Thus, the overwhelming evidence was that – at a ***minimum*** – Defendants had a good faith basis for believing that they were exempt from the requirements of Regulation O.  Defendants'

---

[4] Admittedly, the consultations with Krane (and others) were in the context of LHDR.  However, the undisputed evidence is that the model used for LHDR (*i.e.* headquarters attorneys, and Class B members in various states) was very similar to the model used for TMLG.  (Dkt. #390 at 3-A-79:9-80:23; Searns Dep. 23-24, 130, 137-38)

belief was both subjectively and objectively reasonable.  Thus, there is no evidence to support "reckless" or "knowing" violations of Regulation O.  *See Sec. & Exch. Comm'n v. Ferrone*, 163 F. Supp. 3d 549, 569 (N.D. Ill. 2016) (noting that good faith is inconsistent with reckless conduct); *see also United States v. Dish Network, L.L.C.*, 667 F. Supp. 2d 952, 961–62 (C.D. Ill. 2009) (requiring knowledge of conduct *and* knowledge that conduct is unlawful).

*First,* the undisputed evidence is that Defendants believed they were engaged in the valid practice of law through two properly organized law firms.  Defendants organized TMLG and CFLG as *law firms.*  The Class A members of those firms were all lawyers who were licensed to practice law.  (Dkt. #329-1 at ¶¶ 2-9)  TMLG and CFLG provided training and instructions to its non-legal staff, and they implemented strict policies and procedures to be followed in communications with clients and work performed on their behalf.[5]  The non-legal staff was client-focused, highly organized, and trained and supervised by attorneys.[6]  Attorneys had the final decision-making power regarding the acceptance of individuals as clients of the firm *and* regarding the submission of mortgage modification applications (or, where applicable, the delivery of

---

[5] *See* Dkt. #390 at 3-A-100:22-104:10; Dkt. #387 at 2-P-18:12-20, 26:19-27:8, 27:21-28:7 30:4-31:2, 32:2-9, 35:17-37:18, 38:1-39:4, 39:1-4, 41:3-13, 42:7-13, 69:12-14, 90:13-91:4, 130:2-131:5, 132:4-24, 145:1-18, 147:11-148:21, 149:1-18; Searns Dep. 38, 41-42, 62-64, 87-90, 127)
[6] *See* Dkt. #387 at 26:19-27:8, 27:21-28:7 30:4-31:2, 32:2-9, 35:17-37:18, 38:1-39:4, 39:1-4, 41:3-13, 42:7-13, 69:12-14, 90:13-91:4, 130:2-131:5, 132:4-24, 145:1-18, 147:11-148:21, 149:1-18; Searns Dep. 38, 62-64, 87-90, 127.

foreclosure and short sale services) to those clients.[7]  Defendants were hardly alone in their belief

that TMLG and CFLG were law firms.  Every Class B attorney and former client agreed.[8]

      *Second*, the undisputed evidence is that Defendants had a good faith basis for their belief

that was based upon due diligence and was objectively and subjectively reasonable.  The "Class B

model" had been vetted by Steven Krane at Proskauer Rose and Robby Birnbaum at Greenspoon

Marder, and Defendants reviewed and were familiar with the ethical rules regarding multi-

jurisdiction practice.  (Dkt. #390 at 3-A-79:9-80:23; Searns Dep. 23-24, 130, 137-38)  Moreover,

this was not Defendants' first foray into multi-jurisdictional practice involving consumers.  For

over 15 years, Macey and Aleman had operated a highly-successful consumer bankruptcy practice,

Legal Helpers, that served hundreds of thousands of clients, and they grew that firm from one

small office to 110 offices with 300 employees in 19 states.  (Dkt. #390 at 3-A-75:18-76:21)  Thus,

Macey and Aleman had spent many years in the consumer legal marketplace, practicing multi-

jurisdictional law and effectively managing both the legal and business aspects of that practice.

      *Third,* Defendants properly affiliated with licensed attorneys in every state in which they

provided services.  Indeed, the parties stipulated that 102 Class B attorneys were licensed and in

good standing during the entire time they provided services to TMLG and CFLG.  (Dkt. #376; DE

---

[7] *See* Dkt. #390 at 3-A-103:16-104:10; Dkt. #387 at 2-P-39:1-4, 69:12-14, 122:3-14, 123:24-126:18, 127:7-11, 132:4-24.

