IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

CONSUMER FINANCIAL PROTECTION BUREAU,

              Plaintiff,

                                         OPINION and ORDER

   v.

                                       14-cv-513-wmc

THE MORTGAGE LAW GROUP, LLP,
CONSUMER FIRST LEGAL GROUP, LLC,
THOMAS G. MACEY, JEFFERY J. ALEMAN,
JASON E. SEARNS and HAROLD E. STAFFORD,

              Defendants.

The Consumer Financial Protection Bureau brought this civil enforcement action under the Consumer Financial Protection Act of 2010 ("the Act"), 12 U.S.C. §§ 5564-65, against two former mortgage relief services providers and their principals for alleged violations of Regulation O, 12 C.F.R. part 1015, including misrepresenting their services to consumers in a number of respects, failing to make required disclosures, and illegally collecting advance fees. [1]  The Honorable Barbara B. Crabb resolved many of these claims in the Bureau's favor on summary judgment, including finding the individual defendants liable under the Act for the misconduct of The Mortgage Law Group (TMLG) and Consumer First Legal Group (CFLG) I and II.[2]  *See* Jul. 20, 2016 Summ. Judg. Ord. (dkt.

---

[1] The bureau also alleged that defendants' misrepresentations constituted deceptive practices under the Act, 12 U.S.C. §§ 5531, 5536, but amended its complaint to dismiss those counts before trial. (Dkt. #355, at 6-7 (granting plaintiff's motion to mend complaint to dismiss Counts IX and X with prejudice).)

[2] To avoid confusion, the court will follow the parties' lead and use "CFLG I" to refer to the company solely owned by Harold Stafford between January to July 2012 and "CFLG II" to refer to the company jointly owned by Thomas Macey, Jeffery Aleman, Jason Searns, and Stafford after July 2012.

#191).  Also, the parties stipulated to entry of final judgment against TMLG.  (Dkt. #404.)  A bench trial before me was then held to resolve the remaining factual issues, including:  (1) whether defendants qualified for an exemption under the Act as attorneys engaged in "the practice of law and licensed in the states in which [the] consumers resided"; (2) whether consumers actually received the services of an attorney in seeking a loan modification; (3) whether TMLG and CFLG "intake specialists" told consumers not to communicate with their lenders; (4) whether the companies' oral and written communications with consumers misrepresented the likelihood of obtaining a mortgage loan modification; (5) whether the companies' welcome letters misrepresented the amount of time necessary to obtain a loan modification; and (6) what civil penalties, if any, are appropriate.[3]

This opinion addresses these factual issues, as well as:  defendants' motion for directed verdict as to issues (3) and (5) on which the court reserved ruling at the close of plaintiff's evidence (dkt. #377);[4] defendants' unopposed motion to strike those portions of plaintiff's post-trial brief on Regulation O that exceed the scope of the issue framed by the court (dkt. #403); and the parties' remaining objections to deposition designations

---

[3] While there remained a number of additional factual questions related to the bureau's claims that defendants made misrepresentations in internet and television advertising, the court ultimately granted defendants' motion for directed verdict as to those claims because the bureau conceded that it could not prove those misrepresentations.  *See* Ord. on Dir. Verd. (dkt. #377, at 1-2).

[4] The court also reserved ruling on whether defendants Stafford and CFLG I failed to make the disclosures required by 12 C.F.R. § 1015.4(b)(1).   As the court later clarified on the record at trial, however, Judge Crabb granted summary judgment in the bureau's favor on that claim in her July 2016 summary judgment order (dkt. #191 at 51).

(dkt. #308 and #311). Specifically, for the reasons set forth below, the court finds that none of the named defendants qualify for the attorney exemption under Regulation O. The court also finds that defendants CFLG II, Aleman, and Searns are liable for failing to provide consumers with legal representation as promised and directing consumers not to communicate with their lenders. With respect to issues (4) and (5), the court further finds that the Bureau failed to prove that defendants misrepresented the likelihood of obtaining a consumer loan modification or that their welcome letters misrepresented the amount of time necessary to obtain a loan modification. While defendants CFLG II, Macey, Aleman, and Searns are subject with one exception to civil penalties under a reckless standard, and defendants Stafford and CFLG I are subject to similar penalties under a strict liability standard, the court will not award civil penalties or enter final judgment in this case until the parties have had the opportunity to be heard further on the issue of damages, including whether injunctive relief is appropriate, the amount of civil penalties to be awarded, and how those penalties should be calculated, as well as any mitigating factors.

BACKGROUND FACTS

## I. Regulation of Mortgage Relief Services

In the wake of the 2008 financial crisis, many consumers facing home foreclosures turned to mortgage assistance relief service ("MARS") providers for help. Historically, MARS providers have been for-profit companies that widely promoted their ability to help consumers save their homes by negotiating with lenders and taking other steps to prevent foreclosure. *See* Mortgage Assistance Relief Services, NPRM, 75 Fed. Reg. 10707-01,

10709-10711 (Mar. 9, 2010). A focus of their advertising was on the providers' ability to obtain mortgage loan modifications, as opposed to other forms of foreclosure relief. *Id.* Once in contact with a consumer, MARS providers often used high pressure sales techniques and made a number of misleading statements about the type of services provided and the results achieved. Typically, MARS providers would also charge consumers advance fees in the thousands of dollars, collecting their entire compensation at the beginning of the transaction (or in two to three, large installment payments) without regard to the actual services provided. *Id.* Moreover, some of these providers failed to perform even the most basic of promised services, causing consumers not only to lose the thousands of dollars they paid to the providers, but eventually lose their homes as well. NPRM, 75 Fed. Reg. at 10710-10712.

