# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

CONSUMER FINANCIAL PROTECTION BUREAU,

    Plaintiff,

                OPINION and ORDER

  v.

                14-cv-513-wmc

THE MORTGAGE LAW GROUP, LLP,
CONSUMER FIRST LEGAL GROUP, LLC,
THOMAS G. MACEY, JEFFERY J. ALEMAN,
JASON E. SEARNS and HAROLD E. STAFFORD,

    Defendants.

---

Plaintiff brought this civil enforcement action under the Consumer Financial Protection Act of 2010 ("the Act"), 12 U.S.C. §§ 5564-65, against two former mortgage relief services providers and their principals for violations of Regulation O, 12 C.F.R. part 1015, including misrepresenting their services to consumers in a number of respects, failing to make required disclosures, and illegally collecting advance fees.  On July 20, 2016, the Honorable Barbara B. Crabb resolved a number of the claimed violations against defendants on summary judgment, including finding the individual defendants liable under the Act for the misconduct of institutional defendants The Mortgage Law Group (TMLG) and Consumer First Legal Group (CFLG) I and II.[1]  (Dkt. #191.)  Following a subsequent transfer of the case to me for reasons unrelated to the merits, the remaining disputes proceeded to a bench trial in April 2017.  In its first post-trial order on June 21, 2017, the

---

[1] "CFLG I" refers to the company solely owned by defendant Stafford between January to July 2012; and "CFLG II" refers to the company jointly owned by defendants Macey, Aleman, Searns, and Stafford after July 2012.

court entered monetary and injunctive relief against defendant TMLG only, including imposition of civil penalties, while leaving other questions to be further briefed by the other defendants. (Dkt. #404.)[2] On November 15, 2018, the court issued its second post-trial order with respect to various issues of liability and level of scienter of the remaining defendants -- CFLG I and II, Harold Stafford, Thomas Macey, Jeffery Aleman, and Jason Searns -- although the court refrained from entering final judgment until the parties had an opportunity to be heard on the issues of damages and injunctive relief. Those issues included: (1) whether civil penalties should be awarded against the remaining defendants under 12 U.S.C. § 5565(c); (2) how those penalties, if any, should be calculated; and (3) whether any relevant mitigating factors apply. (Dkt. #409.) Having considered the parties' additional briefs with respect to these issues, and the court's factual findings as set forth in its post-trial orders on liability, the court now orders restitution and disgorgement, civil penalties, and permanent injunctive relief as set forth below.

OPINION

As the court explained in its post-trial orders, the Act authorizes courts to "grant any appropriate legal or equitable relief with respect to a violation of Federal consumer financial law, including a violation of a rule or order prescribed under [that] ... law." 12 U.S.C. § 5565(a)(1). While the Act provides for various forms of relief, including restitution, disgorgement, civil money penalties, and "limits on the activities or functions of the person," § 5565(a)(2), it does not expressly authorize the imposition of exemplary

---

[2] That order was later amended on November 15, 2018, at the parties' request. (Dkt. #410).

or punitive damages, § 5565(a)(3).  Here, the Consumer Financial Protection Bureau ("the Bureau') seeks restitution, disgorgement, civil money penalties, and permanent injunctive relief, all of which are addressed in this order.

## I.  Restitution and Disgorgement

The Bureau seeks restitution jointly and severally from:  defendants Macey, Aleman, and Searns with respect to TMLG's advanced fees in the amount of $18,716,725.78; defendants CFLG, Macey, and Aleman with respect to CFLG II's advanced fees in the amount of $2,897,566; and defendants Stafford and CFLG with respect to CFLG I's advanced fees in the amount of $94,730.  To the extent that any portion of these amounts can no longer be returned directly to consumers as restitution, the Bureau further asks that the leftover funds be deposited in the United States Treasury as disgorgement of defendants' ill-gotten gains.  *See FTC v. Lanier Law, LLC,* 194 F. Supp. 3d 1238, 1287 (M.D. Fla. 2016) (ordering disgorgement of revenues that defendants derived through deceptive and improper solicitations, misleading sales tactics, and impermissible advance fees).

Previously, Judge Crabb determined on summary judgment that the appropriate measure for restitution or disgorgement in this case is defendants' *net* revenues—the amount of advance fees collected from their clients *minus* any refunds made to those clients—which totaled $18,331,737[3] for TMLG and $2,992,296 for the CFLG entities

---

[3]  This first amount differs from the Bureau's current request of $18,716,725.78, which includes an additional $384,988.78 in TMLG's net revenue that defendants only disclosed to the Bureau months after trial, and that the TMLG trustee stipulated to for purposes of a settlement with the Bureau.  *See* TMLG Final Order (dkt. #410, ¶ 14).

($94,730 for CFLG I and $2,897,566 for CFLG II). (Dkt. #191 at 4.) Before trial, defendants moved this court to reconsider that ruling and reduce the restitution amount to account for the benefits that some consumers may have received from defendants' services in the form of mortgage modifications. The court denied this motion for reconsideration, finding that: (1) defendants had waived the issue by failing to develop it properly in their original response to the Bureau's motion for summary judgment; and (2) even if no waiver had occurred, the question whether a consumer was lucky enough to obtain a mortgage loan modification is ultimately irrelevant to the question whether defendants used misleading or deceptive representations to induce consumers to pay them fees, particularly since it is highly likely that the client would have obtained the same relief on his or her own or with assistance from a free, non-profit provider of loan resolution services. (Dkt. #256.)