[8] *See* Dkt. #386 at 1-A-57:22-25, 61:4-8, 131:2-5, 173:14-19; Dkt. #389 at 1-P-8:7-11, 12:21-22, 104:14-17; Dkt. #383 at 2-A-15:10-15, 64:11-14; Dkt. #391 at 4-A-13:1-14, 16:21-17:7, 21:19-22:17; 24:14-25:9, 55:17-22; 58:6-22; 60:7-62:6, 70:12-71:6, 71:7-13, 94:13-24, 102:8-15, 105:14-106:20, 112:17-113:18, 117:13-118:7; 120:17-121:20, 123:17-124:18; 151:6-152:4, 152:24-153:12, 154:23-155:12, 155:21-156:10; Dkt. #385 at 4-P-11:8-12:8, 15:8-19, 18:8-24, 22:2-17, 28:25-29:10; Banyon Dep. at 38:7-16, 39:3-5; Daines Dep. 134:11-15, 174:19-175:1, 175:5-9, 176:11-15; Delgado Dep. 44:14-18, 45:23-46:4, 46:18-25, 48:2-11, 75:22-76:5, 92:10-14, 93:6-14, 156:24-157:5; Gustafson Dep. at 99:6-15, 97:25-98:4, 99:22-23, 100:21-101:1, 104:11-15; Harrington Dep. 180:13-21, 241:11-16; Powell Dep. at 171:9-14, 218:1-9; Ruggiero Dep. 131:13-25; Trebbe Dep. 132:5-7, 132:11-22, 142:20-143:2.

670, 671-A)  With respect to the remaining attorneys, Defendants provided other documentary and testimony evidence to support those attorneys' licensure, and Defendants refer to the Court to their brief on that point.  (Dkt. #394; DE 670, 671-A)  In addition, the Class B attorneys testified that they executed partnership and/or membership agreements with the firms.[9]

*Fourth,* the undisputed evidence at trial was that TMLG and CFLG attorneys provided legal services to clients.  *All* of the representative Class B attorneys who provided testimony at trial (either live or by deposition designation) testified that they were providing legal services to clients as part of the practice of law:

- Mark Scheer (Colorado, Georgia, Missouri, New Jersey, Pennsylvania): "Yes [I believed I was practicing law]…It wasn't that dissimilar from what I had been doing for the prior, whatever it was, 25 years or so, which is looking at legal issues and trying to help people with legal issues."  (Dkt. #391 at 4-A-24:14-23; *see also id.* at 4-A-13:1-14, 16:21-17:7, 21:19-22:17, 24:24-25:9)

- Justin Rammell (Colorado, Nebraska, Utah, Wyoming): "It's the practice of law because you have federal law and regulations and options for a person in financial straits.  And you're trying to determine how best to fit them into available programs, whether that's a bankruptcy or whether that's a mortgage modification, and that's a legal determination about what is best for that person in that situation." (Dkt. #391 at 4-A-70:12-71:6; *see also id.* at 4-A-55:17-22, 58:6-22, 60:7-62:6, 94:13-24)

- Daniel Reiff (Minnesota): "[T]he client has a specific legal issue, namely, they are in breach of their contract….And that was a major concern for us is that what do you do about the breach, because it's – I personally did a short sale[.]" (Dkt. #391 at 4-A-123:17-124:14; *see also id.* at 4-A-102:8-15, 105:14-106:20, 112:17-113:18, 117:13-118:7, 120:17-121:20; DE 621, 622)

- Bryan Fears (Colorado, Oklahoma, Texas): "[I]f you're evaluating a client situation and I have my lawyer hat on – which is not tough in Texas, that's for sure.  It's tough to buy a car without practicing law in Texas….But I'm evaluating the holistic situation of a client, not just for one specific remedy.  That's the practice of law." (Dkt. #385 at 4-A-154:23-155:12; *see also id.* at 4-A-151:6-152:4, 152:24-153:12, 155:21-156:10; DE 601)