To help prevent MARS providers from taking advantage of consumers, the Federal Trade Commission (FTC), and later the Bureau, issued regulations requiring such entities to make certain disclosures to consumers, barring them from making certain representations, and preventing them from collecting advance fees until the consumer had executed a written agreement with his or her lender incorporating the offer of mortgage assistance relief. MARS Final Rule, 75 Fed. Reg. at 75128; Regulation O, 12 CF.R. Pt. 1015. In its proposed rulemaking, the FTC specifically noted that "a growing number of MARS providers are employing or affiliating with lawyers" and the "providers often tout the expertise of these attorneys in negotiating with lenders and servicers." NPRM, 75 Fed. Reg. at 10710-10712. The FTC further noted that: (1) "some MARS providers

make the specific claim that they offer legal services, when, in fact, no attorneys are employed at the company or, even if there are, they do little or no legal work for consumers"; and (2) "a growing number of attorneys themselves are engaged in deceptive and unfair practices in the marketing and sale of MARS." *Id.* Although both the Consumer Protection Act and Regulation O—the regulation at issue in this case—contain a specific exemption for attorneys, that exemption is limited to attorneys who are providing mortgage assistance relief services as part of the practice of law and who are licensed in the state in which the consumer receiving those services resides. 12 U.S.C. § 5517(e)(1); 12 C.F.R. § 1015.7.

## II. Summary Judgment Holdings

Consistent with the court's detailed findings of undisputed fact and conclusions of law, which will not be repeated in this opinion, the court granted plaintiff's motion for summary judgment in the following respects:

1. The initial and monthly retainer fees charged by The Mortgage Law Group and Consumer First Legal Group qualify as advance fees under 12 C.F.R. § 1015.5(a).

2. The companies failed to make the disclosure required under 12 C.F.R. § 1015.4(b)(1) in the manner required under § 1015.4(b)(4) in either their telephonic communications with potential clients or the written retainer agreements sent to newly enrolled clients.

3. The companies implied in their welcome letter that consumers should not communicate with their lenders.

4. The companies' intake specialists implied that consumers who were current on their mortgage loans should stop making payments on them.

5. The companies told consumers during intake calls, and again in retainer agreements and welcome letters, that they would receive services from an attorney and legal representation in seeking a loan modification. Consumer First Legal Group also made this representation on its website.

6. The companies' intake specialists misrepresented the performance of nonprofit housing counselor agencies or programs.

7. Aleman may be held individually liable for any violations of the Act or regulation on the part of The Mortgage Law Group at any time during its operations and of Consumer First Legal Group beginning in July 2012 related to the receipt of advance fees, misrepresentations made by the companies in oral and written communications to consumers (though not in advertising) and any failures to disclose a consumer's right to reject services.

8. Searns may be held individually liable for any violations of the Act or regulation on the part of The Mortgage Law Group at any time during its operations related to the receipt of advance fees, misrepresentations made by the company in oral and written communications to consumers (though not in advertising) and any failure to disclose a consumer's right to reject services.

9. Macey may be held individually liable for any violations of the Act or regulation on the part of The Mortgage Law Group at any time during its operations and of Consumer First Legal Group beginning in July 2012 related to the receipt of advance fees, misrepresentations made in the retainer agreement about consumers' receipt of legal services and any failures to disclose a consumer's right to reject services in the retainer agreement.

10. The appropriate measure for restitution or disgorgement in this case is defendants' net revenues, which includes the amount of advance fees collected from their clients minus any refunds made to those clients. The Mortgage Law Group received total net revenues in the amount of $18,331,737 and Consumer First Legal Group received total net revenues in the amount of $2,992,296.

(Dkt. #191 p. 2-4.)

## III.  Defendants' Operations

## A. CFLG I

In January 2012, defendant Harold Stafford, an attorney, created defendant CFLG I and managed its day-to-day activities from an office in Madison, Wisconsin. Consumer Defense Attorneys (CDA), a Florida entity, screened potential clients for CFLGI by making an initial assessment of the consumers' financial situation and asking the consumers for a signed retainer agreement. Upon a client's referral to CFLG I, Dan Matthews, defendant Stafford's assistant, spoke with the client and undertook the same pre-enrollment qualification review performed by CDA. Stafford and in-house attorney, Arne Skatrud, then reviewed the client's financial information and initial documentation to determine whether a loan modification application was a viable option. If a loan modification was a possibility, Skatrud conducted an initial call with the client to explain the loan modification process and CFLG I's services, as well as confirm that the client understood the services being offered. *See* Stafford Apr. 16, 2017 Tr. Test. (dkt. #390 at 34-71); Stafford 30(b)(6) Depo. Pt. 1 at 30-34, 42-44, and 52-54 and Pt. 2 at 69-73, 83-94, 100-04, 128-29; Stip. Facts, Pl's Stmt. of PFOF for Trial (dkt. #331 at 4-5).

Matthews sent the enrolled clients a welcome packet and spoke with clients weekly to make sure they submitted all of the documents necessary to apply for a loan modification. CFLG I then contracted with Sharpe Processing to gather and process the clients' documentation and submit the loan modification applications to lenders. Usually either Matthews or Michelle Sharpe from Sharpe Processing spoke with the clients' lenders. Although employees of CDA and Sharpe regularly spoke with consumers, attorney Stafford

did not supervise them.  *Id.*

Instead, Stafford made "of counsel" arrangements with 15 attorneys in 17 states to provide services to clients and assigned each client an attorney in his or her state.  The local attorneys were told to contact their clients within 48 hours of the client's first payment, to introduce themselves as the "lead attorney," and to explain the loan modification process to that client.  This lead attorney would also review their clients' files at least monthly to make sure that the client was making payments and being responsive to documentation requests, as well as assure that the administrative staff were not giving legal advice to any clients.  Stafford provided the local attorneys with a script and the requirements for the initial consultation and monthly reviews and paid them $25 for each initial consultation, $15 for each file review, and about $125 if the attorney spoke with a lender or got involved with a negotiation or settlement.  *Id.*

Attorney Stafford and his assistant Skatrud regularly audited the client notes entered by contract attorneys in CFLG I's database to ensure that the contract attorneys were doing their jobs and contacting clients.  After Stafford or Skatrud had approved the client's loan modification application, the client's local attorney reviewed the documentation for completeness and accuracy.  Between January 2012 and July 2012, CFLG I enrolled 27 clients in various states and obtained successful loan modifications for 14 or just over 50%.  *Id.*

### B. TMLG and CFLG II

Defendant TMLG actually first entered the MARS marketplace in 2011, after a number of earlier iterations by its founders, defendants Thomas Macey, Jeffrey Aleman, and Jason Searns, who are all attorneys with long, somewhat notorious histories of providing debt relief services.[5]   Macy apparently provided financial backing, while Aleman managed TMLG's day-to-day business from the company's headquarters in Chicago, Illinois, and Searns was in charge of regulatory and ethics issues.   After only six months of operations, defendants Macey, Aleman, and Searns also bought all but 5% of Stafford's interest in CFLG I in July 2012, then continued to operate it as CFLG II.   *See* Aleman May 19, 2015 30(b)(6) Depo. Pt. 1, at 33 and 90-93.