Using the briefing on remedies as an opening, defendants once again ask the court to reconsider its prior ruling on the measure and amount of restitution or disgorgement, asserting that there is new, contrary authority on the issue. Specifically, defendants cite *CFPB v. Nationwide Biweekly Admin.*, 2017 WL 3948396 (N.D. Cal. Sept. 8, 2017), and *CFPB v. CashCall, Inc.*, 2018 WL 485963 (C.D. Cal. Jan. 19, 2018), as more recent decisions in which restitution and disgorgement were not ordered. Contrary to defendants' assertions, however, both of these unpublished decisions turn on facts easily distinguishable from those in this case. In particular, neither *Nationwide* nor *CashCall* involved illegal advanced fees or misrepresentations under Regulation O.

Moreover, the reasons provided for denying restitution in those cases do not apply here. In *Nationwide*, the Northern District of California found that a complete refund of "set up fees" charged to consumers for a mortgage "interest minimization" program would have been both unfair and unwarranted because the Bureau had only proven that some, rather than all, of defendants' challenged marketing statements were false or misleading and, in particular, the Bureau failed to prove that the nature of the set up fees were not adequately disclosed. *Nationwide*, 2017 WL 3948396, at *1, 13. Similarly, the Central District of California found in *CashCall* that restitution was not an appropriate remedy because the Bureau failed to prove that defendants engaged in a deliberate scheme to evade consumer protection laws. For that reason, the Bureau expressly distinguished the facts before it in *CashCall* from:

> The majority of case law in the Ninth Circuit addressing the CFPA and the appropriateness of restitution stem[ming] from cases in which a defendant has engaged in a type of fraud that is akin to what is commonly referred to as that of a "snake oil salesman." *See Nationwide*, 2017 WL 3948396, at *11. In these cases, a defendant's scheme to defraud typically uses fraudulent misrepresentations to dupe consumers into believing they are purchasing something other than what they actually receive. *See F.T.C. v. Figgie, Inc.*, 994 F.2d 595, 604 (9th Cir. 1993) ("the seller's misrepresentations tainted the customers' purchasing decisions. If they had been told the truth, perhaps they would not have bought rhinestones at all or only some . . . . The fraud in the selling, not the value of the thing sold, is what entitles consumers in this case to full refunds for each [product] that is not useful to them.").

*CashCall*, 2018 WL 485963, at *12. Indeed, the court explained in *CashCall* that there was no evidence that the defendants "set out to deliberately mislead consumers as to the nature of the Western Sky Loan Program or otherwise intended to defraud them or that consumers anticipated receiving a benefit that they did not actually receive under the loan agreements." *Id*.

Unlike in *Nationwide* and *CashCall*, the Bureau here satisfied its burden of proof with respect to both advanced fees charged and misrepresentations made. As this court found in both the summary judgment and post-trial orders, defendants used fraudulent misrepresentations to dupe customers into purchasing in advance a service that they could have received for free and for which they received no readily measurable benefit. Just as with defendants' earlier-filed motion for reconsideration of the court's ruling on restitution, "[n]ot only do defendants still fail to present any concrete evidence of satisfied or even partially satisfied clients, they continue to completely ignore that the relevant question is whether any client received a marginal benefit over and above what that same client would have received using the free services." (Dkt. #256 at 7.)

Finally, citing *SEC v. Kokesh*, 137 S. Ct. 1635 (2017), *United States v. Bajakajian*, 524 U.S. 321, (1998), and *Bell v. Wolfish*, 441 U.S. 520 (1979), defendants contend that the Supreme Court generally considers sanctions to be inherently punitive if they are imposed for the purpose of deterring violations of public laws. Under defendants' reasoning, awarding the restitution amount sought by the Bureau amounts to the same thing, which is precluded under the CFPA, 12 U.S.C. § 5565(a)(3) ("Nothing in this subsection shall be construed as authorizing the imposition of exemplary or punitive damages."). Said another way, defendants maintain that absent evidence that either TMLG or CFLG were *unjustly* enriched, any award of disgorgement as a deterrent is inherently punitive.[4]

---

[4] While defendants cite their tax returns as entered into evidence at trial in support of their contention that they actually lost money, the court held on the record at trial that it was impossible to tell anything from these statements and that there was not a clear record as to the actual, overall

In support of their argument, defendants do not even attempt to argue that *Bell* or *Bajakajian* are applicable beyond the general proposition that sanctions imposed for the purpose of deterring public law infractions are inherently punitive.[5]  Instead, defendants principally rely on *Kokesh*, in which the United States Supreme Court held that disgorgement sought by the SEC in that case should be considered a "penalty" for the purposes of the five-year statute of limitations period on SEC enforcement actions for "any civil fine, penalty, or forfeiture."  *Kokesh*, 137 S. Ct. at 1639 (citing 28 U.S.C. § 2462). However, *Kokesh* did not address whether disgorgement qualified as "punitive damages"; to the contrary, the Supreme Court explained in *Kokesh* that "nothing in this opinion should be interpreted as an opinion on whether courts possess authority to order disgorgement in SEC enforcement proceedings or on whether courts have properly applied disgorgement principles in this context."  *Id.* at 1642 n.3.  For this reason alone, *Kokesh* has no bearing on what counts as punitive damages under the CFPA.  *See FTC v. Dantuma*, 748 F. App'x 735, 737 (9th Cir. 2018) (limited holding in *Kokesh* inapplicable to assessing district courts' power to impose restitution and disgorgement of unjust gains under FTC Act).