---

[9] *See* Dkt. #391 at 4-A-12:17-23, 13:18-14:3, 76:13-16, 77:3-78:12, 99:18-100:16, 147:25-149:4; Dkt. #385 at 4-P-10:5-10; Gustafson Dep. at 118:19-119:5, 126:7-10; Harrington Dep. 21:19-22:10, 214:4-11; Powell Dep. at 161:18-162:15, 247:1-18; Ruggiero Dep. 63:10-22; 226:7-21; Trebbe Dep. 107:13-23; PE 118, 291-293, 304, 309, JE 1004, 1022, 1023, 1035, 1036, 1090-1105.

17

- Philip Murdock: "I filed a response to the discovery request, and then I think I amended the pleadings[.]" (Dkt. #385 at 4-P-22:2-17; *see also id.* at 4-P-11:8-12:8, 15:8-19, 18:8-24, 28:25-29:10; DE 601-603)

- Rex Daines (Oregon): "So I think it's practicing law because you're dealing with a legal obligation, a mortgage, and how a person is going to resolve that, and, you know, that affects – there are other legal obligations in their life as well….[Loan modification] is directly linked to legal issues your client – that people are having." (Daines Dep. 175:5-9, 176:11-15; *see also* 134:11-15, 174:19-175:1)

- Richard Gustafson (California): "[B]y providing a service of helping a client, whether it be with bankruptcy, in this case mortgage modification, if I'm approving the file, it means that I think that this person has a chance to obtain relief, legal relief of a legal debt[.]" (Gustafson Dep. 100:21-101:1; *see also* 99:6-15, 97:25-98:4, 99:22-23, 104:11-15)

- Colin Banyon (Illinois): "I handled…foreclosure defense. I would file appearances in cases in Illinois for clients that were in foreclosure. I would talk to clients about what their best goal is, what they wanted to achieve in a case." (Banyon Dep. at 38:7-16; *see also* 39:3-5)

- Kevin Trebbe (Arizona): "I would be helping clients refinance their house. That is a legal document, or you know, a mortgage is a legal document, so it's the practice of law I guess by default." (Trebbe Dep. 142:20 – 143:2)

- Frank Grey Powell (North Carolina): "I was a lawyer in that firm, and so all the file reviews I did, I considered that to be part of the legal work I was doing for them. So I would say every file review was advice, representation, advice, and supervision." (Powell Dep. 171:9-14; *see also* 218:1-9)

- Jacqueline Delgado (Florida): "I would, one, verify we received all the documents that were requested and necessary to complete and submit their loan modification. I would reach out to the processor, paralegal, and email them…and they would usually get back to me and tell me [where they were in the process], and I would relay that to the bank – to the client." (Delgado Dep. 75:22 – 76:5; *see also* 44:14-18, 45:23-46:4)

Indeed, during closing arguments the Court suggested the Class B attorneys were engaged in the practice of law, and that if the CFPB brought an action against the local attorneys for violations of Regulation O, the action would fail as the local attorneys would be subject to the attorney exemption. (Dkt. #388 at 5-A-13, 16-17)

18

*Fifth,* both the clients and the attorneys agreed that an attorney-client relationship existed. At trial, eight former clients testified.  TMLG and CFLG submitted completed loan applications for five of the eight clients, and they performed considerable work on each of the eight clients' files.[10]  Importantly, ***none*** of the eight clients testified that they were deceived about the nature of the services provided or the firms' fees structures.  ***All*** of those clients testified that they understood they were retaining a "law firm" or a "team."[11]  Similarly, the local attorneys all testified that they believed that they had an attorney-client relationship with the clients whose files they reviewed.[12]

Thus, the overwhelming evidence at trial was that Defendants established TMLG and CFLG as law firms to provide mortgage modification mitigation services to their clients. Defendants conducted due diligence and had a reasonable belief that they were operating as law firms outside the purview of Regulation O.  Defendants worked to put the appropriate policies, procedures, and affiliations in place so that they could provide legal services to clients in multiple states while providing adequate oversight of the non-legal personnel.  That conduct is neither knowing nor reckless.  Accordingly, civil money penalties – much less penalties associated with "reckless" or "knowing" violations are not appropriate.