Unlike Attorney Stafford's original CFLG I, the operations of TMLG and CFLG II were substantially the same, which is unsurprising since Aleman managed the day-to-day operations of both entities from a new office in Chicago.   The majority of TMLG's and CFLG II's work for consumers was performed by 30 to 40 non-attorneys -- referred to variously as "client intake specialists," "fronters," or "closers" -- under the direction of a few attorneys at a call center consisting of a large room some 70 floors up in what was then the Sears Tower at the companies' headquarters in Chicago or at an office in Delray, Florida.   These intake specialists fielded calls from potential consumers, gathered

---

5 Legal Helpers Debt Resolution, LLC, was one such predecessor entity, which was born out of a more successful national bankruptcy firm started by Macey and Aleman in the 1990s in Chicago called Legal Helpers, PC.   In 2009, Searns joined Legal Helpers Debt Resolution, LLC, which eventually morphed into The Mortgage Law Group in 2011, and was still owed and controlled by Macey, Aleman and Searns.

information about the consumers, and explained the services offered by the companies. While TMLG initially contracted and worked with independent companies, including Client Attorney Processing Solutions ("CAPS"), to provide document collection and processing work, it began using its own employees for those functions as well. CFLG II similarly used its own employees for this work, with many of its document processors shared office space with TMLG's processors.

The intake specialists worked from a standardized script provided by TMLG and CFLG II. If a consumer expressed interest in their services, the intake specialist transferred the prospect to an attorney at company headquarters, who would review the services offered. The headquarters' attorneys also worked from a script, read prepared consumer statements about the program and fees. TMLG and CFLG II did not enroll a prospect into their respective mortgage modification programs unless he or she endorsed each statement that the headquarters attorney posed by answering "yes." After answering "yes" to all statements in the script posed by the corporate headquarters attorney, the prospect was transferred back to the intake specialist to sign a retainer agreement for services. After signing, TMLG and CFLG II would then send new clients a "welcome letter" and "packet."

During this initial call (or as soon thereafter as possible), an intake specialist would gather the client's bank account information to set up payments for an initial retainer fee and recurring monthly payments. The intake specialists also gathered the financial documents necessary to submit a loan modification application on behalf of the client.

Once the document processors assembled and reviewed those documents, intake specialists used TMLG's and CFLG II's internal customer relationship management software to indicate that the document compilation was complete and ready for an "attorney review" at headquarters. After their review, the headquarters attorney passed the consumer file along to a "local attorney" for further review.

Unlike the modest fee structure adopted by CFLG I, most of which went to the local, lead counsel, the upfront and then monthly fees charged by CFLG II and TMLG would run in the thousands of dollars per client, and were retained by the two national entities. Plus, any additional work beyond submission of the initial loan modification (e.g., for legal representation in a foreclosure or bankruptcy proceeding) would have to be negotiated and paid for separately. Still, similar to CFLG I, TMLG and CFLG II sought affiliations with local attorneys in most states in which the prospective consumers resided, except by use of so-called "Class B" memberships or partnerships. (TMLG also had "of counsel" arrangements with some attorneys in a few states.) These local attorneys did not share in the vast majority of the fees charged and none of the profits or losses of TMLG or CFLG II, nor did they have any supervision or control over the companies' staff or operation. They performed limited work for the companies, which primarily involved reviewing packets containing consumers' financial information, for which they were initially paid $40 on a per-file basis, and later $25 for approving the file at "intake" and another $25 for approving the actual loan modification request.

Local attorneys were not notified of information or documents for review until TMLG and CFLG II processors and headquarters attorneys had already reviewed and approved the information or documents for local attorney approval. TMLG and CFLG II provided local attorneys with directions, instructions, and guidelines on what they were to do. Most reviews took between 5 – 10 minutes and perhaps up to 30 minutes. Only in very rare instances did the local attorneys make recommendations regarding intakes or mortgage loan modification requests or speak directly with a client about his or her file. Instead, when a local attorney approved an intaker or the submission package and recorded that fact in the companies' computer system, the system generated an automatic email to the client in the local attorney's name, often without local counsel's approval and typically without their knowledge.

The intake specialists were then responsible for faxing completed loan modification packets to the clients' loan servicers. While TMLG and CFLG II managers had developed some relationships with individuals at various national or regional banks, the vast majority of time the loan modification packet would not be directed to any particular individual at the bank. *See* Gerst Apr. 25, 2017 Tr. Test. (dkt. 387 at 13).

In the end, despite collecting upfront fees of $1,000 to $2,000 and additional monthly fees, TMLG obtained loan modifications for just 26 percent of it enrolled clients (or about 1,369 of a possible 5,265), while CFLG II obtained loan modifications for only 17 percent of its enrolled clients (or about 190 of a possible 1,116). Ultimately, TMLG operated for less than two years, declining new clients in the first quarter of 2013 and

ceasing all operations by the third quarter of 2013.  *See* Aleman May 20, 2015 Depo., at

13-14 and 20; Banyon May 1, 2015 Depo., at 34-35.  Similarly, CFLG II stopped taking

new clients in November 2012 and stopped serving existing clients in the second quarter

of 2013.  *See* Aleman May 19, 2015 30(b)(6) Depo. Pt. 2, at 34-35.

OPINION

## I. Attorney Exemption

Notwithstanding the limited, largely superficial role played by lead counsel in the

operations of TMLG and CFLG I, defendants now claim that they qualify for the

exemption or "safe harbor" set forth in Regulation O as attorneys who provided mortgage

relief services "as part of the practice of law and licensed in the states in which their

consumers reside," 12 C.F.R. § 1015.7(a), because they operated as "multijurisdictional"

law firms with partners or attorneys working on an "of counsel" basis in every state in

which they served consumers.  In retort, the Bureau argued at trial that:  (1) none of the

work performed by headquarters staff or the local attorneys rose to the level of the practice

of law; (2) the defendants never intended to provide legal representation to their clients;

and (3) the arrangements that TMLG, CFLG I, CFLG II and the individual defendants

had with local attorneys were mere shams to avoid liability under the Consumer Financial

Protection Act.