Unlike an award of punitive damages, the CFPA also expressly allows for disgorgement, 12 U.S.C. § 5565(a)(2)(D), which, contrary to defendants' suggestion, does

---

profitability of the companies.  Trial Tr. 3-P-80-84 (dkt. #384 at 80-84.)  Tellingly, that was evidence in the defendants' control, not the Bureau's.

[5]  The reason for this is obvious:  both cases are distinguishable from this case in that they did not address whether disgorgement qualifies as punitive damages in the context of a civil case.  In *Bell*, 441 U.S. at 539-41, the Supreme Court addressed whether the practice of "double-bunking" pretrial detainees in holding cells violated their constitutional right not to be punished before being found guilty.  In *Bajakajian*, 524 U.S. at 332-34, the Supreme Court held that a forfeiture constitutes a fine under the excessive fines clause of the Eighth Amendment, at least if imposed as punishment for an offense.

not turn on the benefit obtained by defendants, but rather on the amount they wrongfully took.  *See* Jul. 20, 2016 Summ. Judg. Ord. (dkt. #191 at 48-49) (citing cases with holdings to this effect); *FTC v. Febre*, 128 F.3d 530, 536-37 (7th Cir. 1997) (rejecting argument that relief should be limited to "defendants' profits" and explaining that "disgorgement is meant to place the . . . consumer in the same position *he* would have occupied had the seller not induced *him* into the transaction" and to "prevent[] the defendant from being unjustly enriched") (emphasis added).  In addition, the Court of Appeals for the Seventh Circuit has held that "[d]isgorgement to the United States Treasury does not transform compensatory damages into punitive damages."  *Febre*, 128 F.3d at 537 ("To ensure that defendants are not unjustly enriched by retaining some of their unlawful proceeds by virtue of the fact that they cannot identify all the consumers entitled to restitution and cannot distribute all the equitable relief ordered to be paid, the FTC often requests orders directing equitable disgorgement of the excess money to the United States Treasury.").[6]

Accordingly, the court finds that restitution is warranted where consumers (1) were charged advanced fees that were specifically prohibited by regulation, (2) were enticed to do so through various misrepresentations, and (3) received no measurable benefit for payment of those fees.  Specifically, this results in the awards as follows against the

---

[6] Defendants also point for support to *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 607-08 (9th Cir. 1993), in which the Ninth Circuit ruled that a district court order requiring defendants to remit funds unclaimed by injured consumers to non-profit organizations was punitive, and unavailable under the FTC Act.  However, unlike the CFPA, the FTC Act does *not* expressly provide for disgorgement, authorizing only "such relief as the court finds necessary to redress *injury to consumers*."  15 U.S.C. § 57b(b) (emphasis added).  Without more clear authority, therefore, the court is not persuaded that *Figgie* stands for the general proposition that disgorgement is not available under a statute expressly providing for that remedy while precluding exemplary or punitive damages.  Regardless, the Seventh Circuit has not reached such a conclusion.

respective defendants:

1. TMLG, Macey, Aleman, and Searns are jointly and severally liable for restitution in the amount of $18,716,725.78 with respect to the advance fees that TMLG collected from consumers.

2. CFLG, Macey, and Aleman Searns are jointly and severally liable for restitution in the amount of $2,897,566 with respect to the advanced fees that CFLG II collected from consumers.

3. Stafford and CFLG are jointly and severally liable for restitution in the amount of $94,730 with respect to the advanced fees that CFLG I collected from consumers.

The Bureau also requests that to the extent any portions of the restitution amounts ordered cannot be returned to the individual consumers, the court order defendants to disgorge their ill-gotten gains to the United States Treasury. While the court agrees that disgorgement is an appropriate remedy under the CFPA, this is a purely theoretical question because it is highly unlikely that the Bureau will begin to recover the full restitution amount from defendants, jointly or severally, given their questionable financial resources. Regardless, to avoid any risk that disgorgement may be deemed punitive in this case, the court will order that any excess restitution—minus any reasonable costs incurred by the Bureau in collecting and dispersing the restitution award—be applied first toward any outstanding civil penalties assessed against defendants, and second that the remainder, if any, revert to defendants on a pro rata basis consistent with the percentages of their allocated debt as set forth above.

## II. Civil Penalties

### A. Background

For violations of consumer financial laws, including Regulation O, 12 U.S.C.

§ 5565(c)(2) provides in applicable part three tiers of civil monetary penalties:

(A) First tier

For any violation of a law, rule, or final order or condition imposed in writing by the Bureau, a civil penalty may not exceed $5,000 for each day during which such violation or failure to pay continues.

(B) Second tier

Notwithstanding paragraph (A), for any person that recklessly engages in a violation of a Federal consumer financial law, a civil penalty may not exceed $25,000 for each day during which such violation continues.

(C) Third tier

Notwithstanding subparagraphs (A) and (B), for any person that knowingly violates a Federal consumer financial law, a civil penalty may not exceed $1,000,000 for each day during which such violation continues.[7]

In determining the amount of any penalty, the court must take into account the appropriateness of the penalty with respect to several mitigating factors discussed below. 12 U.S.C. § 5565(c)(3).