---

[10] *See* Dkt. #386 at 1-A-60:18-13, 79:11-23, 95:24-96:7, 129:5-11, 149:18-23; 175:11-25, 182:15-18; Dkt. #389 at 1-P-17:9-15, 36:13-37:11, 113:9-22; 118:3-14, 131:16-132:10; PE 66, 178, 183, 189, 462; DE 577; JE 1057, 1059, 1065-1068, 1113, 1114.

[11] *See* Dkt. #386 at 1-A-57:22-25, 61:4-8, 131:2-5, 173:14-19; Dkt. #389 at 1-P-8:7-11, 12:21-22, 104:14-17; Dkt. #383 at 2-A-15:10-15, 64:11-14.

[12] *See* Dkt. #391 at 4-A-71:7-13; 118:2-7, 124:15-18; 155:2-4; Dkt. #385 at 4-P-29:7-10; Delgado Dep. 46:18-25, 48:2-11, 92:10-14, 93:6-14, 156:24-157:5; Harrington Dep. 180:13-21, 241:11-16; Ruggiero Dep. 131:13-25; Trebbe Dep. 132:5-7, 11-22. *See* Dkt. #391 at 4-A-71:7-13; 118:2-7, 124:15-18; 155:2-4; Dkt. #385 at 4-P-29:7-10; Delgado Dep. 46:18-25, 48:2-11, 92:10-14, 93:6-14, 156:24-157:5; Harrington Dep. 180:13-21, 241:11-16; Ruggiero Dep. 131:13-25; Trebbe Dep. 132:5-7, 11-22.

**D.     The Evidence At Trial Established That CFLG I Was A Law Firm Not Subject To Regulation O, Making Civil Penalties Inappropriate.**

The evidence with respect to CFLG I was very similar.  CFLG I was organized as a law firm, established relationships with attorneys in various states, and provided legal services on behalf of its 27 clients.  Stafford testified that he personally worked with and vetted the attorneys he recruited to work for CFLG I, and he entered into written of-counsel agreements with those attorneys.  (Dkt. #390 at 3-A-32:11-33:7, 36:2-14)  Stafford and another Wisconsin attorney, Arne Skatrud, personally reviewed the retainer agreement with every client before he or she signed the agreement.  (Dkt. #390 at 3-A-38:4-19)  The local attorneys were the lead attorneys for each client.  (Dkt. #390 at 3-A-47:22-48:2)  Stafford required the assigned CFLG I attorney to personally make contact with the client within 48 hours of retaining CFLG I, and personally contact clients at least once per month. (Dkt. #390 at 3-A-34:13-25, 39:10-23)  Stafford regularly contacted clients and reviewed CRM notes to ensure the local attorneys were actively representing clients and performing work on their behalf.  (Dkt. #390 at 3-A-40:22-41:10, 59:11-25)

Mark Scheer was one CFLG I local attorney.  He frequently spoke with clients, kept notes regarding his activities on behalf of those clients, and communicated regularly with Stafford regarding the work he did for those clients.  (Dkt. #391 at 4-A-13:1-17)  Thus, the evidence at trial established that the CFLG I local attorneys served as the lead attorney for each client, had considerable contact with each client, and loan modifications were obtained for approximately 50% of the CFLG I clients.  Here again, the conduct was neither knowing nor reckless, thus making civil penalties inappropriate.

**III.    The CFPB Did Not Meet The Required Burden For Civil Money Penalties On Counts V and VI.**

    **A.    The Claims Asserted In Counts V and VI.**

Count V is a claim for misrepresentations that TMLG allegedly made to clients and potential clients.   The CFPB alleged four types of misrepresentations: (1) the likelihood of obtaining a loan modification; (2) the amount of time to do a loan modification; (3) consumers' obligations to continue making loan payments; and (4) consumers would receive legal representation.  On summary judgment, the Court found that: (1) intake specialists implied that consumers should stop making loan payments; and (2) consumers were told that they would receive legal services (but stopped short of finding that this was a misrepresentation or deceptive practice). (Dkt. # 191)  The Court has already entered judgment in favor of Aleman and Searns with respect to misrepresentations in advertisements.  (Dkt. # 377; Dkt. #363)  With respect to the remaining issues, Aleman and Searns may face individual liability for violations; and Macey may face liability for violations in the retainer agreement.  (Dkt. # 191, 377)