Certain parts of the parties' closing arguments at trial prompted the court to order

post-trial briefs on a few, narrow legal issues, including whether Congress intended the Act

to apply to attorneys or law firms who were practicing law in a state through or with local

13

counsel. Apr. 28, 2017 Tr. Trans. (Dkt. #388 at 5-A-98:17-99:2).[6] For their part, defendants misconstrued the court's order as suggesting that Regulation O's attorney exemption could, or at least should, be interpreted to exclude multi-jurisdictional legal practice. Having created that strawman, defendants then argue that such an interpretation would be inconsistent with the scope of legal practice permitted under Model Rule Professional Conduct 5.5(d) and state statutes, because Regulation O would not allow for the multi-state practice of attorneys who are admitted pro hoc vice, who are part of a national or regional firm, or who otherwise represent clients in association with local counsel.

Contrary to defendants' construction, the court was not suggesting that multi-jurisdictional legal practices *cannot* qualify for the attorney exemption in Regulation O. Nor will this court attempt to offer an opinion as to whether the various forms of legal practice permitted by Model Rule 5.5 or under comparable state laws satisfy the exemption's requirements. The relevant question in this case is only whether *defendants* were providing legitimate legal services to consumers in need of assistance with mortgage relief through attorneys licensed in the state where those consumers reside.

---

[6] In response, the Bureau filed a post-trial brief that in large part argued the evidence presented at trial (dkt. #403), while defendants moved to strike those portions of the Bureau's brief that went beyond a discussion of the legal issues posed by the court. Because the Bureau has not opposed that motion and the court agrees that the Bureau's brief amounts to a second closing argument of the facts, the court will grant defendants' motion to strike and has not considered those portions of the Bureau's post-trial brief that exceed the scope of the court's post-trial order.

As this court discussed in it its pretrial order on this issue, a review of the individual state standards shows that they all have core principles in common.   Mar. 10, 2017 Ord. (dkt. 294).   The fundamental inquiry in each state's practice of law jurisprudence is whether the services provided involved the application of legal principles and judgment to a particular set of facts.   As guidance for the parties in this case, this court focused on the American Bar Association's model definition of the "practice of law" as "the application of legal principles and judgment with regard to the circumstances or objectives of a person that require the knowledge and skill of a person trained in the law."   *See* http://www.americanbar.org/groups/professional responsibility/task force model definition practice law/model definition challenge.html.   Subsection (c) of the model definition provides examples of activities that satisfy this standard, including giving advice or counsel to persons as to their legal rights or responsibilities or to those of others; selecting, drafting, or completing legal documents or agreements that affect the legal rights of a person; and negotiating legal rights or responsibilities on behalf of a person.

Although the court welcomed input from the parties regarding its presumption that the model definition provided a workable definition for the practice of law nationwide, neither side has addressed the matter further.   By default, as well as practicality, the court will look to the general principals expressed in the model definition in determining whether the local attorneys here were engaged in the practice of law at the time they were providing services for defendants' clients.   In particular, the court finds that defendants cannot avoid regulation of their conduct under the Act when local counsel's involvement consisted

primarily, and in most cases exclusively, of pro forma document review, although Stafford's original arrangement under CFGI I's model presents a closer question. Not only were TMLG's and CFLG II's local "Class B partners" not partners in any legal or even meaningful sense of that word, their limited relationship to the defendants was an obvious, even cynical, attempt to avoid the Bureau's ability to regulate practices that have otherwise been deemed illegal for many years, and for good reason given the vulnerability, naiveté and desperation of consumers facing the impending loss of their home.

Indeed, apart from responding to simple questions posed by a national attorney from a checklist during a 15-minute phone call, clients did not have a substantive discussion, if any at all, with any attorney until after they had been informed (or in many cases, misinformed) about the scope of defendants' services, signed a retainer agreement, paid a sizable advance fee, and submitted their financial documentation. Even after engaging defendants as their purported "local" attorneys, the role of the local attorney was *by design* almost always perfunctory, rather than substantive. Accordingly, the court finds that the Bureau's enforcement of its regulations against TMLG and CFLG II in no way interferes with the legitimate practice of law, which after all is the purpose of the exemption. Indeed, other than the conduct of local counsel, themselves, many of whom appear to have acted without knowledge of the exorbitant upfront charges and none of whom are defendants, allowing the exemption to shield the conduct from the Act's scrutiny would be to extend protection to actors, including national counsel, who are violating the profession's code of conduct. That is not a tenable position.

16

As noted, the evidence as to Attorney Stafford and CFLG I is not nearly so stark, particularly in light of the fact that Stafford adopted a more modest fee structure and took precautions to ensure that the local attorney established a meaningful, ongoing relationship with their clients and received the bulk of compensation. Still, at trial, defendants adduced very little evidence about CFLG I, its general operations, and the extent of the services provided whether by national or local attorneys. If anything, the evidence that was presented supported an inference that the local attorneys in particular did not routinely advise CFLG I clients, nor were they called upon to apply legal principles and judgment to individual cases. Accordingly, this court finds that defendants have not met their burden of showing that Stafford and CFLG I qualify for the attorney exemption.

## II.  Misrepresentations under Regulation O

### A.  No Communication with Lenders (Counts III and IV)

The Bureau brought claims against all defendants alleging that representatives of TMLG, CFLG I, and CFLG II told consumers over the telephone not to communicate with their lenders in violation of § 1015.3(a). *See* Compl., Cts. III and IV (dkt. #1, as amended by dkt. #302). On summary judgment, this court found that defendants Aleman, Stafford, and Searns could be held individually liable for such representations, but defendant Macey could not. Dkt. #191, at 39-44. At trial, the court further granted a motion for directed verdict as to defendants Stafford and CFLG I, because the Bureau

acknowledged it offered no evidence that either made such representations, while reserving on the motion for directed verdict as to defendants TMLG and CFLG II. (Dkt. #377.)