Although there is little case law with respect to assessing civil penalties under the CFPA, district courts generally have broad discretion in calculating civil penalties under federal statutes. *See, e.g., Tull v. United States*, 107 S. Ct. 1831, 1840 (1987) (penalty calculations under the federal Clean Water Act ("CWA") are "highly discretionary"); *United States v. B & W Inv. Properties*, 38 F.3d 362, 367-68 (7th Cir. 1994) (calculating penalty and applying mitigating factors under Clean Air Act is within trial court's

---

[7] As the Bureau notes, these amounts have since been adjusted upward, but only for penalties assessed after January 31, 2019, whose associated violations occurred on or after November 2, 2015. *See* 12 C.F.R. § 1083.1. Because this lawsuit concerns activities that predate November 2, 2015, the increased civil penalties do not apply here. *Consumer Fin. Prot. Bureau v. Universal Debt & Payment Sols., LLC*, 2019 WL 1295004, at *19 (N.D. Ga. Mar. 21, 2019).

discretion); *U.S. EPA v. Envtl. Waste Control, Inc.*, 917 F.2d 327, 335 (7th Cir. 1990) ("[A]ssessment of penalties [under the federal Resource Conservation and Recovery Act] is committed to the informed discretion of the trial court, and will be reversed only upon a showing that the district court abused its discretion.").

In its post-trial order, this court determined that certain defendants were subject to penalties under the first tier for the following violations:

(1) Stafford and CFLG I for charging advanced fees in violation of 12 C.F.R. §§ 1015.3(b)(9), 1015.4(b)(1) and (4), and 1015.5(a); and

(2) CFLG II, Aleman, and Searns for off-script misrepresentations made by intake specialists in violation of 12 C.F.R. § 1015.3(a).

(Dkt. #409 at 23-24, 34.) The court further determined that certain defendants were also subject to penalties under the second tier for the following violations:

(1) Aleman for making certain misrepresentations, failing to make certain disclosures, and charging advanced fees in violation of 12 C.F.R. §§ 1015.3(a) (welcome letter), 1015.3(b)(4), 1015.3(b)(8), 1015.3(b)(9), 1015.4(b)(1) and (4), and 1015.5(a);

(2) Macey for making certain misrepresentations, failing to make certain disclosures, and charging advanced fees in violation of 12 C.F.R. §§ 1015.3(b)(8), 1015.5(a), and1015.4(b)(1) and (4);

(3) Searns for making certain misrepresentations, failing to make certain disclosures, and charging advanced fees in violation of 12 C.F.R. §§ 1015.3(a) (welcome letter), 1015.3(b)(4), 1015.3(b)(8), 1015.4(b)(1) and (4), and 1015.5(a).

(4) CFLG II for making certain misrepresentations, failing to make certain disclosures, and charging advanced fees in violation of 12 C.F.R. §§ 1015.3(a) (welcome letter), 1015.3(b)(8), 1015.3(b)(9), 1015.4(b)(1) and (4), and 1015.5(a).

*Id.* In order to determine the amount of civil penalties against each defendant, however, it is also necessary to consider both the number of violations that occurred and the number

of days that defendants engaged in each violation. The parties dispute the method for calculating both.

## A. Number of Violations

The Bureau proposes to treat the violation of each regulatory section as a separate count, calculating a total of four counts each for Macey, Stafford, and CFLG I and seven counts each for Aleman, Searns, and CFLG II. On the other hand, defendants would have the court calculate the penalties based on the counts in the complaint, which grouped the regulatory violations under the following topic categories: advanced fees (§ 1015.5(a)), communications with lender (§ 1015.3(a)), misrepresenting services (§§ 1015.3(b)(1-9)), and failure to make disclosures (§ 1015.4(b)(1)). In support of the latter approach, defendants argue that it would be duplicative to penalize them for committing different versions of the same type of conduct. For example, § 1015.3(b) prohibits mortgage assistance relief providers from making misrepresentations to consumers concerning a variety of topics, including the likelihood of obtaining mortgage assistance relief, the provision of legal representation, and the availability and effectiveness of non-profit or free mortgage assistance relief.

Said another way, under the Bureau's proposal, defendants would be penalized separately for violating each of the distinct subsections of § 1015.3(b), whereas defendants propose assessing the penalty based on the general conduct of making misrepresentations, without regard to the subject of the misrepresentations. The Bureau further points out in support of its approach that the civil penalty provision for consumer protection laws refers to "any violation." Moreover, there is no authority for grouping violations based on the

counts in a complaint. For example, the Bureau reasons that by engaging in discreet acts, defendants CFLG II, Aleman, and Searns each committed two separate "violations" of § 1015.3(a)—such as (1) advising consumers not to contact their lenders in welcome letters and (2) providing the same advice through off-script remarks in telephone calls.

Whatever merit the Bureau's interpretation may have on a different set of facts, the court finds that its application would result in excessive and duplicative penalties in this case, particularly in light of the restitution burden that defendants already face. Therefore, exercising the discretion granted by the civil penalty statute and relevant case law, this court will calculate the number of violations based on the general category of each defendants' misconduct—such as making misrepresentations or failing to make certain disclosures—rather than on subcategories for each specific type of misconduct.