Count VI is a claim for misrepresentations that CFLG allegedly made to clients.  The CFPB alleged four types of misrepresentations:  (1) likelihood of obtaining a loan modification; (2) the amount of time to do a loan modification; (3) consumers would receive legal representation; and (4) availability and performance of non-profit services.  On summary judgment, the Court found that: (1) CFLG told consumers in intake calls, retainer agreements, welcome letters, and on the website that they would receive legal services; and (2) intake specialists misrepresented performance of non-profit services.  (Dkt. # 191)  The Court has already entered judgment in favor of Aleman (with respect to advertisements) and Stafford (on the vast majority of Count VI).  (Dkt. # 377; *see also* Dkt. 390 at 3-A-4:6-16)  If the attorney exemption does not apply, Aleman may face individual liability for any violations (except for third party advertising), Stafford may face

21

individual liability for misrepresentations regarding the provision of legal services for CFLG I, and Macey may face individual liability for violations in the retainer agreement only.  (Dkt. # 191, 377)

> **B.**    **The CFPB Did Not Meet Its Burden Of Showing Either Reckless Or Knowing Violations With Respect To The Claims In Counts V And VI.**

With respect to Counts V and VI, Defendants' status as attorneys and law firms is sufficient to remove them from the purview of Regulation O.  Thus, the arguments set forth above in Section II(C) are applicable to these counts as well.  However, even assuming *arguendo* that Defendants do not qualify for the attorney exemption, it is clear from the evidence at trial that the CFPB cannot meet its burden for liability – much less civil penalties – with respect to Counts V or VI.

> **1.**    **The CFPB Cannot Establish Any Basis For Civil Penalties Associated With Misrepresentations In Direct  Communications  With  Potential Clients.**

The CFPB claims that TMLG and CFLG II misrepresented the likelihood of obtaining a loan modification, the length of time to obtain a loan modification, and a client's obligations to continue making loan payments in communications with consumers.  For evidence of "reckless" or "knowing" violations of Regulation O, the CFPB hangs its hat on the deposition testimony of Victor Anderson.  That reliance is misplaced.  Victor Anderson's testimony does not establish a policy or practice for the law firms.  As this Court noted, Anderson's testimony is "problematic." (Dkt. #390 at 3-A-5:6-8)  Indeed, there are several problems with Anderson's testimony.

*First,* Anderson's testimony is in direct contravention of well-documented and established TMLG and CFLG II policies and procedures. The law firms provided intake personnel and others with scripts and directives on what not to say.  (Dkt. #387 at 2-P-26:19-27:24, 77:10-78:3; JE 1005, 1010)  Once a potential client was informed of the nature of the firms' services and the fee structure,  the  potential  client  spoke  with  an  attorney,  who  also  went  over  the  terms  of

representation.  (Dkt. #390 at 3-A-90:1-15; JE 1005; PE 216)  During that call, the attorney specifically informed the potential client that: (1) he may speak to a local attorney in his area at any time; (2) a loan modification application could be denied by the lender; (3) the law firms do not make any specific guarantees of any result; (4) the law firms' activity may not prevent adverse actions by a lender; and (5) a local attorney would review his file before he would be officially accepted as a client.  (PE 216; *see also* JE 1010; Dkt. #384 at 3-P-86:6-87:12)  As the Court heard during an exemplar call, there was no pressure or bullying a client into retaining the law firms. Finally, both a headquarters attorney **and** a local attorney reviewed a potential client's financial information and approved the representation.  (Dkt. #387 at 2-P-122:3-14, 123:24-126:18, 127:7-11; Dkt. #390 at 3-A-90:16-91:12; Dkt. #384 at 3-P-32:3-10)  Thus, even assuming *arguendo* that an intake person went off-script, there were **three** other checkpoints a potential client went through before the firm accepted that person as a client.  As William Murphy stated, "[t]o the best of my ability, we wanted to only accept those that seemed to need the help and might qualify for it." (Dkt. # 389 at 98-99)