While the call scripts used by defendants TMLG and CFLG II instructed intake specialists *not* to tell consumers to stop talking with their lenders, there is little question that many, if not most, intake specialists did just that. In particular, two consumer witnesses credibly testified that representatives of TMLG told them not to talk to their lender during telephone calls. *See* Pulz Tr. Test. (dkt. #386, at 57); Johnson Tr. Test. (dkt. #386, at 100). In addition, Victor Anderson, who worked as a "closer" for both companies, testified during his deposition that closers frequently told consumers to "just cut off contact with your lender." See Jul. 2, 2015 Anderson Depo., p. 130:12-13. Also telling is the fact that the companies' welcome letter to consumers stated "[w]hile we will not tell you not to speak to your servicer, we must advise you that to do so is risky. We have seen several clients hurt by deceptive practices when their servicer calls." (Dkt. #191 at 31 (finding that a reasonable consumer would conclude from these statements that notwithstanding the disclaimer to the contrary, defendants were strongly implying consumers should not communicate with their lender).)

In fairness, TMLG's compliance officer, William August Murphy II, did testify that he (and others) took some steps to mitigate this practice, *see* dkt. #389, at 70-79, by monitoring calls for noncompliant statements and instructing closers on proper statements. However, the court finds more credible the testimony of customers and intake specialists, who even Murphy acknowledged were pressured to induce binding commitments from

consumers. *See* Murphy Tr. Test. (dkt. #389, at 70) ("closers had a bonus incentive that could graduate based on the number of sales in a month" and "you didn't want to [have a] zero on the board"). Accordingly, the court denies defendants' motion for directed verdict and finds in favor of the Bureau as to these claims against defendants CFLG II, Aleman, and Searns.

### B.  Receipt of Legal Representation (Counts V and VI)

On summary judgment, the court also determined that consumers who enrolled in the services offered by TMLG, CFLG I, and CFLG II believed that they would be represented by an attorney because intake specialists, headquarter attorneys, the retainer agreement and the welcome letter all told them (or in the case of intake specialists, were at least instructed to assure them) that they would receive legal representation and services from an attorney specifically assigned to their file. (Dkt. #191 at 3 and 36.) Also on summary judgment, this court found that defendants Aleman, Stafford, and Searns could be held individually liable for these representations in oral and written communications with consumers and that defendant Macey could be held liable for representations made in the retainer agreement. (Dkt. #191, at 39-44.) The remaining factual question for trial was, therefore, whether consumers actually received the promised legal services.

While there is evidence that CFLG II and TMLG technically "assigned" a local attorney to a consumer's file, the companies' oral and written communications with consumers implied that the consumer would be assigned a lawyer who would provide a legal strategy, when in fact virtually all lawyers followed a narrow checklist to double check

19

whether that client's file was complete. Indeed, the evidence at trial confirmed that only in very rare cases did a national or a local attorney identify a consumer's need for legal services in the form of a short sale or foreclosure defense. Even if the ordinary file review performed by national or local attorneys were construed as a form of legal service, rather than the clerical task it almost invariably proved to be, it was certainly not the type or extent of meaningful legal representation that defendants regularly led consumers to believe they would receive for the thousands of dollars in fees they were typically being charged upfront. In this sense, the entire business of CFLG II and TMLG was a continuation of the "bait and switch" tactics used by the individual defendants in past fraudulent schemes with a gloss to try to claim an exemption as legal services under the CFPA. Accordingly, the court will deny defendants' motion for directed verdict and find in favor of the Bureau as to its claims under § 1015.3(b)(8) against defendants CFLG II, Aleman, and Searns for misrepresentations made in telephone calls, welcome letters, and retainer agreements, and against defendant Macey for misrepresentations in the retainer agreements.

Although it is a closer question, the evidence as to CFLG I and Stafford is not as strong, since it appears as originally designed, and to a lesser extent even in practice, local attorneys were delegated more of a "lead" role in representing debtors' interests. For reasons explained, any semblance of a meaningful role by national or local counsel was dropped once CFLG II took over operations. Accordingly, the court finds that the Bureau has failed to meet its burden as to defendants CFLG I and Stafford on this issue.

## C. Likelihood of Obtaining Loan Modification (Counts V and VI)

Defendants' call scripts further instructed intake specialists to encourage consumers to pay their initial retainer fee by telling consumers that "we have been seeing very strong results from the lenders we've been working with" (Pl. Exh. 32), while the welcome letter sent to consumers stated that "you have a significant advantage because we are familiar with the process and expedite it through our contacts" (Jt. Exh. 1006). In its summary judgment motion (dkt. #99 at 16) and again at trial, the Bureau argued that neither company had a very strong success rate, and in most cases, neither sent the loan modification packets to any particular person at the bank, nor followed up with anyone special.

Still, the consumer witnesses testifying at trial were unable to identify any *specific* statements made by the companies' representatives that were misleading. Moreover, none of the consumer witnesses testified that the vague and isolated references in the written materials to "very strong results" and having "a significant advantage" through the companies' "contacts" caused them to believe that they would qualify for and obtain a loan modification, especially in light of the fact that the retainer agreement expressly stated the companies were not promising a particular result.

While the consumers certainly did not receive the services or attention that they were led to expect, that is a separate question from whether they were misled as to the *role* local counsel would play.[7] Accordingly, the court finds that the Bureau has not met its

---

[7] In the case of CFLG I, where local counsel seemed to take more of a lead role, even that may not

burden of showing that defendants violated § 1015.3(b)(1) by misrepresenting the likelihood that consumers would obtain a loan modification.

### D. Amount of Time to Achieve Loan Modification (Counts V and VI)

The welcome letter that TMLG and CFLG II sent to consumers stated that a loan modification takes between 90 and 120 days to complete, while the Bureau not only offered evidence that most clients did not receive a loan modification, but even if they did, it took TMLG an average of 211 days to achieve that result and CFLG II an average of 165 to 170 days. While these discrepancies are misleading on their face, and likely material for consumers facing the imminent loss of their home, the welcome letter also qualifies these estimated times by explaining: "we are seeing many workouts take anywhere from 90-120 days; however, every case is unique based on each client's servicer and circumstances."