### B. Duration of Violations

The Bureau also proposes basing the penalties on the time period during which defendants collected advanced fees from consumers because (1) data exists to calculate those dates and (2) the receipt of advanced fees can serve as a proxy for other relevant misconduct.[8] Therefore, the Bureau estimates that: Macey and Aleman were engaged in violations for the 743 days between July 21, 2011 (the effective date of the statute) and August 1, 2013 (the last day on which CFLG II received an advanced fee); Searns was engaged in violations for the 583 days between July 21, 2011 and February 22, 2013 (the last day on which TMLG received an advanced fee); CFLG II was engaged in violations for

---

[8] To the extent that the illegal practice took place before the effective date of the CFPA (i.e., July 21, 2011), the Bureau used that date to start the clock.

the 358 days between August 9, 2012 and August 1, 2013 (the period during which it received advanced fees); and Stafford and CFLG I were engaged in violations for the 47 days between May 14 and June 29, 2012 (the period during which CFLG I received advanced fees). (Dkt. #411 ¶¶ 5-9.) In contrast, defendants argue that their violations ended when their respective companies enrolled their last consumer, not when the last advanced fee was collected.

In its reply brief, the Bureau concedes that it erred in calculating the duration for violations *other than for payment of advanced fees*. Specifically, the violations relating to misrepresentations, telling consumers not to communicate with their lenders, and failing to make certain disclosures occurred only at the time a consumer was enrolled and not during the entire period that advanced fees were collected. Still, the Bureau correctly points out that because § 1015.5(a) makes it unlawful to "[r]equest *or receive* payment of any fee . . . until the consumer has executed a written agreement" regarding mortgage assistance relief, defendants continued violating the advanced fee prohibition for as long they kept collecting those fees. Accordingly, the court will calculate the time period for: (1) violations related to misrepresentations (§ 1015.3(b)), telling consumers not to communicate with lender (§ 1015.3(a)), and failing to make certain disclosures ((§ 1015.4(b)) based on the dates of consumer enrollment; and (2) violations related to charging advanced fees (§ 1015.5(a)) based on the dates on which those fees were collected.

The parties appear to agree on: the first and late dates on which each company collected advanced fees; the first and last dates that CFLG I enrolled consumers; and the first date on which TMLG and CFLG II enrolled a consumer. However, they dispute the

last date of enrollment for TMLG and CFLG II.   The Bureau has submitted a declaration from one of its investigators, Ryan Thomas, who reviewed trial exhibits containing client data for TMLG (Jt. Tr. Exh. #1087) and CFLG II (Jt. Tr. Exh. #1112), and found that TMLG last enrolled a client on January 2, 2013, and CFLG II last enrolled a client on January 4, 2013.   (Dkt. #417, ¶¶ 7-8.)   According to the declaration from defense counsel's paralegal supervisor, Nicole Waters, however, the trial exhibits show that TMLG enrolled its last client on October 30, 2012, and CFLG II enrolled its last client on November 30, 2012.   (Dkt. #416, ¶¶ 6-7.)

The court's review of the declarations, and the client data upon which they relied, shows that the Bureau is correct and Thomas's declaration is accurate.   Moreover, while neither defendants nor Waters explain why she identified an earlier date for TMLG's last enrollment, Waters acknowledges in her declaration that there is a single client record entry for CFLG II dated January 4, 2013, and she explains that this "date appears to be a data entry error, [because]:   (1) no other clients enrolled in December 2012 or January 2013 (see Tr. Ex. 1112); and (2) the parties stipulated that CFLG II stopped enrolling clients in November 2012 (dkt. 329-1 at 32)." *Id.*   As the Bureau points out, however, the parties' stipulation in this regard states that "[i]n November 2012, after only a few months of operation, Macey directed that CFLG II be wound up" (dkt. # 329-1), but says nothing about when CLFG II stopped enrolling customers.   Therefore, the court finds that the date of last client enrollment was more probably than not January 2, 2013, for TMLG and January 4, 2013, for CFLG II.

Defendants further contend that the Bureau improperly used the combined lifespan of TMLG and CFLG to calculate the number of days (743) for every violation committed by Macey and Aleman, while, as defendants point out, TMLG and CFLG were in business for different amounts of time, and neither company was in business for a total of 743 days. The court agrees that a different number of days should be used for the duration of TMLG-related violations versus CFLG-related violations. Accordingly, the court finds the following dates apply with respect to the relevant time periods:

- TMLG-related advanced fee violations occurred July 21, 2011 through February 22, 2013 (538 days).

- TMLG-related enrollment violations occurred July 21, 2011 through January 2, 2013 (532 days).

- CFLG I-related advanced fee and enrollment violations occurred May 14, 2012 through June 29, 2012 (47 days).

- CFLG II-related advanced fee violations occurred August 9, 2012 through August 1, 2013 (358 days).

- CFLG II-related enrollment violations occurred August 3, 2012 through January 4, 2013 (155 days)

**C. Application of Mitigating Factors**

The CFPA requires the consideration of the following factors, but appears to place no emphasis on any one or group of factors: (1) the size of financial resources and good faith of the person charged; (2) the gravity of the violation or failure to pay; (3) the severity of the risks to or losses of the consumer, which may take into account the number of products or services sold or provided; (4) the history of previous violations; and (5) such other matters as justice may require. 12 U.S.C. § 5565(c)(3). Except for the remaining

financial resources of the defendants, all of these factors weigh in favor of substantial civil penalties with respect to each of the defendants.