   ***Second,*** Anderson's testimony is contradicted by the evidence of firm oversight.  Aleman was deeply involved in the day-to-day operations of TMLG and CFLG, and that he was in near-constant communication with Kelly Sibert and Colin Banyon (two Chicago headquarters attorneys responsible for overseeing various parts of the operations), Jay Gerst (who oversaw the non-legal staff in Florida), and the Class B attorneys in the various states.  (Dkt. #390 at 3-A-87:15-91:12, 91:23-93:22, 100:22; Dkt. #387 at 2-P-42:17-44:10)  Aleman further testified that he had a hand in creating the policies and procedures, and that TMLG and CFLG staff were expected to abide by those policies and procedures. (Dkt. #390 at 3-A-100;22-104:10; Dkt. #384 at 3-P-32:3-10)  Searns testified that he conducted audits of intake calls, procedures, and client files to ensure compliance

with firm policies and procedures.  (Searns Dep. 62-64)  Indeed, all of the evidence demonstrates that TMLG and CFLG managing attorneys took steps to ensure that those policies and procedures were followed.

*Third,* Anderson's testimony is contradicted by the live testimony of his direct supervisor. William Murphy (whom Defendants submit is a far more credible witness) testified that employees received guidelines and were to follow those guidelines and scripts.  (Dkt. #389 at 1-P-50:22 - 51:25, 94:17-22, 98:22-25)  Murphy also specifically testified that attorney approval was required before an individual became a client of the firm, and that TMLG was "selective" in its acceptance of clients, meaning that it wanted "to only accept those that seemed to need the help and might qualify for it."  (Dkt. #389 at 1-P-99:2-8)

*Fourth,* Anderson's testimony is contradicted by numerous other sources of evidence presented at trial.  Of the eight clients who testified at trial, only two (Johnson and White) testified that intake personnel misrepresented the length of time that it would take to get a loan modification, and only one (White) said that she was guaranteed a loan modification.[13]  (Dkt. #386 at 1-A-92:14-16, 148:17-22)  *None* of the other clients who testified at trial identified any other purported misrepresentations by intake personnel.  Similarly, of TMLG and CFLG's combined 6,381 clients, only 7 of the 92 complaining clients accused them of misrepresenting the likelihood of obtaining a loan modification, and only 2 of the 92 complaining clients accused them of misrepresenting the length of time to get a loan modification.  (Dkt. #383 at 2-A-123:22-125:5)  Finally, Anderson's claims of "high pressure" intake processes is contradicted by the intake call performed by attorney Michael Barrett.  (PE 216)

---

[13] Ms. White also testified that she had tried to obtain a loan modification for several months on her own, and was unsuccessful.  Thus, Ms. White was well aware that there were no guarantees of a loan modification.  (Dkt. #386 at 1-A-148:17-19)

**Fifth,** the evidence presented at trial demonstrates that the length of time to obtain a loan modification was **not** misrepresented in written communications with clients. The welcome letter stated that a loan modification typically took 90-120 days, but included the express caveat that every situation is different. (DE 513; JE 1021) There was no evidence presented that anyone was deceived by those statements.

**Sixth,** Anderson was terminated for misconduct. (Anderson Dep. 274-275) That fact, by itself, should demonstrate that TMLG and CFLG II took steps to remedy problems and remove personnel who refused to follow their policies and procedures. That fact also calls his credibility into great question.

In sum, Anderson's testimony, at best, demonstrates that certain employees periodically violated the policies and practices of TMLG and CFLG. Placed in context, it is clear that the conduct described by Anderson was the exception – not the norm – and that the conduct described by Anderson was not tolerated by either firm. That is why he was fired. Anderson's testimony is not enough to sustain a liability finding (after all, how can the Court determine how many potential clients were exposed to Anderson-esque statements; or determine whether those potential clients survived further screening to become clients?). And Anderson's testimony is certainly not enough to justify civil penalties for "reckless" or "knowing" violations.