For this reason, the court found in its July 2015 summary judgment opinion, that "[a] reasonable reading of the cited language is that even though defendants anticipated that the mortgage workout would take somewhere between 90 to 120 days, it could take longer in some circumstances," and further held that it could not find as a matter of law that a "consumer would find the statement in the companies' welcome letter to be misleading." Dkt. #191 at 34. At trial, the Bureau offered no further evidence that consumers found the welcome letter misleading in this respect, whether anecdotally or

be in question.

otherwise, nor that unqualified assurances as to timing were given to consumers as a matter of course in subsequent phone calls. Accordingly, the Bureau failed to meet its burden of showing that defendants' welcome letters violated § 1015.3(b)(2) by misrepresenting the amount of time to obtain a loan modification, and it will grant defendants' motion for directed verdict as to this issue as well.

## III. Summary of Liability Findings

To summarize, the court has found defendants liable at summary judgment or at trial in the following respects:

Count I

- Defendants Macey, Aleman, and Searns are individually liable for advanced fees charged by TMLG in violation of § 1015.5(a).

Count II

- Defendants CFLG I and CFLG II charged advanced fees in violation of § 1015.5(a).

- Defendants Macey and Aleman are individually liable for CFLG II's violations of § 1015.5(a).

- Defendant Stafford is individually liable for CFLG I's violations of § 1015.5(a).

Count III

- Defendants Aleman and Searns are individually liable for representations in TMLG welcome letters and in telephone calls with TMLG intake specialists that consumers should not communicate with their lenders in violation of § 1015.3(a).

Count IV

- Defendant CFLG II's intake specialists and welcome letters told consumers not to communicate with their lenders in violation of § 1015.3(a), and defendant Aleman

is individually liable for those statements.

## Count V

- Defendants Aleman and Searns are individually liable for the misrepresentations made by TMLG's intake specialists that a consumer has no obligation to continue making loan payments (§ 1015.3(b)(4)).

- Defendants Aleman and Searns are individually liable for the misrepresentations made by TMLG intake specialists and in TMLG's retainer agreements and welcome letters that consumers would receive legal representation in violation of § 1015.3(b)(8).

- Defendant Macey is individually liable for the misrepresentation in TMLG's retainer agreement that consumers would receive legal representation in violation of § 1015.3(b)(8).

## Count VI

- Defendant CFLG II made misrepresentations to consumers during intake calls, on websites, and in retainer agreements and welcome letters that consumers would receive legal representation, in violation of § 1015.3(b)(8).

- Defendants CFLG I's and CFLG II's intake specialists misrepresented the relative performance of non-profit relief service providers to consumers in violation of § 1015.3(b)(9).

- Defendant Aleman is individually liable for CFLG II's misrepresentations concerning legal representation and non-profit relief services.

- Defendant Stafford is individually liable for CFLG I's misrepresentations concerning performance of non-profit relief services.

- Defendant Macey is individually liable for CFLG II's misrepresentations concerning legal representation in the retainer agreements.

## Count VII

- Defendants Aleman and Searns are individually liable for TMLG's failure to make disclosures as required by § 1015.4(b)(1) and (4) in its telephonic communications with consumers and the retainer agreements it sent to enrolled clients.

- Defendant Macey is individually liable for TMLG's failure to make disclosures required by § 1015.4(b)(1) and (4) in the retainer agreements it sent to enrolled clients.

<u>Count VIII</u>

- CFLG I and II failed to make disclosures required by § 1015.4(b)(1) and (4) in its telephonic communications with consumers and in the retainer agreements it sent to enrolled clients.

- Defendant Macey is individually liable for CFLG II's failure to make the disclosure in its retainer agreements.

- Defendant Aleman is individually liable for CFLG II's failure to make the disclosure in its telephonic communications and retainer agreements.

- Defendant Stafford is individually liable for CFLG I's failure to make the disclosure in its telephonic communications and retainer agreements.

## IV. Civil Penalties

### A. Legal Standard

As the court explained in its summary judgment opinion, the Consumer Protection Act authorizes courts to "grant any appropriate legal or equitable relief with respect to a violation of Federal consumer financial law, including a violation of a rule or order prescribed under a Federal consumer financial law." 12 U.S.C. § 5565(a)(1). For violations of consumer financial laws, including Regulation O, § 5565(c) provides three tiers of civil monetary penalties: strict liability, reckless, and knowing. However, the statute does not define the terms "reckless" or "knowing," and there is no meaningful case law interpreting those terms as used in this provision. Accordingly, the parties rely on common law standards to define these terms. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S.

25

47, 58 and 68 (2007) ("[A] common law term in a statute comes with a common law meaning, absent anything pointing another way.").

"[T]he common law has generally understood [recklessness] in the sphere of civil liability as conduct violating an objective standard:   action entailing 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'"   *Safeco* 551 U.S. at 68-69 (applying common-law meaning of recklessness in Fair Credit Reporting Act case) (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)); *see also Slade v. Bd. of Sch. Directors of City of Milwaukee*, 702 F.3d 1027, 1029 (7th Cir. 2012) (To qualify as reckless, "it is enough that the risk, besides being serious and eminently avoidable, is obvious; it need not be known to the defendant."); *Murray v. New Cingular Wireless Services, Inc.*, 523 F.3d 719, 725–26 (7th Cir. 2008) (defining recklessness in FCRA action as "something more than negligence but less than knowledge of the law's requirements").   Similarly, the Restatement (Third) of Torts: Physical & Emotional Harm § 2 (2016) states that a person acts recklessly if, in the face of known or obvious risks created by the conduct, the person demonstrates his or her indifference to those risks by failing to adopt precautions involving even slight burdens in comparison to the magnitude of the risks.

The parties dispute whether a "knowing" violation requires both knowledge of the facts that constitute the offense *and* knowledge that the conduct constitutes a violation. The Bureau cites several cases involving criminal prosecutions in support of its contention that only knowledge of the facts of the offense are required.   *See United States v. O'Malley*, 739 F.3d 1001, 1006-07 (7th Cir. 2014) (transporting and illegally dumping asbestos

material); *Bryan v. United States*, 524 U.S. 184, 191-92 (1998) (dealing firearms without a license); *Boyce Motor Lines v. United States*, 342 U.S. 337, 339 n.3 (1952) (illegally transporting flammable substances); *United States v. Int'l Minerals & Chem. Corp.*, 402 U.S. 558, 559 (1971) (illegally transporting dangerous acidic materials).