As to the first factor, the CFPA does not define the term "financial resources" or limit the consideration of this factor to any specific point in time. The Bureau acknowledges that in ordering penalties under other statutory schemes, such as under the securities laws or the Commodity Exchange Act, courts have considered the past, current, and future financial condition of the defendant. *SEC v. Narvett*, 2014 WL 5148394, at *3 (E.D. Wis. Oct. 14, 2014); *SEC v. Amella*, 2012 WL 13050551, at *2 (N.D. Ill. Dec. 10, 2012); *CFTC v. Reisinger*, 2017 WL 4164197, at *12 (N.D. Ill. Sept. 19, 2017). At the same time, the Bureau notes that courts have ordered significant penalties, even though the defendants claimed that they had no current ability to pay and had significant debts, based on the defendants' ability to earn in the future. *See, e.g., SEC v. Michel*, 2008 WL 516369, at *2 (N.D. Ill. Feb. 22, 2008) (imposing penalty equal to 150% of disgorgement amount, despite defendant's claims of large debts, lack of current net worth, and bar on work in securities industry, because defendant has ability to work in other areas); *U.S. Commodity Futures Trading Comm'n v. Reisinger*, No. 2017 WL 4164197, at *12 (N.D. Ill. Sept. 19, 2017) (imposing penalty of 10% of financial gain because "while [the defendant] is unemployed, the record provides no reason to suppose that she is unemployable").

Moreover, as noted above, neither party in this case presented any clear evidence on summary judgment or at trial from which the court can reach definitive findings with respect to the disposition of the companies' profits or the financial resources of the individual defendants who started and ran these companies. The Bureau correctly points

out that TMLG and CFLG collected millions of dollars in fees from consumers, while defendants argue that neither company is currently in operation, plus Macey and Aleman have had their law licenses suspended. Ultimately, the court agrees with the Bureau that it is likely that Macey, Aleman, Searns, and Stafford, who are all experienced businessmen and trained lawyers, at least have future earning potential, even if much of their past earnings have been on the backs of financially distressed consumers. In addition, Macey was the principal financial backer of both TMLG and CFLG II and held the largest ownership stake. Accordingly, while there is no evidence that any of the defendants have sizable, remaining financial resources, they were in the best position to prove otherwise and chose not to do so. Certainly, this is not a situation where the defendants' finances are so limited that only a nominal penalty should be imposed, particularly given the egregious and calculated nature of their violations.

The remaining factors overlap because they raise similar issues as to defendants' conduct, intent, and injury to consumers. In previous rulings on summary judgment and in post-trial orders, the court found that Macey, Aleman, and Searns based their entire business model with respect to TMLG and CFLG II on "bait and switch" practices, all while trying to claim an exemption for the provision of legal services under the CFPA. (Dkt. #191 at 38-46; dkt. #409 at 20.) As discussed at length in the second post-trial order, most of the misconduct attributed to Macey, Aleman, and Searns was also committed in a deliberate or at least reckless manner. (Dkt. #409 at 33.)

Macey was a major financial backer of both firms, while Aleman managed the day-to-day business, and Searns was in charge of regulatory and ethics issues. Collectively,

defendants Macey, Aleman, and Searns took illegal, advanced fees from 5,449 consumers in the amount of $18,716,725.78 in connection with TMLG over the course of about two years. In addition, defendants Macey and Aleman took further illegal, advanced fees in the amount of $2,897,566 from 1,089 consumers in connection with CFLG II over the course of about a year. Despite the thousands of dollars that they charged each consumer in advanced fees, a majority of TMLG and CFLG II consumers received neither a mortgage loan modification nor the legal representation that had been promised, and for those who did, almost certainly they could have done so without any cost or assistance from defendants.

In contrast, defendants Stafford and CFLG I had less of an impact on the consumers they harmed. CFLG I collected $94,730 in advanced fees from only 27 consumers; moreover, 14 of those individuals received a loan modification. In addition, given the court's previous findings that Stafford and CFLG I adopted a more modest fee structure and took precautions to ensure that local attorneys actually established a meaningful, ongoing relationship with their clients, their conduct was far less egregious than that of the other defendants.

As the court recognized in the second of its post-trial orders, defendants Macey, Aleman, and Searns also appeared to have had long (and somewhat notorious) histories of offering dubious debt relief services, including running into difficulties with state regulators in the past. Additionally, in its brief in support of civil penalties, the Bureau cites consent decrees entered by various state courts concerning Legal Helpers Debt Resolution—the predecessor to TMLG—and a bankruptcy decision condemning the debt relief and

bankruptcy firm previously operated by defendant Searns.[9]   The Bureau admits that there

is no evidence that defendant Stafford had a similar history of past violations.

Finally, defendants argue that no separate penalties should be assessed against

CFLG for its activities, because doing so would only result in double counting in the event

that the individual defendants associated with CFLG I (Stafford) and CFLG II (Macey and

Aleman) are held individually liable for CFLG's penalty.[10]   Defendants raise a fair point

to which the Bureau provides no meaningful response.   Therefore, although the court

declines to let the corporate entity CFLG off the hook for its actions, defendants Macey,

Aleman, and Stafford will not be held individually liable for the civil penalties assessed

against that entity.

Considering all of the relevant factors, including defendants' respective lack of good

faith, the gravity of their violations, and the effect on the ultimate consumers they

specifically targeted, the court finds that the mitigating factors weigh most strongly against

defendants Macey and Aleman, to a somewhat lesser extent against Searns and CFLG II,

and by far the least against Stafford and CFLG I.   While defendants argue that they should

not be subject to any penalty, the Bureau recommends that Macey and Aleman pay 20%

of the maximum penalty, Searns and CFLG II pay 15%, and Stafford and CFLG I pay 5%.