## 2. The CFPB Is Not Entitled To Civil Penalties Associated With Statements That Clients Would Receive Legal Services.

As set forth extensively herein, TMLG and CFLG were law firms, and TMLG and CFLG attorneys provided legal representation to their clients. Attorneys conducted initial reviews of client files to assess whether a mortgage modification application was an appropriate course of action, conducted a final review and approval of a mortgage modification application, defended clients in foreclosure actions where necessary, and represented clients in connection with short

25

sales where necessary.[14]  The attorneys believed they had an attorney-client relationship with the clients.[15]  The same is true of CFLG I.  (Dkt. #390 at 3-A-32:11-33:7, 34:13-25, 36:2-14, 38:4-19, 39:10-23, 40:22-41:10, 47:22-48:2, 59:11-25)

To be sure, the vast majority of TMLG and CFLG clients required only mortgage modification assistance (and not foreclosure defense or short sale assistance), and the Class B attorneys were not paid a great deal for their work.  However, that does not change the fact that the services provided by those attorneys to those clients were ***legal*** services.  Accordingly, the evidence does not support a finding of knowing or reckless violations of Regulation O.  At a minimum, the work performed by the local attorneys constitutes legal services.  When the evidence presented at trial is viewed in its totality, it is clear that Defendants were operating law firms, they had a good faith belief that their law firms were not subject to the requirements of Regulation O, and civil monetary penalties are not appropriate.

## CONCLUSION

WHEREFORE, for the reasons set forth herein, Defendants Consumer First Legal Group, LLC, Thomas G. Macey, Jeffrey J. Aleman, and Harold E. Stafford respectfully request that, if this Court declines to apply Regulation O's attorney exemption, this Court adopt the legal standards set forth herein and decline to impose civil money penalties in this case.

---

[14] *See* Dkt. #387 at 2-P-18:12-20, 35:17-37:18, 38:1-39:4, 69:12-14, 90:13-91:4, 122:3-14, 123:24-126:18, 127:7-11, 130:2-131:5, 132:4-24; Dkt. #391 at 4-A-19:8-20:4, 21:2-22:20, 24:14-16, 50:12-19, 58:2-59:3, 101:3-10, 102:5-15, 105:14-106:20, 102:1-121:22, 150:22-24, 151:6-52:16, 152:24-154:5, 154:23-155:12, 167:4-7; Dkt. #385 at 4-P-11:15-22, 15:8 – 19:14, 22:2-23:17, 28:25-29:10.

[15] *See* Dkt. #391 at 4-A-71:7-13; 118:2-7, 124:15-18; 155:2-4; Dkt. #385 at 4-P-29:7-10; Delgado Dep. 46:18-25, 48:2-11, 92:10-14, 93:6-14, 156:24-157:5; Harrington Dep. 180:13-21, 241:11-16; Ruggiero Dep. 131:13-25; Trebbe Dep. 132:5-7, 11-22.

Dated:  May 24, 2017                          RATHJE & WOODWARD, LLC

                               By:  */s/ Timothy D. Elliott*_____
                                    Douglas M. Poland (SBN 1055189)
                                    10 E. Doty St., Ste. 507
                                    Madison, WI 53703
                                    Tel.: (608) 960-7430
                                    dpoland@rathjewoodward.com

                                    Timothy D. Elliott (*pro hac vice*)
                                    Emily A. Shupe (*pro hac vice*)
                                    300 E. Roosevelt Rd., Ste. 300
                                    Wheaton, IL 60187
                                    Tel.: (630) 668-8500
                                    telliott@rathjewoodward.com
                                    eshupe@rathjewoodward.com

                                    **COUNSEL FOR CONSUMER FIRST
                                    LEGAL GROUP, LLC, THOMAS
                                    MACEY, JEFFREY ALEMAN, JASON
                                    SEARNS, AND HAROLD STAFFORD**

## <u>CERTIFICATE OF SERVICE</u>

I, Timothy D. Elliott, an attorney, do hereby certify that on May 24, 2017, I served the foregoing Defendants' Response to Plaintiff's Brief On Knowing and Recklessness on all counsel of record via the ECF System.

Dated:  May 24, 2017                                 /s/ Timothy D. Elliott