As defendants point out, however, a reasonable person would not be surprised to learn that the above types of conduct were unlawful, whereas most of the conduct at issue in this case involved activities—such as requiring advanced fees, telling someone not to contact their bank, or failing to make certain disclosures—that are not obviously wrongful, dangerous or illegal on their face.   In *Liparota v. United States*, 471 U.S. 419 (1985), the Supreme Court relied on similar reasoning in interpreting 7 U.S.C. § 2024(b)(1) (pertaining to food stamps) to require the government to prove that the defendant knew that his acquisition of food stamps was unauthorized by statute or regulations.   *Id.* at 433 ("A food stamp can hardly be compared to a hand grenade . . . nor can the unauthorized acquisition or possession of food stamps be compared to the selling of adulterated drugs. . .").

Defendants similarly argue "knowing" should be defined in the same way as that term has been interpreted in the civil penalty provision of the Federal Trade Commission Act for unfair or deceptive acts or practices, 15 U.S.C. § 45(m), because "a considerable portion of the CFPA's operative language is based" on the FTCA.  *Consumer Fin. Prot. Bureau v. ITT Educ. Services, Inc.*, 219 F. Supp. 3d 878, 894 (S.D. Ind. 2015).   Courts applying § 45(m) have required proof of knowledge of both the facts constituting the

offense and that the facts constitute an offense. *E.g., United States v. Dish Network, LLC*, 667 F. Supp. 2d 952, 961–62 (C.D. Ill. 2009) ("A person knowingly violates an FTC rule if, under the circumstances, a reasonable, prudent person would have known of the existence of the rule and that his or her acts or practices violated the rule."). Consistent with this approach, one federal district court suggested in dicta that a defendant who knew about the requirements of Regulation O and thought he could get "a slap on the wrist for his illegal conduct" could be penalized under either the reckless or knowing standard. *See Consumer Fin. Prot. Bureau v. Siringoringo*, 2016 WL 102435, at *7 n.4 (C.D. Cal. Jan. 7, 2016) (approving a more conservative proposed penalty in line with a strict liability standard). The court finds this approach more persuasive given that the regulated conduct is *in at least some part* not obviously illegal in nature and the complexities of the regulatory scheme make the applicability of Regulation O open to some dispute, particularly with respect to the applicability of the attorney exemption provision. Accordingly, the court agrees that to be held liable for a knowing violation of regulation, defendants must have known about the conduct constituting the violation and that the conduct violated Regulation O.

Here, the individual defendants were all experienced consumer law attorneys who were well aware of the requirements of Regulation O and their effect on the provision of mortgage relief services. The defendants nevertheless argue that they cannot be held liable for knowingly or recklessly violating Regulation O's provisions because they held a good faith belief that they were exempt from its requirements. In support of this argument,

defendants point out that all of the individual defendants, and many of their employees, made clear in their deposition and trial testimony that they *intended* that TMLG, CFLG I and CFLG II operate as national law firms providing legal services to clients in need of mortgage loan modifications, thereby bringing their conduct within the regulation's exemption for the practice of law.   They further point out that defendant Searns actually obtained a legal opinion that the model used to create TMLG's predecessor, Legal Helpers Debt Resolution, qualified as a national law firm, reasoning that a similar model would satisfy Regulation O's exemption requirements.   (Searns May 28, 2015 depo. at 120-24.) To assemble the elements of a law firm, defendants also employed attorneys at their headquarters, ensured that clients signed retainer agreements for legal services, and made arrangements with local attorneys to review the loan modification applications that would be submitted for clients.   In response, the Bureau argues that defendants "set up their businesses in order to do what they thought might comply with, or create the impression that they complied with, the exemption, including the very limited—even sometimes nonexistent—intake and submission reviews, or 'touchpoints,' of the local attorneys." Pltf.'s Post Tr. Br. on Knowing and Reckless (dkt. #393 at 8).

The Bureau's evidence strongly supports its inference that the defendants cynically attempted to manipulate their businesses to create the façade of a national legal practice, while continuing practices that were otherwise plainly prohibited by the Consumer Financial Protection Act of 2010 and its regulations.   This falls short of proving that any of the defendants *knew* with certainty that they would be subject to liability under

Regulation O, rather than strongly suspected. Given that the parameters of the regulatory exemption have not yet been well-defined, therefore, this court cannot reach the conclusion that any of the defendants violated the regulation under the knowing standard for civil monetary penalties.

Still, the court finds that the "superficial structures and processes designed" (*id.* at 6) by Macey, Aleman, and Searns for TMLG and CFLG II so obviously lacked the hallmarks of a viable, national law firm and meaningful use of local counsel that these defendants should have known they did not qualify for the attorney exemption under Regulation O. Indeed, the risk that these defendants did not qualify for the attorney exemption was so serious, obvious, and eminently avoidable that they are liable under the second tier of civil monetary penalties for the reckless violation of a consumer financial law. As discussed in other sections of this opinion, while CFLG II and TMLG made arrangements with local attorneys to perform limited document review services on a fee-per-file basis, however sincere *some* of the local attorney's intent may have been to provide meaningful legal services, few did and even those seldom. Instead, local attorneys, wittingly or unwittingly, provided cover for exactly the kind of assembly line mortgage relief services that bilked clients of upfront and monthly fees they could ill afford.

The creation of a "Class B" partnership for local counsel was an even more cynical and transparent attempt to hide behind Regulation O. Contrary to the name, none of the local counsel had any ownership interest in or control over the operations of either company. While Searns admitted that the "Sokolove model [one of TMLG's

30

predecessors] had originally a .10 percent ownership rights [for local counsel] because that's what Proskauer Rose said they'd like to see in it even though they are not equity partners so that they have a slight interest in the firm," Searns May 28, 2015 depo. at 128, neither TMLG nor CFLG II followed even that advice, apparently hoping that the loose contractual arrangements made with local attorneys would suffice.