In light of the above considerations and the court's rulings with respect to defendants'

---

[9] Even though these documents were not formally admitted into evidence at trial, the Court takes judicial notice of them pursuant to Federal Rule of Evidence 201.

[10] As previously noted, CFLG I and II represent different time and ownership periods during which distinct violations occurred.   Although the distinction affects *how* the civil penalties are calculated, CFLG itself remained a single legal entity and is subject to just a single, independent penalty, if that.

liability, level of knowledge, and duration of misconduct, the court finds the Bureau's

proposal reasonable and will award civil penalties in the following amounts:

| Defendant and Type of Violation | No. of Counts Per Type of Violation | No. of Days Engaged in Violations | Penalty Amount at $5,000/day (Strict Liability) | Penalty Amount at $25,000/day (Reckless) | Total Maximum Penalty | Mitigated Penalty |
|---|---|---|---|---|---|---|
| | | | | | | |
| **Macey** | | | | | | |
| TMLG advanced fees | 1 | 538 | | $13,450,000 | | |
| CFLG II advanced fees | 1 | 358 | | $8,950,000 | | |
| TMLG enrollment violations | 2 | 532 | | $26,600,000 | | |
| CFLG II enrollment violations | 2 | 155 | | $7,750,000 | | |
| | | | | | $56,750,000 | **$11,350,000** |
| | | | | | | |
| **Aleman** | | | | | | |
| TMLG advanced fees | 1 | 538 | | $13,450,000 | | |
| CFLG II advanced fees | 1 | 358 | | $8,950,000 | | |
| TMLG enrollment violations | 3 | 532 | | $39,900,000 | | |
| CFLG II enrollment violations | 3 | 155 | | $11,625,000 | | |
| | | | | | $73,925,000 | **$14,785,000** |
| | | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Searns** | | | | | | |
| TMLG advanced fees | 1 | 538 | | $13,450,000 | | |
| TMLG enrollment violations | 3 | 532 | | $39,900,000 | | |
| | | | | | $53,350,000 | **$8,002,500** |
| | | | | | | |
| **Stafford** | | | | | | |
| | 3 | 47 | $705,000 | | $705,000 | **$35,250** |
| | | | | | | |
| **CFLG** | | | | | | |
| CFLG I (advanced fees and enrollment) | 3 | 47 | $705,000 | | $705,000 | $35,250 |
| CFLG II advanced fees | 1 | 358 | | $8,950,000 | $8,950,000 | $1,342,500 |
| CFLG II enrollment violations | 3 | 155 | | $11,625,000 | $11,625,000 | $1,743,750 |
| | | | | | $21,280,000 | **$3,121,500** |

## III.   Permanent Injunction

Finally, the Bureau seeks a permanent injunction banning:   (1) defendants Macey, Aleman, Searns, and CFLG from marketing, selling, providing, offering to provide, and assisting others to market, sell, provide, or offer to provide, any mortgage assistance relief products or services as defined in 12 C.F.R. § 1015.2, and any debt relief products or services, as defined in the Telemarketing Sales Rule, 16 C.F.R. § 310.2(o); and (2) defendant Stafford from marketing, selling, providing, offering to provide, and assisting others to market, sell, provide, or offer to provide, any mortgage assistance relief products

or services as defined in 12 C.F.R. § 1015.2. Defendants oppose the imposition of a permanent injunction against any of them, particularly one so broad in scope.

The Consumer Protection Act grants courts the power to order "limits on the activities or functions of the person" who violates that statute. 12 U.S.C. § 5565(a)(2)(G). "In an action for a statutory injunction, once a violation has been demonstrated, the moving party need only show that there is a reasonable likelihood of future violations in order to obtain relief." *S.E.C. v. Holschuh*, 694 F.2d 130, 144 (7th Cir. 1982) (citing *Commodity Futures Trading Commission v. Hunt*, 591 F.2d 1211, 1220 (7th Cir.1979)). "In predicting the likelihood of future violations, a court must assess the totality of the circumstances surrounding the defendant and his violation, including such factors as the gravity of harm caused by the offense; the extent of the defendant's participation and his degree of scienter; the isolated or recurrent nature of the infraction and the likelihood that the defendant's customary business activities might again involve him in such transactions; the defendant's recognition of his own culpability; and the sincerity of his assurances against future violations." *Id.*

Under the totality of the circumstances here, a permanent injunction is certainly warranted with respect to defendants Macey, Aleman, Searns, and CFLG, and a five-year injunction is appropriate for defendant Stafford. The gravity of harm caused by defendants' actions, and their degree of individual participation and scienter, is discussed at length above and in the post-trial orders. Although Stafford's conduct affected far fewer consumers and involved much less money than that of Macey, Aleman, Searns, and CFLG, all of the defendants were personally involved in a fraudulent scheme to charge already

financially-distressed, vulnerable individuals exorbitant fees for purported mortgage relief services that were offered in violation of law and of little, if any, actual value. *Consumer Fin. Prot. Bureau v. Siringoringo*, 2016 WL 102435, at *5-6 (C.D. Cal. Jan. 7, 2016) (finding similar in issuing permanent injunction). Nor do their violations represent isolated instances; rather, they spanned several months to a few years, and in the case of Macey, Aleman, and Searns, represented a continuation of the same or similar activities that came under regulatory scrutiny in the past. If defendants were to renew the practices of TMLG and CFLG, other potential victims could suffer similar harm and may receive only a fraction of monetary damages to compensate them for their injuries.[11] *See Siringoringo*, 2016 WL 102435, at *5-6 (finding similar).

Although defendants argue that both TMLG and CFLG are now out of business, and Macey and Aleman have suspended law licenses, all of the individual defendants have shown a propensity to create new businesses offering to provide loan modification services to financially-strapped consumers. Moreover, defendants appear to have failed to recognize even now their culpability with respect to Regulation O or provide any assurances that they will not commit future violations. Considering the totality of the circumstances, therefore, the court finds that there is a reasonable likelihood that each and every defendant may commit similar violations of the statute in the future. The court further finds that the public interest is best served by the issuance of injunctions reasonably

---

[11] In fact, Stafford testified at his deposition that after he sold his shares in CFLG, he opened *another* loan modification business called Consumer First Legal Network, which he described as a mirror image of CFLG. (Dkt. #72 at 139-40.)

preventing defendants from engaging in behavior related to their illegal conduct in this case.

"A federal court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 132 (1969) (quoting *NLRB v. Express Publ'g Co.*, 312 U.S. 426, 435 (1941)). Defendants argue that the limitation on the offering and provision of mortgage relief services would apply regardless of whether such activity is part of the practice of law, and therefore violates the Consumer Protection Act's prohibition on the Bureau regulating the practice of law, 12 U.S.C. 5517(e)(1). However, the wording of the proposed injunction makes express that the mortgage assistance relief products or services to be enjoined are those defined in 12 C.F.R. § 1015.2, which under the exemption in 12 C.F.R. § 1015.7(a) does *not* include the provision of legitimate services provided as part of the practice of law.

Finally, defendants argue that the scope of the proposed injunction with respect to Macey, Aleman, Searns, and CFLG is overly broad to the extent that it seeks to prohibit them from offering or providing debt relief services because the Bureau has failed to define those services or show how they relate to the violations at issue in this case. However, the wording of the proposed injunction expressly identifies debt relief services as those set forth in the Telemarketing Sales Rule, 16 C.F.R. § 310.2(o), including "any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured

creditors or debt collectors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector." Given the past conduct of Macey, Aleman, Searns, and CFLG with respect to mortgage relief services, it is more than reasonable to anticipate that these defendants will likely to engage in similar illegal practices with respect to other types of debt. Therefore, the court will permanently enjoin defendants Macey, Aleman, Searns, and CFLG from providing debt relief services as well as mortgage relief services.

## ORDER

IT IS ORDERED that:

A. Restitution in the following amounts

1. Defendants TMLG, Macey, Aleman, and Searns are jointly and severally liable for restitution in the amount of $18,716,725.78 with respect to the advance fees that TMLG collected from consumers, payable within 30 days to the Bureau to be disbursed on a pro rata basis to the extent practical (or otherwise as the court might approve in the future).

2. Defendants CFLG, Macey, and Aleman Searns are jointly and severally liable for restitution in the amount of $2,897,566 with respect to the advanced fees that CFLG II collected from consumers, payable within 30 days to the Bureau to be disbursed on a pro rata basis to the extent practical (or otherwise as the court might approve in the future).

3. Defendants Stafford and CFLG are jointly and severally liable for restitution in the amount of $94,730 with respect to the advanced fees that CFLG I collected from consumers, payable within 30 days to the Bureau to be disbursed on a pro rata basis to the extent practical (or otherwise as the court might approve in the future).

4. To the extent that any portions of the restitution amounts paid cannot reasonably be returned to consumers by the Bureau within one year of receipt, then the excess —minus any reasonable costs incurred by the Bureau in implementing the restitution award—shall be applied toward the civil penalties assessed against defendants, with the remainder, if any, reverting to defendants.

B. Defendants are directed to pay civil penalties to the Bureau in the following amounts on or before 30 days from date of this order. These amounts represent civil penalties owed to the United States pursuant to 12 U.S.C. § 5565(c) and are not compensation for actual pecuniary loss and, therefore, are not subject to discharge under the Bankruptcy Code pursuant to 11 U.S.C. § 523(a)(7).

   1. Macey in the amount of $11,350,000.

   2. Aleman in the amount of $14,785,000.

   3. Searns in the amount of $8,002,500.

   4. Stafford in the amount of $35, 250.

   5. CFLG in the amount of $3,121,500.

C. No interest shall accrue on the ordered payments if timely made. In the event of any default in payment, the entire unpaid amount shall constitute a debt due and immediately owing and post-judgment interest shall be assessed from the date of this order until payment is made as set forth in 28 U.S.C. § 1961.

D. An injunction pursuant to Federal Rule of Civil Procedure 65 is also ENTERED under the following terms and conditions:

   1. Defendants Macey, Aleman, Searns, and CFLG are permanently enjoined from marketing, selling, providing, offering to provide, and assisting others to market, sell, provide, or offer to provide, any mortgage assistance relief products or services as defined in 12 C.F.R. § 1015.2, and any debt relief products or services, as defined in the Telemarketing Sales Rule, 16 C.F.R. § 310.2(o); and

   2. Defendant Stafford is enjoined for five years from marketing, selling, providing, offering to provide, and assisting others to market, sell, provide, or offer to provide, any mortgage assistance relief products or services as defined in 12 C.F.R. § 1015.2.

E. The clerk of court is directed to enter final judgment in favor of the Bureau consistent with this court's summary judgment order, post-trial orders, and this order.

Entered this 4th day of November, 2019.

BY THE COURT:
/s/
WILLIAM M. CONLEY
District Judge