The evidence as to Stafford and CFLG I is less clear, particularly in light of the fact that Stafford adopted more precautions to ensure that all of the services provided by CFLG I *were* part of the practice of law. At trial, the Bureau adduced very little evidence about CFLG I and its general operations, and the evidence that was presented supported an inference that Stafford and another attorney working with him assigned clients to a local attorney directly upon intake and then took steps to ensure that the local attorney established an actual client relationship with their CFLG I clients. Accordingly, the court concludes that the bureau has met its burden only as to the first tier of civil penalties with respect to CFLG I and Stafford, which subjects these two defendants to strict liability for the violations that they committed.

As for knowledge of the facts constituting the violations, Judge Crabb determined in her court's July 2016 summary judgment order that defendants were in a position to know about the conduct that comprised TMLG's and CFLG II's violations of Regulation O, with the exception of Macey in certain circumstances. *See* Jul. 2016 Ord. (dkt. 191 at 38-46.) I agree. The individual defendants drafted and/or reviewed their companies' call scripts, welcome letters, and retainer agreements, while Macey's involvement was limited

to the knowledge of the contents of TMLG's retainer agreement. As Judge Crabb further explained in her summary judgment order, "to hold any of the individual defendants liable for the corporate defendants' violations of the Act or Regulation O, plaintiff must show that the individuals: (1) participated directly in the illegal practices or acts or had the authority to control them; and (2) knew or should have known about the illegal practices." Jul. 2016 Ord. (dkt. 191 at 38 (citing *Federal Trade Commission v. Bay Area Business Council, Inc.*, 423 F.3d 627, 636 (7th Cir. 2005)).

All defendants argue in their post-trial brief on civil penalties that the Bureau has not proven they knowingly or recklessly made the misrepresentations alleged in Counts V and VI of the complaint, because the only evidence that the Bureau adduced was the vague deposition testimony of Anderson, who they argue is suspect given he was terminated for misconduct. This argument would have relevance as to whether intake specialists went "off script" and made certain misrepresentations to consumers, but none of the misrepresentations in Counts V and VI for which defendants were found liable involved "off script" statements. To the contrary, the court has determined that defendants are *not* liable for vague misrepresentations related to the likelihood of obtaining a loan modification or the amount of time necessary to obtain one. Rather, Judge Crabb determined on summary judgment that: (1) the companies' call scripts misrepresented the consumer's obligation to continue making payments to their lenders; (2) the companies' call scripts, welcome letters, and retainer agreements stated that consumers would receive legal services from an attorney and legal representation in seeking a loan

modification; and (3) CFLG's call script contained misrepresentations concerning the performance of non-profit service providers. As to each, the court now finds that: Macey knew or should have known about, and recklessly disregarded, the misrepresentations made in TMLG's and CFLG II's retainer agreements; Aleman knew or should have known about, and recklessly disregarded, misrepresentations made in TMLG's and CFLG II's call scripts, welcome letters, and retainer agreements; and Searns knew or should have known about, and recklessly disregarded, misrepresentations made in TMLG's call scripts, welcome letters, and retainer agreements.

As discussed in the liability section of this opinion, the court further finds that TMLG and CFLG II intake specialists also regularly were encouraged to and went "off script," telling consumers not to communicate with their lenders as alleged in Counts III and IV of the complaint. Apart from Anderson's equivocal testimony that that he "think[s]" closers were "permitted" to tell consumers that they should not communicate with their lenders or servicers (Jul. 2, 2015 Anderson Depo., pp. 129:12-15), however, the Bureau has not adduced evidence showing that Aleman or Searns knew or suspected that this practice occurred and failed to take steps to prevent it. Moreover, the evidence showed that Macey had no role in the day-to-day operations of TMLG or CFLG II. Accordingly, with respect to this practice alone, the court finds that defendants CFLG II, Aleman, and Searns are only strictly liable under the first tier of civil penalties.

# ORDER

IT IS ORDERED that:

1. Defendants CFLG I, CFLG II, Jeffery Aleman, Thomas Macey, Jason Searns, and Harold Stafford are not entitled to an exemption for attorneys under Regulation O, 12 C.F.R. § 1015.7(a), while engaging in any of the conduct at issue in this lawsuit.

2. Defendants CFLG II, Aleman, and Searns violated 12 C.F.R. § 1015.3(a) in the manner outlined in this opinion and are subject to civil penalties for reckless violations in association with misrepresentations in the welcome letter and strict liability for off-script misrepresentations made by intake specialists.

3. Defendant CFLG II recklessly violated the following provisions of Regulation O in the manner outlined in this opinion:   12 C.F.R. §§ 1015.3(b)(8), 1015.3(b)(9), 1015.4(b)(1) and (4), and 1015.5(a).

4. Defendant Aleman recklessly violated the following provisions of Regulation O in the manner outlined in this opinion:   12 C.F.R. §§ 1015.3(b)(4), 1015.3(b)(8), 1015.3(b)(9), 1015.4(b)(1) and (4), and 1015.5(a).

5. Defendant Macey recklessly violated the following provisions of Regulation O in the manner outlined in this opinion:   12 C.F.R. §§ 1015.3(b)(8), 1015.5(a), and 1015.4(b)(1) and (4).

6. Defendant Searns recklessly violated the following provisions of Regulation O in the manner outlined in this opinion:   12 C.F.R. §§ 1015.3(b)(4), 1015.3(b)(8), 1015.4(b)(1) and (4), and 1015.5(a).

7. Defendants CFLG I and Stafford violated the following provisions of Regulation O in the manner outlined in this opinion:   12 C.F.R. §§ 1015.3(b)(9), 1015.4(b)(1) and (4), and 1015.5(a), and are subject to the first tier of civil penalties under 12 U.S.C. § 5565(c)(2)(A).

8. Defendants' motion to strike plaintiff's post-trial brief on Regulation O (dkt. #403) is GRANTED to the extent that the brief exceeds the scope of the issue framed by the court.

9. Plaintiff shall have until December 17, 2018, to file a brief addressing the issue of damages and injunctive relief, including the amount of civil penalties, if any, that should be awarded against defendants under 12 U.S.C. § 5565(c), how those penalties should be calculated, and any relevant mitigating factors.

Defendants shall have until January 7, 2019, to respond, and plaintiff shall have until January 17, 2019, to reply.

Entered this 15th day of November, 2018.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge